**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 11 |
| MALLINCKRODT PLC, *et al* | Case No. 20-12522 (JTD) (Bankr. D. Del.) (Jointly Administered) |
| Debtors.[1] | |
| SANOFI-AVENTIS U.S. LLC, | |
| Appellant, | |
| v. | C.A. No. 1:21-cv-01636 (LPS) |
| MALLINCKRODT PLC, *et al.*, | |
| Appellees. | |

# APPELLANT'S OPENING BRIEF

Stuart M. Brown (DE #4050)
Aaron S. Applebaum (DE #5587)
DLA PIPER LLP (US)
1201 North Market Street, Suite 2100
Wilmington, DE 19801
Telephone: (302) 468-5700
Facsimile: (302) 394-2341
E-mail: stuart.brown@us.dlapiper.com
aaron.applebaum@us.dlapiper.com

Laura F. Ketcham (*pro hac vice* admission pending)
MILLER & MARTIN PLLC
Volunteer Building Suite 1200
832 Georgia Avenue
Chattanooga, TN 37402
Telephone: (423) 785-8383
Facsimile: (423) 321-1556
E-mail: laura.ketcham@millermartin.com

Dated: January 25, 2022

[1] A complete list of the Debtors in the above-referenced chapter 11 cases may be obtained on the website of the Debtors' claims and noticing agent at http://restructuring.primeclerk.com/Mallinckrodt. The Debtors' mailing address is 675 McDonnell Blvd., Hazelwood, Missouri 63042.

Jason Hopkins (*pro hac vice* admission pending)
DLA PIPER LLP (US)
1900 N. Pearl St., Suite 2200
Dallas, TX 75201-2482
Telephone: (214) 743-4546
Email: jason.hopkins@us.dlapiper.com

Ilana H. Eisenstein (*pro hac vice* admission pending)
DLA PIPER LLP (US)
One Liberty Place
1650 Market Street, Suite 5000
Philadelphia PA 191903-7300
Telephone: (215) 656-3300
Email: ilana.eisenstein@us.dlapiper.com

*Counsel to Appellant sanofi-aventis U.S. LLC*

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Rule 7.1(a) of the Federal Rules of Civil Procedure, Rule 8012 of the Federal Rules of Bankruptcy Procedure, and Rule 26.1 of the Federal Rules of Appellate Procedure, sanofi-aventis U.S. LLC states that it is an indirect wholly-owned subsidiary of Sanofi, which is publicly traded on the NASDAQ under the symbol SNY. No parent or publicly traded corporation owns 10% or more of Sanofi's stock.

# TABLE OF CONTENTS

**Page**

INTRODUCTION AND SUMMARY OF ARGUMENT ........................................ 1

STATEMENT OF THE BASIS OF APPELLATE JURISDICTION ........................ 3

STATEMENT OF ISSUES ........................................................................ 3

STANDARD OF REVIEW ....................................................................... 3

STATEMENT OF THE CASE .................................................................. 4

A. The 2001 Asset Purchase Agreement .................................................. 4

B. The Debtors' Bankruptcy Proceedings ................................................ 7

I. SUMMARY OF THE ARGUMENT ........................................................ 9

II. ARGUMENT ........................................................................................ 11

A. The Debtors' Ownership of Acthar Gel is Subject to the Royalty ........ 11

B. Future Royalty Obligations Arise When the Debtors Sell Acthar Gel ... 16

C. Reorganized Debtors Remain Bound by Non-Executory Contracts ....... 23

D. The Right to Sell Acthar Gel Cannot be Severed from the Royalty ....... 25

III. CONCLUSION ................................................................................... 28

# TABLE OF AUTHORITIES

**Cases** **Page(s)**

*In re Access Beyond Techs, Inc.*,
237 B.R. 32 (Bankr. D. Del. 1991)....................24

*In re Anes*,
195 F.3d 177 (3d Cir. 1999)....................4

*In re CellNet Data Systems, Inc.*,
327 F.3d 242 (3d Cir. 2003)....................27

*In re Columbia Gas*,
50 F.3d 233 (3d Cir. 1995)....................19, 20, 21, 23

*In re Edge*,
60 B.R. 690 (Bankr. M.D. Tenn. 1984)....................16

*In re Foothills Texas, Inc.*,
476 B.R. 143 (Bankr. D. Del. 2012)....................12

*In re Grossman's*,
607 F.3d 114 (3d Cir. 2010)....................*passim*

*In re Hays & Co. v. Merrill Lynch, Pierce, Fenner & Smth, Inc.*,
885 F.2d 1149 (3d Cir. 1989)....................10, 24, 25

*In re Hernandez*,
287 B.R. 795 (Bankr. D. Ariz. 2002)....................24

*In re JZ L.L.C.*,
371 B.R. 412 (B.A.P. 9th Cir. 2007)....................24

*Mission Prod. Holdings, Inc. v. Tempnology, LLC*,
139 S. Ct. 1652 (2019)....................25

*In re Monument Record Corp.*,
61 B.R. 866 (Bankr. M.D. Tenn. 1986)....................14, 15, 16

*National Labor Relations Board v. Bildisco*,
465 U.S. 513 (1984)....................24

*In the Matter of Resyn Corp.*,
945 F.2d 1279 (3d Cir. 1991) ....................................................................18

*In re Surfside Resort & Suits, Inc.*,
344 B.R. 179 (Bankr. M.D. Fla. 2006)..........................................................24

*United States v. Security Indus. Bank*,
459 U.S. 70 (1982)...........................................................................................26

*Viera v. Life Ins. Co. of North America*,
642 F.3d 407 (3d Cir. 2011) ..............................................................................4

*In re Waste Systems Int'l., Inc.*,
280 B.R. 824 (Bankr. D. Del. 2002)....................................................21, 22, 23

*Wright v. Owens Corning*,
679 F.3d 101 (3d Cir. 2012) ......................................................................*passim*

**Rules and Statutes**

11 U.S.C. 1141(d)(A).........................................................................................11

11 U.S.C. § 365(g)(1).........................................................................................25

28 U.S.C. § 158(a)(1)...........................................................................................3

**Other Authorities**

U.S. CONST. amend. V .......................................................................................26

## INTRODUCTION AND SUMMARY OF ARGUMENT[2]

In 2001, Questcor, a predecessor to Mallinckrodt plc and its affiliated chapter 11 debtors (the "**Debtors**"), entered into an Asset Purchase Agreement ("**APA**") with Sanofi to acquire the rights to Acthar Gel, subject to a perpetual 1% Royalty on annual net sales. Acthar Gel became the Debtors' flagship product, with annual sales peaking near $1 billion. The Debtors continued to honor the Royalty after they merged with Questcor in 2014. But after entering into chapter 11, the Debtors sought to manipulate the Bankruptcy Code to obtain an incredible windfall – to divorce the Royalty from their ownership of Acthar Gel, in an undisguised effort to continue reaping the benefits from manufacturing and selling Acthar Gel, but without honoring the Royalty.

The Debtors have abandoned their initial argument that the 2001 APA was an "executory contract" that they could "reject" under section 365 of the Bankruptcy Code, which was rejected by the Bankruptcy Court because Sanofi has no unperformed obligations. Moreover, if the 2001 APA were executory, the Debtors could not reject the burdens of a contract (the Royalty) while keeping the benefits (the rights to sell Acthar Gel).

---

2 Capitalized terms used but not otherwise defined in this *Introduction and Summary of Argument* and the below *Statement of Issues and Standard of Review* have the meaning ascribed to them elsewhere in this Opening Brief.

The Debtors then argued, in the alternative, that the Royalty, even for net sales occurring years in the future, should be deemed a "claim" that arose prior to the bankruptcy filing, and that they could discharge that general unsecured claim under a confirmed chapter 11 plan. The Bankruptcy Court agreed with the Debtors and ruled that all Royalty obligations, even those which will arise only *after* confirmation of a plan, should be treated as pre-petition damages claims. The Bankruptcy Court's ruling was erroneous.

Royalties accruing on post-confirmation sales of Acthar Gel are not claims that may be discharged in a bankruptcy, because such Royalties "arise" post-confirmation and the Bankruptcy Code only permits the discharge of claims that arise before the plan is confirmed. Further, under controlling Third Circuit precedent, it is clear that non-executory contracts ride through a bankruptcy case unaffected, because they cannot be rejected and as such, the obligations under such agreements that have not yet arisen are not discharged. For these reasons, the Debtors cannot separate the Royalty from the property rights giving rise to the sale of Acthar Gel – if they wish to continue manufacturing and selling Acthar Gel, then they must honor the Royalty that goes with it. The Bankruptcy Court's contrary ruling should be reversed.

## STATEMENT OF THE BASIS OF APPELLATE JURISDICTION

The United States Bankruptcy Court for the District of Delaware (the "**Bankruptcy Court**") entered a final order on November 8, 2021 (the "**Order**").[3] Sanofi timely appealed the Order on November 19, 2021.[4] This Court has jurisdiction pursuant to 28 U.S.C. § 158(a)(1).

## STATEMENT OF ISSUES

1. Did the Bankruptcy Court err in ruling that future obligations under a non-executory contract, which arise only if the Debtors sell Acthar Gel after confirmation, may be discharged as pre-petition unsecured claims under the Bankruptcy Code?

2. Did the Bankruptcy Court err in ruling that the Debtors may continue to sell Acthar Gel, the rights to which are subject to a perpetual annual Royalty, without paying the Royalty as and when it arises and comes due post-petition and post-confirmation?

## STANDARD OF REVIEW

The Bankruptcy Court's ruling consisted only of decisions of law – no factual issues are being appealed as the parties agreed that the disputed issues before the

---

[3] *See Appendix in Support of Appellant's Opening Brief* ("AA") AA1-2; D.I. 5210.

[4] *See* AA3-11; D.I. 5416.



EAST\187574406.9

Bankruptcy Court raised only legal questions. Exercising its appellate jurisdiction, this Court reviews the Bankruptcy Court's conclusions of law de novo.[5] When reviewing the legal interpretation of a contract, a court will review the lower court's determinations de novo.[6]

## STATEMENT OF THE CASE

### A. The 2001 Asset Purchase Agreement

On July 27, 2001, Aventis Pharmaceuticals Products Inc. ("**Aventis**"), as seller, and Questcor Pharmaceuticals, Inc. ("**Questcor**"), as purchaser, entered into an asset purchase agreement (the "**APA**").[7] Under the APA, Aventis sold certain assets and assigned certain intellectual property rights related to dosage forms that have corticotropin as such product's active ingredient ("**Acthar Gel**") to Questcor.[8]

Section 2.1 of the APA provides, in relevant part, that "As of the Effective Date, and ***subject to the terms and conditions of this Agreement***, Seller hereby sells, assigns, conveys, transfers, and delivers to Purchaser, and Purchaser purchases and accepts from Seller, the following assets related to the Product," which include

---

5 *See In re Anes*, 195 F.3d 177, 180 (3d Cir. 1999) ("In core matters, the District Court reviews the Bankruptcy Court's findings of fact for clear error and its conclusions of law de novo.").

6 *See Viera v. Life Ins. Co. of North America*, 642 F.3d 407, 413 (3d Cir. 2011).

7 *See* AA26-54; D.I. 4675, Ex. B.

8 *Id*.

Seller's rights to trademarks, contracts, intellectual property, equipment and inventory related to the manufacture and sale of Acthar Gel.[9]

Under Sections 2.3(a) and 2.3(b) of the APA, Questcor paid $100,000 and an additional amount for inventory.[10] The APA's treatment of these payment obligations is markedly different from the perpetual Royalty. Specifically, Section 2.3(c) of the APA provides that the future sales of Acthar Gel will be subject to a Royalty, as part of the "full and fair consideration for" the rights to sell Acthar Gel. This Royalty would continue "for so long as Purchaser, any of its Affiliates or any of its licensees, or any of their respective successors or assigns, sells the Product," and was calculated as "one percent (1%) of all Net Sales in excess of $10 Million Dollars ($10,000,000) in any given calendar year, pursuant to the terms of Section 2.6 herein"[11] (the "**Royalty**").[12]

Section 2.4 of the APA provides for the grant of a purchase money security interest to seller in and to the assets sold, as security solely for the performance of its payment obligations in section 2.3(a) and 2.3(b) of the APA. Specifically, no lien

---

9 *Id*., §2.1 (internal definitions omitted, emphasis added).

10 *Id*., §2.3(a) and 2.3(b).

11 *Id*. §2.3(c) (internal definitions omitted).

12 *Id*. §2.6. Section 2.6 requires the Purchaser to provide Seller a written report within thirty (30) days after the end of each calendar year in which Purchaser records net sales, along with payment of the Royalty.

was granted with respect to future Royalty obligations under section 2.3(c).[13] Importantly, the APA does not provide any basis for the seller to accelerate damages if the Purchaser fails to pay the Royalty in any given year. Sanofi's only remedy is to sue each year in which the Debtors enjoy net sales over $10 million but fail to pay the Royalty.

Finally, section 7.6 of the APA prohibits either party from assigning its rights and obligations without prior written consent of the other party, other than for assignments to an Affiliate. Any such assignment would not relieve the assigning party of its obligations, and is not deemed effective until the assignee executes and delivers an acceptable instrument in writing assuming the obligations under the APA.[14]

Mallinckrodt Pharmaceuticals Ireland Limited ("**MP Ireland**") is the specific Debtor entity that is the successor-in-interest to Questcor under the APA, and Sanofi is the successor-in-interest to Aventis.[15] In 2014, in compliance with section 7.6 of the APA and in connection with Debtors' acquisition of Questcor and MP Ireland's assumption of Questcor's rights and obligations under the APA, Mallinckrodt represented to Sanofi, to induce Sanofi's consent to the transfer and assignment of

---

13 *Id*. §2.4.

14 *Id*. §7.6.

15 *See* AA55-57; D.I. 4675, Ex. C.

the APA to the Debtors, that the Debtors assumed the Royalty obligation and would continue paying the Royalty.[16]

**B. The Debtors' Bankruptcy Proceedings**

Each Debtor filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code in the Bankruptcy Court on October 12, 2020 (the "**Petition Date**").

On August 6, 2021, the Debtors filed an "Exhibit U" to their "Plan Supplement" which the Debtors later amended on August 13, 2021 and again on October 8, 2021[17] ("**Exhibit U**"). Exhibit U listed the 2001 APA among the executory contracts that the Debtors proposed to reject under the chapter 11 plan – although the APA was mislabeled as "Royalty Agreement," dated July 27, 2001, between Debtor "Mallinckrodt plc" and "Aventis Intercontinental." The combined mislabeling of the APA with the Debtors' attempt to reject an obviously non-executory agreement reflects the Debtors' overall bad faith in seeking to strip the Royalty from the Debtors' rights to Acthar Gel.

On October 12, 2021, Sanofi filed a motion with the Bankruptcy Court seeking a determination that either (1) the APA is not an executory contract and that the Debtors cannot discharge Royalty obligations that arise post-Petition Date or

16 *See* AA58-60; D.I. 4675, Ex. D.

17 *See* AA61-88; D.I. 3596, AA89-117, D.I. 3721, and AA118-150; D.I. 4640.

post-confirmation; or (2) that the APA is executory and, if the Court otherwise authorizes rejection, then the Debtors may not retain the benefits under the APA – selling Acthar Gel – after rejection.[18]

On October 20, 2021, the Debtors filed an objection and cross-motion, asking the Court to find that the APA *is* executory or, in the alternative, if it is not executory, that royalty obligations under the APA are pre-Petition Date debts subject to discharge.[19] Sanofi filed its reply to the Debtors' objection on October 26, 2021.[20]

The Bankruptcy Court heard argument on October 29, 2021 and took the matter under advisement.[21] Subsequently, on November 4, 2021, the Bankruptcy Court issued an oral ruling, finding that the APA was *not* executory and could not be rejected, but that all royalty obligations under the APA were pre-Petition Date claims that could be discharged under a confirmed plan.[22] The Bankruptcy Court then issued the Order on November 8, 2021.[23] Sanofi timely filed its *Notice of Appeal and Statement of Election* on November 19, 2021,[24] and its *Statement of*

---

18 *See* AA12-25; D.I. 4675.

19 *See* AA151-178; D.I. 4820.

20 *See* AA179-198; D.I. 4988.

21 *See* AA199-330; D.I. 5094.

22 *See* AA331-473; D.I. 5186.

23 *See* AA474-475; D.I. 5210.

24 *See* AA476-484; D.I. 5409.

*Issues on Appeal* on December 2, 2021.[25]

## I. SUMMARY OF THE ARGUMENT

The Debtors acquired the right to manufacture and sell Acthar Gel *subject to the Royalty* – the Bankruptcy Code provides no basis to sever one from the other. The Bankruptcy Court's ruling that future Royalty obligations under the non-executory APA may be discharged ignores the nature of the Royalty and the APA, the plain language of section 1141(d)(1)(A) of the Bankruptcy Code and binding Third Circuit precedent, all of which make clear that Royalties flowing from the Debtors' post-confirmation sales of Acthar Gel arise post-confirmation and cannot be discharged. The question is not when the parties signed the APA, but when each Royalty obligation arises. The Bankruptcy Court erred in ruling that each future Royalty obligation should be deemed to arise before the Petition Date.

The Debtors' suggestion that all Royalty obligations under the APA arose when the parties signed the APA in 2001 misconstrues the nature of the Royalty. The Royalty is not akin to an installment sales contract under which a purchase price is amortized over time. If that were the case, then the APA would presumably have been structured differently in multiple ways – none of which appear in the plain text of the APA. Instead, the structure of the APA is to create a simple royalty, under which the acquisition of Acthar Gel is subject to a perpetual annual 1% royalty on

---

25 *See* AA485-487; D.I. 5633.

net sales for however many calendar years the product is sold. Each year's Royalty is a standalone obligation that only arises, at the earliest, when the Debtors choose to sell Acthar Gel in any given calendar year. Suggesting that each Royalty, and therefore, all Royalties, somehow arose over twenty (20) years ago defies reason and common sense.

Section 1141 of the Bankruptcy Code, the chapter 11 discharge provision, plainly provides that only claims that arise *prior to confirmation* may be discharged. The Bankruptcy Court's ruling cannot be squared with binding Third Circuit precedent that claims arise when the conduct occurs that gives rise to a right to payment.[26] Here, the conduct giving rise to Sanofi's right to the Royalty is the Debtors' act of selling Acthar Gel. Royalty obligations related to sales that occur in the future arise in the future, not prior to confirmation and, thus, cannot be discharged. The Bankruptcy Court also ignored binding Third Circuit precedent that non-executory contracts ride through bankruptcy cases unaffected.[27] Claims that arise post-confirmation remain the obligation of the reorganized debtors and are not discharged.

Debtors in chapter 11 may "reject" executory contracts, but even rejection does not operate to rescind or terminate such contracts. Given that rejection does

---

[26] *See, e.g.*, *Grossman's* and *Owens Corning*, *infra*.

[27] *See, e.g.*, *Hays*, *infra.*

not result in rescission or termination of executory contracts, certainly no basis exists to treat non-executory contracts, which *cannot be rejected*, as having been rescinded or terminated. Because the contract is not rescinded, obligations arising in the future are not dischargeable and the Debtors remain obligated to honor the Royalty annually and for however long as the reorganized Debtors, as successors to the Debtors, choose to continue selling Acthar Gel.

## II. ARGUMENT

Section 1141(d)(1)(A) of the Bankruptcy Code provides that "confirmation of a plan – (A) discharges the debtor from any debt that arose before the date of such confirmation . . ."[28] Accordingly, by its plain language, Royalty obligations under the APA may only be discharged if the debt arising from the sale "arose before the date of . . . confirmation" of the Debtors' chapter 11 plan. In the event the Debtors sell Acthar Gel post-confirmation, the annual Royalty obligations that flow from such sales will arise post-confirmation and may not be discharged under section 1141 of the Bankruptcy Code.

### A. The Debtors' Ownership of Acthar Gel is Subject to the Royalty

The crux of the Debtors' position before the Bankruptcy Court was that the Royalty should be viewed as a pre-Petition Date claim because it arises out of the APA which was signed before the Petition Date. The Debtors' argument

[28] 11 U.S.C. 1141(d)(A).

misconstrues the nature of the Royalty and confuses *when* a claim arises versus *from where* the claim arises.

As set forth above, the Royalty is calculated as 1% of the Debtors' net sales of Acthar Gel in any given calendar year for as many years as the Debtors sell Acthar Gel. The Debtors suggest this should be viewed as an installment sale contract - where a total purchase price is amortized through a stream of payments over time. That is an inaccurate characterization of the Royalty and is inconsistent with the plain language of the APA.

Even a cursory review of the APA makes clear that the Royalty bears none of the traditional hallmarks of an amortized purchase price. First, there is no set purchase price in the APA, and the term "Royalty" connotes a property interest that the seller retains in the property sold, rather than a drawn-out or amortized purchase price.[29] Further, the APA conveyed title to the assets being sold on the effective date, not some later date after a threshold amount of the Royalty had been collected. In addition, the APA does not cap the total amount of the Royalty payments to be made, nor does it limit the time period that the Royalty had to be paid, which might have brought the total amount of the Royalty payments in line with the parties' expectations of the value of the assets. Similarly, the APA does not include any

---

[29] For example, in the oil and gas industry, "an overriding royalty is an interest in real property regarded as a covenant running with the land. . . ." *In re Foothills Texas, Inc.*, 476 B.R. 143, 147 (Bankr. D. Del. 2012).

pre-payment provision by which the Purchaser could pay a fixed amount to obtain relief from the remaining Royalty and thus sever the assets from the Royalty. And finally, the APA does not include an acceleration clause, that would enable the seller to sue for future Royalties in the event of breach. The APA contains none of these provisions that would be consistent with the Debtors' view of the Royalty as a drawn-out purchase price.

Instead, the plain language of the APA makes clear that the Royalty is an obligation that attached to and runs with the property sold. The condition and obligation to pay the Royalty is not limited in time or total amount, and section 2.1 of the APA makes clear that the conveyance of ownership in the assets being sold was "subject to" the other terms and conditions of the APA, which necessarily includes the annual Royalty. Indeed, it is telling that the APA grants to the seller a lien for the other components of the purchase price, but not the Royalty. The decision to expressly carve out the Royalty from the lien cannot be reconciled with the Debtors' characterization of the Royalty as an amortized component of the purchase price. Likewise, the APA's section 7.6 assignment provision, which only permits assignment of the rights and obligations of the APA so long as the assignee assumes responsibility to pay the Royalty makes clear that the Royalty is an obligation that was intended to stay with the intellectual property necessary to manufacture and sell Acthar Gel.

A royalty is not the same as a drawn-out payment of a fixed purchase price. It is an obligation that attaches to the assets sold, as made clear by the "subject to" language in the APA. To sever the Royalty from the Acthar Gel, as suggested by the Debtors, would not only give the Debtors and their successors a substantial windfall, but would impermissibly retroactively change the entire nature of the sale transaction in the first place. This result cannot be reconciled with the plain language of the APA.

The analogous case of *In re Monument Record Corp.*[30] aptly demonstrates the character of a royalty and how royalty obligations should be treated in a bankruptcy case. In *Monument*, the debtor record company produced and recorded sound recordings.[31] Singer and song-writer Roy Orbison had contracted with the debtor to record songs in return for specified royalties.[32] The parties later split up, via a termination agreement that terminated the exclusive recording contract, but preserved certain royalties. Specifically, the agreement provided that certain songs were transferred to Orbison and others remained the property of the recording company (that later became a debtor), subject to the obligation to pay the royalty.[33]

30 61 B.R. 866 (Bankr. M.D. Tenn. 1986).

31 *Id*. at 867.

32 *Id*.

33 *Id*. at 868.

After the debtor commenced its bankruptcy case, Orbison moved to compel the debtor to assume or reject the agreements. The court, just like the Bankruptcy Court here, found that the agreements were not executory because there were not unperformed material obligations remaining for both sides.[34] Specifically, just like with the APA, the only remaining obligations were the debtor's obligations to pay royalties.[35]

Just like with the non-executory APA here, the court characterized the nature of the agreement as "[h]ere, Orbison essentially sold the debtor the right to use certain recordings."[36] The court continued that "If continued use [of the Orbison recordings] is economically advantageous, then the debtor can market and use the recordings acquired pursuant to the 1978 termination agreement subject to the obligation to pay royalties."[37] The facts and reasoning of the court in *Monument* are completely analogous with the APA and future Royalties that may be owed to Sanofi if the Debtors and their successors and assigns choose to sell Acthar Gel in the future.[38] Both cases involve non-executory contracts pursuant to which assets were

---

[34] *Id*.

[35] *Id*.

[36] *Id*. at 868.

[37] *Id*. at 869.

[38] Further, *Monument* was decided in a jurisdiction that follows precedent analogous to the Third Circuit's decisions in *Grossman's* and *Owens Corning*. *See*

conveyed subject to a royalty. Just like in *Monument*, if the Debtors here determine it is economically advantageous to continue selling Acthar Gel, then they can do so, subject to the Royalty.

**B. Future Royalty Obligations Arise When the Debtors Sell Acthar Gel**

Before the Bankruptcy Court, the Debtors incorrectly argued that Sanofi's future Royalty claims are "prepetition, dischargeable claim[s]" because "[r]ights to payment (*i.e.*, claims) from a debtor under a prepetition contract are prepetition claims, even if they will not come due until some future date or upon some future occurrence."[39] The Debtors, in essence, asked the Bankruptcy Court to enact an all-encompassing, overarching rule that would classify every obligation that has *any connection* to a prepetition contract as a "prepetition claim" that can be discharged. The Debtors' argument has no merit and is inconsistent with the applicable case law addressing when claims arise.

The plain language of section 1141(d)(1)(A) of the Bankruptcy Code makes clear that a chapter 11 plan may only discharge debts "that ***arose before*** the date of such confirmation."[40] The Debtors' suggestion that future Royalty obligations, as to

---

*In re Edge*, 60 B.R. 690, 706 (Bankr. M.D. Tenn. 1984) (noting disagreement with *Frenville* and holding that a claim arises when conduct occurs).

[39] *See* AA163-164; D.I. 4820, ¶33.

[40] 11 U.S.C. § 1141(d)(1)(A) (emphasis added).

which the Debtors have no present liability, arose before the Petition Date, defies logic and reason.

The APA demonstrates that the Debtors' Royalty obligations do not arise unless and until the Debtors actually sell Acthar Gel during a particular calendar year. It is the Debtors' affirmative act of selling Acthar Gel that gives rise to the Royalty, and where the Acthar Gel sales occur post-confirmation, the resulting Royalty cannot be said to have arisen pre-Petition Date. Notably, the Debtors expressly admitted this in their pleadings before the Bankruptcy Court, stating that "Sanofi is not entitled to a payment unless and until, and only for so long as, Acthar is sold by the Debtors."[41] That should be the end of the discussion – the Debtors' liability to pay the Royalty for any given year did not arise when the APA was signed, but *will* arise upon the Debtors' *future sales of Acthar*. The Debtors' *post-Petition Date* and *post-confirmation* Royalty obligations are not debts "that arose before the date of such confirmation" (assuming the Debtors' plan is confirmed), and thus cannot be discharged.

As the Bankruptcy Court itself acknowledged in a prior opinion in these very

---

41 *See* AA167-168; D.I. 4820, ¶41.

bankruptcy cases,[42] the Third Circuit's decisions in *Grossman's*[43] and *Owen's Corning*[44] set forth the Third Circuit's test for determining when a "claim" arises under the Bankruptcy Code. In those cases, the Third Circuit "rejected *Frenville's* 'accrual test,' and in its place established the rule that a 'claim' arises when an individual is exposed pre-petition to a product or other conduct giving rise to an injury, which underlies a 'right to payment' under the Bankruptcy Code."[45]

While cast in the light of tort damages, the principles espoused by the Third Circuit in *Grossman's* and *Owen's Corning* apply with equal strength with regard to contractual claims. The test, as clearly articulated by the Third Circuit, is *when the conduct occurs that underlies a right to payment*. Here, Sanofi only has a right to payment for a Royalty if and when the Debtors affirmatively engage in the conduct of selling Acthar Gel. If that conduct occurs post-confirmation, then the Royalty

---

42 *See Memorandum Opinion and Order*, Case No. 20-12522 (JTD) (Bankr. D. Del., Oct. 19, 2021) [D.I. 4792]. The Bankruptcy Court ruled that alleged antitrust injuries resulting from the Debtors' alleged pre-petition anti-competitive conduct were nonetheless claims that arose post-petition so long as the injuries related to sales of Acthar Gel that took place post-petition. This establishes the law of the case for this issue and should also be determinative. *See In the Matter of Resyn Corp.*, 945 F.2d 1279, 1281 (3d Cir. 1991) ("when a court decides upon a rule of law, that rule should continue to govern the same issues in subsequent stages of the litigation.").

43 *In re Grossman's*, 607 F.3d 114 (3d Cir. 2010).

44 *Wright v. Owens Corning*, 679 F.3d 101 (3d Cir. 2012).

45 *Owens Corning*, 679 F.3d at 104.

arises post-confirmation. It is not the signing of the APA, but rather the Debtors' selling of Acthar Gel that gives rise to the Debtors' liability for the Royalty in a given year. The Bankruptcy Court committed error by not evaluating future Royalty claims under the *Grossman's* and *Owens Corning* test.

The Bankruptcy Court, instead of applying *Grossman's* and *Owens Corning*, erroneously held that this case was controlled by the Third Circuit's decision in *In re Columbia Gas*.[46] The only similarity between the present case and *Columbia Gas* is that both involve non-executory contracts. In *Columbia Gas*, the contract was a pre-petition settlement agreement, under which the Debtor was required to deposit a fixed amount of money, $30 million, into an escrow account, with $15 million due by March 21, 1991 and the other $15 million by March 23, 1992. The debtor filed for bankruptcy after making the first payment but before the second.

The distinction between the $15 million owed by the debtor in *Columbia Gas* and future Royalty payments that may be owed by the Debtors to Sanofi is clear. The debtors in *Columbia Gas* had a fixed obligation to pay an amount certain by a specified date in the future. That future payment was not dependent on and did not relate to any future conduct – just the mere passage of time. Clearly, no one could dispute that the debtor had an obligation to make that payment when it commenced its bankruptcy case. But the same cannot be said for the Debtors here, which do not

---

[46] 50 F.3d 233, 239 (3d Cir. 1995).

and will not have any obligation to make future Royalty payments unless and until they, in the future, affirmatively act to sell Acthar Gel.

Moreover, the issues before the Court in *Columbia Gas* did not even address whether the remaining payment owed by the debtor should be construed as a pre-petition or post-petition claim. The issue before the Court was simply whether the pre-petition settlement agreement was an executory contract, and the court correctly ruled that it was not. The Debtors and the Bankruptcy Court focused on the following statement by the Third Circuit in *Columbia Gas*:

> In cases where the nonbankrupt party has fully performed, it makes no sense to talk about assumption or rejection. At that point only a liability exists for the debtor—a simple claim held by the nonbankrupt against the estate, and "[t]he estate has whatever benefit it can obtain from the other party's performance and the trustee's rejection would neither add to nor detract from the creditor's claim or the estate's liability." Rejection is meaningless in this context, and assumption would be of no benefit to the estate, serving only to convert the nonbankrupt's claim into a first priority expense of the estate at the expense of the other creditors.[47]

But this statement must be viewed in the context of the facts of that case – not only was the settlement agreement entered into pre-petition, but all of the debtor's obligations under that agreement also arose pre-petition. This is entirely distinct from the facts of this case and the treatment of future Royalties which will only arise if the Debtors sell Acthar Gel in the future. And to reiterate, the issue before the

[47] *Id*. at 239 (internal citations omitted).

Court in *Columbia Gas* was not when future obligations under the non-executory contract arose. Even if it was, the Court presumably would have applied the now discredited *Frenville* test, and not the current test set forth in *Grossman's* and *Owens Corning*.

The above-quoted language from *Columbia Gas* cannot be fairly applied to claims under non-executory contracts that arise post-confirmation because the agreement in *Columbia Gas* had no such future-arising claims, rendering *Columbia Gas* inapposite. The claims at issue were fixed in amount and date of payment by a non-executory contract and all arose prior to the bankruptcy filing. Applied here, Sanofi does not dispute that *pre-existing* Royalty claims under the APA, i.e., Royalty obligations that came due prior to the Petition Date, constitute claims subject to discharge under a confirmed plan.

The Bankruptcy Court also committed error by relying on the bankruptcy court decision of *In re Waste Systems Int'l., Inc.*[48] In that case, the issue before the Court was an objection to an administrative expense claim arising out of a consulting agreement. The facts of *Waste Systems* are significantly different from those faced here – as they did not involve a sale of an asset subject to a royalty. In that case, as part of a larger transaction, a third party (Gabe) transferred real property (on which was situated a waste treatment facility) to the purchaser of a business. In connection

48 280 B.R. 824 (Bankr. D. Del. 2002)

with the transfer, Gabe and the purchaser entered into a consulting agreement, under which the purchaser paid Gabe $100,000 per year for consulting services, plus expenses. The consulting agreement also provided that, so long as the purchaser owns the transferred property, the purchaser would pay Gabe a royalty of one dollar ($1.00) per ton of all waste delivered to the facility.

The question before the Court in *Waste Systems* was not when a claim under a non-executory contract arises – but whether the counterparty to an otherwise expired consulting agreement should be entitled to an administrative expense claim for the royalty under section 503(b) of the Bankruptcy Code. The Court's decision was that the counterparty had failed to meet his burden to prove that he had provided a post-petition benefit to the estate to justify an administrative expense claim. That decision has no bearing on this case. In reaching the conclusion that Gabe was not entitled to an administrative expense claim, the Court made a broader statement that "Since the Consulting Agreement is a pre-petition non-executory contract, any claims arising from it are general unsecured claims."[49] The Court was not deciding, and had not been asked to decide, whether future, post-confirmation claims under that contract would be discharged under a plan, or when such claims arose. Because the Court's statement extended beyond the question before the Court in that case, it is dicta. Further, it is also improper to place any reliance on *Waste Systems* to inform

[49] *Id*. at 827.

a decision as to when a claim arises, because *Waste Systems* was entered years before the Third Circuit issued its decision in *Grossman's*. While, again, the Court in *Waste Systems* did not even address when a claim arises, if it had, it would have relied on the now-discredited *Frenville* test.

The Bankruptcy Court committed error by not evaluating when Royalty obligations coming due from post-confirmation sales arise under the test articulated in *Grossman's* and *Owens Corning*, and further by improperly extending the rulings of *Columbia Gas* and *Waste Systems* to issues that were not before the courts in those cases. Neither *Columbia Gas* nor *Waste Systems* addressed the issue of when future obligations under non-executory contracts arise, and application of dicta from those cases to address that question is improper. This is especially so because both *Columbia Gas* and *Waste Systems* pre-dated *Grossman's* when the Third Circuit overruled *Frenville* and articulated the current test for determining when a claim arises. This Court should apply the test in *Grossman's* and *Owens Corning* and conclude that future Royalty obligations will arise, if at all, post-confirmation, and thus cannot be discharged under section 1141 of the Bankruptcy Code. The Bankruptcy Court's decision should be reversed.

**C. Reorganized Debtors Remain Bound by Non-Executory Contracts**

Because the APA cannot be assumed or rejected, the Debtors remain, and the

reorganized debtors will become and remain, bound by it.[50] Under controlling Third Circuit precedent, as a non-executory contract, the APA should be deemed to "ride through" confirmation unaffected, and the parties, and their permitted successors and assigns, will remain bound by its terms.[51] In their pleadings to the Bankruptcy Court, the Debtors failed to refute the overwhelming weight of authority that makes clear that non-executory contracts ride through a bankruptcy case.

Most tellingly, the Debtors' argument to the Bankruptcy Court that the Third Circuit's recent decision in *Weinstein* somehow supports the Debtors' position

---

[50] *See, e.g.*, *In re Hays & Co. v. Merrill Lynch, Pierce, Fenner & Smth, Inc.*, 885 F.2d 1149 (3d Cir. 1989) ("a trustee is generally bound by the debtor's non-executory contracts); *see also In re JZ L.L.C.*, 371 B.R. 412, 425 (B.A.P. 9th Cir. 2007) ("Contracts that are not executory do not need to be assumed in order to remain in effect and typically are viewed as assets or liabilities in bankruptcy"); *In re Surfside Resort & Suits, Inc.*, 344 B.R. 179, 192 (Bankr. M.D. Fla. 2006) ("non-executory contracts 'ride through' a bankruptcy case."); *In re Access Beyond Techs, Inc.*, 237 B.R. 32, 41 (Bankr. D. Del. 1991) ("If the License Agreement were not executory, it would not be subject to the proscriptions contained in section 365 and would survive the bankruptcy case unaffected")

[51] *See Hays, supra*; *see also Stewart Foods*, 64 F.3d 141, 145 (4th Cir. 1995) ("Because § 365 applies only to executory contracts, a debtor-in-possession does not have the option of rejecting or assuming non-executory contracts and remains bound by the debtor's obligations under those contracts after the bankruptcy filing"); *JZ*, 371 B.R. at 425 (discussing why non-executory contracts should ride through bankruptcy); *see also National Labor Relations Board v. Bildisco*, 465 U.S. 513, 546 n. 12 (1984) ("In the unlikely event that the contract is neither accepted nor rejected, it will "ride through" the bankruptcy proceeding and be binding on the debtor even after a discharge is granted. The nondebtor party's claim will therefore survive the bankruptcy proceeding."); *In re Hernandez*, 287 B.R. 795, 799–803 (Bankr. D. Ariz. 2002) (discussing the ride through doctrine)

cannot be reconciled with the actual text of that decision, in which the Third Circuit stated that "[a] non-executory contract . . . can be sold under § 363 to a buyer, *who must satisfy post-closing obligations* but need not worry about pre-closing breaches or defaults, which typically remain unsecured claims against the debtor's estate."[52] The Third Circuit made clear that *pre-existing claims* under a non-executory contract may be treated as unsecured claims, but not obligations that arise in the future. The Debtors similarly failed to address the binding precedent decision in *Hays*, in which the Third Circuit expressly held that "a trustee is generally bound by the debtor's non-executory contracts."

**D. The Right to Sell Acthar Gel Cannot be Severed from the Royalty**

Why does the Bankruptcy Code permit a debtor to reject an executory contract, but provides no such rights with respect to a non-executory contract? Under the Bankruptcy Code, rejection of a contract constitutes a court-sanctioned breach immediately before the Petition Date,[53] but is not, however, tantamount to a rescission or termination of the contract.[54] But the court-sanctioned breach goes both ways. While rejection permits a debtor to not perform its future obligations under

---

52 *Weinstein*, 997 F.3d 497, 501 (3d Cir. 2021) (emphasis added).

53 *See* 11 U.S.C. § 365(g)(1) (rejection "constitutes a breach of such contract immediately before the date of the filing of the petition.")

54 *See Mission Prod. Holdings, Inc. v. Tempnology, LLC*, 139 S. Ct. 1652, 1661 (2019).

the rejected executory contract, it also relieves the non-debtor counterparty from fulfilling its own remaining material obligations. It is this point, the fact that the non-debtor counterparty *has unperformed material obligations* remaining on the contract, that makes it inherently fair for an executory contract to be rejected, and explains why executory contracts may be rejected but non-executory contracts may not. A debtor can get relief from a burdensome contract, certainly, but there must be an exchange – the non-debtor debtor party also gets relief from its own obligations.[55] If *both sides* do not have continuing obligations, the debtor cannot reject the contract. In this case, as Sanofi addressed before the Bankruptcy Court, had the Debtors been successful in rejecting the APA, this would have required the Debtors to return the intellectual property, or at least prohibit them from selling Acthar Gel if they could reject the obligation to pay the Royalty.

The Bankruptcy Code only permits a debtor to reject executory contracts, because it is the corresponding ability of the non-debtor to also stop performing that prevents rejection from constituting an unconstitutional taking under the 5th Amendment. The Bankruptcy Code avoids this impermissible result by requiring a

---

55 Allowing the Debtors to "reject" the APA and then continue manufacturing and selling Acthar Gel free of the Royalty would constitute an impermissible taking without just compensation. *See, e.g.*, U.S. CONST. amend. V.; *United States v. Security Indus. Bank*, 459 U.S. 70, 75 (1982) ("[t]he bankruptcy power is subject to the Fifth Amendment's prohibition against taking private property without compensation.").

pre-requisite showing that the contract is executory, i.e., that unperformed material obligations remain on both sides. This balances the scale by preventing debtors from avoiding future obligations – obligations that have not *arisen* yet – if the counterparty has fully performed.

This underlying spirit is also visible in section 365(n) of the Bankruptcy Code, which provides that when a debtor-licensor rejects an intellectual property licensing agreement, the non-debtor licensee may elect to keep using the licensed intellectual property, but must continue paying all royalty obligations.[56] While this case does not involve a rejected license, the situation is nonetheless analogous. Here, the Debtors essentially "elect," post-bankruptcy, to continue selling Acthar Gel, which they purchased from Sanofi subject to a royalty obligation. If non-debtor licensees who elect to keep using intellectual property even after rejection must continue to pay royalties, the Debtors should too, especially where here the Debtors were not even able to reject the underlying agreement because it is not executory.

Sanofi materially performed all of its obligations under the APA – it delivered the assets, including all of the intellectual property and other assets related to Acthar Gel, to the Debtors. The Debtors' acquisition of such assets was subject to a royalty obligation. The Debtors seek to shed that royalty obligation in the future, while keeping the property acquired, which would give the Debtors an unfair windfall.

---

56 *See In re CellNet Data Systems, Inc.*, 327 F.3d 242, 246 (3d Cir. 2003)

The Debtors should not be permitted to continue selling Acthar Gel if they do not have to pay the royalty. The decision of the Bankruptcy Court should be reversed.

## III. CONCLUSION

For the reasons set forth herein, Sanofi respectfully requests that this Court reverse the Bankruptcy Court's Order and find that Debtors' Royalty obligation may not be discharged as pre-petition unsecured claims under the Bankruptcy Code.

Dated: January 25, 2022

**DLA PIPER LLP (US)**

*/s/ Stuart M. Brown*
Stuart M. Brown (DE #4050)
Aaron S. Applebaum (DE #5587)
1201 North Market Street, Suite 2100
Wilmington, DE 19801
Telephone: (302) 468-5700
Facsimile: (302) 394-2341
E-mail: stuart.brown@us.dlapiper.com
aaron.applebaum@us.dlapiper.com

- and -

Jason Hopkins
1900 N. Pearl St., Suite 2200
Dallas, TX 75201-2482
Telephone: (214) 743-4546
Email: jason.hopkins@us.dlapiper.com

- and -

Ilana H. Eisenstein
One Liberty Place
1650 Market Street, Suite 5000
Philadelphia PA 191903-7300
Telephone: 215-656-3300
Email: ilana.eisenstein@us.dlapiper.com

- and –

**MILLER & MARTIN PLLC**
Laura F. Ketcham
Volunteer Building Suite 1200
832 Georgia Avenue
Chattanooga, TN 37402
Telephone: (423) 785-8383
Facsimile: (423) 321-1556
E-mail: laura.ketcham@millermartin.com

*Attorneys for sanofi-aventis U.S. LLC*