# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

---------------------------------------------------x

In re:                                                  :          Chapter 11
                                                        :
MALLINCKRODT PLC, *et al*                               :          Case No. 20-12522 (JTD) (Bankr.
                                                        :          D. Del.) (Jointly Administered)
              Debtors.[1]                               :
----------------------------------------------------:

SANOFI-AVENTIS U.S. LLC,                                x
                                                        :
              Appellant,                                :
                                                        :
v.                                                      :          C.A. No. 1:21-cv-01636 (LPS)
                                                        :
MALLINCKRODT PLC, *et al*.,                             :
                                                        :          REDACTED PUBLIC VERSION
              Appellees.                                :          FILED:   02/01/22*
---------------------------------------------------x

## APPENDIX IN SUPPORT OF APPELLANT'S OPENING BRIEF
## (PAGES 1 – 487)

Stuart M. Brown (DE #4050)                  Laura F. Ketcham (*pro hac vice*
Aaron S. Applebaum (DE #5587)               admission pending)
DLA PIPER LLP (US)                          MILLER & MARTIN PLLC
1201 North Market Street, Suite 2100        Volunteer Building Suite 1200
Wilmington, DE  19801                       832 Georgia Avenue
Telephone: (302) 468-5700                   Chattanooga, TN 37402
Facsimile: (302) 394-2341                   Telephone: (423) 785-8383
E-mail: stuart.brown@us.dlapiper.com        Facsimile: (423) 321-1556
        aaron.applebaum@us.dlapiper.com     E-mail: laura.ketcham@millermartin.com


Dated:  January 25, 2022

---

[1]    A complete list of the Debtors in the above-referenced  chapter 11 cases may be obtained on the website of the Debtors' claims and noticing agent at http://restructuring.primeclerk.com/Mallinckrodt. The Debtors' mailing address is 675 McDonnell Blvd., Hazelwood, Missouri 63042.

\* The parties conferred and agree that pleadings originally filed under seal with The Bankruptcy Court may be filed without redactions, other than the schedules to the Asset Purchase Agreement, which will remain under seal.

Jason Hopkins (*pro hac vice*
admission pending)
DLA PIPER LLP (US)
1900 N. Pearl St., Suite 2200
Dallas, TX 75201-2482
Telephone: (214) 743-4546
Email: jason.hopkins@us.dlapiper.com

Ilana H. Eisenstein (*pro hac vice*
admission pending)
DLA PIPER LLP (US)
One Liberty Place
1650 Market Street, Suite 5000
Philadelphia PA  191903-7300
Telephone:   (215) 656-3300
Email:  ilana.eisenstein@us.dlapiper.com

*Counsel to Appellant sanofi-aventis U.S.
LLC*

## APPENDIX

| DOCKET NO. | DATE | TITLE | PAGE NOS. |
|---|---|---|---|
| 5210 | 11/08/21 | Order in Connection with Expedited Motion for Pre-Confirmation Determination that Debtors Cannot Reject or Discharge Post-Confirmation Royalty Obligations Related to Sale of Acthar Gel | AA 1 – 2 |
| 5416 | 11/19/21 | Transmittal of Record on Appeal to District Court | AA 3 – 11 |
| 4675 | 10/12/21 | Expedited Motion for Pre-Confirmation Determination that Debtors Cannot Reject or Discharge Post-Confirmation Royalty Obligations Related to Sale of Acthar | AA 12 – 25 |
| 4675, Ex. B | 10/12/21 | Asset Purchase Agreement | AA 26 – 54 |
| 4675, Ex. C | 10/12/21 | Assignment and Assumption Agreement | AA 55 – 57 |
| 4675, Ex. D | 10/12/21 | December 12, 2014 Correspondence | AA 58 – 60 |
| 3596 | 08/06/21 | Notice of Filing of Exhibit U (Rejected Executory Contract/Unexpired Lease List) of Plan Supplement for the Joint Plan of Reorganization of Mallinckrodt plc and its Debtor Affiliates Under Chapter 11 of the Bankruptcy Code | AA 61 – 88 |
| 3721 | 8/13/21 | Notice of Filing of Amended Exhibit U (Rejected Executory Contract/Unexpired Lease List) of Plan Supplement for the Joint Plan of Reorganization of Mallinckrodt plc and its Debtor Affiliates Under Chapter 11 of the Bankruptcy Code | AA 89 – 117 |
| 4640 | 10/08/21 | Notice of Filing of Further Amended Exhibit U (Rejected Executory Contract/Unexpired Lease List) of Plan Supplement for the Joint Plan of Reorganization of Mallinckrodt plc and its Debtor Affiliates Under Chapter 11 of the Bankruptcy Code | AA 118 – 150 |

*

1

| DOCKET NO. | DATE | TITLE | PAGE NOS. |
|---|---|---|---|
| 4820 | 10/20/21 | Debtors' (I) Omnibus Objection to (A) Expedited Motion for Pre-Confirmation Determination That Debtors Cannot Reject or Discharge Post-Confirmation Royalty Obligations Related to Sale of Acthar Gel and (B) Motion of sanofi-aventis U.S. LLC for Temporary Allowance of Claims for Purposes of Voting to Accept or Reject Plan and to Classify Claims Under Class 7 of Plan and (II) Cross-Motion for Order (A) Authorizing Rejection of Asset Purchase Agreement and (B) Finding Royalty Obligations to Be Prepetition Debts Subject to Discharge | AA 151 – 178 |
| 4988 | 10/26/21 | Reply of sanofi-aventis U.S. LLC to Debtors' Omnibus Objection to (A) Expedited Motion for Pre-Confirmation Determination that Debtors Cannot Reject or Discharge Post-Confirmation Royalty Obligations Related to Sale of Acthar Gel and (B) Motion of sanofi-aventis U.S. LLC for Temporary Allowance of Claims for Purposes of Voting to Accept or Reject Plan and to Classify Claims Under Class 7 of Plan | AA 179 – 198 |
| 5094 | 10/29/21 | Transcript regarding Hearing Held 10/29/2021 | AA 199 – 330 |
| 5186 | 11/04/21 | Transcript regarding Hearing Held 11/4/2021 | AA 331 – 473 |
| 5210 | 11/08/21 | Order in Connection with Expedited Motion for Pre-Confirmation Determination that Debtors Cannot Reject or Discharge Post-Confirmation Royalty Obligations Related to Sale of Acthar Gel | AA 474 – 475 |
| 5409 | 11/19/21 | Sanofi's Notice of Appeal and Statement of Election | AA 476 – 484 |
| 5633 | 12/02/21 | Statement of Issues on Appeal | AA 485 – 487 |

\*\*

EAST\187750199.1

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| MALLINCKRODT PLC, *et al.* | ) Case No. 20-12522 (JTD) |
| | ) |
| Debtors.[1] | ) (Jointly Administered) |
| | ) |
| | ) **Re: Docket Nos. 4675, 4820, 4988 & 5207** |

### ORDER IN CONNECTION WITH EXPEDITED MOTION FOR
### PRE-CONFIRMATION DETERMINATION THAT DEBTORS
### CANNOT REJECT OR DISCHARGE POST-CONFIRMATION
### ROYALTY OBLIGATIONS RELATED TO SALE OF ACTHAR GEL

Upon the motion (the "**Motion**")[2] of sanofi-aventis U.S. LLC ("**Sanofi**"), for entry

of an order determining that the Debtors cannot reject or discharge their post-confirmation

Royalty obligations to Sanofi under the Debtors' proposed joint plan of reorganization (the

"**Plan**"); and the Court having jurisdiction to consider the Motion and the relief requested

therein pursuant to 28 U.S.C. §§ 157 and 1334, and the Amended Standing Order of

Reference from the United States District Court for the District of Delaware dated as of

February 29, 2012; and consideration of the Motion and the relief requested therein being

a core proceeding under 28 U.S.C. § 157(b); and the Court having authority to enter a final

order consistent with Article III of the United States Constitution; and venue being proper

before this Court under 28 U.S.C. §§ 1408 and 1409; and it appearing that proper and

adequate notice of the Motion has been given and that no other or further notice is

necessary; and good and sufficient cause appearing therefor and upon the record of this

---

[1]     A complete list of the Debtors in these chapter 11 cases may be obtained on the website of the Debtors' claims and noticing agent at http://restructuring.primeclerk.com/Mallinckrodt. The Debtors' mailing address is 675 McDonnell Blvd., Hazelwood, Missouri 63042.

[2]     Capitalized terms not otherwise defined herein have the meanings set forth in the Motion.

contested matter including the hearing on November 4, 2021, at which the Court provided findings of fact and conclusions of law supporting its determinations below, it is hereby

**ORDERED, ADJUDGED, AND DECREED THAT:**

1.      The Motion is GRANTED in part and DENIED in part, as set forth herein.

2.      The Court hereby determines that the APA is not executory for purposes of Section 365 of the Bankruptcy Code and cannot be rejected under Section 365 of the Bankruptcy Code.

3.      The Court also hereby determines, however, that Sanofi's claims for post-Petition Date breaches of the APA, including for any payment of any royalties thereunder, by the Debtors constitute pre-Petition Date unsecured claims that may be discharged under the Bankruptcy Code.

4.      This Order shall be immediately effective and enforceable upon its entry.

5.      This Court shall retain jurisdiction with respect to all matters arising from or related to the implementation and/or interpretation of this Order. This Order finally resolves the dispute presented by the Motion and is final and appealable.

**Dated: November 8th, 2021**
**Wilmington, Delaware**

**JOHN T. DORSEY**
**UNITED STATES BANKRUPTCY JUDGE**

*The parties conferred and agree that pleadings originally filed under seal with The Bankruptcy Court may be filed without without redactions, other than schedules to the APA, which will remain under seal.

AA0000002

UNITED STATES BANKRUPTCY COURT
DISTRICT OF DELAWARE

## APPEAL TRANSMITTAL SHEET

**Case Number:** 20-12522  BK ⊙ AP ◯

If AP, related BK case number: N/A

**Title of Order Appealed:** Order in Connection with Expedited Motion for Pre-Confirmation Determination that Debtors Cannot Reject or Discharge Post-Confirmation Royalty Obligations Related to Sale of Acthar Gel

**Docket #:** 5210          **Date Entered:** 11/8/2021

Item Transmitted:

| | | | |
|---|---|---|---|
| ☑ **Notice of Appeal** | **Docket #:** 5409 | **Date Filed:** 11/19/2021 |
| ☐ **Amended Notice of Appeal** | **Docket #:** | **Date Filed:** |
| ☐ **Cross Appeal** | **Docket #:** | **Date Filed:** |
| ☐ **Motion for Leave to Appeal** | **Docket #:** | **Date Filed:** |
| ☐ **Request for Certification of Direct Appeal** | **Docket #:** | **Date Filed:** |

**Appellant/Cross Appellant:**

sanofi-aventis U.S. LLC

**Appellee/Cross Appellee**

Mallinckrodt plc

**Counsel for Appellant/Cross Appellant:**

Stuart M. Brown (DE #4050)
Aaron S. Applebaum (DE #5587)
Kaitlin MacKenzie (DE #5924)

**Counsel for Appellee/Cross Appellee:**

Mark D. Collins, Esq.
Michael J. Merchant, Esq.
Robert J. Stern, Jr., Esq.
Amanda R. Steel, Esq.
Brendan J. Schlauch, Esq.

| | | |
|---|---|---|
| **Filing fee paid?** | Yes ⊙ | No ◯ |
| **IFP application filed by applicant?** | Yes ◯ | No ⊙ |
| **Have additional appeals of the same order been filed?** | Yes ◯ | No ⊙ |
| **\*If Yes, has District Court assigned a Civil Action Number?** | Yes ◯ | No ⊙ |
| **Civil Action Number:** | | |

*(continued on next page)*          AA0000003

**Notes:**

*I hereby certify that all designated items are available electronically through CM/ECF.*

**Date:** 11/22/2021          by: /s/Jason Spencer
                                   _____
                                              **Deputy Clerk**

Bankruptcy Court Appeal (BAP) Number:    21-82

AA0000004

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

|                                    |     |                                 |
| ---------------------------------- | --- | ------------------------------- |
| In re:                             | )   | Chapter 11                      |
|                                    | )   |                                 |
|                                    | )   | Case No. 20-12522 (JTD)         |
| MALLINCKRODT PLC, *et al.*         | )   |                                 |
|                                    | )   | (Jointly Administered)          |
| Debtors.[1]                        | )   |                                 |
| _____     | )   | **Re: Docket No. 5210**         |

## NOTICE OF APPEAL AND STATEMENT OF ELECTION

Pursuant to Rule 8003 of the Federal Rules of Bankruptcy Procedure and 28 U.S.C. § 158(a)(1), sanofi-aventis U.S. LLC ("**Sanofi**") submits this Notice of Appeal in conformity with Official Bankruptcy Form B417.

**Part 1: Identity of Appellant**

1. Name(s) of Appellant(s): sanofi-aventis U.S. LLC.

2. Position of Appellant(s) in the adversary proceeding or bankruptcy case which is subject of this appeal: creditor and party-in-interest.

**Part 2: Identify the subject of this appeal**

1. Describe the judgment, order, or decree appealed from:

   *Order in Connection with Expedited Motion for Pre-Confirmation Determination That Debtors Cannot Reject or Discharge Post-Confirmation Royalty Obligations Related to Sale of Acthar Gel* [D.I. 5210] (the "**Order**").

   A copy of the Order is attached hereto as **Exhibit A**.

2. State the date on which the judgment, order, or decree was entered: November 8, 2021.

**Part 3: Identify the subject of this appeal**

List the names of all parties to the judgment, order, or decree appealed from and the names, addresses, and telephone numbers of their attorneys (attach additional pages if necessary):

---

[1]     A complete list of the Debtors in these chapter 11 cases may be obtained on the website of the Debtors' claims and noticing agent at http://restructuring.primeclerk.com/Mallinckrodt. The Debtors' mailing address is 675 McDonnell Blvd., Hazelwood, Missouri 63042.

AA0000005

1. Mallinckrodt plc and its affiliated debtors listed on **Attachment 1** hereto.

   **Attorneys:**

   George A. Davis, Esq.
   George Klidonas, Esq.
   Andrew Sorkin, Esq.
   Anupama Yerramalli, Esq.
   Latham & Watkins LLP
   885 Third Avenue
   New York, New York 10022
   Telephone:     (212) 906-1200

   Jeffrey E. Bjork, Esq.
   Latham & Watkins LLP
   355 South Grand Avenue
   Suite 100
   Los Angeles, California 90071
   Telephone:     (213) 485-1234

   Jason B. Gott, Esq.
   Latham & Watkins LLP
   330 North Wabash Avenue
   Suite 2800
   Chicago, Illinois 60611
   Telephone:     (312) 876-7700

   Elizabeth Marks, Esq.
   Latham & Watkins LLP
   Clarendon Street
   Boston, Massachusetts 02116
   Telephone:     (617) 948-6000

   Mark D. Collins, Esq.
   Michael J. Merchant, Esq.
   Robert J. Stern, Jr., Esq.
   Amanda R. Steel, Esq.
   Brendan J. Schlauch, Esq.
   Richards, Layton & Finger, P.A.
   One Rodney Square
   920 North King Street
   Wilmington, Delaware 19801
   Telephone:     (302) 651-7700

EAST\186315807.1

AA0000006

**Part 4: Optional election to have appeal heard by District Court (applicable only in certain districts)**

If a Bankruptcy Appellate Panel is available in this judicial district, the Bankruptcy Appellate Panel will hear this appeal unless, pursuant to 28 U.S.C. § 158(c)(1), a party elects to have the appeal heard by the United States District Court. If an appellant filing this notice wishes to have the appeal heard by the United States District Court, check below. Do not check the box if the appellant wishes the Bankruptcy Appellate Panel to hear the appeal.

☐ Appellant elects to have the appeal heard by the United States District Court rather than by the Bankruptcy Appellate Panel.

Dated: November 19, 2021        **DLA PIPER LLP (US)**

*/s/ Stuart M. Brown*
Stuart M. Brown (DE #4050)
Aaron S. Applebaum (DE #5587)
Kaitlin MacKenzie (DE #5924)
1201 North Market Street, Suite 2100
Wilmington, Delaware 19801
Telephone: (302) 468-5700
Facsimile: (302) 394-2341
Email: stuart.brown@us.dlapiper.com
      aaron.applebaum@us.dlapiper.com
      kaitlin.mackenzie@us.dlapiper.com

- and -

Jason Hopkins (TX 24059969)
1900 North Pearl Street
Suite 2200
Dallas, Texas 75201-2482
Telephone: (214) 743-4546
Email: jason.hopkins@us.dlapiper.com

**MILLER & MARTIN PLLC**
Laura F. Ketcham
Volunteer Building Suite 1200
832 Georgia Avenue
Chattanooga, Tennessee 37402
Telephone: (423) 785-8383
Facsimile: (423) 321-1556
Email: laura.ketcham@millermartin.com

*Attorneys for sanofi-aventis U.S. LLC*

AA0000007

# ATTACHMENT 1

Acthar IP Unlimited Company
IMC Exploration Company
Infacare Pharmaceutical Corporation
INO Therapeutics LLC
Ludlow LLC
MAK LLC
Mallinckrodt APAP LLC
Mallinckrodt ARD Finance LLC
Mallinckrodt ARD Holdings Inc.
Mallinckrodt ARD Holdings Limited
Mallinckrodt ARD IP Unlimited Company
Mallinckrodt ARD LLC
Mallinckrodt Brand Pharmaceuticals LLC
Mallinckrodt Buckingham Unlimited Company
Mallinckrodt Canada ULC
Mallinckrodt CB LLC
Mallinckrodt Critical Care Finance LLC
Mallinckrodt Enterprises Holdings, Inc.
Mallinckrodt Enterprises LLC
Mallinckrodt Enterprises UK Limited
Mallinckrodt Group S.a.r.l.
Mallinckrodt Holdings GmbH
Mallinckrodt Hospital Products Inc.
Mallinckrodt Hospital Products IP Unlimited Company
Mallinckrodt International Finance SA
Mallinckrodt International Holdings S.a.r.l.
Mallinckrodt IP Unlimited Company
Mallinckrodt LLC Mallinckrodt Lux IP S.a.r.l.
Mallinckrodt Manufacturing LLC
Mallinckrodt Pharma IP Trading Unlimited Company
Mallinckrodt Pharmaceuticals Ireland Limited
Mallinckrodt Pharmaceuticals Limited
Mallinckrodt Quincy S.a.r.l.
Mallinckrodt UK Finance LLP
Mallinckrodt UK Ltd
Mallinckrodt US Holdings LLC
Mallinckrodt US Pool LLC
Mallinckrodt Veterinary, Inc.
Mallinckrodt Windsor Ireland Finance Unlimited Company
Mallinckrodt Windsor S.a.r.l.
MCCH LLC MEH, Inc.
MHP Finance LLC
MKG Medical UK Ltd

AA0000008

MNK 2011 LLC
MUSHI UK Holdings Limited
Ocera Therapeutics, Inc.
Petten Holdings Inc.
SpecGx Holdings LLC
SpecGx LLC
ST Operations LLC
ST Shared Services LLC
ST US Holdings LLC
ST US Pool LLC
Stratatech Corporation
Sucampo Holdings Inc.
Sucampo Pharma Americas LLC
Sucampo Pharmaceuticals, Inc.
Therakos, Inc.
Vtesse LLC
WebsterGx Holdco LLC
Mallinckrodt Equinox Finance LLC

AA0000009

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
| MALLINCKRODT PLC, *et al.* | ) | Case No. 20-12522 (JTD) |
|  | ) |  |
| Debtors.[1] | ) | (Jointly Administered) |
|  | ) |  |
| _____ | ) | **Re: Docket Nos. 4675, 4820, 4988 & 5207** |

## ORDER IN CONNECTION WITH EXPEDITED MOTION FOR PRE-CONFIRMATION DETERMINATION THAT DEBTORS CANNOT REJECT OR DISCHARGE POST-CONFIRMATION ROYALTY OBLIGATIONS RELATED TO SALE OF ACTHAR GEL

Upon the motion (the "**Motion**")[2] of sanofi-aventis U.S. LLC ("**Sanofi**"), for entry of an order determining that the Debtors cannot reject or discharge their post-confirmation Royalty obligations to Sanofi under the Debtors' proposed joint plan of reorganization (the "**Plan**"); and the Court having jurisdiction to consider the Motion and the relief requested therein pursuant to 28 U.S.C. §§ 157 and 1334, and the Amended Standing Order of Reference from the United States District Court for the District of Delaware dated as of February 29, 2012; and consideration of the Motion and the relief requested therein being a core proceeding under 28 U.S.C. § 157(b); and the Court having authority to enter a final order consistent with Article III of the United States Constitution; and venue being proper before this Court under 28 U.S.C. §§ 1408 and 1409; and it appearing that proper and adequate notice of the Motion has been given and that no other or further notice is necessary; and good and sufficient cause appearing therefor and upon the record of this

---

[1]     A complete list of the Debtors in these chapter 11 cases may be obtained on the website of the Debtors' claims and noticing agent at http://restructuring.primeclerk.com/Mallinckrodt.  The Debtors' mailing address is 675 McDonnell Blvd., Hazelwood, Missouri 63042.

[2]     Capitalized terms not otherwise defined herein have the meanings set forth in the Motion.

AA0000010

contested matter including the hearing on November 4, 2021, at which the Court provided findings of fact and conclusions of law supporting its determinations below, it is hereby

**ORDERED, ADJUDGED, AND DECREED THAT:**

1. The Motion is GRANTED in part and DENIED in part, as set forth herein.

2. The Court hereby determines that the APA is not execcutory for purposes of Section 365 of the Bankruptcy Code and cannot be rejected under Section 365 of the Bankruptcy Code.

3. The Court also hereby determines, however, that Sanofi's claims for post-Petition Date breaches of the APA, including for any payment of any royalties thereunder, by the Debtors constitute pre-Petition Date unsecured claims that may be discharged under the Bankruptcy Code.

4. This Order shall be immediately effective and enforceable upon its entry.

5. This Court shall retain jurisdiction with respect to all matters arising from or related to the implementation and/or interpretation of this Order. This Order finally resolves the dispute presented by the Motion and is final and appealable.

**Dated: November 8th, 2021**
**Wilmington, Delaware**

**JOHN T. DORSEY**
**UNITED STATES BANKRUPTCY JUDGE**

AA0000011

FILED UNDER SEAL

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | **)** Chapter 11 |
| | **)** |
| MALLINCKRODT PLC, *et al.* | **)** Case No. 20-12522 (JTD) |
| | **)** |
| Debtors.[1] | **)** (Jointly Administered) |
| | **)** |
| | **)** **Hearing Date: TBD** |
| | **)** |
| | **)** **Obj. Deadline: TBD** |
| | **)** |
| | **)** |

## EXPEDITED MOTION FOR PRE-CONFIRMATION DETERMINATION THAT DEBTORS CANNOT REJECT OR DISCHARGE POST-CONFIRMATION ROYALTY OBLIGATIONS RELATED TO SALE OF ACTHAR GEL

sanofi-aventis U.S. LLC ("**Sanofi**"), a creditor in the jointly administered bankruptcy cases of the above-captioned debtors (the "**Debtors**"), by and through its undersigned counsel, hereby moves, (this "**Motion**"), for entry of an order, in substantially the form attached hereto as **Exhibit A**, determining that the Debtors, through their proposed joint plan of reorganization (the "**Plan**"), cannot reject that certain asset purchase agreement pursuant to which the Debtors' predecessor obtained assets and rights to manufacture, distribute and sell Acthar Gel products, subject to a continuing royalty to Sanofi, or otherwise discharge their post-Petition Date or post-confirmation royalty obligations to Sanofi. Sanofi seeks expedited consideration of this Motion, in advance of the confirmation hearing on the Plan. In support of this Motion, Sanofi represents as follows:

### INTRODUCTION

1. The Debtors originally obtained the rights to their most valuable product, Acthar Gel, under a non-severable asset purchase agreement (the "**APA**") through a predecessor of

---

[1] A complete list of the Debtors in these chapter 11 cases may be obtained on the website of the Debtors' claims and noticing agent at http://restructuring.primeclerk.com/Mallinckrodt. The Debtors' mailing address is 675 McDonnell Blvd., Hazelwood, Missouri 63042.

Mallinckrodt Pharmaceuticals Ireland Limited ("**MP Ireland**"), under which the Debtors acquired intellectual property and other property and rights from Sanofi's predecessor, including the right to manufacture, distribute and sell Acthar Gel, in exchange for a royalty of 1% of the Debtors' annual net sales of the product in excess of $10 million (the "**Royalty**").  The ongoing sale of Acthar Gel is a necessary component of the feasibility of any plan in these Chapter 11 Cases, as the Debtors enjoy annual revenue approaching $800 million from the sale of Acthar Gel alone.[2]

    2.    Despite the fact that no Debtor scheduled the APA as an executory contract on its Schedule G, the Debtors (without specifying which Debtor) have recently taken the meritless position that they (or the undisclosed Debtor or Debtors obligated under the APA to pay the Royalty) can somehow "reject" the APA as executory, while at the same time continuing to sell Acthar Gel without paying the Royalty.  The Debtors' position raises a fundamental and threshold legal question for the Court's determination: is the APA an executory contract?  If not, the Debtors cannot reject the APA, and the Debtors cannot discharge or otherwise be excused from honoring Royalty obligations that arise post-Petition Date and/or post-confirmation.[3]  If it is, then the APA may be rejected (subject to the requirements of section 365), but not while the Debtors keep the benefits under it.  Whether the APA is executory or not, the Debtors cannot have their cake and eat it, too: nothing in the Bankruptcy Code permits the Debtors to sell Acthar Gel without also paying Sanofi the Royalty pursuant to the APA.[4]

---

[2]    *See* Disclosure Statement at p. 43 (disclosing that Acthar Gel is the single largest generator of revenue for Debtors); and p. 177 (indicating that Debtors rely on certain intellectual property to achieve feasibility, "most notably in relation to Acthar Gel").

[3]    For avoidance of doubt, references herein to "post-confirmation" assume both that the Court has confirmed the Plan and that the effective date of the Plan occurs.

[4]    To the extent the Debtors' have knowingly taken a meritless position—that they can reap the benefits of a contract without fulfilling its obligations—the Debtors' tactics reflect a complete lack of good faith.  But this appears to be exactly the Debtors' intention, as even though they listed the APA on their list of contracts to be

3.       The Court should make this determination pre-confirmation, because it significantly impacts confirmation proceedings and the scope of related discovery.  If the Court determines that the continued sale of Acthar Gel is necessarily subject to the Royalty, issues between Sanofi and the Debtors would likely be limited to the proper calculation of Sanofi's administrative expense claim for post-Petition Date Royalty payments.  While that issue is meaningful, at least to Sanofi, its resolution should not affect the Debtors' proposed timeline and ability to seek confirmation of their plan.

4.       If, however, the Court determines that the Debtors can, somehow, reject the APA while continuing to sell Acthar Gel, then the proper treatment of Sanofi's resulting damages claim must be addressed in terms of confirmation, including, *inter alia*: (1) the classification of such claim, (2) the resulting impact of such claim on other claimants who would then receive a much smaller distribution, as well as on the Debtors' ongoing contractual obligations related to Acthar Gel, such as their distribution agreement with CuraScript that they have already separately sought to assume [D.I. 4487]; and (3) whether the proposed treatment of such claim and the class into which such claim is classified discriminates unfairly so as to warrant denial of confirmation.  These confirmation issues would require substantial pre-hearing discovery and an additional one to two days of testimony and argument at the confirmation hearing.  A pre-confirmation determination, however, that either the APA is not executory, or that the APA may not be rejected while retaining its benefits, will avoid substantial expenditures of the Court's time and the parties' resources.

---

rejected under the Plan, the Debtors have readily admitted throughout these cases that the continued sale of Acthar Gel is the cornerstone of their business and intended restructuring, and their disclosure statement did not contain even the slightest hint or disclose any risk factor that the Debtors might lose the right to sell Acthar Gel as a result of rejecting the APA.

AA0000014

**JURISDICTION AND VENUE**

5.      The Court has jurisdiction over this Motion pursuant to 28 U.S.C. Sections 157 and 1334(b) and the *Amended Standing Order of Reference from the United States District Court for the District of Delaware* dated as of February 29, 2012. This is a core proceeding pursuant to 28 U.S.C. Section 157(b).

6.      Pursuant to Rule 9013-1(f) of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "**Local Rules**"), Sanofi consents to the entry of a final judgment or order with respect to this Application if it is determined that this Court, absent consent of the parties, cannot enter final orders or judgments consistent with Article III of the United States Constitution.

7.      Venue is proper before this Court pursuant to 28 U.S.C. Sections 1408 and 1409.

8.      The statutory and legal predicates for the relief requested herein is section 365 of the Bankruptcy Code ("**Bankruptcy Code**").

**FACTUAL BACKGROUND**

**A.  General Background**

9.      Each Debtor filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code on October 12, 2020 (the "**Petition Date**").

10.     On June 18, 2021, the Debtors filed the *Joint Plan of Reorganization of Mallinckrodt PLS and its Debtor Affiliates Under Chapter 11 of the Bankruptcy Code* [D.I. 2916] (as amended, revised or modified, the "**Plan**") and related *Disclosure Statement for Joint Chapter 11 Plan of Reorganization of Mallinckrodt PLC and its Debtor Affiliates Under Chapter 11 of the Bankruptcy Code* [D.I.2917] (as amended, revised or modified, the "**Disclosure Statement**").  On September 29, 2021, the Debtors filed an amended version of the Plan [D.I.

-4-

4508], which contains material adverse modifications not relevant here.  References herein to the Plan are to the amended version of the Plan (to the extent of any discrepancy).

**B.  The APA and Sanofi's Administrative Claims**

11.     On July 27, 2001, Aventis Pharmaceuticals Products Inc. ("**Aventis**"), as seller, and Questcor Pharmaceuticals, Inc. ("**Questcor**"), as purchaser, entered into the APA, pursuant to which Aventis sold certain assets and assigned certain rights, including inventory and intellectual property related to any and all dosage forms that have corticotropin as such product's active ingredient to which Aventis had rights (hereinafter, "**Acthar Gel**") to Questcor, in exchange for a purchase price consisting primarily of an annual Royalty equal to "one percent (1%) of all Net Sales in excess of ten million dollars ($10 million) in any given calendar year" for so long as the purchaser, any of its affiliates or licensees, or any of their respective successors or assigns, sells the product.  A copy of the APA is attached hereto as **Exhibit B**.  Given the Debtors' performance in selling and profiting from the sale of Acthar Gel, the Debtors' acknowledge in their schedules that the property and rights conveyed to the Debtors have a value in excess of $3 billion, while the Royalties paid as of the Petition Date aggregate less than $90 million.

12.     Debtor MP Ireland is the successor-in-interest to Questcor under the APA.  *See Assignment and Assumption* agreement, dated December 12, 2014, a copy of which is attached hereto as **Exhibit C**.  In 2014, in connection with Debtors' acquisition of Questcor and MP Ireland's assumption of Questcor's rights and obligations under the APA, Mallinckrodt represented to Sanofi, to induce Sanofi's consent to the transfer and assignment of the APA to the Debtors, that the Debtors assumed the Royalty obligation and would continue paying the Royalty.  *See* Letter dated December 12, 2014, a copy of which is attached hereto as **Exhibit D**.

AA0000016

The Debtors have not disclosed whether MP Ireland retains title and rights to the assets and rights acquired under the APA, or whether MP Ireland has attempted to transfer such assets and rights to an affiliate.  Sanofi has sought information regarding the current alleged ownership and attempted transfers of such assets and rights from the Debtors, which requests remain outstanding.

13.     Sanofi is the successor-in-interest to Aventis under the APA.

**C.  The Debtors' Proposed "Rejection" of the APA**

14.     Article V.A of the Plan provides that all executory contracts "not previously rejected, assumed, or assumed and assigned . . . will be deemed assumed as of the Effective Date pursuant to sections 365 and 1123 of the Bankruptcy Code except any Executory Contract or Unexpired Lease (1) identified on the Rejected Executory Contract/Unexpired Lease List . . . as an Executory Contact or Unexpired Lease to be rejected."  Plan, Art. V.A.

15.     On August 6, 2021, the Debtors filed "Exhibit U" to the Plan Supplement [D.I. 3596], as later amended on August 13, 2021 and on October 8, 2021 [D.I. 3721 and 4640, respectively] ("**Exhibit U**"), which is the referenced Rejected Executory Contract/Unexpired Lease List under the Plan.  Exhibit U includes a so-called "Royalty Agreement" dated July 27, 2001 between Debtor "Mallinckrodt plc" and "Aventis Intercontinental."  The Debtors have only recently confirmed this was intended to refer to the APA with Sanofi, despite mislabeling every aspect of the APA in Exhibit U.[5]

---

[5]     Indeed, even though Sanofi recently notified the Debtors that the APA was mislabeled on Exhibit U, the Debtors again failed to correct the record for the Court and other parties-in-interest when they recently filed a further amended version on October 8, 2021.  As a consequence, until the Debtors correct the record, none of the Court, Sanofi or any other party in these cases can know Debtors' true intent.

AA0000017

**RELIEF REQUESTED**

16.     By this Motion, Sanofi seeks entry of an order determining that either (1) the APA is not executory and the Debtors cannot discharge Royalty obligations that arise post-Petition Date or post-confirmation; or (2) that the APA is executory and, if the Court makes other predicate findings and determinations to authorize rejection, may be rejected, but that the Debtors may not retain the benefits under the APA—selling Acthar Gel—after rejection.

**BASIS FOR RELIEF**

17.     Section 1123(b)(2) of the Bankruptcy Code provides that a plan may, "subject to section 365 of this title, provide for the assumption, rejection, or assignment of any executory contract or unexpired lease of the debtor not previously rejected under this title." 11 U.S.C. § 1123(b)(2).

18.     Section 1141(d)(1)(A), in turn, provides that "confirmation of a plan – (A) discharges the debtor from any debt that arose before the date of such confirmation, and any debt of a kind specified in section 502(g), 502(h), or 502(i) of this title . . ." 11 U.S.C. 1141(d)(A).

### A. The Debtors Cannot Reject the APA if it is Not an Executory Contract and Cannot Discharge Post-Petition Date or Post-Confirmation Royalty Obligations Arising Thereunder

19.     If the Court determines that the APA is not an executory contract, then the Debtors cannot reject it and they cannot discharge Royalty obligations that arise post-Petition Date  or after confirmation of the Plan.

20.     An executory contract is "a contract under which the obligation of both the bankrupt and the other party to the contract are so far underperformed that the failure of either to complete performance would constitute a material breach excusing the performance of the other." *In re Exide Technologies*, 607 F.3d 957, 962 (3d Cir. 2010).  Contracts are not executory where one party has substantially performed and, therefore, did not owe any "material continuing

AA0000018

obligation[s]." *Id.* at 964; *see also*, *In re Weinstein Co. Holdings*, 997 F.3d 497, 507 (3d Cir. 2021) (contract not executory where one party had already substantially performed and no material unperformed contractual obligations remained); *In re Foothills Texas, Inc.*, 476 B.R. 143 (Bankr. D. Del. 2012) (assignment of 5% working interest in oil and gas lease was in the nature of an 'overriding royalty interest' and, where assignee had already fully paid for such interest, instrument was not executory); *In re Learning Publications, Inc.*, 94 B.R. 763 (Bankr. M.D. Fla. 1988) (sale agreement by author of copyright and publishing rights, subject to royalty obligation, was not executory, because author had no continuing material performance obligations); *In re Monument Record Corp.*, 61 B.R. 866 (Bankr. M.D. Tenn. 1986) (agreement between performer and record company that left record company only with obligation to pay royalties was not executory because it had been fully performed by one party).

21.      The Court can determine that the APA is not executory for the straightforward reason that Sanofi has fully performed all obligations under it; there are no factual disputes between the parties to Sanofi's knowledge.  Sanofi (through its predecessor) delivered the Assets (as defined in the APA), which was Sanofi's sole material obligation under the APA.  Sanofi has no "material continuing obligation."  Exide, 607 F.3d at 962.

22.      If the Court finds that Sanofi has no material continuing obligation under the APA, which determination can be made upon a review of the four corners of the APA, the APA cannot be assumed or rejected and the Debtors remain, and the reorganized debtors will remain, bound by it.  *See*, *e.g.*, *In re Hays & Co. v. Merrill Lynch, Pierce, Fenner & Smth, Inc.*, 885 F.2d 1149 (3d Cir. 1989) ("a trustee is generally bound by the debtor's non-executory contracts); *see also*, *In re Weinstein Co. Holdings LLC*, 997 F.3d 497, 511 (3d Cir. 2021) ("the Bankruptcy Code views the . . . Agreement as a non-executory contract that is in essence a liability for the

AA0000019

Debtors"); *In re JZ L.L.C.*, 371 B.R. 412, 425 (B.A.P. 9th Cir. 2007) ("Contracts that are not executory do not need to be assumed in order to remain in effect and typically are viewed as assets or liabilities in bankruptcy"); *In re Surfside Resort & Suits, Inc.*, 344 B.R. 179, 192 (Bankr. M.D. Fla. 2006) ("non-executory contracts 'ride through' a bankruptcy case."); *In re Access Beyond Techs, Inc.*, 237 B.R. 32, 41 (Bankr. D. Del. 1991) ("If the License Agreement were not executory, it would not be subject to the proscriptions contained in section 365 and would survive the bankruptcy case unaffected").

23. If the Court so finds, the APA would ride through confirmation unaffected, and the parties to it would remain bound by its terms. *Hays*, *supra*; *Stewart Foods*, 64 F.3d at 145 ("Because § 365 applies only to executory contracts, a debtor-in-possession does not have the option of rejecting or assuming non-executory contracts and remains bound by the debtor's obligations under those contracts after the bankruptcy filing"); *JZ*, 371 B.R. at 425 (discussing why non-executory contracts should ride through bankruptcy); *see also National Labor Relations Board v. Bildisco*, 465 U.S. 513, 546 n. 12 (1984) ("In the unlikely event that the contract is neither accepted nor rejected, it will "ride through" the bankruptcy proceeding and be binding on the debtor even after a discharge is granted. The nondebtor party's claim will therefore survive the bankruptcy proceeding."); *In re Hernandez*, 287 B.R. 795, 799–803 (Bankr. D. Ariz. 2002) (discussing the ride through doctrine).

24. In sum, if the APA is not executory, the Debtors may not reject it. Instead, the situation addressed in *Monument* is analogous: "[i]f continued use of the Orbison recordings is not economically advantageous then the debtor can seek to sell its rights in those recordings or otherwise dispose of its interests. If continued use is economically advantageous, then the debtor

AA0000020

can market and use the recordings . . . subject to the obligation to pay royalties." *Id*. at 869. The Debtors here have the same options.

### B. If the APA is Executory, the Debtors Cannot Reject It While Continuing to Sell Acthar Gel Without Paying the Royalty

25.     If, on the other hand, the Court determines that the APA *is* an executory contract (which Sanofi does not concede and the Debtors have the burden to prove), then the Debtors cannot reject it while keeping the benefits, i.e., the Debtors may not sell Acthar Gel without paying the Royalty. Neither the Bankruptcy Code nor applicable law permit the Debtors to reject the burdens of a contract, while assuming or retaining the benefits. *See, e.g., Sharon Steel Corp. v. National Fuel Gas Distribution Corp.,* 872 F.2d 36, 40 (3d Cir. 1989) ("we acknowledge the general principle that a debtor may not reject a contract but maintain its benefits"); *In re Heafitz*, 85 B.R. 274, 283 (Bankr. S.D.N.Y. 1988) (trustee must either reject contract in full or assume contract in full, which includes both benefits and burdens); *In re Holland Enterprises, Inc.*, 25 B.R. 301, 303 (Bankr. E.D.N.C. 1982) ("Debtor cannot have its cake and eat it too. . . ." "a debtor may not retreat to [section 365], derived from the inherent equitable powers of the bankruptcy courts, to avoid an obligation while it enjoys a benefit which arises in conjunction with that obligation").

26.     Under the Plan, the Debtors seek to "reject" the APA, presumably based on the misguided belief that such rejection would permit the Debtors to continue selling Acthar Gel without having to pay the Royalty annually. The Debtors cannot use rejection under section 365 as a sword selectively to reject only the Debtors' obligation to pay the Royalty, while keeping the right to sell Acthar Gel royalty-free. But this inequitable result is evidently exactly what the Debtors intend. Indeed, the Debtors failed to include any indication at all in the Disclosure Statement that they intended to "reject" the very agreement under which they acquired the rights

AA0000021

to Acthar Gel, let alone any discussion of how their business would be affected and disrupted if the Debtors were to lose such rights as a result of rejection.  The absence of any such discussion demonstrates the Debtors' lack of good faith in proposing in the Plan to reject the APA in the first place, as they only intended to proceed with such rejection if they could realize an inequitable windfall contrary to applicable law at Sanofi's expense.

27.     The Debtors' suggestion that they can reject the APA and then somehow continue to sell Acthar Gel free of the Royalty flies in the face of established bankruptcy principles; it is akin to a debtor rejecting a lease and then suggesting that it should be permitted to retain the right to occupy the leased premises without paying rent or other obligations under the rejected lease.  If the Debtors wish to continue selling Acthar Gel, they must pay the annual Royalty. Alternatively, they can stop selling Acthar Gel and return the intellectual property to Sanofi, or they can sell the property they acquired under the APA to a third-party subject to the Royalty obligation.  Because the Debtors improperly attempt to use the Plan to reap the benefits of the APA while rejecting its burdens, the Debtors have subjected confirmation of the Plan to meritorious confirmation objections that the Plan violates the Bankruptcy Code and was not proposed in good faith, thereby rendering the Plan unconfirmable.[6]

### BASIS FOR PRE-CONFIRMATION RELIEF

28.     Whether the APA is executory is a threshold issue regarding Sanofi's involvement in the confirmation process with respect to the Debtors' Plan.  If the Court determines either (1) that the APA is not executory, such that post-confirmation obligations to pay the Royalty annually ride through the bankruptcy unaffected, or (2) that the APA is executory, but that the Debtors may not retain the benefits under it while avoiding their

---

[6]     Sanofi reserves all rights to object to confirmation of the Plan on these and any other applicable bases.

AA0000022

obligations under it, then the universe of potential disputes between Sanofi and the Debtors would likely be limited to extent of Sanofi's pre-Petition Date claims and proper classification of such claims and post-Petition Date administrative claims. At most, Sanofi believes this to be an approximate $6 million issue, which, in the larger context of the Debtors' bankruptcy cases, however determined, would not materially affect the Debtors' ability to confirm the Plan.

29.     If, however, the Court determines that that the APA *is* an executory contract or that the Debtors can somehow discharge their post-confirmation Royalty obligations, then the Plan would potentially affect Sanofi in a multitude of ways that Sanofi would need to address through discovery and during the confirmation hearing, including, without limitation, Sanofi's objection to: (a) the Debtors' business judgment in seeking to reject the APA in light of the obvious dependence of the Debtors' business enterprise on the continued sale of Acthar Gel; (b) the Debtors' unlawful attempt to reject the APA while keeping the right to sell Acthar Gel; (c) the Plan's unfair and discriminatory treatment of the class into which the Debtors have classified Sanofi's claims, including damages claims in excess of $100 million; (d) whether the Plan satisfies the best interest of creditors test; and (e) whether the Plan is feasible in light of the fact that the Debtors, upon rejection, would lose the right to continue selling Acthar Gel.

30.     Because *none* of these issues should need to be addressed if the Court determines either that the APA is not executory, or that it is executory but must be rejected or assumed in full, Sanofi respectfully suggests that this discrete legal issue should be determined now, before the parties devote significant further resources in discovery and trial preparation for a confirmation dispute that could easily be avoided. Addressing this threshold issue prior to confirmation is also consistent with the Debtors' handling of their motion to assume their distribution agreement related to Acthar Gel [D.I. 4487], as well as the Acthar antitrust parties'

-12-

AA0000023

arguments that the legality of the Debtors' sales of Acthar Gel and related issues are confirmation or pre-confirmation issues.

## CONCLUSION

**WHEREFORE**, Sanofi respectfully requests that the Court enter an order, in substantially the form submitted herewith as **Exhibit A**, (I) (A) determining that the Debtors cannot reject or discharge their post-confirmation Royalty obligations to Sanofi under the Plan; and (II) granting such other and further relief as the Court deems warranted.

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

AA0000024

**DLA PIPER LLP (US)**

Dated: October 12, 2021

/s/   *Stuart M. Brown*
Stuart M. Brown (DE #4050)
Aaron S. Applebaum (DE #5587)
Kaitlin W. MacKenzie (DE #5924)
1201 North Market Street, Suite 2100
Wilmington, Delaware 19801
Telephone: (302) 468-5700
Facsimile: (302) 394-2341
E-mail: stuart.brown@us.dlapiper.com
        aaron.applebaum@us.dlapiper.com
        kaitlin.mackenzie@us.dlapiper.com
                - and -

Jason Hopkins (TX 24059969)
1900 N. Pearl St., Suite 2200
Dallas, TX 75201-2482
Telephone: (214) 743-4546
Email:  jason.hopkins@us.dlapiper.com

**MILLER & MARTIN PLLC**
Laura F. Ketcham
Volunteer Building Suite 1200
832 Georgia Avenue
Chattanooga, TN 37402
Telephone: (423) 785-8383
Facsimile: (423) 321-1556
E-mail:  laura.ketcham@millermartin.com

*Attorneys for sanofi-aventis U.S. LLC*

AA0000025

## **EXHIBIT B**

Asset Purchase Agreement

(filed under seal)

AA0000026

# ASSET PURCHASE AGREEMENT

THIS ASSET PURCHASE AGREEMENT (the "Agreement"), dated as of July 27, 2001 (the "Effective Date"), is made and entered into by and between AVENTIS PHARMACEUTICALS PRODUCTS INC., a Delaware corporation ("Seller"), and QUESTCOR PHARMACEUTICALS, INC., a California corporation ("Purchaser").  Capitalized terms used in this Agreement shall have the meanings ascribed to them in Article I hereof or as otherwise set forth herein.

## RECITALS

WHEREAS, Seller is engaged in the business of manufacturing and selling the Product (as defined herein), with such Product being sold under the Trademarks (as defined herein); and

WHEREAS, Seller desires to sell, transfer and assign to Purchaser, and Purchaser desires to purchase and acquire from Seller, any and all rights in, to and under the Product and related Assets (as defined herein), and in connection therewith, Purchaser has agreed to assume certain liabilities of Seller relating to the Product and such Assets, all on the terms and conditions set forth herein.

NOW, THEREFORE, in consideration of the mutual covenants and agreements set forth in this Agreement, and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the parties hereto hereby agree as follows:

## ARTICLE I

## DEFINITIONS

The following terms shall have the meanings set forth below.  Unless the context indicates otherwise, the singular shall include the plural and the plural shall include the singular.

1.1 "Affiliate" shall mean any entity that directly, or indirectly through one or more intermediaries, controls or is controlled by or is under common control with the party specified. For the purposes of this Section 1.1 only, "control" will refer to (a) the possession, directly or indirectly, of the power to direct the management or policies of a person or entity, whether through the ownership of voting securities, by contract or otherwise, or (b) the ownership, directly or indirectly, of at least fifty percent (50%) (or, if less, the maximum ownership interest permitted by law) of the voting securities or other ownership interest of an entity.

1.2 "Agreement" shall have the meaning set forth in the preamble.

1.3 "Assets" shall have the meaning set forth in Section 2.1 herein.

1.4 "Assumed Liabilities" shall have the meaning set forth in Section 2.2(a) herein.

1.5 "Athena Agreement" shall mean any and all agreements, written or oral, between Seller or any of its Affiliates and Athena Rx Home Pharmacy, a division of Elan Pharmaceuticals, Inc.

AA0000027

1.6    "Business Day" or "business day" shall mean a day other than Saturday, Sunday or any day on which banks located in the State of Delaware are authorized or obligated to close. Whenever this Agreement refers to a number of days, such number shall refer to calendar days unless Business Days (or business days) are specified.

1.7    "Effective Date" shall have the meaning set forth in the preamble.

1.8    "Equipment" shall have the meaning set forth in Section 2.1(d) herein.

1.9    "FDA" shall mean the United States Food and Drug Administration or any successor entity thereto.

1.10    "FDA Meeting" shall mean the February 7, 2001 meeting between representatives of the FDA, Seller and Purchaser.

1.11    "Finished Product Inventory" shall have the meaning set forth in Section 2.3(b).

1.12    "Governmental or Regulatory Authority" shall mean any court, tribunal, arbitrator, authority, agency, commission, official or other instrumentality of the United States or any state, county, city or other political subdivision within the United States.

1.13    "Indemnitee" shall have the meaning set forth in Section 5.2 herein.

1.14    "Indemnitor" shall have the meaning set forth in Section 5.2(a) herein.

1.15    "Inventory" shall have the meaning set forth in Section 2.1(e) herein.

1.16    "Knowledge" or "knowledge" shall mean actual knowledge after reasonable investigation by any executive officer of those things which a reasonably diligent inquiry and exercise of means of information at hand would have disclosed.

1.17    "Labeling Material" shall have the meaning set forth in Section 6.3 herein.

1.18    "Laws" shall mean all laws, statutes, rules, regulations, ordinances and other pronouncements having the effect of law of the United States or any state, county, city or other political subdivision within the United States or of any Governmental or Regulatory Authority.

1.19    "Losses" shall mean any and all liabilities, debts, obligations, damages, fines, penalties, deficiencies, losses and expenses (including, without limitation, interest, court costs, amounts paid in settlement, reasonable fees of attorneys, accountants and other experts or other reasonable expenses of litigation or other proceedings or of any claim, default or assessment).

1.20    "NDA" shall mean the New Drug Application filed with the FDA under application number 8-372.

1.21    "Net Sales" shall mean total gross invoiced sales of the Product, including any sales of the Product under any trademark other than the Trademark, by Purchaser, its Affiliates

AA0000028

and/or their respective assignees, licensees or distributors to a Third Party end user, less the following deductions to the extent included in such gross invoiced sales price for the Product, or otherwise directly paid or incurred by Purchaser, its Affiliates, sublicensees and/or their respective assignees, licensees or distributors with respect to the sale of the Product to non-Affiliates:

(a)    any rebates, quantity, trade and cash discounts, retroactive price reductions, and other usual and customary discounts to customers accrued and subsequently paid, in the ordinary course of business;

(b)    returns;

(c)    freight, transportation, postage and insurance to the extent included in the invoice price; and

(d)    sales taxes, tariffs, duties and other governmental charges (including value added tax) actually paid in connection with the sale (but excluding income taxes).

1.22    "NORD Agreement" shall mean any and all agreements, written or oral, between Seller or any of its Affiliates and the National Organization for Rare Disorders, Inc.

1.23    "Product" shall mean any and all dosage forms of the finished product that have corticotropin as such product's active ingredient that Seller has rights to.

1.24    "Proprietary Rights" shall have the meaning set forth in Section 2.1(c) herein.

1.25    "Purchase Price" shall have the meaning set forth in Section 2.3 herein.

1.26    "Purchaser" shall have the meaning set forth in the preamble.

1.27    "Regulatory Documents" shall have the meaning set forth in Section 2.1(b) herein.

1.28    "Remaining Inventory" shall have the meaning set forth in Section 2.3(b) herein.

1.29    "Retained Liabilities" shall have the meaning set forth in Section 2.2(b) herein.

1.30    "Royalty Payment" shall have the meaning set forth in Section 2.3(c) herein.

1.31    "Seller" shall have the meaning set forth in the preamble.

1.32    "Third Party" shall mean a person or entity other than Seller, Purchaser or Affiliates of either.

1.33    "Trademarks" shall mean ACTHAR and ACTHAR GEL.

AA0000029

## ARTICLE 2

## SALE OF ASSETS. LICENSE GRANT, CLOSING AND CERTAIN POST-CLOSING OBLIGATIONS

2.1    Sale of Assets.  As of the Effective Date, and subject to the terms and conditions of this Agreement, Seller hereby sells, assigns, conveys, transfers, and delivers to Purchaser, and Purchaser purchases and accepts from Seller, the following assets related to the Product (collectively, the "Assets"):

(a)    any and all of Seller's and its Affiliates' rights, title, and interests in, to and under the Trademarks in any country of the world, together with the goodwill of the business symbolized by the Trademarks, including but not limited to, common law rights and the registrations listed in **Schedule 2.1(a)** attached hereto;

(b)    any and all of Seller's and its Affiliates' rights, title, and interest in, to and under the NDA and all related regulatory filings, and any regulatory filings of Seller for the Product outside the United States (if any), and including, without limitation, all documents related to the safety database and medical information files for the Product (collectively, the "Regulatory Documents");

(c)    any and all of Seller's and its Affiliates' rights, title and interest in, to and under any and all know-how and other proprietary rights owned and/or controlled by Seller or its Affiliates and used in the manufacture and/or testing of the Product, including, without limitation, records, processes and procedures used in the extraction process, biological assay testing and manufacturing of the Product (collectively, the "Proprietary Rights");

(d)    the equipment set forth on **Schedule 2.1(d)** attached hereto (the "Equipment"); and

(e)    the Product inventory set forth on **Schedule 2.1(e)** attached hereto delivered to Purchaser in accordance with the terms and conditions of this Agreement, consisting of finished Product, work-in-progress, raw materials (active ingredients and excipients), packaging materials and other supplies and materials on hand, to the extent used exclusively in the production of the Product (collectively, the "Inventory"). Inventory held pursuant to the terms of the Athena Agreement at Athena Rx Home Pharmacy's place of business is expressly excluded from the Assets.

2.2    Liabilities.

(a)    **Assumed Liabilities.**  On the Effective Date, and subject to the terms and conditions of this Agreement, Purchaser assumes and agrees to pay, perform and discharge when due the following liabilities and obligations arising in connection with the Assets (the "Assumed Liabilities"):

(i)    **Obligations under the Trademarks and Regulatory Documents.**  All liabilities and obligations under the Trademarks and the Regulatory Documents arising and to be performed on or after the Effective Date.

AA0000030

(ii)    Medicaid/Medicare Rebates; Chargebacks; Credits.

(1)    State and federal Medicaid/Medicare rebates in connection with the Product sold by Purchaser after the Effective Date;

(2)    Chargeback rebates and similar payments to wholesalers and other distributors in connection with the Product in the Territory beginning one month after the Effective Date; and

(3)    Credits, utilization based rebates, reimbursements, and similar payments to buying groups, insurers and other institutions in connection with the Product sold by Purchaser after the Effective Date.

(iii)    **Recalls.** From and after the Effective Date, all liabilities, obligations and responsibilities relating to voluntary and involuntary recalls of units of the Product sold by Purchaser after the Effective Date.

(iv)    **Products Liability.** From and after the Effective Date, all liabilities, obligations and responsibilities relating to product liability claims or threatened claims relating to units of the Product sold by Purchaser after the Effective Date; provided, however, that liability for such claims or threatened claims shall not be assumed by Purchaser solely to the extent such claims arise from: (i) the manufacturing, storage or handling of Finished Product Inventory by Seller or its Affiliates before shipment of such Finished Product Inventory to Purchaser; and (ii) the storage or handling of the Remaining Inventory by Seller or its Affiliates after the Effective Date.

(v)    **Returns.** From and after the Effective Date, all liabilities and obligations with respect to return of units of Product, provided that Seller shall reimburse Purchaser for the actual cost of credits given to the trade for returned Product with respect to returns received at any time regarding units of Product sold by Seller prior to the Effective Date. Purchaser shall provide Seller with reasonably detailed documentation for any costs to be reimbursed by Seller hereunder and Seller shall have the right to audit such documentation pursuant to the procedures set forth in Section 2.6(d) herein.

(b)    **Retained Liabilities.** Except for the Assumed Liabilities and as set forth in this Agreement, Purchaser shall not assume by virtue of this Agreement or the transactions contemplated hereby, and shall have no liability for, any Losses of Seller of any kind, character or description, whatsoever or wheresoever, including, but not limited to, any obligations or Losses with respect to the NORD Agreement, the Athena Agreement or distribution of Product by Seller pursuant to such Agreements (the "Retained Liabilities").

2.3    **Purchase Price.** Subject to the terms and conditions of this Agreement, Purchaser shall pay to Seller as full and fair consideration for the Assets the following consideration (the "Purchase Price"):

(a)    Upon the later to occur of (i) the date of the first commercial shipment of Product by Purchaser to a Third Party or (ii) the date that is ninety (90) days after the Effective

Date, Purchaser shall pay to Seller One Hundred Thousand Dollars ($100,000) by wire transfer to an account designated by Seller; and

(b)    Upon the later to occur of (i) the date of the first commercial shipment of Product by Purchaser to a Third Party or (ii) the date that is ninety (90) days after the Effective Date, Purchaser shall pay Seller Eleven Dollars ($11.00) per vial as the total purchase price for all of the filled and labeled vials of finished Product in the Inventory and available for sale to Purchaser as of the Effective Date (the "Finished Product Inventory"), an estimate of which is set forth on **Schedule 2.1(e)** attached hereto.  In addition, in accordance with the provisions of Section 2.5 herein, Purchaser shall pay Seller for any of the Inventory described on **Schedule 2.1(e)** other than the Finished Product Inventory purchased as described in the first sentence of this Section 2.3(b), including any of the frozen mini-bombs of active raw ingredient, that is used by Purchaser to produce product to be sold by Purchaser to the trade, (the "Remaining Inventory"), such Inventory to be sold to Purchaser by Seller at a purchase price equal to Seller's standard costs for such Inventory, the standard costs for which are set forth on **Schedule 2.1(e)**, and payment shall be due and payable upon receipt of such Inventory delivered in accordance with Section 2.5; and provided, however, that Purchaser shall not be obligated to purchase any more than one hundred twenty five percent (125%) of the estimate set forth on **Schedule 2.1(e)**; and

(c)    for so long as Purchaser, any of its Affiliates or any of its licensees, or any of their respective successors or assigns, sells the Product, Purchaser shall pay to Seller an annual royalty equal to one percent (1%) of all Net Sales in excess of Ten Million Dollars ($10,000,000) in any given calendar year (the "Royalty Payment"), pursuant to the terms and conditions of Section 2.6 herein.

2.4    **Grant of Security Interest.**  Purchaser hereby grants to Seller a purchase money security interest in and to the Assets, as security solely for the performance by Purchaser of its payment obligations only for the portion of the Purchase Price set forth in Sections 2.3(a) and 2.3(b), together with the right of Seller to repossess the Assets with reasonable advance written notice in the event such obligations are not paid in full within thirty (30) days after becoming due and payable (the "Security Interest").  Purchaser agrees to execute all documents, including without limitation, an UCC-1 Financing Statement or its equivalent, reasonably necessary for Seller to perfect the Security Interest.  The Security Interest shall terminate automatically upon receipt by Seller of the payments set forth in Sections 2.3(a) and 2.3(b).  Promptly upon receipt of such payments, Seller shall execute all documents reasonably necessary to remove and eliminate the Security Interest, including, without limitation, any liens arising therefrom.

2.5    **Inventory.**

(a)    **Finished Product Inventory.**  Promptly after the Finished Product Inventory has been relabeled as provided in Section 6.3, Seller shall ship to Purchaser, FOB Seller's distribution facility on a carrier designated by Purchaser, all of such relabeled Finished Product Inventory.  Payment for such Finished Product Inventory shall be made by Purchaser as described in Section 2.3(b) hereof.

AA0000032

(b)    **Remaining Inventory.**  Seller shall retain the Remaining Inventory in Seller's possession and control after the Effective Date and until: (i) such Remaining Inventory is used by Seller to manufacture filled and labeled vials of finished Product from all or any part of such Remaining Inventory pursuant to Section 6.1(a); and/or (ii) Seller ships all or any part of such Remaining Inventory to Purchaser or to a Third Party designated by Purchaser. Notwithstanding the other provisions of this Section 2.5(b), Seller shall have no obligation to retain or maintain such Remaining Inventory longer than one (1) year after the Effective Date and Purchaser expressly acknowledges that Remaining Inventory may be used in manufacturing under the Supply Agreement and may be unavailable or available in different quantities thereafter as set forth herein.  Payment for such Remaining Inventory shall be made by Purchaser as described in Section 2.3(b) hereof.  During the period after the Effective Date that Seller remains in possession and control of the Remaining Inventory, Seller shall use reasonable commercial efforts to maintain such Remaining Inventory in accordance with the specifications therefor.

(c)    **Shipping.**  All shipments hereunder shall be FOB Seller's distribution facility and the risk of loss for such shipments shall pass to Purchaser upon the transfer of the Inventory to the carrier designated by Purchaser for each such shipment.  Seller shall, at its sole cost and expense, package and label Finished Product Inventory and Remaining Inventory (to the extent purchased by Purchaser) for shipping to Purchaser using reasonable commercial diligence to prevent breakage, spoilage or damage to such Finished Product Inventory and Remaining Inventory.

2.6    **Royalty Payments.**

(a)    **Annual Report and Payment.**  Within thirty (30) days after the end of each calendar year following the Effective Date during which Purchaser records any Net Sales, Purchaser shall provide to Seller a written report setting forth in reasonable detail, including, without limitation, the deductions taken in computing Net Sales, the total amount of Net Sales for such calendar year and the amount of any Royalty Payment due to Seller based on (i) the Net Sales for such calendar year and (ii) the Royalty Payment terms and conditions set forth in Section 2.3(c) herein.  Each such annual report shall include payment in the amount of any Royalty Payment due to Seller for the calendar year to which the annual report relates.

(b)    **Taxes.**  Any tax required to be withheld by Purchaser on Royalty Payments due Seller hereunder shall be deducted from the amount of Royalty Payments otherwise due, and Purchaser shall supply Seller with appropriate evidence of such tax and payment thereof.

(c)    **Books and Records.**  Purchaser shall, and shall require its licensees or distributors to, maintain full and complete books and records of all information necessary for the computation of Net Sales and the royalties payable hereunder for a period of three (3) years after the end of the fiscal year to which they relate.  All such books and records shall be maintained in accordance with generally accepted accounting principles consistently applied.

(d)    **Audit Rights.**  Upon reasonable prior written notice to Purchaser, Seller shall have the right at any time (but no more often than once yearly and in any event within three

AA0000033

(3) years after the close of the year to which the audit relates) to have an audit performed of the books of account and other records of Purchaser during normal business hours for the sole purpose of verifying the Royalty Payments made hereunder. The fees and expenses of any such audit shall be borne by Seller, except in the event that the audit reveals an underpayment of more than five percent (5%) of the actual amount determined to be due, whereupon such fees and expenses shall be borne by Purchaser. Purchaser shall within sixty (60) days of the results of such audit provide for payment of amounts which are underpaid, unless a bona fide dispute exists as to the results of such audit.

2.7    **Delivery of Documentation.**  Within twenty (20) days after the Effective Date, Seller shall, at its sole cost and expense, deliver to Purchaser, at the address set forth in Section 7.3 herein, originals of the materials comprising the Regulatory Documents (provided that Seller shall have the right to retain one copy of such Regulatory Documents solely for its archival purposes); provided, however, that if, Purchaser receives an inquiry from the FDA or an equivalent foreign regulatory agency relating to the Product, then Seller shall use its best efforts to deliver to Questcor such documentation within ten (10) days of the Effective Date or allow Questcor to have access to such documentation at its current location so that Questcor may respond as necessary to such inquiry.

2.8    **Taxes.**  Purchaser shall be responsible for and shall promptly pay all federal, state, and local transfer, sales, and other taxes, if any, levied or imposed as a result of the transactions contemplated by this Agreement, excluding any tax payable on any income or gain of Seller.

2.9    **Further Actions by the Parties.**  Each of the parties shall use its reasonable commercial efforts to take all actions and to do all things necessary, proper, or advisable in order to consummate and make effective the transactions contemplated by this Agreement.

## ARTICLE 3

## REGULATORY MATTERS

3.1    **Filings with Governmental or Regulatory Authorities Regarding Transfer of the NDA and Foreign Equivalents.**

(a)    On or promptly after the Effective Date, but not later than ten (10) days after the Effective Date, the parties shall each file with the FDA a letter containing any information required pursuant to 21 C.F.R.  § 314.72, or any successor regulation thereto, regarding the transfer of ownership of the NDA from Seller to Purchaser (the "Notification Letters"). In their respective Notification Letters, Seller shall file the information required of a former owner of the NDA, and Purchaser shall file the information required of a new owner of the NDA. The parties shall file such Notification Letters in a form similar to the sample letters set forth in **Schedule 3.1**. The parties also agree to use their best efforts to take any and all other actions required by the FDA, or other necessary Governmental or Regulatory Authorities, if any, to effect the transfer of the NDA from Seller to Purchaser. Seller may retain an archival copy of the NDA, including supplements and records that are required to be kept under 21 C.F.R.  § 314.81.

AA0000034

(b)     Seller shall transfer to Purchaser, at Purchaser's request and sole expense, any Regulatory Documents relating to filings equivalent to the NDA made outside the United States.  In addition, Seller will use its best efforts, at Purchaser's request and sole cost and expense, to cause its Affiliates to transfer any regulatory filings of Seller's Affiliates for the Product outside the United States (if any).

3.2    Responsibility for the Assets and the Product.

(a)     Subject to Section 6.1(b), on the date of receipt by the FDA of the Notification Letter of Seller, Purchaser shall assume all regulatory responsibilities permitted by applicable laws and regulations to be assumed by Purchaser, reporting and otherwise, in connection with the Assets and the Product including, but not limited to, responsibility for reporting any adverse drug events in connection with the Product, and responsibility for compliance with the Prescription Drug Marketing Act of 1987, as the same may be amended from time to time; provided however, that from the Effective Date until the date that the FDA is notified of such transfer, Purchasers shall only be obligated to assume such responsibilities to the extent permitted by law, and the parties shall work together to assure that such obligations are met during such period.

(b)     The parties will agree upon procedures to ensure a smooth transition from Seller to Purchaser of the activities required to be undertaken by the holder of the NDA.

(c)     Upon the Effective Date, Purchaser shall assume all responsibility for any and all fee obligations for holders or owners of approved new drug applications and approved, marketed prescription drug products relating to the Assets and Product, including, but not limited to, those defined under the Prescription Drug User Fee Act of 1992, as the same may be amended from time to time.

(d)     Promptly after the Effective Date, Purchaser and Seller shall take all actions necessary or required under applicable Laws to reflect that the Assets are owned by Purchaser and that Purchaser has responsibility therefor.

## ARTICLE 4

## REPRESENTATIONS AND WARRANTIES

4.1    **Representations and Warranties of Seller**.  Seller represents and warrants to Purchaser as follows:

(a)     **Organization and Standing.**  Seller is a corporation, duly organized, validly existing and in good standing under the laws of the jurisdiction of its incorporation.

(b)     **Power and Authority.**  Seller has all requisite corporate or limited liability company power and authority to execute, deliver, and perform this Agreement and the other agreements and instruments to be executed and delivered by it pursuant hereto and to consummate the transactions contemplated herein and therein.  The execution, delivery, and performance of this Agreement by Seller does not, and the consummation of the transactions contemplated hereby will not, violate any provisions of Seller's organizational documents,

AA0000035

bylaws, any law or regulation applicable to Seller, or any agreement, mortgage, lease, instrument, order, judgment, or decree to which Seller is a party or by which Seller is bound or result in the creation or acceleration of any lien charge, security interest, or other encumbrance on the Assets.

(c)     **Corporate Action; Binding Effect.**  Seller has duly and properly taken all action required by law, its organizational documents, or otherwise, to authorize the execution, delivery, and performance of this Agreement and the other instruments to be executed and delivered by it pursuant hereto and the consummation of transactions contemplated hereby and thereby.  This Agreement has been duly executed and delivered by Seller and constitutes, and the other instruments contemplated hereby when duly executed and delivered by Seller will constitute, legal, valid, and binding obligations of Seller enforceable against it in accordance with their respective terms, except as enforcement may be affected by bankruptcy, insolvency, or other similar laws and by general principles of equity as applied by a court of competent jurisdiction.

(d)     **Consents.**  No consent or approval of, or filing with or notice to, any Governmental or Regulatory Authority or any other person not a party to this Agreement is required or necessary to be obtained by Seller or on its behalf in connection with the execution, delivery, and performance of this Agreement or to consummate the transactions contemplated hereby, except as contemplated by Section 3.1 hereof.

(e)     **Ownership of Assets; Condition of Assets.**  Seller is the sole owner of the Assets and the Assets are free and clear of all liens, claims, charges, or encumbrances.

(f)     **Finished Product Inventory Warranty.**  The Finished Product Inventory delivered hereunder shall conform to the specifications therefor, and shall have been manufactured in accordance with cGMP and the manufacturing process as approved by the FDA at the time of manufacture.

(g)     **Litigation or Disputes.**  There is no claim, outstanding commitment to any governmental regulatory agency, action, suit, proceeding, investigation, or arbitration pending or, to Seller's knowledge, threatened against Seller relating to the Assets, and Seller is not in violation of or in default with respect to any applicable law, rule, regulation, judgment, order, writ, injunction, award, or decree of any arbitrator, court, or administrative body, the result of any of which, either individually or cumulatively, would have a materially adverse effect on the Assets or Seller's compliance with and performance under the terms of this Agreement.

(h)     **Patents, Trademarks and Proprietary Rights.**

(i)     Seller is not aware of any unexpired patent that claims or covers any of the Assets owned by Seller (the "Patent").  To the extent that a Patent or patent application exists as of the Effective Date of this Agreement, Seller covenants not to sue Purchaser under such Patent or any other patent issuing from a patent application that claims priority to the patent application that issued into such Patent.

AA0000036

(ii)    There is no claim, action, suit, or proceeding, pending or, to Seller's Knowledge, threatened alleging that the use by Seller or its Affiliates of the Trademarks or the Proprietary Rights infringes any intellectual property rights of third parties.

(iii)    Seller has not executed or granted to any Affiliate or any Third Party any license, sublicense, or contract covering the Trademarks or the Proprietary Rights.

(i)    **Equipment.** The equipment listed on Schedule 2.1(d) is all the equipment solely dedicated to the extraction process of the manufacture (but not the filling process) and testing of the Product in Seller's Kankakee, IL, plant.

4.2    **Representations and Warranties of Purchaser.** Purchaser represents and warrants to Seller as follows:

(a)    **Organization and Standing.** Purchaser is a corporation duly organized, validly existing and in good standing under the laws of the State of California.

(b)    **Power and Authority.** Purchaser has all requisite corporate power and authority to execute, deliver, and perform this Agreement, and the other agreements and instruments to be executed and delivered by it pursuant hereto and to consummate the transactions contemplated herein and therein. The execution, delivery, and performance of this Agreement by Purchaser do not, and the consummation of the transactions contemplated hereby will not, violate any provision of Purchaser's articles of incorporation, bylaws, any law or regulation applicable to Purchaser, or any agreement, mortgage, lease, instrument, order, judgment, or decree to which Purchaser is a party or by which Purchaser is bound.

(c)    **Corporate Action; Binding Effect.** Purchaser has duly and properly taken all action required by law, its articles of incorporation, its bylaws, or otherwise, to authorize the execution, delivery, and performance by it of this Agreement and the other instruments to be executed by it pursuant hereto and the consummation of the transactions contemplated hereby and thereby. This Agreement has been duly executed and delivered by Purchaser and constitutes, and the other instruments contemplated hereby when duly executed and delivered by Purchaser will constitute, legal, valid, and binding obligations of Purchaser enforceable against it in accordance with their respective terms, except as enforcement may be affected by bankruptcy, insolvency, or other similar laws and by general principles of equity as applied by a court of competent jurisdiction.

(d)    **Consents.** No consent or approval of, or filing with or notice to, any federal, state, or local governmental or regulatory authority, agency, or department or any other person not a party to this Agreement is required or necessary to be obtained by Purchaser or on its behalf in connection with the execution, delivery, and performance of this Agreement or to consummate the transactions contemplated hereby, except as contemplated by Section 3.1 hereof.

4.3    **Survival of Representations/Warranties.** The representations and warranties contained in this Article IV, and that portion of the indemnification with respect thereto pursuant to Article V, shall survive the Effective Date and continue in effect for a period of one (1) year

AA0000037

thereafter, except for the representation set forth in Section 4.1(f) which shall survive beyond such one (1) year period.

4.4     **Brokers.**   Each party hereby represents that all negotiations relative to this Agreement and the transactions contemplated hereby have been carried out by each such party directly with the other party without the intervention of any Third Party on behalf of either party in such manner as to give rise to any valid claim by any Third Party against either party for a finder's fee, brokerage commission or similar payment.

4.5     **Manufacturing Process.**   Purchaser hereby acknowledges and agrees that the Assets and Product are being sold hereunder on an 'as is' compliance basis with respect to the manufacture of the Product in accordance with the FDA's position at the FDA Meeting and that Seller makes no representation or warranty or in any way guarantees that the FDA will issue minutes of the FDA Meeting that reflect the FDA's consent to allow the manufacture of the Product as it is being manufactured by Seller as of the Effective Date, or that the FDA will continue to allow the manufacture in such manner in the future, regardless of the FDA's position in the minutes of the FDA Meeting.  Purchaser acknowledges that the FDA has not approved or issued minutes of the FDA Meeting documenting the FDA's consent to manufacture in the manner set forth at the FDA Meeting, and Purchaser accepts any risk associated therewith. Accordingly, Purchaser accepts any and all risks of Losses associated with any change of the FDA's position from that set forth at the FDA Meeting regarding the manufacture of the Product.

4.6     **Disclaimer of Warranties.**  EXCEPT AS EXPRESSLY PROVIDED HEREIN, SELLER DISCLAIMS ALL OTHER WARRANTIES, EXPRESS OR IMPLIED, WITH REGARD TO THE ASSETS AND THE PRODUCT, INCLUDING, BUT NOT LIMITED TO, THE WARRANTY OF MERCHANTABILITY AND THE WARRANTY OF FITNESS FOR A PARTICULAR PURPOSE.

4.7     **As-Is Acknowledgement.**  Except as expressly set forth herein, Purchaser acknowledges that the Assets are being sold hereunder on an as-is basis, the Assets are being sold with no representations made by Seller as to condition of the Assets.

4.8     **Patent Acknowledgement.**  Purchaser acknowledges that other parties, including without limitation American Medical Technologies, may have filed patent applications claiming or covering products that have corticotropin as an active ingredient, and that Seller has done no investigation with respect to such patent applications.

## ARTICLE 5

## INDEMNIFICATION

5.1     Indemnification.

(a)     Subject to Section 5.1(c) and Section 5.2, Seller shall indemnify Purchaser and its officers, directors, employees, agents and Affiliates in respect of, and hold each of them harmless from and against, any and all Losses suffered, incurred or sustained by any of them or to which any of them becomes subject, resulting from, arising out of, or relating to,:

(i)    The Retained Liabilities; and

(ii)    For the term set forth in Section 4.3, misrepresentation or breach of any warranty or covenant by Seller made or contained in this Agreement; and

(iii)    Litigation or other claims arising from acts, failures to act or events relating to the Assets or the Product which occurred prior to the Effective Date; and

(iv)    The use, storage or transportation of the Products before the Effective Date; and

(v)    The testing performed by Seller pursuant to Section 6.1(b).

Notwithstanding any provision herein to the contrary, the parties agree that in no event will Seller be liable to Purchaser for special, consequential, indirect, punitive or similar damages; provided however, that indemnification claims for Losses arising solely out of third party claims shall not be so limited.

(b)    Subject to Section 5.1(c) and Section 5.2, Purchaser shall indemnify Seller and its officers, directors, employees, agents and Affiliates in respect of, and hold each of them harmless from and against, any and all Losses suffered, incurred or sustained by any of them or to which any of them becomes subject, resulting from, arising out of or relating to:

(i)    The Assumed Liabilities; and

(ii)    For the term set forth in Section 4.3, misrepresentation or breach of any warranty or covenant by the Purchaser made or contained in this Agreement; and

(iii)    Litigation or other claims arising from acts, failures to act or events relating to the Assets or the Product that occur on or after the Effective Date; except for claims arising from: (1) the manufacturing, storage or handling of Finished Product Inventory by Seller or its Affiliates before shipment of such Finished Product Inventory to Purchaser; and (2) the storage or handling of the Remaining Inventory by Seller or its Affiliates after the Effective Date.

(iv)    The use of the Assets on or after the Effective Date, except those Assets that remain within Seller's exclusive control.

(v)    The manufacture or testing of the Assets or the Products by Purchaser or a Third Party appointed by Purchaser; and

(vi)    Any cartons, package inserts, labels or any other supplies provided by Purchaser.

Notwithstanding any provision herein to the contrary, the parties agree that in no event will Purchaser be liable to Seller for special, consequential, indirect, punitive or similar damages.

AA0000039

(c)     Notwithstanding anything to the contrary contained in this Agreement, no amounts of indemnity shall be payable as a result of any claim in respect of any Losses arising under paragraph (a) or (b) of Section 5.1:

(i)     unless, until and then only to the extent that the Indemnified Parties thereunder have suffered, incurred, sustained or become subject to Losses referred to in such paragraphs in excess of Twenty-Five Thousand Dollars ($25,000) in the aggregate;

(ii)     with respect to any Losses, to the extent that the party seeking indemnification had a reasonable opportunity, but failed, in good faith to mitigate such Losses, including, but not limited to, the failure to use commercially reasonable efforts to recover under such party's policy of insurance or under a contractual right of set-off or indemnity; or

(iii)     with respect to any Losses, to the extent that such Losses are caused by (a) any inaccuracy of a representation or breach of a warranty made by the party seeking indemnification in the Agreement or (b) the gross negligence or intentional misconduct of such party or any of its officers, directors, employees, agents or Affiliates.

5.2     **Method of Asserting Claims**.  A party (the "Indemnitee") that intends to claim indemnification under this Article V shall:

(a)     notify the other party (the "Indemnitor") in writing of any Losses with respect to which the Indemnitee intends to claim indemnification as soon as practicable after the Indemnitee becomes aware of any such Losses;

(b)     permit the Indemnitor to assume the defense thereof with counsel mutually satisfactory to the parties; and

(c)     cooperate with the Indemnitor, at the Indemnitor's expense, in the defense thereof.

With respect to any matter for which the Indemnitor has an obligation to indemnify the Indemnitee under this Agreement, the Indemnitee shall have the right to participate and be represented (at the Indemnitor's expense) by legal counsel of the Indemnitee's choice in all proceedings and negotiations, if representation by counsel retained by Indemnitor would be inappropriate due to actual or potential differing interests between the Indemnitee and any other party represented by such counsel in such proceedings.  The indemnity agreement in this Article V shall not apply to amounts paid in settlement of any Losses if such settlement is effected without the consent of the Indemnitor, which consent shall not be unreasonably withheld. Failure of the Indemnitee to deliver notice to the Indemnitor within a reasonable time after becoming aware of potential Losses shall not relieve the Indemnitor of any liability to the Indemnitee pursuant to this Article V, except to the extent such delay prejudices the Indemnitor's ability to defend such action.  The Indemnitor shall not settle or compromise any claim or Losses in any manner that admits fault on the part of the Indemnitee without the express prior written consent of the Indemnitee, which consent may be withheld for any reason or no reason.

## ARTICLE 6

## TRANSITION SERVICES

6.1    Product Supply and Testing.

(a)    **Supply.**  If needed by Purchaser and only until the earlier to occur of (i) such time as manufacturing of the Product can be transferred to Purchaser or its designated Third Party supplier or (ii) twelve (12) months following the Effective Date, Seller shall, at Purchaser's written request, manufacture, and fill and label vials of, finished Product from existing mini-bombs of raw active ingredient in the Remaining Inventory pursuant to terms and conditions of a supply agreement to be negotiated and agreed upon in good faith by and between the parties; provided that the price shall be Eleven Dollars ($11) per vial of filled and labeled finished Product and the other terms and conditions of such manufacture shall be consistent with Seller's previous manufacture of filled and labeled vials of Product for its own use.

(b)    **Testing.**  Seller will perform, at its sole cost and expense, any and all testing of all batches of the Finished Product Inventory and related tasks that Seller has, as of the Effective Date, committed to the FDA to perform on the Finished Product Inventory produced by Seller prior to the Effective Date, such testing commitments consisting solely of stability testing on lots of Finished Product Inventory manufactured by Seller until the second anniversary of the manufacture of such lots.  For purposes of clarity, this obligation relates solely to Finished Product Inventory manufactured before the date hereof.   Any testing related to Products produced pursuant to Section 6.1(a) will be set forth in the supply agreement, which is described in Section 6.1(a).

6.2    Transfer of Product Manufacturing and Testing.

(a)    **Site Identification; Timetable.**  Subject to Section 6.1(a), Purchaser shall identify sites for the manufacture of the active ingredient for, and finished dosage forms of, the Product, and for the testing of the Product and the active ingredient, components and intermediates that is required by the FDA or similar regulatory agency.  Seller shall transfer the manufacturing and testing of the active ingredient, components and intermediates and the finished Product to such sites as set forth on **Schedule 6.2** in accordance with the provisions of Section 6.2(b) herein.

(b)    **Seller's Obligations.**  Seller will provide Purchaser with reasonable assistance in transferring the manufacturing and testing of the Product and the active ingredient, components and intermediates to Purchaser or its designated Third Party suppliers, including the shipment of the Equipment to, and re-installation of the Equipment at, the applicable transferee site and the training of employees of Purchaser or its designated Third Party suppliers on the manufacturing and testing processes.  **Schedule 6.2** sets forth the project team and a projected timeline for the transfers.  The costs and expenses of preparing and shipping the Equipment to the Third Party sites and any Seller costs or expenses related to such training and/or consultation services provided by Seller or its Affiliates at the Kankakee, Illinois manufacturing site shall be at Seller's sole cost and expense.  Purchaser shall reimburse Seller for all costs and expenses related to assistance with re-installing Equipment at the Third Party sites and any training and/or

AA0000041

consulting services performed by Seller or its Affiliate at locations outside of the Kankakee, Illinois manufacturing site at a rate of One Thousand Dollars ($1,000) per person per day plus reasonable travel expenses.

(c)   **Payment.**  Purchaser shall pay Seller for the costs and expenses to be reimbursed by Purchaser to Seller pursuant to Section 6.2(b) herein within thirty (30) days after Purchaser's receipt of each invoice from Seller for such costs and expenses. Each Seller invoice shall include reasonable details and documentation regarding the costs and expenses being invoiced by Seller for services rendered pursuant to Section 6.2(b) herein.

**6.3**   **Relabeling.**  Seller shall relabel such amount of the Finished Product Inventory as Purchaser shall request (which amount shall allow a reasonable number of vials to not be relabeled and remain available to Athena for use in administration of the NORD program until such program is terminated by Seller) using such materials ("Labeling Materials") as Purchaser shall make available to Seller. Seller shall use commercially reasonable efforts to complete such relabeling no later than 8 weeks after receipt of the last to be received Labeling Materials. Such relabeling shall be performed in accordance with Seller's standard procedures for such relabeling. The cost for such relabeling shall be $4 per vial.

## ARTICLE 7

## GENERAL PROVISIONS

**7.1**   **Payment of Transaction Expenses.**  All legal fees and other expenses incurred on behalf of Seller in connection with the negotiation of this Agreement and the consummation of the transactions contemplated herein will be borne by Seller; and all legal fees and other expenses incurred on behalf of Purchaser in connection with the negotiation of this Agreement and the consummation of the transactions contemplated herein will be borne by Purchaser.

**7.2**   **No Other Representations.**  Except as expressly set forth in this Agreement, neither Seller nor Purchaser are making any representation or warranty whatsoever, express or implied, including, but not limited to, any implied representation or warranty as to condition, merchantability or suitability as to any of the Assets. In particular, Seller does not make any representation or warranty to Purchaser with respect to (i) the information set forth in the offering materials provided to Purchaser by Seller or (ii) any financial projection or forecast relating to the business prospects for the Product. With respect to any projection or forecast delivered by or on behalf of Seller to Purchaser, Purchaser acknowledges that (i) there are uncertainties inherent in attempting to make such projections and forecasts, (ii) it is familiar with such uncertainties, (iii) it is taking full responsibility for making its own evaluation of the adequacy and accuracy of all such projections and forecasts furnished to it and (iv) it shall have no claim against Seller with respect to such projections and forecasts prepared in good faith by Seller.

**7.3**   Notices.

(a)   Except as otherwise specifically provided herein, any notice or other documents to be given under this Agreement shall be in writing and shall be deemed to have

AA0000042

been duly given if sent by registered post, nationally recognized overnight courier or facsimile transmission to a party or delivered in person to a party at the address or facsimile number set out below for such party or such other address as the party may from time to time designate by written notice to the other:

If to Purchaser, to:

> Questcor Pharmaceuticals, Inc.
> 3260 Whipple Road
> Union City, California 94587
> Attn: Vice President, Sales & Marketing
> Facsimile: 510-400-0719

If to Seller, to:

> Aventis Pharmaceuticals Products Inc.
> 300 Somerset Corporate Center
> Bridgewater, New Jersey 08807-2854
> Attn: Vice President, Business Development
> Facsimile: 908-243-7219

with a copy to:

> Aventis Pharmaceuticals Products Inc.
> 300 Somerset Corporate Center
> Bridgewater, New Jersey 08807-2854
> Attn: General Counsel North America
> Facsimile: 908-243-7220

    **(b)**    Any such notice or other document shall be deemed to have been received by the addressee three (3) business days following the date of dispatch of the notice or other document by post or, where the notice or other document is sent by overnight courier, by hand or is given by facsimile, simultaneously with the transmission or delivery. To prove the giving of a notice or other document it shall be sufficient to show that it was dispatched.

    **7.4**    **Late Payments**. Any payments due to Seller hereunder that are not received within thirty (30) days of the date on which such payment is due shall accrue interest on any amount overdue, at the lesser of (i) the prime rate as reported by the Morgan Guaranty Bank and Trust, New York, New York (the "Prime Rate") on the date such payment is due, plus an additional three percent (3%) or (ii) the maximum rate permitted by law, such interest to begin accruing on a daily basis from the date of invoice or the date the payment is due hereunder, as the case may be, and shall accrue both before and after any judgment rendered with respect thereto by a court of competent jurisdiction.

    **7.5**    **Entire Agreement; Amendment.**

    (a)    This Agreement, together with the Schedules attached hereto, embodies and sets forth the entire agreement and understanding of the parties with respect to the subject

matter herein and there are no promises, terms, conditions or obligations, oral or written, expressed or implied, other than those contained herein. The terms of this Agreement shall supersede all previous and contemporaneous oral or written agreements which may exist or have existed between the parties relating to the subject matter of this Agreement. No party shall be entitled to rely on any agreement, understanding or arrangement which is not expressly set forth in this Agreement. Any other terms and conditions are hereby expressly excluded.

(b)     This Agreement shall not be amended, modified, varied or supplemented except in writing signed by duly authorized representatives of the parties.

**7.6     Assignment.** No party shall be entitled to assign its rights and obligations hereunder without the prior written consent of the other party; provided, however, a party shall be entitled, without the prior written consent of the other party, to assign its rights and obligations hereunder to an Affiliate, but such assignment to an Affiliate shall not relieve the assigning party of its obligations hereunder. No permitted assignment hereunder shall be deemed effective until the assignee shall have executed and delivered an instrument in writing reasonably satisfactory in form and substance to the other parties pursuant to which the assignee assumes all of the obligations of the assigning party hereunder. Any purported assignment of this Agreement in violation of this Section 7.6 shall be void. This Agreement shall be binding upon the successors and permitted assigns of the parties and the name of a party appearing herein shall be deemed to include the names of its successors and assigns.

**7.7     Headings, Interpretation.** The headings used in this Agreement are for convenience only and are not a part of this Agreement nor affect the interpretation of any of its provisions.

**7.8     Attachments.** All Schedules referenced herein are hereby made a part of this Agreement.

**7.9     Independent Parties.** This Agreement shall not be deemed to create any partnership, joint venture, amalgamation or agency relationship between the parties. Each party shall act hereunder as an independent contractor.

**7.10     Governing Law.** This Agreement shall be governed by and construed under the laws of the State of Delaware, without giving effect to the choice of law provisions thereof.

**7.11     Dispute Resolution.** If a dispute or claim relating to or arising from this Agreement cannot be resolved by representatives of the parties in the ordinary course of business, then such dispute or claim shall be referred in writing and by referencing this Section 7.11 to the President  of Seller and the Chief Executive Officer of Purchaser, respectively. If such officers are unable to resolve such dispute or claim presented to them under the preceding sentence within thirty (30) days of referral, then either party may take whatever action is available to it under law and equity.

**7.12     No Waiver.** Neither the failure nor delay on the part of either party to require the strict performance of any term, covenant or condition of this Agreement or to exercise any right or remedy available on a breach thereof shall constitute a waiver of any such breach or of any such term or condition. The consent to, or the waiver of, any breach, or the failure to require on

AA0000044

any single occasion the performance or timely performance of any term, covenant, or condition of this Agreement shall not be construed as authorizing any subsequent or additional breach and shall not prevent a subsequent enforcement of such term, covenant, or condition.

**7.13    Severability.**  In the event that any provision of this Agreement or the application thereof to any party or circumstance shall be finally determined by a court of proper jurisdiction to be invalid or unenforceable to any extent, then (i) a suitable and equitable provision shall be agreed to by the Parties in writing and substituted for the invalid or unenforceable provision in order to carry out, so far as may be valid and enforceable, the intent and purpose of such invalid and unenforceable provision and (ii) the remainder of this Agreement and the application of such provision to the parties or circumstances other than those to which it is held invalid or unenforceable shall not be affected thereby.

**7.14    Interpretation.**  The parties hereto acknowledge and agree that (i) each party and its representatives has reviewed and negotiated the terms and provisions of this Agreement and have contributed to its revision, (ii) the rule of construction to the effect that any ambiguities are resolved against the drafting party shall not be employed in the interpretation of this Agreement and (iii) the terms and provisions of this Agreement shall be construed fairly as to each party hereto and not in favor of or against either party regardless of which party was generally responsible for the preparation of this Agreement.

**7.15    Counterparts.**  This Agreement may be executed simultaneously in two or more counterparts, each of which shall be deemed an original, but both of which together shall constitute a single agreement.

**7.16    Third Party Beneficiaries.**  This Agreement is not intended to confer upon any Third Party rights or remedies hereunder, except as may be received or created as part of a valid assignment.

**7.17    Further Assurances.**  Each party shall execute and deliver such additional instruments and other documents and use all commercially reasonable efforts to take or cause to be taken, all actions and to do, or cause to be done, all things necessary under applicable law to consummate the transactions expressly set forth in this Agreement.

**7.18    Terms of this Agreement.**  The parties agree not to disclose any terms or conditions of this Agreement to any Third Party without the prior written consent of the other party, except to advisors, investors, lenders and others on a need-to-know basis under conditions which reasonably ensure the confidentiality thereof or for disclosures only of the existence and general subject matter of this Agreement, or to the extent required by applicable Laws; provided, however, prior to any such required disclosure the non-disclosing party shall be allowed to review the proposed disclosure, and the disclosing party agrees to consider in good faith any proposed revisions thereof provided to the disclosing party within two (2) business days of the non-disclosing party's receipt of the proposed disclosure and the disclosing party shall seek confidential treatment for such disclosure as permitted by applicable Laws.

AA0000045

IN WITNESS WHEREOF, the parties hereto have each caused this Agreement to be duly executed as of the date first above written.

SELLER:

AVENTIS PHARMACEUTICALS PRODUCTS INC.

By: _John R. Leone_

Name: _John R. Leone_

Title: _Sr. Vice President_

Date: _7/27/01_

PURCHASER:

QUESTCOR PHARMACEUTICALS, INC.

By: _Charles J. Casamento_

Name: _CHARLES J. CASAMENTO_

Title: _CHAIRMAN PRESIDENT + CEO_

Date: _July 27, 2001_

AA0000046



AA0000047



AA0000048



AA0000049



AA0000050



AA0000051



AA0000052



AA0000053



AA0000054

## **EXHIBIT C**

Assignment and Assumption Agreement

(filed under seal)

AA0000055

## ASSIGNMENT AND ASSUMPTION

THIS ASSIGNMENT AND ASSUMPTION (this "Assignment") is dated as of December 12, 2014, by and between Questcor Pharmaceuticals, Inc., a California corporation ("Assignor"), and Mallinckrodt Pharmaceuticals Ireland Limited, a private limited company formed under the laws of the country of Ireland, ("Assignee").

### BACKGROUND

Assignor desires to assign, transfer and set over to Assignee all of its right, title and interest in and to the Asset Purchase Agreement between Assignor and sanofi-aventis U.S. LLC successor-in-interest to Aventis Pharmaceuticals Inc., dated as of July 27, 2001 (the "Agreement"), and Assignee desires to assume and accept the same.

NOW, THEREFORE, in consideration of the mutual covenants and agreements contained herein and in connection with a corporate restructuring involving Assignor and Assignee, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Assignor and Assignee, intending to be legally bound hereby, covenant and agree as follows:

1.      Assignor hereby assigns, transfers and sets over to Assignee all of its right, title and interest in and to the Agreement, and Assignee hereby assumes and agrees to perform and be bound by all of terms, covenants and conditions of the Agreement that are to be performed by, and are binding upon, the Assignor thereunder, including without limitation, Section 2.3(c) thereof.

2.      This Assignment shall be construed and enforced in accordance with the laws of the State of Delaware.

3.      Sanofi-aventis U.S. LLC is an intended third-party beneficiary hereof.

[Signature page follows]

AA0000056

IN WITNESS WHEREOF, the parties hereto have executed this Assignment as of the date first above written.

**Assignor:**

Questcor Pharmaceuticals, Inc., a California corporation

By: _____
Name:  Ryan D. Chavez
Title:  General Counsel
Autoimmune and Rare Diseases Business

**Assignee:**

Mallinckrodt Pharmaceuticals Ireland Limited, a private limited company formed under the laws of the country of Ireland.

By: _____
Name:  Aaron Keogh,
Title:   Director of Finance, Global External Supply

AA0000057

## **EXHIBIT D**

December 12, 2014 Correspondence

(filed under seal)

AA0000058



December 12, 2014

Sanofi U.S. (sanofi-aventis U.S. LLC successor-in-interest to Aventis Pharmaceuticals Products, Inc.)
55 Corporate Center
Bridgewater, New Jersey 08807
Attn:   Sheila Chandonnet, Legal Development
        1-908-981-4956
        sheila.chandonnet@sanofi.com

RE:     Assignment of Agreement (the "Assignment") executed by and between Questcor
        Pharmaceuticals, Inc., and Aventis Pharmaceuticals Products, Inc. Effective Date of
        July 27, 2001 ("Agreement")

To Whom It May Concern,

This letter confirms that on August 14, 2014, Questcor Pharmaceuticals, Inc. ("Questcor"), through a
merger, became an indirect wholly-owned subsidiary of Mallinckrodt plc ("Mallinckrodt").

Pursuant to Section 7.6 of the Agreement, please be advised that Questcor is assigning all of its right,
title and interest and delegating all of its obligations, responsibilities and duties, including without
limitation payment of royalty, under the Agreement to Mallinckrodt Pharmaceuticals Ireland Limited
("MPIL"), a private limited company formed under the laws of the country of Ireland and a
Mallinckrodt affiliate effective as of December 12, 2014.  Through such assignment agreement, MPIL
agrees to accept and be bound to all of the terms, conditions, and responsibilities under the Agreement
after December 12, 2014.  A copy of the instrument of assignment and assumption is attached hereto.

For clarity, the royalty payments owing under the Agreement will not be adversely impacted in any
way by this Assignment, and if any additional or withholding taxes are due or owing as a result of this
Assignment, royalty payments will be grossed-up accordingly.

Any disputes under the Agreement shall be governed by the laws of Delaware, without giving effect to
its conflicts of laws provisions (as set forth in Section 7.10 of the Agreement), and MPIL submits to
venue and jurisdiction in the State of Delaware, United States with respect to any disputes under the
Agreement.

This letter and the attached assignment shall be treated as confidential information and held
accordingly.

Please sign and return a copy of the signed letter to indicate your consent.  We thank you in advance
for working with us to ensure a smooth transition.

AA0000059

If you have any questions or concerns, please feel free to contact Scherer Sanders by phone (443-973-2022) or email (scherer.sanders@mallinckrodt.com).

Sincerely,

Ryan D. Chavez
General Counsel
Autoimmune and Rare Diseases Business (formerly Questcor)


**SANOFI U.S.**
**(sanofi-aventis U.S. LLC)**

Read and Agreed: _____

Print Name and Title: Director, Alliance Management


**MALLINCKRODT PHARMACEUTICALS IRELAND LIMITED**

Read and Agreed: _____

Print Name and Title:  Aaron Keogh, Director of Finance, Global External Supply

# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| In re: | Chapter 11 |
| MALLINCKRODT PLC, *et al.*, | Case No. 20-12522 (JTD) |
| Debtors.[1] | (Jointly Administered) |

## NOTICE OF FILING OF <u>EXHIBIT U</u> (REJECTED EXECUTORY CONTRACT/UNEXPIRED LEASE LIST) OF PLAN SUPPLEMENT FOR THE JOINT PLAN OF REORGANIZATION OF MALLINCKRODT PLC AND ITS DEBTOR AFFILIATES UNDER CHAPTER 11 OF THE BANKRUPTCY CODE

**PLEASE TAKE NOTICE** that, as contemplated by the *Joint Plan of Reorganization of Mallinckrodt plc and its Debtor Affiliates Under Chapter 11 of the Bankruptcy Code* (as may be amended, modified, or supplemented from time to time, and including all exhibits and supplements thereto, the "***Plan***"), the above-captioned debtors and debtors-in-possession (collectively, the "***Debtors***") hereby file <u>Exhibit U</u> (Rejected Executory Contract/Unexpired Lease List) of the plan supplement (the "***Plan Supplement***")[2] with the United States Bankruptcy Court for the District of Delaware (the "***Bankruptcy Court***"). Capitalized terms used but not defined herein have the meanings set forth in the Plan.

**PLEASE TAKE FURTHER NOTICE** that certain documents, or portions thereof, contained in <u>Exhibit U</u> and the Plan Supplement remain subject to continuing negotiations among the Debtors and interested parties with respect thereto. The Debtors and such applicable interested parties reserve all of their respective rights, subject to the terms and conditions set forth in the Plan and the Restructuring Support Agreement (as amended), with respect to the final form of such documents and to amend, revise, or supplement the Plan Supplement, and any of the documents and designations contained herein, at any time before the Effective Date of the Plan, or any such other date as may be provided for by the Plan or by order of the Bankruptcy Court.

**PLEASE TAKE FURTHER NOTICE** that <u>Exhibit U</u> of the Plan Supplement is integral to, part of, and incorporated by reference into the Plan. Please note, however, <u>these documents have not yet been approved by the Bankruptcy Court</u>. If the Plan is confirmed, the documents

---

[1] A complete list of the Debtors in these Chapter 11 Cases may be obtained on the website of the Debtors' claims and noticing agent at http://restructuring.primeclerk.com/Mallinckrodt. The Debtors' mailing address is 675 McDonnell Blvd., Hazelwood, Missouri 63042.

[2] The Debtors are filing each of the exhibits comprising the Plan Supplement under separate notices of filing. For the convenience of the Court and all parties-in-interest, the Debtors will file a master list of Plan Supplement documents that includes the applicable docket number for each separately filed Plan Supplement exhibit.

AA0000061

contained in the Plan Supplement will be approved by the Bankruptcy Court pursuant to the order confirming the Plan.

**PLEASE TAKE FURTHER NOTICE** that any Proofs of Claim asserting Claims arising from the rejection of the Executory Contracts and Unexpired Leases pursuant to the Plan or otherwise must be filed with the Notice and Claims Agent within thirty (30) days of the effective date of the rejection of the applicable Executory Contract or Unexpired Lease. **Any Proofs of Claim arising from the rejection of the Executory Contracts and Unexpired Leases that are not timely filed shall be automatically disallowed without further order of the Bankruptcy Court.** All Allowed Claims arising from the rejection of the Executory Contracts and Unexpired Leases shall constitute General Unsecured Claims and shall be treated in accordance with Article III.B of the Plan.

**PLEASE TAKE FURTHER NOTICE** that the copies of the documents included in the Plan Supplement or the Plan, or any other document filed in the Debtors' chapter 11 cases, may be obtained free of charge by contacting the Debtors' Notice and Claims Agent, Prime Clerk LLC, by: (i) calling the Debtors' restructuring hotline at 877-467-1570 (US/Canada); 347-817-4093 (International); (ii) visiting the Debtors' restructuring website at: https://cases.primeclerk.com/mallinckrodt; and/or (iii) writing to (a) Mallinckrodt plc Ballot Processing, c/o Prime Clerk LLC One Grand Central Place, 60 East 42nd Street, Suite 1440, New York, NY 10165 or (b) mallinckrodtinfo@primeclerk.com. You may also obtain copies of any pleadings filed in these chapter 11 cases for a fee via PACER at: http://www.deb.uscourts.gov or free of charge at https://restructuring.primeclerk.com/mallinckrodt/.

**THIS NOTICE IS BEING SENT TO YOU FOR INFORMATIONAL PURPOSES ONLY. IF YOU HAVE QUESTIONS WITH RESPECT TO YOUR RIGHTS UNDER THE PLAN OR ABOUT ANYTHING STATED HEREIN OR IF YOU WOULD LIKE TO OBTAIN ADDITIONAL INFORMATION, PLEASE CONTACT THE NOTICE AND CLAIMS AGENT AT THE NUMBER OR ADDRESS SPECIFIED ABOVE. PLEASE NOTE THAT THE NOTICE AND CLAIMS AGENT CANNOT PROVIDE LEGAL ADVICE**

RLF1 25796286v.1

AA0000062

Dated: August 6, 2021

*/s/ Garrett S. Eggen*

**RICHARDS, LAYTON & FINGER, P.A.**
Mark D. Collins (No. 2981)
Michael J. Merchant (No. 3854)
Amanda R. Steele (No. 5530)
Brendan J. Schlauch (No. 6115)
Garrett S. Eggen (No. 6655)
One Rodney Square
920 N. King Street
Wilmington, DE 19801
Telephone:    (302) 651-7700
Facsimile:    (302) 651-7701
Email:         collins@rlf.com
               merchant@rlf.com
               steele@rlf.com
               schlauch@rlf.com
               eggen@rlf.com


- and -

George A. Davis (admitted *pro hac vice*)
George Klidonas (admitted *pro hac vice*)
Andrew Sorkin (admitted *pro hac vice*)
Anupama Yerramalli (admitted *pro hac vice*)
**LATHAM & WATKINS LLP**
1271 Avenue of the Americas
New York, New York 10020
Telephone:    (212) 906-1200
Facsimile:    (212) 751-4864
Email:         george.davis@lw.com
               george.klidonas@lw.com
               andrew.sorkin@lw.com
               anu.yerramalli@lw.com

- and -

Jeffrey E. Bjork (admitted *pro hac vice*)
**LATHAM & WATKINS LLP**
355 South Grand Avenue, Suite 100
Los Angeles, California 90071
Telephone:    (213) 485-1234
Facsimile:    (213) 891-8763
Email:         jeff.bjork@lw.com

- and -

Jason B. Gott (admitted *pro hac vice*)
**LATHAM & WATKINS LLP**
330 North Wabash Avenue, Suite 2800
Chicago, Illinois 60611
Telephone:    (312) 876-7700
Facsimile:    (312) 993-9767
Email:         jason.gott@lw.com

*Counsel for Debtors and Debtors in Possession*

.

AA0000063

# Exhibit U

## Rejected Executory Contract/Unexpired Lease List

You have been identified as a party to one or more of the potential Executory Contracts or Unexpired Leases listed on the rejection schedule attached hereto as **Schedule 1** (the "**Rejected Contract Schedule**"). The Debtors hereby provide notice that, pursuant to section 365 of the Bankruptcy Code, the Debtors propose to reject each potential Executory Contract or Unexpired Lease listed on the Rejected Contract Schedule on the Effective Date of the Plan with such rejection being effective as of the petition date (*i.e.*, October 12, 2020).[3]

Certain documents, or portions thereof, contained in this Exhibit U and the Plan Supplement remain subject to continuing negotiations among the Debtors and interested parties with respect thereto. Subject to the terms and conditions set forth in the Plan and the Restructuring Support Agreement, the Debtors reserve all rights to—for any reason whatsoever (including based on objections received to Article V.G of the Plan)—amend, revise, or supplement this Exhibit U, and any of the documents and designations contained herein, at any time before the Effective Date of the Plan, or any such other date as may be provided for by the Plan or by order of the Bankruptcy Court.

In accordance with the *Order (A) Establishing Bar Dates and Related Procedures for Filing Proofs of Claim and (B) Approving Form and Manner of Notice Thereof* [Docket No. 667] and the Plan, any Proofs of Claim asserting Claims arising from the rejection of the Executory Contracts and Unexpired Leases must be filed with the Notice and Claims Agent within thirty (30) days of the effective date of the rejection of the applicable Executory Contract or Unexpired Lease. All Allowed Claims arising from the rejection of the Executory Contracts and Unexpired Leases shall constitute General Unsecured Claims and shall be treated in accordance with Article III.B of the Plan. **Any Person or Entity that is required to file a Proof of Claim arising from the rejection of a potential Executory Contract or Unexpired Lease listed on the Rejected Contract Schedule that fails to timely do so shall be forever barred, estopped and enjoined from asserting such Claim, and such Claim shall not be enforceable, against the Debtors, the Reorganized Debtors or the Estates, and the Debtors, the Reorganized Debtors and their Estates and their respective assets and property shall be forever discharged from any and all indebtedness and liability with respect to such Claim unless otherwise ordered by the Bankruptcy Court or as otherwise provided herein. All such Claims shall, as of the Effective Date of the Plan, be subject to the permanent injunction set forth in Article IX of the Plan.**

The Debtors' listing of a poential Executory Contract or Unexpired Lease on the Rejected Contract Schedule shall not be deemed or construed as (a) a promise by the Debtors to seek the rejection of such contract or lease, (b) a limitation or waiver on the Debtors' ability to amend, modify or supplement the Rejected Contract Schedule, (c) a limitation or waiver on the Debtors'

---

[3] In accordance with Article V.A of the Plan, each Executory Contract and Unexpired Lease that is not rejected as of the Effective Date will be deemed assumed as of the Effective Date pursuant to sections 365 and 1123 of the Bankruptcy Code.

ability to seek to assume or reject any Executory Contract or Unexpired Lease, or (d) an admission that any potential Executory Contract or Unexpired Lease is, in fact, an Executory Contract or Unexpired Lease under section 365 of the Bankruptcy Code. Moreover, the Debtors explicitly reserve their rights, in their sole discretion, to reject or assume each Executory Contract or Unexpired Lease pursuant to section 365(a) of the Bankruptcy Code and nothing herein (i) alters in any way the prepetition nature of such agreements or the validity, priority, or amount of any claims of a counterparty such agreements against the Debtors that may arise under such agreements, (ii) creates a postpetition contract or agreement, or (iii) elevates to administrative expense priority any claims of a counterparty to an Executory Contract or Unexpired Lease against the Debtors that may arise under such agreements. The Debtors reserve all their rights, claims and causes of action with respect to the potential Executory Contracts, Unexpired Leases and other agreements listed on the Rejected Contract Schedule, including the right to amend, revise, or supplement the Rejected Contract Schedule for any reason whatsoever, including based on objections received to Article V.G of the Plan.

AA0000065

**Schedule 1**

**Rejected Contract Schedule**

AA0000066

## Schedule 1
## Executory Contracts and Unexpired Leases to be Rejected*

| Name and Address of Counterparty | Debtor | Unique ID | Contract Type | Description |
|---|---|---|---|---|
| Accenture<br>Attn: Contracts Management<br>Accenture LLP<br>Berwyn, PA 19312 | | | | |
| | Mallinckrodt LLC | 68937 | Service Agreements | MASTER SERVICES AGREEMENT Dated 09/05/2018 |
| | Sucampo Pharmaceuticals, Inc. | 68122 | Service Agreements | Master Professional Services Agreement Dated 02/01/2014 |
| | Mallinckrodt Hospital Products Inc. | 68884 | Service Agreements | Amendment No. 2 to StartingPoint Software License Agreement Dated 07/19/2018 |
| | Mallinckrodt Enterprises LLC | 70480 | Service Agreements | STATEMENT OF WORK NO. 2 Dated 02/06/2019 |
| Access Tea<br>Access TCA, Inc.<br>1 Main Street<br>Whitinsville, MA 01588 | | | | |
| | Mallinckrodt LLC | 70562 | Service Agreements | Master Services Agreement Dated 09/25/2017 |
| | SpecGx LLC | 12591 | Service Agreements | Access TCA SOW2 for 2020 Services |
| | ST Shared Services LLC | 80150 | Other | Other Dated 03/18/2021 |
| | Mallinckrodt LLC | 12134 | Service Agreements | Service Agreements Contract Dated 07/14/2019 |
| | Mallinckrodt LLC | 12134 | Service Agreements | Service Agreements Contract Dated 07/16/2019 |
| | Mallinckrodt ARD Holdings Inc. | 76544 | Service Agreements | Service Agreements Contract Dated 09/21/2020 |
| | Mallinckrodt LLC | ACCESSTCAINC-SOW-0 | Service Agreements | Service Agreements Contract Dated 09/23/2017 |
| | Mallinckrodt ARD Holdings Inc. | 65481 | Service Agreements | STATEMENT OF WORK — Neph #32 |
| | Mallinckrodt Hospital Products Inc. | 75586 | Service Agreements | STATEMENT OF WORK NO. 41 Dated 04/09/2020 |
| American Express<br>PO BOX 1270 PO BOX 1270<br>NEWARK, NJ 07101-1270 | | | | |
| | Mallinckrodt LLC | 49205 | Service Agreements | Business Travel Services Agreement Dated 06/01/2016 |

* Each Executory Contract and Unexpired Lease identified on this Schedule 1 includes any modifications, amendments, addenda or supplements thereto or restatements thereof.

**Schedule 1**

**Executory Contracts and Unexpired Leases to be Rejected***

| Name and Address of Counterparty | Debtor | Unique ID | Contract Type | Description |
|---|---|---|---|---|
| | Mallinckrodt LLC | 66632 | Service Agreements | AMENDMENT TO BUSINESS TRAVEL SERVICE AGREEMENT Dated 09/01/2017 |
| | Mallinckrodt LLC | 73202 | Other | DATA PROTECTION AUTHORIZATION AND DIRECTION Dated 06/06/2013 |
| | Mallinckrodt Pharmaceuticals Limited | 74709 | Service Agreements | Data Release Authorization Dated 04/01/2013 |
| | Mallinckrodt LLC | AMERICANEXPRESSTR | Service Agreements | Services Agreement Contract Dated 06/04/2016 |
| | Mallinckrodt LLC | AMERICANEXPRESSTR | Service Agreements | Services Agreement Contract Dated 05/30/2016 |
| | Mallinckrodt LLC | AMERICANEXPRESSTR | Service Agreements | Services Agreement Contract Dated 05/25/2015 |
| | Mallinckrodt LLC | AMERICANEXPRESSTR | Service Agreements | Services Agreement Contract Dated 11/08/2014 |
| | Mallinckrodt LLC | AMERICANEXPRESSTR | Service Agreements | Services Agreement Contract Dated 10/05/2014 |
| | Mallinckrodt LLC | AMERICANEXPRESSTR | Service Agreements | Services Agreement Contract Dated 09/07/2014 |
| | Mallinckrodt LLC | AMERICANEXPRESSTR | Service Agreements | Services Agreement Contract Dated 01/19/2014 |
| | Mallinckrodt LLC | AMERICANEXPRESSTR | Service Agreements | Services Agreement Contract Dated 05/28/2013 |
| | Mallinckrodt LLC | AMEXCANADAINC-MA | Service Agreements | Services Agreement Contract Dated 05/15/2013 |
| | Mallinckrodt LLC | AMERICANEXPRESSTR | Service Agreements | Services Agreement Contract Dated 04/13/2013 |
| | Mallinckrodt LLC | 12993 | Service Agreements | Services Agreement Contract Dated 05/29/2016 |
| | Mallinckrodt LLC | 73693 | Service Agreements | Statement of Work Dated 11/10/2014 |
| | Mallinckrodt plc | 73080 | Other | Letter Agreement Dated 04/15/2013 |
| | Mallinckrodt LLC | 74144 | Other | ADDENDUM TO LETTER AGREEMENT Dated 01/21/2014 |
| | ST Shared Services LLC | 77802 | Other | Amendments Dated 12/03/2020 |
| | Mallinckrodt LLC | 72496 | Other | Amendment to the Letter Agreement Dated 09/09/2014 |
| | Mallinckrodt plc | 75073 | Service Agreements | AMENDMENT TO THE BUSINESS TRAVEL SERVICES AGREEMENT Dated 06/01/2016 |
| | ST Shared Services LLC | 77802 | Other | AMENDMENT TO BUSINESS TRAVEL SERVICES AGREEMENT |
| | Mallinckrodt plc | 72964 | Other | ADDENDUM TO THE LETTER AGREEMENT Dated 05/27/2015 |

* Each Executory Contract and Unexpired Lease identified on this Schedule 1 includes any modifications, amendments, addenda or supplements thereto or restatements thereof.

AA0000068

**Schedule 1**

**Executory Contracts and Unexpired Leases to be Rejected***

| Name and Address of Counterparty | Debtor | Unique ID | Contract Type | Description |
|---|---|---|---|---|
| Ancla Consultancy Llc<br>Ancla Consultancy Services LLC<br>300 Carnegie Center, Suite 150<br>Princeton, NJ 08540 | Mallinckrodt LLC | 69613 | Other | Letter Agreement Dated 04/15/2013 |
| | Mallinckrodt plc | 67516 | Service Agreements | MASTER SERVICES AGREEMENT Dated 07/06/2017 |
| | Mallinckrodt LLC | 67518 | Service Agreements | Scope of Work #03 Migration of Argus Cases and Corresponding Data Dated 05/11/2018 |
| | Mallinckrodt LLC | ANCLACONSULTANCY | Purchase/Pricing and Supply Agreements | Operating Materials & Supplies Contract Dated 08/11/2018 |
| Anderson Packaging<br>AmerisourceBergen Corporation<br>1300 Morris Drive<br>Chesterbrook, PA 19087 | | | | |
| | Mallinckrodt LLC | 46738 | Service Agreements | QUALITY AGREEMENT Dated 02/21/2017 |
| | Mallinckrodt LLC | 46745 | Service Agreements | Letter re: Release and Settlement of Loss of Exalgo 32mg Tablets, Lot 317252 Dated 07/24/2013 |
| Ashland LLC and International Specialty Products Inc.<br>Robin E. Lampkin, Esq.<br>5200 Blazer Parkway<br>Dublin, OH 43017 | | | | |
| | Mallinckrodt LLC | AshlandISP1.1 | JDA | Joint Defense Agreement dated 8/2014 |
| | Mallinckrodt LLC | AshlandISP1.2 | SPA | SPA dated March 31, 1992 |
| Atos Digital Health Solutions Inc<br>Attn: Kevin McBride<br>4851 Regent Boulevard<br>Irving, TX 75063 | | | | |

* Each Executory Contract and Unexpired Lease identified on this Schedule 1 includes any modifications, amendments, addenda or supplements thereto or restatements thereof.

Case 20-12522-JTD  Doc 3596-1  Filed 08/06/21  Page 7 of 25

## Schedule 1

## Executory Contracts and Unexpired Leases to be Rejected*

| Name and Address of Counterparty | Debtor | Contract Type | Unique ID | Description |
|---|---|---|---|---|
| | ST Shared Services LLC | Other | 80125 | Other Dated 09/01/2020 |
| | Mallinckrodt Pharmaceuticals Limited | Other | 68133 | Letter re: Amendment # 6 to Statement of Work # 2 – Personnel and Facility Space, Dated September 13, 2016, as amended Dated 07/01/2018 |
| | Mallinckrodt plc | Other | 77906 | Letter re: Amendment # 5 to Statement of Work # 2 – Personnel and Facility Space, DatedSeptember 13, 2016, as amended |
| | Mallinckrodt plc | Other | 77906 | Amendments Dated 07/01/2018 |
| Aventis Intercontinental 55 Corporate Drive Bridgewater, NJ 08807 | Mallinckrodt plc | Other | AventisRoyalty1 | Royalty Agreement Dated 07/27/2001 |
| | Mallinckrodt LLC | Purchase/Pricing and Supply Agreements | SANOFIAVENTISUSLL | Operating Materials & Supplies Contract Dated 12/30/1999 |
| | Mallinckrodt LLC | Customer | 00001001 | Sanofi Winthrop Industrie Dated 07/13/2015 |
| | Mallinckrodt LLC | Confidentiality Agreements/NDA | 00001390 | Sanofi-Aventis U.S. LLC USA CDA Dated 11/07/2017 |
| | Mallinckrodt plc | Confidentiality Agreements/NDA | 00000793 | APJQUAL-Aventis Intercontinental FRA.ORIG.10_FEB_2005 |
| | Mallinckrodt LLC | Confidentiality Agreements/NDA | 52800 | Amendment #2 to Mutual Confidentiality Agreement Between sanofi-aventis U.S., Inc. and Mallinckrodt LLC Dated 12/13/2013 |
| | Sucampo Pharmaceuticals, Inc. | Confidentiality Agreements/NDA | 71735 | CONFIDENTIAL DISCLOSURE AGREEMENT Dated 10/12/2017 |
| | Mallinckrodt LLC | Confidentiality Agreements/NDA | 52798 | NON-DISCLOSURE AGREEMENT Dated 08/30/2016 |
| Baxter W Illinois Route 120 WG1-2N ROUND LAKE, IL 60073 | | | | |

* Each Executory Contract and Unexpired Lease identified on this Schedule 1 includes any modifications, amendments, addenda or supplements thereto or restatements thereof.

**Schedule 1**

**Executory Contracts and Unexpired Leases to be Rejected\***

| Name and Address of Counterparty | Debtor | Unique ID | Contract Type | Description |
|---|---|---|---|---|
| | Mallinckrodt plc | 47154 | Purchase/Pricing and Supply Agreements | PURCHASE AND SALE AGREEMENT Dated 01/07/2018 |
| | Mallinckrodt Pharmaceuticals Ireland Limited | 47154 | Service Agreements | PURCHASE AND SALE AGREEMENT Dated 01/07/2018 |
| | Mallinckrodt LLC | 47156 | Service Agreements | VALUE MANAGED RELATIONSHIP AGREEMENT Dated 07/01/1994 |
| | Mallinckrodt LLC | 47154 | Service Agreements | PURCHASE AND SALE AGREEMENT Dated 01/07/2018 |
| | Mallinckrodt Manufacturing LLC | 47154 | Service Agreements | PURCHASE AND SALE AGREEMENT Dated 01/07/2018 |
| | Mallinckrodt LLC | 47141 | Service Agreements | ADDENDUM NO.2 Dated 07/25/2011 |
| | Mallinckrodt LLC | 47139 | Service Agreements | Addendum NO.9 Dated 01/20/2012 |
| | Mallinckrodt LLC | 00000796 | Customer | Baxter Healthcare LLC Dated 12/19/2013 |
| | Mallinckrodt LLC | 47144 | Service Agreements | CONFIDENTIAL DISCLOSURE AGREEMENT |
| | Mallinckrodt LLC | 47146 | Service Agreements | CONFIDENTIALITY AGREEMENT |
| | Mallinckrodt plc | 46608 | Other | Letter re: Assignment of Baxter International Inc. Distribution Agreement to Baxter Diagnostics Inc. Dated 08/17/1990 |
| | Mallinckrodt LLC | 47155 | Customer | MEMORANDUM OF AGREEMENT Dated 04/01/1991 |
| | Mallinckrodt LLC | 47142 | Service Agreements | MUTUAL CONFIDENTIAL DISCLOSURE AGREEMENT Dated 03/19/2014 |
| Carestream Attention: NSB Financial Services MC 00710 150 Verona Street Rochester, NY  14608 | | | | |
| | Therakos, Inc. | 69412 | Service Agreements | MASTER SERVICE AGREEMENT Dated 01/01/2014 |
| | Therakos, Inc. | 65979 | Service Agreements | Amended and restated master service agreement Dated 12/08/2017 |
| | Therakos, Inc. | 65980 | Service Agreements | Addendum #1 Service Quality Agreement Dated 11/17/2017 |
| | Therakos, Inc. | 65977 | Service Agreements | ADDENDUM TO EXISTING QUALITY AGREEMENT Dated 03/26/2020 |

\* Each Executory Contract and Unexpired Lease identified on this Schedule 1 includes any modifications, amendments, addenda or supplements thereto or restatements thereof.

## Schedule 1
## Executory Contracts and Unexpired Leases to be Rejected*

| Name and Address of Counterparty | Debtor | Unique ID | Contract Type | Description |
|---|---|---|---|---|
| | Mallinckrodt plc | 65978 | Service Agreements | FIRST AMENDMENT TO THE AMENDED AND RESTATED MASTER SERVICE AGREEMENT Dated 01/01/2020 |
| | Therakos, Inc. | 65981 | Service Agreements | Revised and restated addendum 2 to amended and restated master service agreement s-25388 pricing addendum Dated 11/17/2017 |
| | Therakos, Inc. | 65982 | Service Agreements | Exhibit A to Amended and Restated Master Service Agreement Dated 12/08/2017 |
| Certara Usa<br>PO BOX 32080<br>NEW YORK, NY 10087 | | | | |
| | Mallinckrodt LLC | CERTARAUSAINC-SO | Purchase/Pricing and Supply Agreements | Supplies and Materials Contract 02/27/2017 |
| | Mallinckrodt LLC | PHARSIGHTCORPORA | Purchase/Pricing and Supply Agreements | Supplies and Materials Contract Dated 01/30/2017 |
| | Mallinckrodt LLC | CERTARAUSAINC-AM | Purchase/Pricing and Supply Agreements | Supplies and Materials Contract Dated 12/05/2010 |
| | Mallinckrodt LLC | 13016 | Purchase/Pricing and Supply Agreements | Supplies and Materials Contract Dated 11/29/2016 |
| | ST Shared Services LLC | 68408 | Confidentiality Agreements/NDA | MUTUAL CONFIDENTIALITY AGREEMENT Dated 12/04/2019 |
| | Ocera Therapeutics, Inc. | 71876 | Confidentiality Agreements/NDA | Amendment No. 1 to Consulting Agreement Dated 10/13/2017 |
| | Mallinckrodt LLC | 72066 | Confidentiality Agreements/NDA | Work Order No. 11 Dated 01/16/2017 |
| Cignon Uk<br>Cignon UK LtdDavidson House<br>ForburySquare Reading UK RG1 3EU England | | | | |
| | ST Shared Services LLC | 62894 | Purchase/Pricing and Supply Agreements | Purchase Order Dated 12/30/2019 |

* Each Executory Contract and Unexpired Lease identified on this Schedule 1 includes any modifications, amendments, addenda or supplements thereto or restatements thereof.

Case 20-12522-JTD   Doc 3596-1   Filed 08/06/21   Page 10 of 25

## Schedule 1
### Executory Contracts and Unexpired Leases to be Rejected*

| Name and Address of Counterparty | Debtor | Unique ID | Contract Type | Description |
|---|---|---|---|---|
| Continental Traffic Service Inc<br>DBA CTSI GLOBAL<br>1 SOUTH PRESCOTT ST<br>MEMPHIS, TN  38111 | | | | |
| | SpecGx LLC | 12322 | Service Agreements | Service Agreement dated June 25th, 2020 |
| | Mallinckrodt LLC | 12322 | Service Agreements | Freight Contract Dated 10/30/2019 |
| Diamond Technologies<br>4001 MILLER RD, 3 0 WILMINGTON DE 19802<br>US | | | | |
| | Mallinckrodt Pharmaceuticals Limited | 68162 | Service Agreements | Proposal for: Mallinckrodt Pharmaceuticals Regarding Application Development & Support Services Dated 01/27/2016 |
| | Mallinckrodt Pharmaceuticals Limited | 68163 | Service Agreements | Database Enhancement Estimate Dated 04/28/2017 |
| | ST Shared Services LLC | 75604 | Service Agreements | STATEMENT OF WORK |
| D-Town Associates<br>120 Pennsylvania Ave.<br>Malvern, PA  19355 | | | | |
| | Therakos, Inc. | 63552 | Leases | Lease Agreement Dated 04/01/2013 |
| | Therakos, Inc. | 63553 | Leases | FIRST AMENDMENT TO LEASE AGREEMENT  Dated 05/21/2013 |
| Eberhard Carls University Tuebingen<br>Children's hospital Tuebingen<br>Prof. Dr. med. R. Handgretinger<br>Tuebingen,  72076 | | | | |
| | Therakos, Inc. | University Hospital Tuebi | Other | Research Funding Agreement dated  2/20/2014 |
| | Therakos, Inc. | 73612 | Service Agreements | RESEARCH FUNDING AGREEMENT Dated 04/07/2014 |
| | Mallinckrodt plc | 80549 | Other | Other Dated 05/06/2021 |

* Each Executory Contract and Unexpired Lease identified on this Schedule 1 includes any modifications, amendments, addenda or supplements thereto or restatements thereof.

## Schedule 1
### Executory Contracts and Unexpired Leases to be Rejected*

| Name and Address of Counterparty | Debtor | Unique ID | Contract Type | Description |
|---|---|---|---|---|
| Everbridge Everbridge, Inc.25 Corporate DriveFor legal notice:Attention: Legal Department Burlington MA 1803 USA | ST Shared Services LLC | 68469 | Service Agreements | Master Services Agreement Dated 01/31/2020 |
| Evonik Attn: General Counsel 299 Jefferson Rd Parsippany, NJ 07054 | Ocera Therapeutics, Inc. | EvonikAddedContract1 | Other | Master Services Agreement Dated 03/10/2016 |
| | SpecGx LLC | 912 | Purchase/Pricing and Supply Agreements | Operating Materials & Supplies Contract Dated 12/19/2018 |
| | Mallinckrodt LLC | EVONIKCORPORATIO | Purchase/Pricing and Supply Agreements | Operating Materials & Supplies Contract Dated 08/14/2017 |
| | SpecGx LLC | 912 | Purchase/Pricing and Supply Agreements | Operating Materials & Supplies Contract Dated 12/17/2018 |
| | Mallinckrodt LLC | 51361 | Service Agreements | Letter re: Master Service Agreement dated February 11, 2010 (the "Agreement") between Mallinckrodt Inc. ("you") and Transferra Nanosciences Inc. (formerly Northern Lipids Inc.) ("Transferra") Dated 07/29/2016 |
| | Mallinckrodt plc | EvonikAddedContract4 | Other | Amendment to Statement of Work Dated 09/01/2020 |
| | Mallinckrodt Pharmaceuticals Ireland Limited | 48940 | Leases | FIRST AMENDMENT TO SERVICES AGREEMENT |
| | Mallinckrodt Pharmaceuticals Ireland Limited | 48934 | Leases | Letter Agreement Dated 02/28/2014 |
| | Ocera Therapeutics, Inc. | EvonikAddedContract2 | Other | Letter of Intent Dated 08/11/2017 |
| | Ocera Therapeutics, Inc. | 71725 | Service Agreements | NON-DISCLOSURE AGREEMENT Dated 08/07/2017 |
| | Mallinckrodt plc | EvonikAddedContract3 | Other | Statement of Work Dated 04/10/2016 |

* Each Executory Contract and Unexpired Lease identified on this Schedule 1 includes any modifications, amendments, addenda or supplements thereto or restatements thereof.

Case 20-12522-JTD   Doc 3596-1   Filed 08/06/21   Page 12 of 25

**Schedule 1**

**Executory Contracts and Unexpired Leases to be Rejected***

| Name and Address of Counterparty | Debtor | Unique ID | Contract Type | Description |
|---|---|---|---|---|
| Fcb Health PO BOX 74008222 CHICAGO, IL 60674 | Mallinckrodt ARD Holdings Inc. | 74617 | Settlement/Consent/Termination/Indemnification Agreements | ASSIGNMENT AND ASSUMPTION AGREEMENT AND AMENDMENT NO. 1 Dated 06/27/2016 |
| | Mallinckrodt ARD Holdings Inc. | 72078 | Service Agreements | First Amendment to Statement of Work Dated 10/19/2017 |
| | Mallinckrodt ARD Holdings Inc. | 71293 | Service Agreements | AMENDMENT TO MASTER SERVICE AGREEMENT Dated 06/07/2017 |
| | Mallinckrodt ARD LLC | 75571 | Service Agreements | STATEMENT OF WORK NO. 203 Dated 04/15/2020 |
| | Mallinckrodt ARD Holdings Inc. | 74817 | Service Agreements | Statement of Work No. 24 Dated 10/01/2016 |
| | Mallinckrodt ARD Holdings Inc. | 75015 | Service Agreements | Statement of Work No. 27 Dated 10/01/2016 |
| | Mallinckrodt ARD Holdings Inc. | 74802 | Service Agreements | Statement of Work No. 29 Dated 10/05/2016 |
| | Mallinckrodt ARD Holdings Inc. | 75013 | Service Agreements | Statement of Work No. 33 Dated 10/01/2016 |
| | Mallinckrodt ARD Holdings Inc. | 75008 | Service Agreements | Statement of Work No. 42 to Master Service Agreement Dated 03/01/2017 |
| | Mallinckrodt ARD Holdings Inc. | 74830 | Service Agreements | Statement of Work No. 43 Dated 03/01/2017 |
| | Mallinckrodt ARD Holdings Inc. | 74727 | Service Agreements | Statement of Work No. 46 Dated 01/01/2017 |
| | Mallinckrodt ARD Holdings Inc. | 74814 | Service Agreements | Statement of Work No. 48 Dated 02/01/2017 |
| | Mallinckrodt ARD Holdings Inc. | 74771 | Service Agreements | Statement of Work No. 49 to Master Service Agreement Dated 02/08/2017 |
| | Mallinckrodt ARD Holdings Inc. | 71934 | Service Agreements | Statement of Work No. 53 to Master Service Agreement Dated 03/23/2017 |
| First Object 1320 Greenway Drive Suite 855 Irving, TX 75038 | Mallinckrodt plc | 73445 | Service Agreements | PROFESSIONAL SERVICES AGREEMENT Dated 07/21/2014 |

* Each Executory Contract and Unexpired Lease identified on this Schedule 1 includes any modifications, amendments, addenda or supplements thereto or restatements thereof.

Case 20-12522-JTD   Doc 3596-1   Filed 08/06/21   Page 13 of 25

## Schedule 1
## Executory Contracts and Unexpired Leases to be Rejected*

| Name and Address of Counterparty | Debtor | Unique ID | Contract Type | Description |
|---|---|---|---|---|
| | Mallinckrodt plc | 69659 | Service Agreements | PROFESSIONAL SERVICES AGREEMENT Dated 07/28/2014 |
| | ST Shared Services LLC | 75459 | Service Agreements | WORK ORDER NO. 16 Dated 07/01/2020 |
| Fortis Advisors Llc | | | | |
| | Mallinckrodt plc | VTSMerger1 | Other | Vtesse Merger Agreement Dated 03/31/2017 |
| Fresenius<br>ATTN: FRANZ KAINZ, PHD<br>BORKENBERG 14<br>OBERURSEL, DE 61440 | | | | |
| | Mallinckrodt plc | 00001269 | Confidentiality Agreements/NDA | Fresenius Kabi Manufacturing SA (PTY) Limited ZAF CDA Dated 10/05/2017 |
| | Mallinckrodt plc | 21459TherakosCust | Customer | Therakos Customer HENRY FORD - Included w/ Fresenius |
| | SpecGx LLC | 00001400 | Confidentiality Agreements/NDA | Fresenius Kabi Viet Nam VNM CDA Dated 05/17/2019 |
| | Mallinckrodt Medical Imaging - Ireland | Fresenius4 | | Manufacturing and Supply Agreement dated 8/6/2014 |
| | Mallinckrodt Pharmaceuticals Ireland Limited | 63566 | Purchase/Pricing and Supply Agreements | SECOND AMENDMENT TO MANUFACTURING AND SUPPLY AGREEMENT Dated 12/20/2017 |
| | Mallinckrodt plc | 21481TherakosCust | Customer | Therakos Customer FRESENIUS |
| | Mallinckrodt LLC | 00000109 | Customer | FRESENIUS KABI USA Dated 04/30/2017 |
| | SpecGx LLC | 00001141 | Purchase/Pricing and Supply Agreements | Fresenius Kabi Deutschland GmbH DEU CDA Dated 06/10/2018 |
| | Mallinckrodt Pharmaceuticals Ireland Limited | Fresenius1 | | Assignment Agreement dated 9/29/2014 |
| | SpecGx LLC | 00000110 | Purchase/Pricing and Supply Agreements | FRESENIUS KABI DEUTSCHLAND Dated 06/16/2019 |
| | Mallinckrodt Medical Imaging - Ireland | Fresenius5 | | Amendment to Manufacturing and Supply Agreement dated 11/4/2014 |

* Each Executory Contract and Unexpired Lease identified on this Schedule 1 includes any modifications, amendments, addenda or supplements thereto or restatements thereof.

## Schedule 1
### Executory Contracts and Unexpired Leases to be Rejected*

| Name and Address of Counterparty | Debtor | Unique ID | Contract Type | Description |
|---|---|---|---|---|
| Gartner<br>PO BOX 911319<br>DALLAS, TX 75391-1319 | | | | |
| | Mallinckrodt LLC | GARTNERINC-MAS-000 | Software/IT/Licensing Agreement | Dues, Memberships, Charity Contract Dated 06/29/2013 |
| | Mallinckrodt LLC | 68889 | Service Agreements | Statement of Work No. 1 Dated 12/02/2014 |
| | Mallinckrodt LLC | GARTNERINC-SOW-000 | Software/IT/Licensing Agreement | Dues, Memberships, Charity Contract Dated 11/30/2014 |
| | Mallinckrodt LLC | 70448 | Service Agreements | Statement of Work No. 2 to Master Service Agreement Dated 12/15/2014 |
| | Mallinckrodt LLC | GARTNERINC-SOW-000 | Software/IT/Licensing Agreement | Dues, Memberships, Charity Contract Dated 12/13/2014 |
| | Mallinckrodt LLC | GARTNERINC-MAS-000 | Software/IT/Licensing Agreement | Dues, Memberships, Charity Contract Dated 03/30/2015 |
| | Mallinckrodt LLC | GARTNERINC-QT-0007 | Software/IT/Licensing Agreement | Dues, Memberships, Charity Contract Dated 09/29/2015 |
| | Mallinckrodt LLC | GARTNERINC-QT-0007 | Software/IT/Licensing Agreement | Dues, Memberships, Charity Contract Dated 11/29/2015 |
| | Mallinckrodt LLC | GARTNERINC-MAS-000 | Software/IT/Licensing Agreement | Dues, Memberships, Charity Contract Dated 07/19/2016 |
| | Mallinckrodt LLC | GARTNERINC-MAS-001 | Software/IT/Licensing Agreement | Dues, Memberships, Charity Contract Dated 05/30/2018 |
| | Mallinckrodt plc | GARTNERINC-MAS-001 | Software/IT/Licensing Agreement | Dues, Memberships, Charity Contract Dated 06/29/2018 |
| Genpact<br>66 BUCKINGHAM GATE<br>4TH FLR<br>LONDON, SW1E 6AU | | | | |
| | Mallinckrodt LLC | 69963 | Service Agreements | MASTER SERVICES AGREEMENT Dated 08/18/2017 |
| | Mallinckrodt LLC | 12986 | Service Agreements | Service Agreements Contract Dated 03/22/2016 |

\* Each Executory Contract and Unexpired Lease identified on this Schedule 1 includes any modifications, amendments, addenda or supplements thereto or restatements thereof.

Case 20-12522-JTD   Doc 3596-1   Filed 08/06/21   Page 15 of 25

**Schedule 1**

**Executory Contracts and Unexpired Leases to be Rejected***

| Name and Address of Counterparty | Debtor | Unique ID | Contract Type | Description |
|---|---|---|---|---|
| | Mallinckrodt LLC | 69446 | Service Agreements | Change Order No. 01 To SOW NO. 1 - Veeva Support Services Dated 10/26/2017 |
| | Mallinckrodt LLC | 68184 | Service Agreements | Change Order No. 02 Dated 12/21/2017 |
| | Mallinckrodt LLC | 68185 | Service Agreements | MASTER SERVICES AGREEMENT Dated 08/18/2017 |
| | Mallinckrodt LLC | 69055 | Service Agreements | MUTUAL CONFIDENTIALITY AGREEMENT Dated 06/20/2017 |
| | ST Shared Services LLC | 67866 | Service Agreements | STATEMENT OF WORK NO. 18 Dated 01/01/2020 |
| | ST Shared Services LLC | 75569 | Service Agreements | STATEMENT OF WORK NO. 20 Dated 04/07/2020 |
| Greater Boston Medical Associates Law office of Michael Paolini 1646 Centre Street West Roxbury, MA  02132 | Mallinckrodt ARD Holdings Inc. | 45946 | Service Agreements | CLINICAL STUDY AGREEMENT — INVESTIGATOR INITIATED STUDY Dated 03/24/2016 |
| Greathouse, Kenneth R Lillian Stenfeldt, Esq. Rimon, P.C. Menlo Park, CA  94025 | Mallinckrodt Pharmaceuticals Ireland Limited | 49343 | Confidentiality Agreements/NDA | CONFIDENTIAL SETTLEMENT AGREEMENT AND RELEASE Dated 10/01/2014 |
| Guidespark 1400A Seaport Blvd. Suite 500 Redwood City, CA  94063 | Mallinckrodt LLC | 67336 | Purchase/Pricing and Supply Agreements | MASTER SUBSCRIPTION AGREEMENT Dated 08/15/2016 |
| | Mallinckrodt LLC | 72789 | Purchase/Pricing and Supply Agreements | MUTUAL NONDISCLOSURE AGREEMENT Dated 04/27/2016 |

* Each Executory Contract and Unexpired Lease identified on this Schedule 1 includes any modifications, amendments, addenda or supplements thereto or restatements thereof.

**Schedule 1**

**Executory Contracts and Unexpired Leases to be Rejected***

| Name and Address of Counterparty | Debtor | Unique ID | Contract Type | Description |
|---|---|---|---|---|
| | Mallinckrodt LLC | 67338 | Purchase/Pricing and Supply Agreements | FIRST AMENDMENT TO MASTER SUBSCRIPTION AGREEMENT Dated 01/25/2019 |
| | Mallinckrodt LLC | 67340 | Purchase/Pricing and Supply Agreements | Letter re: Consent to Assignment Dated 03/12/2020 |
| | Mallinckrodt LLC | 67337 | Purchase/Pricing and Supply Agreements | Order Form # 004 Dated 10/17/2016 |
| | Mallinckrodt LLC | 67341 | Purchase/Pricing and Supply Agreements | Order Form # 006 Dated 01/14/2019 |
| Happyomot 701 Northpointe Pkwy Suite 300 West Palm Beach, FL 33407 | Mallinckrodt plc | HappyOrNotContract | Other | Service Supply Agreement dated 10/31/2018 |
| Hospira PO BOX 744292 ATLANTA, GA 30374 | Mallinckrodt plc | 46220 | Purchase/Pricing and Supply Agreements | SUPPLY AGREEMENT Dated 07/01/1998 |
| | Mallinckrodt plc | 69701 | Purchase/Pricing and Supply Agreements | CONFIRMATION OF ASSIGNMENT OF DEVELOPMENT AND SUPPLY AGREEMENT Dated 11/23/2010 |
| Human Care Systems 84 STATE ST, SUITE 720 BOSTON, MA 02109 | Mallinckrodt ARD LLC | 76500 | Service Agreements | Services Agreement Contract Dated 07/20/2020 |
| | Mallinckrodt ARD LLC | 75464 | Service Agreements | STATEMENT OF WORK NO. 1901 Dated 04/27/2020 |
| | Mallinckrodt ARD Holdings Inc. | 75515 | Service Agreements | STATEMENT OF WORK NO. 1907 Dated 04/20/2020 |
| | Mallinckrodt ARD Holdings Inc. | 75465 | Service Agreements | STATEMENT OF WORK NO. 1907 Dated 05/04/2020 |
| | Mallinckrodt plc | 65384 | Service Agreements | STATEMENT OF WORK NO. 1910 Dated 03/23/2020 |

* Each Executory Contract and Unexpired Lease identified on this Schedule 1 includes any modifications, amendments, addenda or supplements thereto or restatements thereof.

## Schedule 1
## Executory Contracts and Unexpired Leases to be Rejected*

| Name and Address of Counterparty | Debtor | Unique ID | Contract Type | Description |
|---|---|---|---|---|
| Iraj Sabahi Research Inc<br>2161 Colorado Ave<br>Suite A2<br>Turlock, CA  95382 | Mallinckrodt plc | IRAJ SABAHI RESEARC | Other | Clinical Study Agreement dated 12/11/2014 |
| Koverse<br>Koverse, Inc.<br>999 Third Avenue<br>Seattle, WA  98104 | Mallinckrodt Enterprises LLC | 68440 | Service Agreements | MASTER SERVICES AGREEMENT Dated 09/03/2019 |
| | Mallinckrodt Enterprises LLC | 74555 | Service Agreements | MUTUAL CONFIDENTIALITY AGREEMENT Dated 06/26/2019 |
| | Mallinckrodt Enterprises LLC | 69898 | Service Agreements | STATEMENT OF WORK NO. 1 |
| Lloyd Glenn<br>Thomas E. Wallerstein<br>Venable LLP<br>San Francisco, CA  94105 | Mallinckrodt Pharmaceuticals Ireland Limited | 49343 | Confidentiality Agreements/NDA | CONFIDENTIAL SETTLEMENT AGREEMENT AND RELEASE Dated 10/01/2014 |
| Maxcare<br>Attn: Lonny D. Wilson, Executive Director<br>Pharmacy Providers of Oklahoma, Inc.<br>Oklahoma City, OK  73154 | Mallinckrodt LLC | 00001027 | Patient Assistance Agreement | Patient Assistance Program dated January 16, 2014 |
| | Mallinckrodt LLC | 00001027 | Amendment | Amendment ot Patient Assistance Program Agreement dated April 14, 2014 |
| | Mallinckrodt LLC | 00001027 | Service Agreements | Maxcare RX Dated 01/16/2014 |

\* Each Executory Contract and Unexpired Lease identified on this Schedule 1 includes any modifications, amendments, addenda or supplements thereto or restatements thereof.

Case 20-12522-JTD   Doc 3596-1   Filed 08/06/21   Page 18 of 25

## Schedule 1
## Executory Contracts and Unexpired Leases to be Rejected*

| Name and Address of Counterparty | Debtor | Unique ID | Contract Type | Description |
|---|---|---|---|---|
| Nasdaq Corporate Solutions LBX#11700 PO BOX 780700 PHILADELPHIA, PA 19178 | | | | |
| | Mallinckrodt LLC | Nasdaq1.2 | Master Services Agreement | Master Services Agreement Dated April 12, 2019 |
| | Mallinckrodt LLC | Nasdaq1.1 | Service Order | Service Order dated April 12, 2019 |
| Novotech (Australia) Pty Novotech (Australia) Pty Limited Attn: General Counsel Pyrmont,  NSW 2035 | | | | |
| | Mallinckrodt ARD Holdings Inc. | 69148 | Service Agreements | CLINICAL RESEARCH ORGANIZATION MASTER SERVICES AGREEMENT Dated 10/14/2015 |
| | Mallinckrodt ARD Holdings Inc. | 69494 | Service Agreements | CHANGE ORDER NO.1 TO STATEMENT OF WORK NO.1 Dated 05/12/2016 |
| | Mallinckrodt ARD Holdings Inc. | 69587 | Service Agreements | CHANGE ORDER NO. 2 to SOW Dated 09/21/2017 |
| | Mallinckrodt ARD Holdings Inc. | 62218 | Service Agreements | CHANGE ORDER NO. 3 TO STATEMENT OF WORK NO. 1 Dated 04/10/2018 |
| | Mallinckrodt ARD Holdings Inc. | 62219 | Service Agreements | CHANGE ORDER NO. 4 TO STATEMENT OF WORK NO. 1 Dated 7/ __/2019 |
| | Ocera Therapeutics, Inc. | 73957 | Service Agreements | CHANGE ORDER REQUEST FORM Dated 02/24/2016 |
| Pharmaceutics International PO BOX 842332 BOSTON, MA 02284 | | | | |
| | Mallinckrodt LLC | 12551 | Purchase/Pricing and Supply Agreements | Manufacturing Agreement Contract Dated 01/20/2020 |
| | Mallinckrodt LLC | 51920 | Other | Complete Preparation of Process Validation in Preparation to Manufacture Validation Batches of Morphine Sulfate, 10mg/mL and 25mg/mL for Mallinckrodt LLC Dated 02/28/2013 |

* Each Executory Contract and Unexpired Lease identified on this Schedule 1 includes any modifications, amendments, addenda or supplements thereto or restatements thereof.

**Schedule 1**

**Executory Contracts and Unexpired Leases to be Rejected***

| Name and Address of Counterparty | Debtor | Unique ID | Contract Type | Description |
|---|---|---|---|---|
| | Mallinckrodt LLC | 51921 | Other | Manufacture of Validation Batches of Morphine Sulfate, 10mg/mL and 25mg/mL for Mallinckrodt LLC Dated 07/09/2013 |
| | Mallinckrodt LLC | 00001375 | Confidentiality Agreements/NDA | Pharmaceutics International, Inc. (Pii) USA CDA Dated 10/31/2017 |
| | SpecGx LLC | 12749 | Service Agreements | Pharmaceutics Intl Sublocade binding term sheet_4.1.20_Binding Term sheet |
| Purdue University Collections Office 610 Purdue Mall West Lafayette, IN  47906 | | | | |
| | Mallinckrodt LLC | Purdue University College | Other | Letter of Agreement for Medical Educational Support dated 10/31/2019 |
| Reed Technology And Information Ser Reed Technology and Information Services Inc. 7 Walnut Grove Drive Horsham, PA 19044 | | | | |
| | Mallinckrodt LLC | 68820 | Service Agreements | CONVERSION SERVICES AGREEMENT Dated 10/17/2017 |
| Revhealth 55 BANK ST MORRISTOWN, NJ  07960 | | | | |
| | Mallinckrodt LLC | 69681 | Service Agreements | MASTER SERVICES AGREEMENT Dated 09/29/2017 |
| | Mallinckrodt LLC | 71306 | Service Agreements | MUTUAL CONFIDENTIALITY AGREEMENT  Dated 09/29/2017 |
| | Mallinckrodt ARD LLC | 75519 | Service Agreements | FIRST AMENDMENT TO STATEMENT OF WORK NO. 8 Dated 03/31/2020 |
| | Mallinckrodt ARD LLC | 75549 | Service Agreements | STATEMENT OF WORK NO. 15 Dated 04/23/2020 |
| | Mallinckrodt ARD LLC | 75565 | Service Agreements | STATEMENT OF WORK NO. 18 Dated 05/18/2020 |

* Each Executory Contract and Unexpired Lease identified on this Schedule 1 includes any modifications, amendments, addenda or supplements thereto or restatements thereof.

**Schedule 1**

**Executory Contracts and Unexpired Leases to be Rejected***

| Name and Address of Counterparty | Debtor | Unique ID | Contract Type | Description |
| --- | --- | --- | --- | --- |
| Russell Smestad<br>Russel Smestad 6419 Wydown CircleMiddleton, WI 53562with copy to:Michael Best & Friedrich LLP1 S. Pinckney Street, Suite 700Madison, WI 53701Attn: Tod B Linstroth | | | | |
| | Mallinckrodt Hospital Products Inc. | 53353 | Other | AGREEMENT AND PLAN OF MERGER Dated 08/10/2016 |
| | Mallinckrodt International Finance SA | 53353 | Other | AGREEMENT AND PLAN OF MERGER Dated 08/10/2016 |
| | Mallinckrodt plc | 53353 | Other | AGREEMENT AND PLAN OF MERGER Dated 08/10/2016 |
| Saama<br>900 E. Hamilton Ave, Suite 200 Campbell, CA 95008 | | | | |
| | Mallinckrodt Enterprises LLC | 75426 | Service Agreements | CHANGE ORDER 1 TO STATEMENT OF WORK Dated 06/25/2020 |
| Sensei Project Solutions<br>45 WEST JEFFERSON ST 45 WEST JEFFERSON ST PHOENIX, AZ 85003 | | | | |
| | Mallinckrodt LLC | 68195 | Service Agreements | MASTER SERVICES AGREEMENT Dated 02/15/2018 |
| | Mallinckrodt Pharmaceuticals Limited | 75527 | Service Agreements | PPM Support Dated 03/18/2020 |
| | Mallinckrodt Pharmaceuticals Limited | 75527 | Service Agreements | PPM Support Dated 03/18/2020 |
| | Mallinckrodt LLC | 70919 | Service Agreements | MUTUAL CONFIDENTIALITY AGREEMENT Dated 10/10/2017 |

* Each Executory Contract and Unexpired Lease identified on this Schedule 1 includes any modifications, amendments, addenda or supplements thereto or restatements thereof.

## Schedule 1
## Executory Contracts and Unexpired Leases to be Rejected*

| Name and Address of Counterparty | Debtor | Unique ID | Contract Type | Description |
|---|---|---|---|---|
| Sfc Owner Llc<br>300 Broadacres Drive<br>Suite 126<br>Bloomfield, NJ 07003 | Mallinckrodt plc | 000068 | Leases | Lease Contract |
| Stratacom<br>StrataCom, Inc.<br>3523 45th St S<br>Fargo, ND 58104 | ST Shared Services LLC | 75492 | Service Agreements | MASTER SERVICES AGREEMENT Dated 04/28/2020 |
| | Mallinckrodt Pharmaceuticals Limited | 74244 | Service Agreements | Chance Request Form No. 4 Dated 09/30/2017 |
| | Mallinckrodt LLC | 73962 | Service Agreements | Statement of Work No. 1 Dated 09/30/2016 |
| | ST Shared Services LLC | 75613 | Service Agreements | Statement of Work No. 9 – 2020 to Master Service Agreement Dated 02/01/2020 |
| Stuart Rose<br>Venable LLP<br>Thomas E. Wallerstein<br>San Francisco, CA 94105 | Mallinckrodt Pharmaceuticals Ireland Limited | 49343 | Confidentiality Agreements/NDA | CONFIDENTIAL SETTLEMENT AGREEMENT AND RELEASE Dated 10/01/2014 |
| Symbiance<br>Symbiance Inc.,<br>51 Everett Drive, Suite 1320<br>Princeton, NJ 08540 | Mallinckrodt Enterprises LLC | 67540 | Service Agreements | MASTER SERVICES AGREEMENT Dated 06/12/2019 |
| | Mallinckrodt LLC | 70811 | Service Agreements | Master Services Agreement Dated 06/12/2019 |
| | Mallinckrodt plc | 67538 | Service Agreements | STATEMENT OF WORK NO. 1 Dated 08/12/2019 |

* Each Executory Contract and Unexpired Lease identified on this Schedule 1 includes any modifications, amendments, addenda or supplements thereto or restatements thereof.

## Schedule 1

### Executory Contracts and Unexpired Leases to be Rejected*

| Name and Address of Counterparty | Debtor | Unique ID | Contract Type | Description |
|---|---|---|---|---|
| Synapse<br>Attn: Alex DeVincenzo<br>One World Trade Center<br>New York , NY 10007 | Mallinckrodt Enterprises LLC | 67543 | Service Agreements | STATEMENT OF WORK NO. 2 Dated 09/01/2019 |
| | Mallinckrodt LLC | 70653 | Service Agreements | MASTER SERVICES AGREEMENT Dated 12/17/2018 |
| | Mallinckrodt LLC | 70750 | Service Agreements | MUTUAL CONFIDENTIALITY AGREEMENT Dated 10/29/2018 |
| | Mallinckrodt ARD Holdings Inc. | 69635 | Service Agreements | STATEMENT OF WORK NO. 4 Dated 01/18/2019 |
| | Mallinckrodt ARD Holdings Inc. | 70645 | Service Agreements | STATEMENT OF WORK NO. 7 Dated 02/13/2019 |
| | Mallinckrodt ARD Holdings Inc. | 70662 | Service Agreements | STATEMENT OF WORK  Dated 01/01/2019 |
| | Mallinckrodt Hospital Products Inc. | 67901 | Service Agreements | STATEMENT OF WORK NO. 17 Dated 03/11/2020 |
| | Mallinckrodt ARD LLC | 75615 | Service Agreements | STATEMENT OF WORK NO. 18 Dated 04/30/2020 |
| The Continental Stock Transfer and Trust Company<br>One State Street<br>30th Floor<br>New York, NY 10004 | | | | |
| | Ocera Therapeutics | CSTTC1.1 | Contingent Value Rights Agreement | Contingent Value Rights Agreement dated December 7, 2017 |
| The Reynolds Company<br>Attn: Rose Marshall<br>11550 N Harrells Ferry Road<br>Baton Rouge, LA 70816 | | | | |
| | Mallinckrodt plc | ReynoldsContract1 | Other | Techconnect Support Agreement Renewal date 8/28/2019 |
| Tracelink<br>400 Riverpark Drive Suite 200<br>North Reading, MA 01864 | | | | |

* Each Executory Contract and Unexpired Lease identified on this Schedule 1 includes any modifications, amendments, addenda or supplements thereto or restatements thereof.

Case 20-12522-JTD   Doc 3596-1   Filed 08/06/21   Page 23 of 25

## Schedule 1
## Executory Contracts and Unexpired Leases to be Rejected*

| Name and Address of Counterparty | Debtor | Unique ID | Contract Type | Description |
|---|---|---|---|---|
| Ucl Business Plc<br>The Network Building<br>97 Tottenham Court Road<br>London,   WIT 4TP | Mallinckrodt Pharmaceuticals Ireland Limited | 70927 | Confidentiality Agreements/NDA | MUTUAL CONFIDENTIALITY AGREEMENT  Dated 06/09/2017 |
| | Ocera Therapeutics, Inc. | 70312 | Software/IT/Licensing Agreement | SECOND AMENDED AND RESTATED LICENSE AGREEMENT Dated 07/01/2015 |
| Valiance Partners<br>80 MORRISTOWN RD, 320 80 MORRISTOWN RD, 320<br>BERNARDSVILLE, NJ  07924- | | | | |
| | Mallinckrodt LLC | 70796 | Service Agreements | MASTER SERVICES AGREEMENT Dated 06/08/2012 |
| | Mallinckrodt LLC | 12968 | Service Agreements | Consulting Contract Dated 11/10/2018 |
| | Mallinckrodt LLC | 12974 | Service Agreements | Consulting Contract Dated 06/06/2012 |
| | Mallinckrodt LLC | 73434 | Service Agreements | Addendum #1 to the Schedule #1 of the Mallinckrodt Master Services Agreement Dated 02/03/2014 |
| | Mallinckrodt LLC | 74642 | Service Agreements | AMENDMENT TO  MASTER SERVICES AGREEMENT Dated 11/13/2018 |
| | Mallinckrodt LLC | 62322 | Service Agreements | Mallinckrodt — Valiance Statement of Work Terlipressin Studies eTMF Migration, Testing & Validation Dated 03/01/2018 |
| | Mallinckrodt LLC | 74124 | Service Agreements | STATEMENT OF WORK  #2  Dated 02/03/2014 |
| | Mallinckrodt LLC | 72220 | Service Agreements | STATEMENT OF WORK #4 Dated 10/07/2016 |
| | Mallinckrodt LLC | 53965 | Service Agreements | STATEMENT OF WORK (SOW) #2 Migration to NextDocs Dated 02/03/2014 |
| | Mallinckrodt LLC | 72532 | Service Agreements | Statement of Work Dated 06/09/2016 |

* Each Executory Contract and Unexpired Lease identified on this Schedule 1 includes any modifications, amendments, addenda or supplements thereto or restatements thereof.

Case 20-12522-JTD  Doc 3596-1  Filed 08/06/21  Page 24 of 25

**Schedule 1**

**Executory Contracts and Unexpired Leases to be Rejected\***

| Name and Address of Counterparty | Debtor | Unique ID | Contract Type | Description |
|---|---|---|---|---|
| Visual Bi Solutions<br>Visual BI Solutions, Inc.<br>5600 Tennyson Pkwy<br>Plano, TX  75024 | | | | |
| | Mallinckrodt plc | 68911 | Service Agreements | PROFESSIONAL SERVICES AGREEMENT Dated 09/11/2014 |
| | Mallinckrodt LLC | 68197 | Service Agreements | WORK ORDER NO.11 Dated 05/02/2016 |
| Westin Hotels & Resorts<br>6902 East Greenway Parkway<br>Scottsdale, AZ  85254 | | | | |
| | Mallinckrodt plc | WESTIN HOTELS & RE | Other | Group Event Agreement dated 5/22/2019 |
| Whizdotai<br>22 HAROLD AVE<br>EDISON, NJ  08820 | | | | |
| | Mallinckrodt LLC | 71146 | Service Agreements | SUBSCRIPTION AND SERVICES AGREEMENT Dated 08/10/2018 |
| | Mallinckrodt LLC | 70938 | Service Agreements | MUTUAL CONFIDENTIALITY AGREEMENT  Dated 07/25/2017 |
| Zs Associates<br>Attention: Jim Adelizzi<br>4365 Executive Drive, Suite 1530,<br>San Diego, CA  92121 | | | | |
| | Mallinckrodt LLC | 54424 | Service Agreements | ACCESSMONITOR SUBSCRIPTION AGREEMENT Dated 06/30/2012 |
| | Mallinckrodt LLC | 69913 | Service Agreements | Partial Assignment of Master Software License, Hosting and Related Services Agreement Dated 04/04/2013 |
| | Mallinckrodt plc | 69913 | Service Agreements | Partial Assignment of Master Software License, Hosting and Related Services Agreement Dated 04/04/2013 |
| | Mallinckrodt LLC | 68212 | Service Agreements | Statement of Work No. 23 Dated 07/14/2014 |

\* Each Executory Contract and Unexpired Lease identified on this Schedule 1 includes any modifications, amendments, addenda or supplements thereto or restatements thereof.

**Schedule 1**

**Executory Contracts and Unexpired Leases to be Rejected***

| Name and Address of Counterparty | Debtor | Unique ID | Contract Type | Description |
|---|---|---|---|---|
| | Mallinckrodt LLC | 70131 | Service Agreements | Statement of Work No. 47 Dated 10/10/2016 |
| | Mallinckrodt Hospital Products Inc. | 69225 | Service Agreements | Third Party Data Use Agreement Dated 09/21/2011 |
| | Mallinckrodt LLC | 69064 | Service Agreements | THIRD AMENDMENT TO MASTER SERVICES AGREEMENT Dated 01/19/2018 |

* Each Executory Contract and Unexpired Lease identified on this Schedule 1 includes any modifications, amendments, addenda or supplements thereto or restatements thereof.

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
| MALLINCKRODT PLC, *et al.*, | ) | Case No. 20-12522 (JTD) |
|  | ) |  |
| Debtors.[1] | ) | (Jointly Administered) |
|  | ) |  |
|  | ) | **Re: Docket No. 3596** |

**NOTICE OF FILING OF AMENDED <u>EXHIBIT U</u> (REJECTED EXECUTORY
CONTRACT/UNEXPIRED LEASE LIST) OF PLAN SUPPLEMENT FOR
THE JOINT PLAN OF REORGANIZATION OF MALLINCKRODT PLC AND
ITS DEBTOR AFFILIATES UNDER CHAPTER 11 OF THE BANKRUPTCY CODE**

**PLEASE TAKE NOTICE** that, on August 6, 2021, as contemplated by the *Joint Plan of Reorganization of Mallinckrodt plc and its Debtor Affiliates Under Chapter 11 of the Bankruptcy Code* (as may be amended, modified, or supplemented from time to time, and including all exhibits and supplements thereto, the "***Plan***"), the above-captioned debtors and debtors-in-possession (collectively, the "***Debtors***") filed <u>Exhibit U</u> (Rejected Executory Contract/Unexpired Lease List) [Docket No. 3596] of the plan supplement (the "***Plan Supplement***") with the United States Bankruptcy Court for the District of Delaware (the "***Bankruptcy Court***"). Capitalized terms used but not defined herein have the meanings set forth in the Plan.

**PLEASE TAKE FURTHER NOTICE** that the Debtors hereby file an amended version of <u>Exhibit U</u> (the "***Amended <u>Exhibit U</u>***"). Amended <u>Exhibit U</u> is attached hereto as **Exhibit 1**.

**PLEASE TAKE FURTHER NOTICE** that certain documents, or portions thereof, contained in Amended <u>Exhibit U</u> and the Plan Supplement remain subject to continuing negotiations among the Debtors and interested parties with respect thereto. The Debtors and such applicable interested parties reserve all of their respective rights, subject to the terms and conditions set forth in the Plan and the Restructuring Support Agreement (as amended), with respect to the final form of such documents and to further amend, revise, or supplement the Plan Supplement, and any of the documents and designations contained herein, at any time before the Effective Date of the Plan, or any such other date as may be provided for by the Plan or by order of the Bankruptcy Court.

**PLEASE TAKE FURTHER NOTICE** that Amended <u>Exhibit U</u> of the Plan Supplement is integral to, part of, and incorporated by reference into the Plan. Please note, however, <u>these documents have not yet been approved by the Bankruptcy Court</u>. If the Plan is confirmed, the

---

[1] A complete list of the Debtors in these Chapter 11 Cases may be obtained on the website of the Debtors' claims and noticing agent at http://restructuring.primeclerk.com/Mallinckrodt. The Debtors' mailing address is 675 McDonnell Blvd., Hazelwood, Missouri 63042.

AA0000089

documents contained in the Plan Supplement will be approved by the Bankruptcy Court pursuant to the order confirming the Plan.

**PLEASE TAKE FURTHER NOTICE** that any Proofs of Claim asserting Claims arising from the rejection of the Executory Contracts and Unexpired Leases pursuant to the Plan or otherwise must be filed with the Notice and Claims Agent within thirty (30) days of the effective date of the rejection of the applicable Executory Contract or Unexpired Lease. **Any Proofs of Claim arising from the rejection of the Executory Contracts and Unexpired Leases that are not timely filed shall be automatically disallowed without further order of the Bankruptcy Court.** All Allowed Claims arising from the rejection of the Executory Contracts and Unexpired Leases shall constitute General Unsecured Claims and shall be treated in accordance with Article III.B of the Plan.

**PLEASE TAKE FURTHER NOTICE** that the copies of the documents included in the Plan Supplement or the Plan, or any other document filed in the Debtors' chapter 11 cases, may be obtained free of charge by contacting the Debtors' Notice and Claims Agent, Prime Clerk LLC, by: (i) calling the Debtors' restructuring hotline at 877-467-1570 (US/Canada); 347-817-4093 (International); (ii) visiting the Debtors' restructuring website at: https://cases.primeclerk.com/mallinckrodt; and/or (iii) writing to (a) Mallinckrodt plc Ballot Processing, c/o Prime Clerk LLC One Grand Central Place, 60 East 42nd Street, Suite 1440, New York, NY 10165 or (b) mallinckrodtinfo@primeclerk.com. You may also obtain copies of any pleadings filed in these chapter 11 cases for a fee via PACER at: http://www.deb.uscourts.gov or free of charge at https://restructuring.primeclerk.com/mallinckrodt/.

**THIS NOTICE IS BEING SENT TO YOU FOR INFORMATIONAL PURPOSES ONLY. IF YOU HAVE QUESTIONS WITH RESPECT TO YOUR RIGHTS UNDER THE PLAN OR ABOUT ANYTHING STATED HEREIN OR IF YOU WOULD LIKE TO OBTAIN ADDITIONAL INFORMATION, PLEASE CONTACT THE NOTICE AND CLAIMS AGENT AT THE NUMBER OR ADDRESS SPECIFIED ABOVE. PLEASE NOTE THAT THE NOTICE AND CLAIMS AGENT CANNOT PROVIDE LEGAL ADVICE.**

Dated: August 13, 2021

_/s/ Amanda R. Steele_
**RICHARDS, LAYTON & FINGER, P.A.**
Mark D. Collins (No. 2981)
Michael J. Merchant (No. 3854)
Amanda R. Steele (No. 5530)
Brendan J. Schlauch (No. 6115)
One Rodney Square
920 N. King Street
Wilmington, DE 19801
Telephone:     (302) 651-7700
Facsimile:     (302) 651-7701
Email:          collins@rlf.com
                merchant@rlf.com
                steele@rlf.com
                schlauch@rlf.com


- and -

George A. Davis (admitted _pro hac vice_)
George Klidonas (admitted _pro hac vice_)
Andrew Sorkin (admitted _pro hac vice_)
Anupama Yerramalli (admitted _pro hac vice_)
**LATHAM & WATKINS LLP**
1271 Avenue of the Americas
New York, New York 10020
Telephone:     (212) 906-1200
Facsimile:     (212) 751-4864
Email:          george.davis@lw.com
                george.klidonas@lw.com
                andrew.sorkin@lw.com
                anu.yerramalli@lw.com

- and -

Jeffrey E. Bjork (admitted _pro hac vice_)
**LATHAM & WATKINS LLP**
355 South Grand Avenue, Suite 100
Los Angeles, California 90071
Telephone:     (213) 485-1234
Facsimile:     (213) 891-8763
Email:          jeff.bjork@lw.com

- and -

Jason B. Gott (admitted _pro hac vice_)
**LATHAM & WATKINS LLP**
330 North Wabash Avenue, Suite 2800
Chicago, Illinois 60611
Telephone:     (312) 876-7700
Facsimile:     (312) 993-9767
Email:          jason.gott@lw.com

_Counsel for Debtors and Debtors in Possession_

AA0000091

# **Exhibit 1**

AA0000092

## Exhibit U

### Rejected Executory Contract/Unexpired Lease List

You have been identified as a party to one or more of the potential Executory Contracts or Unexpired Leases listed on the rejection schedule attached hereto as **Schedule 1** (the "***Rejected Contract Schedule***").  The Debtors hereby provide notice that, pursuant to section 365 of the Bankruptcy Code, the Debtors propose to reject each potential Executory Contract or Unexpired Lease listed on the Rejected Contract Schedule on the Effective Date of the Plan with such rejection being effective as of the petition date (*i.e.*, October 12, 2020).[2]

Certain documents, or portions thereof, contained in this Exhibit U and the Plan Supplement remain subject to continuing negotiations among the Debtors and interested parties with respect thereto.  Subject to the terms and conditions set forth in the Plan and the Restructuring Support Agreement, the Debtors reserve all rights to—for any reason whatsoever (including based on objections received to Article V.G of the Plan)—amend, revise, or supplement this Exhibit U, and any of the documents and designations contained herein, at any time before the Effective Date of the Plan, or any such other date as may be provided for by the Plan or by order of the Bankruptcy Court.

In accordance with the *Order (A) Establishing Bar Dates and Related Procedures for Filing Proofs of Claim and (B) Approving Form and Manner of Notice Thereof* [Docket No. 667] and the Plan, any Proofs of Claim asserting Claims arising from the rejection of the Executory Contracts and Unexpired Leases must be filed with the Notice and Claims Agent within thirty (30) days of the effective date of the rejection of the applicable Executory Contract or Unexpired Lease. All Allowed Claims arising from the rejection of the Executory Contracts and Unexpired Leases shall constitute General Unsecured Claims and shall be treated in accordance with Article III.B of the Plan.  **Any Person or Entity that is required to file a Proof of Claim arising from the rejection of a potential Executory Contract or Unexpired Lease listed on the Rejected Contract Schedule that fails to timely do so shall be forever barred, estopped and enjoined from asserting such Claim, and such Claim shall not be enforceable, against the Debtors, the Reorganized Debtors or the Estates, and the Debtors, the Reorganized Debtors and their Estates and their respective assets and property shall be forever discharged from any and all indebtedness and liability with respect to such Claim unless otherwise ordered by the Bankruptcy Court or as otherwise provided herein.  All such Claims shall, as of the Effective Date of the Plan, be subject to the permanent injunction set forth in Article IX of the Plan.**

The Debtors' listing of a poential Executory Contract or Unexpired Lease on the Rejected Contract Schedule shall not be deemed or construed as (a) a promise by the Debtors to seek the rejection of such contract or lease, (b) a limitation or waiver on the Debtors' ability to amend, modify or supplement the Rejected Contract Schedule, (c) a limitation or waiver on the Debtors'

---

[2]     In accordance with Article V.A of the Plan, each Executory Contract and Unexpired Lease that is not rejected as of the Effective Date will be deemed assumed as of the Effective Date pursuant to sections 365 and 1123 of the Bankruptcy Code.

AA0000093

ability to seek to assume or reject any Executory Contract or Unexpired Lease, or (d) an admission that any potential Executory Contract or Unexpired Lease is, in fact, an Executory Contract or Unexpired Lease under section 365 of the Bankruptcy Code. Moreover, the Debtors explicitly reserve their rights, in their sole discretion, to reject or assume each Executory Contract or Unexpired Lease pursuant to section 365(a) of the Bankruptcy Code and nothing herein (i) alters in any way the prepetition nature of such agreements or the validity, priority, or amount of any claims of a counterparty such agreements against the Debtors that may arise under such agreements, (ii) creates a postpetition contract or agreement, or (iii) elevates to administrative expense priority any claims of a counterparty to an Executory Contract or Unexpired Lease against the Debtors that may arise under such agreements. The Debtors reserve all their rights, claims and causes of action with respect to the potential Executory Contracts, Unexpired Leases and other agreements listed on the Rejected Contract Schedule, including the right to amend, revise, or supplement the Rejected Contract Schedule for any reason whatsoever, including based on objections received to Article V.G of the Plan.

RLF1 25828862v.2

AA0000094

**Schedule 1**

**Rejected Contract Schedule**

AA0000095

**Schedule 1**

**Executory Contracts and Unexpired Leases to be Rejected***

| Name and Address of Counterparty | Debtor | Unique ID | Contract Type | Description |
|---|---|---|---|---|
| Accenture<br>Attn: Contracts Management<br>Accenture LLP<br>Berwyn, PA 19312 | | | | |
| | Mallinckrodt LLC | 68937 | Service Agreements | MASTER SERVICES AGREEMENT Dated 09/05/2018 |
| | Sucampo Pharmaceuticals, Inc. | 68122 | Service Agreements | Master Professional Services Agreement Dated 02/01/2014 |
| | Mallinckrodt Hospital Products Inc. | 68884 | Service Agreements | Amendment No. 2 to StartingPoint Software License Agreement Dated 07/19/2018 |
| | Mallinckrodt Enterprises LLC | 70480 | Service Agreements | STATEMENT OF WORK NO. 2 Dated 02/06/2019 |
| Access Tea<br>Access TCA, Inc.<br>1 Main Street<br>Whitinsville, MA 01588 | | | | |
| | Mallinckrodt LLC | 70562 | Service Agreements | Master Services Agreement Dated 09/25/2017 |
| | SpecGx LLC | 12591 | Service Agreements | Access TCA SOW2 for 2020 Services |
| | ST Shared Services LLC | 80150 | Other | Other Dated 03/18/2021 |
| | Mallinckrodt LLC | 12134 | Service Agreements | Service Agreements Contract Dated 07/14/2019 |
| | Mallinckrodt LLC | 12134 | Service Agreements | Service Agreements Contract Dated 07/16/2019 |
| | Mallinckrodt ARD Holdings Inc. | 76544 | Service Agreements | Service Agreements Contract Dated 09/21/2020 |
| | Mallinckrodt LLC | ACCESSTCAINC-SOW-0 | Service Agreements | Service Agreements Contract Dated 09/23/2017 |
| | Mallinckrodt ARD Holdings Inc. | 65481 | Service Agreements | STATEMENT OF WORK — Neph #32 |
| | Mallinckrodt Hospital Products Inc. | 75586 | Service Agreements | STATEMENT OF WORK NO. 41 Dated 04/09/2020 |
| American Express<br>PO BOX 1270 PO BOX 1270<br>NEWARK, NJ 07101-1270 | | | | |
| | Mallinckrodt LLC | 49205 | Service Agreements | Business Travel Services Agreement Dated 06/01/2016 |

* Each Executory Contract and Unexpired Lease identified on this Schedule 1 includes any modifications, amendments, addenda or supplements thereto or restatements thereof.

**Schedule 1**

**Executory Contracts and Unexpired Leases to be Rejected\***

| Name and Address of Counterparty | Debtor | Unique ID | Contract Type | Description |
|---|---|---|---|---|
| | Mallinckrodt LLC | 66632 | Service Agreements | AMENDMENT TO BUSINESS TRAVEL SERVICE AGREEMENT Dated 09/01/2017 |
| | Mallinckrodt LLC | 73202 | Other | DATA PROTECTION AUTHORIZATION AND DIRECTION Dated 06/06/2013 |
| | Mallinckrodt Pharmaceuticals Limited | 74709 | Service Agreements | Data Release Authorization Dated 04/01/2013 |
| | Mallinckrodt LLC | AMERICANEXPRESSTR | Service Agreements | Services Agreement Contract Dated 06/04/2016 |
| | Mallinckrodt LLC | AMERICANEXPRESSTR | Service Agreements | Services Agreement Contract Dated 05/30/2016 |
| | Mallinckrodt LLC | AMERICANEXPRESSTR | Service Agreements | Services Agreement Contract Dated 05/25/2015 |
| | Mallinckrodt LLC | AMERICANEXPRESSTR | Service Agreements | Services Agreement Contract Dated 11/08/2014 |
| | Mallinckrodt LLC | AMERICANEXPRESSTR | Service Agreements | Services Agreement Contract Dated 10/05/2014 |
| | Mallinckrodt LLC | AMERICANEXPRESSTR | Service Agreements | Services Agreement Contract Dated 09/07/2014 |
| | Mallinckrodt LLC | AMERICANEXPRESSTR | Service Agreements | Services Agreement Contract Dated 01/19/2014 |
| | Mallinckrodt LLC | AMERICANEXPRESSTR | Service Agreements | Services Agreement Contract Dated 05/28/2013 |
| | Mallinckrodt LLC | AMEXCANADAINC-MA | Service Agreements | Services Agreement Contract Dated 05/15/2013 |
| | Mallinckrodt LLC | AMERICANEXPRESSTR | Service Agreements | Services Agreement Contract Dated 04/13/2013 |
| | Mallinckrodt LLC | 12993 | Service Agreements | Services Agreement Contract Dated 05/29/2016 |
| | Mallinckrodt LLC | 73693 | Service Agreements | Statement of Work Dated 11/10/2014 |
| | Mallinckrodt plc | 73080 | Other | Letter Agreement  Dated 04/15/2013 |
| | Mallinckrodt LLC | 74144 | Other | ADDENDUM TO LETTER AGREEMENT Dated 01/21/2014 |
| | ST Shared Services LLC | 77802 | Other | Amendments Dated 12/03/2020 |
| | Mallinckrodt LLC | 72496 | Other | Amendment to the Letter Agreement Dated 09/09/2014 |
| | Mallinckrodt plc | 75073 | Service Agreements | AMENDMENT TO THE BUSINESS TRAVEL SERVICES AGREEMENT Dated 06/01/2016 |
| | ST Shared Services LLC | 77802 | Other | AMENDMENT TO BUSINESS TRAVEL SERVICES AGREEMENT |
| | Mallinckrodt plc | 72964 | Other | ADDENDUM TO THE LETTER AGREEMENT Dated 05/27/2015 |

\* Each Executory Contract and Unexpired Lease identified on this Schedule 1 includes any modifications, amendments, addenda or supplements thereto or restatements thereof.

Case 20-12522-JTD   Doc 3721-1   Filed 08/13/21   Page 7 of 26

## Schedule 1
### Executory Contracts and Unexpired Leases to be Rejected*

| Name and Address of Counterparty | Debtor | Unique ID | Contract Type | Description |
|---|---|---|---|---|
| Ancla Consultancy Llc<br>Ancla Consultancy Services LLC<br>300 Carnegie Center, Suite 150<br>Princeton, NJ  08540 | Mallinckrodt LLC | 69613 | Other | Letter Agreement Dated 04/15/2013 |
| | Mallinckrodt plc | 67516 | Service Agreements | MASTER SERVICES AGREEMENT Dated 07/06/2017 |
| | Mallinckrodt LLC | 67518 | Service Agreements | Scope of Work #03 Migration of Argus Cases and Corresponding Data Dated 05/11/2018 |
| | Mallinckrodt LLC | ANCLACONSULTANCY | Purchase/Pricing and Supply Agreements | Operating Materials & Supplies Contract Dated 08/11/2018 |
| Anderson Packaging<br>AmerisourceBergen Corporation<br>1300 Morris Drive<br>Chesterbrook, PA  19087 | Mallinckrodt LLC | 46738 | Service Agreements | QUALITY AGREEMENT Dated 02/21/2017 |
| | Mallinckrodt LLC | 46745 | Service Agreements | Letter re: Release and Settlement of Loss of Exalgo 32mg Tablets, Lot 317252 Dated 07/24/2013 |
| Ashland LLC and International Specialty Products Inc.<br>Robin E. Lampkin, Esq.<br>5200 Blazer Parkway<br>Dublin, OH  43017 | Mallinckrodt LLC | AshlandISP1.1 | JDA | Joint Defense Agreement dated 8/2014 |
| | Mallinckrodt LLC | AshlandISP1.2 | SPA | SPA dated March 31, 1992 |
| Atos Digital Health Solutions Inc<br>Attn: Kevin McBride<br>4851 Regent Boulevard<br>Irving, TX  75063 | | | | |

* Each Executory Contract and Unexpired Lease identified on this Schedule 1 includes any modifications, amendments, addenda or supplements thereto or restatements thereof.

Case 20-12522-JTD   Doc 3721-1   Filed 08/13/21   Page 8 of 26

**Schedule 1**

**Executory Contracts and Unexpired Leases to be Rejected***

| Name and Address of Counterparty | Debtor | Unique ID | Contract Type | Description |
|---|---|---|---|---|
| | ST Shared Services LLC | 80125 | Other | Other Dated 09/01/2020 |
| | Mallinckrodt Pharmaceuticals Limited | 68133 | Other | Letter re: Amendment # 6 to Statement of Work # 2 – Personnel and Facility Space, Dated September 13, 2016, as amended Dated 07/01/2018 |
| | Mallinckrodt plc | 77906 | Other | Letter re: Amendment # 5 to Statement of Work # 2 – Personnel and Facility Space, DatedSeptember 13, 2016, as amended |
| | Mallinckrodt plc | 77906 | Other | Amendments Dated 07/01/2018 |
| Aventis Intercontinental 55 Corporate Drive Bridgewater, NJ 08807 | Mallinckrodt plc | AventisRoyalty1 | Other | Royalty Agreement Dated 07/27/2001 |
| | Mallinckrodt LLC | SANOFIAVENTISUSLL | Purchase/Pricing and Supply Agreements | Operating Materials & Supplies Contract Dated 12/30/1999 |
| | Mallinckrodt LLC | 00001001 | Customer | Sanofi Winthrop Industrie Dated 07/13/2015 |
| | Mallinckrodt LLC | 00001390 | Confidentiality Agreements/NDA | Sanofi-Aventis U.S. LLC USA CDA Dated 11/07/2017 |
| | Mallinckrodt plc | 00000793 | Confidentiality Agreements/NDA | APLQUAL-Aventis Intercontinental FRA.ORIG.10_FEB_2005 |
| | Mallinckrodt LLC | 52800 | Confidentiality Agreements/NDA | Amendment #2 to Mutual Confidentiality Agreement Between sanofi-aventis U.S., Inc. and Mallinckrodt LLC Dated 12/13/2013 |
| | Sucampo Pharmaceuticals, Inc. | 71735 | Confidentiality Agreements/NDA | CONFIDENTIAL DISCLOSURE AGREEMENT Dated 10/12/2017 |
| | Mallinckrodt LLC | 52798 | Confidentiality Agreements/NDA | NON-DISCLOSURE AGREEMENT Dated 08/30/2016 |
| Baxter W Illinois Route 120 WG1-2N ROUND LAKE, IL 60073 | | | | |

* Each Executory Contract and Unexpired Lease identified on this Schedule 1 includes any modifications, amendments, addenda or supplements thereto or restatements thereof.

Case 20-12522-JTD   Doc 3721-1   Filed 08/13/21   Page 9 of 26

## Schedule 1

## Executory Contracts and Unexpired Leases to be Rejected*

| Name and Address of Counterparty | Debtor | Unique ID | Contract Type | Description |
|---|---|---|---|---|
| | Mallinckrodt plc | 47154 | Purchase/Pricing and Supply Agreements | PURCHASE AND SALE AGREEMENT Dated 01/07/2018 |
| | Mallinckrodt Pharmaceuticals Ireland Limited | 47154 | Service Agreements | PURCHASE AND SALE AGREEMENT Dated 01/07/2018 |
| | Mallinckrodt LLC | 47156 | Service Agreements | VALUE MANAGED RELATIONSHIP AGREEMENT Dated 07/01/1994 |
| | Mallinckrodt LLC | 47154 | Service Agreements | PURCHASE AND SALE AGREEMENT Dated 01/07/2018 |
| | Mallinckrodt Manufacturing LLC | 47154 | Service Agreements | PURCHASE AND SALE AGREEMENT Dated 01/07/2018 |
| | Mallinckrodt LLC | 47141 | Service Agreements | ADDENDUM NO.2 Dated 07/25/2011 |
| | Mallinckrodt LLC | 47139 | Service Agreements | Addendum NO.9 Dated 01/20/2012 |
| | Mallinckrodt LLC | 00000796 | Customer | Baxter Healthcare LLC Dated 12/19/2013 |
| | Mallinckrodt LLC | 47144 | Service Agreements | CONFIDENTIAL DISCLOSURE AGREEMENT |
| | Mallinckrodt LLC | 47146 | Service Agreements | CONFIDENTIALITY AGREEMENT |
| | Mallinckrodt plc | 46608 | Other | Letter re: Assignment of Baxter International Inc. Distribution Agreement to Baxter Diagnostics Inc. Dated 08/17/1990 |
| | Mallinckrodt LLC | 47155 | Customer | MEMORANDUM OF AGREEMENT Dated 04/01/1991 |
| | Mallinckrodt LLC | 47142 | Service Agreements | MUTUAL CONFIDENTIAL DISCLOSURE AGREEMENT Dated 03/19/2014 |
| Bh Consulting<br>The Linc Cenre Blanchardstown Road North<br>Dublin  Ireland | | | | |
| Carestream<br>Attention: NSB Financial Services MC 00710<br>150 Verona Street<br>Rochester, NY  14608 | ST Shared Services LLC | 75416 | Other | Proposal for Enterprise Disaster Recovery Project Management Presented to ST Shared Services LLC Dated 06/18/2020 |

* Each Executory Contract and Unexpired Lease identified on this Schedule 1 includes any modifications, amendments, addenda or supplements thereto or restatements thereof.

Case 20-12522-JTD   Doc 3721-1   Filed 08/13/21   Page 10 of 26

## Schedule 1
## Executory Contracts and Unexpired Leases to be Rejected*

| Name and Address of Counterparty | Debtor | Unique ID | Contract Type | Description |
|---|---|---|---|---|
| | Therakos, Inc. | 69412 | Service Agreements | MASTER SERVICE AGREEMENT Dated 01/01/2014 |
| | Therakos, Inc. | 65979 | Service Agreements | Amended and restated master service agreement Dated 12/08/2017 |
| | Therakos, Inc. | 65980 | Service Agreements | Addendum #1 Service Quality Agreement Dated 11/17/2017 |
| | Therakos, Inc. | 65977 | Service Agreements | ADDENDUM TO EXISTING QUALITY AGREEMENT Dated 03/26/2020 |
| | Mallinckrodt plc | 65978 | Service Agreements | FIRST AMENDMENT TO THE AMENDED AND RESTATED MASTER SERVICE AGREEMENT Dated 01/01/2020 |
| | Therakos, Inc. | 65981 | Service Agreements | Revised and restated addendum 2 to amended and restated master service agreement s-25388 pricing addendum Dated 11/17/2017 |
| | Therakos, Inc. | 65982 | Service Agreements | Exhibit A to Amended and Restated Master Service Agreement Dated 12/08/2017 |
| Certara Usa<br>PO BOX 32080<br>NEW YORK, NY 10087 | Mallinckrodt LLC | CERTARAUSAINC-SO | Purchase/Pricing and Supply Agreements | Supplies and Materials Contract Dated 02/27/2017 |
| | Mallinckrodt LLC | PHARSIGHTCORPORA | Purchase/Pricing and Supply Agreements | Supplies and Materials Contract Dated 01/30/2017 |
| | Mallinckrodt LLC | CERTARAUSAINC-AM | Purchase/Pricing and Supply Agreements | Supplies and Materials Contract Dated 12/05/2010 |
| | Mallinckrodt LLC | 13016 | Purchase/Pricing and Supply Agreements | Supplies and Materials Contract Dated 11/29/2016 |
| | ST Shared Services LLC | 68408 | Confidentiality Agreements/NDA | MUTUAL CONFIDENTIALITY AGREEMENT Dated 12/04/2019 |
| | Ocera Therapeutics, Inc. | 71876 | Confidentiality Agreements/NDA | Amendment No. 1 to Consulting Agreement Dated 10/13/2017 |
| | Mallinckrodt LLC | 72066 | Confidentiality Agreements/NDA | Work Order No. 11 Dated 01/16/2017 |

* Each Executory Contract and Unexpired Lease identified on this Schedule 1 includes any modifications, amendments, addenda or supplements thereto or restatements thereof.

Case 20-12522-JTD   Doc 3721-1   Filed 08/13/21   Page 11 of 26

**Schedule 1**

## Executory Contracts and Unexpired Leases to be Rejected*

| Name and Address of Counterparty | Debtor | Unique ID | Contract Type | Description |
|---|---|---|---|---|
| Cignon Uk<br>Cignon UK LtdDavidson House<br>ForburySquare Reading UK RG1 3EU England | | | | |
| | ST Shared Services LLC | 62894 | Purchase/Pricing and Supply Agreements | Purchase Order Dated 12/30/2019 |
| Continental Traffic Service Inc<br>DBA CTSI GLOBAL<br>1 SOUTH PRESCOTT ST<br>MEMPHIS, TN 38111 | | | | |
| | Mallinckrodt LLC | 12322 | Service Agreements | Freight Contract Dated 10/30/2019 |
| | SpecGx LLC | 12322 | Service Agreements | Service Agreement dated June 25th, 2020 |
| Diamond Technologies<br>4001 MILLER RD, 3 0 WILMINGTON DE 19802<br>US | | | | |
| | Mallinckrodt Pharmaceuticals Limited | 68162 | Service Agreements | Proposal for: Mallinckrodt Pharmaceuticals Regarding Application Development & Support Services Dated 01/27/2016 |
| | Mallinckrodt Pharmaceuticals Limited | 68163 | Service Agreements | Database Enhancement Estimate Dated 04/28/2017 |
| | ST Shared Services LLC | 75604 | Service Agreements | STATEMENT OF WORK |
| D-Town Associates<br>120 Pennsylvania Ave.<br>Malvern, PA 19355 | | | | |
| | Therakos, Inc. | 63552 | Leases | Lease Agreement Dated 04/01/2013 |
| | Therakos, Inc. | 63553 | Leases | FIRST AMENDMENT TO LEASE AGREEMENT Dated 05/21/2013 |

* Each Executory Contract and Unexpired Lease identified on this Schedule 1 includes any modifications, amendments, addenda or supplements thereto or restatements thereof.

Case 20-12522-JTD   Doc 3721-1   Filed 08/13/21   Page 12 of 26

## Schedule 1
### Executory Contracts and Unexpired Leases to be Rejected*

| Name and Address of Counterparty | Debtor | Unique ID | Contract Type | Description |
|---|---|---|---|---|
| Eberhard Carls University Tuebingen Children's hospital Tuebingen Prof. Dr. med. R. Handgretinger Tuebingen,  72076 | | | | |
| | Therakos, Inc. | University Hospital Tuebi | Other | Research Funding Agreement dated  2/20/2014 |
| | Therakos, Inc. | 73612 | Service Agreements | RESEARCH FUNDING AGREEMENT Dated 04/07/2014 |
| | Mallinckrodt plc | 80549 | Other | Other Dated 05/06/2021 |
| Everbridge Everbridge, Inc.25 Corporate DriveFor legal notice:Attention: Legal Department  Burlington MA 1803 USA | | | | |
| | ST Shared Services LLC | 68469 | Service Agreements | Master Services Agreement Dated 01/31/2020 |
| Evonik Attn: General Counsel 299 Jefferson Rd Parsippany, NJ  07054 | | | | |
| | Ocera Therapeutics, Inc. | EvonikAddedContract1 | Other | Master Services Agreement Dated 03/10/2016 |
| | SpecGx LLC | 912 | Purchase/Pricing and Supply Agreements | Operating Materials & Supplies Contract Dated 12/19/2018 |
| | Mallinckrodt LLC | EVONIKCORPORATIO | Purchase/Pricing and Supply Agreements | Operating Materials & Supplies Contract Dated 08/14/2017 |
| | SpecGx LLC | 912 | Purchase/Pricing and Supply Agreements | Operating Materials & Supplies Contract Dated 12/17/2018 |
| | Mallinckrodt LLC | 51361 | Service Agreements | Letter re: Master Service Agreement dated February 11, 2010 (the "Agreement") between Mallinckrodt Inc. ("your") and Transferra Nanosciences Inc. (formerly Northern Lipids Inc.) ("Transferra") Dated 07/29/2016 |
| | Mallinckrodt plc | EvonikAddedContract4 | Other | Amendment to Statement of Work Dated 09/01/2020 |

\* Each Executory Contract and Unexpired Lease identified on this Schedule 1 includes any modifications, amendments, addenda or supplements thereto or restatements thereof.

**Schedule 1**

**Executory Contracts and Unexpired Leases to be Rejected\***

| Name and Address of Counterparty | Debtor | Unique ID | Contract Type | Description |
|---|---|---|---|---|
| | Mallinckrodt Pharmaceuticals Ireland Limited | 48940 | Leases | FIRST AMENDMENT TO SERVICES AGREEMENT |
| | Mallinckrodt Pharmaceuticals Ireland Limited | 48934 | Leases | Letter Agreement Dated 02/28/2014 |
| | Ocera Therapeutics, Inc. | EvonikAddedContract2 | Other | Letter of Intent Dated 08/11/2017 |
| | Ocera Therapeutics, Inc. | 71725 | Service Agreements | NON-DISCLOSURE AGREEMENT Dated 08/07/2017 |
| | Mallinckrodt plc | EvonikAddedContract3 | Other | Statement of Work Dated 04/10/2016 |
| Fcb Health<br>PO BOX 74008222<br>CHICAGO, IL  60674 | Mallinckrodt ARD Holdings Inc. | 74617 | Settlement/Consent/Termination/Indemnification Agreements | ASSIGNMENT AND ASSUMPTION AGREEMENT AND AMENDMENT NO. 1 Dated 06/27/2016 |
| | Mallinckrodt ARD Holdings Inc. | 72078 | Service Agreements | First Amendment to Statement of Work Dated 10/19/2017 |
| | Mallinckrodt ARD Holdings Inc. | 71293 | Service Agreements | AMENDMENT TO MASTER SERVICE AGREEMENT Dated 06/07/2017 |
| | Mallinckrodt ARD LLC | 75571 | Service Agreements | STATEMENT OF WORK NO. 203 Dated 04/15/2020 |
| | Mallinckrodt ARD Holdings Inc. | 74817 | Service Agreements | Statement of Work No. 24 Dated 10/01/2016 |
| | Mallinckrodt ARD Holdings Inc. | 75015 | Service Agreements | Statement of Work No. 27 Dated 10/01/2016 |
| | Mallinckrodt ARD Holdings Inc. | 74802 | Service Agreements | Statement of Work No. 29 Dated 10/05/2016 |
| | Mallinckrodt ARD Holdings Inc. | 75013 | Service Agreements | Statement of Work No. 33 Dated 10/01/2016 |
| | Mallinckrodt ARD Holdings Inc. | 75008 | Service Agreements | Statement of Work No. 42 to Master Service Agreement Dated 03/01/2017 |
| | Mallinckrodt ARD Holdings Inc. | 74830 | Service Agreements | Statement of Work No. 43 Dated 03/01/2017 |
| | Mallinckrodt ARD Holdings Inc. | 74727 | Service Agreements | Statement of Work No. 46 Dated 01/01/2017 |
| | Mallinckrodt ARD Holdings Inc. | 74814 | Service Agreements | Statement of Work No. 48 Dated 02/01/2017 |
| | Mallinckrodt ARD Holdings Inc. | 74771 | Service Agreements | Statement of Work No. 49 to Master Service Agreement Dated 02/08/2017 |

\* Each Executory Contract and Unexpired Lease identified on this Schedule 1 includes any modifications, amendments, addenda or supplements thereto or restatements thereof.

## Schedule 1

## Executory Contracts and Unexpired Leases to be Rejected*

| Name and Address of Counterparty | Debtor | Unique ID | Contract Type | Description |
|---|---|---|---|---|
| First Object<br>1320 Greenway Drive<br>Suite 855<br>Irving, TX  75038 | Mallinckrodt ARD Holdings Inc. | 71934 | Service Agreements | Statement of Work No. 53 to Master Service Agreement Dated 03/23/2017 |
| | Mallinckrodt plc | 73445 | Service Agreements | PROFESSIONAL SERVICES AGREEMENT Dated 07/21/2014 |
| | Mallinckrodt plc | 69659 | Service Agreements | PROFESSIONAL SERVICES AGREEMENT  Dated 07/28/2014 |
| | ST Shared Services LLC | 75459 | Service Agreements | WORK ORDER NO. 16 Dated 07/01/2020 |
| Fortis Advisors Llc | Mallinckrodt plc | VTSMerger1 | Other | Vtesse Merger Agreement Dated 03/31/2017 |
| Fresenius<br>ATTN: FRANZ KAINZ, PHD<br>BORKENBERG 14<br>OBERURSEL, DE  61440 | Mallinckrodt LLC | 00000109 | Customer | FRESENIUS KABI USA Dated 04/30/2017 |
| | Mallinckrodt Medical Imaging - Ireland | Fresenius4 | | Manufacturing and Supply Agreement dated 8/6/2014 |
| | Mallinckrodt Pharmaceuticals Ireland Limited | 63566 | Purchase/Pricing and Supply Agreements | SECOND AMENDMENT TO MANUFACTURING AND SUPPLY AGREEMENT Dated 12/20/2017 |
| | Mallinckrodt plc | 21459TherakosCust | Customer | Therakos Customer HENRY FORD - Included w/ Fresenius |
| | Mallinckrodt plc | 00001269 | Confidentiality Agreements/NDA | Fresenius Kabi Manufacturing SA (PTY) Limited ZAF CDA Dated 10/05/2017 |
| | SpecGx LLC | 00001400 | Confidentiality Agreements/NDA | Fresenius Kabi Viet Nam VNM CDA Dated 05/17/2019 |
| | Mallinckrodt Medical Imaging - Ireland | Fresenius5 | | Amendment to Manufacturing and Supply Agreement dated 11/4/2014 |

\* Each Executory Contract and Unexpired Lease identified on this Schedule 1 includes any modifications, amendments, addenda or supplements thereto or restatements thereof.

**Schedule 1**

**Executory Contracts and Unexpired Leases to be Rejected***

| Name and Address of Counterparty | Debtor | Unique ID | Contract Type | Description |
|---|---|---|---|---|
| | Mallinckrodt Pharmaceuticals Ireland Limited | Fresenius1 | | Assignment Agreement dated 9/29/2014 |
| | SpecGx LLC | 00000110 | Purchase/Pricing and Supply Agreements | FRESENIUS KABI DEUTSCHLAND Dated 06/16/2019 |
| | SpecGx LLC | 00001141 | Purchase/Pricing and Supply Agreements | Fresenius Kabi Deutschland GmbH DEU CDA Dated 06/10/2018 |
| | Mallinckrodt plc | 21481TherakosCust | Customer | Therakos Customer FRESENIUS |
| Gartner PO BOX 911319 DALLAS, TX 75391-1319 | Mallinckrodt LLC | GARTNERINC-MAS-000 | Software/IT/Licensing Agreement | Dues, Memberships, Charity Contract Dated 06/29/2013 |
| | Mallinckrodt LLC | 68889 | Service Agreements | Statement of Work No. 1 Dated 12/02/2014 |
| | Mallinckrodt LLC | 70448 | Service Agreements | Statement of Work No. 2 to Master Service Agreement Dated 12/15/2014 |
| | Mallinckrodt LLC | GARTNERINC-SOW-000 | Software/IT/Licensing Agreement | Dues, Memberships, Charity Contract Dated 11/30/2014 |
| | Mallinckrodt LLC | GARTNERINC-SOW-000 | Software/IT/Licensing Agreement | Dues, Memberships, Charity Contract Dated 12/13/2014 |
| | Mallinckrodt LLC | GARTNERINC-MAS-000 | Software/IT/Licensing Agreement | Dues, Memberships, Charity Contract Dated 03/30/2015 |
| | Mallinckrodt LLC | GARTNERINC-QT-0007 | Software/IT/Licensing Agreement | Dues, Memberships, Charity Contract Dated 09/29/2015 |
| | Mallinckrodt LLC | GARTNERINC-QT-0007 | Software/IT/Licensing Agreement | Dues, Memberships, Charity Contract Dated 11/29/2015 |
| | Mallinckrodt LLC | GARTNERINC-MAS-000 | Software/IT/Licensing Agreement | Dues, Memberships, Charity Contract Dated 07/19/2016 |
| | Mallinckrodt LLC | GARTNERINC-MAS-001 | Software/IT/Licensing Agreement | Dues, Memberships, Charity Contract Dated 05/30/2018 |
| | Mallinckrodt plc | GARTNERINC-MAS-001 | Software/IT/Licensing Agreement | Dues, Memberships, Charity Contract Dated 06/29/2018 |

* Each Executory Contract and Unexpired Lease identified on this Schedule 1 includes any modifications, amendments, addenda or supplements thereto or restatements thereof.

**Schedule 1**

**Executory Contracts and Unexpired Leases to be Rejected\***

| Name and Address of Counterparty | Debtor | Unique ID | Contract Type | Description |
|---|---|---|---|---|
| Genpact<br>66 BUCKINGHAM GATE<br>4TH FLR<br>LONDON,   SW1E 6AU | | | | |
| | Mallinckrodt LLC | 69963 | Service Agreements | MASTER SERVICES AGREEMENT Dated 08/18/2017 |
| | Mallinckrodt LLC | 12986 | Service Agreements | Service Agreements Contract Dated 03/22/2016 |
| | Mallinckrodt LLC | 69446 | Service Agreements | Change Order No. 01 To SOW NO. 1 - Veeva Support Services Dated 10/26/2017 |
| | Mallinckrodt LLC | 68184 | Service Agreements | Change Order No. 02 Dated 12/21/2017 |
| | Mallinckrodt LLC | 68185 | Service Agreements | MASTER SERVICES AGREEMENT  Dated 08/18/2017 |
| | Mallinckrodt LLC | 69055 | Service Agreements | MUTUAL CONFIDENTIALITY AGREEMENT Dated 06/20/2017 |
| | ST Shared Services LLC | 67866 | Service Agreements | STATEMENT OF WORK NO. 18 Dated 01/01/2020 |
| | ST Shared Services LLC | 75569 | Service Agreements | STATEMENT OF WORK NO. 20 Dated 04/07/2020 |
| Greater Boston Medical Associates<br>Law office of Michael Paolini<br>1646 Centre Street<br>West Roxbury, MA  02132 | | | | |
| | Mallinckrodt ARD Holdings Inc. | 45946 | Service Agreements | CLINICAL STUDY AGREEMENT — INVESTIGATOR INITIATED STUDY Dated 03/24/2016 |
| Greathouse, Kenneth R<br>Lillian Stenfeldt, Esq.<br>Rimon, P.C.<br>Menlo Park, CA  94025 | | | | |
| | Mallinckrodt Pharmaceuticals Ireland Limited | 49343 | Confidentiality Agreements/NDA | CONFIDENTIAL SETTLEMENT AGREEMENT AND RELEASE Dated 10/01/2014 |

\* Each Executory Contract and Unexpired Lease identified on this Schedule 1 includes any modifications, amendments, addenda or supplements thereto or restatements thereof.

**Schedule 1**

**Executory Contracts and Unexpired Leases to be Rejected***

| Name and Address of Counterparty | Debtor | Unique ID | Contract Type | Description |
|---|---|---|---|---|
| Guidespark<br>1400A Seaport Blvd.<br>Suite 500<br>Redwood City, CA 94063 | | | | |
| | Mallinckrodt LLC | 67336 | Purchase/Pricing and Supply Agreements | MASTER SUBSCRIPTION AGREEMENT Dated 08/15/2016 |
| | Mallinckrodt LLC | 72789 | Purchase/Pricing and Supply Agreements | MUTUAL NONDISCLOSURE AGREEMENT Dated 04/27/2016 |
| | Mallinckrodt LLC | 67338 | Purchase/Pricing and Supply Agreements | FIRST AMENDMENT TO MASTER SUBSCRIPTION AGREEMENT Dated 01/25/2019 |
| | Mallinckrodt LLC | 67340 | Purchase/Pricing and Supply Agreements | Letter re: Consent to Assignment Dated 03/12/2020 |
| | Mallinckrodt LLC | 67337 | Purchase/Pricing and Supply Agreements | Order Form # 004 Dated 10/17/2016 |
| | Mallinckrodt LLC | 67341 | Purchase/Pricing and Supply Agreements | Order Form # 006 Dated 01/14/2019 |
| Happyornot<br>701 Northpointe Pkwy<br>Suite 300<br>West Palm Beach, FL 33407 | | | | |
| | Mallinckrodt plc | HappyOrNotContract | Other | Service Supply Agreement dated 10/31/2018 |
| Hospira<br>PO BOX 744292<br>ATLANTA, GA 30374 | | | | |
| | Mallinckrodt plc | 46220 | Purchase/Pricing and Supply Agreements | SUPPLY AGREEMENT Dated 07/01/1998 |
| | Mallinckrodt plc | 69701 | Purchase/Pricing and Supply Agreements | CONFIRMATION OF ASSIGNMENT OF DEVELOPMENT AND SUPPLY AGREEMENT Dated 11/23/2010 |

* Each Executory Contract and Unexpired Lease identified on this Schedule 1 includes any modifications, amendments, addenda or supplements thereto or restatements thereof.

## Schedule 1
### Executory Contracts and Unexpired Leases to be Rejected*

| Name and Address of Counterparty | Debtor | Unique ID | Contract Type | Description |
|---|---|---|---|---|
| Human Care Systems<br>84 STATE ST, SUITE 720<br>BOSTON, MA  02109 | | | | |
| | Mallinckrodt ARD LLC | 76500 | Service Agreements | Services Agreement Contract Dated 07/20/2020 |
| | Mallinckrodt ARD LLC | 75464 | Service Agreements | STATEMENT OF WORK NO. 1901 Dated 04/27/2020 |
| | Mallinckrodt ARD Holdings Inc. | 75515 | Service Agreements | STATEMENT OF WORK NO. 1907 Dated 04/20/2020 |
| | Mallinckrodt ARD Holdings Inc. | 75465 | Service Agreements | STATEMENT OF WORK NO. 1907 Dated 05/04/2020 |
| | Mallinckrodt plc | 65384 | Service Agreements | STATEMENT OF WORK NO. 1910 Dated 03/23/2020 |
| Iraj Sabahi Research Inc<br>2161 Colorado Ave<br>Suite A2<br>Turlock, CA  95382 | IRAJ SABAHI RESEARC | | Other | Clinical Study Agreement dated 12/11/2014 |
| | Mallinckrodt plc | | | |
| Koverse<br>Koverse, Inc.<br>999 Third Avenue<br>Seattle, WA  98104 | | | | |
| | Mallinckrodt Enterprises LLC | 68440 | Service Agreements | MASTER SERVICES AGREEMENT Dated 09/03/2019 |
| | Mallinckrodt Enterprises LLC | 74555 | Service Agreements | MUTUAL CONFIDENTIALITY AGREEMENT Dated 06/26/2019 |
| | Mallinckrodt Enterprises LLC | 69898 | Service Agreements | STATEMENT OF WORK NO. 1 |
| Lloyd Glenn<br>Thomas E. Wallerstein<br>Venable LLP<br>San Francisco, CA  94105 | Mallinckrodt Pharmaceuticals Ireland Limited | 49343 | Confidentiality Agreements/NDA | CONFIDENTIAL SETTLEMENT AGREEMENT AND RELEASE Dated 10/01/2014 |

* Each Executory Contract and Unexpired Lease identified on this Schedule 1 includes any modifications, amendments, addenda or supplements thereto or restatements thereof.

**Schedule 1**

**Executory Contracts and Unexpired Leases to be Rejected\***

| Name and Address of Counterparty | Debtor | Unique ID | Contract Type | Description |
|---|---|---|---|---|
| Maxcare<br>Attn: Lonny D. Wilson, Executive Director<br>Pharmacy Providers of Oklahoma, Inc.<br>Oklahoma City, OK  73154 | | | | |
| | Mallinckrodt LLC | 00001027 | Patient Assistance Agreement | Patient Assistance Program dated January 16, 2014 |
| | Mallinckrodt LLC | 00001027 | Amendment | Amendment ot Patient Assistance Program Agreement dated April 14, 2014 |
| | Mallinckrodt LLC | 00001027 | Service Agreements | Maxcare RX Dated 01/16/2014 |
| Nasdaq Corporate Solutions<br>LBX#11700 PO BOX 780700<br>PHILADELPHIA, PA  19178 | | | | |
| | Mallinckrodt LLC | Nasdaq1.2 | Master Services Agreement | Master Services Agreement Dated April 12, 2019 |
| | Mallinckrodt LLC | Nasdaq1.1 | Service Order | Service Order dated April 12, 2019 |
| Novotech (Australia) Pty<br>Novotech (Australia) Pty Limited<br>Attn: General Counsel<br>Pyrmont,  NSW 2035 | | | | |
| | Mallinckrodt ARD Holdings Inc. | 69148 | Service Agreements | CLINICAL RESEARCH ORGANIZATION MASTER SERVICES AGREEMENT Dated 10/14/2015 |
| | Mallinckrodt ARD Holdings Inc. | 69494 | Service Agreements | CHANGE ORDER NO.1 TO STATEMENT OF WORK NO.1 Dated 05/12/2016 |
| | Mallinckrodt ARD Holdings Inc. | 69587 | Service Agreements | CHANGE ORDER NO. 2 to SOW Dated 09/21/2017 |
| | Mallinckrodt ARD Holdings Inc. | 62218 | Service Agreements | CHANGE ORDER NO. 3 TO STATEMENT OF WORK NO. 1 Dated 04/10/2018 |
| | Mallinckrodt ARD Holdings Inc. | 62219 | Service Agreements | CHANGE ORDER NO. 4 TO STATEMENT OF WORK NO. 1 Dated 7/__/2019 |
| | Ocera Therapeutics, Inc. | 73957 | Service Agreements | CHANGE ORDER REQUEST FORM Dated 02/24/2016 |

\* Each Executory Contract and Unexpired Lease identified on this Schedule 1 includes any modifications, amendments, addenda or supplements thereto or restatements thereof.

**Schedule 1**

**Executory Contracts and Unexpired Leases to be Rejected***

| Name and Address of Counterparty | Debtor | Unique ID | Contract Type | Description |
|---|---|---|---|---|
| Pharmaceutics International<br>PO BOX 842332<br>BOSTON, MA 02284 | | | | |
| | Mallinckrodt LLC | 12551 | Purchase/Pricing and Supply Agreements | Manufacturing Agreement Contract Dated 01/20/2020 |
| | Mallinckrodt LLC | 51920 | Other | Complete Preparation of Process Validation in Preparation to Manufacture Validation Batches of Morphine Sulfate, 10mg/mL and 25mg/mL for Mallinckrodt LLC Dated 02/28/2013 |
| | Mallinckrodt LLC | 51921 | Other | Manufacture of Validation Batches of Morphine Sulfate, 10mg/mL and 25mg/mL for Mallinckrodt LLC Dated 07/09/2013 |
| | Mallinckrodt LLC | 00001375 | Confidentiality Agreements/NDA | Pharmaceutics International, Inc. (Pii) USA CDA Dated 10/31/2017 |
| | SpecGx LLC | 12749 | Service Agreements | Pharmaceutics Intl Sublocade binding term sheet_4.1.20_Binding Term sheet |
| Purdue University Collections Office<br>610 Purdue Mall<br>West Lafayette, IN 47906 | | | | |
| | Mallinckrodt LLC | Purdue University College | Other | Letter of Agreement for Medical Educational Support dated 10/31/2019 |
| Reed Technology And Information Ser<br>Reed Technology and Information Services Inc.<br>7 Walnut Grove Drive<br>Horsham, PA 19044 | | | | |
| | Mallinckrodt LLC | 68820 | Service Agreements | CONVERSION SERVICES AGREEMENT Dated 10/17/2017 |
| Revhealth<br>55 BANK ST<br>MORRISTOWN, NJ 07960 | | | | |

* Each Executory Contract and Unexpired Lease identified on this Schedule 1 includes any modifications, amendments, addenda or supplements thereto or restatements thereof.

Case 20-12522-JTD  Doc 3721-1  Filed 08/13/21  Page 21 of 26

**Schedule 1**

**Executory Contracts and Unexpired Leases to be Rejected***

| Name and Address of Counterparty | Debtor | Unique ID | Contract Type | Description |
|---|---|---|---|---|
| | Mallinckrodt LLC | 69681 | Service Agreements | MASTER SERVICES AGREEMENT Dated 09/29/2017 |
| | Mallinckrodt LLC | 71306 | Service Agreements | MUTUAL CONFIDENTIALITY AGREEMENT Dated 09/29/2017 |
| | Mallinckrodt ARD LLC | 75519 | Service Agreements | FIRST AMENDMENT TO STATEMENT OF WORK NO. 8 Dated 03/31/2020 |
| | Mallinckrodt ARD LLC | 75549 | Service Agreements | STATEMENT OF WORK NO. 15 Dated 04/23/2020 |
| | Mallinckrodt ARD LLC | 75565 | Service Agreements | STATEMENT OF WORK NO. 18 Dated 05/18/2020 |
| Russell Smestad  Russel Smestad 6419 Wydown CircleMiddleton, WI 53562with copy to:Michael Best & Friedrich LLP1 S. Pinckney Street, Suite 700Madison, WI 53701Attn: Tod B Linstroth | | | | |
| | Mallinckrodt plc | 53353 | Other | AGREEMENT AND PLAN OF MERGER Dated 08/10/2016 |
| | Mallinckrodt International Finance SA | 53353 | Other | AGREEMENT AND PLAN OF MERGER Dated 08/10/2016 |
| | Mallinckrodt Hospital Products Inc. | 53353 | Other | AGREEMENT AND PLAN OF MERGER Dated 08/10/2016 |
| Saama  900 E. Hamilton Ave, Suite 200 Campbell, CA  95008 | Mallinckrodt Enterprises LLC | 75426 | Service Agreements | CHANGE ORDER 1 TO STATEMENT OF WORK Dated 06/25/2020 |
| Sensei Project Solutions  45 WEST JEFFERSON ST 45 WEST JEFFERSON ST  PHOENIX, AZ  85003 | Mallinckrodt LLC | 68195 | Service Agreements | MASTER SERVICES AGREEMENT Dated 02/15/2018 |

* Each Executory Contract and Unexpired Lease identified on this Schedule 1 includes any modifications, amendments, addenda or supplements thereto or restatements thereof.

Case 20-12522-JTD   Doc 3721-1   Filed 08/13/21   Page 22 of 26

## Schedule 1
### Executory Contracts and Unexpired Leases to be Rejected*

| Name and Address of Counterparty | Debtor | Unique ID | Contract Type | Description |
|---|---|---|---|---|
| | Mallinckrodt Pharmaceuticals Limited | 75527 | Service Agreements | PPM Support Dated 03/18/2020 |
| | Mallinckrodt Pharmaceuticals Limited | 75527 | Service Agreements | PPM Support Dated 03/18/2020 |
| | Mallinckrodt LLC | 70919 | Service Agreements | MUTUAL CONFIDENTIALITY AGREEMENT Dated 10/10/2017 |
| Sfc Owner Llc<br>300 Broadacres Drive<br>Suite 126<br>Bloomfield, NJ 07003 | Mallinckrodt plc | 000068 | Leases | Lease Contract |
| Stratacom<br>StrataCom, Inc.<br>3523 45th St S<br>Fargo, ND 58104 | ST Shared Services LLC | 75492 | Service Agreements | MASTER SERVICES AGREEMENT Dated 04/28/2020 |
| | Mallinckrodt Pharmaceuticals Limited | 74244 | Service Agreements | Chance Request Form No. 4 Dated 09/30/2017 |
| | Mallinckrodt LLC | 73962 | Service Agreements | Statement of Work No. 1 Dated 09/30/2016 |
| | ST Shared Services LLC | 75613 | Service Agreements | Statement of Work No. 9 – 2020 to Master Service Agreement Dated 02/01/2020 |
| Stratatech<br>Michael Best & Friedrich LLP<br>1 S. Pinckney Street, Suite 700<br>Madison, WI 53701 | Mallinckrodt International Finance SA | 53353 | Intercompany | AGREEMENT AND PLAN OF MERGER Dated 08/10/2016 |
| | Mallinckrodt plc | 53353 | Intercompany | AGREEMENT AND PLAN OF MERGER Dated 08/10/2016 |

* Each Executory Contract and Unexpired Lease identified on this Schedule 1 includes any modifications, amendments, addenda or supplements thereto or restatements thereof.

Case 20-12522-JTD   Doc 3721-1   Filed 08/13/21   Page 23 of 26

## Schedule 1
### Executory Contracts and Unexpired Leases to be Rejected*

| Name and Address of Counterparty | Debtor | Unique ID | Contract Type | Description |
|---|---|---|---|---|
| | Mallinckrodt plc | 53353 | Intercompany | AGREEMENT AND PLAN OF MERGER Dated 08/10/2016 |
| | Mallinckrodt International Finance SA | 53353 | Intercompany | AGREEMENT AND PLAN OF MERGER Dated 08/10/2016 |
| | Mallinckrodt Hospital Products Inc. | 53353 | Intercompany | AGREEMENT AND PLAN OF MERGER Dated 08/10/2016 |
| | Mallinckrodt Hospital Products Inc. | 53353 | Intercompany | AGREEMENT AND PLAN OF MERGER Dated 08/10/2016 |
| Stuart Rose Venable LLP Thomas E. Wallerstein San Francisco, CA 94105 | Mallinckrodt Pharmaceuticals Ireland Limited | 49343 | Confidentiality Agreements/NDA | CONFIDENTIAL SETTLEMENT AGREEMENT AND RELEASE Dated 10/01/2014 |
| Symbiance Symbiance Inc., 51 Everett Drive, Suite 1320 Princeton, NJ 08540 | Mallinckrodt Enterprises LLC | 67540 | Service Agreements | MASTER SERVICES AGREEMENT Dated 06/12/2019 |
| | Mallinckrodt LLC | 70811 | Service Agreements | Master Services Agreement Dated 06/12/2019 |
| | Mallinckrodt plc | 67538 | Service Agreements | STATEMENT OF WORK NO. 1 Dated 08/12/2019 |
| | Mallinckrodt Enterprises LLC | 67543 | Service Agreements | STATEMENT OF WORK NO. 2 Dated 09/01/2019 |
| Synapse Attn: Alex DeVincenzo One World Trade Center New York , NY  10007 | Mallinckrodt LLC | 70653 | Service Agreements | MASTER SERVICES AGREEMENT Dated 12/17/2018 |
| | Mallinckrodt LLC | 70750 | Service Agreements | MUTUAL CONFIDENTIALITY AGREEMENT Dated 10/29/2018 |

* Each Executory Contract and Unexpired Lease identified on this Schedule 1 includes any modifications, amendments, addenda or supplements thereto or restatements thereof.

Case 20-12522-JTD   Doc 3721-1   Filed 08/13/21   Page 24 of 26

**Schedule 1**

**Executory Contracts and Unexpired Leases to be Rejected***

| Name and Address of Counterparty | Debtor | Unique ID | Contract Type | Description |
|---|---|---|---|---|
| | Mallinckrodt ARD Holdings Inc. | 69635 | Service Agreements | STATEMENT OF WORK NO. 4 Dated 01/18/2019 |
| | Mallinckrodt ARD Holdings Inc. | 70645 | Service Agreements | STATEMENT OF WORK NO. 7 Dated 02/13/2019 |
| | Mallinckrodt ARD Holdings Inc. | 70662 | Service Agreements | STATEMENT OF WORK  Dated 01/01/2019 |
| | Mallinckrodt Hospital Products Inc. | 67901 | Service Agreements | STATEMENT OF WORK NO. 17 Dated 03/11/2020 |
| | Mallinckrodt ARD LLC | 75615 | Service Agreements | STATEMENT OF WORK NO. 18 Dated 04/30/2020 |
| The Continental Stock Transfer and Trust Company<br>One State Street<br>30th Floor<br>New York, NY  10004 | | | | |
| | Ocera Therapeutics | CSTTC1.1 | Contingent Value Rights Agreement | Contingent Value Rights Agreement dated December 7, 2017 |
| The Reynolds Company<br>Attn: Rose Marshall<br>11550 N Harrells Ferry Road<br>Baton Rouge, LA  70816 | | | | |
| | Mallinckrodt plc | ReynoldsContract1 | Other | Techconnect Support Agreement Renewal date 8/28/2019 |
| Tracelink<br>400 Riverpark Drive Suite 200<br>North Reading, MA  01864 | | | | |
| | Mallinckrodt Pharmaceuticals Ireland Limited | 70927 | Confidentiality Agreements/NDA | MUTUAL CONFIDENTIALITY AGREEMENT  Dated 06/09/2017 |
| Ucl Business Plc<br>The Network Building<br>97 Tottenham Court Road<br>London,  W1T 4TP | | | | |
| | Ocera Therapeutics, Inc. | 70312 | Software/IT/Licensing Agreement | SECOND AMENDED AND RESTATED LICENSE AGREEMENT Dated 07/01/2015 |

* Each Executory Contract and Unexpired Lease identified on this Schedule 1 includes any modifications, amendments, addenda or supplements thereto or restatements thereof.

Case 20-12522-JTD   Doc 3721-1   Filed 08/13/21   Page 25 of 26

**Schedule 1**

## Executory Contracts and Unexpired Leases to be Rejected*

| Name and Address of Counterparty | Debtor | Unique ID | Contract Type | Description |
|---|---|---|---|---|
| Valiance Partners<br>80 MORRISTOWN RD, 320 80 MORRISTOWN RD, 320<br>BERNARDSVILLE, NJ 07924- | | | | |
| | Mallinckrodt LLC | 70796 | Service Agreements | MASTER SERVICES AGREEMENT Dated 06/08/2012 |
| | Mallinckrodt LLC | 12968 | Service Agreements | Consulting Contract Dated 11/10/2018 |
| | Mallinckrodt LLC | 12974 | Service Agreements | Consulting Contract Dated 06/06/2012 |
| | Mallinckrodt LLC | 73434 | Service Agreements | Addendum #1 to the Schedule #1 of the Mallinckrodt Master Services Agreement Dated 02/03/2014 |
| | Mallinckrodt LLC | 74642 | Service Agreements | AMENDMENT TO MASTER SERVICES AGREEMENT Dated 11/13/2018 |
| | Mallinckrodt LLC | 62322 | Service Agreements | Mallinckrodt — Valiance Statement of Work Terlipressin Studies eTMF Migration, Testing & Validation Dated 03/01/2018 |
| | Mallinckrodt LLC | 74124 | Service Agreements | STATEMENT OF WORK #2 Dated 02/03/2014 |
| | Mallinckrodt LLC | 72220 | Service Agreements | STATEMENT OF WORK #4 Dated 10/07/2016 |
| | Mallinckrodt LLC | 53965 | Service Agreements | STATEMENT OF WORK (SOW) #2 Migration to NextDocs Dated 02/03/2014 |
| | Mallinckrodt LLC | 72532 | Service Agreements | Statement of Work Dated 06/09/2016 |
| Visual Bi Solutions<br>Visual Bi Solutions, Inc.<br>5600 Tennyson Pkwy<br>Plano, TX  75024 | | | | |
| | Mallinckrodt plc | 68911 | Service Agreements | PROFESSIONAL SERVICES AGREEMENT Dated 09/11/2014 |
| | Mallinckrodt LLC | 68197 | Service Agreements | WORK ORDER NO.11 Dated 05/02/2016 |
| Westin Hotels & Resorts<br>6902 East Greenway Parkway<br>Scottsdale, AZ  85254 | | | | |

* Each Executory Contract and Unexpired Lease identified on this Schedule 1 includes any modifications, amendments, addenda or supplements thereto or restatements thereof.

**Schedule 1**

**Executory Contracts and Unexpired Leases to be Rejected***

| Name and Address of Counterparty | Debtor | Unique ID | Contract Type | Description |
|---|---|---|---|---|
| Whizdotai<br>22 HAROLD AVE<br>EDISON, NJ 08820 | Mallinckrodt plc | WESTIN HOTELS & RE | Other | Group Event Agreement dated 5/22/2019 |
| | Mallinckrodt LLC | 71146 | Service Agreements | SUBSCRIPTION AND SERVICES AGREEMENT Dated 08/10/2018 |
| | Mallinckrodt LLC | 70938 | Service Agreements | MUTUAL CONFIDENTIALITY AGREEMENT  Dated 07/25/2017 |
| Zs Associates<br>Attention: Jim Adelizzi<br>4365 Executive Drive, Suite 1530,<br>San Diego, CA  92121 | Mallinckrodt LLC | 54424 | Service Agreements | ACCESSMONITOR SUBSCRIPTION AGREEMENT Dated 06/30/2012 |
| | Mallinckrodt LLC | 69913 | Service Agreements | Partial Assignment of Master Software License, Hosting and Related Services Agreement 04/04/2013 |
| | Mallinckrodt plc | 69913 | Service Agreements | Partial Assignment of Master Software License, Hosting and Related Services Agreement Dated 04/04/2013 |
| | Mallinckrodt LLC | 68212 | Service Agreements | Statement of Work No. 23 Dated 07/14/2014 |
| | Mallinckrodt LLC | 70131 | Service Agreements | Statement of Work No. 47 Dated 10/10/2016 |
| | Mallinckrodt Hospital Products Inc. | 69225 | Service Agreements | Third Party Data Use Agreement Dated 09/21/2011 |
| | Mallinckrodt LLC | 69064 | Service Agreements | THIRD AMENDMENT TO MASTER SERVICES AGREEMENT Dated 01/19/2018 |

* Each Executory Contract and Unexpired Lease identified on this Schedule 1 includes any modifications, amendments, addenda or supplements thereto or restatements thereof.

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| MALLINCKRODT PLC, *et al.*, | ) Case No. 20-12522 (JTD) |
| | ) |
| Debtors.[1] | ) (Jointly Administered) |
| | ) |
| | ) **Re: Docket No. 3596, 3721 & 4508** |

**NOTICE OF FILING OF FURTHER AMENDED <u>EXHIBIT U</u> (REJECTED
EXECUTORY CONTRACT/UNEXPIRED LEASE LIST) OF PLAN SUPPLEMENT
FOR THE FIRST AMENDED JOINT PLAN OF REORGANIZATION OF
MALLINCKRODT PLC AND ITS DEBTOR AFFILIATES UNDER CHAPTER 11 OF
THE BANKRUPTCY CODE**

PLEASE TAKE NOTICE that, on September 29, 2021, the above-captioned debtors and debtors-in-possession (collectively, the "***Debtors***") filed the *First Amended Joint Plan of Reorganization of Mallinckrodt plc and its Debtor Affiliates under Chapter 11 of the Bankruptcy Code* [Docket No. 4508] (as may be amended, modified, or supplemented from time to time, and including all exhibits and supplements thereto, the "***Plan***"). Capitalized terms used but not defined herein shall have the meanings set forth in the Plan.

PLEASE TAKE NOTICE that the Debtors previously filed initial and amended versions of <u>Exhibit U</u> (Rejected Executory Contract/Unexpired Lease List) [Docket Nos. 3596 & 3721] of the Plan supplement (the "***Plan Supplement***") with the United States Bankruptcy Court for the District of Delaware (the "***Bankruptcy Court***").

PLEASE TAKE FURTHER NOTICE that the Debtors hereby file a further amended version of <u>Exhibit U</u> (the "***Further Amended <u>Exhibit U</u>***") of the Plan Supplement. Further Amended <u>Exhibit U</u> is attached hereto as **Exhibit 1**.

PLEASE TAKE FURTHER NOTICE that certain documents, or portions thereof, contained in the Further Amended <u>Exhibit U</u> and the Plan Supplement remain subject to continuing negotiations among the Debtors and interested parties with respect thereto. The Debtors and such applicable interested parties reserve all of their respective rights, subject to the terms and conditions set forth in the Plan and the Restructuring Support Agreement (as amended), with respect to the final form of such documents and to further amend, revise, or supplement the Plan Supplement, and any of the documents and designations contained herein, at any time before the

---

[1] A complete list of the Debtors in these Chapter 11 Cases may be obtained on the website of the Debtors' claims and noticing agent at http://restructuring.primeclerk.com/Mallinckrodt. The Debtors' mailing address is 675 McDonnell Blvd., Hazelwood, Missouri 63042.

AA0000118

Effective Date of the Plan, or any such other date as may be provided for by the Plan or by order of the Bankruptcy Court.

**PLEASE TAKE FURTHER NOTICE** that the Further Amended <u>Exhibit U</u> of the Plan Supplement is integral to, part of, and incorporated by reference into the Plan. Please note, however, <u>these documents have not yet been approved by the Bankruptcy Court</u>. If the Plan is confirmed, the documents contained in the Plan Supplement will be approved by the Bankruptcy Court pursuant to the order confirming the Plan.

**PLEASE TAKE FURTHER NOTICE** that any Proofs of Claim asserting Claims arising from the rejection of the Executory Contracts and Unexpired Leases pursuant to the Plan or otherwise must be filed with the Notice and Claims Agent within thirty (30) days of the effective date of the rejection of the applicable Executory Contract or Unexpired Lease. **Any Proofs of Claim arising from the rejection of the Executory Contracts and Unexpired Leases that are not timely filed shall be automatically disallowed without further order of the Bankruptcy Court.** All Allowed Claims arising from the rejection of the Executory Contracts and Unexpired Leases shall constitute General Unsecured Claims and shall be treated in accordance with Article III.B of the Plan.

**PLEASE TAKE FURTHER NOTICE** that the copies of the documents included in the Plan Supplement or the Plan, or any other document filed in the Debtors' chapter 11 cases, may be obtained free of charge by contacting the Debtors' Notice and Claims Agent, Prime Clerk LLC, by: (i) calling the Debtors' restructuring hotline at 877-467-1570 (US/Canada); 347-817-4093 (International); (ii) visiting the Debtors' restructuring website at: https://cases.primeclerk.com/mallinckrodt; and/or (iii) writing to (a) Mallinckrodt plc Ballot Processing, c/o Prime Clerk LLC One Grand Central Place, 60 East 42nd Street, Suite 1440, New York, NY 10165 or (b) mallinckrodtinfo@primeclerk.com. You may also obtain copies of any pleadings filed in these chapter 11 cases for a fee via PACER at: http://www.deb.uscourts.gov or free of charge at https://restructuring.primeclerk.com/mallinckrodt/.

**THIS NOTICE IS BEING SENT TO YOU FOR INFORMATIONAL PURPOSES ONLY. IF YOU HAVE QUESTIONS WITH RESPECT TO YOUR RIGHTS UNDER THE PLAN OR ABOUT ANYTHING STATED HEREIN OR IF YOU WOULD LIKE TO OBTAIN ADDITIONAL INFORMATION, PLEASE CONTACT THE NOTICE AND CLAIMS AGENT AT THE NUMBER OR ADDRESS SPECIFIED ABOVE. PLEASE NOTE THAT THE NOTICE AND CLAIMS AGENT CANNOT PROVIDE LEGAL ADVICE.**

Dated: October 8, 2021

_/s/ Brendan J. Schlauch_
**RICHARDS, LAYTON & FINGER, P.A.**
Mark D. Collins (No. 2981)
Michael J. Merchant (No. 3854)
Amanda R. Steele (No. 5530)
Brendan J. Schlauch (No. 6115)
One Rodney Square
920 N. King Street
Wilmington, DE 19801
Telephone:     (302) 651-7700
Facsimile:     (302) 651-7701
Email:          collins@rlf.com
                merchant@rlf.com
                steele@rlf.com
                schlauch@rlf.com


- and -

George A. Davis (admitted _pro hac vice_)
George Klidonas (admitted _pro hac vice_)
Andrew Sorkin (admitted _pro hac vice_)
Anupama Yerramalli (admitted _pro hac vice_)
**LATHAM & WATKINS LLP**
1271 Avenue of the Americas
New York, New York 10020
Telephone:     (212) 906-1200
Facsimile:     (212) 751-4864
Email:          george.davis@lw.com
                george.klidonas@lw.com
                andrew.sorkin@lw.com
                anu.yerramalli@lw.com

- and -

Jeffrey E. Bjork (admitted _pro hac vice_)
**LATHAM & WATKINS LLP**
355 South Grand Avenue, Suite 100
Los Angeles, California 90071
Telephone:     (213) 485-1234
Facsimile:     (213) 891-8763
Email:          jeff.bjork@lw.com

- and -

Jason B. Gott (admitted _pro hac vice_)
**LATHAM & WATKINS LLP**
330 North Wabash Avenue, Suite 2800
Chicago, Illinois 60611
Telephone:     (312) 876-7700
Facsimile:     (312) 993-9767
Email:          jason.gott@lw.com

_Counsel for Debtors and Debtors in Possession_

AA0000120

**Exhibit 1**

AA0000121

## Exhibit U

### Rejected Executory Contract/Unexpired Lease List

You have been identified as a party to one or more of the potential Executory Contracts or Unexpired Leases listed on the rejection schedule attached hereto as **Schedule 1** (the "***Rejected Contract Schedule***"). The Debtors hereby provide notice that, pursuant to section 365 of the Bankruptcy Code, the Debtors propose to reject each potential Executory Contract or Unexpired Lease listed on the Rejected Contract Schedule on the Effective Date of the Plan with such rejection being effective as of the petition date (*i.e.*, October 12, 2020).[2]

Certain documents, or portions thereof, contained in this Exhibit U and the Plan Supplement remain subject to continuing negotiations among the Debtors and interested parties with respect thereto. Subject to the terms and conditions set forth in the Plan and the Restructuring Support Agreement, the Debtors reserve all rights to—for any reason whatsoever (including based on objections received to Article V.G of the Plan)—amend, revise, or supplement this Exhibit U, and any of the documents and designations contained herein, at any time before the Effective Date of the Plan, or any such other date as may be provided for by the Plan or by order of the Bankruptcy Court.

In accordance with the *Order (A) Establishing Bar Dates and Related Procedures for Filing Proofs of Claim and (B) Approving Form and Manner of Notice Thereof* [Docket No. 667] and the Plan, any Proofs of Claim asserting Claims arising from the rejection of the Executory Contracts and Unexpired Leases must be filed with the Notice and Claims Agent within thirty (30) days of the effective date of the rejection of the applicable Executory Contract or Unexpired Lease. All Allowed Claims arising from the rejection of the Executory Contracts and Unexpired Leases shall constitute General Unsecured Claims and shall be treated in accordance with Article III.B of the Plan. **Any Person or Entity that is required to file a Proof of Claim arising from the rejection of a potential Executory Contract or Unexpired Lease listed on the Rejected Contract Schedule that fails to timely do so shall be forever barred, estopped and enjoined from asserting such Claim, and such Claim shall not be enforceable, against the Debtors, the Reorganized Debtors or the Estates, and the Debtors, the Reorganized Debtors and their Estates and their respective assets and property shall be forever discharged from any and all indebtedness and liability with respect to such Claim unless otherwise ordered by the Bankruptcy Court or as otherwise provided herein. All such Claims shall, as of the Effective Date of the Plan, be subject to the permanent injunction set forth in Article IX of the Plan.**

The Debtors' listing of a potential Executory Contract or Unexpired Lease on the Rejected Contract Schedule shall not be deemed or construed as (a) a promise by the Debtors to seek the rejection of such contract or lease, (b) a limitation or waiver on the Debtors' ability to amend, modify or supplement the Rejected Contract Schedule, (c) a limitation or waiver on the Debtors'

---

[2]     In accordance with Article V.A of the Plan, each Executory Contract and Unexpired Lease that is not rejected as of the Effective Date will be deemed assumed as of the Effective Date pursuant to sections 365 and 1123 of the Bankruptcy Code.

AA0000122

ability to seek to assume or reject any Executory Contract or Unexpired Lease, or (d) an admission that any potential Executory Contract or Unexpired Lease is, in fact, an Executory Contract or Unexpired Lease under section 365 of the Bankruptcy Code. Moreover, the Debtors explicitly reserve their rights, in their sole discretion, to reject or assume each Executory Contract or Unexpired Lease pursuant to section 365(a) of the Bankruptcy Code and nothing herein (i) alters in any way the prepetition nature of such agreements or the validity, priority, or amount of any claims of a counterparty such agreements against the Debtors that may arise under such agreements, (ii) creates a postpetition contract or agreement, or (iii) elevates to administrative expense priority any claims of a counterparty to an Executory Contract or Unexpired Lease against the Debtors that may arise under such agreements. The Debtors reserve all their rights, claims and causes of action with respect to the potential Executory Contracts, Unexpired Leases and other agreements listed on the Rejected Contract Schedule, including the right to amend, revise, or supplement the Rejected Contract Schedule for any reason whatsoever, including based on objections received to Article V.G of the Plan.

RLF1 26134490v.1

AA0000123

**Schedule 1**

**Rejected Contract Schedule**

AA0000124

**Schedule 1**

**Executory Contracts and Unexpired Leases to be Rejected\***

| Name and Address of Counterparty | Debtor | Unique ID | Contract Type | Description |
|---|---|---|---|---|
| Accenture<br>Attn: Contracts Management<br>Accenture LLP<br>Berwyn, PA  19312 | | | | |
| | Mallinckrodt LLC | 68937 | Service Agreements | MASTER SERVICES AGREEMENT Dated 09/05/2018 |
| | Sucampo Pharmaceuticals, Inc. | 68122 | Service Agreements | Master Professional Services Agreement Dated 02/01/2014 |
| | Mallinckrodt Enterprises LLC | 70480 | Service Agreements | STATEMENT OF WORK NO. 2 Dated 02/06/2019 |
| Access Tea<br>Access TCA, Inc.<br>1 Main Street<br>Whitinsville, MA  01588 | | | | |
| | Mallinckrodt LLC | 70562 | Service Agreements | Master Services Agreement Dated 09/25/2017 |
| | SpecGx LLC | 12591 | Service Agreements | Access TCA SOW2 for 2020 Services |
| | ST Shared Services LLC | 80150 | Other | Other Dated 03/18/2021 |
| | Mallinckrodt LLC | 12134 | Service Agreements | Service Agreements Contract Dated 07/14/2019 |
| | Mallinckrodt LLC | 12134 | Service Agreements | Service Agreements Contract Dated 07/16/2019 |
| | Mallinckrodt ARD Holdings Inc. | 76544 | Service Agreements | Service Agreements Contract Dated 09/21/2020 |
| | Mallinckrodt LLC | ACCESSTCAINC-SOW-0 | Service Agreements | Service Agreements Contract Dated 09/23/2017 |
| | Mallinckrodt ARD Holdings Inc. | 65481 | Service Agreements | STATEMENT OF WORK — Neph #32 |
| | Mallinckrodt Hospital Products<br>Inc. | 75586 | Service Agreements | STATEMENT OF WORK NO. 41 Dated 04/09/2020 |
| American Express<br>PO BOX 1270 PO BOX 1270<br>NEWARK, NJ  07101-1270 | | | | |
| | Mallinckrodt LLC | 49205 | Service Agreements | Business Travel Services Agreement Dated 06/01/2016 |
| | Mallinckrodt LLC | 66632 | Service Agreements | AMENDMENT TO BUSINESS TRAVEL SERVICE<br>AGREEMENT  Dated 09/01/2017 |

\* Each Executory Contract and Unexpired Lease identified on this Schedule 1 includes any modifications, amendments, addenda or supplements thereto or restatements thereof.

**Schedule 1**

## Executory Contracts and Unexpired Leases to be Rejected*

| Name and Address of Counterparty | Debtor | Unique ID | Contract Type | Description |
|---|---|---|---|---|
| | Mallinckrodt LLC | 73202 | Other | DATA PROTECTION AUTHORIZATION AND DIRECTION Dated 06/06/2013 |
| | Mallinckrodt Pharmaceuticals Limited | 74709 | Service Agreements | Data Release Authorization Dated 04/01/2013 |
| | Mallinckrodt LLC | AMERICANEXPRESSTR | Service Agreements | Services Agreement Contract Dated 06/04/2016 |
| | Mallinckrodt LLC | AMERICANEXPRESSTR | Service Agreements | Services Agreement Contract Dated 05/30/2016 |
| | Mallinckrodt LLC | AMERICANEXPRESSTR | Service Agreements | Services Agreement Contract Dated 05/25/2015 |
| | Mallinckrodt LLC | AMERICANEXPRESSTR | Service Agreements | Services Agreement Contract Dated 11/08/2014 |
| | Mallinckrodt LLC | AMERICANEXPRESSTR | Service Agreements | Services Agreement Contract Dated 10/05/2014 |
| | Mallinckrodt LLC | AMERICANEXPRESSTR | Service Agreements | Services Agreement Contract Dated 09/07/2014 |
| | Mallinckrodt LLC | AMERICANEXPRESSTR | Service Agreements | Services Agreement Contract Dated 01/19/2014 |
| | Mallinckrodt LLC | AMERICANEXPRESSTR | Service Agreements | Services Agreement Contract Dated 05/28/2013 |
| | Mallinckrodt LLC | AMEXCANADAINC-MA | Service Agreements | Services Agreement Contract Dated 05/15/2013 |
| | Mallinckrodt LLC | AMERICANEXPRESSTR | Service Agreements | Services Agreement Contract Dated 04/13/2013 |
| | Mallinckrodt LLC | 12993 | Service Agreements | Services Agreement Contract Dated 05/29/2016 |
| | Mallinckrodt LLC | 73693 | Service Agreements | Statement of Work Dated 11/10/2014 |
| | Mallinckrodt plc | 73080 | Other | Letter Agreement Dated 04/15/2013 |
| | Mallinckrodt LLC | 74144 | Other | ADDENDUM TO LETTER AGREEMENT Dated 01/21/2014 |
| | ST Shared Services LLC | 77802 | Other | Amendments Dated 12/03/2020 |
| | Mallinckrodt LLC | 72496 | Other | Amendment to the Letter Agreement Dated 09/09/2014 |
| | Mallinckrodt plc | 75073 | Service Agreements | AMENDMENT TO THE BUSINESS TRAVEL SERVICES AGREEMENT Dated 06/01/2016 |
| | ST Shared Services LLC | 77802 | Other | AMENDMENT TO BUSINESS TRAVEL SERVICES AGREEMENT |
| | Mallinckrodt plc | 72964 | Other | ADDENDUM TO THE LETTER AGREEMENT Dated 05/27/2015 |
| | Mallinckrodt LLC | 69613 | Other | Letter Agreement Dated 04/15/2013 |

* Each Executory Contract and Unexpired Lease identified on this Schedule 1 includes any modifications, amendments, addenda or supplements thereto or restatements thereof.

Case 20-12522-JTD   Doc 4640-1   Filed 10/08/21   Page 7 of 30

## Schedule 1
## Executory Contracts and Unexpired Leases to be Rejected*

| Name and Address of Counterparty | Debtor | Unique ID | Contract Type | Description |
|---|---|---|---|---|
| Ancla Consultancy Llc<br>Ancla Consultancy Services LLC<br>300 Carnegie Center, Suite 150<br>Princeton, NJ 08540 | | | | |
| | Mallinckrodt plc | 67516 | Service Agreements | MASTER SERVICES AGREEMENT Dated 07/06/2017 |
| | Mallinckrodt LLC | 67518 | Service Agreements | Scope of Work #03 Migration of Argus Cases and Corresponding Data Dated 05/11/2018 |
| | Mallinckrodt LLC | ANCLACONSULTANCY | Purchase/Pricing and Supply Agreements | Operating Materials & Supplies Contract Dated 08/11/2018 |
| Anderson Packaging, Inc. n/k/a Packaging Coordinators, LLC d/b/a PCI Pharma Services<br>4545 Assembly Drive<br>Rockford, IL 61109 | | | | |
| | Mallinckrodt LLC | 46738 | Service Agreements | QUALITY AGREEMENT Dated 02/21/2017 |
| | Mallinckrodt LLC | 46745 | Service Agreements | Letter re: Release and Settlement of Loss of Exalgo 32mg Tablets, Lot 317252 Dated 07/24/2013 |
| Ashland LLC and International Specialty Products Inc.<br>Robin E. Lampkin, Esq.<br>5200 Blazer Parkway<br>Dublin, OH 43017 | | | | |
| | Mallinckrodt LLC | AshlandISP1.1 | JDA | Joint Defense Agreement dated 8/2014 |
| | Mallinckrodt LLC | AshlandISP1.2 | SPA | SPA dated March 31, 1992 |
| Atos Digital Health Solutions Inc<br>Attn: Kevin McBride<br>4851 Regent Boulevard<br>Irving, TX 75063 | | | | |
| | ST Shared Services LLC | 80125 | Other | Other Dated 09/01/2020 |

* Each Executory Contract and Unexpired Lease identified on this Schedule 1 includes any modifications, amendments, addenda or supplements thereto or restatements thereof.

Case 20-12522-JTD   Doc 4640-1   Filed 10/08/21   Page 8 of 30

## Schedule 1
### Executory Contracts and Unexpired Leases to be Rejected*

| Name and Address of Counterparty | Debtor | Unique ID | Contract Type | Description |
|---|---|---|---|---|
| | Mallinckrodt Pharmaceuticals Limited | 68133 | Other | Letter re: Amendment # 6 to Statement of Work # 2 – Personnel and Facility Space, Dated September 13, 2016, as amended Dated 07/01/2018 |
| | Mallinckrodt plc | 77906 | Other | Letter re: Amendment # 5 to Statement of Work # 2 – Personnel and Facility Space, DatedSeptember 13, 2016, as amended |
| | Mallinckrodt plc | 77906 | Other | Amendments Dated 07/01/2018 |
| Aventis Intercontinental 55 Corporate Drive Bridgewater, NJ 08807 | Mallinckrodt plc | AventisRoyalty1 | Other | Royalty Agreement Dated 07/27/2001 |
| | Mallinckrodt LLC | SANOFIAVENTISUSLL | Purchase/Pricing and Supply Agreements | Operating Materials & Supplies Contract Dated 12/30/1999 |
| | Mallinckrodt LLC | 00001001 | Customer | Sanofi Winthrop Industrie Dated 07/13/2015 |
| | Mallinckrodt LLC | 00001390 | Confidentiality Agreements/NDA | Sanofi-Aventis U.S. LLC USA CDA Dated 11/07/2017 |
| | Mallinckrodt plc | 00000793 | Confidentiality Agreements/NDA | APLQUAL-Aventis Intercontinental FRA.ORIG.10_FEB_2005 |
| | Mallinckrodt LLC | 52800 | Confidentiality Agreements/NDA | Amendment #2 to Mutual Confidentiality Agreement Between sanofi-aventis U.S., Inc. and Mallinckrodt LLC Dated 12/13/2013 |
| | Sucampo Pharmaceuticals, Inc. | 71735 | Confidentiality Agreements/NDA | CONFIDENTIAL DISCLOSURE AGREEMENT Dated 10/12/2017 |
| | Mallinckrodt LLC | 52798 | Confidentiality Agreements/NDA | NON-DISCLOSURE AGREEMENT Dated 08/30/2016 |
| Baxter W Illinois Route 120 WG1-2N ROUND LAKE, IL 60073 | Mallinckrodt plc | 47154 | Purchase/Pricing and Supply Agreements | PURCHASE AND SALE AGREEMENT Dated 01/07/2018 |

* Each Executory Contract and Unexpired Lease identified on this Schedule 1 includes any modifications, amendments, addenda or supplements thereto or restatements thereof.

## Schedule 1
### Executory Contracts and Unexpired Leases to be Rejected*

| Name and Address of Counterparty | Debtor | Unique ID | Contract Type | Description |
|---|---|---|---|---|
| | Mallinckrodt Pharmaceuticals Ireland Limited | 47154 | Service Agreements | PURCHASE AND SALE AGREEMENT Dated 01/07/2018 |
| | Mallinckrodt LLC | 47156 | Service Agreements | VALUE MANAGED RELATIONSHIP AGREEMENT Dated 07/01/1994 |
| | Mallinckrodt LLC | 47154 | Service Agreements | PURCHASE AND SALE AGREEMENT Dated 01/07/2018 |
| | Mallinckrodt Manufacturing LLC | 47154 | Service Agreements | PURCHASE AND SALE AGREEMENT Dated 01/07/2018 |
| | Mallinckrodt LLC | 47141 | Service Agreements | ADDENDUM NO.2 Dated 07/25/2011 |
| | Mallinckrodt LLC | 47139 | Service Agreements | Addendum NO.9 Dated 01/20/2012 |
| | Mallinckrodt LLC | 00000796 | Customer | Baxter Healthcare LLC Dated 12/19/2013 |
| | Mallinckrodt LLC | 47144 | Service Agreements | CONFIDENTIAL DISCLOSURE AGREEMENT |
| | Mallinckrodt LLC | 47146 | Service Agreements | CONFIDENTIALITY AGREEMENT |
| | Mallinckrodt plc | 46608 | Other | Letter re: Assignment of Baxter International Inc. Distribution Agreement to Baxter Diagnostics Inc. Dated 08/17/1990 |
| | Mallinckrodt LLC | 47155 | Customer | MEMORANDUM OF AGREEMENT Dated 04/01/1991 |
| | Mallinckrodt LLC | 47142 | Service Agreements | MUTUAL CONFIDENTIAL DISCLOSURE AGREEMENT Dated 03/19/2014 |
| Bh Consulting<br>The Line Centre Blanchardstown Road North<br>Dublin  Ireland | ST Shared Services LLC | 75416 | Other | Proposal for Enterprise Disaster Recovery Project Management Presented to ST Shared Services LLC Dated 06/18/2020 |
| Callidus Software, Inc.<br>c/o Brown and Connery, LLP<br>Attn: Donald K. Ludman, Esq.<br>Woodbury, NJ  08096 | Mallinckrodt LLC | 47677 | Service Agreements | COVIDIEN CONTRACTOR AGREEMENT Dated 09/21/2011 |

* Each Executory Contract and Unexpired Lease identified on this Schedule 1 includes any modifications, amendments, addenda or supplements thereto or restatements thereof.

**Schedule 1**

**Executory Contracts and Unexpired Leases to be Rejected\***

| Name and Address of Counterparty | Debtor | Contract Type | Unique ID | Description |
|---|---|---|---|---|
| Carestream<br>Attention: NSB Financial Services MC 00710<br>150 Verona Street<br>Rochester, NY  14608 | | | | |
| | Therakos, Inc. | Service Agreements | 69412 | MASTER SERVICE AGREEMENT Dated 01/01/2014 |
| | Therakos, Inc. | Service Agreements | 65979 | Amended and restated master service agreement Dated 12/08/2017 |
| | Therakos, Inc. | Service Agreements | 65980 | Addendum #1 Service Quality Agreement Dated 11/17/2017 |
| | Therakos, Inc. | Service Agreements | 65977 | ADDENDUM TO EXISTING QUALITY AGREEMENT Dated 03/26/2020 |
| | Mallinckrodt plc | Service Agreements | 65978 | FIRST AMENDMENT TO THE AMENDED AND RESTATED MASTER SERVICE AGREEMENT Dated 01/01/2020 |
| | Therakos, Inc. | Service Agreements | 65981 | Revised and restated addendum 2 to amended and restated master service agreement s-2588 pricing addendum Dated 11/17/2017 |
| | Therakos, Inc. | Service Agreements | 65982 | Exhibit A to Amended and Restated Master Service Agreement Dated 12/08/2017 |
| Century Link / Business Services<br>CenturyLink1801 California St., #900Attn.:<br>Legal Dept  Denver CO 80202 USA | | | | |
| | Mallinckrodt LLC | Other | 71656 | CENTURYLINK TOTAL ADVANTAGE AGREEMENT Dated 02/28/2017 |
| Certara Usa<br>PO BOX 32080<br>NEW YORK, NY  10087 | | | | |
| | Mallinckrodt LLC | Purchase/Pricing and Supply Agreements | CERTARAUSAINC-SOW | Supplies and Materials Contract 02/27/2017 |
| | Mallinckrodt LLC | Purchase/Pricing and Supply Agreements | PHARSIGHTCORPORAT | Supplies and Materials Contract 01/30/2017 |

\* Each Executory Contract and Unexpired Lease identified on this Schedule 1 includes any modifications, amendments, addenda or supplements thereto or restatements thereof.

Case 20-12522-JTD   Doc 4640-1   Filed 10/08/21   Page 11 of 30

**Schedule 1**

## Executory Contracts and Unexpired Leases to be Rejected*

| Name and Address of Counterparty | Debtor | Unique ID | Contract Type | Description |
|---|---|---|---|---|
| | Mallinckrodt LLC | CERTARAUSAINC-AM | Purchase/Pricing and Supply Agreements | Supplies and Materials Contract Dated 12/05/2010 |
| | Mallinckrodt LLC | 13016 | Purchase/Pricing and Supply Agreements | Supplies and Materials Contract Dated 11/29/2016 |
| | ST Shared Services LLC | 68408 | Confidentiality Agreements/NDA | MUTUAL CONFIDENTIALITY AGREEMENT Dated 12/04/2019 |
| | Ocera Therapeutics, Inc. | 71876 | Confidentiality Agreements/NDA | Amendment No. 1 to Consulting Agreement Dated 10/13/2017 |
| | Mallinckrodt LLC | 72066 | Confidentiality Agreements/NDA | Work Order No. 11 Dated 01/16/2017 |
| Cignon Uk<br>Cignon UK LtdDavidson House<br>ForburySquare Reading UK RG1 3EU England | | | | |
| | ST Shared Services LLC | 62894 | Purchase/Pricing and Supply Agreements | Purchase Order Dated 12/30/2019 |
| Continental Traffic Service Inc<br>DBA CTSI GLOBAL<br>1 SOUTH PRESCOTT ST<br>MEMPHIS, TN  38111 | | | | |
| | SpecGx LLC | 12322 | Service Agreements | Service Agreement dated June 25th, 2020 |
| | Mallinckrodt LLC | 12322 | Service Agreements | Freight Contract Dated 10/30/2019 |
| Covidien<br>Tyco Healthcare LLP<br>15 Hampshire Street<br>Mansfield, MA  02048 | | | | |
| | Mallinckrodt plc | 48342 | Service Agreements | SEPARATION AND DISTRIBUTION AGREEMENT Dated 06/28/2013 |
| | Mallinckrodt plc | 48342 | Service Agreements | SEPARATION AND DISTRIBUTION AGREEMENT Dated 06/28/2013 |

\* Each Executory Contract and Unexpired Lease identified on this Schedule 1 includes any modifications, amendments, addenda or supplements thereto or restatements thereof.

## Schedule 1
## Executory Contracts and Unexpired Leases to be Rejected*

| Name and Address of Counterparty | Debtor | Unique ID | Contract Type | Description |
|---|---|---|---|---|
| | Mallinckrodt plc | 48342 | Service Agreements | SEPARATION AND DISTRIBUTION AGREEMENT Dated 06/28/2013 |
| Diamond Technologies 4001 MILLER RD, 3 0 WILMINGTON DE 19802 US | | | | |
| | Mallinckrodt Pharmaceuticals Limited | 68162 | Service Agreements | Proposal for: Mallinckrodt Pharmaceuticals Regarding Application Development & Support Services Dated 01/27/2016 |
| | Mallinckrodt Pharmaceuticals Limited | 68163 | Service Agreements | Database Enhancement Estimate Dated 04/28/2017 |
| | ST Shared Services LLC | 75604 | Service Agreements | STATEMENT OF WORK |
| D-Town Associates 120 Pennsylvania Ave. Malvern, PA  19355 | | | | |
| | Therakos, Inc. | 63552 | Leases | Lease Agreement Dated 04/01/2013 |
| | Therakos, Inc. | 63553 | Leases | FIRST AMENDMENT TO LEASE AGREEMENT  Dated 05/21/2013 |
| Eberhard Carls University Tuebingen Children's hospital Tuebingen Prof. Dr. med. R. Handgretinger Tuebingen,  72076 | University Hospital Tuebi | | Other | |
| | Therakos, Inc. | 73612 | Other | Research Funding Agreement dated  2/20/2014 |
| | Therakos, Inc. | 73612 | Service Agreements | RESEARCH FUNDING AGREEMENT Dated 04/07/2014 |
| | Mallinckrodt plc | 80549 | Other | Other Dated 05/06/2021 |
| Everbridge Everbridge, Inc.25 Corporate DriveFor legal notice:Attention: Legal Department Burlington MA 1803 USA | | | | |
| | ST Shared Services LLC | 68469 | Service Agreements | Master Services Agreement Dated 01/31/2020 |

\* Each Executory Contract and Unexpired Lease identified on this Schedule 1 includes any modifications, amendments, addenda or supplements thereto or restatements thereof.

Case 20-12522-JTD   Doc 4640-1   Filed 10/08/21   Page 13 of 30

## Schedule 1
### Executory Contracts and Unexpired Leases to be Rejected*

| Name and Address of Counterparty | Debtor | Unique ID | Contract Type | Description |
|---|---|---|---|---|
| Evonik<br>Attn: General Counsel<br>299 Jefferson Rd<br>Parsippany, NJ 07054 | | | | |
| | Ocera Therapeutics, Inc. | EvonikAddedContract1 | Other | Master Services Agreement Dated 03/10/2016 |
| | SpecGx LLC | 912 | Purchase/Pricing and Supply Agreements | Operating Materials & Supplies Contract Dated 12/19/2018 |
| | Mallinckrodt LLC | EVONIKCORPORATIO | Purchase/Pricing and Supply Agreements | Operating Materials & Supplies Contract Dated 08/14/2017 |
| | SpecGx LLC | 912 | Purchase/Pricing and Supply Agreements | Operating Materials & Supplies Contract Dated 12/17/2018 |
| | Mallinckrodt LLC | 51361 | Service Agreements | Letter re: Master Service Agreement dated February 11, 2010 (the "Agreement") between Mallinckrodt Inc. ("you") and Transferra Nanosciences Inc. (formerly Northern Lipids Inc.) ("Transferra") Dated 07/29/2016 |
| | Mallinckrodt plc | EvonikAddedContract4 | Other | Amendment to Statement of Work Dated 09/01/2020 |
| | Mallinckrodt Pharmaceuticals Ireland Limited | 48940 | Leases | FIRST AMENDMENT TO SERVICES AGREEMENT |
| | Mallinckrodt Pharmaceuticals Ireland Limited | 48934 | Leases | Letter Agreement Dated 02/28/2014 |
| | Ocera Therapeutics, Inc. | EvonikAddedContract2 | Other | Letter of Intent Dated 08/11/2017 |
| | Ocera Therapeutics, Inc. | 71725 | Service Agreements | NON-DISCLOSURE AGREEMENT Dated 08/07/2017 |
| | Mallinckrodt plc | EvonikAddedContract3 | Other | Statement of Work Dated 04/10/2016 |
| Fcb Health<br>PO BOX 74008222<br>CHICAGO, IL 60674 | | | | |
| | Mallinckrodt ARD Holdings Inc. | 74617 | Settlement/Consent/Termination/Indemnification Agreements | ASSIGNMENT AND ASSUMPTION AGREEMENT AND AMENDMENT NO. 1 Dated 06/27/2016 |
| | Mallinckrodt ARD Holdings Inc. | 72078 | Service Agreements | First Amendment to Statement of Work Dated 10/19/2017 |

* Each Executory Contract and Unexpired Lease identified on this Schedule 1 includes any modifications, amendments, addenda or supplements thereto or restatements thereof.

Case 20-12522-JTD   Doc 4640-1   Filed 10/08/21   Page 14 of 30

**Schedule 1**

**Executory Contracts and Unexpired Leases to be Rejected\***

| Name and Address of Counterparty | Debtor | Unique ID | Contract Type | Description |
|---|---|---|---|---|
| | Mallinckrodt ARD Holdings Inc. | 71293 | Service Agreements | AMENDMENT TO MASTER SERVICE AGREEMENT Dated 06/07/2017 |
| | Mallinckrodt ARD LLC | 75571 | Service Agreements | STATEMENT OF WORK NO. 203 Dated 04/15/2020 |
| | Mallinckrodt ARD Holdings Inc. | 74817 | Service Agreements | Statement of Work No. 24 Dated 10/01/2016 |
| | Mallinckrodt ARD Holdings Inc. | 75015 | Service Agreements | Statement of Work No. 27 Dated 10/01/2016 |
| | Mallinckrodt ARD Holdings Inc. | 74802 | Service Agreements | Statement of Work No. 29 Dated 10/05/2016 |
| | Mallinckrodt ARD Holdings Inc. | 75013 | Service Agreements | Statement of Work No. 33 Dated 10/01/2016 |
| | Mallinckrodt ARD Holdings Inc. | 75008 | Service Agreements | Statement of Work No. 42 to Master Service Agreement Dated 03/01/2017 |
| | Mallinckrodt ARD Holdings Inc. | 74830 | Service Agreements | Statement of Work No. 43 Dated 03/01/2017 |
| | Mallinckrodt ARD Holdings Inc. | 74727 | Service Agreements | Statement of Work No. 46 Dated 01/01/2017 |
| | Mallinckrodt ARD Holdings Inc. | 74814 | Service Agreements | Statement of Work No. 48 Dated 02/01/2017 |
| | Mallinckrodt ARD Holdings Inc. | 74771 | Service Agreements | Statement of Work No. 49 to Master Service Agreement Dated 02/08/2017 |
| | Mallinckrodt ARD Holdings Inc. | 71934 | Service Agreements | Statement of Work No. 53 to Master Service Agreement Dated 03/23/2017 |
| First Object 1320 Greenway Drive Suite 855 Irving, TX 75038 | Mallinckrodt plc | 73445 | Service Agreements | PROFESSIONAL SERVICES AGREEMENT Dated 07/21/2014 |
| | Mallinckrodt plc | 69659 | Service Agreements | PROFESSIONAL SERVICES AGREEMENT Dated 07/28/2014 |
| | ST Shared Services LLC | 75459 | Service Agreements | WORK ORDER NO. 16 Dated 07/01/2020 |
| Fortis Advisors Llc | Mallinckrodt plc | VTSMerger1 | Other | Vtesse Merger Agreement Dated 03/31/2017 |

\* Each Executory Contract and Unexpired Lease identified on this Schedule 1 includes any modifications, amendments, addenda or supplements thereto or restatements thereof.

## Schedule 1
### Executory Contracts and Unexpired Leases to be Rejected*

| Name and Address of Counterparty | Debtor | Unique ID | Contract Type | Description |
|---|---|---|---|---|
| Fresenius<br>ATTN: FRANZ KAINZ, PHD<br>BORKENBERG 14<br>OBERURSEL, DE  61440 | | | | |
| | Mallinckrodt plc | 00001269 | Confidentiality Agreements/NDA | Fresenius Kabi Manufacturing SA (PTY) Limited ZAF CDA Dated 10/05/2017 |
| | SpecGx LLC | 00001141 | Purchase/Pricing and Supply Agreements | Fresenius Kabi Deutschland GmbH DEU CDA Dated 06/10/2018 |
| | SpecGx LLC | 00000110 | Purchase/Pricing and Supply Agreements | FRESENIUS KABI DEUTSCHLAND Dated 06/16/2019 |
| | Mallinckrodt Pharmaceuticals Ireland Limited | Fresenius1 | | Assignment Agreement dated 9/29/2014 |
| | Mallinckrodt Medical Imaging - Ireland | Fresenius5 | | Amendment to Manufacturing and Supply Agreement dated 11/4/2014 |
| | Mallinckrodt LLC | 00000109 | Customer | FRESENIUS KABI USA Dated 04/30/2017 |
| | Mallinckrodt Medical Imaging - Ireland | Fresenius4 | | Manufacturing and Supply Agreement dated 8/6/2014 |
| | Mallinckrodt plc | 21481TherakosCust | Customer | Therakos Customer FRESENIUS |
| | Mallinckrodt plc | 21459TherakosCust | Customer | Therakos Customer HENRY FORD - Included w/ Fresenius |
| | Mallinckrodt Pharmaceuticals Ireland Limited | 63566 | Purchase/Pricing and Supply Agreements | SECOND AMENDMENT TO MANUFACTURING AND SUPPLY AGREEMENT Dated 12/20/2017 |
| | SpecGx LLC | 00001400 | Confidentiality Agreements/NDA | Fresenius Kabi Viet Nam VNM CDA Dated 05/17/2019 |
| Gartner<br>PO BOX 911319<br>DALLAS, TX  75391-1319 | | | | |
| | Mallinckrodt LLC | GARTNERINC-MAS-000 | Software/IT/Licensing Agreement | Dues, Memberships, Charity Contract Dated 06/29/2013 |
| | Mallinckrodt LLC | 68889 | Service Agreements | Statement of Work No. 1 Dated 12/02/2014 |

* Each Executory Contract and Unexpired Lease identified on this Schedule 1 includes any modifications, amendments, addenda or supplements thereto or restatements thereof.

Case 20-12522-JTD   Doc 4640-1   Filed 10/08/21   Page 16 of 30

**Schedule 1**

## Executory Contracts and Unexpired Leases to be Rejected*

| Name and Address of Counterparty | Debtor | Unique ID | Contract Type | Description |
|---|---|---|---|---|
| | Mallinckrodt LLC | 70448 | Service Agreements | Statement of Work No. 2 to Master Service Agreement Dated 12/15/2014 |
| | Mallinckrodt LLC | GARTNERINC-SOW-000 | Software/IT/Licensing Agreement | Dues, Memberships, Charity Contract Dated 11/30/2014 |
| | Mallinckrodt LLC | GARTNERINC-SOW-000 | Software/IT/Licensing Agreement | Dues, Memberships, Charity Contract Dated 12/13/2014 |
| | Mallinckrodt LLC | GARTNERINC-MAS-000 | Software/IT/Licensing Agreement | Dues, Memberships, Charity Contract Dated 03/30/2015 |
| | Mallinckrodt LLC | GARTNERINC-QT-00071 | Software/IT/Licensing Agreement | Dues, Memberships, Charity Contract Dated 09/29/2015 |
| | Mallinckrodt LLC | GARTNERINC-QT-00071 | Software/IT/Licensing Agreement | Dues, Memberships, Charity Contract Dated 11/29/2015 |
| | Mallinckrodt LLC | GARTNERINC-MAS-000 | Software/IT/Licensing Agreement | Dues, Memberships, Charity Contract Dated 07/19/2016 |
| | Mallinckrodt LLC | GARTNERINC-MAS-001 | Software/IT/Licensing Agreement | Dues, Memberships, Charity Contract Dated 05/30/2018 |
| | Mallinckrodt plc | GARTNERINC-MAS-001 | Software/IT/Licensing Agreement | Dues, Memberships, Charity Contract Dated 06/29/2018 |
| Genpact<br>66 BUCKINGHAM GATE<br>4TH FLR<br>LONDON,  SW1E 6AU | Mallinckrodt LLC | 69963 | Service Agreements | MASTER SERVICES AGREEMENT Dated 08/18/2017 |
| | Mallinckrodt LLC | 12986 | Service Agreements | Service Agreements Contract Dated 03/22/2016 |
| | Mallinckrodt LLC | 69446 | Service Agreements | Change Order No. 01 To SOW NO. 1 - Veeva Support Services Dated 10/26/2017 |
| | Mallinckrodt LLC | 68184 | Service Agreements | Change Order No. 02 Dated 12/21/2017 |
| | Mallinckrodt LLC | 68185 | Service Agreements | MASTER SERVICES AGREEMENT  Dated 08/18/2017 |
| | Mallinckrodt LLC | 69055 | Service Agreements | MUTUAL CONFIDENTIALITY AGREEMENT Dated 06/2017 |

* Each Executory Contract and Unexpired Lease identified on this Schedule 1 includes any modifications, amendments, addenda or supplements thereto or restatements thereof.

**Schedule 1**

**Executory Contracts and Unexpired Leases to be Rejected\***

| Name and Address of Counterparty | Debtor | Unique ID | Contract Type | Description |
|---|---|---|---|---|
| | ST Shared Services LLC | 67866 | Service Agreements | STATEMENT OF WORK NO. 18 Dated 01/01/2020 |
| | ST Shared Services LLC | 75569 | Service Agreements | STATEMENT OF WORK NO. 20 Dated 04/07/2020 |
| Greater Boston Medical Associates<br>Law office of Michael Paolini<br>1646 Centre Street<br>West Roxbury, MA  02132 | Mallinckrodt ARD Holdings Inc. | 45946 | Service Agreements | CLINICAL STUDY AGREEMENT — INVESTIGATOR INITIATED STUDY Dated 03/24/2016 |
| Greathouse, Kenneth R<br>Lillian Stenfeldt, Esq.<br>Rimon, P.C.<br>Menlo Park, CA  94025 | Mallinckrodt Pharmaceuticals Ireland Limited | 49343 | Confidentiality Agreements/NDA | CONFIDENTIAL SETTLEMENT AGREEMENT AND RELEASE Dated 10/01/2014 |
| Guerbet<br>Responsable des Affaires Juridiques<br>B.P 50400<br>Roissy CdG Cedex,  95943 | Mallinckrodt Holdings GmbH | 49475 | Software/IT/Licensing Agreement | STOCK PURCHASE AGREEMENT Dated 07/27/2015 |
| | Mallinckrodt International Finance SA | 49475 | Software/IT/Licensing Agreement | STOCK PURCHASE AGREEMENT Dated 07/27/2015 |
| | Mallinckrodt plc | 49475 | Software/IT/Licensing Agreement | STOCK PURCHASE AGREEMENT Dated 07/27/2015 |
| | Mallinckrodt US Holdings LLC | 49475 | Software/IT/Licensing Agreement | STOCK PURCHASE AGREEMENT Dated 07/27/2015 |

\* Each Executory Contract and Unexpired Lease identified on this Schedule 1 includes any modifications, amendments, addenda or supplements thereto or restatements thereof.

Case 20-12522-JTD   Doc 4640-1   Filed 10/08/21   Page 18 of 30

**Schedule 1**

**Executory Contracts and Unexpired Leases to be Rejected***

| Name and Address of Counterparty | Debtor | Unique ID | Contract Type | Description |
|---|---|---|---|---|
| Guidespark<br>1400A Seaport Blvd.<br>Suite 500<br>Redwood City, CA  94063 | | | | |
| | Mallinckrodt LLC | 67336 | Purchase/Pricing and Supply Agreements | MASTER SUBSCRIPTION AGREEMENT Dated 08/15/2016 |
| | Mallinckrodt LLC | 72789 | Purchase/Pricing and Supply Agreements | MUTUAL NONDISCLOSURE AGREEMENT Dated 04/27/2016 |
| | Mallinckrodt LLC | 67338 | Purchase/Pricing and Supply Agreements | FIRST AMENDMENT TO MASTER SUBSCRIPTION AGREEMENT Dated 01/25/2019 |
| | Mallinckrodt LLC | 67340 | Purchase/Pricing and Supply Agreements | Letter re: Consent to Assignment Dated 03/12/2020 |
| | Mallinckrodt LLC | 67337 | Purchase/Pricing and Supply Agreements | Order Form # 004 Dated 10/17/2016 |
| | Mallinckrodt LLC | 67341 | Purchase/Pricing and Supply Agreements | Order Form # 006 Dated 01/14/2019 |
| Happyornot<br>701 Northpointe Pkwy<br>Suite 300<br>West Palm Beach, FL  33407 | | | | |
| | Mallinckrodt plc | HappyOrNotContract | Other | Service Supply Agreement dated 10/31/2018 |
| Hospira<br>PO BOX 744292<br>ATLANTA, GA  30374 | | | | |
| | Mallinckrodt plc | 46220 | Purchase/Pricing and Supply Agreements | SUPPLY AGREEMENT Dated 07/01/1998 |
| | Mallinckrodt plc | 69701 | Purchase/Pricing and Supply Agreements | CONFIRMATION OF ASSIGNMENT OF DEVELOPMENT AND SUPPLY AGREEMENT Dated 11/23/2010 |

* Each Executory Contract and Unexpired Lease identified on this Schedule 1 includes any modifications, amendments, addenda or supplements thereto or restatements thereof.

## Schedule 1
## Executory Contracts and Unexpired Leases to be Rejected*

| Name and Address of Counterparty | Debtor | Unique ID | Contract Type | Description |
|---|---|---|---|---|
| Human Care Systems<br>84 STATE ST, SUITE 720<br>BOSTON, MA  02109 | | | | |
| | Mallinckrodt ARD LLC | 76500 | Service Agreements | Services Agreement Contract Dated 07/20/2020 |
| | Mallinckrodt ARD LLC | 75464 | Service Agreements | STATEMENT OF WORK NO. 1901 Dated 04/27/2020 |
| | Mallinckrodt ARD Holdings Inc. | 75515 | Service Agreements | STATEMENT OF WORK NO. 1907 Dated 04/20/2020 |
| | Mallinckrodt ARD Holdings Inc. | 75465 | Service Agreements | STATEMENT OF WORK NO. 1907 Dated 05/04/2020 |
| | Mallinckrodt plc | 65384 | Service Agreements | STATEMENT OF WORK NO. 1910 Dated 03/23/2020 |
| Iraj Sabahi Research Inc<br>2161 Colorado Ave<br>Suite A2<br>Turlock, CA  95382 | | | | |
| | Mallinckrodt plc | IRAJ SABAHI RESEARC | Other | Clinical Study Agreement dated 12/11/2014 |
| Jubilant Hollisterstier Genera<br>Finance Department<br>16751 Trans-Canada Highway<br>Kirkland, QC  H9H 4J4 | | | | |
| | Mallinckrodt LLC | 12222 | Service Agreements | Other SG&A Contract Dated 04/23/2017 |
| | Mallinckrodt LLC | 13238 | Service Agreements | Jubilant_SoW for 3rd party audit _9.15.20 |
| | Mallinckrodt LLC | 12529 | Purchase/Pricing and Supply Agreements | Manufacturing Agreement Contract Dated 04/25/2017 |
| | Mallinckrodt LLC | JUBILANTHOLLISTERS | Service Agreements | Other SG&A Contract Dated 04/23/2017 |
| | Mallinckrodt LLC | 13241 | Confidentiality Agreements/NDA | Jubilant_Alcami_Mallinckrodt 3 way CDA |

\* Each Executory Contract and Unexpired Lease identified on this Schedule 1 includes any modifications, amendments, addenda or supplements thereto or restatements thereof.

**Schedule 1**

**Executory Contracts and Unexpired Leases to be Rejected***

| Name and Address of Counterparty | Debtor | Unique ID | Contract Type | Description |
|---|---|---|---|---|
| Koverse<br>Koverse, Inc.<br>999 Third Avenue<br>Seattle, WA  98104 | | | | |
| | Mallinckrodt Enterprises LLC | 68440 | Service Agreements | MASTER SERVICES AGREEMENT Dated 09/03/2019 |
| | Mallinckrodt Enterprises LLC | 74555 | Service Agreements | MUTUAL CONFIDENTIALITY AGREEMENT Dated 06/26/2019 |
| | Mallinckrodt Enterprises LLC | 69898 | Service Agreements | STATEMENT OF WORK NO. 1 |
| Lloyd Glenn<br>Thomas E. Wallerstein<br>Venable LLP<br>San Francisco, CA  94105 | | | | |
| | Mallinckrodt Pharmaceuticals Ireland Limited | 49343 | Confidentiality Agreements/NDA | CONFIDENTIAL SETTLEMENT AGREEMENT AND RELEASE Dated 10/01/2014 |
| Lowcounty Center For Veterans Research<br>Brittany BaberExecutive DirectorLowcountry Center for Veterans Research 109 Bee Street<br>Charleston SC 29401 USA | | | | |
| | Ocera Therapeutics, Inc. | 75756 | R&D | VA PHASE III CLINICAL TRIAL COOPERATIVE RESEARCH AND DEVELOPMENT AGREEMENT Dated 05/19/2020 |
| Maxcare<br>Attn: Lonny D. Wilson, Executive Director<br>Pharmacy Providers of Oklahoma, Inc.<br>Oklahoma City, OK  73154 | | | | |
| | Mallinckrodt LLC | 00001027 | Service Agreements | Maxcare RX Dated 01/16/2014 |
| | Mallinckrodt LLC | 00001027 | Amendment | Amendment of Patient Assistance Program Agreement dated April 14, 2014 |

\* Each Executory Contract and Unexpired Lease identified on this Schedule 1 includes any modifications, amendments, addenda or supplements thereto or restatements thereof.

**Schedule 1**

**Executory Contracts and Unexpired Leases to be Rejected\***

| Name and Address of Counterparty | Debtor | Unique ID | Contract Type | Description |
|---|---|---|---|---|
| | Mallinckrodt LLC | 00001027 | Patient Assistance Agreement | Patient Assistance Program dated January 16, 2014 |
| Mcguire Research Institute<br>Robert DreschExecutive DirectorMcGuire Research Institute (151)1201 Broad Rock Boulevard Richmond VA 23249 USA | | | | |
| | Ocera Therapeutics, Inc. | 75755 | R&D | Phase III CLINICAL TRIAL COOPERATIVE RESEARCH AND DEVELOPMENT AGREEMENT (CRADA) Dated 06/22/2020 |
| Mckinsey & Company<br>McKinsey & Company, Inc<br>75 Park Plaza, 3rd Floor<br>Boston, MA 02116-3934 | | | | |
| | Mallinckrodt LLC | MCKINSEYCOMPANYI | Service Agreements | Professional Fees Contract Dated 03/06/2017 |
| | Mallinckrodt LLC | 6141 | Service Agreements | Professional Fees Contract Dated 06/03/2019 |
| | Mallinckrodt LLC | MCKINSEYCOMPANYI | Service Agreements | Professional Fees Contract Dated 07/09/2016 |
| | Mallinckrodt LLC | MCKINSEYCOMPANYI | Service Agreements | Professional Fees Contract Dated 01/30/2016 |
| | Mallinckrodt plc | ANALYSIS-MAS-000767 | Service Agreements | Professional Fees Contract Dated 08/02/2016 |
| | Mallinckrodt LLC | MCKINSEYCOMPANYI | Service Agreements | Professional Fees Contract Dated 08/14/2018 |
| | Mallinckrodt LLC | MCKINSEYCOMPANYI | Service Agreements | Professional Fees Contract Dated 09/29/2015 |
| | Mallinckrodt LLC | MCKINSEYCOMPANYI | Service Agreements | Professional Fees Contract Dated 01/15/2017 |
| | Mallinckrodt LLC | 73937 | Service Agreements | Statement of Work No. 12 Dated 08/19/2015 |
| | Mallinckrodt LLC | MCKINSEYCOMPANYI | Service Agreements | Professional Fees Contract Dated 08/17/2015 |
| | Mallinckrodt LLC | MCKINSEYCOMPANYI | Service Agreements | Professional Fees Contract Dated 09/29/2015 |
| | Mallinckrodt LLC | 73981 | Service Agreements | Statement of Work No. 14 Dated 02/01/2016 |
| | Mallinckrodt LLC | 73617 | Service Agreements | Statement of Work No. 9 Dated 11/03/2014 |
| | Mallinckrodt LLC | 77908 | Service Agreements | STATEMENT OF WORK |
| | Mallinckrodt LLC | 71917 | Service Agreements | Statement of Work No. 16 Dated 03/08/2017 |

\* Each Executory Contract and Unexpired Lease identified on this Schedule 1 includes any modifications, amendments, addenda or supplements thereto or restatements thereof.

Case 20-12522-JTD   Doc 4640-1   Filed 10/08/21   Page 22 of 30

## Schedule 1

### Executory Contracts and Unexpired Leases to be Rejected*

| Name and Address of Counterparty | Debtor | Unique ID | Contract Type | Description |
|---|---|---|---|---|
| | Mallinckrodt LLC | MCKINSEYCOMPANY1 | Service Agreements | Professional Fees Contract Dated 11/01/2014 |
| | Mallinckrodt LLC | MCKINSEYCOMPANY1 | Service Agreements | Professional Fees Contract Dated 01/08/2013 |
| | ST Shared Services LLC | 77880 | Service Agreements | STATEMENT OF WORK |
| | Mallinckrodt LLC | MCKINSEYCOMPANY1 | Service Agreements | Professional Fees Contract Dated 10/30/2016 |
| | Mallinckrodt LLC | 77908 | Service Agreements | Statements of Work Dated 04/12/2020 |
| | ST Shared Services LLC | 77880 | Service Agreements | Statements of Work Dated 04/13/2020 |
| | Mallinckrodt LLC | 50778 | Service Agreements | CONFIDENTIALITY AND SYSTEM ACCESS AGREEMENT Dated 01/16/2016 |
| | Mallinckrodt LLC | 13279 | Service Agreements | McKinsey_Amendment 2_2020 |
| | Mallinckrodt plc | 52271 | Service Agreements | Memorandum re : Statement of Work |
| | Mallinckrodt plc | 52271 | Service Agreements | Memorandum re : Statement of Work |
| | Mallinckrodt LLC | MCKINSEYCOMPANY1 | Service Agreements | Professional Fees Contract Dated 01/03/2015 |
| | Mallinckrodt LLC | MCKINSEYCOMPANY1 | Service Agreements | Professional Fees Contract Dated 01/03/2015 |
| Nasdaq Corporate Solutions LBX#11700 PO BOX 780700 PHILADELPHIA, PA 19178 | Mallinckrodt LLC | Nasdaq1.2 | Master Services Agreement | Master Services Agreement Dated April 12, 2019 |
| | Mallinckrodt LLC | Nasdaq1.1 | Service Order | Service Order dated April 12, 2019 |
| Novotech (Australia) Pty Novotech (Australia) Pty Limited Attn: General Counsel Pyrmont,  NSW 2035 | Mallinckrodt ARD Holdings Inc. | 69148 | Service Agreements | CLINICAL RESEARCH ORGANIZATION MASTER SERVICES AGREEMENT Dated 10/14/2015 |
| | Mallinckrodt ARD Holdings Inc. | 69494 | Service Agreements | CHANGE ORDER NO.1 TO STATEMENT OF WORK NO.1 Dated 05/12/2016 |
| | Mallinckrodt ARD Holdings Inc. | 69587 | Service Agreements | CHANGE ORDER NO. 2 to SOW Dated 09/21/2017 |

* Each Executory Contract and Unexpired Lease identified on this Schedule 1 includes any modifications, amendments, addenda or supplements thereto or restatements thereof.

Case 20-12522-JTD   Doc 4640-1   Filed 10/08/21   Page 23 of 30

**Schedule 1**

**Executory Contracts and Unexpired Leases to be Rejected***

| Name and Address of Counterparty | Debtor | Unique ID | Contract Type | Description |
|---|---|---|---|---|
| | Mallinckrodt ARD Holdings Inc. | 62218 | Service Agreements | CHANGE ORDER NO. 3 TO STATEMENT OF WORK NO. 1 Dated 04/10/2018 |
| | Mallinckrodt ARD Holdings Inc. | 62219 | Service Agreements | CHANGE ORDER NO. 4 TO STATEMENT OF WORK NO. 1 Dated 7/__/2019 |
| | Ocera Therapeutics, Inc. | 73957 | Service Agreements | CHANGE ORDER REQUEST FORM Dated 02/24/2016 |
| Otis Elevator d/b/a Miller Elevator Company Jennifer A. Keller Miller Elevator Company St. Louis, MO 63110 | Mallinckrodt Inc. | Otis1.1 | Miller Elevator Co | Master Maintenance Agreement dated 5/16/2005 |
| Pharmaceutics International PO BOX 842332 BOSTON, MA 02284 | Mallinckrodt LLC | 12551 | Purchase/Pricing and Supply Agreements | Manufacturing Agreement Contract Dated 01/20/2020 |
| | Mallinckrodt LLC | 51920 | Other | Complete Preparation of Process Validation in Preparation to Manufacture Validation Batches of Morphine Sulfate, 10mg/mL and 25mg/mL for Mallinckrodt LLC Dated 02/28/2013 |
| | Mallinckrodt LLC | 51921 | Other | Manufacture of Validation Batches of Morphine Sulfate, 10mg/mL and 25mg/mL for Mallinckrodt LLC Dated 07/09/2013 |
| | Mallinckrodt LLC | 00001375 | Confidentiality Agreements/NDA | Pharmaceutics International, Inc. (Pii) USA CDA Dated 10/31/2017 |
| | SpecGx LLC | 12749 | Service Agreements | Pharmaceutics Intl Sublocade binding term sheet_4.1.20_Binding Term sheet |
| Purdue University Collections Office 610 Purdue Mall West Lafayette, IN 47906 | | | | |

* Each Executory Contract and Unexpired Lease identified on this Schedule 1 includes any modifications, amendments, addenda or supplements thereto or restatements thereof.

Case 20-12522-JTD   Doc 4640-1   Filed 10/08/21   Page 24 of 30

**Schedule 1**

## Executory Contracts and Unexpired Leases to be Rejected*

| Name and Address of Counterparty | Debtor | Unique ID | Contract Type | Description |
|---|---|---|---|---|
| | Mallinckrodt LLC | Purdue University College | Other | Letter of Agreement for Medical Educational Support dated 10/31/2019 |
| Reed Technology And Information Ser<br>Reed Technology and Information Services Inc.<br>7 Walnut Grove Drive<br>Horsham, PA  19044 | | | | |
| | Mallinckrodt LLC | 68820 | Service Agreements | CONVERSION SERVICES AGREEMENT Dated 10/17/2017 |
| Revhealth<br>55 BANK ST<br>MORRISTOWN, NJ  07960 | | | | |
| | Mallinckrodt LLC | 69681 | Service Agreements | MASTER SERVICES AGREEMENT Dated 09/29/2017 |
| | Mallinckrodt LLC | 71306 | Service Agreements | MUTUAL CONFIDENTIALITY AGREEMENT  Dated 09/29/2017 |
| | Mallinckrodt ARD LLC | 75519 | Service Agreements | FIRST AMENDMENT TO STATEMENT OF WORK NO. 8 Dated 03/31/2020 |
| | Mallinckrodt ARD LLC | 75549 | Service Agreements | STATEMENT OF WORK NO. 15 Dated 04/23/2020 |
| | Mallinckrodt ARD LLC | 75565 | Service Agreements | STATEMENT OF WORK NO. 18 Dated 05/18/2020 |
| Russell Smestad, as Representative of<br>Securityholders (both as defined in that certain<br>Agreement and Plan of Merger Dated as of August<br>10, 2016)<br><br>Russel Smestad 6419 Wydown<br>CircleMiddleton, WI 53562with copy<br>to:Michael Best & Friedrich LLP1 S. Pinckney<br>Street, Suite 700Madison, WI 53701Attn: Tod<br>B Linstroth | Mallinckrodt Hospital Products<br>Inc. | 53353 | Other | AGREEMENT AND PLAN OF MERGER Dated 08/10/2016 |
| | Mallinckrodt plc | 53353 | Other | AGREEMENT AND PLAN OF MERGER Dated 08/10/2016 |

* Each Executory Contract and Unexpired Lease identified on this Schedule 1 includes any modifications, amendments, addenda or supplements thereto or restatements thereof.

## Schedule 1
### Executory Contracts and Unexpired Leases to be Rejected*

| Name and Address of Counterparty | Debtor | Unique ID | Contract Type | Description |
|---|---|---|---|---|
| | Mallinckrodt International Finance SA | 53353 | Other | AGREEMENT AND PLAN OF MERGER Dated 08/10/2016 |
| Saama<br>900 E. Hamilton Ave, Suite 200<br>Campbell, CA  95008 | | | | |
| | Mallinckrodt Enterprises LLC | 75426 | Service Agreements | CHANGE ORDER 1 TO STATEMENT OF WORK Dated 06/25/2020 |
| Sensei Project Solutions<br>45 WEST JEFFERSON ST 45 WEST JEFFERSON ST<br>PHOENIX, AZ  85003 | | | | |
| | Mallinckrodt LLC | 68195 | Service Agreements | MASTER SERVICES AGREEMENT Dated 02/15/2018 |
| | Mallinckrodt Pharmaceuticals Limited | 75527 | Service Agreements | PPM Support Dated 03/18/2020 |
| | Mallinckrodt Pharmaceuticals Limited | 75527 | Service Agreements | PPM Support Dated 03/18/2020 |
| | Mallinckrodt LLC | 70919 | Service Agreements | MUTUAL CONFIDENTIALITY AGREEMENT Dated 10/10/2017 |
| Sfc Owner Llc<br>300 Broadacres Drive<br>Suite 126<br>Bloomfield, NJ  07003 | | | | |
| | Mallinckrodt plc | 000068 | Leases | Lease Contract |
| Stratacom<br>StrataCom, Inc.<br>3523 45th St S<br>Fargo, ND  58104 | | | | |
| | ST Shared Services LLC | 75492 | Service Agreements | MASTER SERVICES AGREEMENT Dated 04/28/2020 |

* Each Executory Contract and Unexpired Lease identified on this Schedule 1 includes any modifications, amendments, addenda or supplements thereto or restatements thereof.

## Schedule 1

### Executory Contracts and Unexpired Leases to be Rejected*

| Name and Address of Counterparty | Debtor | Unique ID | Contract Type | Description |
|---|---|---|---|---|
| | Mallinckrodt Pharmaceuticals Limited | 74244 | Service Agreements | Chance Request Form No. 4 Dated 09/30/2017 |
| | Mallinckrodt LLC | 73962 | Service Agreements | Statement of Work No. 1 Dated 09/30/2016 |
| | ST Shared Services LLC | 75613 | Service Agreements | Statement of Work No. 9 – 2020 to Master Service Agreement Dated 02/01/2020 |
| Stuart Rose<br>Venable LLP<br>Thomas E. Wallerstein<br>San Francisco, CA  94105 | | | | |
| Symbiance<br>Symbiance Inc.,<br>51 Everett Drive, Suite 1320<br>Princeton, NJ  08540 | Mallinckrodt Pharmaceuticals Ireland Limited | 49343 | Confidentiality Agreements/NDA | CONFIDENTIAL SETTLEMENT AGREEMENT AND RELEASE Dated 10/01/2014 |
| | Mallinckrodt Enterprises LLC | 67540 | Service Agreements | MASTER SERVICES AGREEMENT  Dated 06/12/2019 |
| | Mallinckrodt LLC | 70811 | Service Agreements | Master Services Agreement Dated 06/12/2019 |
| | Mallinckrodt plc | 67538 | Service Agreements | STATEMENT OF WORK NO. 1 Dated 08/12/2019 |
| | Mallinckrodt Enterprises LLC | 67543 | Service Agreements | STATEMENT OF WORK NO. 2 Dated 09/01/2019 |
| Synapse<br>Attn: Alex DeVincenzo<br>One World Trade Center<br>New York , NY  10007 | Mallinckrodt LLC | 70653 | Service Agreements | MASTER SERVICES AGREEMENT Dated 12/17/2018 |
| | Mallinckrodt LLC | 70750 | Service Agreements | MUTUAL CONFIDENTIALITY AGREEMENT  Dated 10/29/2018 |
| | Mallinckrodt ARD Holdings Inc. | 69635 | Service Agreements | STATEMENT OF WORK NO. 4 Dated 01/18/2019 |
| | Mallinckrodt ARD Holdings Inc. | 70645 | Service Agreements | STATEMENT OF WORK NO. 7 Dated 02/13/2019 |

\* Each Executory Contract and Unexpired Lease identified on this Schedule 1 includes any modifications, amendments, addenda or supplements thereto or restatements thereof.

**Schedule 1**

**Executory Contracts and Unexpired Leases to be Rejected\***

| Name and Address of Counterparty | Debtor | Unique ID | Contract Type | Description |
|---|---|---|---|---|
| | Mallinckrodt ARD Holdings Inc. | 70662 | Service Agreements | STATEMENT OF WORK  Dated 01/01/2019 |
| | Mallinckrodt Hospital Products Inc. | 67901 | Service Agreements | STATEMENT OF WORK NO. 17 Dated 03/11/2020 |
| | Mallinckrodt ARD LLC | 75615 | Service Agreements | STATEMENT OF WORK NO. 18 Dated 04/30/2020 |
| Takeda Consumer Healthcare 1-8-2 Marunouchi Tekko Building 23F Tokyo,  100-0005 | Sucampo Pharma Americas, LLC | Takeda1.1 | Memorandum of Agreement | Memorandum of Agreement dated 9/30/2014 |
| The Continental Stock Transfer and Trust Company The Continental Stock Transfer and Trust Company One State Street New York, NY  10004 | Ocera Therapeutics | CSTTC1.1 | Contingent Value Rights Agreement | Contingent Value Rights Agreement dated December 7, 2017 |
| The Reynolds Company Attn: Rose Marshall 11550 N Harrells Ferry Road Baton Rouge, LA  70816 | Mallinckrodt plc | ReynoldsContract1 | Other | Techconnect Support Agreement Renewal date 8/28/2019 |
| The U.S. Department Of Veterans Affairs Satish Kalanjeri, MD800 Hospital Drive Columbia MO 65201 USA | Ocera Therapeutics, Inc. | 75758 | R&D | Phase III CLINICAL TRIAL COOPERATIVE RESEARCH AND DEVELOPMENT AGREEMENT (CRADA) Dated 05/11/2020 |

\* Each Executory Contract and Unexpired Lease identified on this Schedule 1 includes any modifications, amendments, addenda or supplements thereto or restatements thereof.

**Schedule 1**

**Executory Contracts and Unexpired Leases to be Rejected\***

| Name and Address of Counterparty | Debtor | Unique ID | Contract Type | Description |
|---|---|---|---|---|
| | Ocera Therapeutics, Inc. | 75755 | R&D | Phase III CLINICAL TRIAL COOPERATIVE RESEARCH AND DEVELOPMENT AGREEMENT (CRADA) Dated 06/22/2020 |
| | Ocera Therapeutics, Inc. | 75758 | R&D | Phase III CLINICAL TRIAL COOPERATIVE RESEARCH AND DEVELOPMENT AGREEMENT (CRADA) Dated 05/11/2020 |
| | Ocera Therapeutics, Inc. | 75756 | R&D | VA PHASE III CLINICAL TRIAL COOPERATIVE RESEARCH AND DEVELOPMENT AGREEMENT Dated 05/19/2020 |
| Tracelink 400 Riverpark Drive Suite 200 North Reading, MA  01864 | | | | |
| Mallinckrodt Pharmaceuticals Ireland Limited | | 70927 | Confidentiality Agreements/NDA | MUTUAL CONFIDENTIALITY AGREEMENT  Dated 06/09/2017 |
| Truman Va Medical Research Foundation PO Box 605 Columbia, MO  60205 | | | | |
| Ucl Business Plc The Network Building 97 Tottenham Court Road London,   W1T 4TP | Ocera Therapeutics, Inc. | 75758 | R&D | Phase III CLINICAL TRIAL COOPERATIVE RESEARCH AND DEVELOPMENT AGREEMENT (CRADA) Dated 05/11/2020 |
| | Ocera Therapeutics, Inc. | 70312 | Software/IT/Licensing Agreement | SECOND AMENDED AND RESTATED LICENSE AGREEMENT Dated 07/01/2015 |
| Valiance Partners 80 MORRISTOWN RD, 320 80 MORRISTOWN RD, 320 BERNARDSVILLE, NJ  07924- | | | | |

\* Each Executory Contract and Unexpired Lease identified on this Schedule 1 includes any modifications, amendments, addenda or supplements thereto or restatements thereof.

## Schedule 1
### Executory Contracts and Unexpired Leases to be Rejected*

| Name and Address of Counterparty | Debtor | Unique ID | Contract Type | Description |
|---|---|---|---|---|
| | Mallinckrodt LLC | 70796 | Service Agreements | MASTER SERVICES AGREEMENT Dated 06/08/2012 |
| | Mallinckrodt LLC | 12968 | Service Agreements | Consulting Contract Dated 11/10/2018 |
| | Mallinckrodt LLC | 12974 | Service Agreements | Consulting Contract Dated 06/06/2012 |
| | Mallinckrodt LLC | 73434 | Service Agreements | Addendum #1 to the Schedule #1 of the Mallinckrodt Master Services Agreement Dated 02/03/2014 |
| | Mallinckrodt LLC | 74642 | Service Agreements | AMENDMENT TO MASTER SERVICES AGREEMENT Dated 11/13/2018 |
| | Mallinckrodt LLC | 62322 | Service Agreements | Mallinckrodt — Valiance Statement of Work Terlipressin Studies eTMF Migration, Testing & Validation Dated 03/01/2018 |
| | Mallinckrodt LLC | 74124 | Service Agreements | STATEMENT OF WORK #2 Dated 02/03/2014 |
| | Mallinckrodt LLC | 72220 | Service Agreements | STATEMENT OF WORK #4 Dated 10/07/2016 |
| | Mallinckrodt LLC | 53965 | Service Agreements | STATEMENT OF WORK (SOW) #2 Migration to NextDocs Dated 02/03/2014 |
| Visual Bi Solutions Visual BI Solutions, Inc. 5600 Tennyson Pkwy Plano, TX 75024 | Mallinckrodt LLC | 72532 | Service Agreements | Statement of Work Dated 06/09/2016 |
| | Mallinckrodt plc | 68911 | Service Agreements | PROFESSIONAL SERVICES AGREEMENT Dated 09/11/2014 |
| Westin Hotels & Resorts 6902 East Greenway Parkway Scottsdale, AZ 85254 | Mallinckrodt LLC | 68197 | Service Agreements | WORK ORDER NO.11 Dated 05/02/2016 |
| Whizdotai 22 HAROLD AVE EDISON, NJ 08820 | Mallinckrodt plc | WESTIN HOTELS & RE | Other | Group Event Agreement dated 5/22/2019 |

* Each Executory Contract and Unexpired Lease identified on this Schedule 1 includes any modifications, amendments, addenda or supplements thereto or restatements thereof.

**Schedule 1**

**Executory Contracts and Unexpired Leases to be Rejected\***

| Name and Address of Counterparty | Debtor | Unique ID | Contract Type | Description |
|---|---|---|---|---|
| | Mallinckrodt LLC | 71146 | Service Agreements | SUBSCRIPTION AND SERVICES AGREEMENT Dated 08/10/2018 |
| | Mallinckrodt LLC | 70938 | Service Agreements | MUTUAL CONFIDENTIALITY AGREEMENT Dated 07/25/2017 |
| Zs Associates<br>Attention: Jim Adelizzi<br>4365 Executive Drive, Suite 1530,<br>San Diego, CA  92121 | | | | |
| | Mallinckrodt LLC | 54424 | Service Agreements | ACCESSMONITOR SUBSCRIPTION AGREEMENT Dated 06/30/2012 |
| | Mallinckrodt LLC | 69913 | Service Agreements | Partial Assignment of Master Software License, Hosting and Related Services Agreement Dated 04/04/2013 |
| | Mallinckrodt plc | 69913 | Service Agreements | Partial Assignment of Master Software License, Hosting and Related Services Agreement Dated 04/04/2013 |
| | Mallinckrodt LLC | 68212 | Service Agreements | Statement of Work No. 23 Dated 07/14/2014 |
| | Mallinckrodt LLC | 70131 | Service Agreements | Statement of Work No. 47 Dated 10/10/2016 |
| | Mallinckrodt Hospital Products Inc. | 69225 | Service Agreements | Third Party Data Use Agreement Dated 09/21/2011 |
| | Mallinckrodt LLC | 69064 | Service Agreements | THIRD AMENDMENT TO MASTER SERVICES AGREEMENT Dated 01/19/2018 |

\* Each Executory Contract and Unexpired Lease identified on this Schedule 1 includes any modifications, amendments, addenda or supplements thereto or restatements thereof.

**FILED UNDER SEAL**

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| In re: | ) Chapter 11 |
|  | ) |
| MALLINCKRODT PLC, *et al.*, | ) Case No. 20-12522 (JTD) |
|  | ) |
| Debtors.[1] | ) (Jointly Administered) |
|  | ) |
|  | ) **Re: Docket Nos. 4675 & 4731** |
|  | ) |
|  | ) |

---

## DEBTORS' (I) OMNIBUS OBJECTION TO (A) EXPEDITED MOTION FOR PRE-CONFIRMATION DETERMINATION THAT DEBTORS CANNOT REJECT OR DISCHARGE POST-CONFIRMATION ROYALTY OBLIGATIONS RELATED TO SALE OF ACTHAR GEL AND (B) MOTION OF SANOFI-AVENTIS U.S. LLC FOR TEMPORARY ALLOWANCE OF CLAIMS FOR PURPOSES OF VOTING TO ACCEPT OR REJECT PLAN AND TO CLASSIFY CLAIMS UNDER CLASS 7 OF PLAN AND (II) CROSS-MOTION FOR ORDER (A) AUTHORIZING REJECTION OF ASSET PURCHASE AGREEMENT AND (B) FINDING ROYALTY OBLIGATIONS TO BE PREPETITION DEBTS SUBJECT TO DISCHARGE

---

The debtors and debtors–in–possession in the above-captioned cases (collectively, the "***Debtors***") hereby file this (i) objection (this "***Objection***") to (a) the *Expedited Motion for Pre-Confirmation Determination that Debtors Cannot Reject or Discharge Post-Confirmation Royalty Obligations Related to Sale of Acthar Gel* [D.I. 4675] (the "***Determination Motion***") filed by sanofi-aventis U.S. LLC ("***Sanofi***") and (b) the *Motion of sanofi-aventis U.S. LLC for Temporary Allowance of Claims for Purposes of Voting to Accept or Reject Plan and to Classify Claims Under Class 7 of Plan* [Docket No. 4731] (the "***Voting Motion***," and together with the Determination Motion, the "***Sanofi Motions***") and (ii) cross-motion for entry of an order, substantially in the form

---

[1]   A complete list of the Debtors in these Chapter 11 Cases may be obtained on the website of the Debtors' claims and noticing agent at http://restructuring.primeclerk.com/Mallinckrodt.  The Debtors' mailing address is 675 McDonnell Blvd., Hazelwood, Missouri 63042.

Docket No. 4820
Filed: 10/20/21

AA0000151

FILED UNDER SEAL

attached hereto as **Exhibit A**, (a) authorizing the Debtors to reject their asset purchase agreement with Sanofi and (b) finding the Debtors' royalty payment obligations thereunder are prepetition debts subject to discharge.  In support of this Objection and Cross-Motion, the Debtors respectfully state as follows:

### PRELIMINARY STATEMENT

1.      The Sanofi Motions aim to transform Sanofi's prepetition, general unsecured claims into something they are not:  non-dischargeable rights that give them control over how the Debtors use their intellectual property.  But those motions should both be denied, as they stem from a fundamental misapplication of bankruptcy law to a relatively straight-forward fact pattern.

2.      The Debtors bought the right to market and sell Acthar® Gel from Sanofi; Sanofi actually conveyed those rights to the Debtors twenty years ago; and the Debtors still own those rights today.    However, the contract under which the Debtors irrevocably acquired the rights contains one ongoing component of their purchase price:  an annual "royalty" payment calculated based on the Debtors' net sales of Acthar for the most-recent year.  Those are the facts, and from Sanofi's statements in the Sanofi Motions, it appears there is no dispute on those facts.[2]

3.      Noticeably absent from the fact pattern, even as asserted in the Sanofi Motions, is any basis to conclude that Sanofi is anything other than a prepetition unsecured creditor with a dischargeable contract claim.  The parties' relationship is *not* a license.  There is *no* security interest associated with the royalty payments.  Sanofi did *not* retain or receive (and does not purport to have) any ownership interest in Acthar or in the proceeds of Acthar sales.  No matter how the story is construed, Sanofi has *no right whatsoever to interfere with the Debtors' sale of Acthar now or ever*—it has only a right to assert a claim for breach of contract if the Debtors fail

---

[2] *See* Determ. Mot. ¶¶ 1, 11; Voting Mot. ¶ 14.

US-DOCS\127096244.3RLF1 26200822v.1

AA0000152

**FILED UNDER SEAL**

to make the royalty payment. That much is true regardless of whether the contract is executory, whether the contract is rejected or assumed, or whether Sanofi's claims are prepetition or not; and Sanofi's naked assertions to the contrary are utterly baseless. If it had wanted some other form of protection against bankruptcy risk on the royalty, Sanofi could have negotiated for it, but it did not.

4. As laid out in this Objection, the legal consequences of these facts and non-facts are as blackletter as bankruptcy law comes. Sanofi's right to royalty payments from the Petition Date forward is a prepetition claim derived from a prepetition contract, and that claim can be discharged in these cases. (While the issue of whether the contract is executory affects the process for getting to the discharge, and Sanofi is also wrong on this issue, it is ultimately irrelevant to the consequence of Sanofi's claim being discharged.)

5. Yet despite the undisputed facts here and the clear result under applicable law, the Sanofi Motions seek to contort the legal framework to fit its ends. Boiled down, the Sanofi Motions' most important flaws are the following:

- The Sanofi Motions rely on the idea that Sanofi is still conferring some ongoing, new benefit on the Debtors every time the Debtors sell a vial of Acthar. That is not true. Sanofi conveyed all its rights in Acthar to the Debtors twenty years ago.

- The Sanofi Motions also assert that Sanofi's right to payment of future royalties is not a prepetition claim, but instead is one that will not arise for bankruptcy purposes until the time for payment comes and goes. This assertion defies basic bankruptcy principles.

- The Sanofi Motions argue from a perceived unfairness to the mandated result—that the Debtors would get to keep the property the Debtors rightfully own while also discharging Sanofi's claim. Of course, such is chapter 11 bankruptcy.

- The Determination Motion insists Sanofi has no material obligations still owed to the Debtors, which ignores the indemnification rights the Debtors have under the parties' purchase agreement.

2

AA0000153

FILED UNDER SEAL

6.      With these flaws exposed and the correct principles properly understood and applied, the Sanofi Motions' requests all fall under their own weight.  Sanofi is obligated to the Debtors for indemnification under their agreement, so the agreement is executory.  Sanofi is not presently conferring any right on the Debtors to sell Acthar under the agreement, so it has no right to stop the Debtors from selling Acthar even if the Debtors reject the agreement.  And even if the agreement is not executory, Sanofi's right to payment is just a claim, and it is dischargeable in bankruptcy.

7.      Finally, in addition to all its argumentative flaws, the Voting Motion is also two-and-a-half months too late:  the deadline for Sanofi to file such a motion was July 26, 2021, under the Court's solicitation order.  *See* [D.I. 2911].

8.      For all these reasons, the Court should deny the Sanofi Motions and grant the Cross-Motion.  The Debtors can then continue forward with confirmation of their plan, having left these arguments, and Sanofi's claims, behind them.

## Jurisdiction for Cross-Motion

9.      This Court has jurisdiction to consider this Cross-Motion under 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference* from the United States District Court for the District of Delaware, dated as of February 29, 2012.  This Cross-Motion is a core proceeding pursuant to 28 U.S.C. § 157(b) and, under Rules 2002 and 7008 of the Federal Rules of Bankruptcy Procedure (the "***Bankruptcy Rules***") and Rule 9013-1(f) of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "***Local Rules***"), the Debtors consent to the entry of a final order by the Court in connection with this Motion to the extent that it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments consistent with Article III of the United States Constitution.  Venue for these cases and this Cross-Motion in this district is proper under 28 U.S.C. §§ 1408 and 1409.

FILED UNDER SEAL

The statutory and legal predicates for the relief requested herein is section 365 of title 11 of the United States Code, 11 U.S.C. §§ 101–1532 (the "**Bankruptcy Code**") and Rule 6006 of the Bankruptcy Rules.

### Background

10.     On July 27, 2001, Questcor Pharmaceuticals, Inc. ("**Questcor**"), predecessor in interest to Debtor Mallinckrodt Pharmaceuticals Ireland Limited ("**MPIL**"), entered into that certain *Asset Purchase Agreement* with Aventis Pharmaceuticals Products Inc., predecessor in interest to Sanofi (such agreement being the "**APA**"). A copy of the APA is attached to the Determination Motion as Exhibit B.

11.     Under the APA, Sanofi sold, assigned, conveyed, transferred, and delivered to the Debtors all of its rights, title, and interest to the relevant trademarks, regulatory filings, know-how, and other proprietary rights in relation to Acthar. *See* APA § 2.1. The Debtors assumed a limited universe of liabilities from Sanofi, while Sanofi retained all its liabilities of any kind, other than those limited assumed liabilities. *See* APA § 2.2(b). In addition, the Debtors agreed to pay a "Purchase Price" consisting of three components: (a) $100,000 cash; (b) cash for finished product that Sanofi held in inventory at the time; and (c) an "annual royalty equal to one percent (1%) of all Net Sales [of Acthar] in excess of" $10,000,000. *See* APA § 2.3. Further, Sanofi agreed to indemnify the Debtors for any losses the Debtors might suffer "resulting from, arising out of, or relating to" Sanofi's retained liabilities (among other things). *See* APA § 5.1(a)(i). These final two obligations—the Debtors' liability for the annual royalty and Sanofi's liability for indemnification—are the key material obligations that remain between the parties.

12.     Nowhere does the APA indicate that any rights in or to any of the transferred assets would persist for Sanofi's benefit, but for one exception: a purchase money security interest granted to secure payment of the first two components of the purchase price, the $100,000 cash

**FILED UNDER SEAL**

and the payment for finished product inventory.  *See* APA § 2.4.  In other words, the parties expressly contemplated in what circumstances Sanofi might have a right to regain control over Acthar, and failure to pay the royalty was not one of them.  (For the avoidance of doubt, the two collateralized parts of the purchase price were paid in full long ago.)

13.   On December 12, 2014, after the Debtors had acquired Questcor, Questcor assigned the APA to MPIL, which Sanofi acknowledged by letter agreement of the same date.  *See* Determ. Mot., Ex. C.  Of course, Questcor had already obtained ownership of Acthar twenty years earlier, not subject to any restraint on its alienation.  Rather than assigning its Acthar rights, this action to assign the APA to MPIL simply transferred still-pending rights and obligations under the APA— i.e., indemnification and the annual royalty.

14.   On October 12, 2020 (the "***Petition Date***"), MPIL and the other Debtors commenced these cases by filing voluntary chapter 11 petitions.

15.   On September 29, 2021, the Debtors filed the *First Amended Joint Plan of Reorganization of Mallinckrodt plc and Its Debtor Affiliates Under Chapter 11 of the Bankruptcy Code* [D.I. 4508] (as may be further amended, modified, or supplemented from time to time, the "***Plan***").

### Objection to Sanofi Motions

16.   Sanofi's arguments are as follows.  It asserts the APA is non-executory, cannot be rejected, and imposes non-dischargeable obligations on the Debtors now and after their emergence from chapter 11.  Alternatively, if the APA is found to be executory, Sanofi suggests the Debtors cannot reject the contract, cease paying the royalty, and still continue to sell Acthar.  At bottom, both lines of reasoning lead to Sanofi's conclusion that its rights must be honored, or it can prevent the Debtors from selling Acthar.  In turn, because of that mistaken view, Sanofi believes it is a claimant that is conferring "goods or services" on the Debtors and, therefore, belongs in Class 7

**FILED UNDER SEAL**

under the Plan.  To respond to these arguments, this Objection first establishes that no matter the
outcome, the greatest right that Sanofi has under the APA is to bring a breach of contract claim for
money damages.  Then it addresses the two scenarios of the APA being either executory and
subject to rejection or being non-executory.  In either scenario, as explained below, the Debtors'
royalty obligations are dischargeable.  Finally, this Objection addresses why Sanofi's claims do
not belong in Class 7 under the Plan.

## I.    Sanofi Has No Right to Stop the Sale of Acthar.

17.    The most important piece of Sanofi's arguments is its assertion that it has the right
to stop the Debtors from selling Acthar if the Debtors do not pay the annual royalty.  But Sanofi
has not asserted any reason to believe it would be entitled to injunctive relief in this or any forum
preventing the Debtors from selling Acthar.  The Debtors and Sanofi have a prepetitoin contract.
If the Debtors breach (or reject) that prepetition contract, Sanofi has a breach of contract claim that
is plainly reducible to damages, and no injunction is available.  *Morales v. Trans World Airlines,*
*Inc.*, 504 U.S. 374, 381 (1992) ("It is a basic doctrine of equity jurisprudence that courts of equity
should not act ... when the moving party has an adequate remedy at law and will not suffer
irreparable injury if denied equitable relief." (internal quotation marks omitted)).  Indeed, Sanofi
has already undertaken the exercise of calculating its damages (albeit incorrectly), as demonstrated
by the claim amount it has requested be temporarily allowed in its Voting Motion.

18.    Importantly, the APA itself is conclusive evidence that the parties had no intention
that Sanofi would have any right to interfere with the manufacture and sale of Acthar at this point
in time.  This is so because the APA actually contemplates Sanofi receiving a purchase money
security interest in the rights it conveyed to secure payment of a portion of the purchase price,
*other than the royalty component*.  Nothing else in the APA bestows any rights on Sanofi or
contemplates Sanofi retaining any rights in Acthar.

6

AA0000157

**FILED UNDER SEAL**

19.     Moreover, even if Sanofi were able to show some entitlement to an injunctive remedy, the equitable relief would simply be an alternative to monetary damages for its right to payment under the APA.  As such, that entitlement would still be a "claim" under the Bankruptcy Code and would be discharged and unenforceable against the Debtors from and after the Petition Date.  *See* 11 U.S.C. § 101(5)(B) (defining "claim" as "right to an equitable remedy for breach of performance if such breach gives rise to a right to payment, whether or not such right to an equitable remedy is reduced to judgment, fixed, contingent, matured, unmatured, disputed, undisputed, secured, or unsecured"); *In re CRS Steam, Inc.*, 225 B.R. 833, 841 (Bankr. D. Mass. 1998) ("An equitable remedy, in other words, is a 'claim' if it is an alternative to a right to payment. This requirement certainly makes sense. When it is present, the court can compute the 'payment' due and thereby assign a dollar amount to the remedy, treating it like any other claim.").

## II.     Sanofi's Claims for Royalty Payments Can Be Discharged.

20.     Sanofi's right to payment of the annual royalty—past, present, or future—under the APA can be discharged, regardless of whether the APA is executory or not.  The two distinct procedural and legal pathways, which lead to that same conclusion, are examined further below.

### A.     The APA is Executory and Can Be Rejected.

21.     The APA is executory because of the Debtors' payment obligations and Sanofi's remaining indemnification obligations.  Under Third Circuit law, "[a]n executory contract is a contract under which the obligation of both the bankrupt and the other party to the contract are so far underperformed that the failure of either to complete performance would constitute a material breach excusing the performance of the other."  *Sharon Steel Corp. v. Nat'l Fuel Gas Distrib. Corp.*, 872 F.2d 36, 39 (3d Cir. 1989) (quoting Countryman, Executory Contracts in Bankruptcy, Part 1, 57 Minn. L. Rev. 439, 460 (1973)).  Thus, unless both parties to the contract have unperformed obligations that would constitute a material breach under the agreement if not

7

FILED UNDER SEAL

performed when due, the contract is not considered executory. *In re Exide Techs.*, 607 F.3d 957, 962 (3d Cir. 2010), *as amended* (June 24, 2010). To determine whether the unperformed obligations would constitute a material breach if not performed, the court will look to the contract principles under the relevant nonbankruptcy law that governs the contract, which typically means the state law provided in the agreement's choice-of-law provision. *Id.* The APA is governed by Delaware law.

22.    Delaware has adopted the Restatement (Second) of Contracts (the "***Restatement***") to assist the factfinder in determining the materiality of a breach. *Commonwealth Const. Co. v. Cornerstone Fellowship Baptist Church, Inc.*, 2006 WL 2567916, at *19 (Del. Super. Ct. Aug. 31, 2006), *amended*, 2006 WL 2901819 (Del. Super. Ct. Oct. 3, 2006). Under section 241 of the Restatement, the following factors are relevant to the materiality of a breach: "(a) the extent to which the injured party will be deprived of the benefit which he reasonably expected; (b) the extent to which the injured party can be adequately compensated for the part of that benefit of which he will be deprived; (c) the extent to which the party failing to perform or to offer to perform will suffer forfeiture; (d) the likelihood that the party failing to perform or to offer to perform will cure his failure, taking account of all the circumstances including any reasonable assurances; [and] (e) the extent to which the behavior of the party failing to perform or to offer to perform comports with standards of good faith and fair dealing." *Id.* In addition to these Restatement factors, Delaware courts have explained that "[w]hether a breach is material . . . is a matter of degree and is determined by weighing the consequences [of the breach] in light of the contract." *Johnson v. Thornton*, 2006 WL 4129069, at *2 (Del. Com. Pl. Oct. 19, 2006). Further, Delaware courts have instructed "for a breach of contract to be material, it must go to the root or essence of the agreement between the parties, or be one which touches the fundamental purpose of the contract and defeats

AA0000159

FILED UNDER SEAL

the object of the parties in entering into the contract." *Shore Invs., Inc. v. Bhole, Inc.*, 2011 WL 5967253, at \*5 (Del. Super. Ct. Nov. 28, 2011), *amended*, 2012 WL 2337793 (Del. Super. Ct. Apr. 9, 2012), *aff'd in part, rev'd in part*, 67 A.3d 444 (Del. 2013).

23.     Indemnification obligations have frequently been found to support a finding that a contract is executory.  For example, the court in *In re Safety-Kleen Corp.* considered a contract under which the only unperformed obligations remaining were mutual indemnity rights relating to certain environmental liability matters.  *See* 410 B.R. 164, 168 (Bankr. D. Del. 2009).  The court specifically noted that the presence of the indemnity provisions demonstrated their materiality to the parties and that covered liabilities could continue to arise.  *See id.*  Based on these facts, the court held that the contract was executory.  *See id.*; *see also Philip Servs. Corp. v. Luntz (In re Philip Servs., Inc.)*, 284 B.R. 541, 549 (Bankr. D. Del. 2002) (ongoing indemnification obligations made merger agreement executory).

24.     Clearly, the Debtors' payment obligations are material, and Sanofi's indemnity obligations are just as material.  Specifically, Sanofi is obligated to indemnify the Debtors for any losses they might suffer resulting from, arising out of, or relating to any liability of Sanofi, other than those the Debtors expressly assumed.  That construct is a core aspect of any asset purchase, such as the Acthar acquisition, such that the indemnity is clearly a material obligation here.

25.     Indeed, courts recognize that indemnification is, in effect, an aspect of the purchase price in any transaction and, therefore, a key part of the bargain struck by a buyer.  *See, e.g.*, *Cigna Health & Life Ins. Co. v. Audax Health Sols., Inc.*, 107 A.3d 1082, 1092 (Del. Ch. 2014) ("Two conceivable methods of adjusting the purchase price post-closing are escrow agreements and ***indemnification agreements***." (emphasis added)).

AA0000160

**FILED UNDER SEAL**

26.     Furthermore, the seller's indemnity may be even more central in an asset purchase, as compared to a merger or acquisition of equity, because an asset purchase permits the buyer generally to elect which liabilities it will assume from the seller and which it will not.  Naturally, that structural feature and the results of the parties' negotiations around which liabilities will be assumed informs the purchase price that the buyer pays.  If the buyer knows at the time of the purchase that it will face losses for seller liabilities that it does not assume and knows that it will not have any protection in the form of indemnity, the buyer is likely to strike a different bargain.

27.     None of the cases cited by Sanofi in arguing that the APA is not executory involved a live indemnity obligation going to the fundamental bargain underlying the debtor and non-debtor's contract.  Indeed, the closest fact pattern underlies the Third Circuit's opinion in *Exide* concerning (among other things) an indemnity in a prepetition asset purchase agreement, but the roles of the debtor and non-debtor there were reversed from the facts here, with the debtor having sold the assets to the non-debtor.  Thus, the non-debtor-buyer's indemnification obligations were very limited, and according to the court extended only to matters that had already ceased to exist.  *Exide*, 607 F.3d at 964 ("In regard to the Indemnity Obligation, under the Asset Purchase Agreement, all representations and warranties arising from it expired in 1994, on the third anniversary of the closing and Exide did not present any evidence that any liability assumed by EnerSys was still pending.").

28.     Here, Sanofi's obligations are the opposite.  The substance of Sanofi's indemnity covers ***all*** of its retained liabilities, which could include live and material matters that sometimes (or frequently) evoke arguments of successor liability, such as environmental liabilities.  *See* Sanofi Form 20-F (March 4, 2021) ("The environmental laws of various jurisdictions impose actual and potential obligations on our Company [Sanofi] to manage and/or remediate

AA0000161

**FILED UNDER SEAL**

contaminated sites. These obligations may relate to sites:  that we currently own or operate; that we formerly owned or operated; or where waste from our operations was disposed.").  Thus, it is not only true in the abstract that the seller's indemnity, however structured, is a critical element of the bargain struck by the buyer in an asset purchase, it is tangibly true here with the APA, just as it was in the *Safety-Kleen* decision.  The APA is, therefore, executory and can be rejected.

**B.      After Rejection, Sanofi's Right to Past and Future Royalties Will Be a Prepetition, Dischargeable Claim.**

29.      Sanofi's rejection damages are prepetition, unsecured claims that will be discharged upon the Debtors' emergence.  It is plain under bankruptcy law that claims arising under a rejected contract are prepetition claims, unless the non-debtor has conferred a benefit on the debtor's estate during the proceeding so as to justify an administrative expense claim.  *See* 11 U.S.C. § 365(g)(1) (rejection constitutes deemed breach "immediately before the date of the filing of the petition");  *In re Waste Systems Intern., Inc.*, 280 B.R. 824, 826 (Bankr. D. Del. 2002) ("In the context of executory contracts, a non-debtor party to an executory contract is entitled to an administrative expense claim equal to the value of any post-petition benefit conferred on the estate prior to assumption or rejection of that contract.").

30.      Of direct relevance here, a creditor's right to receive contingent purchase price payments (like the royalty under the APA) under a rejected contract for a prepetition, completed disposition to the debtor is roundly held to be a prepetition, dischargeable claim.  *See In re Lason, Inc.*, 309 B.R. 441, 444 (Bankr. D. Del. 2004) (rejection damages claim for contingent purchase price payable under prepetition merger agreement coming due during bankruptcy case is "a general unsecured claim for breach of a pre-petition contract for the sale of the [seller's] business");  *In re APF Co.*, 270 B.R. 567, 572 (Bankr. D. Del. 2001) ("If the buyer goes into bankruptcy as it did

11

**FILED UNDER SEAL**

here, the consideration not received up front becomes part of the sellers' prepetition claim for damages.").

31.     For all the reasons articulated above, Sanofi has ***not*** conferred any benefit on the Debtors' bankruptcy estates ***during*** these cases.  Sanofi's delivery of any benefit was completed twenty years ago, when it conveyed its rights to Acthar to the Debtors (Questcor).  Sanofi, therefore, has no administrative expense claims.

32.     Thus, the calculus after the Debtors reject the APA is straightforward.  Sanofi's claims for past, present, and future royalties—which are expressly stated to be contingent components of the purchase price under the prepetition APA—will all be prepetition, unsecured claims.  The Debtors' liability on those claims will be discharged pursuant to section 1141 of the Bankruptcy Code, as Sanofi's claims plainly do not qualify for non-dischargeability under section 1141(d)(6) (the only exception to discharge for a reorganizing corporate debtor in chapter 11).

> **C.     If the APA Is *Not* Executory, Sanofi's Right to Past and Future Royalties is Merely a Prepetition, Dischargeable Claim.**

33.     Even if the APA is not deemed executory, the result under controlling law would simply be that Sanofi's right to payment of royalties thereunder is a prepetition, dischargeable claim without the need for the APA to be rejected.  Rights to payment (*i.e.*, claims) from a debtor under a prepetition contract are prepetition claims, even if they will not come due until some future date or upon some future occurrence.  *See* 11 U.S.C. § 101(5) ("claim" means a "right to payment, whether or not such right is…contingent…unmatured"); *id.* at § 1141(d)(1)(A) ("the confirmation of a plan discharges the debtor from any [liability on a claim] that arose before the date of such confirmation"); *Waste Systems*, 280 B.R. at 828 (rejecting argument that "royalties" under non-

AA0000163

**FILED UNDER SEAL**

executory contract arising during case had administrative priority, stating that "obligation to make the royalty payments arose when the [contract] was executed pre-petition").

34.    Further, according to the Third Circuit, the fact that a contract is non-executory and embodies surviving obligations only for the debtor does not change that conclusion. *See In re Columbia Gas Sys. Inc.*, 50 F.3d 233, 239 (3d Cir. 1995) ("In cases where the nonbankrupt party has fully performed...only a liability exists for the debtor—a simple claim held by the nonbankrupt against the estate."). Also clear in the *Columbia Gas* decision is the Third Circuit's view that such claims are prepetition and subject to discharge. *See id.* at 239 n.9 (noting that it would "offend the general policy of the bankruptcy laws" to have such claims elevated above general unsecured claims through assumption of a non-executory contract). Notably, the Third Circuit has just recently ratified that view in the *Weinstein* decision Sanofi cites multiple times in the Determination Motion. *See In re Weinstein Co. Holdings LLC*, 997 F.3d 497, 505-06 (3d Cir. 2021) ("In the case of a non-executory contract where only the debtor has material obligations left to perform...the nonbankrupt counterparty would only have an unsecured claim against the debtor, on which it can typically expect to recover merely cents on the dollar.").

35.    These principles are applied easily here. The APA was signed and it became effective many years before the Petition Date. Sanofi's royalty payments thereunder are contingent claims that arose prepetition, no matter whether the APA is executory or not. Those claims can be discharged because they do not fit the lone exception to discharge applicable here under section 1141(d)(6) of the Bankruptcy Code.

36.    Despite the clarity of these rules, Sanofi's Determination Motion, at paragraphs 22-24, seeks to avoid their consequences with arguments that rely on inapposite and misinterpreted case law:

AA0000164

- *Hays & Co.* dealt with the narrow issue of whether a bankruptcy trustee was bound by an arbitration clause in a prepetition, non-executory contract with a creditor it was trying to sue. *Hays & Co. v. Merrill, Lynch, Pierce, Fenner & Smith, Inc.*, 885 F.2d 1149, 1149 (3d Cir. 1989) ("This is an appeal from an order denying defendant Merrill Lynch's motion to compel arbitration of claims asserted against it by Hays & Co….").  That is irrelevant to whether a creditor's right to payment under such a contract is subject to discharge.

- *Weinstein* involved a buyer purchasing a non-executory contract from the debtor's estate and assuming liabilities thereunder, a difference in context which led to a different result (namely, that the buyer was obligated to honor post-closing payment obligations to the non-debtor counterparty).  *In re Weinstein Co. Holdings LLC*, 997 F.3d 497 (3d Cir. 2021).  And, as noted above, the Third Circuit in this case actually stated the precise rule on which the Debtors are relying and which is the opposite of the rule Sanofi is espousing.

- The Determination Motion's quotation from *In re JZ L.L.C.* is dicta, but in any event, it simply states the same rule as quoted from the *Weinstein* opinion above: a non-executory contract under which the debtor has obligations creates claims against the debtor's estate.  There is no suggestion those claims are immune from discharge. 371 B.R. 412, 425 (B.A.P. 9th Cir. 2007).  The same goes for *Stewart Foods* decision that Sanofi cites.  *See In re Stewart Foods, Inc.*, 64 F.3d 141, 145 (4th Cir. 1995) ("Nonetheless, ***regardless of the nature of the contract***, if at the time of the bankruptcy filing the debtor has an obligation under the contract to pay money to the non-debtor party, that obligation is handled as a pre-petition claim in the bankruptcy proceedings." (emphasis added)).

- The decision in *Surfside Resort*, which Sanofi cites for the proposition that non-executory contracts ride through bankruptcy, concerned an insurance policy owned by the debtor.  In other words, the ***debtor*** had no material obligations under the contract—rather, the debtor's right to proceeds under that policy was an asset that the estate held and that the debtor assigned to a third party under its plan.  *In re Surfside Resort & Suites, Inc.*, 344 B.R. 179, 187 (Bankr. M.D. Fla. 2006) ("According to the Countryman definition, Debtor's obligation to Plaintiff has been satisfied.").  This is just the flipside to the baseline rule that non-executory contracts are treated by the Bankruptcy Code either as claims or assets, not that they have special status immunizing them from the bankruptcy process.  The *Access Beyond* decision likewise concerned a net-beneficial license agreement the debtor wanted to assume; and the opinion also found that contract to be executory, making Sanofi's quotation therefrom dicta.  *In re Access Beyond Techs., Inc.*, 237 B.R. 32, 43 (Bankr. D. Del. 1999) ("[W]e readily conclude that the contract is executory.").

- The Supreme Court's opinion in *Bildisco* concerned an ***executory*** collective bargaining agreement; and the statement referenced in the Determination Motion, which comes from a concurring opinion, was articulating only the court-made "ride through" doctrine that if an ***executory*** contract is not expressly rejected or assumed, it remains in force.  *See Nat'l Labor Relations Bd. v. Bildisco*, 465 U.S. 513, 546

(1984).  Indeed, the *Hernandez* case Sanofi also cites explains quite clearly that the "ride through" doctrine applies only to executory contracts, as a "fallback" if a debtor fails to address an executory contract by assuming or rejecting it.  *See In re Hernandez*, 287 B.R. 795, 799 (Bankr. D. Ariz. 2002) ("Simply stated, the ride through doctrine provides that executory contracts that are neither affirmatively assumed or rejected by the debtor under § 365, pass through the bankruptcy unaffected.").

- Finally, the decision in *Monument Record Corp.* actually highlights exactly why Sanofi is not entitled to the relief requested in the Determination Motion.  There, the non-debtor counterparty had sold the debtor the right to use songs he had recorded, but "subject only to the payment of royalties."  *See In re Monument Record Corp.*, 61 B.R. 866, 868 (Bankr. M.D. Tenn. 1986).  In other words, the debtor's property rights were subjected in the parties' transaction to the requirement that the debtor pay the royalties, as might occur typically in a licensing transaction.  No such limitation exists in the APA.

37.     The reality is that there is no case law supporting Sanofi's legal assertions because those assertions are incorrect and fly in the face of the Bankruptcy Code and blackletter jurisprudence.  If every claim under a non-executory contract rode through bankruptcy unaffected, that would open a gigantic hole in the efficacy of the discharge and directly contravene the deliberately narrow scope of the Bankruptcy Code's exception to discharge in section 1141(d)(6) of the Bankruptcy Code.  There is no such limitation to the Debtors' discharge here under the Bankruptcy Code, and Sanofi's legal arguments should be flatly rejected.

**III.    After Rejection, the Debtors Will Still Own the Right to Sell Acthar.**

38.     Sanofi's argument that, by rejecting the APA, the Debtors will surrender the right to sell Acthar is incorrect.  The Bankruptcy Code expressly states that rejection of a contract constitutes a breach of that contract immediately before the Petition Date.  *See* 11 U.S.C. § 365(g)(1) (rejection "constitutes a breach of such contract immediately before the date of the filing of the petition").  In other words, rejection is not tantamount to a rescission or avoidance of the contract that would require the Debtor to surrender anything of value it had received from the counterparty thereunder before rejection. *See Mission Prod. Holdings, Inc. v. Tempnology, LLC*,

**FILED UNDER SEAL**

139 S. Ct. 1652, 1661 (2019) ("Rejection of a contract—any contract—in bankruptcy operates not as a rescission but as a breach."); *In re Cont'l Airlines*, 981 F.2d 1450, 1459 (5th Cir. 1993) ("The statute does not invalidate the contract, or treat the contract as if it did not exist."). And of course, property interests that the Debtors held on the Petition Date became property of their estates and will re-vest in the reorganized Debtors upon emergence. *See* 11 U.S.C. §§ 541(a)(1), 1141(b).

39. As explained above, the Debtors own the right to sell Acthar, and Sanofi has no right to interfere with it. It derives from ownership of the relevant trademarks and regulatory rights that Sanofi already conveyed to the Debtors under the APA, not from any of the remaining obligations Sanofi has yet to perform. Absent an unwinding of the conveyance of property that occurred twenty years ago (and, to be clear, there is no basis for such theoretical relief), there is no legitimate basis to argue that the Debtors will surrender the right to sell Acthar upon rejection of the APA.

**IV.  Sanofi's Claims Cannot Be Class 7 Claims, So the Voting Motion Should Be Denied.**

40. Sanofi's Voting Motion requests a $121,000,000 claim for voting purposes only as against MPIL and another Debtor, Mallinckrodt ARD IP Unlimited Co. ("*M ARD IP*"), and that its claim be classified in Class 7 under the Plan.

41. As an initial matter, Sanofi's claim for future royalties is a contingent and unliquidated claim, and it should vote for $1 as provided by the solicitation order. Sanofi is not entitled to a payment unless and until, and only for so long as, Acthar is sold by the Debtors. The amount of the payment is contingent on Acthar's price and the Debtors' net revenue therefrom—which many creditors in these cases have argued should be much lower than what the Debtors currently charge. Moreover, Sanofi's assertion that its future claims may be $115,000,000 or more

**FILED UNDER SEAL**

is clearly not tethered to present value,[3] which would be the relevant metric.  *In re B456 Sys., Inc.*, 2017 WL 6603817, at *22 (Bankr. D. Del. Dec. 22, 2017) ("[F]uture damage claims are typically discounted to present value."); *In re Loewen Grp. Int'l, Inc.*, 274 B.R. 427, 434 (Bankr. D. Del. 2002) ("Where, as here, a disputed claim has been asserted in respect to future payments due post-petition, [section 502(b) of the Bankruptcy Code] clearly requires that the claim be discounted to present value as of the petition date.").

42.     Beyond the problems with the size of Sanofi's requested voting claim, its claims do not lie against M ARD IP.  The APA has never been assigned to M ARD IP:  MPIL has been the Debtor-party to the APA since it was assigned to MPIL in 2014 with Sanofi's consent.  And even if MPIL was in breach of the APA (it was not) because the Acthar rights were owned by another Debtor, Sanofi still just has a breach of contract claim against MPIL.  Thus, Sanofi has not articulated any basis for having a claim against M ARD IP, and none should be allowed at this time, even temporarily.

43.     Finally, Sanofi's claims are not, and cannot be, claims in Class 7 under the Plan.[4] The Plan defines a "Trade Claim" belonging in Class 7 as "an Unsecured Claim for the provision of goods and services to the Debtors…"  Plan, Art. I.A.425.  Claimants in Class 7 potentially may recover from a separate cash pool from Class 6 general unsecured creditors, if they vote to accept the Plan and agree to provide favorable trade terms to the Debtors for twelve months after

---

[3]     If Sanofi's payment is 1% of Acthar net sales, and if its requested claim amount of $115,000,000 were a present value, that would indicate a present value of all future Acthar net sales of $11,500,000,000.  Intuitively, that number is much too large given the Debtors' total enterprise valuation is much less than that.

[4]     Despite the fact that the proposed form of order attached to the Voting Motion does not refer to Sanofi's claims being classified as Class 7 claims for all purposes in these chapter 11 cases (rather than just for voting purposes), Sanofi has indicated to the Debtors through counsel that such was its intention with the relief requested in the Voting Motion.  Thus, the Debtors here address the request on that basis.

FILED UNDER SEAL

emergence.  If a claimant in Class 7 rejects the Plan or does not agree to favorable trade terms, it recovers alongside creditors in Class 6(f) instead.

44.    Sanofi's claims do not fit the definition of "Trade Claim."  Its right to royalty payments does not stem from the provision of goods and services to the Debtors; it stems from a sale of intangible assets that was completed twenty years ago.  There can be no argument that the Acthar inventory that was purchased with a discrete component of the overall purchase price supports Sanofi's current claims for royalties arising for the provision of "goods."

45.    Further, Sanofi has voted to reject the Plan, so it cannot receive the enhanced treatment for trade creditors in Class 7 who vote to accept the Plan and agree to favorable trade terms.  Instead, Sanofi will only be entitled to recover alongside creditors in Class 6(f), no matter whether its claim is classified in Class 6(f) or Class 7.  Likewise, the Debtors cannot conceive of how Sanofi could make the requisite concession of providing the reorganized Debtors with favorable trade terms for twelve months to support the enhanced treatment offered to Class 7 claimants.  Sanofi's payment terms are fixed by a contract that Sanofi has no ability to terminate or amend.  So that reality leaves Sanofi recovering, in effect, with Class 6(f), whether its claim is classified in Class 6(f) or Class 7.

46.    In addition to being wrong on the merits and of zero economic consequence to Sanofi, the Voting Motion is also untimely.  Sanofi has been on notice of these chapter 11 cases from the outset.  It received timely notice sent on June 23, 2021, of the entry of the Court's order approving the Debtors' solicitation process, which order provides that counterparties whose agreements have not been assumed or rejected will not be entitled to vote on the Plan absent taking action to request the right to vote.  The order further set a deadline of July 26, 2021, for any motion

18

AA0000169

under Bankruptcy Rule 3018 to be filed.  Thus, Sanofi's Voting Motion should be rejected as untimely.

**Basis for Relief Requested in Cross-Motion**

**V.      Rejecting the APA Is a Sound Exercise of Business Judgment and Should Be Approved**

47.      The Debtors should be authorized to reject the APA because doing so reflects a sound exercise of their business judgment.  Section 365(a) of the Bankruptcy Code provides that a debtor, "subject to the court's approval, may assume or reject any executory contract or unexpired lease of the debtor."  11 U.S.C. § 365(a).  The purpose behind section 365(a) is "to permit the trustee or debtor-in-possession to use valuable property of the estate and to renounce title to and abandon burdensome property."  *Exide*, 607 F.3d at 967 ("Courts may use § 365 to free a [debtor] from burdensome duties that hinder its reorganization."); *Bildisco*, 465 U.S. at 528 ("[t]he authority to reject an executory contract is vital to the basic purpose to a Chapter 11 reorganization, because rejection can release the debtor's estate from burdensome obligations that can impede a successful reorganization.").

48.      The standard applied by courts to determine whether the assumption or rejection of an executory contract should be authorized is the "business judgment" test, which requires a debtor to have determined that the requested assumption or rejection would be beneficial to its estate.  *See Grp. Of Institutional Inv'rs v. Chi., Milwaukee St. Paul & Pac. R.R.,* 318 U.S. 523, 550 (1943) (noting that "the question whether a lease should be rejected…is one of business judgment"); *In re Bildisco,* 682 F.2d 72, 79 (3d Cir. 1982), *aff'd,* 465 U.S. 513 ("The usual test for rejection of an executory contract is simply whether rejection would benefit the estate, the 'business judgment' test."); *accord In re HQ Glob. Holdings, Inc.,* 290 B.R. 507, 511 (Bankr. D. Del. 2003).

19

FILED UNDER SEAL

49.     In applying the business judgment standard, bankruptcy courts give deference to a debtor's decision to assume or reject leases.  *See, e.g.*, *Sharon Steel*, 872 F.2d at 39-40 (affirming the rejection of a service agreement as a sound exercise of the debtor's business judgment when the bankruptcy court found that such rejection would benefit the debtors' estate); *In re Trans World Airlines, Inc.*, 261 B.R. 103, 121 (Bankr. D. Del. 2001) ("[A] debtor's decision to reject an executory contract must be summarily affirmed unless it is the product of bad faith, or whim, or caprice.").

50.     As explained above, after rejecting the APA and emerging from chapter 11, the Debtors will have every right to continue to sell Acthar and will not be burdened with any obligation to pay a royalty to Sanofi.  Thus, rejecting the APA is value accretive to their businesses and these chapter 11 estates, with no downside risks, and the Debtors' decision to reject is therefore an exercise of sound business judgment.

## VI.   The Court Should Find That Sanofi's Royalty Claims are Dischargeable, Prepetition Claims.

51.     With Sanofi having requested by its Determination Motion findings that its claims for royalty payments coming due after the Petition Date are non-dischargeable, and all the facts and the law being to the contrary (as explained above), this Court should not only deny the Determination Motion—it should find affirmatively that Sanofi's rights to payment of past, present, and future royalties under the APA are prepetition claims and will be discharged under the Debtors' plan.  While arguably Sanofi or the Debtors may have been required to commence an adversary proceeding to seek these specific findings, Sanofi's consent (*see* Determ. Mot. ¶ 6) and the Debtors' consent to having the issue determined in this contested matter suffices to make this procedural posture appropriate.  *Accord In re Orfa Corp. of Philadelphia*, 170 B.R. 257, 275 (E.D. Pa. 1994) ("[C]ourts have concluded that where the rights of the affected parties have been

**FILED UNDER SEAL**

adequately presented so that no prejudice has arisen, form will not be elevated over substance and the matter will be allowed to proceed on the merits as originally filed.").

[*Remainder of page intentionally left blank.*]

21

AA0000172

FILED UNDER SEAL

**WHEREFORE**, for the reasons set forth herein, the Debtors respectfully request that the

Court deny the Motions and enter an order substantially in the form attached hereto as **Exhibit A**.

Dated: October 20, 2021

*/s/ Amanda R. Steele*
Mark D. Collins (No. 2981)
Michael J. Merchant (No. 3854)
Amanda R. Steele (No. 5530)
Brendan J. Schlauch (No. 6115)
**RICHARDS, LAYTON & FINGER, P.A.**
One Rodney Square
920 N. King Street
Wilmington, DE 19801
Telephone:    (302) 651-7700
Facsimile:    (302) 651-7701
Email:        collins@rlf.com
              merchant@rlf.com
              steele@rlf.com
              schlauch@rlf.com

George A. Davis (admitted *pro hac vice*)
George Klidonas (admitted *pro hac vice*)
Andrew Sorkin (admitted *pro hac vice*)
Anupama Yerramalli (admitted *pro hac vice*)
**LATHAM & WATKINS LLP**
1271 Avenue of the Americas
New York, New York 10020
Telephone:    (212) 906-1200
Facsimile:    (212) 751-4864
Email:        george.davis@lw.com
              george.klidonas@lw.com
              andrew.sorkin@lw.com
              anu.yerramalli@lw.com

- and -

Jeffrey E. Bjork (admitted *pro hac vice*)
**LATHAM & WATKINS LLP**
355 South Grand Avenue, Suite 100
Los Angeles, California 90071
Telephone:    (213) 485-1234
Facsimile:    (213) 891-8763
Email:        jeff.bjork@lw.com

- and -

Jason B. Gott (admitted *pro hac vice*)
**LATHAM & WATKINS LLP**
330 North Wabash Avenue, Suite 2800
Chicago, Illinois 60611
Telephone:    (312) 876-7700
Facsimile:    (312) 993-9767
Email:        jason.gott@lw.com

*Counsel for Debtors and Debtors in Possession*

AA0000173

**FILED UNDER SEAL**

**<u>Exhibit A</u>**

**Proposed Order**

FILED UNDER SEAL

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
| MALLINCKRODT PLC, *et al.*, | ) | Case No. 20-12522 (JTD) |
|  | ) |  |
| Debtors.[1] | ) | (Jointly Administered) |
|  | ) |  |
|  | ) |  |

## ORDER (A) AUTHORIZING REJECTION OF SANOFI ASSET PURCHASE AGREEMENT AND (B) FINDING ROYALTY OBLIGATIONS OWED TO SANOFI TO BE PREPETITION DEBTS SUBJECT TO DISCHARGE

Upon the motion (the "***Motion***")[2] of the Debtors for entry of an order (this "***Order***") (a) authorizing the Debtors to reject the APA with Sanofi, effective as of the effective date of the Debtors' Plan, and (b) finding that the royalty obligations owed by Debtor MPIL to Sanofi are prepetition debts subject to discharge under the Bankruptcy Code, all as more fully set forth in the Motion; and the Court having reviewed the Motion; and the Court having jurisdiction to consider the Motion and the relief requested therein in accordance with 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference* from the United States District Court for the District of Delaware dated as of February 29, 2012; and the Court having found that this is a core proceeding pursuant to 28 U.S.C. § 157(b)(2) and that this Court may enter a final order consistent with Article III of the United States Constitution; and the Court having found that venue of this proceeding and the Motion in this district is proper pursuant to 28 U.S.C. §§ 1408 and 1409; and it appearing that proper and adequate notice of the Motion has been given and that no other or further notice is

---

[1]    A complete list of the Debtors in these Chapter 11 Cases may be obtained on the website of the Debtors' claims and noticing agent at http://restructuring.primeclerk.com/Mallinckrodt.  The Debtors' mailing address is 675 McDonnell Blvd., Hazelwood, Missouri 63042.

[2]    Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Motion.

**FILED UNDER SEAL**

necessary; and upon the record herein; and after due deliberation thereon; and it appearing that the relief requested in the Motion is in the best interests of the Debtors and their respective estates and creditors; and the Court having determined that there is good and sufficient cause for the relief granted in this Order, it is hereby

**ORDERED, ADJUDGED AND DECREED THAT:**

1.      The Motion is GRANTED as set forth herein.

2.      All objections to the entry of this Order, to the extent not withdrawn or settled, are overruled.

3.      Pursuant to sections 105(a) and 365(a) of the Bankruptcy Code, the APA shall be deemed rejected upon the occurrence of the effective date of the Debtors' Plan.

4.      Any claims based on the rejection of the APA shall be filed in accordance with the Plan and the Confirmation Order (as defined in the Plan).

5.      Any claims for royalty payments under the APA are prepetition claims because they arise from an agreement entered into by the Debtors prepetition, and any debts owed by the Debtors thereon shall be discharged upon the effective date of the Debtors' Plan.

6.      Nothing contained in the Motion or this Order shall be construed as:  (a) an admission as to the validity of any claim against the Debtors or the existence of any lien against the Debtors' properties, (b) a waiver of the Debtors' rights to dispute any claim or lien on any grounds, (c) a promise to pay any claim, (d) an implication or admission that any particular claim would constitute an allowed claim, (e) an assumption of any executory contract or unexpired lease pursuant to section 365 of the Bankruptcy Code, or (f) a waiver by the Debtors of any claims that they may have against Sanofi, whether or not such claims arise under, are related to the rejection of, or are independent of the APA.  Nothing contained in this Order shall be deemed to increase,

AA0000176

**FILED UNDER SEAL**

reclassify, elevate to an administrative expense status, or otherwise affect any claim to the extent it is not paid.

7.     Adequate notice of, and an opportunity for a hearing on, the Motion has been provided, and such notice satisfies the requirements of Bankruptcy Rule 6004(a).

8.     Notwithstanding any applicability of Bankruptcy Rule 6004(h) the terms and conditions of this Order are immediately effective and enforceable upon its entry.  The Debtors are authorized and empowered to take all actions necessary to implement the relief granted in this Order.

9.     The requirements set forth in Bankruptcy Rule 6006 are satisfied.

10.    The Debtors are hereby authorized to take such actions and to execute such documents as may be necessary to implement the relief granted by this Order.

11.    This Court retains exclusive jurisdiction with respect to all matters arising from or related to the implementation, interpretation, and enforcement of this Order.

US-DOCS\127096244.3RLF1 26200822v.1

AA0000177

**FILED UNDER SEAL**

**File an answer to a motion:**

20-12522-JTD Mallinckrodt plc

| | | |
|---|---|---|
| Type: bk | Chapter: 11 v | Office: 1 (Delaware) |
| Assets: y | Judge: JTD | |
| Case Flag: LEAD, SealedDoc(s), MEGA, STANDOrder, CLMSAGNT, APPEAL | | |

**U.S. Bankruptcy Court**

**District of Delaware**

Notice of Electronic Filing

The following transaction was received from Amanda R. Steele entered on 10/20/2021 at 4:14 PM EDT and filed on 10/20/2021

| | |
|---|---|
| **Case Name:** | Mallinckrodt plc |
| **Case Number:** | 20-12522-JTD |
| **Document Number:** | 4820 |

**Docket Text:**
[SEALED] Omnibus Objection //Debtors' (I) Omnibus Objection to (A) Expedited Motion for Pre-Confirmation Determination That Debtors Cannot Reject or Discharge Post-Confirmation Royalty Obligations Related to Sale of Acthar Gel and (B) Motion of sanofi-aventis U.S. LLC for Temporary Allowance of Claims for Purposes of Voting to Accept or Reject Plan and to Classify Claims Under Class 7 of Plan and (II) Cross-Motion for Order (A) Authorizing Rejection of Asset Purchase Agreement and (B) Finding Royalty Obligations to Be Prepetition Debts Subject to Discharge (related document(s)[4675], [4731]) Filed by Mallinckrodt plc (Attachments: # (1) Exhibit A) (Steele, Amanda)

The following document(s) are associated with this transaction:

**Document description:**Main Document
**Original filename:**MNK - Objection.pdf
**Electronic document Stamp:**
[STAMP bkecfStamp_ID=983460418 [Date=10/20/2021] [FileNumber=17293834-0] [6b542c3a1c81a6826835c30119d042d0f3a40fb2577d974414445781b3d3e57f5 d778f11328d1cd2368694c43f87100bcba5a94bd40ea945908788280994aa8]]
**Document description:**Exhibit A
**Original filename:**C:\fakepath\MNK - Ex A.pdf
**Electronic document Stamp:**
[STAMP bkecfStamp_ID=983460418 [Date=10/20/2021] [FileNumber=17293834-1] [1947f2143f413c3b08151c12dd3f5b6296992b79003474c8eb6095f48ac8741ce2 eb09bb3f71b13341e8b79b062bdac1febb4b687d4303a928785cc9c1bed40d]]

**20-12522-JTD Notice will be electronically mailed to:**

Justin R. Alberto on behalf of Interested Party Official Committee of Opioid Related Claimants
jalberto@coleschotz.com, pratkowiak@coleschotz.com;jford@coleschotz.com;bankruptcy@coleschotz.com;lmorton@coleschotz.com

Justin R. Alberto on behalf of Other Prof. Cole Schotz P.C.
jalberto@coleschotz.com, pratkowiak@coleschotz.com;jford@coleschotz.com;bankruptcy@coleschotz.com;lmorton@coleschotz.com

Justin R. Alberto on behalf of Other Prof. Official Committee of Opioid Related Claimants
jalberto@coleschotz.com, pratkowiak@coleschotz.com;jford@coleschotz.com;bankruptcy@coleschotz.com;lmorton@coleschotz.com

Sameer M. Alifarag on behalf of Interested Party Wilmington Savings Fund Society, FSB, as indenture trustee
SAlifarag@pryorcashman.com

Angela M. Allen on behalf of Interested Party Cotter Corporation (N.S.L.)
AAllen@jenner.com, thooker@jenner.com

Philip D. Anker on behalf of Interested Party Covidien Limited (f/k/a Covidien plc)
philip.anker@wilmerhale.com, whdocketing@wilmerhale.com;Yolande.Thompson@wilmerhale.com;Joel.Millar@wilmerhale.com;Allyson.Pierce@wilmerhale.com

David B. Anthony on behalf of Creditor Tribal Leadership Committee
danthony@bergerharris.com, mnicholls@bergerharris.com

Aaron S. Applebaum on behalf of Interested Party sanofi-aventis U.S. LLC
aaron.applebaum@us.dlapiper.com, carolyn.fox@us.dlapiper.com

Joseph N. Argentina, Jr. on behalf of Creditor Bridgeton Landfill, LLC
joseph.argentina@faegredrinker.com, rokeysha.ramos@faegredrinker.com

Joseph N. Argentina, Jr. on behalf of Interested Party VWR International, LLC
joseph.argentina@faegredrinker.com, rokeysha.ramos@faegredrinker.com

W. David Arnold on behalf of Creditor Nemera Buffalo Grove LLC
darnold@rcolaw.com

Bradley R. Aronstam on behalf of Interested Party Angus C. Russell
baronstam@ramllp.com,
hgibbons@ramllp.com;jlano@ramllp.com;jsullivan@ramllp.com;dkrech@ramllp.com;ckwiatkowski@ramllp.com;5031916420@filings.docketbird.com;jparry@ramllp.com

Bradley R. Aronstam on behalf of Interested Party Bryan M. Reasons

AA0000178

FILED UNDER SEAL

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re:<br><br>MALLINCKRODT PLC, *et al.*<br><br>Debtors.[1] | ) Chapter 11<br>)<br>) Case No. 20-12522 (JTD)<br>)<br>) (Jointly Administered)<br>)<br>) **Related D.I.: 4675, 4731, & 4820**<br>)<br>) **Hearing Date: October 29, 2021 at 10:00 a.m. (ET)**<br>)<br>) |

### REPLY OF SANOFI-AVENTIS U.S. LLC TO DEBTORS' OMNIBUS OBJECTION TO (A) EXPEDITED MOTION FOR PRE-CONFIRMATION DETERMINATION THAT DEBTORS CANNOT REJECT OR DISCHARGE POST-CONFIRMATION ROYALTY OBLIGATIONS RELATED TO SALE OF ACTHAR GEL AND (B) MOTION OF SANOFI-AVENTIS U.S. LLC FOR TEMPORARY ALLOWANCE OF CLAIMS FOR PURPOSES OF VOTING TO ACCEPT OR REJECT PLAN AND TO CLASSIFY CLAIMS UNDER CLASS 7 OF PLAN

sanofi-aventis U.S. LLC ("**Sanofi**"), a creditor in the jointly administered bankruptcy cases of the above-captioned debtors (the "**Debtors**"), by and through its undersigned counsel, hereby files this reply to the *Omnibus Objection to (A) Expedited Motion for Pre-Confirmation Determination that Debtors Cannot Reject or Discharge Post-Confirmation Royalty Obligations Related to Sale of Acthar Gel and (B) Motion of Sanofi-Aventis U.S. LLC for Temporary Allowance of Claims for Purposes of Voting to Accept or Reject Plan and to Classify Claims Under Class 7 of the Plan* [D.I. 4820] (the "**Objection**")[2] filed by the Debtors.  In support hereof, Sanofi respectfully states as follows:

---

[1]     A complete list of the Debtors in these chapter 11 cases may be obtained on the website of the Debtors' claims and noticing agent at http://restructuring.primeclerk.com/Mallinckrodt.  The Debtors' mailing address is 675 McDonnell Blvd., Hazelwood, Missouri 63042.

[2]     Capitalized terms not otherwise defined herein have the meanings set forth in the *Expedited Motion for Pre-Confirmation Determination that Debtors Cannot Reject or Discharge Post-Confirmation Royalty Obligations Related to Sale of Acthar Gel* [D.I. 4675] (the "**Pre-Confirmation Motion**") *and the Motion of Sanofi-Aventis U.S. LLC for Temporary Allowance of Claims for Purposes of Voting to Accept or Reject Plan and to Classify Claims Under Class 7 of the Plan* [D.I. 4731] (the "**Temporary Allowance and Classification Motion**"), respectively.

1

## INTRODUCTION

Why do the Debtors insist that a 20-year-old APA is an *executory* contract, relying entirely on a limited indemnification provision that only pertained to a handful of retained liabilities *from 2001* that could not possibly still be asserted against MP Ireland now or in the future?  The Debtors must take this position, because rejection under section 365 is their only way around binding Third Circuit precedent and the plain language of section 1141(d)(1)(A) of the Bankruptcy Code, which make clear that obligations that only arise post-petition or post-confirmation cannot be discharged or rejected.

The following two issues before the Court are discrete and straightforward, and once resolved, will address nearly all of the issues between Sanofi and the Debtors in these cases:

1. ***Is the APA executory?*  No.**  While MP Ireland (and maybe other of the Debtors) must continue to pay the Royalty to Sanofi, Sanofi has no material unperformed obligations under the APA.  The Debtors' reliance on an indemnification provision, under which Sanofi was bound to indemnify MP Ireland with respect to certain liabilities that were not assumed by the purchaser under the APA, lacks any semblance of credibility.  If the APA is not executory, it cannot be rejected under section 365 of the Bankruptcy Code.

2. ***If the APA is not executory, can the Debtors discharge their post-petition and post-confirmation royalty obligations?*  No.**  The question is not whether the APA was signed pre-Petition Date, but whether future royalty obligations arise pre- or post-Petition Date.  Future royalty obligations did not arise when the APA was signed or at any other time pre-Petition Date.  Future royalty obligations will arise post-Petition Date and post-confirmation, ***if and when the Debtors sell Acthar Gel.***  Section 1141 of the Bankruptcy Code, by its plain language, only permits discharge of *pre-confirmation* claims.

If the Court answers these two questions in the negative, the result suggested by Sanofi, then Sanofi's only remaining issue in these cases should be whether the $7.6 million 2021 Royalty Payment may be pro-rated, or whether it should be treated entirely as an administrative expense.  That limited issue can be resolved through a separate administrative claim application and will not affect the plan confirmation process.

2

The following issues, however, as well as Sanofi's significant objections to the Debtors' proposed Plan, will only need to be addressed if the Court answers either of the prior questions in in the affirmative:

3. *If the Court finds that the APA is executory, and permits the Debtors to reject it, may the Debtors nonetheless continue to sell Acthar Gel post-rejection?* **No.** Blackletter bankruptcy law provides that Debtors cannot reject the burdens of an executory contract while keeping the benefits. This very question demonstrates why the APA cannot be executory. The Debtors purchased the right to sell Acthar Gel subject to the Royalty. They cannot credibly maintain that the APA is executory, such that they can reject the Royalty obligation, while at the same time keeping the right to sell Acthar Gel. If they want to reject the burdens (the Royalty), they must give up the benefits (the right to sell Acthar Gel). The Debtors cannot have their cake and eat it, too.

4. *If, contrary to the law and common sense, the Debtors are permitted to reject the APA and keep the benefits, or to otherwise treat their post-Petition Date and post-confirmation Royalty obligations as a pre-Petition Date claim, should Sanofi be permitted to vote its potential damages claim with respect to the proposed plan?* **Yes.** The Debtors only argument against this is that Sanofi somehow should have known, months before the Debtors filed Exhibit U to the Plan Supplement, that the Debtors were going to try to reject the APA or to try to treat Sanofi's post-Petition Date and post-confirmation Royalties as pre-petition claims. The Debtors ignore, however, their own inexcusable failure to list the APA on any Debtors' Schedule G or to schedule any future royalty obligations on any Debtors' Schedule E/F. The Debtors cannot hide behind a June 2021 scheduling order when they disguised and concealed their intentions until August.

5. *If the Court permits the Debtors to reject the APA and keep the benefits, or to otherwise treat their post-Petition Date and post-confirmation Royalty obligations as a pre-Petition Date claim, should Sanofi's unsecured claims, in whatever amounts ultimately allowed, be classified under Class 7 of the Debtors' proposed Plan?* **Yes.** The Debtors' improper death-trap plan structure notwithstanding, the Debtors' only basis for separately classifying claims in Class 7 is continued benefit to the estates. If the Debtors prevail on all of their otherwise untenable positions, then Sanofi, without consent, will be providing the Debtors with the most favorable trade terms in the history of their business – the ability to continue selling their most profitable product without the requirement that they honor the Royalty that goes with it. And unlike other Class 7 claimants, the Debtors propose to force these terms on Sanofi not for a mere 12 months, but for the lifetime of their sales of Acthar Gel. What other claimant in Class 7 is providing (consensually or not) such favorable terms?

AA0000181

## ARGUMENT

### I.      The APA is <u>Not</u> an Executory Contract and Cannot be Rejected

1.      The crux of the Debtors' argument is that the APA is an executory contract that can be rejected under section 365 of the Bankruptcy Code, even though the APA is an asset purchase agreement that was consummated more than 20 years ago.  The Debtors acknowledge the test for whether a contract is executory – "'[a]n executory contract is a contract under which the obligation of both the bankrupt and the other party to the contract are so far underperformed that the failure of either to complete performance would constitute a material breach excusing the performance of the other.'" Objection, ¶21, *citing Sharon Steel Corp. v. Nat'l Fuel Gas Distrib. Corp.*, 872 F.2d 36, 39 (3d Cir. 1989).

2.      The Debtors accurately recite the test but then misapply it by willfully ignoring the facts and nature of the APA.  The Debtors' entire argument is that the APA is executory because it contains an indemnification provision.  Specifically, under section 5.1(a) of the APA, Sanofi agreed to Sanofi indemnify MP Ireland[3] with respect to certain categories of potential claims, one of which (misrepresentations or breaches of warranty) was expressly limited to a one-year term, and none of the rest of which could possibly still be relevant or viable after the passage of more than 20 years.

3.      The first indemnification category, "Retained Liabilities," is defined in section 2.2(b) of the APA as "Losses of Seller . . . including, but not limited to, any obligations for Losses with respect to the NORD Agreement, the Athena Agreement or distribution of Product by Seller pursuant to such Agreements."  APA, §2.2(b).  In short, the APA provides that liabilities of the

---

[3]      As described in the Pre-Confirmation Motion, Sanofi is the successor to the seller, Aventis, under the APA, and MP Ireland is the successor to the purchaser, Questcor (though MP Ireland may have subsequently sought to assign its rights and obligations without notifying Sanofi).  For ease of reference, Sanofi refers to the parties under the APA as Sanofi and MP Ireland.  Sanofi reserves all rights with respect to any improper, unauthorized, and potentially ineffective assignments of its rights and obligations under the APA by MP Ireland.

AA0000182

seller that were not expressly identified as Assumed Liabilities were instead each a Retained Liability, and the seller was required to indemnify the purchaser with respect to such Retained Liabilities. The Debtors assert that this somehow renders the APA executory, though they fail to identify any conceivable way that any indemnified claim could possibly be asserted more than 20 years later.  To the extent any claims *ever* existed, all such claims would now be barred by any possibly applicable statute of limitations, and the Debtors do not even allege that any such claims were ever even brought or threatened at any time in the last 20 years.  This does not rise to the level of an unperformed material obligation.

4.     Similarly, there is no possible basis for the other indemnification obligations to be triggered, as they were all specifically limited to acts and events that occurred prior to the July 27, 2001, effective date of the APA, including general acts or events related to the Assets or Product which occurred prior to July 27, 2001, use, storage or transportation of the Products before July 27, 2001, effective date, and seller's testing (in 2001 or earlier) of batches of finished product being sold under the APA.   *See* APA, §5.1(a)(iii), (iv) and (v).   It is impossible for any such claims to be brought now or in the future, more than 20 years later, against MP Ireland or any other of the Debtors.

5.     Similar stale indemnification obligations were recently examined by the Third Circuit Court of Appeals in *In re Weinstein Co. Holdings LLC*, 997 F.3d 497, 507 (3d Cir. 2021), which held that a producer's continuing obligation under a production agreement to indemnify a film company against third-party claims were ancillary after-thoughts where most of the statutes of limitations had likely expired on most, if not all, of the potential claims.  The Third Circuit considered whether the "remaining obligations go to the 'root of the contract' or 'defeat the

5

purpose of the entire transaction' if breached." *Id*., *citing In re Exide Techs.*, 607 F.3d 957, 962-63 (3d Cir. 2010).

6.    The Third Circuit noted that "courts agree that the employee in a work-made-for-hire contract usually does not have *material* obligations after the work is completed *despite ancillary negative covenants or indemnification obligations*," *Id*. (emphasis added).  The Third Circuit found "immaterial . . . Cohen's obligation to indemnify TWC against third-party claims arising from the breach of his representations, warranties or covenants, as the statute of limitations has likely expired on most, if not all, of the potential claims." *Id*. at  507.  The APA is likewise not executory for the same reasons, where Sanofi's performance was completed in 2001 when the sale closed, and any remaining indemnification obligations, especially 20 years later, are all time-barred and are certainly not material.

7.    The Third Circuit's decision in *Exide*, expressly relied upon by the court in *Weinstein*, mandates the same result.  There, the Third Circuit ruled that, despite containing an indemnification provision, a trademark licensing agreement was not an executory contract because the purchaser had substantially performed its obligations.  The Court noted that "the other two obligations that Exide argues are substantial, the Indemnity Obligation and the Further Assurances Obligation, do not outweigh the factors supporting substantial performance. In regard to the Indemnity Obligation, under the Asset Purchase Agreement, all representations and warranties arising from it expired in 1994, on the third anniversary of the closing and Exide did not present any evidence that any liability assumed by EnerSys was still pending." *Exide*, 607 F.3d at 963. The same is equally true with respect to the APA, where the Debtors cannot present any evidence that any liability that would be covered by indemnification could possibly still be asserted against the Debtors today.

AA0000184

8.      The handful of cases that the Debtors cite to support their position are easily distinguished and demonstrate why there must be an actual *material* obligation remaining by each side for a contract to be an executory.  The Debtors' reliance on a 20-year-old indemnity that could never plausibly be triggered does not pass muster.[4]

9.      First, the environmental indemnity in *in re Safety-Kleen Corp.*, 410 B.R. 164, 168 (Bankr. D. Del. 2009), heavily relied on by the Debtors, is nearly the opposite of the indemnification provision in the APA.  There, the indemnification provision related to damages arising from pre- and post-closing environmental matters, including contamination to a facility that was already subject to a consent order with the United States Environmental Protection Agency.   The court found that those indemnification "obligations are clearly material as to both parties" as they "represent continuing duties to indemnify, contingent on the emergence of covered environmental violations" and that "some of these obligations continue."  *Id*. at 167-68.  The Debtors here cannot make a similar showing, as there is not even a remote possibility of some pre-2001 retained liability surfacing and being asserted against MP Ireland.

10.      Long-term and material environmental issues were also at issue in *In re Philip Services (Delaware), Inc.*, 284 B.R. 541 (Bankr. D. Del. 2002), which is also relied on by the Debtors.  There, the indemnification obligations were still largely unperformed as of the date of the bankruptcy filing, and "[a]ccording to the Defendants, the responsibility for the environmental remediation was one of the 'most important issues' that had to be resolved before the merger could be completed."  *Id*. at 547.  Stale and time-barred indemnified claims in the APA, on the other

---

[4]      In addition to the binding Third Circuit cases discussed above, Sanofi notes that the environmental indemnification cases cited by the Debtors are clearly the exception, and that the general rule is that a mere indemnification provision will not support a finding that a contract is executory.  *See, e.g.*, *Matter of Van Dyk Rsch. Corp.*, 13 B.R. 487 (Bankr. D.N.J. 1981); *see also*, *In re Cap. Acquisitions & Mgmt. Corp.*, 341 B.R. 632, 636 (Bankr. N.D. Ill. 2006); *In re Spectrum Info. Techs., Inc.*, 190 B.R. 741, 748 (Bankr. E.D.N.Y. 1996); *In re Fitch*, 174 B.R. 96, 103 (Bankr. S.D. Ill. 1994); *In re Stein & Day Inc.*, 81 B.R. 263, 266 (Bankr. S.D.N.Y. 1988)

AA0000185

hand, which have never and will never be asserted, are entirely different and do not transform the APA an executory contract.

11.    The Debtors' characterization of section 5.1 of the APA as a "live indemnity obligation going to the fundamental bargain" is laughable.  *See* Objection, ¶27.  Like the indemnification provisions discussed in *Weinstein*, this was, at best, an ancillary provision, standard in any asset purchase agreement, to ensure that the buyer was protected in case a claim was asserted against it beyond those liabilities it agreed to assume.  While it may have been a "live indemnity obligation" when the sale closed, that was more than 20 years ago. No indemnified claims have been asserted against MP Ireland, and no claims could possibly still be viable.  Even if any such claims ever existed, after the passage of more than 20 years, this is not a "live indemnity obligation."

12.    Unlike the few cases cited by the Debtors, where indemnification obligations actually went to the heart of the contract because of ongoing environmental issues, the APA here has been fully performed by Sanofi, and has been fully performed since 2001 when the sale closed and the assets were transferred to MP Ireland, subject to the Royalty.  Because Sanofi has no material unperformed or underperformed obligations, the APA is not executory, and the Debtors cannot reject it.

## II.    *The Debtors Cannot Discharge Post-Confirmation Royalty Obligations*

13.    The Debtors try, unsuccessfully, to paint the 20-year old APA as an executory contract because, if they cannot reject it under section 365, they must overcome binding Third Circuit precedent, the plain language of section 1141(d)(1)(A) of the Bankruptcy Code, and even the recent opinion of this Court *in this case*, all in an effort to discharge Royalty obligations that

AA0000186

have not yet arisen and will not arise until after the Petition Date and, if the Debtors' Plan is ultimately confirmed, after confirmation.

A.      _Future Royalties Arise Post-Petition Date and Post-Confirmation_

14.      The Debtors incorrectly argue that Sanofi's future Royalty claims are "prepetition, dischargeable claim[s]" because "[r]ights to payment (_i.e._, claims) from a debtor under a prepetition contract are prepetition claims, even if they will not come due until some future date or upon some future occurrence." Objection, ¶33.  The Debtors, in essence, ask this Court to enact an all-encompassing, overarching rule that would classify every obligation that has _any connection_ to a prepetition contract as a "prepetition claim" that can be discharged.  The Debtors' argument has no merit and ignores all case law addressing when claims arise.

15.      First, as noted in the Pre-Confirmation Motion, the plain language of section 1141(d)(1)(A) of the Bankruptcy Code only discharges debts "that **_arose before_** the date of such confirmation."  11 U.S.C. § 1141(d)(1)(A) (emphasis added).  The Debtors' suggestion that future Royalty obligations, as to which the Debtors have no present liability, arose prior to the Petition Date, defies logic and reason.

16.      Even a cursory reading of the APA reveals that the Debtors' Royalty obligations do not arise until and unless the Debtors actually sell Acthar Gel during a particular calendar year. It is the Debtors' act of selling Acthar Gel that gives rise to the Royalty, and to the extent such acts occur post-Petition Date and will occur post-confirmation, the resulting Royalty cannot be said to have arisen pre-Petition Date.  Even the Debtors expressly acknowledge this, when they admit that "Sanofi is not entitled to a payment unless and until, and only for so long as, Acthar is sold by the Debtors."  Objection, ¶41.  This alone should be the end of the discussion – the Debtors' liability to pay the Royalty for any given year did not arise when the APA was signed, but _will_ arise upon

9

the Debtors' *future sales of Acthar*.  The Debtors' *post-Petition Date* and *post-confirmation* Royalty obligations are not debts "that arose before the date of such confirmation" (assuming the Debtors' plan is confirmed), and thus cannot be discharged.

> B.  *The Debtors Ignore or Misconstrue Binding Third Circuit Precedent and Other Applicable Case Law*

17.    The Debtors' suggestion that the Third Circuit's decision in *Weinstein*, *supra*, supports their position cannot be reconciled with the actual text of that decision, in which the Third Circuit stated that "[a] non-executory contract . . . can be sold under § 363 to a buyer, *who must satisfy post-closing obligations* but need not worry about pre-closing breaches or defaults, which typically remain unsecured claims against the debtor's estate."  *Weinstein*, 997 F.3d at 501 (emphasis added).  The Third Circuit has thus made crystal clear that pre-existing claims under a non-executory contract may be treated as unsecured claims, but not obligations that arise in the future.[5]  Accordingly, under binding precedent, the only inquiry should be whether the 2021 Royalty Payment should be pro-rated.  While Sanofi's position is that the entirety of the 2021 Royalty Payment did not arise until January 2021, even if the Court rules that it should be pro-rated, this would only affect a portion of the Royalty for one year and would have no bearing on future Royalty obligations that will arise in 2022 or Royalty obligations for subsequent years that may arise later.

18.    The Debtors similarly have no response to the Third Circuit's binding decision in *In re Hays & Co. v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 885 F.2d 1149 (3d Cir. 1989), in which the Third Circuit expressly held that "a trustee is generally bound by the debtor's non-executory contracts."  The Debtors attempt to minimize the importance of this case by burying it

---

[5]    For clarity, the Third Circuit's ruling did not address claims that arose in the gap period between the Petition Date and the date of the sale, which would, presumably, be separately treated as administrative expense claims.

AA0000188

in a bullet list in their Objection and describing it as "irrelevant," but without success. The decision, consistent with *Weinstein* and section 1141 of the Bankruptcy Code, makes clear that while an estate may be able to treat pre-petition claims under a non-executory contract as mere unsecured claims, obligations that arise later, like the counterparty's right to compel arbitration in *Hays*, must be honored. So too, here, if the Debtors choose to continue selling Acthar Gel, they must honor the Royalty obligation that arises from such sales.

19.     The Debtors' attempted reliance on a footnote in *In re Columbia Gas Sys., Inc.*, 50 F.3d 233, 239 n.9 (3d Cir. 1995) is similarly misplaced. That case involved obligations that arose as a result of a settlement of alleged breaches of pre-existing gas purchase contracts. The debtor in that case had a fixed obligation, established under the settlement agreement and at the time the settlement agreement was executed, to deposit certain amounts into an escrow account at specified dates. The Debtors obligations were clearly established and thus arose at the time of execution of the settlement agreement. No such facts exist here, where the Debtors' future obligations to pay the Royalty, if any, will only arise depending on whether the Debtors choose to sell Acthar Gel.

20.     Moreover, the Debtors' futile effort to distinguish *In re Monument Record Corp.*, 61 B.R. 866 (Bankr. M.D. Tenn. 1986) also falls flat, especially given the substantial overlap with the instant case. In *Monument*, the Court addressed a prior sale of rights of Roy Orbison's music, which was subject to a royalty based on future sales. This is fully analogous with the APA, where Sanofi sold MP Ireland the right to manufacture and sell Acthar, subject to the Royalty with respect to future sales. The Debtors try to distinguish by saying that the debtor's property rights were subject to the requirement that it pay the royalty – but that is exactly the same as the APA. Indeed, the express language of section 2.1 of the APA provides for the sale of the Assets "subject to the terms and conditions this Agreement," which necessarily includes the Royalty. Thus, just like

11

in *Monument*, where the record company purchased the rights to Orbison's music "subject to" the royalty, here to, the Debtors purchased the rights to Acthar Gel, "subject to" the Royalty.

21.     The Debtors' suggestion that future Royalties arose in 2001, and not when the Debtors actually engaged in the sale of Acthar Gel, also runs contrary to this Court's rulings in this case in the context of when the Debtors' potential anti-trust claims arise.  In its *Memorandum Opinion and Order* entered on October 19, 2021 (the "**Opinion**") [D.I. 4792], this Court overruled the Debtors' position that any anti-trust liability that may flow from their post-Petition Date sales of Acthar Gel should be treated as pre-Petition Date claims, because those claims *arise* when the Debtors' sold Acthar Gel.

22.     In reaching its decision, the Court noted that the Third Circuit's decisions in *"Grossman's* and *Owen's Corning* . . . set forth the Third Circuit's test for determining when a "claim" arises under the Bankruptcy Code."  Opinion, p. 13.[6]  The Court noted that while the claimants' "alleged overpayment for Acthar may be their "injury," that only tells us when the claim accrues (or became mature and legally ripe for payment), not when it arises (or comes into existence), which is what *Grossman's* instructs us to focus on." Opinion, p. 15. The Court continued "[i]n both *Grossman's/Owens Corning* and here, the claimants were exposed to the product when the debtors sold it to them." *Id*.

23.     While *Grossman's* and *Owen's Corning* (as well as the issues being addressed in the Opinion) involved tort claims, the principles apply with equal force with respect to determining when Royalty obligations *arise* under the APA.  Just like with the potential antitrust claims, here, too, the Debtors' Royalty obligations arise, at the earliest, when the Debtors sell Acthar Gel.

---

[6]     *See In re Grossman's*, 607 F.3d 114 (3d Cir. 2010) and *Wright v. Owens Corning*, 679 F.3d 101 (3d Cir. 2012).

AA0000190

24.     The cases described above and discussed more fully in the Pre-Confirmation Motion can be distilled into the following principle:  obligations flowing from a non-executory contract, just like any other claims in a bankruptcy case, should be treated as unsecured claims if such claims arise before the petition date, but as administrative expense claims or as obligations of the reorganized debtors, when they arise after the petition date or post-confirmation, respectively.  Here, there can be no question that the Royalty obligation for at least part of 2021, all of 2022, and for each year thereafter will arise post-Petition Date or, if the Plan is confirmed, post-confirmation, and cannot be discharged as pre-Petition Date general unsecured claims.

### III.     If the Debtors Reject the APA, they Cannot Continue Selling Acthar Gel

25.     As noted at the outset, disposition of the first two issues discussed herein, whether the APA is executory and whether future Royalty obligations that only arise post-Petition Date and post-confirmation may be discharged, should be entirely dispositive of all material disputes between Sanofi and the Debtors.

26.     If the Court does conclude, however, that the APA is an executory contract *and* that it is a sound exercise of the Debtors' business judgment to reject the APA, then the Court should consider what is the effect of that rejection.

27.     The Debtors' suggestion that they should be permitted to reject their future obligations to pay Royalties, if and when such obligations arise, but yet continue to sell Acthar Gel without honoring the Royalty defies the law, principles of common sense, and simply cannot be correct.   Debtors cannot reject the burdens of a contract while retaining the benefits.  *See Sharon Steel Corp. v. National Fuel Gas Distribution Corp.*, 827 F.3d 36, 40 (3d Cir. 1989) ("a debtor may not reject a contract but maintain its benefits").

AA0000191

28.     For the Debtors to prevail and for the Court to rule that the APA is executory, the Debtors must show that Sanofi has material, unperformed obligations under the APA.  The only possible way to meet this burden would be to suggest that Sanofi is still performing its obligation to convey to the Debtors the right to manufacture and sell Acthar, subject to the Royalty.   Sanofi had no other material obligations under the APA beyond conveying the rights to Acthar Gel, subject to the Royalty, so if the Royalty is rejected, so too must be the Debtors' continued rights to Acthar Gel.

### IV.      *Sanofi Should be Permitted to Vote its Potential Damages Claim*

#### A.   *The Temporary Allowance and Classification Motion is Timely*

29.     If the Debtors prevail on all of the foregoing issues, then Sanofi will be entitled to a substantial damages claim, either as a rejection damages claim or otherwise, and Sanofi should be permitted to vote the value of that claim to accept or reject the Plan to ensure that Sanofi's economic interests are not disenfranchised.

30.     The Debtors should not be permitted to rely on the Solicitation Order to suggest that the Temporary Allowance and Classification Motion is untimely.  The Solicitation Order was entered on June 17, 2021 and established a deadline of July 26, 2021 for parties to file estimation motions under Bankruptcy Rule 3018.   The Debtors, however, chose to disguise their intentions, or at least chose to wait until after the such deadlines had expired to decide to take the position that the APA is an executory contract that will be rejected under the Plan.  The Debtors did not list the APA on Schedule G for any of the Debtors and did not serve Exhibit U to the Plan Supplement on Sanofi until August 19, 2021.  Do the Debtors really suggest that Sanofi should have divined that the Debtors would radically change their position, such that Sanofi should have pre-emptively filed a motion under Bankruptcy Rule 3018 to protect a claim it never even knew existed or could

14

exist?  Sanofi relied on the Debtors' pleadings, including their schedules, and reasonably determined it did not have a claim, other than possibly a pro-rated portion of the 2021 Royalty Payment, for which it did timely file a proof of claim.

31.    Similarly, the Debtors provided no indication that they might label future Royalties as dischargeable unsecured claims, especially, as the Debtors acknowledge, "Sanofi is not entitled to a payment unless and until, and only for so long as, Acthar is sold by the Debtors."  Objection, ¶41.  Again, the Debtors appear to suggest that Sanofi should have been required to guess at what positions the Debtors might take, regardless of the law or what they included in their schedules, and pre-emptively sought temporary allowance of a claim for voting purposes back in July.  There is no possible basis for such retroactive application of deadlines, and the Debtors' suggestion that they should apply here lacks all sense of credibility.

B.   *An Estimated $121 Million Claim for Voting is Appropriate*

32.    Bankruptcy Rule 3018 permits a court to temporarily allow a claim for voting purposes "in an amount which the court deems proper for the purpose of accepting and rejecting a plan."  Fed. R. Bankr. P. 3018 (a).  In the Temporary Allowance and Classification Motion, Sanofi suggests a total claim for voting purposes of $121 million, comprised of $6 million for Sanofi's potential pre-Petition Date Claim (if the 2021 Royalty Payment is pro-rated), and $115 million for Sanofi's potential damages claim (if the Debtors prevail on their attempts to reject the APA or otherwise discharge all future Royalties that will later arise).

33.    With respect to the $6 million potential pre-Petition Date claim, the only way this amount could be less than $6 million is if the Court rules that the 2021 Royalty Payment should *not be* pro-rated, in which case the entirety of the 2021 Royalty Payment would be entitled to payment in full as an administrative expense claim.  Assuming the Debtors oppose this result, the

AA0000193

Court should permit Sanofi to vote the full $6 million to ensure its interests are protected for purposes of voting.

34.     With respect to the $115 million potential damages claim, Sanofi maintains that $115 million is reasonable, and indeed was calculated using the Debtors' own projections and discounted to net present value.

35.     Recognizing, again, that the valuation of Sanofi's potential damages claim for voting purposes is only necessary if the Court concludes that the Debtors can either reject the APA or discharge future Royalties, it is at least clear that the value of the damages claim is significant, and at least in excess of $100 million.  Sanofi believes $115 million is conservatively appropriate and suggests that a reasonable calculation could be even significantly higher.  In any event, if Sanofi does have such a claim, then it should be entitled to vote that claim in a reasonably approximate amount, so that Sanofi's vote will be reflective of the actual potential allowed claim. The Debtors' suggestion that a $1 claim for voting purposes, under which Sanofi would essentially be entirely disenfranchised other than with respect to numerosity, is completely inappropriate.

C. *Sanofi Should be Permitted to Vote its Claims Against both MP Ireland and MP ARD IP*

36.     The Debtors suggest that Sanofi should not be permitted to vote its claims against MP ARD IP because "[t]he APA has never been assigned to M ARD IP:  MPIL has been the Debtor-party to the APA since it was assigned to MPIL in 2014 with Sanofi's consent."  Objection, ¶ 42.  The Debtors may not have formally assigned *the APA*, but they clearly appear to have assigned the rights and obligations under the APA to ARD IP and, if such assignment was effective (as to which Sanofi reserves all rights), then that would result in ARD IP becoming co-liable with MP Ireland for all obligations under the APA, including the Royalty.

16

37.     Section 7.6 of the APA permits each party to "assign its rights and obligations" under the APA to an affiliate, though "no permitted assignment hereunder shall be deemed effective unless the assignee shall have executed and delivered an instrument in writing reasonably satisfactory in form and substance to the other parties. . . ."  Finally, section 7.6 of the APA provides that "This Agreement shall be binding upon the successors and permitted assigns of the parties . . ."  APA, § 7.6.

38.     There is no basis under the APA to support the Debtors' incredible position that MP Ireland could assign away all of its rights to Acthar Gel without regard for section 7.6 of the APA, so long as it did not seek to assign the APA itself.  The plain language of section 7.6 of the APA covers assignments of each parties' "rights and obligations," and MP Ireland could not assign the rights without the obligations – to do otherwise would be to render the final sentence of section 7.6 entirely without meaning.   It is clear from the APA that if MP Ireland assigned its rights to Acthar Gel, the assignee would become bound by the APA, including with respect to the Royalty. It is equally clear, and the Debtors do not deny, that at some point prior to the Petition Date they attempted to transfer the rights in Acthar Gel from MP Ireland to ARD IP.  Based on that purported transfer, Sanofi's potential unsecured claims will lie not only against MP Ireland, but also against ARD IP, and Sanofi should be able to vote its properly allowed claims within respect to both Debtors' plans.

### V.     Sanofi's Potential Damages Claim Should be Classified in Class 7

39.     Through the Temporary Allowance and Classification Motion, Sanofi also asks, under Bankruptcy Rule 3013, for the Court to rule that, if the Debtors are permitted to continue selling Acthar Gel without paying the Royalty, then Sanofi's unsecured claims, including its

AA0000195

resulting damages claim, in whatever amount ultimately allowed, should be appropriately classified under Class 7.

40.     The Debtors argue against inclusion of Sanofi's potential claims in Class 7 for three reasons: (1) because Sanofi has not voted to accept the Plan, (2) because Sanofi cannot agree to provide favorable trade terms to the Debtors for 12 months after emergence, and (3) because Sanofi's claims do not arise from the provision of goods and services to the Debtors.   All these arguments fail.

41.     The Debtors' version of a "death trap" treatment for Class 7 claimants, whereby creditors otherwise entitled to Class 7 Treatment will be automatically given the far-less favorable treatment in Class 6(f) is inappropriate.[7]   In cases where courts approve such provisions, however, they are applied on a class-wide basis, that is, if the class votes to reject the plan, then all class members receive a worse treatment, or if the class votes to accept the plan, then all class members get a more favorable treatment).  *See, e.g.*, *In re MPM Silicones LLC,* No. 14-22503, 2014 WL 4637175 at \*3 (Bankr. S.D.N.Y., Sept. 17, 2014); *In re Adelphia Communications Corp.,* 368 B.R. 140, 175 (Bankr. S.D.N.Y. 2007); *In re Zenith Electronics Corp.,* 241 B.R. 92, 105 (Bankr. D. Del. 1999); and *In re Drexel Burnham Lambert Group.,* 138 B.R. 714, 717 (Bankr. S.D.N.Y. 1992).  Where debtors have tried to use such provisions to only reward the individual creditors who vote to accept, and to punish just those who vote to reject, it has been found improper.  *See In re Affordable Auto Repair Inc.*, No. 19-18367 2020 WL 6991012 at \*2 (Bankr. C.D. Cal. Sept. 2, 2020) (finding that such a plan structure either violates section 1123(a)(4) or, alternatively, calls into question whether the plan was solicited in good faith under section 1126(e).)

---

[7]     These provisions are also known as "carrot and stick," "toggle" or "fish-or-cut-bait" provisions.

AA0000196

42.     Substantively, moreover, if the Debtors are successful in their quest to be able to sell Acthar Gel without paying the Royalty, this result alone should be more than sufficient to justify Sanofi's inclusion in Class 7.  The Debtors suggest that they "cannot conceive of how Sanofi could make the requisite concession of providing the reorganized Debtors with favorable trade terms for twelve months to support the enhanced treatment offered to Class 7 claimants." Objection, ¶ 45.  The Debtors cannot conceive of this, however, because the Debtors seek to force such a concession on Sanofi against its will.  If the Debtors prevail, they will have apparently obtained the right to sell Acthar Gel for an unlimited period of time into the future – far more than twelve months – without having to pay any Royalty to Sanofi.    Respectfully, Sanofi cannot conceive of how any other Class 7 Claimant, willingly or not, could provide more favorable trade terms.

43.     For these reasons, should the Court ultimately determine that Sanofi has an unsecured claim against one or more of the Debtors, such claim should be classified under Class 7 under the Plan.

## CONCLUSION AND RESERVATION OF RIGHTS

For the foregoing reasons, the Court should overrule the Objection, enter an order approving the Pre-Confirmation Motion, and grant Sanofi such other and further relief as the Court deems warranted and appropriate.  Alternatively, if the Court does not enter an order approving the relief sought in the Pre-Confirmation Motion, then Sanofi asks the Court to enter an order approving the Temporary Allowance and Classification Motion, and grant Sanofi such other and further relief as the Court deems warranted and appropriate.  To the extent the Debtors have sought additional relief by including a cross-motion in their Objection, Sanofi reserves all rights if and when the Debtors properly notice such cross-motion, which, to date, they have not done.  Sanofi

AA0000197

further reserves the right, if the Court does not enter an order approving the relief sought in the

Pre-Confirmation Motion, to raise any and all objections in connection with the Debtors' request

for the Court to confirm their proposed Plan.


Dated: October 26, 2021                    **DLA PIPER LLP (US)**

                                           */s/   Stuart M. Brown*
                                           Stuart M. Brown (DE #4050)
                                           Aaron S. Applebaum (DE #5587)
                                           Kaitlin MacKenzie (DE #5924)
                                           1201 North Market Street, Suite 2100
                                           Wilmington, Delaware 19801
                                           Telephone: (302) 468-5700
                                           Facsimile: (302) 394-2341
                                           E-mail: stuart.brown@us.dlapiper.com
                                                   aaron.applebaum@us.dlapiper.com
                                                   kaitlin.mackenzie@us.dlapiper.com
                                                        - and -

                                           Jason Hopkins (TX 24059969)
                                           1900 N. Pearl St., Suite 2200
                                           Dallas, TX 75201-2482
                                           Telephone: (214) 743-4586
                                           Email:  jason.hopkins@us.dlapiper.com

                                           **MILLER & MARTIN PLLC**
                                           Laura F. Ketcham
                                           Volunteer Building Suite 1200
                                           832 Georgia Avenue
                                           Chattanooga, TN 37402
                                           Telephone: (423) 785-8383
                                           Facsimile: (423) 321-1556
                                           E-mail:  laura.ketcham@millermartin.com

                                           *Attorneys for sanofi-aventis U.S. LLC*

AA0000198

```
1                    UNITED STATES BANKRUPTCY COURT
                           DISTRICT OF DELAWARE
2

3                                    .    Chapter 11
      IN RE:                         .
4                                    .    Case No. 20-12522 (JTD)
      MALLINCKRODT PLC, et al.,      .
5                                    .
                                     .    Courtroom No. 5
6                                    .    824 North Market Street
                                     .    Wilmington, Delaware 19801
7                                    .
                          Debtors.   .    Friday, October 29, 2021
8     . . . . . . . . . . . . . . .  .    9:30 A.M.

9                    TRANSCRIPT OF PRETRIAL CONFERENCE
                    BEFORE THE HONORABLE JOHN T. DORSEY
10                    UNITED STATES BANKRUPTCY JUDGE

11    TELEPHONIC APPEARANCES:

12
      For the Debtor:            Michael J. Merchant, Esquire
13                               RICHARDS, LAYTON & FINGER, P.A.
                                 Rodney Square
14                               920 N. King Street
                                 Wilmington, Delaware 19801
15
                                 - and -
16
                                 Betsy Marks, Esquire
17                               LATHAM & WATKINS LLP
                                 200 Clarendon Street
18                               Boston, Massachusetts 02116

19

20    Audio Operator:           Lesa Neal/Jermaine Cooper, ECROs

21    Transcription Company:    Reliable
                                1007 N. Orange Street
22                              Wilmington, Delaware 19801
                                (302)654-8080
23                              Email:  gmatthews@reliable-co.com

24
      Proceedings recorded by electronic sound recording, transcript
25    produced by transcription service.
```

```
 1  APPEARANCES (Cont'd):

 2  For the Debtors:          Jason B. Gott, Esquire
                              LATHAM & WATKINS LLP
 3                            330 North Wasabi Avenue, Suite 2800
                              Chicago, Illinois 60611
 4
                              - and -
 5
                              Christopher Harris, Esquire
 6                            LATHAM & WATKINS LLP
                              1271 Avenue of the Americas
 7                            New York, New York 10020

 8                            - and -

 9                            Emil Kleinhaus, Esquire
                              WACHTELL, LIPTON, ROSEN & KATZ
10                            51 West 52nd Street
                              New York, New York 10019
11
    For Acthar Plaintiffs:    David Haviland, Esquire
12                            HAVILAND HUGHES
                              112 Haddontowne Court, Suite 202
13                            Cherry Hill, New Jersey 08034

14                            - and -

15                            Albert Ciardi, Esquire
                              CIARDI CIARDI & ASTIN
16                            1204 North King Street
                              Wilmington, Delaware 19801
17
18  For Sanofi-Aventis:       Jason Hopkins, Esquire
                              DLA PIPER LLP (US)
19                            1900 N. Pearl Street, Suite 2200
                              Dallas, Texas 75201
20
21  For the Ad Hoc First      Donald Burke, Esquire
    Lien Notes Group:         ROBBINS, RUSSELL, ENGLERT, ORSECK,
22                              UNTEREINER & SAUBER LLP
                              2000 K Street NW, 4th Floor
23                            Washington, DC 20006

24  For the First Lien        Michael Cohen, Esquire
    Term Lender Group:        GIBSON, DUNN & CRUTCHER LLP
25                            200 Park Avenue
                              New York, New York 10166
```

AA0000200

```
 1   APPEARANCES (Cont'd):

 2   For Deutsche Bank:        Michele Meises, Esquire
                               WHITE & CASE LLP
 3                             1221 Avenue of the Americas
                               New York, New York 10020
 4
     For the Committee:        Patrick Birney, Esquire
 5                             ROBINSON & COLE LLP
                               280 Trumbull Street
 6                             Hartford, Connecticut 06103

 7
     Ad Hoc Revolving Loan     James Johnston, Esquire
 8   Participants Group:       JONES DAY LLP
                               555 South Flower Street
 9                             Fiftieth Floor
                               Los Angeles, California 90071
10
     Governmental Plaintiffs   Gerard Cicero, Esquire
11   Ad Hoc Group:             BROWN RUDNICK LLP
                               7 Times Square
12                             New York, New York 10036

13

14

15

16

17

18

19

20

21

22

23

24

25
```

AA0000201

1   CONFIRMATION HEARING RELATED ITEMS:

2   1. Pre-trial Conference for Phase 1 of the Confirmation
    Hearing

3
    2. The Ad Hoc Acthar Group's Motion In Limine to Preclude Use
4   of Late-Produced Acthar Documents by Debtors' Counsel at
    Arnold & Porter [Docket No. 4780 – filed October 18, 2021]

5
    3. Ad Hoc Acthar Group's Motion In Limine to Preclude Any
6   Evidence at Hearing on Debtors' Motion to Assume, or at any
    Plan Confirmation Proceeding, Going to the Merits or to
7   Antitrust Issues Because the Only Issue Before the Court is
    the Exercise of the Debtors' "Business Judgment" [Docket No.
8   4785 – filed October 18, 2021]

9   4. Ad Hoc Acthar Group's Motion In Limine to Sequester
    Witnesses [Docket No. 4786 – filed October 18, 2021]

10
    5. Ad Hoc Acthar Group's Motion In Limine to Order All
11  Witnesses Testify Live, Either in Person or by Zoom with
    Appropriate Restrictions [Docket No. 4787 – filed October 18,
12  2021]

13  6. Ad Hoc Acthar Group's Motion In Limine to Preclude Debtors
    from Presenting Evidence or Testimony that Seeks to Refute or
14  Go Beyond the Scope of, or is Otherwise Inconsistent with, the
    Rule 30(b)(6) Designees [Docket No. 4788 – filed October 18,
15  2021]

16

17

18

19

20

21

22

23

24

25

```
 1              (Proceedings commence at 10:02 a.m.)
 2              THE COURT:  Good morning.  This is Judge Dorsey.
 3    We're on the record in Mallinckrodt PLC, Case Number 20-
 4    12522.
 5              I'll go ahead and turn it over to debtors' counsel
 6    to run the agenda.
 7              MR. MERCHANT:  Good morning, Your Honor.  Michael
 8    Merchant of Richards Layton on behalf of the debtors.
 9              Your Honor, there are several matters on the
10    agenda today, but predominantly this is the date that was
11    scheduled for our pretrial conference with regards to our
12    confirmation hearing.  I see that Ms. Marks is on to address
13    that and the issues surrounding the pretrial order that was
14    filed.
15              THE COURT:  All right.  Ms. Marks, go ahead.
16              MS. MARKS:  Good morning, Your Honor.  Betsy Marks
17    for the debtors from Latham & Watkins.
18              The debtors filed their draft pretrial order
19    yesterday, last night.  We had circulated a draft of that in
20    advance to the objecting parties and other parties-in-
21    interest the day before.  We did try to incorporate feedback
22    where we got it.  There's still some information missing
23    about some of the witnesses.  But what I think we should do
24    this morning is to walk through it.  Your Honor has it, I
25    don't necessarily need to go through every detail in it,
```

1  although I'm happy to answer any questions.  And then, as we

2  get to open items or questions or disputes, we can pause and

3  address those.

4            THE COURT:  All right.

5            MS. MARKS:  Does that make sense for the Court, or

6  would you like to approach it a different way?

7            THE COURT:  No.  Go ahead.

8            MS. MARKS:  Okay.  There are three issues that

9  will be addressed in phase one.  And as I mentioned before,

10  I'm going to embrace the "phase" terminology.  Phase one of

11  the plan confirmation hearing is scheduled to begin next

12  week; it will begin on Monday.  The three issues to be

13  addressed in phase one are the debtors' valuation -- and this

14  is the TEV, as well as some -- as well as some analysis

15  regarding the debtors' liquidation analysis.  The debtors

16  will have two expert witnesses to put on the stand for this

17  topic.

18            The second issue to be addressed is noticing and

19  voting.  We will have one fact witness from Prime Clerk.  I

20  would note that the noticing and voting, while we will be

21  covering this in phase one, we are excluding the opioid

22  noticing program.  That was a different noticing program

23  because there was no bar date for the opioid claimants.  We

24  are saving that to address in phase two, along with other

25  opioid-related issues.

1          The third issue to be addressed in phase one is
2   the funded debt dispute.  It's really a two-party dispute
3   between the debtors and several tranches of noteholders.  So
4   we're referring to that as the "make-whole" or "cram-down"
5   dispute, and that will be -- we've scheduled that to be held
6   on Friday, the 5th.
7          So those are the three issues for phase one.  It's
8   relatively limited.  We will then -- you know, as the plan
9   is, we will then, next week, turn to the Acthar
10  administrative claims hearing, and that will proceed as long
11  as it takes.
12         In phase two, when we come back to the
13  continuation of the plan confirmation hearing, we will hear
14  and litigate all other issues, including the opioid
15  settlement, the UCC allocation, and other plan objections.
16  So that's a general overview of how we see this process
17  unfolding.
18         The witnesses -- I'm scrolling down the pretrial
19  order to the witnesses, which start on Page 10.  As I
20  mentioned, the debtors have two expert witnesses to put on,
21  on valuation.  Those witnesses are Punit Mehta from
22  Guggenheim Securities and Marc Brown from AlixPartners.
23         We -- the debtors would proffer putting forward
24  their direct testimony through declaration, but there have
25  been some objections to that.

```
 1                    THE COURT:  All right.  Ms. Marks, can I --
 2                    MS. MARKS:  This is --
 3                    THE COURT:  -- interrupt you for one second,
 4   please?
 5                    MS. MARKS:  Of course.
 6                    THE COURT:  Is there a way for you to turn off the
 7   notification on your computer because I keep getting bleeps
 8   while you're talking every time you get a message.
 9                    MS. MARKS:  Yes, I am going to -- I'm going to
10   just shut down that program, so you don't hear the beeps.
11                    THE COURT:  All right.  Thank you.
12                    MS. MARKS:  I apologize, Your Honor.
13                    And so, turning back to the witnesses, I don't
14   believe that there are any objections or disputes to the
15   debtors putting on Mr. Mehta or Mr. Guggenheim [sic].  I
16   believe the only dispute relates to whether their testimony,
17   for direct examination, should come in live on the stand or
18   via declaration.  We would propose proffering it through
19   declaration.  There has been an objection to that from the Ad
20   Hoc Acthar Group.
21                    And there is a motion in limine that tees up that
22   issue.  So, in a few minutes, I will turn it over to Chris
23   Harris, who will be arguing that motion in limine.  I'll just
24   finish running through the witnesses for phase one first.
25                    We have a third expert witness, it's Brendan Hayes
```

 1  from Guggenheim Securities, and he will be the debtors'

 2  witness in the funded debt litigation on the 5th.  I don't

 3  believe that there are any disputes regarding him.  The

 4  counterparties to that dispute have not objected to his live

 5  testimony -- or I should say have not objected to his direct

 6  testimony coming in via declaration.

 7          In phase one, the debtors have one fact witness,

 8  it is James -- and I admit I'm not exactly sure how to

 9  pronounce his last name, I think it's Daloia, James Daloia

10  from Prime Clerk, who will be the fact witness on noticing

11  and voting.  Again, we would propose doing his live testimony

12  via declaration, but there is an objection to that, which we

13  can cover.

14          What we have proposed for the order of those --

15  these witnesses is that, on Monday the 1st, we will do Punit

16  Mehta and Marc Brown first, in that order.  We expect that

17  there will be some cross-examination.  The Ad Hoc Acthar

18  Group has indicated that it would like to cross-examine them.

19  Other parties have reserved their rights to do so, and it

20  possible that other parties may want to cross-examine them.

21  But at this point, it seems likely, most likely that it will

22  -- may only be the Ad Hoc Acthar Group.  We will see on that.

23          We then would put James Daloia on the stand on

24  Tuesday to cover notice and voting.  There will be several

25  parties cross-examining James:  The Ad Hoc Acthar Group, the

 1   Russian Federation of Unregistered Shareholders, and the

 2   Canadian Elevator Pension Fund.  So three parties have all

 3   indicated that they would like to cross-examine him, and

 4   other parties have reserved the right to do so, as well.

 5            I understand that we do have the next two days,

 6   Wednesday and Thursday, reserved for the Court, although I

 7   would defer to the Court on whether we do or not.  I'm not

 8   exactly sure of the schedule.  But if there are additional

 9   witnesses, they could proceed on Tuesday into the next days,

10   as need.

11            The funded debt litigation is then set to go

12   forward on Friday.  And as I mentioned, that would be Brendan

13   Hayes from Guggenheim, who would be the debtors' witness.

14   And then the counterparties to that have their own witness,

15   as well.

16            And I will pause there, Your Honor.  We do have

17   some issues to address regarding other parties' witnesses;

18   specifically the Ad Hoc Acthar Group has served a witness

19   list, I think, without about a dozen witnesses, and there are

20   going to be some disputes regarding their witnesses.

21            But first, if it pleases, Your Honor, we could

22   pause and address the topic of whether or not the debtors'

23   witnesses should come in live or be a declaration or -- would

24   you like to address it that way or do you have any questions

25   so far?

1            THE COURT:  Well, we can do that one, first.  But

2  I had a couple of other issues that I saw in the pretrial

3  order.

4            Number one, attorneys being in the room with the

5  witness while they're testifying, I'm not going to allow

6  that.  Witnesses need to be alone.

7            MS. MARKS:  Okay.

8            THE COURT:  I need to be able to see them up

9  close, so I can judge their credibility.  So witnesses will

10 have to be by themselves and not in communication, in any

11 way, with counsel during their testimony.

12           MS. MARKS:  Okay.  Understood.

13           THE COURT:  I had an issue with this idea that

14 witnesses who are being put on by the debtor in connection

15 with phase one, that somebody who is going to be raising an

16 issue in phase two has to cross-examine that witness on phase

17 two issues at that same time.  I'm not going to allow that,

18 either.  We're doing phase one and phase one only.  So, if

19 the witness is going to be coming back in phase two, so be

20 it.

21           We'll have to come back and do it in phase two,

22 number one, because I was asked the other day and the debtors

23 only wanted to provide me with copies of the exhibits for

24 phase one, so I don't even have all the exhibits for phase

25 two.  So we're not going to allow that, either.

AA0000209

```
 1              MS. MARKS:  Okay.

 2              THE COURT:  On use of depositions at trial, the

 3    pretrial order refers to Federal Rule of Evidence 804.

 4    There's also Federal Rule of Evidence -- or excuse me --

 5    Federal Rule of Civil Procedure 32, which governs the use of

 6    depositions at trial.  That wasn't addressed.  And it has

 7    some additional information in Rule 32.  For example, a

 8    deposition of a party opponent can be used for any purpose at

 9    trial.  So that needs to be addressed in the final version.

10    So it should be pursuant to Rule 32 and Rule of Evidence 804.

11              MS. MARKS:  Understood.

12              THE COURT:  Let me see if I had any other issues

13    before we get to the next one.

14         (Pause in proceedings)

15              THE COURT:  All right.  We can go on to the use of

16    declarations for direct.

17              MS. MARKS:  Thank you, Your Honor.  I will turn it

18    over to Chris Harris.  This is a motion in limine, this issue

19    is teed up in the motion in limine filed by the Ad Hoc Acthar

20    Group, which we have responded to.  So Mr. Harris will

21    address this issue in the context of our reviewing that

22    motion.

23              THE COURT:  All right.  Go ahead, Mr. Harris.

24         (No verbal response)

25              THE COURT:  I can't hear you, Mr. Harris, and
```

1  you're frozen.  I don't know if there's something wrong with

2  your computer.

3        (No verbal response)

4              THE COURT:  Can't hear you, Mr. Harris.

5              This is another issue that everybody needs to be -

6  - make sure before we start that I can hear -- especially the

7  witnesses, but I've got to hear the counsel asking the

8  questions, too, obviously.  But everybody should test their

9  systems.  If you need to work with the Court ahead of time to

10  try and test your systems, that's fine, too, we can

11  accommodate that.  But let's make sure everything is working

12  properly.

13              MS. MARKS:  Your Honor, if Mr. Harris needs to

14  figure out the microphone, we could move on to other topics

15  while he does that.  Does that make sense?

16              THE COURT:  Well, let's see --

17              MS. MARKS:  Chris --

18              THE COURT:  -- if he's working now?

19        (No verbal response)

20              THE COURT:  No, still can't hear you, Mr. Harris.

21              All right.  Let's move on to another issue.

22              MS. MARKS:  Okay.  So I believe what we should

23  turn to next would be the rest of the witnesses for phase

24  one.  As I mentioned, for the funded debt litigation on the

25  5th, the counterparties to that dispute do have their own

1  witness.  There is no dispute over that.  And a little bit

2  later, I will be turning it over to Wachtell Lipton, who will

3  be litigating that issue, and they can describe that process

4  for you in more detail.

5            But to go back to phase one, the only other party

6  who has served witnesses for their case-in-chief is the Ad

7  Hoc Acthar Group.  The Ad Hoc Acthar Group has listed in

8  their case-in-chief the same witnesses that the debtors are

9  calling, so Mr. Mehta, Mr. Brown, Mr. Daloia.  To the extent

10  that the debtors are calling those witnesses anyway and

11  they'll be on the stand, you know, we don't have any

12  objection to the Ad Hoc Acthar Group also questioning them.

13            We would ask, though, that the Ad Hoc Acthar Group

14  question them when they are on the stand for all purposes.

15  So, if the debtors are putting them on, on Monday and

16  Tuesday, they will then be available for cross-examination.

17  We would ask that, at that point, the Ad Hoc Acthar Group

18  also question them for whatever purposes they wanted in their

19  case-in-chief, and then the witnesses do not need to be

20  called back the next day or a few days later for the Ad Hoc

21  Acthar Group's case-in-chief.  But I would defer to Your

22  Honor on how you would like to handle that.

23            THE COURT:  Well, as long as it relates to phase

24  one.  As I already said, I'm not going to make anybody cross-

25  examine a witness on phase two issues during phase one.  So,

1   if they intend to use those witnesses in phase two -- I don't

2   know whether that is the case or not -- but to the extent

3   that they -- I don't want to have witnesses called back just

4   because someone else has identified them as a witness.  If

5   they're on the stand being called by the debtor, they can be

6   cross-examined for all purposes.  And I'm not going to allow

7   objections to outside the scope of direct, so that anybody

8   who wants to call a witness can call them or can cross-

9   examine them on the issues outside the scope of direct, as

10  long as it's relate -- relevant to the issues in phase one.

11          MS. MARKS:  Understood, Your Honor.  And yes, this

12  is solely phase one.  We're just talking about the phase one

13  witnesses now.  We do understand and we'll -- our witnesses

14  will be available if someone wants to bring them back for

15  phase two.

16          THE COURT:  Okay.

17          MS. MARKS:  The other witnesses on the Ad Hoc

18  Acthar Group's witness list are what I'll call "new," they

19  are not on any other party's witness list, so they will not

20  otherwise be appearing.  The Ad Hoc Acthar Group -- I'll

21  address the last witness on their list first; it was their

22  expert witness George Miller.  And they have notified me this

23  morning that they will solely be calling Mr. Miller in phase

24  two.  So we don't need to discuss Mr. Miller today.  It

25  sounds like he will be moved from phase one to phase two.

1          The rest of the witnesses on the Ad Hoc Acthar

2    Group's list are all adverse witnesses.  They're seeking to

3    call several members of the UCC, both counsel and committee

4    members.  They're also seeking to call a few other attorneys

5    or parties in this case, Mr. Joe Rice and Mr. Jeffrey Krol.

6          So, at this point, I understand that the UCC had

7    filed a motion to quash the four UCC depositions yesterday.

8    And I think it might make the most sense at this point if I

9    turn it over to them to address those witnesses and argue

10   their motions to quash.  But again, I would defer to the

11   Court on how you would like to hear that.

12         THE COURT:  Well, let me hear from Mr. Haviland

13   first, or whoever is going to speak for the ad hoc group.

14   I'd like to know what the relevance of each of these

15   witnesses is to phase one because it wasn't included in the

16   proposed pretrial order.

17         MR. HAVILAND:  This is Don Haviland for Ad Hoc

18   Acthar Group.  Can you hear me all right, Judge?

19         THE COURT:  Yes.

20         MR. HAVILAND:  Thank you.

21         I think it was in the submission that we got,

22   Judge.  The list is on the combined list that was circulated

23   by the debtors, so I'm not sure if I'm looking on the wrong

24   document, but I'm happy to go through that.

25         So we had agreed with the debtors, once it was

1  made clear what phase one's scope would be, that we would

2  focus on those witnesses and documents, and I think the

3  exchange was done Tuesday; I believe we might have done ours

4  even sooner, to make clear the issues and witnesses that we

5  wanted for valuation and plan voting issues in phase one.

6          The counsel for the debtors was clear that we are

7  going to cross the three witnesses.  Mr. Ciardi is on, to the

8  extent that's an issue that needs to be addressed.

9          As far as the nondebtor witnesses, there are --

10  one, two, three, four, five, six -- six.  We pointed out Mr.

11  Miller will not be called.  Let me work my way back from the

12  last.

13          Mr. Rice, who I actually had a conversation with;

14  he called me from his cell phone after the meet-and-confer,

15  and he told me that he was actually on a meet-and-confer, but

16  hadn't spoken.  We pointed out to him that he, like others,

17  is being called with respect to plan solicitation and voting

18  issues.  There were a number of communications sent by

19  individuals, not committee members, to voters.  Mr. Rice has

20  a number of letters written to opioid creditors.

21          I know Mr. Rice has a busy schedule, Judge, and he

22  agreed to make himself available Wednesday.  We found out

23  from the meet-and-confer that -- and it was the first time we

24  heard that the opioid notice issues were being deferred.  And

25  so it might make sense to have Mr. Rice deferred to that

1   phase two because -- and one of the problems we're struggling

2   with, Judge, is, you know, there's an issue of claims,

3   validity of claims, which then create the right to vote.  And

4   I'll get to the issue raised by Judge Silverstein in Imerys

5   in a moment.  But that's a significant issue in this case.

6            We, the Ad Hoc Acthar Group, this morning, filed a

7   motion for appointment of an examiner, which I see Mr. Astin

8   and Mr. Ciardi on, who are very familiar with that filing,

9   and I think they would like to address that to the Court at

10  some point.  But the issues that are raised in that examiner

11  motion go to the heart of the plan solicitation and voting

12  that's coming up in phase one.

13           And so Mr. Rice is probably an easy one, in terms

14  of the opioid portion of this and what he wrote to and what

15  was done in terms of representations to voters.  To be clear,

16  Judge, there is no one creditor.  Okay?  You've got -- and

17  I'll give you a prime example:  The City of Rockford, my

18  client, has a significant Acthar claim.  Well, Mr. Rice also

19  represents the City of Rockford -- I saw that in a long list

20  of municipalities -- for opioids.

21           So the court-approved notice that went out was

22  vetted, was supposed to be fair and balanced, give folks the

23  chance to objectively decide how to vote.  But when you've

24  got others writing behind that and speaking, they're not

25  giving the same information, in fact, in some ways giving

1   misinformation through the lack of inclusion.  And when you

2   take a claimant like Rockford, they're not being told by that

3   solicitation directive, hey, if you vote this way, it may

4   benefit you in this part of the plan, but it may impact your

5   rights in this other part of the plan.

6            And obviously, the solicitation directive that

7   went out back in the spring is incomplete, in the sense that

8   we now know that there's a significant UCC settlement, which

9   was never disclosed, never described.  The allocation of

10  monies, the least of which going to Acthar to the tune of

11  seven and a half million, none of that was ever noticed,

12  vetted.  So it's a significant issue for this case, Judge.

13           But to close on Mr. Rice, I'm happy to defer that

14  to phase two.  We've got discovery that's ongoing of the UCC,

15  the members that the Court has now heard four times.  So that

16  might be the easiest issue.

17           Let me address the two committee members, Mr.

18  Bevan and Edmond George, who Your Honor has allowed discovery

19  to proceed on.  I think we had a conference on Monday and I

20  reported that we had gotten a schedule for those depositions

21  from the UCC counsel, and then they were abruptly changed and

22  canceled, literally within an hour, Judge.  We were told by

23  Mr. George's counsel that he had an emergency that took him

24  out the entire day Tuesday, so it was canceled.  And it took

25  until yesterday of getting to the point of having to threaten

1  to come to Your Honor for an order that we got a date.  And

2  now we have him scheduled for Tuesday, next week, during this

3  plan confirmation process.  It's frustrating.  So we don't

4  even have the discovery completed yet of Mr. George.

5         And we've had a meet-and-confer, as counsel

6  pointed out, we went over these issues of our witnesses.  We

7  explained in a proffer why they were being called.  Of course

8  we told them we're not going to give you a roadmap on our

9  cross-examination, they are adverse witnesses.  But we told

10 them that they're being called for plan voting, solicitation

11 issues, and the like.  And we gave even greater detail, as I

12 just gave with Mr. Rice.

13        I was able to depose Mr. Bevan yesterday at

14 length.  Mr. Dehney participated with me in that deposition,

15 it went until the end of the day.  And it -- we don't have

16 the transcript yet, Judge, but it just reaffirmed the

17 importance that Mr. Bevan appear before this Court, live on

18 cross-examination.

19        I was, frankly, shocked to get an in limine motion

20 at almost nine o'clock last night, and I apologize for

21 writing your clerk, Judge.  I was reading the Great Gatsby

22 with my fifteen-year-old, and so, as you can imagine, from

23 that book, you wax poetic as we were preparing for his exam

24 today, and I used maybe more prose than I should have.  But I

25 was shocked that we would get something like that, that was

1   clearly planned well in advance of last evening.

2            When this disclosure was made, there was a meet-

3   and-confer.  And then we take this long deposition of a

4   committee member, with committee counsel repeatedly,

5   inappropriately instructing on privilege, when the witness

6   testified under oath that his retainer as a committee member

7   was not for the purpose of practice of law.  And let me say

8   that again.  He was engaged as a proxy, not as a lawyer.

9   There is no privilege when Mr. Bevan sits in his capacity as

10  a committee proxy, and the retainer confirmed that and he

11  agreed to that.

12           But what we learned yesterday, Judge -- and it's

13  not in the motion.  So now I'm arguing a motion that we got

14  at nine o'clock last night that doesn't give this Court the

15  flavor of what has -- what was learned in Imerys -- they

16  don't even mention Imerys and Judge Silverstein striking Mr.

17  Bevan's votes.  Now that situation --

18           THE COURT:  Well, let me --

19           MR. HAVILAND:  -- was different only --

20           THE COURT:  Let me shortcut you here, Mr.

21  Haviland, because I'm not going to hear --

22           MR. HAVILAND:  All right.

23           THE COURT:  -- the motion in limine today.

24           MR. HAVILAND:  Thank you, Your Honor.

25           THE COURT:  I haven't even looked at it, so I'm

```
 1  not hearing that today.
 2            MR. HAVILAND:  Then --
 3            THE COURT:  So my only question now --
 4            MR. HAVILAND:  Then I will just --
 5            THE COURT:  My only question now is:  What are the
 6  relevance of these witnesses that you want to call to the
 7  issues that are going to be presented during phase one?
 8            MR. HAVILAND:  Okay.
 9            THE COURT:  And it's really --
10            MR. HAVILAND:  So the four --
11            THE COURT:  At this point, it's just a relevancy
12  issue.  Are they relevant to phase one --
13            MR. HAVILAND:  That --
14            THE COURT:  -- or are these phase two issues?
15            MR. HAVILAND:  They're phase one voting, Judge.
16  And obviously, the UCC settlement, the allocation, the
17  claims, they're going to be phase two.  But as I said
18  earlier, you can't bifurcate the two because you -- we are,
19  we're looking just at their votes.
20            And we learned yesterday that there was an
21  interesting vote by the committee; there was a two/two split,
22  in terms of the settlement, on whether to approve.  And I
23  won't get into the details on that, but there was a lock.
24  And then we see two things happen:
25            We see the asbestos claimants vote a master ballot
```

1    of sixteen -- 15,000, the same master ballot that Judge

2    Silverstein struck.  So that's the issue.  We're going to

3    present that to the Court, that we don't think those votes

4    are valid for the same reasons.  And it's framed in the

5    examiner motion.

6           Mr. George, who we have not had a chance to talk

7    to, I believe voted no.  So we were told that he, as a proxy

8    for DC 47, voted in favor of the allocation, but then voted

9    no against the plan.  And in the absence of that deposition

10   Tuesday, we won't know how to present that issue.  And we may

11   just agree that the deposition or a portion can be used for

12   that, and so we wouldn't have to call him live.  But we don't

13   know the answer to those questions, so it goes to voting.

14          Let me talk to the two committee counsel.  Ms.

15   Ramsey.  You don't hear anything about Ms. Ramsey's role.

16   She was prominent in Judge Silverstein's Court in her role as

17   a committee counsel in getting Mr. Bevan to change his vote.

18   He voted against the plan, and then he voted to abstain, and

19   then he voted for the plan.  And that was material to Judge

20   Silverstein's analysis of the propriety of the vote at large.

21          What we learned yesterday, though, Ms. Ramsey, in

22   this case, convened a meeting of the asbestos creditors, a

23   whole group of them, before the claims process took place,

24   and encouraged claims to be filed, which Your Honor would not

25   find pass muster under Allegheny or any stretch of Allegheny.

 1  We have heard Your Honor's ruling on class proof of claim and

 2  unsubstantiated proofs of claim.

 3          These block claims, Judge, are as skeletal as

 4  anything you can see.  It is literally -- Mr. Bevan didn't

 5  even remember that he had filed the claims.  When I showed it

 6  to him and the list of the names, he couldn't identify them,

 7  other than to say, oh, I believe they have unsubstantiated

 8  injury, which he finally confirmed means they're not injured

 9  and they never sued Mallinckrodt, but that they're part of

10  this voting block.  And we now know that committee counsel,

11  with a committee member, reached out to a group of creditors

12  to poll all that.  And there are 43,000 such votes, Judge.

13          So Mr. Bevan told us the limits of his knowledge,

14  that he has his 15,000.  But there's 28,000 votes out there,

15  and we don't have even a final vote report yet.  We'll get it

16  today.  And I suspect Prime Clerk will testify, as they did

17  in the Imerys case, we just count the votes, we don't decide

18  this one is good, bad, or indifferent.

19          And I don't want to get into next week without

20  having the ability to have a witness with knowledge.  And in

21  this case, it seems to be Ms. Ramsey who had the meeting

22  before the February claims deadline, and then convened

23  another meeting by Zoom to encourage the vote of these

24  people.  And we don't hear from Mr. Bevan that anybody ever

25  vetted the claims.  The debtors never challenged the claims,

1  as they did the Ad Hoc Acthar Group and the Acthar Insurance

2  Group.  They're happy to have 43,000 yes votes, but they're

3  infirm.

4         And we know they're infirm because there is no

5  claim.  There is no such thing as unsubstantiated injury for

6  premises liability against Mallinckrodt for a premise you

7  haven't identified.  Mr. Bevan couldn't tell me that he had

8  one client that ever worked in a Mallinckrodt facility that

9  was exposed to asbestos that has a case against Mallinckrodt.

10 And yet, he filed thousands of claims and thousands of votes

11 on that issue and committed that others had done so, too.  So

12 we just learned that yesterday, literally until five o'clock,

13 when Mr. Dehney finished his examination, and I'm sure he

14 could give you more.  But there's no doubt in my mind that

15 Ms. Ramsey is relevant.  And Judge, this isn't a privilege

16 issue.  She's talking to creditors.

17        Now let me talk to you about Ms. Hershcopf.  We

18 were told -- we were contacted by an attorney, Jeffrey Krol,

19 who I think wrote a letter to Your Honor back at the time

20 when the issue of notice came up.  And he represents some 16

21 third-party payers who paid for Acthar.  We were told that,

22 on the day of the vote, Ms. Hershcopf and a group of

23 attorneys on a Zoom reached out to him after he had voted

24 against the plan, weeks before, to encourage him to vote to

25 accept the plan.

1          Judge, that sounds a lot like what happened in

2    Imerys.  Now we don't know who was on for Robinson & Cole,

3    but that's a serious issue.  It's a serious issue of vote

4    tampering.  And I'll pause with that.  But we are concerned

5    about what the committee has been doing with or without the

6    debtors' knowledge.

7          But they want to go forward with plan voting

8    issues, well, then we have to vet those to the core because,

9    Your Honor, there are serious problems with this vote, and

10   all we're doing is seeing a tabulation.  We don't have any of

11   the backup that was produced before Judge Silverstein in

12   Imerys.  That process, Judge, which began in March, only just

13   concluded with the Court's decision in mid-October.  Think of

14   that window of time just on voting.

15         And it was begun because of the problem -- and I

16   just call it a "problem."  In our motion for examiner we call

17   it the "Bevan situation.  Because what are you going to call

18   it, right?  You've got this group of lawyers -- and it's not

19   just him -- who don't talk to their clients.  And he

20   confirmed that what he does is what he did here.  He doesn't

21   talk to his clients.  He files omnibus proofs of claim, which

22   Your Honor has found to be not sufficient.

23         And then he votes because he thinks he knows

24   what's best for his clients, even though I pointed out to him

25   that only those who have asbestos exposure and personal

1    injury are covered by the insurance policies, some $17.8

2    million.  And only 200,000 of the 18 million was put in by

3    the debtors as cash.  Well, that's for the premises liability

4    claims.  So those claimants -- and they're allowed to

5    participate, late-filed claims are allowed to participate.  I

6    don't know if late-filed claims were allowed to vote, we

7    haven't gotten that answer yet.

8                THE COURT:  All right.  Mr. Haviland --

9                MR. HAVILAND:  But think --

10               THE COURT:  -- I'm going to cut you off because I

11   got your point, I see what your --

12               MR. HAVILAND:  All right.

13               THE COURT:  -- what your issue is.

14               So let me hear from the debtors on what their view

15   is on the relevancy of these witnesses to phase one.

16               MR. HAVILAND:  Okay.  Thank you, Your Honor.

17               MS. MARKS:  And thank you, Your Honor.

18               You know, I would preface by saying that we did

19   have a meet-and-confer, it included the Ad Hoc Acthar Group

20   and the UCC, several days ago to try to understand the

21   relevancy.  And on that meet-and-confer, we did not hear all

22   of the information we just did.  We didn't really hear much

23   explanation of anything.  I know that the UCC followed up

24   several times after that with additional emails.  And so I

25   think it's helpful today to hear the relevancy, but this is

1  really the first that we're hearing of it.

2          You know, I think, at this point, these are UCC

3  witnesses.  And I see several members of the UCC on the Zoom.

4  And so, if it pleases the Court, I would turn it over to them

5  to address.

6          THE COURT:  All right.  Let me hear from the UCC,

7  keeping in mind I'm not hearing your motion in limine because

8  it -- I haven't even read it yet.

9          MR. BIRNEY:  Good morning, Your Honor.  Patrick

10 Birney, Robinson & Cole, on behalf of the UCC.

11         Your Honor, let me first start by saying that it's

12 somewhat comical that the Ad Hoc Acthar Group's counsel

13 complains about the late-filed motion to quash subpoena that

14 was filed last night, yet spends about 70 percent of his time

15 this morning arguing a designation motion that literally was

16 filed at approximately 10 a.m.  And that's what we're dealing

17 with.  There's two sides of every story.  Most of the time,

18 we have an opportunity to hear Mr. Haviland's story and no

19 one has an opportunity to actually put forth evidence, which

20 is what phase one is all about.

21         Your Honor, I'm not arguing the motion in limine.

22 But this is a pretrial conference.  At Docket Number 4649,

23 the UCC objected to the Ad Hoc Acthar Group's disclosed

24 witness list, including Attorneys Ramsey and Hershcopf.  That

25 testimony is not related to or relevant to phase one.  Phase

1   one was detailed in the pretrial order, phase one was further

2   articulated this morning by Ms. Marks.

3              Your Honor, I've read through Document 4955, 4999,

4   which are the two Prime Clerk declarations.  I didn't hear

5   anything in Mr. Haviland's commentary related to those

6   declarations, as to the relevance.

7              Your Honor, more trouble is that, notwithstanding

8   how Mr. Haviland or the ad hoc -- counsel for the Ad Hoc

9   Acthar Group sort of portrays his inquiries as a fact

10  witness, he's clearly attempting to pierce the privilege and

11  the work product doctrine.  If he has issues with phase one

12  and aspects related to phase one, he'll have more than an

13  opportunity to cross-examine the fact witness from Prime

14  Clerk.

15             Your Honor, we just view this, the designation

16  this morning, the argument on the designation this morning,

17  after he complains about the motion in limine, as just an

18  effort to divert the Court's attention from getting to a

19  confirmed plan, getting through phase one and getting to

20  phase two, Your Honor.

21             Your Honor, a couple of other things that were

22  raised by Mr. Haviland this morning.  Indeed, the UCC

23  participated in the pretrial meet-and-confer with the

24  debtors, the AHG and the UCC.  We did request, as we noted in

25  our objection, that we had concerns and wanted to get a

 1   proffer on what exactly he wanted to call Ms. Hershcopf and

 2   Ms. Ramsey for.  He didn't mention anything about what he

 3   mentioned now, although he claims constant surprise.

 4           He said he may call her or Ms. Ramsey.  He

 5   conceded that he -- that day, that he was seeking the same

 6   testimony from both.  And his proffer was limited to the fact

 7   that those witnesses had signed a letter that was sent out

 8   both the solicitation procedures and once the amended plan

 9   and settlement were advanced.  Your Honor, those letters are

10   customary.  They are standard operating procedure in this

11   case.  And we're not arguing the motion in limine.  But the

12   best evidence under 1004 is those letters.  If he has issues

13   with those letters, he can determine what those issues are

14   from reading the four corners of the letter.

15           Your Honor, again, I do not want to belabor points

16   that we will argue as it relates to our motion in limine in

17   this week.  But there is no doubt that, based on the proffers

18   that were advanced in the pretrial order and Mr. Haviland's

19   commentary this morning, that, if he has an issue with when

20   the votes count or should not be counted, that's a

21   designation issue.  That designation motion has not been --

22   is not ripe, hasn't been joined.

23           We view that has been the case, without evidence,

24   but just oral argument from Mr. Haviland that we view he's

25   mischaracterizing Judge Silverstein's decision.  What the

1  Court found there has not happened here.  Mr. Bevan is a

2  member of the committee in this case, he has filed proofs of

3  claim in this case and testified for seven hours under

4  grueling questions by Mr. Haviland.

5            Your Honor, if the -- again, this is not -- this

6  is my view.  If the Ad Hoc Acthar Group had complied with

7  this Court's pretrial order and the Local Rule 7016 regarding

8  pretrial orders, it was by the figurative skin of its teeth.

9  What is happening here, Your Honor, is another attempt for

10 derailment of this confirmation.  Instead of working

11 constructively through the confirmation case phases, it seems

12 the Ad Hoc Acthar Group is causing needless administrative

13 burn, including by requiring Ms. Hershcopf or Ramsey to

14 testify.

15           Again, Your Honor, I reserve my right to advance -

16 - the UCC reserves its rights to advance all of its arguments

17 that were lodged in our motion to quash subpoena, which the

18 subpoena was served, effectively, on Monday.  It's Friday

19 now, we served it on Thursday with a lot of moving parts

20 during the course of the week.  There's no unfair surprise

21 here.

22           And Your Honor, as we advance those arguments in

23 our motion -- preliminarily, in our motion to quash next

24 week, we are going to reiterate the fact that we simply do

25 not believe that any testimony from Ms. Hershcopf or Ms.

1   Ramsey is relevant for purposes of phase one.  We are going

2   to also argue that we truly believe that the Ad Hoc Acthar

3   Group is attempting to pierce privilege, get into mental

4   impressions, which we do not believe Third Circuit precedent

5   actually allows.

6           And finally, Your Honor, the best evidence rule.

7   If Mr. Haviland and the Ad Hoc Acthar Group has an issue with

8   the letters, it can review the letters and call us.  Thank

9   you, Your Honor.

10          THE COURT:  All right.  Well, here's what we're

11  going to do.  I'm going to reserve on deciding whether or not

12  the ad hoc group can call Ms. Hershcopf, Ms. Ramsey, Mr.

13  Bevan, and Mr. George until I review the motion in limine.

14  I'll hear that at some point later this week, hopefully.

15  I'll give Mr. Haviland an opportunity to respond to the

16  motion in limine.  Is it a motion in limine or a motion to

17  quash?  It's a motion to quash, right?  Is that what we're

18  talking about?

19          MR. BIRNEY:  Correct, Your Honor.  We framed it as

20  a motion to quash subpoena.

21          THE COURT:  All right.  I'll give Mr. Haviland an

22  opportunity to respond to that and I will consider it.  If we

23  don't get to it later this week, we'll get to it some time

24  next week for sure.

25          There's no prejudice to the Ad Hoc Acthar Group if

AA0000230

1  those witnesses aren't called in week one because, as laid

2  out in the pretrial order, there will be no oral arguments at

3  the end of phase one and I will not be making any rulings at

4  the end of phase one.  So the whole thing will be ruled upon

5  after we get through the entire confirmation hearing.

6          So let's get the briefing -- get some additional

7  briefing on the motion to quash and we'll deal with once I

8  have an opportunity to review it more carefully.

9          MR. HAVILAND:  Your Honor, may I suggest that we

10  get a response in by Tuesday.  Under the debtors' schedule, I

11  think that might be the point where they are possibly

12  wrapping up; and then, before we transition to objection

13  evidence, that might be the opportunity to fit in the in

14  limine discussion.

15          THE COURT:  All right.  If you can get it done

16  that quickly, that would be great.

17          MR. HAVILAND:  Thank you, Your Honor.

18          THE COURT:  All right.  So that takes care of --

19  so Mr. Miller is going to be a phase two witness, Mr. Rice is

20  going to be a phase two witness.  And then the other four

21  witnesses, we'll decide after I hear the motion to quash.

22          All right.  Ms. Marks, next -- I have some other

23  hands up.  Mr. Pohl, did you want to say something?

24      (No verbal response)

25          THE COURT:  If you do, you're frozen, Mr. Pohl,

1   and I can't hear you.

2          (No verbal response)

3              MS. MARKS:  Your Honor, it did look like he froze.

4   Maybe he'll log back on.

5              I was also going to raise there's another witness

6   on the Ad Hoc Acthar Group's, Mr. Krol.  So would -- and just

7   to clarify, was that addressed, he's also phase two?

8              THE COURT:  Mr. Krol?

9              MS. MARKS:  Or was Mr. Krol not discussed yet.  He

10  -- mister --

11             THE COURT:  I don't think Mr. Krol was discussed

12  at this point.  Who is Mr. Krol?

13             MS. MARKS:  Okay.  He is a -- he falls in a

14  different category.  So, Mr. Haviland, if you want to go

15  ahead with him.

16             MR. HAVILAND:  I did -- can you hear me, Judge?

17             THE COURT:  Yes.

18             MR. HAVILAND:  I did mention Mr. Krol.  I worked

19  my way of up the bottom.  Mr. Krol had written to the Court

20  back at the time of the class claims objection about not

21  receiving notice.  And then we were contacted recently that

22  he had been contacted by Ms. Hershcopf on the day of the plan

23  vote.  I think I did mention this.  And we had put into our

24  evidentiary submission an email that he received from Ms.

25  Hershcopf about his vote.  His clients all voted to reject

 1  the plan and he was encouraged to change that vote and vote

 2  in favor of the plan.  I -- there's no motion to quash as to

 3  him.  We might wait to see what happens with these committee

 4  counsel depositions.  But he's relevant to that issue, in

 5  terms of the vote.

 6          And Judge, this goes beyond what Mr. Birney

 7  described.  This isn't about the letter by the UCC; this is

 8  about the UCC reaching out to creditors who have lodged a

 9  vote.  We don't know why they do that, why they did that.

10  But the evidence shows that there was a plan solicitation,

11  that the committee made a recommendation in June to reject,

12  and the committee made a recommendation to accept, but then

13  felt the need to contact people on the day of the vote.  And

14  that raises some serious issues in our mind, and that's what

15  Mr. Krol speaks to.

16          THE COURT:  All right.  I've got a couple of hands

17  up now.  Mr. Cicero?

18          MR. CICERO:  Good morning, Your Honor.  Can you

19  hear me and see me?

20          THE COURT:  Yes, yes.

21          MR. CICERO:  I'm standing in for Mr. Pohl

22  (indiscernible)

23          THE COURT:  Well, now I'm losing you, too, Mr.

24  Cicero, you're breaking up.

25          MR. CICERO:  Can you hear me?

1            THE COURT:  Yes.  Now I can.

2            MR. CICERO:  Okay.  I'm going to -- yeah, I'm

3    going to stand as close -- sit as close to the --

4            THE COURT:  Let me give you another piece of

5    advice for everybody on the call, on the Zoom.  If you dial

6    in separately by telephone, it makes it easier for me to hear

7    you if there are issues with your computer because,

8    sometimes, if you're only using your computer microphone and

9    you have a bad internet connection, I can loose you.  You can

10   dial in to Zoom and dial in on your phone and use your phone

11   for audio and the Zoom for video, and it makes it easier

12   sometimes, so ...

13           MR. CICERO:  Thank you, Your Honor.  I will

14   implement that advice going forward.

15           My firm Brown Rudnick is co-counsel with Kramer

16   Levin to the Governmental Plaintiffs' Ad Hod Group.  And I

17   just wanted to rise to speak a little bit about the

18   (indiscernible) in a little more context (indiscernible)

19           THE COURT:  Now --

20           MR. CICERO:  I think it was very helpful.

21           THE COURT:  You're breaking up too much, Mr.

22   Cicero, I can't hear you.

23           MR. CICERO:  Okay.  That's unfortunate.  If you

24   give me one second, I'm going to try and put headphones in --

25           THE COURT:  All right.

1        MR. CICERO:  -- if you give me one second.

2      (Pause in proceedings)

3        MR. CICERO:  Can you hear me any better now, Your

4  Honor.

5        THE COURT:  Much better.  Thank you.

6        MR. CICERO:  Okay.  I apologize again for the

7  inconvenience.

8        Brown Rudnick, my firm, is co-counsel with Kramer

9  Levin and the Gilbert firm for the Ad Hoc Governmental

10  Plaintiffs' Group.  And we just wanted to provide a little

11  more context for what we understand Mr. Rice is being called

12  for.  And I think it was very helpful for Mr. Haviland to

13  agree to shift him to phase two, where it -- you know, any

14  relevant testimony that may be adduced would probably be best

15  put there.

16        But Mr. Rice and his firm are co-lead counsel of

17  the PEC and the MDL for the National Opioid Litigation that

18  is, you know, pretty much the landing ground for most of the

19  major opioid litigation against all of the -- you know, all

20  of the defendants, if they're not inside of bankruptcy.

21        And the PEC, as a sitting member, in and of itself

22  on the ad hoc committee, negotiated the restructuring support

23  agreement that you've heard a lot about early on in the case.

24  And one of the obligations in that agreement with the debtors

25  was for the PEC to recommend to vote -- recommend to the MDL

38

1   constituents to vote their opioid claims in favor of the --

2   in favor of the plan, accepting the plan, if the ultimate

3   deal that was embodied in the plan of reorganization, you

4   know, conformed with the RSA and was agreed to by the ad hoc

5   committee.

6           And you know, we got a little color on what Mr.

7   Haviland is seeking to speak with Joe Rice, who was the

8   signatory on ultimately the recommendation that went out to

9   the MDL members regarding their opioid claims.  And you know,

10  we could sit and debate, you know, the relevance of that to,

11  you know, his plan objections.  But you know, maybe that's

12  better reserved for when we're actually in phase two.  I just

13  wanted to give the Court, you know, a little more context on

14  what that issue is.  And you know, maybe we will be able to,

15  going forward with Mr. Haviland, kind of, you know, determine

16  really what the contours of what he's looking for Joe to

17  speak on.

18          As you might know, the Motley Rice firm is

19  involved elsewhere in the case.  We, as committee -- ad hoc

20  committee counsel, don't represent the Motley Rice firm in

21  connection, for example, their representation of Rhode

22  Island.  You know, they may -- they certainly represent

23  individual clients, governmental creditors in the case.  We

24  don't represent them in that capacity.  So there is -- has to

25  be more discussion done, you know, prior to actually Mr. Rice

```
 1   being called, to determine who -- whether he -- his own
 2   counsel needs to be, you know, available to, you know, help
 3   defend him, and really kind of gauging exactly what
 4   testimony, you know, Mr. Haviland deems may be relevant to
 5   this case is going to be necessary for those discussions.
 6           So that's all I rise to tell and to talk about
 7   now.
 8           THE COURT:  All right.  Well --
 9           MR. CICERO:  And if Your Honor has any questions -
10   -
11           THE COURT:  Yeah, we'll deal --
12           MR. CICERO:  -- for me (indiscernible)
13           THE COURT:  -- with all of that when we get to
14   phase two because we'll have another pretrial order when we
15   get to phase two and it will discuss those issues then.
16           MR. CICERO:  Understood.  Thank you, Your Honor.
17           THE COURT:  All right.  Ms. Marks, where were we
18   before we switched gears here.
19           THE COURT:  Oh, Mr. Krol.
20           MS. MARKS:  So --
21           THE COURT:  Mr. Krol.  Yes, did we finish mister -
22   - Mr. Haviland, were you finished with Mr. Krol?
23           MR. HAVILAND:  I was.
24           THE COURT:  Yeah --
25           MS. MARKS:  So, Your Honor, I believe next we
```

1  could move to the Russian shareholders.

2            THE COURT:  Well, I don't think we have a --

3            MS. MARKS:  And there is --

4            THE COURT:  Is Mr. Krol being called in phase one

5  or not?  That hasn't been resolved yet.

6            MR. HAVILAND:  He's on our phase one list, Your

7  Honor, yes.

8            THE COURT:  Well, I think you said, Mr. Haviland,

9  that you would wait and see how the depositions played out,

10 and then also how this motion in limine plays out.  We can

11 deal with that issue when we get to the motion in limine.

12 We'll talk about Mr. Krol then, even though he's not a part

13 of the motion.  I keep calling it a "motion in limine."  It's

14 a motion to quash.  We can talk about him --

15           MR. BIRNEY:  Your Honor --

16           THE COURT:  -- when we get to the motion to quash,

17 as well.

18           MR. HAVILAND:  I agree with that, Your Honor.

19 Thank you.

20           THE COURT:  All right.  Mr. Birney, did you want

21 to say something?

22           MR. BIRNEY:  Your Honor, I apologize for burdening

23 the Court with this, but just I needed 30 seconds to respond

24 to what Mr. Haviland said.

25           Your Honor, the -- this Court's scheduling order

1   and Local Rule 7016 require meet-and-confer, require

2   cooperation and collaboration, in terms of preparing this

3   Court for the confirmation hearing.  And what I think I heard

4   Mr. Haviland just admit was that he really didn't meet and

5   confer.  He said it was voting and the letter, but it really

6   was more than that.

7            And Your Honor, that's the -- that's been the

8   problem.  As my colleague Mr. Klein noted on the record two

9   or three weeks ago, the meet-and-confer has a valuable place

10  in Chapter 11 restructuring.  And when a party actually comes

11  to the table and meets and confers, they need to do it in

12  good faith.  And just -- I just urge good faith meet-and-

13  confers on a going forward basis, and I just apologize if

14  Your Honor -- I had a requirement to make sure the record was

15  straight on that.

16           THE COURT:  Well, yeah, absolutely, meet-and-

17  confers are important, I expect them to be done in good

18  faith.  But when parties come in and say we had a meet-and-

19  confer and we said and they said and we disagree and they

20  disagree and we tried to this and they tried to do that, I

21  have no way of knowing.  I can't make rulings on those

22  issues.  So I expect the parties to meet and confer and do so

23  in good faith.  But at the end of the day, I just got to

24  decide based on whatever the issue is, as put before me.

25           All right.  Mr. Haviland?

1          MR. HAVILAND:  Your Honor, I don't want to belabor

2   the point, but we did have a meet-and-confer.  And during the

3   course of that entire hour, I didn't hear from Mr. Birney.

4   We spoke with the debtors about these issues, and now they're

5   before the Court.  I just -- this narrative that's being

6   created here is just -- it's not productive.

7          THE COURT:  All right.  I --

8          MR. HAVILAND:  Thank you.

9          THE COURT:  I agree and I don't want to talk about

10  it any more because I have no way of knowing which side is

11  correct, so let's move on.

12         MS. MARKS:  Your Honor, before we move on, I think

13  this is an appropriate time.  I did want to make one comment,

14  generally, on witness lists.  I think it's important for all

15  parties and all objecting parties to keep in mind, as we go

16  forward on to phase two, for phase one the issues were very

17  limited.  The debtors only have four witnesses on their case-

18  in-chief.  As I mentioned, the Ad Hoc Acthar Group's witness

19  list has a dozen.

20         We did attempt to meet-and-confer.  I can support

21  Mr. Birney that, you know, we don't believe the Ad Hoc Acthar

22  Group responded in good faith.  We really did not get

23  explanations from them as to relevancy.  They did not partake

24  the drafting of the pretrial order.

25         THE COURT:  All right.

1        MS. MARKS:  We explained --

2        THE COURT:  I've already --

3        MS. MARKS:  -- in writing --

4        THE COURT:  I've already said I don't want to --

5        MS. MARKS:  Okay.

6        THE COURT:  -- hear any more about what happened -

7    -

8        MS. MARKS:  Okay.

9        THE COURT:  -- during the meet-and-confers.

10        MS. MARKS:  Okay.  All right.  So, to move on,

11   Your Honor, the next objecting party that has requested to

12   bring witnesses is the Russian Federation of Shareholders.

13   These shareholders are not represented by counsel, they are

14   pro se.  We have been in touch with them over email.  They

15   have mentioned that they will be bringing four

16   representatives from brokers who bought their shares in

17   Mallinckrodt PLC.  I don't know whether there are any

18   representatives from the Russian Federation on this hearing.

19        The debtors do object to those witnesses

20   appearing. The first time that they were disclosed to us was

21   on the 27th, which was Wednesday.  We tried to depose them

22   today.  My understanding is that several of the shareholders

23   did show up at the deposition, but that the brokers could not

24   appear.  They're requiring some sort of order from the Court.

25        You know, in short, Your Honor, it's not clear to

1    me whether these brokers will actually be appearing or not.

2    I did want to raise it for the Court.  The same group has

3    also voiced some objections to the declaration of Mr. Daloia.

4    They were unspecified, I don't know what their objections

5    are, but they have objected to Mr. Daloia.

6              And so, at this point, I would pause to see if

7    anyone from the Russian Federation is on the hearing and

8    would like to address these issues.

9              THE COURT:  All right.  Is there anyone on for the

10   Russian Federation?

11        (No verbal response)

12             THE COURT:  All right.  Having heard nothing.

13             The witnesses were identified late.  If they are

14   not willing to appear for a deposition, they certainly are

15   not -- aren't going to be allowed to testify, so those

16   witnesses are not going to be allowed to appear.

17             MR. HAVILAND:  Your Honor, I know that counsel

18   probably knows this.  There's a deposition taking place in my

19   conference room of the Russian Federation as we speak, so --

20             THE COURT:  Well, individuals.

21             MR. HAVILAND:  -- I don't know what --

22             THE COURT:  I think it was individuals, wasn't it,

23   Ms. Marks, you said?

24             MS. MARKS:  Yes.  So we had counsel appear at the

25   deposition and several shareholders appeared at the

1    deposition to say that their witnesses, who are the brokers,

2    were not available to appear.  So I'm not sure --

3              THE COURT:  And those --

4              MS. MARKS:  -- what Mr. Haviland is --

5              THE COURT:  And the broker --

6              MS. MARKS:  -- referring to.

7              THE COURT:  The witnesses who were identified were

8    officers of the broker.  So, if the officers of the brokers

9    are not willing to appear to be deposed, they're not going to

10   testify.

11             MS. MARKS:  Thank you, Your Honor.

12             Your Honor, the fourth -- or I should say the

13   third issue that will be litigated, as I've mentioned, it's

14   the funded debt litigation.  At this point, if Emil Kleinhaus

15   is on the conference, I was planning to turn it over to him

16   to address that litigation, which will occur on the 5th, if

17   that would please the Court.

18             Mr. Kleinhaus, are you ready at this time?

19             MR. KLEINHAUS:  I am here.  Good morning, Your

20   Honor.  I hope you can see and hear me.

21             THE COURT:  I can.  Thank you.

22             MR. KLEINHAUS:  So I will -- Emil Kleinhaus,

23   Wachtell, Lipton, Rosen & Katz, we're co-counsel for the

24   debtors, including on certain financing and corporate

25   matters.

1          I'm going to speak briefly about the proposed

2  approach to the so-called "make-whole" and "cram-down"

3  litigation, and then I want to flag one issue that we may

4  need help on with respect to that litigation.

5          The good news, Your Honor, on the funded debt is

6  that the debtors have agreements with the vast majority of

7  creditors in the capital structure:  Term lenders, revolving

8  lenders, unsecured noteholders, and most recently second lien

9  noteholders.  So we're down to the first lien noteholders who

10  are objecting to the plan.

11          Now the treatment of the first lien noteholders in

12  the plan is, in summary, that their debt will be reinstated

13  in full without paying a make-whole.  We, the debtors,

14  believe that's permitted under Section 1124.  The first lien

15  noteholders disagree.  That issue has been briefed

16  extensively and will be presented.

17          Now, if the Court does not agree with the debtors

18  on reinstatement, the debtors have various other objections

19  to the make-whole to be resolved and the debtors will issue

20  cram-down paper to satisfy the first lien note claim, to what

21  -- including the make-whole, to whatever extent it's allowed,

22  if at all.

23          So, in logical order, the first issue is

24  reinstatement.  That will be the only issue if the debtors

25  are correct.  The second issue is allowance of the make-whole

1   without regard to reinstatement.  And the third issue is the

2   cram-down notes and, in particular, a dispute over the

3   interest rate on those notes.

4          And for the hearing, what -- we've been working

5   cooperatively with the first lien noteholders and reached

6   agreement on a number of things.  The first thing we've

7   reached agreement on is a process for the hearing, which is a

8   little bit different than the process for the rest of phase

9   one.  So I just want to explain that and make sure the Court

10  is comfortable with it.

11         In particular, we would propose to address the

12  issues in the order I just laid them out, which is

13  essentially the logical order under the plan, with

14  reinstatement and make-whole first, and then cram-down, and

15  to have oral argument on those issues during phase one, not

16  just evidence.

17         And as it happens, most of the testimony on these

18  issues relates to the last issue in the order, which is cram-

19  down, and the interest rate.  So we would have argument on

20  reinstatement and the make-whole and then testimony from the

21  two competing experts on each side.  And while this is a

22  somewhat different approach than the rest of phase one, our

23  view -- and I -- the first lien noteholders I think agree,

24  but they're on the hearing -- is that it would be the most

25  organized and logical way to present these issues in the

1   order that they present -- that they're presented in the

2   plan.

3           We've also reached agreement on witnesses.  There

4   will be one live witness from each side, Mr. Hayes on our

5   side, Mr. Manning from the objectors.  Both of their direct

6   testimony will be by declaration with limited supplemental

7   direct testimony permitted live, which we think is

8   appropriate because the declarations include -- in

9   particular, Mr. Manning's declaration made some changes to

10  the expert reports, some updates, so we'd like to have some

11  opportunity for live testimony to supplement the declaration

12  for direct testimony.

13          There will also be some deposition testimony that

14  will be designated.  We've been working with the first lien

15  noteholders on designations for Mr. Reasons, Mr. Einwalter,

16  and Mr. Welch.  We're not expecting to have live testimony

17  from those witnesses at this time on the make-whole and cram-

18  down litigation.

19          As to exhibits, we're working to reach agreement

20  on the admission of exhibits.  If there are any issues, we'll

21  have them ready for resolution at the hearing.

22          There is one issue to flag relating to

23  confidentiality.  As Your Honor may know, the company is out

24  in the market now and has been and will be, raising exit

25  financing.  It's received indications of interest from

 1   various banks and will be negotiating over the coming weeks.

 2           As part of the cram-down case, the first lien

 3   notes have received those indications of interest in

 4   discovery and their expert has opined that those responses

 5   from banks support the objectors' position on the cram-down

 6   rate, while Mr. Hayes, the company's witness, and the debtors

 7   have responded that, to the extent these indications of

 8   interest are probative, they support the company's position

 9   on the cram-down rate.  Those arguments are set forth in the

10   first lien note objection and in the confirmation brief that

11   we filed that's focused on the first lien note issues.

12           Now the company, Your Honor, has a significant

13   concern about having a public trial regarding its ongoing

14   exit financing process.  If we have that kind of public

15   litigation, the different financing sources that are part of

16   a competitive process will see in real time what their

17   competitors have conveyed and communicated.  It would be like

18   giving bidders in an auction realtime information on what the

19   other bidders are doing.

20           Now we understand and respect the strong policy

21   and presumption in favor of public access to proceedings, and

22   the debtors would strongly prefer not to have to limit access

23   and raise those issues.  But we also have a duty to the

24   estate not to allow the confirmation hearing to affect and

25   possibly hurt the debtor in the marketplace in real time.  So

AA0000247

1   we may need to ask the Court to seal the courtroom or the

2   virtual courtroom for discrete lines of questioning.

3          What we would propose to do is to work with the

4   objectors over the next week to try to narrow this issue as

5   much as possible, so that any request for sealing would be

6   for as limited a time as possible and as limited subject

7   matter as possible.  In other proceedings, including another

8   confirmation hearing before another court in Delaware, I

9   remember trying to avoid specific references to certain

10  matters, so that it would be possible to avoid sealing.

11         I'm not sure and I'm not confident that, given the

12  nature of the expert testimony here, there won't be a need

13  for specific lines of questioning on matters that the debtors

14  are concerned would become public in a way that could be

15  detrimental from a competitive perspective.

16         So that's the issue.  I presented how we'd like to

17  deal with it.  And we'd, of course, welcome any guidance from

18  the Court as to how the Court thinks we should best deal with

19  it.  But otherwise, we'll bring it back to the Court next

20  Friday if it's a live issue.

21         THE COURT:  Well, yeah, we will have to deal with

22  that once we get to it, I think, and see what the testimony

23  is.  This is an issue that I wasn't prepared to address

24  today.  I know the difficulty of trying to avoid saying

25  things during an open hearing that might be confidential that

1   could have an adverse impact, but if there is something in

2   the expert reports, I don't know if there is -- are you

3   worried about cross examination of the experts?

4          MR. KLEINHAUS:  Yes.  Your Honor, I think in the

5   declarations we're going to deal with that with motions to

6   seal.  Of course, Your Honor will decide the motions to seal,

7   but we have a path to deal with it by those declarations

8   being sealed.  There is a written testimony record that the

9   court will have on the exact dispute that I referred to

10  regarding the ongoing financing.

11         So I think there is a path to deal with that.  Of

12  course, the court will decide whether to seal those

13  declarations or not.  What we are concerned about is cross

14  examination on this exact subject matter which will be live.

15         THE COURT:  Well, as I said, we will have to deal

16  with that once we get to it.  I know there is some way to

17  setup separate rooms within a zoom hearing that if we got to

18  a point where we needed to seal the courtroom we could

19  perhaps setup a separate zoom room.  I don't know how to do

20  that.  I will defer to the IT people for that one.  So that

21  might be a way to handle it if and when we get to that point.

22         I, at least, reviewed the papers initially on this

23  issue.  Is there testimony -- and I wasn't sure by what you

24  were saying.  Are you saying that the 1124 issue is a

25  strictly legal issue there would be no need for testimony?

AA0000249

1          MR. KLEINHAUS:  It's mostly legal.  There is some

2    limited testimony in Mr. Hayes's declaration.  So -- and Mr.

3    Hayes will be testifying that day on the cram-down issue.  So

4    he will be available for cross.  But the 1124 issue is

5    primarily legal with some limited factual testimony.

6          I think the same is true as to the debtors other

7    objections to the make-whole.  Again, primarily legal with

8    some limited testimony from Mr. Hayes and then the cram-down

9    dispute by contrast.  We have significant expert testimony on

10   both sides.

11         THE COURT:  So the experts are only for if there

12   has to be the cram-down?

13         MR. KLEINHAUS:  Not entirely, Your Honor.  Mr.

14   Hayes has some limited expert testimony on the make-whole

15   issue, but the vast majority is on cram-down.

16         THE COURT:  Alright, is there a way to separate

17   the issues so that I only hear the testimony regarding 11245

18   and the make-whole payment, and then have argument on that,

19   rule on that issue before we see if we need to go into the

20   additional testimony?

21         MR. KLEINHAUS:  The debtors would think that would

22   be fine in the sense that there are just a few paragraphs in

23   Mr. Hayes's direct testimony on the 1124 and make-whole

24   issues.  So we could present those few paragraphs and then

25   present the rest later as needed.

53

1          THE COURT:  Well let me ask the first lien lenders

2    what their position is on all of this.

3          Mr. Burke, are you speaking for them?

4          MR. BURKE:  Yes, Your Honor.  This is Donald Burke

5    from Robins Russell on behalf of the first lien notes group.

6          I think I largely agree with Mr. Kleinhaus's

7    summary of the issues and the order in which we would propose

8    to address them.  We do agree that the order that Mr.

9    Kleinhaus laid out is the, you know, logical order for the

10   court to hear these issues given the plan treatment here.

11         With respect to the confidentiality issue that Mr.

12   Kleinhaus flagged we have been in discussion with the debtors

13   on this point.  You know, I think in line with the general

14   preference for open and public court proceedings. It's our

15   preference to do as much as possible, potentially everything

16   in a public courtroom without sealing, but we are, as I said,

17   continuing to discuss with the debtors to understand their

18   position in the interest that they are asserting.  You know,

19   we are happy to work cooperatively with them to try to reduce

20   or eliminate any dispute on this issue.

21         I think it is something that is probably premature

22   to be getting into the details now, and we can, hopefully,

23   narrow or eliminate any dispute ahead of next week's hearing.

24         THE COURT:  Okay. Thank you, Mr. Burke.

25         Mr. Johnston, you wish to be heard?

AA0000251

1          MR. JOHNSTON:  Good morning, Your Honor.  Can you

2   hear me?

3          THE COURT:  Yes.

4          MR. JOHNSTON:  Jim Johnston of Jones Day on behalf

5   of a group of revolving credit facility lenders.

6          I just wanted to confirm and, I guess, clarify

7   that in connection with this day of phase one the

8   intercreditor issues that were raised by the first lien

9   noteholders also will be argued.  The first lien noteholders

10  implicated issues with respect to the distributions going to

11  the first lien revolving credit facility and term lender

12  facility, as well as the second lien noteholders in

13  conjunction with their arguments about the treatment, and

14  reinstatement and/or cram-down.

15         We will have something to say on that point and I

16  think it's probably best argued -- it implicates both

17  reinstatement as well as the cram-down.  So I'm not sure when

18  its best argued.  I think at that day and maybe at the end of

19  the reinstatement argument and then at the end of the cram-

20  down argument if you get there.  But I didn't want to be left

21  out in the cold and say that we will have something to say

22  and would like to argue it.

23         THE COURT:  Alright, Mr. Cohen, go ahead.

24         Let me hear from everybody before I speak.

25         MR. COHEN:  Your Honor, do you hear me?

1           THE COURT:  Yes.

2           MR. COHEN:  Thank you, Your Honor.  Michael Cohen,

3  Gibson Dunn & Crutcher on behalf of the ad hoc first lien

4  term loan group.

5           We too, in addition, would be, you know, speaking

6  on issues related to intercreditor matters as they relate to

7  reinstatement and logically understand that to be part of the

8  argument on the reinstatement point, but just wanted to

9  clarify that we would be involved in that.

10          In addition, I do echo and agree wholeheartedly

11 with Mr. Kleinhaus that it would be extremely prejudicial to

12 a live negotiation that the debtors are taking to have any

13 sort of market negotiated data put into the public domain.

14 So I just want to emphasize that, you know, it's a pretty

15 significant issue as well.

16          THE COURT:  Thank you.

17          Mr. Kleinhaus, you agree wiht the idea that the

18 intercreditor issues need to be addressed in both the make-

19 whole payment and the cram-down?

20          MR. KLEINHAUS:  I think that makes sense because

21 the noteholders have objected to reinstatement.  Their first

22 argument relates to the make-whole, but they have also made

23 an argument about it's a creditor matter.  So logically that

24 should be addressed as part of reinstatement.  Then if the

25 court does reach cram-down, because the court disagrees with

1   the debtors on reinstatement, in that scenario then, yes, I

2   think if a creditor matters to the extent they need to be

3   addressed there as well.

4        THE COURT:  I think the best way to do this is to

5   -- it looks like your lights went out, Mr. Kleinhaus.  Did

6   you lose power or something?

7        MR. KLEINHAUS:  No, they go off automatically.

8   Embarrassing event, sorry.

9        THE COURT:  I think it makes sense to deal with

10  the 1124 and the make-whole payment issue first and present

11  whatever evidence relates to that, whatever argument relates

12  to that, have a ruling on that issue.  So we see if we need

13  to move to what we will refer to as phase one B of this

14  particular issue.  We got a lot of phases here. Then if need

15  be we will hear the testimony on the cram-down and the

16  argument on the cram-down afterwards.

17        MR. KLEINHAUS:  Your Honor, thank you.

18        Just to clarify that, so the parties know where

19  we're hearing, we had planned to do all of this next Friday.

20  In light of Your Honor's comment I would like to just get

21  clarification so if Your Honor intends to rule on the

22  threshold issues we may need to revisit the timing of these -

23  - of aspects of this hearing.

24        I think if the court is going to rule -- I also

25  just want to be clear as to where the delineation is going to

1   be because I really view it as three issues:

2           One, reinstatement. If the debtors win on

3   reinstatement we're done under 1124 because we have an

4   argument, of course, that we can reinstate without the make-

5   whole.  So that is issue one.

6           Issue two, we have a number of other objections to

7   the make-whole, if we're wrong on reinstatement, asking the

8   court not to enforce and allow the make-whole claim for

9   purposes of whatever treatment, including cram-down.  So that

10  is the second set of issues.  Whether the make-whole should

11  be enforced if we're wrong on reinstatement and then you have

12  cram-down.

13          So I would just ask for some further guidance as

14  to whether the court wants to hear issue one, reinstatement,

15  and then be done, then do everything else later, or should we

16  go through issue two in that first phase.

17          THE COURT:  Well I think it was my original

18  question whether 1124 -- the 1124 issue is just a strictly

19  legal issue. Is there any evidence that needs to be put on

20  just for the 1124 issue?

21          MR. KLEINHAUS:  Yeah, so on the 1124 issue the

22  evidence consists of a few paragraphs in Mr. Hayes's

23  declaration including paragraphs on matters such as how the

24  make-whole is calculated and there are a couple of other

25  paragraphs there about the make-whole. So it is very limited,

1  but the answer is, yes.

2          For that second set of issues, which is our other

3  objections to the make-whole including on various *ipso facto*

4  arguments, it's the same very limited evidence.  So it's very

5  limited evidence on our 1124 case and our objections to the

6  make-whole. Then quite a lot of evidence on the cram-down.

7          THE COURT:  Alright, it makes sense to me to do

8  1124 first, hear whatever evidence there is on 1124.  I will

9  make a ruling on that hopefully that day, if not certainly by

10 Monday.  So this may have to bleed over into the following

11 week, but we will see how that goes.  But we will do 1124

12 first, then we will do the other objections to the make-

13 whole, and then the cram-down if necessary in that order.

14         MR. KLEINHAUS:  Thank you, Your Honor.  So we will

15 plan and work with the objectors to be ready just on 1124 for

16 next Friday and we will take it from there.

17         THE COURT:  Thank you.

18         Ms. Meises, you raised your hand.  Did you want to

19 say something on this?

20      (No verbal response)

21         THE COURT:  You're muted.

22      (No verbal response)

23         THE COURT:  You're still muted.

24      (No verbal response)

25         THE COURT:  I lost her.  Well we will see if she

1   comes back on and wanted to say something related to this

2   issue.

3           But in the meantime let's move onto whatever our

4   next issue, Ms. Marks.

5           MS. MARKS:  Thank you, Your Honor.

6           THE COURT:  Here she is. Let's see if she comes

7   back on.

8           MS. MEISES:  Are you able to hear me now?

9           THE COURT:  Yes.  Thank you.

10          MS. MEISES:  Good morning, Your Honor.  Michele

11  Meises from White & Case on behalf of DB as administrative

12  agent under the credit agreement.

13          I just wanted to let the court know that we

14  received an extension to file a response to the first lien

15  noteholders' objection with respect to the intercreditor

16  issues and we also want to reserve time to address that issue

17  when it comes up.

18          THE COURT:  Okay.

19          MS. MEISES:  Thank you.

20          THE COURT:  Thank you.

21          Ms. Marks, any other issues?

22          MS. MARKS:  Thank you, Your Honor.

23          Your Honor may have noticed we did not include any

24  documentary issues in the pretrial order, evidentiary

25  objections to exhibits.  We believe that those could be

1    handled next week either in advance of when the documents

2    will  be admitted or during the hearing itself.

3            The exhibit lists are relatively limited for phase

4    one.  I believe Richards Layton submitted exhibit binders to

5    the court last night.  We will work with the objecting

6    parties on any objections either party may have to one

7    another's exhibits, but we didn't think that it was necessary

8    to do those objections today.  So I just wanted to flag for

9    Your Honor that we will not be covering any exhibit

10   objections today.

11           THE COURT:  Okay.  I assume the parties are going

12   to meet and confer on those objections before you bring it to

13   me?

14           MS. MARKS:  Yes, Your Honor.

15           Your Honor, the last issue in the pretrial order

16   there are a series of disputes that we listed at the end.  I

17   think that the court has either covered most of those or

18   those will be covered in the *motions in limine.*

19           So I actually think that takes us to the end of

20   the pretrial order unless Your Honor has more questions. I

21   did want to close before we turn it over to Mr. Harris for

22   the *motions in limine* I did want to close by saying that the

23   debtors appreciate the cooperation of all of the creditors

24   and objecting parties in this case.  Moving forward to the

25   confirmation hearing and preparing is not easy when there are

1  so many parties involved.

2         This case has thousands of creditors, hundreds of

3  parties in this hearing and approximately 37 objecting

4  parties who have filed objections to the plan.  You know, we

5  appreciate that the vast majority of these objecting parties

6  are really seeking to limit the evidence and the argument

7  that they're going to put in at the plan confirmation

8  hearing.  We may see more of them wanting to be involved in

9  phase two, but we do appreciate that everyone or most

10  everyone is really trying to have an efficient and

11  streamlined process.

12         So the debtors just wanted to extend their

13  appreciation to all of the creditors and the objecting

14  parties who have been cooperating and acting in good faith.

15         THE COURT:  Thank you, Ms. Marks.

16         MS. MARKS:  With that, Your Honor, I will turn it

17  over to Mr. Harris.  He is going to address all of the

18  *motions in limine.*  I believe it may make sense to start with

19  the one that is most relevant to the witnesses that we teed

20  up earlier whether or not their testimony should come in live

21  on the stand or via declaration.

22         THE COURT:  Alright, I see Mr. Harris.

23         Mr. Ciardi, are you going to be responding for the

24  ad hoc group? Is that why your hand is up?

25         MR. CIARDI:  Your Honor, between Mr. Haviland and

1    I, we will both be responding. I have -- I didn't -- this

2    actually goes back to something Ms. Marks had said earlier,

3    not her closing, which we all appreciate, and I was not

4    objecting to that.

5              On exhibits and objections, Your Honor, some of

6    those objections are going to be really related to the

7    context in how they're presented and by what witness puts

8    them on.  So I did not want to foreclose being able to object

9    to an exhibit, or its introduction, or witness's use of that

10   because we somehow don't address all of our objections that

11   we may raise at trial because those objections may change

12   based on how they're presented or used.

13             So I didn't know what Your Honor's preference

14   would be for that just so that as we go into reviewing them

15   are we looking at really just authenticity type issues to try

16   to knock them out of the way or are we looking for every

17   trial objection that we may raise at the time of the hearing.

18   Some of this will bleed into the *motions in limine* I think,

19   but only because we didn't really address exhibits because

20   they're not in this.  I just want to know Your Honor's

21   preference so that we know what we should be addressing pre -

22   -

23             THE COURT:  No.  Pre-objections are only those

24   that are -- where the document just -- there is no way that

25   the documents should be able to come into evidence.  I will

 1  put it that way.

 2          MR. CIARDI:  So authenticity, but not hearsay.

 3          THE COURT:  I'm not going to say that if you

 4  didn't object to an exhibit prior to the person testifying

 5  about that exhibit that you can't raise a subsequent

 6  objection as well.

 7          MR. CIARDI:  Understood.  Thank you, Your Honor.

 8          THE COURT:  I will hear objections during trial.

 9          Mr. Harris.

10          MR. HARRIS:  Thank you, Your Honor.

11          Let me first just make sure you can hear me now

12  and I have a working speaker.

13          THE COURT:  Yes, I can hear you.  Thank you.

14          MR. HARRIS:  Thank you.  My apologies for earlier.

15          The ad hoc group has filed a number of *motions in

16  limine*. They are their motions and I am not sure if they are

17  still pursuing them all. So I would suggest we turn it over

18  to Mr. Ciardi and Mr. Haviland to proceed with the ones they

19  are interested in pursuing.

20          THE COURT:  Mr. Haviland.

21          MR. HAVILAND:  Thank you, Your Honor.

22          I think you covered some of the issues.

23  Obviously, the *in limine* motion we filed for a live

24  proceeding was addressed by the court that we will proceed by

25  zoom.  We noted our objection.  Hopefully we could get in

AA0000261

 1  person with Your Honor, but that does lead to the next issue

 2  which is the -- its Docket 4787, the *motion in limine* to

 3  require live testimony.  I don't know why there was some

 4  confusion about that, but live is live.  It doesn't

 5  necessarily leave live in Delaware, but we do want witnesses

 6  live by zoom.

 7          Your Honor has already given the parties a lot of

 8  direction on that. I don't read the objection to be that

 9  strong.  I think that the debtors quoted back Your Honor's

10  lines about the preference for live testimony if there is an

11  objection. I think the issue really comes to two.

12          So there's depositions and, Judge, in our motion

13  we did cite to Rule 34 -- I'm sorry, Rule 32, Federal Rules

14  (a)(4)(e).  And we did that because we were not a party to

15  all of the depositions that were taking place and, obviously,

16  under that rule it's the use by the party opponent against

17  the debtors we can use them, but -- and I know the debtors

18  have been designating various deposition testimony for their

19  use.  We're not yet clear at this point in time how much is

20  coming in on issues that concern the ad hoc Acthar group.

21          We're trying to make sure that we have the full

22  and fair opportunity to cross-examine.  So as far as the

23  depositions go I think Your Honor has asked for that citation

24  to the rule to be put in the court's order and all parties

25  abide by it.

1          I think the remaining issue, and Mr. Ciardi might

2  address this, since the witnesses he's handling are by

3  declaration.   I will just note the debtors acknowledge Your

4  Honor's observation that if a party objects then the witness

5  should come live unless it's a discreet issue that can be

6  handled by declaration.

7          Just as hearing the colloquy I pulled up Mr. Metta

8  [phonetic].   Obviously, he says who he is, what his history

9  was, the things he had done and we had no problem with that,

10 obviously, but when he gets to Paragraph 13 and he says now

11 I'm going to look at Mr. Eisenberg's expert report and I'm

12 going to tell you what I think about that I think Your Honor

13 will observe, well, that is hearsay and now you have a

14 declarant reaching out for a hearsay expert report that would

15 not come into trial.   You would have the expert live.

16          So with that I will turn it over to Mr. Ciardi

17 because I know he's focused on those particular witnesses and

18 declarations leaving with the point that we're in agreement

19 with the debtors that if it's a narrow issue that can be

20 addressed in a non-controversial way without citation to

21 hearsay we have no problem with declarations to streamline

22 factual issues, but I give you that one example that that's

23 where it gets difficult.   I think Your Honor said you spend

24 more time trying to excise the hearsay from the declaration

25 then just having the witness come and speak on it.

1            Thank you.

2            THE COURT:  Mr. Ciardi.

3            MR. CIARDI:  Yes, Your Honor.  Thank you.

4            So it really -- I mean I am just focusing on Mr.

5    Metta and Mr. Brown's proposed declarations.  They are the

6    experts.  This is a side or small piece of the case.

7    Valuation is critical.  We are not looking to -- I don't even

8    remember the last time I cross-examined an expert on their

9    qualifications especially on a case of this size.  They're

10   both highly qualified individuals.  We're not looking to do

11   that, but when you get to the meet of the opinion that should

12   be live.  The debtors need to present that witness, he needs

13   to present his opinions live so that we can examine what or

14   what not should come in on direct as opposed to by

15   declaration. Then we will cross-examine.

16           This is not -- these are not the two witnesses

17   that should be doing anything by a declaration, Your Honor.

18   These are the key witnesses in the case, at least in phase

19   one.  They should testify live.  If their declarations are

20   any gage of how long that direct will be it doesn't appear to

21   be that long, so we're not really adding too much in, but for

22   us to go back and pull out, well, this may be objectionable

23   hearsay or this may be objectionable lack of personal

24   knowledge, and do all that, and rewrite their direct, and

25   then lay out in the process of that our cross examination I

1  don't think that is appropriate.

2          I think it would be appropriate to have them

3  testify live.  It doesn't seem like it will be very long.

4  It's a trial.  There will then be cross, we move on.  That is

5  really where we are on that issue. We seem to be taking the

6  laboring war, at least, as to the cross of these two

7  witnesses.  And I think it would be appropriate for

8  everything to just be live, Your Honor.

9          THE COURT:  Well let me ask you in the interest of

10  trying to streamline things, Mr. Ciardi, are you -- I think I

11  heard you say you're not objecting to the qualifications of

12  these witnesses.

13          MR. CIARDI:  We are not, Your Honor.  And we're

14  not looking to -- if -- again, I think we could stipulate to

15  that. I mean, again, it's as to valuation and we just need to

16  agree what they're the expert of, but then we stipulate.  I

17  am not looking to have a half an hour of testimony and then

18  me not cross just to waste the court's time on their

19  qualifications.

20          THE COURT:  Alright, well to the extent you can

21  stipulate to their expertise and what the area of their

22  expertise is I would encourage you to do that and we can

23  submit the curriculum vitae of the experts without objection

24  and that takes care of the qualifications which is usually a

25  fairly good chunk of expert testimony.

1            Are there expert reports of the experts in

2   addition to their declarations?

3            MR. CIARDI:  There are, Your Honor.  Yes.

4            THE COURT:  Okay.  Is there an objection to the

5   introduction of the expert reports?

6            MR. CIARDI:  So, Your Honor, and I raise it only

7   because the expert's opinion is really what comes out on the

8   stand and what they testify too; however, experts have been

9   able to use their reports in conjunction with their

10  testimony. So while we may have issues in the reports and may

11  cross-examine them on the reports and the opinion, I only

12  raise that, Your Honor, because it is a witness gives their

13  opinion the stand as to what their issue is, but they have,

14  obviously, relied upon what is in their report and may refer

15  to it.  It's certainly not a memory test.

16           So I don't have an issue with the report.  We have

17  it.  We're going to use it in cross examination.  But I don't

18  want the allowance of that to come in, in some fashion that

19  that is the opinion, it's what the witness says ultimately

20  becomes the opinion.  So I don't know if that made sense what

21  I just said, Your Honor, but I think you understand where I'm

22  going.  I don't want the allowance of the report in to

23  somehow allow that to substitute for the witness's testimony.

24           THE COURT:  No, I understand.  So if there is no

25  objection to the introduction of the reports I would ask that

AA0000266

1  they be submitted.  In the "real world" so to speak they

2  wouldn't be considered hearsay, but it's certainly in the

3  context of a bench trial to have those expert reports so that

4  I can look at them as well while the witness is testifying

5  and while they are being cross-examined. It certainly helps

6  me.

7          So if there is no objection to the introduction of

8  the reports I would have them introduced subject to the idea

9  as you said, Mr. Ciardi, that their opinion is what they

10  testify to on the stand, not what is in the report.

11          MR. CIARDI:  Understanding, Your Honor, that we

12  may have issues with certain things that are said in the

13  report which will, obviously, come out in cross examination -

14  -

15          THE COURT:  Of course.

16          MR. CIARDI:  -- but that, I think, can be

17  addressed then.  The report is coming in, I don't think Your

18  Honor admits it until we get to the end anyway.  So just with

19  that caveat we would be okay wiht that, Your Honor.

20          THE COURT:  Alright.  So the only question then is

21  whether or not these declarations are going to come in, in

22  lieu of direct testimony.  Is that what I am hearing?

23          MR. CIARDI:  I believe that is correct, Your

24  Honor.  And given the length of them we think it would just

25  be easier and more streamlined to do everything as a direct

1  and cross in the traditional fashion especially since phase

2  one, as it relates to value, is two witnesses.

3           THE COURT:  Alright.

4           MR. CIARDI:  We're not dealing with dozens of

5  witnesses that are getting to a point, its two witnesses.

6           THE COURT:  Mr. Harris.

7           MR. HARRIS: Thank you, Your Honor.

8           So I will try and be brief here, but the *motion in*

9  *limine* itself, which calls for a blanket rule that all

10 declarations are excluded as a matter of law, I think that is

11 no longer before Your Honor. I think at the last hearing, on

12 the 19th, you made clear you were not adopting a blanket

13 rule, you would address this case by case.  That is because

14 there are many different evidentiary issues at play here.

15          So what we now have is a dispute about two

16 declarations that the debtors would like to use as their

17 affirmative testimony.  Those are of Mr. Pudent Metta

18 [phonetic] and Mr. Mark Brown.  We have provided three other

19 declarations that appears no one is objecting to their use as

20 our affirmative testimony.  That is a declaration by Mr.

21 Hayes, Brendan Hayes of Guggenheim, which will be for the

22 make-whole dispute.  Then two declarations of Mr. James

23 Daloia of Prime Clerk about voting.  I didn't hear any

24 objection to those going in as the direct testimony.

25          So just to be clear on the two declarations that

1  we do hear an objection to all we are trying to do is

2  simplify the hearing by having those serve as the direct

3  testimony. Those declarations were served on October 20th.

4  They track the expert reports that were served two months ago

5  in August.  Those witnesses were available to be deposed for

6  the last two months.  No one has sought to depose them and

7  they will all be in the courtroom and they will be cross-

8  examined.

9         Why am I pointing out these facts?  I am pointing

10  them out because that means they satisfy the requirements for

11  admissibility under Rule 807 which is the cash-all exception

12  which as Your Honor knows allows what might, otherwise, be

13  hearsay to be admitted if there are sufficient guarantees of

14  trustworthiness.  These declarations clearly satisfy that.

15  They are sworn under penalty of perjury.  The witnesses have

16  been available to be deposed on the statements in them.  You

17  know, the declarations themselves have been out there have

18  been served a week and a half ago and the expert reports that

19  they track were served two months ago.

20         All the witnesses will be available for cross

21  examination. So those are exactly the factors that the courts

22  say are guarantees of sufficient trustworthiness for 807.  So

23  the Third Circuit in Bohler-Uddeholm, 247 F.3d 79, listed

24  those exact factors as indicating when there is sufficient

25  guarantees of trustworthiness for an out of court statement

1   to be admitted.

2           The declarant was known and named, the statement

3   was made under oath and penalty of perjury, the declarant was

4   aware of the pending litigation at that time, he made the

5   declaration and, thus, knew his assertions were subject to

6   cross examination.  The statements were based on personal

7   observation.  The declarant was not employed by the plaintiff

8   at the time of this statement and had no financial interest.

9   And his position and background qualified him to make the

10  assertions.

11          There are clearly sufficient guarantees of

12  trustworthiness and for that reason many courts have allowed

13  similar out of court statements to be admitted when the

14  witness is available for cross examination.  You know, the

15  cases that the ad hoc group cites are all about the

16  importance and criticality of cross examination as the most

17  important took for trustworthiness.  We agree.  These

18  witnesses will be there.  There is really no benefit to be

19  served and certainly no dispute as to the trustworthiness of

20  these declarants by minimizing the burden on the court by

21  having the declarations come in as their direct testimony.

22          The only other thing I would add on this is that

23  this issue has come  up before in other courts and many other

24  courts have a process or a rule that for bench trials they

25  prefer that direct testimony come in through the form of

1  declarations.  That is both because it fits within 807 and

2  because in the alternative a witness could just stand up and

3  adopt the declaration live and that would be their testimony.

4  There is nothing to be gained from going through that

5  additional step.

6          Just to give Your Honor one cite on a case that

7  approved exactly these two points that I just made that this

8  kind of a declaration, as the affirmative testimony, followed

9  by cross examination sufficient under 807 or that

10  alternatively if a witness could just stand up and adopt the

11  testimony its Kuntz v. Sea Eagle Diving Adventures Corp., 199

12  F.3d 665, District of Hawaii case.

13          So we're focusing on these two declarations.  We

14  know these witnesses have sufficient credibility, their

15  credentials aren't at stake.  The declarations had been in

16  the hands of the ad hoc group for a week and a half and the

17  expert reports that they track had been in their hands for

18  two months subject to deposition and will be available for

19  cross examination.

20          THE COURT:  Well I am not -- I am going to make

21  the witnesses testify live. I have an objection to the use of

22  the declarations.  I have seen this problem come up before

23  where a declaration is sought to be introduced and then I

24  have to go through the declaration and resolve objections to

25  what is in the declaration for any number of evidentiary

74

1  reasons.  Frankly, I want to hear from the witnesses, so

2  we're going to them live; at least Mr. Metta and Mr. Brown.

3  Those are the only two.

4          Are there any other objections to introductions of

5  declarations for any other witnesses?

6          MR. HARRIS:  I think Mr. Haviland had a comment on

7  Mr. Daloia, Your Honor.

8          MR. HAVILAND:  Your Honor, Don Haviland from

9  Haviland Hughes for the ad hoc Acthar group again.

10          Mr. Daloia's declaration that we received is an

11  unsigned document that really only relates to notices that

12  were sent to Class 14 equity interest.  So I -- we have no

13  problem with the declaration as submitted. I expect that Mr.

14  Daloia is going to testify more to the substance of what was

15  done in terms of plan solicitation, voting, and things like

16  that.

17          To the extent that I'm missing something in the

18  declaration I have no problem with that one, but I expect the

19  substance is really going to come in on the stand.  So I just

20  wanted to be clear that what we see and what we receive is

21  not objectionable, but -- and, obviously, Your Honor, there

22  is a voluminous exhibit that summarized the tabulation of

23  voting and I think there is a final report due today that we

24  haven't seen.

25          So I would expect the debtors would be calling Mr.

1    Daloia live on direct.  And if I'm hearing that correctly

2    then we don't have an issue, we're not really focused on the

3    declaration per say.

4             THE COURT:  Alright, well to the extent this

5    declaration is unsigned it needs to be signed under penalty

6    of perjury or it's not going to be admitted.  Is there a

7    signed version, Mr. Harris?

8             MS. MARKS:  Your Honor, if I may.  Mr. Daloia he

9    will be filing an amended declaration today with the final

10   voting results.  So the prior declarations were preliminary,

11   they were just for preliminary voting results.  So it will be

12   signed and I would just -- I didn't quite understand Mr.

13   Haviland's position.  We are planning to proffer his direct

14   testimony for the amended declaration that will get filed

15   today and will be signed.

16            THE COURT:  Well I guess we will have to wait to

17   see the amended declaration then before I rule on this issue.

18            MR. HAVILAND:  Judge, I will talk to Ms. Marks

19   about it and maybe there's a process to allow that to come in

20   whole or in part, but I can't comment on something that we

21   haven't seen.

22            Thank you.

23            THE COURT:  Okay.  Any other *motions in limine*?

24            Mr. Haviland.

25            MR. HAVILAND:  Judge, I think there is only other

76

1   issue that pertains to phase one.  There are three other

2   motions that I will just cover later, but we had made a

3   general *motion in limine,* which is at Docket 4786, to

4   sequester witnesses.

5           This issue has come up a couple of times in these

6   proceedings about sequestration.  I think the issue we have

7   here is I don't believe that any of the debtor witnesses are

8   going to reappear in phase two.  I think that was the issue

9   that was raised by the debtors in their response.

10          As far as the voting portion of phase one we would

11  ask that -- and I know, Judge, a lot of this is going to be

12  addressed once we get to the *in limine* motion, but our

13  witnesses and -- but our concern is for fact witnesses that

14  are being asked to testify on the stand about voting they --

15  well I know for a fact that some, Mr. Bevan's, Mr. George,

16  will be called in phase two as committee members in terms of

17  the settlement and what they voted on there and all the

18  issues about the allocation.

19          We just -- Your Honor had already made the

20  admonition that witnesses shouldn't be talking to counsel and

21  shouldn't be during the stand.  And I guess -- so the issue

22  that we have right now is if we go forward with any of those

23  witnesses -- and I will exclude committee counsel, obviously

24  I am not asking that Ms. Hershcopf and Ms. Ramsey not

25  participate; although, I see they're not in the 250 some

1   people today.  So that is not the request.  It would be as to

2   Mr. Bevan, Mr. George and any fact witness who is going to

3   reappear in phase two.

4            We want to make sure that they are sequestered as

5   the testimony is coming in because as we learned yesterday in

6   the deposition of Mr. Bevan a lot of good facts come out when

7   you're cross examining somebody and they don't have prior

8   information about what others have said.  So the issue I'm

9   struggling with, Judge, is how we handle that in the

10  intervening couple of weeks from phase one to phase two,  and

11  really as to the non-lawyer, although they're both lawyers,

12  but committee members as a proxy.

13           I believe that is the only -- Mr. Kroll will not

14  be coming back, I don't believe, and I don't think there is

15  any other fact witness.

16           THE COURT:  Mr. Harris.

17           MR. HARRIS:  Thank you, Your Honor.

18           So what we heard today is a lot more limited then

19  what the *motion in limine* about sequestration raises.  It

20  sounds like the only sequestering they are asking for is for

21  Mr. Daloia.  I just wanted to make a few other things clear

22  because the motion is a lot broader than this.

23           One is that the standard rule that experts are not

24  sequestered because they need to hear the facts in lieu of a

25  legal case we mentioned.

1          Second is that if a party is a natural person that

2    person is not sequestered.  So among our witnesses is Roger

3    Frankel the future claims representative who is a party in

4    interest to the confirmation hearing and a natural person.  I

5    don't know if he has an interest in attending, but he would

6    be exempt under Rule 615(a) as well.

7          The third point, which is one that Mr. Haviland

8    conceded which is helpful, is that, of course, counsel who

9    has been identified as witnesses are not excluded and we

10   appreciate that.

11         A further point is that, of course, a party, who

12   is the corporation, can designate a representative. So if

13   there are multiple corporate entities involved each one can

14   designate a representative and that is the Forest Lab's case.

15              THE COURT:  Can we mute everybody please.

16              MR. HARRIS:  Mr. Daloia, of course, is not --

17              THE COURT:  Hold on one second, Mr. Harris.

18         (Pause)

19              THE COURT:  Mr. Harris, you are good to go.

20              Everyone else, if you are not speaking --

21              UNIDENTIFIED SPEAKER:  Judge, we can't hear you

22   now.

23              THE COURT:  They can't hear me, I'm mute too.

24         (Pause)

25              THE COURT:  Can everyone hear me now?

1          (No verbal response)

2               THE COURT:  No, they can't hear me.

3          (Audio goes off)

4               THE COURT:  Can everyone hear me now?

5               MR. HARRIS:  Yes, Your Honor.

6               THE COURT:  Okay.  We had a slight technical

7    problem there.

8               I'm sorry.  Go ahead, Mr. Harris.

9               MR. HARRIS:  Thank you, Your Honor.

10              I was just clarifying that we also have some

11   witnesses who are the representative of a particular debtor

12   such as our two independent directors.  I don't know if they

13   will want to attend any other portions besides when they

14   testify in phase two, but they would fit within 615(b) if

15   they did.

16              So then just specific to Mr. Daloia's situation,

17   and it may apply if there are any other witnesses who would

18   be called in phase one and then again in phase two.  The only

19   thing we would like to -- you know, there will be likely a

20   two week recess between these two portions and they will be

21   covering different topics.

22              What we would like to be clear on is that these

23   witnesses are not prevented from speaking --

24              THE COURT:  You froze, Mr. Harris.

25              MS. MARKS:  Your Honor, I can jump-in while he

1   unfreezes.

2             THE COURT:  I heard the point which is they want -

3   - you want to be able to talk to witnesses between phases one

4   and two.  That is -- there is a general Delaware rule that if

5   you take more than a couple of days between a witness's

6   testimony that counsel is allowed to speak to that witness

7   and particularly in this case where it is going to be

8   completely different issues between phase one and phase two.

9             So there is no prohibition to counsel talking to a

10  witness who might appear and testify in phase one who is then

11  going to appear and testify in phase two.

12            MR. HARRIS:  Thank you, Your Honor.

13            MR. BIRNEY:  Your Honor, may I be heard?

14            THE COURT:  Go ahead, Mr. Birney.

15            MR. BIRNEY:  Your Honor, Patrick Birney, Robinson

16  & Cole, on behalf of the committee.

17            As noted earlier in today's proceeding there are

18  two members, two legal counsels who have proxies for members

19  of the committee and there are two counsel on the committee

20  that are on Mr. Haviland's witness list. Obviously, the UCC

21  raises concerns in advance of objections with this order

22  would prohibit committee from conducting its business.  We

23  have weekly meetings.  We have emails that go back and forth.

24  We don't want to be prohibited from being able to conduct

25  committee business.

AA0000278

1          THE COURT:  Well certainly the committee has to

2     conduct its business.  The prohibition on speaking to

3     witnesses has to do with their testimony or potential

4     testimony, not to conducting day to day business of the

5     committee.  So there is no blanket prohibition as it relates

6     to matters outside the scope of the hearing.

7          MR. BIRNEY:  Thank you for the clarification on

8     the record for that, Your Honor.  We appreciate it.

9          THE COURT:  Counsel for the committee, obviously,

10    are not to be sequestered even if they do become witnesses,

11    they are allowed to appear. Experts are allowed to be on for

12    the entire case.  Representatives of not only counsel, but a

13    client representative is allowed to be on the call at all

14    times.

15          So at least one member of the committee should be

16    allowed to be on for all purposes at all times, but I will

17    leave that up to the parties to figure out.  If there is an

18    issue that comes up we will discuss it at that time.

19          MR. BIRNEY:  Thank you, Your Honor.

20          THE COURT:  Any other *motion in limine,* Mr.

21    Haviland?

22          MR. HAVILAND:  Your Honor, there are three, but

23    perhaps Mr. Harris and I can have one of our on the record

24    agreements as we like to do.

25          My first one is Docket 4788 which was a *motion in*

1   *limine* to limit testimony in relation to 30(b)(6) designees.

2   I don't think there are any in phase one, in fact I'm

3   confident there aren't. So I believe that is a phase two

4   issue.  We have seen the debtor's response to that. I think

5   there is probably good reason to meet and confer over that

6   issue between the two phases. So I don't think that that

7   needs to be pressed today.

8           Mr. Harris.

9           MR. HARRIS:  I'm fine meeting and conferring. I

10  think we likely will reach agreement on that.

11          THE COURT:  Alright.

12          MR. HAVILAND:  Thank you.

13          Then Docket 4785 and somewhat related is the 4780.

14  4785 is a *motion in limine* going to the merits of antitrust

15  issues.  This motion, since it was filed back on October the

16  18th, has been informed by the phasing, I know we don't like

17  to use that, but I think Ms. Marks has come around to the

18  idea that they're phases.

19          We don't know what the adversary phase, whatever

20  that is, is going to be.  This really was directed at the

21  October 25th hearing on the motion to assume and then that

22  morphed into an adversary.  So I think -- and the debtor's

23  response was they are not putting on any evidence, certainly

24  not in phase one, and between phases one and two we will have

25  to decide -- they also said debtors were not intending to

1  introduce evidence in phase two.  So that may be an agreement

2  as well and maybe Mr. Harris and I can (indiscernible) on

3  that one.

4          THE COURT:  Alright.

5          MR. HARRIS:  I agree.  I believe this motion is

6  probably no longer relevant.  It was focused on the motion to

7  assume, not really on the confirmation hearing.  We do not,

8  certainly in phase one or in phase two, intend to put on

9  evidence about the legality of the CuraScript contract which

10 is the focus of this.  So I imagine we will likely decide

11 that this motion doesn't need to be decided before phase two

12 either.  I am happy to address this with Mr. Haviland at a

13 later time as we get closer to phase two.

14         THE COURT:  Alright.

15         MR. HAVILAND:  Your Honor, the one caveat is that

16 the plan that is before the court still has incorporated into

17 it findings relating to antitrust, but, again, I will meet

18 with Mr. Harris over those issues.

19         The last one, if I may, Your Honor, is Docket

20 4780. It is our *motion in limine* to preclude the use of late

21 produced documents by the debtor's counsel, Arnold & Porter,

22 who have been directing the discovery on Acthar issues.

23         This is a very large *motion in limine,* Judge.  It

24 has a long declaration.  Its phase two.  To give you that

25 comfort we don't need to get into the issues now.  Again,

1  related to the one we just dealt with I'm not sure how much

2  at all these issues will come in phase two.  Mr. Harris and I

3  may agree.

4          Our concern, Your Honor, was we were stayed and

5  enjoined in proceeding on the merits under 362 and 105.  And

6  we have, despite accusations to the contrary, adhered to the

7  stays and injunctions, and not participated in merits based

8  discovery. I know Your Honor has suspended discovery in the

9  adversary with the exception of propounding it.

10          So we have a significant issue as to what was

11  generated in the context of this bankruptcy realizing there

12  is a separate Acthar insurance group case going on and there

13  is some overlap there.  I don't know -- I do think a meet and

14  confer with Mr. Harris would be very helpful on that because

15  I think some of this has been mooted to the extent the

16  adversary is coming in and they're not going to use phase two

17  for these issues.  But I don't think there is anything to

18  address today, Your Honor.

19          THE COURT:  Thank you.

20          MR. HARRIS:  I'm fine not having this addressed

21  today, but just to be clear there was no stay of Mr. Haviland

22  seeking discovery in the bankruptcy.  Discovery is not

23  suspended in the adversary, but I am hopeful we can reach

24  resolution on whatever objections he may have to particular

25  exhibits when he identifies the things he does not like for

1  phase two.  So I am not fine not having this decided today.

2          THE COURT:  Thank you.

3          MR. HAVILAND:  Thank you, Your Honor.  That's all

4  we have.

5          THE COURT:  Anything else for today?  I do need to

6  -- if we do have to go much further I am going to have to

7  take a recess for about an hour.

8          MR. HOPKINS:  Your Honor, Jason Hopkins, DLA

9  Piper, on behalf of sanofi-aventis US LLC.

10          We've got our pre-confirmation motion that we

11  discussed with the court earlier this week.  That is set for

12  hearing today. I don't think it will take a whole lot of

13  time, but we could certainly break now if the court is

14  prepared for that.

15          THE COURT:  Yes.  We will take a recess now then

16  because I do have a meeting I need to attend.  So we will

17  recess until, let's make it, 1:15. So I will see everybody at

18  1:15.

19      (Recess taken at 11:58 a.m.)

20      (Proceedings resumed at 1:24 p.m.)

21          THE COURT:  I apologize for the delay.  The

22  meeting I had took a little bit longer than expected.

23          We were going to go to, I think, Mr. Hopkins, who

24  is going to speak about Sanofi.

25          MR. HOPKINS:  Thank you, Your Honor.  I appreciate

1   it.

2              We've got to motions set for hearing this

3   afternoon.  One is the motion we discussed earlier this week

4   that's seeking a pre-confirmation determination as to whether

5   debtors can continue to sell Acthar Gel without paying an

6   ongoing royalty that's provided for in the asset purchase

7   agreement, pursuant to which debtors acquired the ability to

8   sell that Acthar Gel.  And I see Phil Wang on.  He joined

9   that, on behalf of the Glenridge Principals, and I suspect he

10  may want to chime in on that.

11             Separately, we have a motion for a temporary

12  allowance of claims for voting purposes, I suspect -- well, I

13  don't suspect -- the Court's determination of that first

14  motion may impact whether we need to proceed with that second

15  one.  So, if the Court is okay with it, I'd start with that

16  royalty motion.

17             THE COURT:  All right.  Let's go ahead.

18             MR. HOPKINS:  So, as I said, Your Honor, this

19  dispute is about that asset purchase agreement that contains

20  the royalty provisions in it.  This is the agreement 20 years

21  ago, pursuant to which Sanofi sold to Mallinckrodt, the

22  rights to sell this Acthar Gel.  There were sort of two

23  components of the agreement.  The first was the sale of that,

24  in exchange for a set consideration.  The second part was an

25  ongoing professional royalty; 1 percent of net sales.

1            So, the question this motion is asking the Court

2     to answer for us is whether the debtors can continue to sell

3     Acthar Gel post-confirmation and in perpetuity, without

4     paying for it, without paying that royalty.  And we're only

5     talking, here, Your Honor, about post-confirmation sales and

6     we're asking the Court to make this ruling now, because we

7     think that it will, among other things, significantly impact

8     the length and issues to be tried over the next three weeks

9     and in the various phases.

10            Now, the debtors have put forth two arguments for

11    why they think they can sell Acthar Gel without paying that

12    royalty.  The first one is they say the contract is

13    executory.  The royalty agreement is executory under Section

14    365 and they can, therefore, reject it.

15            Leaving aside the question of, how can they reject

16    the contract and then still continue to derive a benefit from

17    it -- we don't think they can -- but I think we can leave

18    that set aside, because it appears, at least to Sanofi,

19    pretty clear, that this contract is not executory.

20    Obviously, here, we're looking for material performance on

21    both sides of the contract.

22            Now, as I said, there are two components to this

23    asset purchase agreement.  One was the purchase and sale of

24    the ability to sell Acthar Gel.  That happened 20 years ago.

25    There is no dispute that as to that portion of the asset

 1   purchase agreement, there is no remaining obligation on the

 2   part of Sanofi.

 3            The second part is the royalty obligation.  As to

 4   that, Sanofi has absolutely nothing left to do.  Sanofi's

 5   only role here is to sit back and collect a check once a year

 6   after debtors tally up their net sales and pay 1 percent of

 7   that over to Sanofi.  So, on that basis, we think that this

 8   is not an executory contract because there is no ongoing

 9   material obligation of Sanofi.

10            The debtors say, okay, well, we got that, but

11   there is an indemnity provision in this agreement.  There is,

12   it's at Section 5.1; routine, straightforward indemnity for

13   things like litigation arising from acts prior to the

14   effective date of the contract.

15            When you look at an indemnity clause like that,

16   the question set up by the Weinstein case from earlier this

17   year is whether it goes to the heart of the contract; if so,

18   then perhaps there is -- perhaps there can be a finding of

19   executoriness of the contract, but if not, the contract is

20   not executory.  And we think, Your Honor, that this indemnity

21   provision, just like the one in Weinstein, is routine and

22   immaterial, especially given the fact that 20 years has

23   passed since it was executed and no claim has ever been made

24   on it and debtors have not explained to the Court or to us

25   how any claim ever could be made on it, you know, the fact

AA0000286

 1  that 20 years has gone by.

 2          The debtors cite, in support of their argument,

 3  that this is a material provision.  They cite environmental

 4  cases.  Now, obviously, if you buy a Superfund site and the

 5  seller is going to indemnify you for cleanup costs, there is

 6  a certain material nature to that ongoing indemnification for

 7  the cleanup costs, but this isn't a Superfund case; it's an

 8  asset purchase agreement that contains a royalty provision

 9  and we can't find any law, and I'd submit that the debtors

10  have not provided any to the Court that says that a routine,

11  normal indemnification provision, the kind of which is found

12  in virtually every commercial contract in the world, supports

13  a finding of executoriness under Section 365.

14          So, for those reasons, we ask the Court to find

15  that that indemnity provision does not go to the root of the

16  contract and to hold that that royalty agreement is not

17  executory.  But we need one more thing from the Court and

18  that is where the debtors have their other basis that they

19  use to try to avoid ongoing payment of that royalty, post-

20  confirmation.  They say, well, if we go sell Acthar Gel post-

21  confirmation and then at the end of the year of say, 2025, in

22  January of 2026, if you calculate 1 percent of total net

23  sales and we'll tell you what that is, they say, Your Honor,

24  that that gives rise to a dischargeable pre-petition claim.

25  2025 rulings are a dischargeable pre-petition claim.

1         But the question that's obvious here is:  When

2    does that claim arise?  When is the right to payment for the

3    royalties that are payable in 2025?  Is there a present right

4    to pay on those?

5         I don't see how.  We don't know what they are.  We

6    don't know the amount of them.  We don't even know if debtors

7    will be selling Acthar Gel in 2025.  If they don't have any

8    obligation to do that, they could decide not to and avoid the

9    royalty.

10        I think that if Sanofi had sued Mallinckrodt to

11   collect on royalties that would be payable in 2025, that

12   Mallinckrodt would have very little work to do to get that

13   work dismissed.  So, it's hard to me to understand the

14   argument that that claim, which won't arise until 2025 is

15   somehow a dischargeable pre-petition claim.

16        I think more fundamentally, maybe -- the Court has

17   already ruled on this -- last week, the Court says, antitrust

18   claims that arise, if at all, from the post-confirmation sell

19   of Acthar Gel, arise when that gel is sold, if it ever is.

20        We'd submit, Your Honor, this is the same thing

21   here.  That contract claim, that royalty claim, that arises,

22   if at all, from post-confirmation sales of Acthar Gel as

23   rises, if at all, when that Acthar Gel is sold.

24        So, for those reasons, Your Honor, we'd ask the

25   Court to, number one, tell the parties, determine for the

1  benefit of the parties that this royalty agreement is not

2  executory and to make a determination that claims arising

3  from post-confirmation sales of Acthar Gel are not

4  dischargeable, pre-petition claims that have already arisen.

5          THE COURT:  All right.  Mr. Wang did you want to

6  be heard in support, as well?

7          MR. WANG:  Yes, Your Honor.

8          Phillip Wang, on behalf of three clients here:

9  Kenneth Greathouse, Stuart Rose, and Lloyd Glenn, who we've

10 all been referring to as the "Glenridge Principals."

11         Also on the Zoom call today, Your Honor, is my co-

12 counsel, Grant Dick, from the Cooch and Taylor firm.  I

13 believe this is our first opportunity to appear in front of

14 Your Honor, so thank you for that.

15         The Glenridge Principals are the original source

16 of the vision for Acthar Gel, which I think we all understand

17 is the debtors' most successful, valuable, and profitable

18 pharmaceutical product.  These three individuals are the ones

19 who had the vision and the expertise to devise the successful

20 and complicated manufacturing and regulatory strategy to

21 acquire Acthar on behalf of the Mallinckrodt predecessor,

22 QuestCor.

23         So, really, in short, Your Honor, they originated

24 Acthar for Mallinckrodt.  They are owed royalty payments for

25 their vision and their work based on future net sales of

1  Acthar and I think it's important to note that there are no

2  pre-petition royalties due to them from the debtors.

3      I do want to address the non-executoriness the

4  Glenridge Principals' royalty agreement, because it is a

5  different agreement than Sanofi's APA.  The debtors here are

6  contending that the confidentiality provision in the royalty

7  agreement for the Glenridge Principals is what makes it an

8  executory contract, but that confidentiality provision, Your

9  Honor, by itself, is insufficient to transform the contract

10  into an executory one.

11      First, I want to note that it's the debtors'

12  burden to prove that the royalty agreement is executory.  The

13  test is just like what Mr. Hopkins had set forth.  I believe

14  he was referring to the Exide case in the Third Circuit, you

15  know, whether a breach of the allegedly remaining

16  confidentiality obligations is material as whether a breach

17  is so substantial as to defeat the purpose of the entire

18  transaction that goes to the root of the contract, and this

19  is significant, that excuses the other parties' performance.

20      Here, the royalty agreement is governed by

21  California law, but the Ninth Circuit and California law are

22  consistent in this test, that's the In re Aslan case, 909

23  F.2d 367.  And the Ninth Circuit said that departure from

24  full performance constitutes a material breach if it is so

25  dominant or pervasive as in any real or substantial measure

AA0000290

1   to frustrate the purpose of the contract.

2           So, here, this is a run-of-the-mill, boilerplate

3   confidentiality provision in the Glenridge Principals'

4   royalty agreement.  It can't be said that this breach defeats

5   the purpose of the contract, that it goes to the root of the

6   contract, or that it frustrates the purpose of the contract.

7   Certainly, a Glenridge Principals' breach cannot excuse

8   performance by the debtors, and this makes sense because the

9   debtors have already received all of the benefits under the

10  royalty agreement.

11          The fact remains that the Glenridge Principals

12  have already substantially performed.  Mallinckrodt has

13  enjoyed billions of dollars in revenue from Acthar sales over

14  the last 20 years, none of which would have been possible but

15  for the Glenridge Principals' origination of this product for

16  Mallinckrodt's predecessor.

17          The only real remaining obligation is for the

18  debtors to pay the royalties and that's it.  Confidentiality

19  is merely ancillary.

20          And as a practical matter, Your Honor, if a

21  confidentiality provision were sufficient, to change a

22  contract into an executory contract, there really would be

23  very few, if any, non-executory contracts.  The debtors point

24  to the language in the confidentiality clause which says that

25  the parties intend for the confidentiality provision to be

1  material.

2         But the decision whether a contract obligation is

3  material is not for the parties to decide; it's for the Court

4  to analyze whether they're producing is sufficiently material

5  for purposes of deciding if the contract is executory.  So,

6  it's not outcome determinative, Your Honor, that the royalty

7  agreement recites the confidentiality as a material term.

8         If you look at the royalty agreement, and I'm sure

9  Your Honor has already done that, there's nothing

10 commercially sensitive in the royalty agreement and the

11 debtors have not identified any specific term that they want

12 to keep confidential.  And the debtors, themselves, are okay

13 with discussing the terms of the royalty agreement in open

14 court today.

15        Your Honor, we join in Mr. Hopkins' argument and

16 Sanofi's argument that this charge is not appropriate.  We

17 think it is definitely appropriate to refer to Your Honor's

18 decision on the partial summary judgment motion, with regard

19 to, I think this is the Attestor and Humana, the Acthar

20 Insurance Claimants' administrative expense claims, and

21 Mr. Hopkins highlighted the point there that the claims, tort

22 claims, right, only arise when and if the debtors sell

23 Acthar, post-petition, post-confirmation, et cetera.

24        So, I want to make the extra point here that's,

25 right now, unique to the Glenridge Principals, is that the

1  pending -- there's a pending adversary proceeding that the

2  Glenridge Principals have commenced and that adversary

3  proceeding should not be affected by this motion.  In the

4  adversary proceeding, and I know the judge may not have seen

5  it, because there's nothing for the judge to do in that case

6  just yet, the Glenridge Principals raise tort claims against

7  Mallinckrodt, this would be MPIL, so Mallinckrodt Ireland,

8  and also Mallinckrodt ARD, LLC.

9         There's no breach of contract claims in the

10  adversary proceeding.  The tort claims are not quite as grand

11  as the antitrust claims brought by Attestor and Humana,

12  because the damages are much less; although, those damages

13  are still very substantial to the three individuals, who are

14  our clients.

15         But the issues addressed in this motion under the

16  Bankruptcy Code, with regard to executoriness and with regard

17  to whether they condition assume or reject, these are issues

18  that are unique to this motion.  They are separate, toward

19  issues in the adversary proceeding, so our reservation of

20  rights as to the adversary proceeding is appropriate, Your

21  Honor.

22         Based on our Rule 2004 investigation earlier in

23  the case, we obtained evidence to be able to bring these

24  claims against MPIL and ARD because we learned that ARD is

25  the only Mallinckrodt entity that is actually selling Acthar.

1  It's not MPIL, the one who purchased Acthar and signed the

2  royalty agreement with the Glenridge Principals.

3          We also learned that ARD receives all the income

4  from the sales of Acthar.  So, tracing for conversion and

5  constructive trust purposes is going to be relatively

6  straightforward in the adversary proceeding, we believe.  And

7  neither the deponent, nor debtors' counsel, could explain how

8  or why the ability to sell Acthar was somehow transferred

9  from MPIL to ARD.

10          And this is exactly a proper topic for fact

11  discovery that is needed in the adversary proceeding to

12  determine the liability of MPIL, ARD, and perhaps there's

13  other debtors and nondebtors that might be liable for the

14  royalty payments, as well, but we just don't know that yet,

15  Your Honor.  But, again, the proper proceeding for such

16  discovery is the pending adversary proceeding.

17          I wanted to raise one point about the cross-

18  motions, Your Honor, too, and then I think I'll be done.  And

19  I think Mr. Hopkins alluded to this, as well, but our view is

20  that the debtors are not entitled to any affirmative relief

21  by their cross-motion.  It was procedurally defective.  It's

22  not noticed for hearing today.  There's no briefing schedule.

23  So, in short, I think it lacks due process.

24          Now, Sanofi filed their motion on the 13th.  The

25  Glenridge Principals filed our joinder on the 21st.  And then

1  the debtors filed an objection to our joinder on the evening

2  of the 26th.  That's really not sufficient time for the

3  Glenridge Principals to file a timely response before this

4  morning's hearing, Your Honor.

5           So, we don't believe the debtors are entitled to

6  any affirmative relief under the cross-motion.  It can be

7  essentially ignored.

8           Your Honor, the debtors also raised in their

9  objection, something they quoted as the law of the case.  I

10 don't think that's applicable here.  The way I understand how

11 the law of the case works is that there's an issue in the

12 case, then it's taken up on appeal, and then it comes back.

13 And then as the Trial Court-level tribunal, we're all bound

14 by the Appellate Court's decision on that.  That's (audio

15 interference) here, but if the debtors continue to press

16 their version of law of the case, it's got to be a two-way

17 street, right.

18          So, the Court's decision to deny the debtors'

19 partial summary judgment motion that we mentioned earlier for

20 the Acthar Insurance Claimants' tort claims, that they arose

21 post-petition, should then also apply to the Glenridge

22 Principals' similar claim, because in addition to the

23 adversary proceeding, Your Honor, the Glenridge Principals

24 have also filed administrative expense claims -- they were

25 filed timely -- in this case, as well, in addition to the

 1  proofs of claim that they filed.

 2          I'll leave it at that, Your Honor, and reserve

 3  some time if you have questions or if we need to respond to

 4  the debtors' counsel.

 5          THE COURT:  Okay.  Thank you, Mr. Wang.

 6          Mr. Gott, are you speaking for the debtors?

 7          MR. GOTT:  Yes, Your Honor.

 8          Can you hear me okay?

 9          THE COURT:  Yes.

10          MR. GOTT:  Jason Gott from Latham & Watkins on

11  behalf of the debtors for the record.

12          Let me tackle the procedure point up front and

13  then I'll dive into the argument.  By our cross-motions that

14  were stated in our two separate responses to Sanofi's and

15  Glenridge's motions, all we're really asking for is that the

16  Court, instead of simply denying the two motions, the two

17  requests, simply state in the affirmative what the rationale

18  would be behind those denials that, as we believe, Sanofi's

19  argument is wrong and Glenridge's argument is wrong, and that

20  the contracts are, in fact, rejectable and rejection should

21  be approved and the claims thereunder should be considered

22  discharged.

23          So, I don't really see how anyone is prejudiced.

24  These two parties have brought these issues in front of Your

25  Honor today.  Glenridge complains about the timing of our

1   response to their motion as a reason that our motion is

2   deficient.  Of course, their motion, their joinder was only

3   filed eight days ago and it's about a different contract.

4   So, it necessarily involves different issues and so, you

5   know, if any shortcomings in the amount of time that they had

6   to deal with our response were really of their own making and

7   (audio interference) --

8           THE COURT:  You're starting to break up, Mr. Gott.

9           MR. GOTT:  Can you hear me any better now?  Maybe

10  I should speak louder.

11          THE COURT:  Yes.

12          MR. GOTT:  Okay.  I will certainly speak louder

13  and I'll dial in on the phone, if need be.

14          So, with the procedural points noted, and you

15  know, we can tackle any procedural deficiencies Your Honor

16  may have concerns about at the end depending on which way

17  you're inclined to rule.  But allow me to set the table and

18  make sure that we're all on the same page with the issues.

19          There's two overlapping things for each of these

20  creditors.  Are their respective contracts executory and are

21  their claims for royalties under those contracts

22  dischargeable, despite the debtors' intention to continue

23  selling Acthar?

24          So, under controlling law, the claims are

25  dischargeable.  There's nothing, either Sanofi or Glenridge

1   can do to stop the debtors from selling Acthar after

2   emergence and the debtors will have no obligations to pay

3   those royalties.  That's true whether the contracts are

4   executory or (audio interference).

5          So, the executoriness question is really only

6   relevant to the process of getting from here to there; in

7   other words, do the debtors have to reject the agreement to

8   discharge the claims?

9          Of course, the wise thing for any debtor to do in

10  this situation is to pursue rejection, especially with a plan

11  of reorganization that provides for the assumption of all

12  executory contracts that aren't expressly rejected.  One

13  could imagine a scenario where six months after we emerge, a

14  claimant shows up and argues that their contract was

15  executory and assumed by default, and we then have lost the

16  option of rejection.

17         But the reality is, it doesn't matter for the

18  endgame if these contracts are not executory.  What matters

19  is there's nothing unique about these claims that make them

20  any different than any other claim under the contract.  The

21  debtors owe these parties money and they will be paid under

22  the plan and these creditors are trying to elevate their

23  simple, contractual claims to something they are not.

24         I'll start first with Sanofi.  You just heard

25  their arguments.  They recognize that what they have is a

1   contractual point.  So, the first issue is, is Sanofi's APA

2   executory?

3              Now, we're all in agreement that Countryman is the

4   standard here.  The royalty payments contemplated in the APA

5   are, of course, material and ongoing.  And that means that

6   with this first question, what we really need to answer is

7   does Sanofi have a material, ongoing obligation?

8              And the answer is:  Yes.  Sanofi owes

9   indemnification for any liability that the debtors might be

10  exposed to that is actually Sanofi's retained liability under

11  the APA.  We pointed out that that could cover environmental

12  liabilities, which Sanofi states in its public filings, it

13  has material exposure to.

14             So, the description you heard a few minutes ago of

15  that indemnification clause is much narrower than it really

16  is, which is it's a broad indemnification.  The only real

17  response to that argument that we've heard from Sanofi is

18  that the indemnity must be dead, in effect, because any

19  possible liability it covers must be time-barred.

20             But there's no legal backup for that.  They didn't

21  cite any and I think it's a position that most environmental

22  regulators might find alarming, that if Sanofi was dumping

23  pollution in 2000 and it isn't discovered until 2020, that

24  Sanofi's liability might be time-barred.

25             So, the obligation is there and it is real, but

1   that leads to the question:  Is it material to the contract?

2          And once again, the answer is:  Yes.  In fact, the

3   right to indemnification is central to the bargain the

4   parties struck.  Like in many other acquisitions, it operates

5   to reallocate value between the parties if a future event

6   affecting value comes to pass.

7          So, if Sanofi were to refuse to pay the debtors

8   indemnity for a loss the debtors suffer on account of a

9   liability that's really Sanofi's, the question under

10  applicable law here is whether that would deprive the debtors

11  of what they bargained for, and of course it would.  The

12  debtors bargained to buy certain assets, assume certain

13  liabilities, and not be exposed to any other liability.  And

14  the price they agreed to pay incorporated those deals.

15         Sanofi tries to dismiss the indemnity as standard

16  in any asset purchase agreement but isn't that exactly the

17  point; it's an economic term that is important to ensuring

18  the parties get the benefit of their bargain, which is

19  exactly why it appears in most asset purchase agreements.

20  Sanofi's argument is like dismissing the purchase price terms

21  as immaterial because they're in every contract.

22         We're not talking about the governing law

23  provision or severability or lawyers' notice (indiscernible).

24  The indemnification can fundamentally alter the allocation

25  value between the buyer and the seller.

```
 1              Indeed, courts have recognized that
 2    indemnification rights can support a finding of executoriness
 3    in circumstances like these.  We think the relevance of the
 4    cases in their briefs, compared to the relevance of the cases
 5    in ourself speaks volumes.  They cite to a case with an
 6    individual movie producer indemnifying for his own contract
 7    breaches and another case where the debtor was the seller,
 8    and those are Third Circuit cases, to be sure, but they are
 9    completely different circumstances.
10              On the other hand, we cite the decision in, In re
11    Safety-Kleen Corp., 410 B.R. 164 (Bankr. D. Del. 2009), which
12    involved a debtor that was a buyer with a 15-year
13    indemnification right under the purchase agreement.
14              The debtors, here, are the buyer under this APA
15    and the indemnification is open-ended.  But Safety-Kleen is
16    the closest analog by a mile and it's on our side.  This APA
17    could be deemed executory.
18              Now, the second big question:  Are the royalty
19    claims dischargeable?
20              Sanofi seemingly concedes that if the contract is
21    executory, the claims are, strictly speaking, dischargeable
22    after rejection.  But that conclusion just opens a different
23    trapdoor in their version of the story, that the debtors
24    can't keep the benefits of the APA while rejecting the
25    burdens.
```

1          And they're right about that, as a statement of

2     the law, but what they're wrong about is when they define the

3     benefits under the APA as including the right to utilize the

4     Acthar intellectual property.

5          When a debtor rejects a contract, it loses the

6     future benefits of (audio interference), because rejection is

7     a breach that then excuses the other party from performing

8     going forward.  But rejection doesn't undo the things the

9     parties have already done under the (audio interference);

10    it's just a breach.  It isn't a rescission.  It doesn't

11    permit the counterparty to set aside everything that's been

12    done.  It's just a breach and the nondebtor can stop

13    performing from that point on.

14         And that's fine here.  We have made that

15    calculation.  Walking away from our indemnification rights,

16    an acceptable trade-off for not paying royalties into the

17    future.  But the asset-sale fees is already done and (audio

18    interference).  It was completed 20 years ago, as you heard

19    Mr. Hopkins say.  So there's no basis for suggesting that

20    owning and using the assets is a future benefit that the

21    debtors will lose after rejection.

22         Sanofi has no right to interfere with the debtors'

23    intellectual property rights or to try to sell Acthar,

24    itself, and Sanofi hasn't articulated any such situation.

25    Whatever happens in this bankruptcy process doesn't change

1    that because bankruptcy generally takes parties' property

2    rights as it finds (audio interference).  That's (audio

3    interference) bankruptcy law under (audio interference).

4              And this is also consistent with principals stated

5    by the Supreme Court recently in the <u>Mission Products</u>

6    <u>Holdings</u> case:

7              "Rejection of a contract -- any contract -- in

8    bankruptcy operates not as a rescission, but as a breach."

9              That's <u>Mission Product Holdings, Inc. v</u>

10   <u>Tempnology, LLC</u>, 139 S. Ct. 1652, 1661 (2019).

11             So, Sanofi will be excused after rejection from

12   having to honor its obligations like the indemnity, but it

13   doesn't get to unwind everything that was done before the

14   breach, especially the transfer of property rights that

15   occurred 20 years ago.

16             Now, what if Your Honor feels that the contract is

17   not executory?

18             Well, we get to the same place.  The rule is well

19   stated by the Third Circuit in the <u>Weinstein</u> decision from

20   this past May that Sanofi has cited repeatedly.  Now, Sanofi

21   wants to use this case to support its argument that a

22   reorganized debtor has to honor a non-executory contract

23   (indiscernible).  Here's what the Third Circuit directly

24   said:

25             "In the case of a non-executory contract where

 1  only the debtor has material obligations left to perform, the

 2  contract is a liability of the estate.  And if the buyer

 3  wants to buy them, the buyer is voluntarily assuming that

 4  liability.  Under the terms of the sale, the buyer must

 5  typically fulfill obligations under the contract it bought

 6  after the sale closes, just as it would with any other asset

 7  or liability."

 8          And this next part is key:

 9          "If no buyer came forward, the non-bankrupt

10  counterparty would only have an unsecured claim against the

11  debtor, on which it can typically expect to recover, merely,

12  cents on the dollar."

13          That's In re Weinstein HoldCo., LLC, 997 F.3d 497,

14  505-506, (3d Cir. 2020).  So, it's right there.  That's the

15  rule.  That's the law that governs.

16          If a contract is not executory because the

17  nondebtor has performed, the nondebtor just has a claim.

18  It's only if that claim gets voluntarily assumed that the

19  claimant would get anything other than cents on the dollar,

20  even for post-bankruptcy obligations.

21          Sanofi quotes language in its reply from the

22  Weinstein decision about the consequences for a buyer that

23  voluntarily assumes an agreement and they seem to expect that

24  the same principle should hold for a debtor that goes through

25  bankruptcy and doesn't voluntarily (audio interference).

1        Of course, going through Chapter 11 means a debtor

2   can reject agreements and can get a discharge; two benefits

3   that are not available to a buyer in a 363 sale.  So,

4   Sanofi's argument fails.

5        We also cited the Columbia Gas decision from the

6   Third Circuit that says the same thing, where a contract is

7   non-executory against the debtor, there's just, "A simple

8   claim held by the non-bankrupt (audio interference) against

9   the estate."  In re Columbia Gas System, Inc., 50 F.3d 233,

10  239 (3d Cir. 1995).

11       So, the creditor doesn't have a non-dischargeable

12  claim, doesn't have a right to take back everything that it

13  had given to the debtor; it just has a simple (audio

14  interference).

15       Now, we have for the first time in Sanofi's reply,

16  a reference to Grossman's in their attempt to argue that Your

17  Honor's summary judgment ruling in the Acthar administrative

18  claims proceedings somehow bolsters their position.  Now, I

19  want to dig in on that a little bit because, one, we didn't

20  have an opportunity to respond on Grossman's in writing and,

21  two, it really helps illustrate where their reasoning goes

22  wrong.

23       The argument is that because the debtors don't

24  have to pay the royalty unless and until we sell Acthar, the

25  claim doesn't arise under Grossman's until we sell (audio

 1   interference).  And that's simply a misapplication of

 2   Grossman's and Your Honor's ruling, both of which concern

 3   remedies and law for torts or antitrust injury, and so we're

 4   not analogous at all.

 5          Unlike what Sanofi is saying, it's been repeated

 6   over and over again by courts that obligations under a pre-

 7   petition contract are pre-petition claims.  They arise when

 8   the contract is signed.  The Third Circuit said that in

 9   Weinstein and in Columbia Gas.

10          And, really, even if you read Grossman's

11   carefully, the Third Circuit said the same there.  The Court

12   discussed the then-latest thinking from its fellow circuit

13   courts and the various approaches had taken on the question

14   of when does a claim arise?

15          And they're all really focused on the tort

16   context, to be sure, but it's still informative.  There's one

17   point where the Court looks at the Eleventh Circuit's Piper

18   test and that's a pre-petition relationship; in other words,

19   was there a pre-petition relationship between the debtor and

20   the claimant?

21          Plainly, a documented, contractual relationship

22   contemplating the payments at issue would satisfy that

23   standard.  Now, the Third Circuit in Grossman's then says

24   that the pre-petition relationship test is too narrow.

25          So, if Sanofi's claims here under a pre-petition

AA0000306

1   contract would satisfy that <u>Piper</u> test and the claims

2   satisfying the <u>Piper</u> test all fit completely inside the

3   universe of claims that are pre-petition under <u>Grossman's</u>,

4   then Sanofi's claims are pre-petition claims under

5   <u>Grossman's</u>.  They're just contingent on future events

6   occurring; in other words, selling Acthar.

7          Even more relevant is what the <u>Grossman's</u> Court

8   was rejecting in its (audio interference), which is the

9   <u>Frenville</u>.  <u>Frenville</u> is exactly the principle Sanofi is

10  arguing (audio interference).  The <u>Frenville</u>'s Court's

11  reasoning was that because applicable law wouldn't have

12  allowed the creditor there to institute its lawsuit for

13  indemnification pre-petition, its claim couldn't have arisen

14  pre-petition.

15          Sanofi is saying the same thing, when you peel

16  things back; you even heard a little bit of it in

17  Mr. Hopkins' argument.  They're saying that they don't have a

18  right to collect a payment, to sue for a payment until the

19  royalty is triggered by an Acthar sale.  That's what they

20  mean when they say a sale of Acthar gives rise to the royalty

21  (audio interference).

22          That reasoning cannot be followed hereafter

23  <u>Grossman's</u>.  But the reasoning also falls under its own

24  weight because there would be no royalty obligation if

25  weren't for the contract.  It's not just a sale of Acthar

1    that, in Sanofi's words, "gives rise to the royalty"; it was

2    the execution of the agreements in 2001, followed by the

3    realization of the contingency of Acthar being sold.

4          As a matter of fact, if you read the <u>Frenville</u>

5    decision, even the <u>Frenville</u> Court says what the debtors are

6    saying here today about contractual relationship:

7          "When parties agree in advance that one party will

8    indemnify the other party in the event of a certain

9    occurrence, there exists a right to payment; albeit,

10   contingent, upon the signing of that agreement."

11         And the Court said that that is:

12         "A classic case of a contingent right to payment

13   under the Code.  The right to payment exists as of the

14   signing of the agreement but is dependent on the occurrence

15   of a future event."

16         And that's at 744 F.2d 336.

17         Now, of course, that is a statement in *dicta*.

18   <u>Frenville</u>, of course, was overruled on other grounds, but we

19   can take from that statement, and from <u>Grossman's</u>, which said

20   <u>Frenville</u> was too narrow (audio interference) and from

21   <u>Columbia Gas</u> --

22         THE COURT:  Hold on, Mr. Gott.

23         Whoever's not speaking, mute your phone.

24         VOICE:  You will now be placed into the

25   conference.  Press star for help.

1          THE COURT:  Mr. Garfinkel, I think that's you.  I

2  see your microphone coming up.  Please mute yourself.

3          Okay.  Go ahead, Mr. Gott.

4          MR. GOTT:  Sure.  So, what we can take from the

5  statement in Frenville from Grossman's, which said Frenville

6  was too narrow, from Columbia Gas and from Weinstein and from

7  dozens of other cases around the country that we could cite,

8  is that contingent claims created by a pre-petition contract

9  arise pre-petition.

10          Now, those are all reasons under controlling law

11  that their claims are pre-petition, dischargeable claims.

12  But we can even go one step further, because Sanofi's royalty

13  claims are just like the claims in two of the highly

14  persuasive cases that we cited, to which Sanofi did not

15  respond at all in their papers.  Those are, In re Lason, 309

16  B.R. 441, and, In re APF Co., 270 B.R. 567.

17          Now, there's a wrinkle, which is that the debtors

18  had already rejected the relevant contracts under their plans

19  in those cases, but for all the reasons I just argued, that

20  doesn't change the analysis.  The claim is the claim is the

21  claim, whether it's under a non-executory contract or a

22  rejected executory contract.

23          Each of the debtors in those two cases rejected

24  pre-petition acquisition agreements, in which they owed their

25  sellers contingent (audio interference).  They were

1   contingent because they were only payable if the buyer ended

2   up hitting EBITDA targets at various checkpoints after

3   closing.

4           Now, the courts in those two cases considered

5   whether those specific payments, which were triggered by

6   events that the buyer/debtor did not achieve and could not

7   have achieved until after the petition date, whether those

8   payments were administrative claims.

9           And that's exactly the principle that Sanofi is

10  arguing for here, in saying that their claims don't arise

11  until the contingency occurs.  But the Lason and the APF

12  opinions directly refute that.  To quote Judge Walsh:

13          "It is an installment of the purchase price,

14  payment of which is conditioned on the future profitability

15  of the business.  If the buyer goes into bankruptcy, as it

16  did here, the consideration not received up front becomes

17  part of the sellers' prepetition claim for damages.  I have

18  seen any number of situations where a prepetition seller's

19  earnout entitlements are adversely impacted by the buyer's

20  bankruptcy."

21          That's 270 B.R. 572.

22          Sanofi's royalty is exactly like an amount,

23  exactly like the EBITDA milestones in these two cases; in

24  other words, to better phrase Judge Walsh, this isn't

25  particularly close.  Those royalty claims arose pre-petition

1   and they will be (audio interference).

2          I'll move to Glenridge now and then, if it's

3   necessary, we'll come back down to Sanofi's voting issues

4   that Mr. Hopkins suggested.

5          So, on to Glenridge.  You heard Mr. Wang's version

6   of the backstory.  Just briefly, to frame up our view of that

7   backstory, the Glenridge Principals purport to have come up

8   with the idea for what later became QuestCor's Acthar

9   strategy.  Then they say they raised that idea and the

10  opportunity to acquire Acthar from Sanofi to QuestCor.

11         So, QuestCor and Glenridge agreed that in

12  exchange, QuestCor would make periodic payments to Glenridge,

13  based upon how well Acthar did.  Glenridge never actually

14  acquired any rights to Acthar.  They claim they had,

15  essentially, a deal in principle with Sanofi to buy them, but

16  that isn't an accurate characterization and, in any event, it

17  isn't relevant to the issues today.

18         Instead, what matters is Glenridge never had any

19  rights in the intellectual property underlying Acthar;

20  moreover, if one supposes that Glenridge did acquire rights

21  from Sanofi in 2001, they then signed a royalty agreement in

22  QuestCor in 2002, under which Glenridge expressly assigned

23  any rights it may have had to QuestCor.

24         Now, under the 2002 royalty agreement, QuestCor

25  did, indeed, make payments for several years of more than

114

1  $30 million worth.  The parties' relationship apparently

2  devolved though and in the early teens, they were caught up

3  in cross-litigations against (audio interference).

4          So, when Mallinckrodt fired QuestCor in 2014, the

5  debtors looked to settle those litigations and in doing so,

6  they agreed to the (audio interference).  The deal is pretty

7  straightforward.  The lawsuits were settled.  The releases

8  were exchanged.  And the debtors agreed to make an up-front

9  payment of $35 million and then a quarterly payment based on

10 Acthar sales, and so the aggregate amount with quarterly

11 payments came to $170 million.

12          There are a number of other terms in that

13 agreement, including one that's important for today; an

14 agreement that the contract's terms would remain

15 confidential.  And that's where I want to bridge to the legal

16 argument, because that confidentiality provision is a really

17 clear and simple basis for the Court to find that the

18 contract is executory.

19          The Third Circuit said in the Weinstein decision

20 we discussed earlier:

21          "Where the contract makes plain that certain

22 unperformed obligations are material, we can conclude the

23 contract is executory without further analysis."

24          That's In re Weinstein Co. Holdings, LLC, 997 F.3d

25 508.

1          And you heard Mr. Wang say in the confidentiality

2   term in the Glenridge agreement, the parties agree that term

3   was a material term of disagreement and that the breach of

4   this term may cause irreparable harm.

5          That's really the end of the story, per the Third

6   Circuit, in the Weinstein case.  The contract could be deemed

7   executory.

8          And other than that question, Your Honor, meaning

9   the executoriness question, the rest of the analysis is based

10  on the same legal principles I articulated earlier.

11  Glenridge's rights to payment of the royalties comes from a

12  pre-petition contract, so it's a pre-petition claim.  It

13  doesn't arise from Acthar sales here.  The sale of Acthar is

14  just a contingency that causes the right to accrue or to

15  (indiscernible).

16         Those pre-petition claims are dischargeable,

17  whether the agreement is executory or not.  Glenridge has not

18  articulated any reason why they would be non-(audio

19  interference).

20         Finally, Glenridge has no right under the

21  agreement or otherwise to interfere with the debtors'

22  enjoyment of its property.  Glenridge never owned, and does

23  not own today, any rights whatsoever in the Acthar

24  intellectual property.

25         Whether the contract with Glenridge is rejected

1  because it's executory or even if it's not executory, the

2  debtors simply do not derive their rights from (audio

3  interference).  And the theory that you heard articulated

4  that the Glenridge agreement is a but-for predicate to those

5  rights and, therefore, Glenridge has the ability to impede

6  Acthar sales if the royalties aren't paid, it's just not

7  supported by any law and really finds no support in the

8  agreement itself, though, in our view, the Glenridge

9  agreement checks all the same boxes under the agreement.

10 It's executory and can be rejected.  But even if it isn't

11 executory, any claims deriving from it are pre-petition and

12 dischargeable, and there's nothing in the contract that would

13 give Glenridge any right to interfere with the debtors'

14 enjoyment of their property rights after approval.

15         And with that, I'm concluded on the two issues

16 that Mr. Hopkins teed up at the beginning of this session of

17 the hearing, so unless Your Honor has any questions, I'll

18 stop.

19         THE COURT:  All right.  Mr. Hopkins and then I'll

20 come to you, Mr. Wang.

21         MR. HOPKINS:  Thank you, Your Honor.  I'll be very

22 brief.

23         We both now have cited to the Exide case and that

24 Court found that the contract was not executory to that

25 contract because there had been no evidence establishing that

1  any liability was pending or threatened.  The same is true

2  here.

3          Mr. Gott accuses me of misrepresenting the scope

4  of the indemnity provision.  It's pretty straightforward,

5  Your Honor.  It says, for misrepresentation of breach of

6  warranty by the seller for covenants in the agreement:

7          "For the use, storage, or transportation of Acthar

8  Gel prior to the effective date of the contract."

9          It's a standard provision.  Pre-effective date

10 stuff is the responsibility of the seller.  Post-effective

11 date stuff is the responsibility of the buyer.  The problem

12 here, the effective date was 20 years ago.

13         Mr. Gott said, well, maybe there's some

14 environmental liability.  There's no evidence of that, but

15 more to the point, Sanofi didn't sell Mallinckrodt any real

16 property as to which environmental liability could attach.

17 Sanofi told Mallinckrodt the right to sell Acthar Gel.  There

18 is no environmental liability that could ever attach to that.

19         On the dischargeability issue, Mr. Gott says all

20 claims on non-executory, pre-petition contracts are

21 dischargeable.

22         That's not what the Code says.  The Code says,

23 pre-petition claims are dischargeable.  And that gets to the

24 question of, when does a claim arise?

25         Now, Mr. Gott says, Well, okay, antitrust claims

1    relating to the post-confirmation sale of Acthar Gel arise

2    post-confirmation, but contract claims relating to the post-

3    confirmation sale of Acthar Gel somehow arise pre-petition.

4          There's no basis for distinguishing between tort

5    and contract claims when these facts that give rise to the

6    claim are some future, potential sale of Acthar Gel.  This is

7    not a contingent claim.  It's a claim that doesn't exist yet.

8    It may never exist.  If debtors don't sell Acthar Gel, no

9    royalty will be due.  If they do sell the gel, the royalty

10   will be due.

11         That's not a contingent claim.  It is a claim --

12         THE COURT:  Well, Mr. Hopkins, let me ask you a

13   question about that, because isn't that exactly what the

14   Court in Grossman's said, that if there is -- in Grossman's,

15   the claim arose at the time the party was, the claimant was

16   exposed to the debtors' product or conduct.  Even though they

17   would have had no right to get a payment at that time,

18   because they hesitant exhibited any effects from that

19   exposure and it was only after the bankruptcy that those

20   people developed symptoms, as a result of exposure to the

21   asbestos, but the Court said that was still a pre-petition

22   claim, didn't it?

23         MR. HOPKINS:  Yes, Your Honor, it did.

24         And I don't think that's inconsistent with what

25   I'm asking the Court to do here.  Grossman's stands for the

1    proposition that if you cause damage to someone pre-petition

2    and that damage manifests itself later, that is a

3    dischargeable pre-petition claim.

4         But that's not what's happening here.  There has

5    been no harm caused that is yet to be determined.  There has

6    been no wrongful acts that will later result in harm.  This

7    is the analysis the Court went through in its October 19th

8    opinion and said, Wait a minute, if there is going to be harm

9    caused by sales of Acthar Gel in violation of antitrust laws,

10   that harm is not going to occur until post-confirmation sales

11   of Acthar Gel, and that's exactly what I think holds true

12   with this contract claim.

13        So, this is not where there was some damage that

14   was caused pre-petition, as in Grossman's and all of those

15   product liability cases, where we find out later that, here's

16   the dollar amount it needs to be.  There just isn't any harm

17   yet and there might not ever be.

18        THE COURT:  Well, that was true in Grossman's,

19   true.  There was no harm at the time the person was exposed

20   to asbestos and there might not never have been, but they

21   still had a pre-petition claim.

22        MR. HOPKINS:  That's right, Your Honor, but the

23   wrongful act, the exposing someone to asbestos, distributing

24   a negligently manufactured product, whatever it is, that had

25   already occurred.  I think that was the basis for the Third

1    Circuit's ruling is, hey, the damage has already been done.

2    The ball has been set in motion that will ultimately result

3    in recoverable damages.

4         That's not true here.  There is no wrongful act

5    and we're just waiting to see if and when damages become

6    recoverable for it.  There's not a wrongful act here yet.

7         THE COURT:  Okay.  Go ahead.

8         MR. HOPKINS:  That's all I have, Your Honor,

9    unless the Court has other questions?

10        THE COURT:  All right.  Thank you.

11        Mr. Wang?

12        MR. WANG:  Yes, Your Honor.  Just to follow-up on

13   that Grossman's point, for the Glenridge Principals, there

14   are no royalties that are due for any pre-petition period.

15   So, there is no possibility of an exposure to asbestos, like

16   what happened in Grossman's, pre-petition, in this situation.

17   And so, I think the denial of the debtors' partial summary

18   judgment motion, Your Honor's decision on that was right on

19   point.

20        You know, each time the debtors sell Acthar post-

21   petition now, right, and use the Glenridge Principals'

22   royalties for some other purpose, that's a new injury and

23   that's exactly why we have raised tort claims in our

24   adversary proceeding.

25        I think that's all I have, Your Honor.  I would

1   just be repeating myself on the confidentiality provisions,

2   as just boilerplate language.  It does not go to the root of

3   the contract.  I'll leave it there.

4           THE COURT:  Okay.  Thank you.

5           Mr. Gott, I have a question for you.  Why should

6   the debtors be able to reject these contracts and still reap

7   the benefit of these contracts by selling the product that

8   they bought from somebody else or royalties payments for the

9   development of that product?

10          MR. GOTT:  Your Honor, the answer is built into

11  your question there, which is, or at least as to Sanofi.  If

12  you recall, Glenridge has never owned any rights to the

13  intellectual property, but as to Sanofi, the rights were

14  purchased and this royalty payment was a component of the

15  purchase price.

16          So, one thing that gets a little, that's been a

17  little lost in all this, and you hear some of the principals,

18  I think, muddy it up in the briefing from Sanofi and in

19  argument, just because this payment stream is called a

20  royalty doesn't mean that there's a license or an ongoing

21  transferal of intellectual property rights by Sanofi to the

22  debtors.

23          And, usually, when you hear the term "royalty,"

24  you think of something like that, there where's a required

25  payment to be made periodically and that payment forms the

AA0000319

1   basis for continued conferral of rights.

2            Here, if you look at the APA, it's plain under the

3   conveyance provisions that Sanofi, and I'll pull up the

4   language to quote it, explained that Sanofi hereby sells --

5   apologies -- here we go.  It says:

6            "Sanofi hereby sells, assigns, conveys, transfers,

7   and delivers to Mallinckrodt, all of Sanofi's rights, title,

8   and interests in the Acthar intellectual property."

9            So, and, again, I think I said it during my

10  argument, I do not disagree with the principle that if you

11  reject a contract, you don't get the benefits of future

12  performance by the other side.  But you heard Mr. Hopkins

13  said at the outset that, at least as to the delivery of

14  intellectual property rights, Sanofi has completed performed.

15  Sanofi performed 20 years ago.  We don't need them to perform

16  tomorrow.  We don't need them to perform next year in order

17  for the debtors to own the intellectual property.  That's our

18  property rights and we don't need anything from Sanofi to be

19  able to utilize those.

20            THE COURT:  Okay.  Thank you, Mr. Gott.

21            All right.  Well, I'm going to take it under

22  advisement.  I'm not going to rule right now, but I will rule

23  before we get to Phase II, which I think this would be more

24  of a Phase II issue.  I'm not going to be ruling on any, on

25  the confirmation of the plan during Phase I or making any

1  findings at all during Phase I.

2          So, I'm going to take this under advisement and at

3  some point, between now and whenever we get to Phase II, I'll

4  give you my ruling on it.

5          I guess that brings up the question of how we deal

6  with the second motion, which is the motion to -- what was

7  it? -- oh, for temporary allowance of claims.

8          Mr. Hopkins, how does this affect that or do we

9  need to address that at this point?

10          MR. HOPKINS:  I think that we can deal with that

11  however the Court wants.  There seems to be there are two

12  approaches.  We can reset this for one of the various

13  hearings that will be scheduled over the next week or 10 days

14  or we could proceed now.

15          THE COURT:  Okay.  Why don't we -- I think it's

16  going to, like you said, Mr. Hopkins, it's going to depend on

17  how I rule on this, so let's wait on that issue until after I

18  rule on this one, rather than take the time now.

19          MR. HOPKINS:  Yes, sir.

20          THE COURT:  All right.  Okay.

21          Anything else on the agenda, Mr. Merchant?

22          MR. MERCHANT:  I'm looking at my colleagues just

23  to confirm, Your Honor, but I don't believe so, from the

24  debtors' perspective.

25          THE COURT:  All right.  Mr. Ciardi, I see you have

1   your hand raised.

2           MR. CIARDI:  Your Honor, I have two questions and

3   one goes to a process for Monday, and I only ask how the

4   Court wants us to proceed with the exhibits.  So, if we're

5   going to have 250 people on the Zoom and start with share

6   screen, I don't know if that's going to cause delays in the

7   system.  I mean, today was very choppy for a lot of the

8   people that were participating.

9           So, will the witnesses have the exhibits on their

10  own screens already because the debtor put them up on a share

11  file for everybody?  Will this be (indiscernible)?

12          Whatever the Court's preference is, I just don't

13  want to learn it Monday morning; I'd like to know it now.

14  So, if it's something I've got to be ready for, I can at

15  least get my IT people prepared.

16          THE COURT:  Mr. Harris, what's the proposal for

17  the debtors?

18          MR. HARRIS:  Your Honor, we propose that any party

19  sponsoring a witness, and most of these people are the

20  debtors' witnesses, to make sure that the witness has

21  available, you know, the zip folder with all of the exhibits.

22  I think I agree with Mr. Ciardi, it's more efficient to have

23  the witness look at the document on their own screen, as

24  opposed to trying to look at it through a shared screen.

25          THE COURT:  I agree.  I think it works better.

1  So, the witnesses should have whatever documents they're

2  going to be asking -- well, I guess they should have all of

3  them, because we don't know what cross-examination is going

4  to bring.  So, they should have access to all of the joint

5  exhibits so they can bring them up on their own.

6           And I have them, as well, and I can bring them up

7  on one of my screens, so that should work.  The same would

8  work as if they were sitting in the courtroom; they'd have

9  the document in front of them and I'd have it in front of me

10 and everybody else would have it in front of them.  So, I

11 think that works fine.

12           MR. CIARDI:  Understood, Your Honor.

13           And that would have been my preference, as well, I

14 just didn't know if, at the same time, it also needed to get

15 it up on the screen.  I assume as long as we identify it and

16 there is a common set of identifications that are, I think,

17 for all the exhibits, so the record will be clear.  It just

18 won't be on the screen.

19           And then the only other point I wanted to raise

20 with Your Honor is we did file, which I think obviously is

21 not for today or even for maybe next week, but the hearing on

22 the examiner and the designation of ballots probably should

23 be teed up before the Phase II part starts, because it would

24 be dealing with a voting issue.

25           And I'm glad to meet-and-confer with all the

1   parties on that, but I did want to get Your Honor's idea of

2   where you would want it to be.  So, before we disagree and

3   then have to come back to you, at least we have a little

4   guidance to help, I guess, guide us in our meet-and-confer.

5            THE COURT:  Well, I haven't seen the motion, so I

6   can't really comment on what I think, in terms of when it

7   should be heard.  I'll ask the parties to meet-and-confer on

8   that and then, if I have to, I'll decide when it's going to

9   be heard; otherwise, if the parties agree, then I'll hear it

10  when it's agreed to.

11           MR. CIARDI:  Understood, Your Honor.

12           And then we will -- these issues may come up, but

13  whenever Your Honor hears the issue on the motion to quash,

14  so we just wanted to, I guess, bring it up to the forefront,

15  but thank you.  We'll address it with the parties.

16           THE COURT:  All right.  Thank you.

17           MR. GOTT:  Your Honor, if I may just very briefly?

18           Can you hear me okay?

19           THE COURT:  Go ahead, Mr. Gott.

20           MR. GOTT:  Thank you.

21           I just wanted to raise as a matter of timing and

22  for Your Honor's awareness because I know there's a lot on

23  your agenda, we have another motion from Sanofi set for next

24  Thursday at 3:30 p.m., where I think these issues of the

25  interplay between the contract and the rights and the

1   arguments you just heard are going to be pretty central to

2   the arguments that you're going to hear next Thursday.  So, I

3   wanted to make sure that you're aware of that.  I think it

4   would be beneficial to have Your Honor's ruling before that

5   hearing if at all possible, but in any event, you'll hear

6   more from both sides next Thursday.

7            THE COURT:  All right.  We'll see how that goes.

8            A couple of housekeeping issues for the hearing.

9   When witnesses are testifying, I have a screen right in front

10  of me that allows me to see whoever has their camera on, on

11  the Zoom call separately.  So, when there are -- when there's

12  a witness testifying, I only want to see the witness,

13  whoever's questioning the witness and whoever's going to be

14  cross-examining or defending the witness.  I should only see

15  those people on the screen.

16           And, really, I don't need to see cross-examination

17  until you get there, but if you have an objection, you can

18  just raise it at the time.  But I'm sure there are going to

19  be main parties that are going to be cross-examining, so,

20  basically, I don't want to see more than three people on the

21  screen at one time is what I'm trying to say.  So, the

22  witness, whoever's questioning the witness, and whoever's

23  defending the witness, or whoever is going to be objecting to

24  questions on direct.

25           Mr. Ciardi?

1          MR. CIARDI:  Yes, Your Honor.

2          And I guess on objections, do you want us to, I

3    mean because there is somewhat of a lag, if we believe there

4    will be an objection at some point in time, do a hand raise

5    and then at least you know something's coming; again, I'm

6    just trying to get a feel for how you want to run the Zoom

7    trial.

8          Every one, I have been in, every judge does them

9    differently, so I just -- I don't know what your preference

10   is.

11         THE COURT:  Well, a hand raise certainly makes it

12   easier because I can see you before the question is finished

13   and I can then tell the witness to pause until I hear what

14   the objection is.  I'll assume it's an objection if a witness

15   is testifying.  And in that case, you do need to have your

16   camera on.  These are all, like, these little things that we

17   pick up as we've gone through this whole process with remote

18   hearings.

19         If your camera is not on and you raise your hand

20   and I'm looking at the screen in front of me, I can't see the

21   hand raise.  So, if you raise your hand and want to be heard,

22   raise your hand and have your camera on so I can see it on

23   the screen in front of me.

24         MR. CIARDI:  So, then, if I'm the party cross-

25   examining Mr. Mette (phonetic), for example, I would still

1    leave my screen on.  The debtors have their screen on.

2    Mr. Mette, and those should be the only three screens that

3    are live at that point, then?

4                 THE COURT:  Yes.  Yes.

5                 MR. CIARDI:  Okay.

6                 THE COURT:  Now, I understand there may be

7    multiple parties who want to ask cross-examination questions.

8    I don't know.  I guess I should ask that question:  Are there

9    plans for multiple cross-examinations of the witnesses?

10                Do we know, Mr. Harris?

11                MR. HARRIS:  Your Honor, at this point, the only

12   parties who have indicated that they will cross-examine are

13   the ad hoc group.  Other parties have reserved their rights.

14   So, as of now, it's just the ad hoc group, but (audio

15   interference).

16                THE COURT:  All right.  So, for now, it should

17   just be debtors' counsel and the Ad Hoc Acthar Group counsel,

18   the witness, and then if somebody else wants to raise an

19   objection, turn your camera on and raise your hand, then I'll

20   see you on my screen.

21                MR. CIARDI:  Your Honor, those were my only

22   issues, just so get the logistics for Monday.  That's all.

23                THE COURT:  All right.  Any other housekeeping

24   things before we -- or any other questions people have about

25   how the process is going to work?

1          MS. MARKS:  Your Honor, this is Betsy Marks from

2   the debtors.

3          Just to clarify, while everyone is on the hearing

4   together, are we starting at 10:00 a.m. on Monday and

5   9:30 a.m. Tuesday?  Do I have that right?

6          THE COURT:  Yeah, I wanted to -- I was going to

7   talk about that.  I had originally had it on my calendar

8   starting at 9:30, but because it was in the scheduling order

9   at 10:00, I kept it at ten o'clock.  I will leave it to the

10  parties.  I know we have people all over the country and all

11  over the world, in some cases, who are going to be

12  participating in this.  I know it's probably difficult for

13  people on the West Coast if we start earlier than 10:00;

14  that's seven o'clock for them.  But, I prefer, during trial,

15  to start at 9:30.  That gives me a little bit of time in the

16  morning to see if anything has come up in my emails and take

17  care of any issues that have popped up before we start.  That

18  still gives us an extra half hour for the trial.

19         So, if there's no objection to that, we'll start

20  at 10:00 on Monday and then after that, we'll start at 9:30.

21  Now, there may be days where we're starting at different

22  times, because I do have other hearings that I had to

23  schedule in between.  So, for example, and I tried to do

24  these at times when it wouldn't interfere with the trial.

25  So, Monday, I have you all day.  Tuesday, I have a chambers

1    conference at noon.  I set it for noon so that we could do it

2    during the lunch hour.  So, that shouldn't interfere with the

3    day.  On Wednesday, I have a 1:00 p.m. sale hearing, which

4    hopefully won't take more than an hour.  So, we'll still

5    start at 9:30 on Wednesday.  I'll take a late lunch break so

6    that we can have lunch and hopefully be done with the sale

7    hearing before we begin again, but I would anticipate

8    probably picking up again on Wednesday at 2:00.  On Thursday,

9    I have us starting at 1:00, because I have another sale

10   hearing in the morning, so we'll just plan on starting at

11   1:00 on Thursday, and then Friday, you have all day.  So,

12   that's the schedule for next week.

13           And then we can talk -- I have other things for

14   the week after that.  Hopefully some of those will come off,

15   so we'll hold off on talking about those until we get to

16   closer to the end of next week and then we'll figure out what

17   the schedule will be for the week after that.

18           MS. MARKS:  Thank you, Your Honor.

19           THE COURT:  Okay.  All right.

20           Any other issues that people have before we break?

21           MS. MARKS:  Not from the debtors.  Thank you, Your

22   Honor.

23           THE COURT:  All right.  Thank you, all.

24           I know this is challenging, especially as a remote

25   hearing, but we'll do the best we can.  Hopefully, we will

1  minimize difficulties with video and voice and we'll be able

2  to move this along pretty smoothly.

3          As I said, if you want to talk with IT people

4  ahead of time, you should do that to see about making sure

5  that you are set up properly so that I can hear you and I can

6  hear the witness and see the witness, particularly, the

7  witnesses, and hopefully, we'll make this go as smoothly as

8  possible.

9          Okay.  Thank you all very much.  Have a good

10 weekend.  I'll see -- well, you are all going to be very busy

11 this weekend, I think.  I'll see everybody on Monday.

12          We're adjourned.

13          COUNSEL:  Thank you, Your Honor.

14      (Proceedings concluded at 2:31 p.m.)

15

16                      CERTIFICATE

17

18    We certify that the foregoing is a correct transcript

19 from the electronic sound recording of the proceedings in the

20 above-entitled matter.

21
   /s/Mary Zajaczkowski            October 29, 2021
22 Mary Zajaczkowski, CET**D-531

23 /s/Coleen Rand                  October 29, 2021
   Coleen Rand, AAERT Cert. No. 341
24
25 /s/William J. Garling           October 29, 2021
   William J. Garling, CE/T 543

AA0000330

```
1                    UNITED STATES BANKRUPTCY COURT
                        DISTRICT OF DELAWARE
2
                                 .   Chapter 11
3    IN RE:                       .
                                 .   Case No. 20-12522 (JTD)
4    MALLINCKRODT PLC, et al.,    .
                                 .
5                                 .   Courtroom No. 5
                                 .   824 North Market Street
6                                 .   Wilmington, Delaware 19801
                                 .
7                    Debtors.    .   Thursday, November 4, 2021
8    . . . . . . . . . . . . . . . . .   1:00 P.M.

9                      TRANSCRIPT OF HEARING
                BEFORE THE HONORABLE JOHN T. DORSEY
10                UNITED STATES BANKRUPTCY JUDGE

11                  CONFIRMATION HEARING (DAY 3)

12   APPEARANCES:

13   For the Debtor:          Michael J. Merchant, Esquire
14                            RICHARDS, LAYTON & FINGER, P.A.
                              Rodney Square
15                            920 N. King Street
                              Wilmington, Delaware 19801
16
                              - and -
17
                              Christopher Harris, Esquire
18                            LATHAM & WATKINS LLP
                              1271 Avenue of the Americas
19                            New York, New York 10020

20
     Audio Operator:          Jermaine Cooper, ECRO
21
     Transcription Company:   Reliable
22                            1007 N. Orange Street
                              Wilmington, Delaware 19801
23                            (302)654-8080
                              Email:  gmatthews@reliable-co.com
24
25   Proceedings recorded by electronic sound recording, transcript
     produced by transcription service.
```

```
1   APPEARANCES (Cont'd):

2   For the Debtors:              Betsy Marks, Esquire
                                  LATHAM & WATKINS LLP
3                                 200 Clarendon Street
                                  Boston, Massachusetts 02116
4
    For Acthar Plaintiffs:        David Haviland, Esquire
5                                 William Platt, Esquire
                                  HAVILAND HUGHES
6                                 112 Haddontowne Court, Suite 202
                                  Cherry Hill, New Jersey 08034
7
8   For the Governmental          Daniel Eggermann, Esquire
    Plaintiff Ad Hoc              KRAMER LEVIN NAFTALIS & FRANKEL LLP
9   Committee:                    1177 6th Avenue
                                  New York, New York 10036
10
    For the U.S. Trustee:         Jane Leamy, Esquire
11                                UNITED STATES DEPARTMENT OF JUSTICE
                                  OFFICE OF THE UNTED STATES TRUSTEE
12                                844 King Street, Suite 2207
                                  Lockbox 35
13                                Wilmington, Delaware 19801
14
    For the Canadian              Laurence May, Esquire
15  Elevator Industry             EISEMAN LEVINE LEHRHAUPT
    Pension Trust                   & KAKOYIANNIS, P.C.
16                                805 Third Avenue, 10th Floor
                                  New York, New York 10022
17

18

19

20

21

22

23

24

25
```

CONTINUATION OF CONFIRMATION HEARING:

1. First Amended Joint Plan of Reorganization of Mallinckrodt PLC and its Debtor Affiliates under Chapter 11 of the Bankruptcy Code [Docket No. 4508; Filed 9/29/21]

    **Court's Ruling:  Matter Continued**

ADDITIONAL MATTER GOING FORWARD:

2. [Sealed] Expedited Motion for Pre-Confirmation Determination that Debtors Cannot Reject or Discharge Post-Confirmation Royalty Obligations Related to Sale of Acthar Gel [Docket No. 4675 – filed October 12, 2021]

    **Court's Ruling:  4**

DEBTORS' WITNESS(s):

**JAMES DALOIA**

    Direct Examination by Ms. Marks        17

    Cross Examination by Mr. Haviland        46

    Cross Examination by Ms. Leamy        109

    Cross Examination by Mr. Eggermann        111

    Cross Examination by Mr. May        114

    Redirect Examination by Ms. Marks        132

| EXHIBITS: | ID | Rec'd |
|---|---|---|
| Ad Hoc Group Exhibits 49 and 50 | | 15 |
| Exhibits A, B and C to Daloia Declaration | | 45 |

1          (Proceedings commence at 1:00 p.m.)

2          THE COURT:  Good afternoon.  This is Judge Dorsey.

3   We're on the record in Mallinckrodt PLC; Case No. 20-12522.

4   It is a continuation of the confirmation hearing.

5          Other than my rulings that I indicated I was going

6   to give is there anything else on the agenda other than the

7   confirmation hearing, Mr. Merchant?

8          MR. MERCHANT:  No, Your Honor.  We did -- well for

9   the record Michael Merchant of Richards, Layton & Finger on

10  behalf of the debtors.

11          Your Honor, there was a Sanofi standing motion on

12  the agenda, but the parties agreed to continue that till the

13  12th.  So it's just your ruling.  And then I understand there

14  will be one witness going forward today.  And before we get

15  to that I think Mr. Harris has a statement for the court

16  regarding the other witness that was potentially going to

17  testify today.

18          THE COURT:  What are we doing first, my ruling or

19  are we going right to the witness?

20          MR. MERCHANT:  I think we can defer to Your

21  Honor's preference on that.

22          THE COURT:  Why don't we do the ruling first and

23  get that out of the way.

24          Sanofi-aventis U.S. LLC filed a motion for

25  expedited pre-confirmation determination that the debtors

1    cannot reject or discharge post-confirmation royalty payments

2    related to Acthar, one of the debtors most profitable

3    products.  The contract at issue is an APA or asset purchase

4    agreement pursuant to which Sanofi's predecessor in interest,

5    Aventis Pharmaceuticals Products, Inc., sold all of its

6    rights, titles and interest in Acthar to debtor's predecessor

7    in interest, Questcor Pharmaceuticals, Inc., 20 years ago.

8            Under the APA the purchaser was required to make

9    two payments based upon certain events in addition to what is

10   referred to as a royalty payment based upon sales of Acthar

11   for as long as the purchaser, under the APA, sold Acthar.

12           The purchaser granted a security interest to the

13   seller only with regard to the first two payment obligations,

14   but not with regard to the royalty payments. It is important

15   to note that although the third type of payment is referred

16   to as a royalty the APA is not a licensing agreement.  It was

17   an outright sale of assets.

18           The debtors proposed plan of reorganization

19   proposes to reject the APA, relieving itself of the

20   obligation to make any further royalty payments to Sanofi

21   while continuing to sell Acthar post-confirmation.  Sanofi

22   filed a motion seeking pre-confirmation determination that

23   the debtors cannot reject because the contract is non-

24   executory of discharged post-confirmation royalty payments.

25           The debtors countered that there are still

1   material obligations on both sides under the APA and,

2   therefore, it is executory.  And even if it is non-executory

3   the debtor's breach of the agreement by non-payment of

4   royalties, as defined in the APA, are merely prepetition

5   general unsecured claims -- hold on.

6          Debtors -- let me go back just to make sure we

7   have it on the record.  Debtor counters that there are still

8   material obligations on both sides under the APA and,

9   therefore, it is executory and even if it is non-executory

10  debtors breach of the agreement by non-payment of royalties

11  as defined in the APA are merely prepetition general

12  unsecured claims subject to discharge.

13          Having reviewed the pleadings and considered the

14  parties positions of oral argument I conclude that while the

15  APA is not an executory contract subject to rejection the

16  debtors breach of the APA only results in a prepetition

17  unsecured claim for damages subject to discharge upon

18  confirmation of a plan of reorganization.

19          The Third Circuit has adopted the countryman

20  definition of what constitutes an executory contract, that is

21  where the obligations of the bankrupt and the other party are

22  so under-performed that the failure of either to complete

23  performance would constitute a material breach excusing the

24  others' performance.  That is Sharon Steel Corp., v. National

25  Fuel Distribution Corp., 872 F.2d 36 at 39, Third Circuit

1  1989.

2          In an attempt to establish the existence of

3  material under-performed obligations on the part of Sanofi

4  debtors point only to the existence of an indemnification

5  provision in the APA.  The indemnification provision provides

6  that Sanofi will indemnify the debtors for (1) seller's

7  retained liabilities; (2) misrepresentations or breach of

8  representations and warranties; (3) claims or liabilities

9  relating to the assets or product prior to the effective date

10  of the APA; use, storage or transportation of the products

11  before the effective date of the APA; and testing performed

12  by seller relating only to finished products manufactured

13  before the date of the APA.

14          As previously noted, the APA was entered into 20

15  years ago.  The debtors did not make any attempt to establish

16  that there were any even remotely possible claims that could

17  potentially arise after all that time other than vague

18  references to unspecified environmental claims.

19          I am unconvinced, therefore, that there are any

20  real material indemnification claims that would support a

21  finding that the APA is executory; see In Re Weinstein

22  Company Holdings, LLC, 997 F.3d 497 at 507, Third Circuit

23  2021 where the court found that a statute of limitations has

24  likely -- where a statute of limitations has likely run on

25  most, if not all, potential claims and an indemnification

1    provision is immaterial.

2              Having concluded that the indemnification

3    provision is not a material ongoing obligation of Sanofi ad

4    the only remaining material obligation is debtor's payment of

5    money due under the contract, the APA is a non-executory

6    contract and, therefore, cannot be rejected; In Re Roth

7    American, Inc., 107 B.R. 44 at 46, Bankruptcy Middle District

8    of Pennsylvania 1989.

9              The remaining question then is whether the

10   debtor's post-petition breach of the APA by refusing to make

11   the royalty payments constitutes a prepetition claim subject

12   to discharge.  The Third Circuit addressed this issue in In

13   Re Columbia Gas, 50 F.3d 233 at 239, Third Circuit 1995 as

14   follows:

15             "In cases where the non-bankrupt party as fully

16   performed it makes no sense to talk about assumption or

17   rejection.  At that point a liability exists for the debtor,

18   a simple claim held by the non-bankrupt against the estate,

19   and the estate has whatever benefit it can obtain from the

20   other parties performance, and the trustee's rejection would

21   neither add to nor detract from the creditor's claim or the

22   estate's liability.  Rejection is meaningless in this context

23   and assumption would be of no benefit to the estate serving

24   only to convert the non-bankrupt's claim into a first

25   priority expense of the estate to the detriment of the other

1  creditors."

2         Sanofi argues that because the royalty payments

3  under the APA arose only after the debtors sell Acthar and

4  those sales continued post-petition and will also continue

5  post-confirmation that obligation cannot be discharged in

6  bankruptcy.  Judge Walrath addressed this similar argument in

7  Waste Systems International, Inc., 280 B.R. 824, Bankruptcy

8  District of Delaware 2002.

9         In Waste Systems the creditor argued that post-

10 petition payments that came due under a prepetition

11 consulting agreement were administrative expenses because

12 they only arose when the debtor delivered waste to a specific

13 facility and those deliveries occurred post-petition.  Judge

14 Walsh rejected that argument concluding that,

15         "The obligation to make royalty payments arose

16 when the consulting agreement was executed prepetition."

17         In that case, as here, there are no post-petition

18 transactions between the debtor and Sanofi.  The only

19 transaction between those two parties, or more accurately

20 their predecessors in interest, occurred prepetition.  While

21 a right to payment under the APA may accrue post-petition,

22 any claims arising from the APA are prepetition general

23 unsecured claims.

24         As previously noted, the royalty payments are not

25 subject to a security interest and the contract at issue is

1  not a license, but rather was an outright sale of Acthar and

2  all related assets that was consummated prepetition.  Sanofi

3  did not retain any type of ownership interest in Acthar;

4  therefore, the prepetition claims are subject to discharge

5  under the debtor's proposed plan.  Therefore, Sanofi's motion

6  is denied.

7          Turning to the second motion filed by Glenridge

8  Principals motion; Glenridge Principals, which was actually a

9  joinder to Sanofi's motion.  Three individuals who identify

10 themselves as "Glenridge Principals" filed a joinder to the

11 Sanofi motion for a pre-confirmation determination that the

12 debtors cannot reject their agreement with the debtors.

13         The Glenridge Principals describe themselves as

14 the "original source of the vision for Acthar gel."  They

15 claim that they devised a successful and complicated

16 manufacturing, regulatory and pricing strategy for Acthar

17 before reaching an agreement in principal to acquire Acthar

18 from Sanofi's predecessor Aventis Pharmaceuticals.

19         One can assume from this description that the sale

20 to the Glenridge Principals had not been consummated at the

21 time the debtor's predecessor, Questcor, purchased Acthar

22 from Aventis which is the APA at issue in my previous ruling.

23         In January 2002 Glenridge entered into a separate

24 agreement with Questcor, which is identified as a royalty

25 agreement and release.  In that agreement Glenridge assigned

AA0000340

1    to Questcor "all rights, titles, claims or interest it has,

2    whether existing or not, in Acthar and the purchase

3    agreement, i.e. the APA."

4            Although not described in the royalty agreement

5    the Glenridge principals assert, in their joinder, that they

6    "then helped Questcor implement the strategy they had

7    devised."  Following disputes between Glenridge and Questcor

8    in 2011 the Glenridge Principals and debtor entered into a

9    confidential settlement agreement and release in February of

10   2015.

11           The settlement agreement provided that upon

12   payment of an initial royalty payment the original royalty

13   agreement would be terminated.  The agreement the debtors

14   seek to reject under the proposed plan, therefore, is the

15   2015 settlement agreement.  The Glenridge Principals did not

16   make any of their own arguments in their papers and simply

17   rely on the arguments made by Sanofi.

18           The debtors contend that the settlement agreement

19   is executory because it contains a confidentiality provision.

20   That provision includes, in part, the following language: The

21   parties acknowledge and agree that this confidentiality

22   provision is a material term of this agreement and that the

23   breach of this term may cause irreparable harm that shall be

24   grounds for expedited injunctive relief.

25           While the existence of a confidentiality provision

AA0000341

1   might not ordinarily considered a material term that would

2   make a contract executory the Third Circuit has recognized

3   that,

4          "Parties can contract around a default rule such

5   as the substantial performance rule, that is they can agree

6   that what to the ordinary person is immaterial is nonetheless

7   not so."

8          That is Weinstein 997 F.3d at 507.  The Weinstein

9   court went onto state that,

10          "Where the contract makes plain that certain

11   under-performed obligations are material we can conclude that

12   the contract is executory without further analysis."

13          That is at 508.  The parties to the settlement

14   agreement made that quite plain in the confidentiality

15   provision that it was a material term and, therefore, I need

16   not -- and, therefore, I can conclude the agreement is

17   executory without further analysis and the settlement

18   agreement can be rejected.

19          The Glenridge Principals' argument that if the

20   settlement agreement is rejected the debtors must stop

21   selling Acthar is without merit.  As previously noted the

22   original royalty agreement transferred all rights, title and

23   interest, if any, that the Glenridge Principals had in Acthar

24   to the debtors.  Neither the royalty agreement nor the

25   settlement agreement are licensing agreements and the

1    Glenridge Principals do not retain any security interest in

2    Acthar when it was transferred.

3            As explained in connection with the Sanofi APA any

4    damages arising out of the breach of the settlement agreement

5    are prepetition unsecured claims particularly, in this case,

6    since the rejection is considered a breach of the rejected

7    contract immediately prior to filing bankruptcy.

8            Moreover, any amounts that may have been due under

9    the settlement agreement post-petition do not meet the test

10   for administrative expense.  In Re O'Brien Environmental

11   Engineering, Inc., 181 F.3d 527 at 532 through 533, Third

12   Circuit 1999 set out the test (1) there must be a post-

13   petition transaction between the creditor and the debtor; (2)

14   the estate must receive a benefit from the transaction.  The

15   Glenridge Principals fail to meet either of those

16   requirements.

17           First, the only transaction between the debtors

18   and Glenridge occurred prepetition when the parties executed

19   the settlement agreement.

20           Second, there is no benefit to the estate because

21   the Glenridge Principals had already transferred all of their

22   rights, title and interest to the debtors prepetition;

23   therefore, the Glenridge Principals' motion is also denied.

24           The parties should concur and submit a proposed

25   form of order on both of those motions.

1              Any questions?

2        (No verbal response)

3              THE COURT:  Let's move on then.

4              MR. MERCHANT:  Your Honor, I will cede the podium

5   to Mr. Harris.

6              THE COURT:  Mr.  Harris.

7              MR. HARRIS:  Thank you, Your Honor.  Chris Harris

8   of Latham & Watkins for the debtors.

9              This will be brief.  You may recall a discussion

10  on Tuesday about the ad hoc group potentially calling Mr.

11  Kroll as a witness.  The debtors and the ad hoc group have

12  agreed that in lieu of Mr. Kroll's testimony the debtors will

13  agree to the admissibility of two exhibits; its ad hoc group

14  Exhibits 49 and 50.  And also we will stipulate that the

15  claims listed on Exhibit 50 voted to reject before October

16  13th, 2021.

17             THE COURT:  Alright.

18             MR. HARRIS:  If Mr. Haviland could confirm if I --

19  correct if I said anything incorrect.

20             THE COURT:  Mr. Haviland.

21             MR. HAVILAND:  Thank you, Your Honor. I want to

22  say as a preface that I have always in this case had a

23  professional working relationship with Mr. Harris and I am

24  pleased to report it's ongoing.  I agree with everything he

25  just said.

 1              THE COURT:  Alright.

 2              MR. HAVILAND:  Thank you.

 3              THE COURT:  Thank you.

 4              MR. HAVILAND:  And we would publish those exhibits

 5   to the court.  Thank you.

 6              THE COURT:  They're admitted pursuant to the

 7   party's stipulation.

 8         (Ad Hoc Group Exhibits 49 and 50 received into

 9   evidence)

10              MR. HARRIS:  Then on behalf of the debtors our

11   next witness will be Mr. Daloia and my colleague, Betsy

12   Marks, will be handling that examination. So I am going to

13   stand up and Ms. Marks will sit here.  If your chambers are

14   able to rename our video as Betsy Marks that would probably

15   be simpler for everyone.

16              THE COURT:  Do we have Mr. Daloia.  We've been

17   debating the correct pronunciation of your name, Mr. Daloia.

18   We're going to change the name on your screen too to show

19   that you are Mr. Daloia.

20              Mr. Stanford, I'm going to turn off your video

21   because I only want to see people who are actually going to

22   be questioning and cross-examining the witness.

23              We're still working your name change, but go

24   ahead, Ms. Marks.

25              MS. MARKS:  Thank you, Your Honor.

1           The court may also want to change this monitor to

2    Betsy Marks, M-A-R-K-S; although, I am happy to proceed as

3    Mr. Harris.

4           THE COURT:  We're in the process of doing that.

5    It takes a little bit of time.

6           MS. MARKS:  Okay.  Your Honor, may I also ask for

7    Gail Reiser to be given permission to share her screen in

8    case we need that?

9           THE COURT:  Yes.

10          MS. MARKS:  Thank you.

11          THE COURT:  Hold on one second.

12       (Pause)

13          THE COURT:  We're trying to find Ms. Reiser

14   amongst the -- if you could raise your hand, Ms. Reiser, it

15   will help identify you.

16       (Pause)

17          THE COURT:  Ms. Reiser now has screen share.  You

18   can go ahead.

19          MS. MARKS:  Thank you, Your Honor.  For the record

20   Betsy Marks from Latham & Watkins on behalf of the debtors.

21                      DIRECT EXAMINATION

22   BY MS. MARKS:

23   Q    Mr. Daloia, could you please spell your last name for

24   the record?

25   A    D-A-L-O-I-A.

```
 1              THE COURT:  I'm sorry, I need to swear the
 2  witness.
 3              Mr. Daloia, can you please raise your right hand?
 4  State your full name for the record and spell your last name.
 5              MR. DALOIA:  James Daloia, D-A-L-O-I-A.
 6              JAMES DALOIA, DEBTOR WITNESS, SWORN
 7              THE COURT:  Go ahead, Ms. Marks.
 8              MS. MARKS:  Thank you.
 9                      DIRECT EXAMINATION
10  BY MS. MARKS:
11  Q     Mr. Daloia, what is your current occupation?
12  A     I am the director of global corporate actions at Prime
13  Clerk.
14  Q     What is Prime Clerk?
15  A     We are the claims, noticing and solicitation agent for
16  the debtors.
17  Q     How long have you worked at Prime Clerk?
18  A     About seven years.
19  Q     And have you held the same position, director of global
20  corporate actions, the entire time that you have been there?
21  A     Effectively, yes.  The title has changed slightly as we
22  moved around, but it's been the same job with the same
23  responsibilities.
24  Q     And at a high level what are your job responsibilities
25  at Prime Clerk?
```

1   A      I run the solicitation group and I operate it to make

2   sure that the day to day operations are run completely and

3   that, you know, we are following procedures with the court as

4   well as making sure that everything is being done in

5   compliance with the (indiscernible).

6   Q      Ca you tell me what is involved, generally, in

7   solicitation?

8   A      Solicitation involves identifying and providing the

9   materials within a bankruptcy especially when it comes to

10  plan noticing with the proper materials as outlined in the

11  procedures order.

12  Q      And do your job responsibilities also include

13  tabulation>

14  A      Yes.

15  Q      And at a high level what is tabulation?

16  A      Tabulation is the intake and review of the ballots, you

17  know, for a plan solicitation as well as the quality

18  assurance review of those ballots in making sure, again, that

19  it all follows the procedures and that ultimately filing the

20  vote tabulation.

21  Q      When did Prime Clerk first become involved in

22  Mallinckrodt's Chapter 11 case?

23  A      Late summer of 2020.

24  Q      And what is Prime Clerk's role in this case?

25  A      Again, we're the claims, noticing and solicitation

1   agent.

2   Q     And what do those roles entail generally?

3   A     Generally it's the -- there's noticing on behalf of the

4   debtors as well as the claims -- you know, we work as an

5   agent of the court to collect claims, maintain a claims

6   register, maintain a docket on the website.  There is inquiry

7   responses and then, again, down to the solicitation, noticing

8   of those parties and tabulation to the point of helping with

9   distributions under the plan as well.

10  Q     How many people are on the team total for Mallinckrodt

11  at Prime Clerk?

12  A     All included with the case team who handles the claims

13  and our team as well as support staff it's roughly 50.

14  Q     And is there a team at Prime Clerk dedicated to

15  solicitation?

16  A     Yes, my group.

17  Q     How many people are on that team?

18  A     Working on this case it's about 18 with five of us

19  being intimately involved.

20  Q     And who at Prime Clerk is responsible for the day to

21  day operations of the solicitation and tabulation procedures?

22  A     That would be me.

23  Q     And in the Mallinckrodt case what is your role with

24  respect to solicitation and tabulation?

25  A     Again, it's the overview, watching and making sure the

1  day to day operations run smoothly as well as making sure

2  that mailing to tabulation, quality assurance and filing are

3  in compliance with the procedures that are approved by the

4  court.

5  Q    And let's talk about those procedures. Does the

6  solicitation process that Prime Clerk conducted in this case,

7  did it follow the debtor's solicitation procedures?

8  A    Yes, it did.

9  Q    And are the solicitation procedures contained in a

10 written document that the debtors filed on the docket?

11 A    Yes, they are.

12 Q    Did the court approve the debtor's solicitation

13 procedures in this case?

14 A    Yes, they did.

15 Q    And are you familiar with those solicitation

16 procedures?

17 A    Yes.

18 Q    And I know that it's a long document, but at a high

19 level what is your understanding as to what solicitation

20 procedures are?

21 A    The solicitation procedures, you know, at a high level

22 outline those parties that are -- it gives you the rules

23 regarding the parties entitled to vote on the plan, who

24 should receive which documents, as well as the outline of the

25 rules related to tabulation, the amounts, what should and

1  should not be counted, and things like that as well as

2  relevant deadlines.

3  Q     Throughout the solicitation process did Prime Clerk

4  endeavor to follow the solicitation procedures in this case?

5  A     Yes, we did.

6  Q     So let's focus first on the solicitation of parties who

7  were entitled to work on the plan.  What is your

8  understanding as to which creditors were entitled to vote on

9  the plan?

10  A     There is a number of classes.  It is a relatively long

11  list.

12  Q     So this doesn't have to be a memory test.

13       Mr. Daloia, do you have your final declaration in front

14  of you or handy?

15  A     I have it next to me over here.

16         MS. MARKS:  Your Honor, may Mr. Daloia have his

17  final declaration in front of him?

18         THE COURT:  Yes.

19  BY MS. MARKS:

20  Q     So, Mr. Daloia, if you open the declaration to page 3

21  onto page 4 there is a chart.  Do you see that?

22  A     Yes.

23  Q     And could you generally walk us through who the classes

24  were that were entitled to vote on the plan?

25  A     Sure.  So -- and some of these have subclasses.  So

1   Classes 2(b) and (c) were the loan claims for the 2024 and

2   2025 loan respectively.  Classes 3, 4 and 5 covered both the

3   first -- sorry, all of the first, second and -- I'm sorry, I

4   got distracted by the screen, so sorry.  Third, fourth --

5   Classes 3, 4 and 5 were the first lien, second lien and

6   general unsecured notes.

7        For Class 6 it was broken up into: (a) was the Acthar

8   claims, (b) was generic price fixing claims, (c) was asbestos

9   claims, (d) the legacy unsecured note claims, (e) the

10  environmental claims, (f) the other general unsecured claims,

11  and (g) which was the 4.75 percent unsecured notes claims.

12  Class 7 were trade claims.  Classes 8 and 9 referred to the

13  relevant opioid claims as well as Class 10 which was the

14  settled federal and state Acthar claims.

15  Q    Thank you.  I should have mentioned for the record this

16  exhibit its Debtor's P-1, 22.

17       Mr. Daloia, let's take Class 6 as an example.  How did

18  Prime Clerk determine which claimants were entitled to vote

19  on the plan?

20  A    So we -- what is created is based on the claims, it's a

21  plan class report that is signed off on by the advisors and

22  counsel, but, you know, in review with those parties we

23  reviewed all the claims that had been filed along with the

24  schedules to determine which claims are in which class.

25  Q    Did Prime Clerk review proofs of claim or objections to

1  confirm whether claimants were entitled to vote?

2  A     Yes.  That is part of the review.

3  Q     And was that process generally the same for the holders

4  in Classes 3, 4 and 5?

5  A     No.  So those three classes, along with the unsecured

6  notes claims and the 4.75 percent note claims in Class 6,

7  were done as part of the standard process for noticing

8  beneficial holders of securities.

9  Q     Okay.  We will get to that in a minute.

10        What about for the opioid claimants in Classes 8 and 9?

11 How did Prime Clerk determine which of those claimants were

12 entitled to vote?

13 A     So 8 and 9 was a -- those classes were not based on a

14 bar date for filed claims.  Those are, you know, what we

15 refer to as the unknown parties because, you know, for the

16 most part working with the OCC, trying to notice as many of

17 those parties as possible so that they be able to come in and

18 vote; however, since there was no bar date or claims process

19 these parties were unknown.

20        So I believe my colleague, Jeanne Finegan, will be

21 testifying, it's my understanding, in the second phase of the

22 hearing regarding how the noticing program worked.

23 Q     And what about for the funded debt holders in Class 2,

24 what was the process to determine whether those holders were

25 entitled to vote?

1  A      So those records are maintained by the lender agent who

2  would provide us with a list as of the voting record date of

3  those parties, their contact information and the amount that

4  they are entitled to vote.

5  Q      Thank you.

6         Mr. Daloia, are you familiar with the term "nominees"?

7  A      Yes.

8  Q      And what are nominees in this context?

9  A      Nominees are simply banks and brokers that hold

10 relevant security, you know, bonds, equities, on behalf of

11 beneficial holders.

12 Q      How did Prime Clerk identify nominees who held claims

13 on behalf of the beneficial holders of funded debt or other

14 debt claims?

15 A      So we received what's called an SPR, securities

16 position report, from DTC, Depository Trust Company, who is

17 the depository and the clearing house for pretty much all

18 U.S. securities.  What they provide us based on requests as

19 of the record date is the listing of the nominees that own

20 positions on behalf of beneficial holders for the relevant

21 security.

22 Q      And what about nominees who held claims on behalf of

23 shareholders? How did Prime Clerk identify those nominees?

24 A      It's relatively the same process.

25 Q      And once all of the holders and the nominees for all

1  classes were identified except the opioid claimants in 8 and

2  9, how did Prime Clerk solicit those holders and nominees to

3  vote?

4  A    Well it depends on the type. So for Class 2, again, we

5  received those notices -- we received the information from

6  the lender agent and using that information we mailed the

7  relevant documents to those holders directly using regular

8  mail.  For the parties that are bondholders we would request,

9  you know, based on the record date, we make our request to

10 the nominees and many of them use proxy agents.

11      So making a request they would provide us with a number

12 of holders they had as of that record date, and we would

13 provide them with a number of packages, total packages from

14 each of those individuals and send them to them with

15 instructions to serve to those holders via -- within five

16 business days.

17      Then with Class 6 parties there is multiple ways.  You

18 have what's called a non-notes master ballot which went out

19 to the attorneys, part of a directive process, as well as

20 those that were identified as claim holders that did not have

21 an attorney as part of their filing, their claim filing or

22 their schedule.  They were served with a customized ballot

23 with the relevant solicitation materials.

24      Then -- sorry, that was also the same for Class 7.

25 Q    Did Prime Clerk send any materials via email?

1  A     If we did it was based on request.   A party would

2  reach out to us and ask us to send them "soft copies" or

3  emailed copies of the documents.   In addition we do email the

4  relevant depositories in both the United States, Canada and

5  Europe for posting.  Each one has their internal noticing

6  system that we send it to them via email so that they can

7  post-date on their internal system.

8  Q     And who was responsible for distributing these

9  solicitation packages to claimants?

10 A     Prime Clerk.

11 Q     Did Prime Clerk also create websites where the

12 solicitation materials could be found and accesses?

13 A     Yes.

14 Q     We have our standard website that we have for all cases

15 that had all the materials.  That also includes the docket,

16 plus there was separate tabs that included the solicitation

17 materials as well as directions on how to submit ballots or

18 other forms.  And in this case, in conjunction with the OCC,

19 we also created a website called (indiscernible) vote.com

20 that was specific for the opioid parties, the Class 8 and 9

21 parties, for them to come forward and receive the information

22 and submit ballots.

23 Q     Generally, what was included in the solicitation

24 packages that Prime Clerk sent out?

25 A     For all parties you did have the confirmation hearing

1   notice along with a flash drive that included the plan, the

2   disclosure statement and the disclosure statement order.

3   They all received also a copy of the solicitation procedures

4   and the relevant ballot.  Also certain classes did have --

5   the UCC, I believe, had a separate letter to certain groups

6   as well as the OCC had a letter to certain groups.

7   Q    Let's turn to the ballots that were solicited to claim

8   holders to vote on the plan.  Were there different types of

9   ballots permitted here?

10  A    Yes.

11  Q    And what were they?

12  A    You had the master ballot -- sorry, the notes master

13  ballot along with the notes beneficial holder ballot.  You

14  did have direct ballots, you know, what I will refer to as

15  direct ballots, but those are ballots that were sent directly

16  to claim holders or the loan parties.  And each of them were

17  relevant to the class that they were for.  That was also for

18  class 7 as well.

19       You also, in this case, did have the non-notes master

20  ballot that attorneys could use to aggregate and send in the

21  votes on behalf of their clients.

22  Q    And we will come back to talk about the master ballots

23  in a little more detail, but, first, what process did Prime

24  Clerk go through to generate a ballot for a particular

25  claimant?

1  A      If the claimant was known and they were receiving a

2  direct ballot we would create a customized ballot with

3  internal markings and quality assurance checks that ties it

4  back to the individuals claim.

5  Q      And were some ballots pre-populated in this case?

6  A      Yes.  Some of those ballots were pre-populated.

7  Q      Which claimants or subclasses received a pre-populated

8  ballot?

9  A      You had Class 2(a) and (b), certain parties throughout

10  Class 6 and Class 7.

11  Q      And which claimants or subclasses did not receive a

12  pre-populated ballot?

13  A      So any of the -- sorry, any of the claims in applying

14  class that was related to (indiscernible).  So 3, 4 and 5,

15  then two subclasses within 6, as well as anyone in 8 and 9

16  were not pre-populated.

17  Q      And you mentioned notes, master ballots and non-notes

18  master ballots.  What is a notes master ballot?

19  A      Notes master ballot is a type of ballot that is used by

20  nominees or their proxy agents.  This allows them to

21  aggregate the votes on behalf of their beneficial holders and

22  provide, you know, Prime Clerk or whoever the agent is, those

23  votes on that aggregated document.

24  Q      And what is your understanding of how the solicitation

25  procedures required notes master ballots to be solicited?

1  A     Well, they were served to the -- the packages were

2  served on the nominees, as noted before, and then down to the

3  beneficial holders with instructions to serve to the

4  beneficial holders.  They then collect the master ballots --

5  the beneficial holder ballots and reflect them on the master

6  ballot and return them to Prime Clerk.

7  Q     And what is a non-notes master ballot?

8  A     In this case the non-notes master ballot is a master

9  ballot that attorneys were able to use to aggregate their

10 clients' votes and provide that master ballot to Prime Clerk

11 rather than thousands of individual ballots for their

12 clients.

13 Q     What does an attorney or law firm have to do to submit

14 a non-notes master ballot?

15 A     To submit a non-notes master ballot, first, there was a

16 solicitation directive process in which they would make a

17 request to submit their master ballot based on that request.

18 Then Prime Clerk would send them a master ballot with -- you

19 know, the master ballot included instructions on how to

20 complete the master ballot and return it to us.

21 Q     You mentioned a solicitation directive.  Is this a

22 written document?

23 A     Yes.

24 Q     And generally what is a solicitation directive?

25 A     The solicitation directive simply was a way for

AA0000359

 1   attorneys to identify for Prime Clerk how they would like to

 2   vote on behalf of their clients.

 3   Q    And what options did an attorney or a law firm have

 4   when it received a solicitation directive?

 5   A    They had three options.  They could do the master

 6   ballot process or they could provide us with a listing of

 7   their clients and request that we, Prime Clerk, serve those

 8   parties directly based on that information.  There is also a

 9   third option where we could make individual ballots, send

10   them to the attorney for them to disseminate out to their

11   clients.

12   Q    Did an attorney or a law firm have to certify anything

13   in order to be authorized to submit a non-notes master

14   ballot?

15   A    My understanding on the certification, on the ballot,

16   and the directive that they were the attorney for those

17   clients and that they had the authority to make these votes

18   or elections based on their clients' wishes.

19   Q    And looking back at that chart in your final

20   declaration, Debtor P-1, 22, do you remember for which

21   classes law firms submitted non-notes master ballots?

22   A    Sure.  I will work a little bit backwards.  In 8 and 9

23   they did.  Then in Classes 6(a), 6(b), 6(c), 6(e), and (f).

24   Then there was also one in Class 10.

25   Q    Do you remember how many solicitation directives

1    requesting a non-notes master ballot Prime Clerk received in

2    this case?

3    A      It was about 130.

4    Q      And how did Prime Clerk identify the attorneys or law

5    firms that represented claimants?

6    A      It was either parties or law firms that had filed

7    claims on behalf of their clients. So they were noted in the

8    claims register or, otherwise, scheduled.  Also those --

9    there were attorneys that had made themselves known as a

10   party in interest as well as, and again this will go to the

11   noticing program, but, you know, outreach to all parties to

12   make them aware of this matter.

13   Q      And how did Prime Clerk serve those attorneys or firms?

14   A      Regular mail.  And based on, you know, some did come

15   back and ask us to email them the ballots.

16   Q      Did Prime Clerk provide direct instructions to these

17   law firms in terms of the process for the non-notes master

18   ballots?

19   A      They were on the directive and the master ballots on

20   how to complete them, but we did help certain -- you know, if

21   asked we would help walk them through the process so that

22   they can return them properly.

23   Q      Did Prime Clerk conduct town halls to make sure the

24   attorneys understood the process?

25   A      Yes.  There were a couple of town halls, you know,

1    helping out in the process.

2    Q     Were you aware that one creditor group in this case,

3    the ad hoc Acthar group, has raised some issues concerning

4    the ballots submitted by the Bevan & Associates law firm?

5    A     I have been made aware of that.

6    Q     Do you know if the Bevan law firm submitted a

7    solicitation directive?

8    A     They did.

9    Q     And do you know if the Bevan's law firm requested a

10   non-notes master ballot?

11   A     They did.

12   Q     And did they submit a non-notes master ballot?

13   A     Yes.

14   Q     Did Prime Clerk follow the solicitation procedures with

15   respect to the Bevan law firm?

16   A     Yes.

17   Q     And did Prime Clerk deviate at all from the court

18   ordered non-notes master ballot process in connection with

19   the Bevan law firm?

20   A     No.

21   Q     So I'd now like to turn to the service of the notice of

22   non-voting status.  Is it your understanding that some

23   holders were entitled to receive notice of non-voting status?

24   A     Yes.

25   Q     And who are Class 14 shareholders?

1    A      Those are the current equity holders for Mallinckrodt

2    as of the voting record date.

3    Q      What is your understanding as to what the solicitation

4    procedures require with respect to the solicitation package

5    for these Class 14 shareholders?

6    A      They were served the confirmation hearing notice as

7    well as a notice of non-voting status for wholly impaired

8    parties and that form also included an opt-out of certain

9    releases of the plan.

10   Q      How did Prime Clerk identify nominees for these

11   shareholders?

12   A      Similar to the bondholder process we requested an SPR,

13   securities position report, from DTC as of that voting record

14   date and they provide us a listing of nominees, banks and

15   brokers, that own the equity on behalf of beneficial holders.

16   Q      Do the solicitation procedures contain any requirements

17   for soliciting shareholders who no longer held equity

18   interest in the debtors?

19   A      No.

20   Q      Did you still serve former shareholders?

21   A      Yes.

22   Q      What was the deadline for Class 14 shareholders to

23   submit their opt-out forms?

24   A      October 13th, 2020.

25   Q      Did Prime Clerk follow the procedures set forth in the

1    solicitation procedures to determine how to solicit those

2    votes?

3    A      Yes.

4    Q      What are the ways that a shareholder could hold the

5    debtor's equity interest?

6    A      They can hold it as a beneficial holder through a

7    nominee, bank or broker, they can also hold it as a directly

8    registered holder on the books and records of the transfer

9    agent.  In this case it's Computershare.

10   Q      So let's look at the direct holders first.  How were

11   the current and former shareholders who directly held equity

12   identified?

13   A      We requested the list for the current as of the voting

14   record date from Computershare and they provide that listing

15   with contact information as well as -- although irrelevant

16   for this purpose, but the number of shares.

17   Q      Turning to the beneficial owners who own the equity

18   through a nominee, how were they served?

19   A      They were served with -- again, the nominees we make a

20   request as of the voting record date to provide us with the

21   counts of how many parties that they hold for, and from there

22   we provide the nominees or their proxy agents with those

23   number of packages with instructions to serve down to the

24   beneficial holders.

25   Q      And you testified that the direct holders were

1   identified from Computershare.  What is Computershare?

2   A    They are a transfer agent.

3   Q    And what is a transfer agent?

4   A    Amongst other things, but for this case they basically

5   maintain the record of equity holders in the amount of shares

6   outstanding for their companies, in this case Mallinckrodt.

7   Q    So Computershare is Mallinckrodt's transfer agent?

8   A    Correct.

9   Q    And is Computershare or whatever the transfer agent is

10  that a standard source for obtaining the names of registered

11  shareholders?

12  A    Yes, it is.

13  Q    And you testified that after obtaining the list of

14  registered holders from Computershare, Prime Clerk served

15  them all, served all registered holders as of the voting

16  record date?

17  A    We did.

18  Q    Did Prime Clerk include instructions for both current

19  and former registered holders to return opt-out forms if they

20  wanted?

21  A    Not to -- their current holders received the

22  instructions and the opt-out form. The former received a

23  notice to those former holders.

24  Q    And how did you serve the current and former registered

25  holders?

1  A     Via regular mail.

2  Q     Did you email any of them?

3  A     Only if it was requested.

4  Q     And you mentioned that Class 14 shareholders could also

5  be beneficial owners of the debtor's equity interest.  Was

6  Prime Clerk able to serve those beneficial holders directly?

7  A     No.  We served them through the nominees.

8  Q     Is that consistent with industry practice?

9  A     Yes, that is standard.

10 Q     And did Prime Clerk follow a similar process for

11 noticing former beneficial shareholders?

12 A     Yeah, it's similar.

13 Q     What instructions did Prime Clerk give with respect to

14 returning their opt-out forms?

15 A     The instructions on how to submit an opt-form were on

16 the document that was provided to them simply was our website

17 and through that website they had the ability to submit the

18 opt-out form.

19 Q     Did Prime Clerk do anything else to make sure that the

20 Class 14 shareholders receive the required notices?

21 A     In addition to the standard service we also made sure

22 to post, again, the notices with the relevant repositories in

23 the US, Canada and Europe.

24 Q     And how does this process compare to how Prime Clerk

25 serves shareholders in other bankruptcy cases?

1    A      It's similar.

2    Q      How does this process compare to how Prime Clerk serves

3    beneficial shareholders outside of bankruptcy like in an

4    exchange offer?

5    A      Again, it's similar.

6    Q      Do you remember how many opt-out forms Prime Clerk

7    received?

8    A      About 2,200.

9    Q      And of those how many were from registered holders?

10   A      Less than 100.

11   Q      Has Prime Clerk determined the validity of those opt-

12   out forms?

13   A      We don't make the determination on validity.

14   Q      Did Prime Clerk receive any opt-out forms from anyone

15   or any entity other than Class 14 shareholders?

16   A      We did receive a Class 13 opt-out form.

17   Q      Was that from the Canadian Elevator Industry Pension

18   Trust?

19   A      Correct.

20   Q      To the best of your knowledge, at the time solicitation

21   of the plan commenced were any holders of claims or interest

22   classified in Class 13?

23   A      They were not.

24   Q      The solicitation procedures order also contains

25   requirements for tabulating ballots received from the holders

1    of claims or interest?

2    A    Correct.

3    Q    And did Prime Clerk follow those procedures?

4    A    Yes, we did.

5    Q    The result of the final tabulation was reflected in the

6    final declaration you filed with the court on October 31st,

7    is that right?

8    A    That is correct.

9    Q    What was the first step that Prime Clerk took when it

10   received a ballot?

11   A    Whenever we receive a ballot, whether online or hard

12   copy we make sure that it is date stamped and processed into

13   our internal system.

14   Q    And what would happen next?

15   A    It would be an intake process, you know, the data entry

16   of the document coming in as well as from there quality

17   assurance of making sure that the ballot was valid and

18   followed all procedures and, you know, that they would be

19   tabulated correctly.

20   Q    What makes a ballot valid?

21   A    If it's valid based on the solicitation procedures and

22   the order that is approved by the court.

23   Q    And I think you already mentioned this date, but remind

24   us what was the voting deadline in this case?

25   A    For all classes but 8 and 9 it was October 13th of 2021

1  and then for 8 and 9 it was extended to October 20th, of

2  2021.

3  Q     How often did Prime Clerk tabulate the ballots in this

4  case?

5  A     Every day.

6  Q     And that involved quality assurance?

7  A     Yes.

8  Q     What happened to ballots that were determined to be

9  invalid?

10  A     If they are invalid based on the solicitation

11  procedures and the order we marked them as defective or not

12  included in tabulation and they are noted with the reason why

13  they weren't included on my vote declaration, in this case

14  Exhibit B of the vote declaration.

15  Q     So they were excluded from the final tabulation?

16  A     Yes.

17  Q     And what would be an example of a ballot that would be

18  invalid or what are some examples?

19  A     You know, as outlined in the order they are -- if they

20  don't have a vote on them, if they come back blank or

21  unsigned, if there's a duplicate vote, if a vote comes in or

22  a valid ballot is superseded by another valid ballot later

23  on.

24  Q     And before you submitted your final declaration on

25  October 31st had you submitted a preliminary declaration?

1    A      Yes.

2    Q      On or around October 22nd?

3    A      Yes.

4    Q      What was Prime Clerk doing between the submission of

5    the preliminary declaration and the final declaration?

6    A      We were continuing to tabulate and quality assurance

7    review of Classes 8 and 9 since they were extended and there

8    was large number of votes, as well as further quality

9    assurance of the other results.

10   Q      And were there any changes between the tabulations in

11   your preliminary declaration and your final declaration?

12   A      Yes.

13   Q      So let's take a look at that.  If you turn back to your

14   final declaration there is a chart at the top of page 7.  So

15   let's talk briefly about some of the changes and let's use

16   Class 6(a) as an example.

17          Your declaration shows that the total votes in the

18   preliminary declaration were 129,062.  That number dropped to

19   207 in the final declaration.  You know, that is, obviously,

20   a big change.  Why were so many votes excluded from the final

21   declaration?

22   A      Between when we reviewed, along with direction of

23   counsel, we noticed that the original declaration included a

24   large number of votes that were on master ballots, but not

25   tied to valid claims.  So after review and removing a large

1  number of master ballots that were submitted without these

2  valid claims that is what ended up being the reduced amount.

3  Q     Do you remember approximately how many master ballots

4  were submitted for Class 6(a)?

5  A     It was about 10 in total.

6  Q     Do you remember any of the law firms that submitted

7  those master ballots?

8  A     Yes.

9  Q     Do you want to give us a few examples of who you

10  remember?

11  A     Sure.  There was Haviland Hughes, as well as Willkie

12  Farr & Gallagher, Motley Rice, Dalloway [phonetic] -- I

13  apologize, I forget the full name of the firm.

14  Q     What was the result after Prime Clerk excluded these

15  Class 6 votes?

16  A     As noted in my declaration these classes were rejected.

17  Q     Did Prime Clerk follow the solicitation procedures in

18  excluding these votes?

19  A     Yes.

20  Q     And did the exclusion that occurred between the

21  preliminary declaration and the final declaration change the

22  vote in any of the classes?

23  A     No.

24  Q     So, Mr. Daloia, let's keep looking at your final

25  declaration.  Again, this is Debtor's Exhibit P-1, 22.  Are

1   there exhibits attached to your declaration?

2   A     Yes.

3   Q     Do you remember how many?

4   A     There is, I guess, four because there is A-1 and A-2 as

5   well as Exhibit B and Exhibit C.

6   Q     And right now you only have Exhibit A in front of you?

7   A     Yes.

8   Q     Is that because B and C are large files?

9   A     Yes.

10  Q     But you are familiar with Exhibits B and C?

11  A     Yes, I am.

12  Q     And Exhibit A, the two Exhibit A's do they tabulate the

13  results of the voting?

14  A     Yes.

15  Q     And Exhibit B reflects what ballots were excluded?

16  A     Yes.

17  Q     And Exhibit C reflects opt-outs?

18  A     Correct.

19  Q     Now did you and your team at Prime Clerk prepare these

20  exhibits?

21  A     Yes.

22  Q     Is it part of your ordinary business practice to

23  tabulate results as reflected in the exhibits?

24  A     Yes.

25  Q     And is part of your ordinary business practice to

```
 1   generate exhibits such as A, B and C attached to your
 2   declaration that reflect the results of your tabulation?
 3   A     Yes.
 4   Q     And have the exhibits and the tabulations been kept in
 5   Prime Clerk's ordinary records?
 6   A     Yes.
 7   Q     And was the tabulation done at or near the time that
 8   the ballots were cast and received by Prime Clerk?
 9   A     Yes.
10   Q     Are the ballots available to a creditor if a creditor
11   asks to review a particular ballot?
12   A     Yes.
13   Q     And are these exhibits A, B and C accurate to the best
14   of your knowledge?
15   A     Yes, they are.
16          MS. MARKS:  Your Honor, I would move to introduce
17   Exhibits A, B and C to the final declaration of James Daloia
18   into evidence.
19          THE COURT:  Any objection?
20          MR. HAVILAND:  Yes, Your Honor.  Don Haviland,
21   Haviland Hughes, for the ad hoc Acthar group.
22          We object under Federal Rules of Evidence 1006.
23   And if I may, Your Honor, the rule plainly provides that to
24   have an exhibit serve as a summary of voluminous or not
25   conveniently available information the proponent of the
```

1  exhibit must establish that the information is not available

2  in court.  We see that part.  The parts that we object are

3  whether or not the summary or chart is an accurate

4  compilation of voluminous records.  We contest whether or not

5  the summaries are accurate and whether or not the underlying

6  documents reflect what is summarized in the charts.

7          The Third Circuit in the case of Eichorn v. AT&T

8  recognized that the contents of the voluminous writings

9  cannot be conveniently put before the court other than in a

10 form, but also Rule 1006 is not a backdoor vehicle for the

11 introduction of evidence which is, otherwise, inadmissible

12 especially in the case where the summaries are not accurate.

13         In this case, Your Honor, we don't believe that

14 there has been a proper foundation laid for the accuracy

15 especially given the fact that under the court's deadlines

16 Prime Clerk provided an affidavit, a declaration which we're

17 not seeing offered here and we have objected to that as

18 hearsay, but that was provided on October 22nd.  That

19 provided a tabulation which is materially inconsistent with

20 what is being offered right now.

21         The tabulations, as you have seen a piece of,

22 Judge, materially change the volume of the vote and because

23 the documents need to be independently verified, and we don't

24 believe that they have been, we contest to their admission at

25 this point in time.  We would ask the court to sustain the

1   objection subject to further review.

2            THE COURT:  Ms. Marks.

3            MS. MARKS:  Your Honor, the witness testified that

4   the exhibits are accurate.  I think they're a classic example

5   of a summary of voluminous rights under Federal Rule of

6   Evidence 1006.  Even if they aren't they would be

7   independently admissible as a business record under Federal

8   Rule of Evidence 803(6).

9            THE COURT:  I agree.  I think the foundation has

10  been set.  There is no indication that the records are not

11  accurate in any way.  Mr. Daloia testified extensively about

12  how these records are collected, compiled and included in

13  their system.  These would also constitute a business record

14  and, therefore, they are admissible.

15           So I will overrule the objection.  Exhibits A, B

16  and C to the declaration are admitted.

17       (Exhibits A, B and C to Daloia declaration received

18  into evidence)

19           MS. MARKS:  Thank you, Your Honor.

20  BY MS. MARKS:

21  Q    Thank you, Mr. Daloia.  I just have a few final

22  questions.

23       To the best of your knowledge did Prime Clerk tabulate

24  all of the valid ballots accurately in this case?

25  A    Yes.

1  Q     And to the best of your knowledge did Prime Clerk's

2  tabulation comply with the court approved solicitation?

3  A     Yes.

4  Q     And did the solicitation process itself comply with the

5  court approved solicitation procedures?

6  A     Yes.

7          MS. MARKS:  No further questions, Your Honor.

8          THE COURT:  Thank you.

9          Mr. Haviland, cross?

10         MR. HAVILAND:  Thank you, Your Honor.

11                      CROSS-EXAMINATION

12 BY MR. HAVILAND:

13 Q     Mr. Daloia, my name is Don Haviland from Haviland

14 Hughes.  Can you hear me okay?

15 A     Yes, I can.

16 Q     Good.  I know that the technology is helpful, but if

17 you don't hear a question, just let me know.  I want to make

18 sure we have a clear record between us.

19     Sir, before we begin, I just want to get some

20 foundational stuff.  I see someone walking back and forth,

21 are you in a conference room?

22 A     Yes, I am.

23 Q     Is the door open to that room?

24 A     No, no, no --

25 Q     And there's no --

```
 1  A      -- it's us.

 2  Q      I'm sorry.  There's no one else in there with you?

 3  A      No, there isn't.

 4  Q      All right.  And you have, I see, a number of devices in

 5  front of you.  You have a monitor that you can see straight

 6  ahead where you see me and the Court?

 7  A      Yeah.

 8  Q      Okay.  And then you have a laptop to your right.

 9  What's that, sir?

10  A      The laptop just has the -- any of the voluminous

11  documents that weren't printed out, so mainly the Exhibit B

12  from my vote declaration.

13  Q      Okay.  And is there a device directly in front of you?

14  A      This is -- this controls the screen.

15  Q      Okay, fine.  And then to your left, I believe, you've

16  got a number of binders.  What do you have there, sir?

17  A      Those are all the exhibits.

18  Q      Okay.  If we can, just to streamline here -- and

19  counsel was very efficient, I am going to try to do the same

20  -- if you could get in front of you, sir, your two

21  declarations.

22            MR. HAVILAND:  And, for the Court's record, the

23  October 22nd declaration of Mr. -- Daloia, it is, right,

24  Daloia?

25            THE WITNESS:  Daloia, yes --
```

1          MR. HAVILAND:  Okay.

2          THE WITNESS:  -- you got it right.

3          MR. HAVILAND:  Thank you.  Docket Number 4955, I

4   believe, is Joint PI, Exhibit 4.

5   BY MR. HAVILAND:

6   Q    Do you have that in front of you, sir?

7   A    Yes, I do.

8   Q    All right.  Do you also have the exhibit -- Exhibits A

9   and B to that?  Well, B is large, but Exhibit A.

10  A    I have Exhibit A and B is on the computer right next to

11  me --

12  Q    Understood.

13  A    -- if needed.

14  Q    The exhibit that counsel referenced, your second

15  declaration, which was Docket 5087, do you have that in front

16  of you as well?

17  A    The final declaration?

18  Q    Yes, sir.

19  A    Yes.

20          MR. HAVILAND:  And I believe the first that

21  appears in the debtors' exhibit would be Debtor Phase 1

22  Exhibit 22, Your Honor.

23  BY MR. HAVILAND:

24  Q    Mr. Daloia, I'm going to review those declarations with

25  you in a moment, so if you just want to hold that for a

1  second.  I just want to go back over some questions you were

2  asked by counsel for the debtors.

3      First of all -- and I may go a little out of order, but

4  I just want to kind of cover some things that were just asked

5  of you -- the voting deadline, you said that there was a

6  deadline of October 13th, right?

7  A    That was the final deadline, yeah.

8  Q    In fact, the solicitation that went out in -- was it

9  June when the original solicitation went out?

10 A    Yeah, the end of June.

11 Q    Okay.  That actually had a different date, did it not?

12 A    It did.

13 Q    What date was that?

14 A    I would have to look again, but it was sometime in

15 September.

16 Q    Okay.  And how many times was the voting deadline

17 extended, sir?

18 A    I don't remember exactly, but two or three times, I

19 believe.

20 Q    Okay.  So it went from sometime in September and the

21 final was October the 13th?

22 A    For everyone but 8 and 9, correct.

23 Q    Everyone but 8 and 9, which is the -- if I'm right

24 about this, is the opioid classes, right?

25 A    Correct.

1   Q    Did they always have that extended date that you

2 testified about, October the 20th?

3   A    Not at the beginning, no.

4   Q    What was their original deadline?

5   A    Again, I forget the exact deadline, but it was the same

6 as the other classes.

7   Q    Okay.  So somewhere between the original solicitation

8 directive going out to creditors there was this additional

9 extension added of a week for the class 8 and 9 opioid

10 claimants, right?

11   A    That's correct.

12   Q    And where did you get the notification that that

13 extension should be allowed?

14   A    I'm not sure I understand the question.

15   Q    How did you know there was an additional week for the

16 class 8 and 9 voters?

17   A    It was at the direction of counsel.

18   Q    When you say counsel -- and you said that earlier -- do

19 you mean the debtors' counsel?

20   A    Yes, sorry --

21   Q    Okay.

22   A    -- Latham.

23   Q    Latham.  Were there -- was there particular people -- I

24 know you have 50 in your office and another eight or so in

25 your group -- how about in the debtors' counsel, who was your

```
 1  primary interface, if you had one or more?
 2  A     I had a lot of people.
 3  Q     So who told you that there should be an additional week
 4  given for the opioid voters?
 5  A     I don't remember specifically.
 6  Q     Somebody at Latham?
 7  A     It was somebody at Latham, yes.
 8  Q     And I saw on your second declaration, sir, you used a
 9  couple of conventions and I just want to make sure we
10  understand, so we're on the same page as we talked this
11  afternoon.  In your footnote 4 of your second declaration,
12  you write that "after a further review by the debtors'
13  professionals," do you see that?
14  A     Yes.
15  Q     To whom are you referring when you say "debtors'
16  professionals"?
17  A     Counsel and advisers.
18  Q     Okay, because you use advisers in a separate paragraph
19  and that's over if you go to footnote 8.  You say, "debtors
20  and their advisers," do you see that?
21  A     Yes.
22  Q     Okay.  So did you have interactions with anyone within
23  the debtor entities, not counsel or advisers, about either
24  the solicitation, the vote, or any of those issues?
25  A     No.
```

1   Q     Okay.  Debtors' professionals, do you -- you're

2   considering counsel, Latham?

3   A     Yes.

4   Q     Advisers, who's in that category?

5   A     It would be AlixPartners.

6   Q     Okay.  So -- and anyone else that you or your group

7   talked to during this process, from the solicitation to the

8   tabulation to vote, other than Latham or AlixPartners?

9   A     No.

10  Q     Okay.  So I'm going to just talk about Latham and

11  AlixPartners, to be clear, so we're not confusing ourselves

12  about debtors' professionals and advisers, is that okay with

13  you?

14  A     Sure, yes.

15  Q     Okay, great.  Let me ask you, sir, have you ever

16  tabulated the final vote?

17  A     I don't understand the question.

18  Q     So I've struggled trying to figure out numbers in your

19  exhibits.  You have vote tallies along classes, but did you

20  ever tally up the entire vote across all classes in this

21  case?

22  A     You mean -- yes, yes.

23  Q     Okay, because I didn't hear any testimony about that.

24  And did you ever put that in any declaration what the final

25  tallies were?

```
 1  A     No, we don't tally that way.  I mean, we -- like I
 2  said, we did look at it in that sense, but we don't provide
 3  the report in that way.
 4  Q    Okay.  And you're not testifying about the final tally,
 5  is that right, in terms of the aggregate vote across all
 6  classes?
 7  A     No.
 8  Q     All right.  The debtors filed a reply brief where they
 9  used a statistic that had a really large number in it,
10  793,000.  Does that sound familiar to you in terms of the
11  overall creditors that voted in favor of the plan?
12  A     It seems about the number.
13  Q     So, I can't get there, sir, and perhaps you can look at
14  one of your charts and tell me how you get to that number.
15  Can you tell me how you get to 793,000?
16  A     I'm not sure of what in particular.  If they're talking
17  about votes, that might -- I'm sure that also includes -- it
18  could include the fact of them.  I don't' know what you're
19  referring to.
20  Q     Well, I have a big binder too and at the time of your
21  first declaration, sir, the debtors filed a brief and they --
22  in that brief, they talked about your declaration.  Have you
23  seen that reply brief that came in support of the plan of
24  reorganization?
25  A     No.
```

1   Q     All right.  Well, let me just read you the paragraph

2   because it's referring to you, sir.

3            MR. HAVILAND:  And, for counsel and the Court, let

4   me give you the reference I'm looking to.  This is the

5   Debtors' Memorandum of Law in Support of Confirmation of the

6   First Amended Joint Plan of Reorganization, Docket Number

7   5016; filed October the 27th, 2021.

8   BY MR. HAVILAND:

9   Q     And, sir, in that document on page 14 there's a

10  category talking about the voting report and they make

11  reference to your declaration that you filed back in October

12  22nd, your first declaration, okay?  And it's in conjunction

13  with that discussion -- and it continues over time, but I

14  want to read you the paragraph at paragraph 126, okay?

15           "Out of the more than 793,000 creditors that have voted

16  in favor of the plan thus far," okay?  And I just can't get

17  the math to work, sir, to get to 793,000 votes in favor of

18  the plan under your first declaration.  So do you have any

19  idea where that statistic comes from?

20  A     No, I don't know where they pulled the number from.

21  Q     Can you tell me that as of the date of your October

22  22nd declaration, what was the final tally at that point of

23  all votes cast?

24  A     No, I don't -- I don't have that.

25  Q     Can you tell me, as of the date of your first

1   declaration, the total votes cast to accept the plan?

2   A      I don't remember it offhand.

3   Q      Can you tell the tally of the votes cast as of October

4   22nd to reject the plan?

5   A      No.

6   Q      Can you tell me, sir, in terms of the vote, a

7   percentage in terms of those to favor and accept the plan or

8   those to reject?

9   A      The percentage was over 50 percent.

10  Q      Okay, you say it's over 50 percent, but you can't give

11  me any type of quantum in terms of was it by one vote?  We're

12  seeing some stuff in New Jersey in the last couple of days.

13  What was the quantum that led to more than 50 percent?

14  A      I don't remember the totals.  I do remember --

15  Q      Was it --

16  A      -- it being 50 -- over 50 percent.

17  Q      Was it a close vote?

18  A      Meaning?

19  Q      Was it like 51 percent?  We just had the -- as I said,

20  the Governor of New Jersey declared victory with a margin of

21  one percent.  Was it more than one percent?

22  A      Again, I don't remember exactly.

23  Q      Okay.  And, as you sit here today, you can't tell me

24  that it was 50 point something percent, 51, 55 percent, is

25  that right?

1  A    No, like I -- since we don't tabulate that way, I don't

2  have all the numbers in front of me, but I do have a note

3  that it -- I do remember it being above 50 percent.

4  Q    Okay, you remember that.  The debtors in their papers

5  also spoke to a different aspect of the vote and that is the

6  dollar value.  Did you ever quantify the dollar value of the

7  vote in terms of the quantum of dollars being voted by each

8  voting creditor?

9  A    No.

10  Q    You never did that at all?

11  A    No.

12  Q    Okay.  Because I see in your chart, sir, you have some

13  dollars ascribed to certain voting classes.  So you did do

14  that, right?

15  A    Yes, to the individual classes, of course, yes.

16  Q    Okay.  And the debtors in that reply paper -- I won't

17  burden you with -- I'm sure Ms. Marks knows what I'm talking

18  about -- they use the value -- again, back on October 27,

19  looking at your first report, that the dollar value was 88

20  percent in favor of accepting the plan.  Do you have any

21  basis to agree to or disagree with that?

22  A    No, I don't.

23  Q    You have no sense of whether that value is accurate, is

24  that fair?

25  A    I don't know.

1  Q     Okay.  Today, now that you've amended your report and

2  you've got this final one, do you know what the percentage in

3  terms of dollars is that voted in favor of the plan to

4  accept?

5  A     Again, we don't tally on an aggregate basis across

6  multiple plan classes, so, no.

7  Q     And you're not offering an opinion in terms of either

8  the number of vote, whether it's 50 percent or higher, or the

9  dollar value today, fair?

10  A     No, like I said, the number is above 50 percent, I did

11  not -- I know it's -- I did not do the amounts.

12  Q     I just want to be clear, sir.  In your direct

13  examination, you didn't offer an opinion about whether or not

14  more than 50 percent voted, isn't that right?

15  A     In the direct, no, I did not.

16  Q     Okay.  And today, since you've re-tabulated, right --

17  you've got a new tabulation and I'm going to go through that

18  in a moment -- do you have any sense of whether it's more

19  than 50 percent in favor of the plan?

20  A     Can you clarify, in number?

21  Q     Sure.  Counsel just went through your modifications,

22  I'll call it.  And if you want, sir, you could grab your

23  declaration and go to that paragraph that counsel directed

24  you to, which is paragraph 14.  And I'm going to do some

25  quick math here, it's not my strongest suit, but the Acthar

```
 1  claims, you had a preliminary declaration total vote of

 2  129,062 votes; do you see that, sir?

 3  A     Yes.

 4  Q     And that was knocked down to 207?

 5  A     Correct.

 6  Q     So, give or take, you struck 129,000 votes?

 7  A     Correct.

 8  Q     All right.  And then in generics price-fixing claims,

 9  6(b), you originally tabulated 257,504 votes, right?

10  A     Yes.

11  Q     And then that got reduced to 218,447, right?

12  A     Correct.

13  Q     A difference of, give or take, 40,000 votes, right?

14  A     Some -- yeah.

15  Q     And then, finally, the asbestos class claims, 6(c), you

16  had an original tally of 27,614, right?

17  A     Correct.

18  Q     And that dropped by about 1200 votes, right?

19  A     Correct.

20  Q     So, just doing some simple math here, I'm at about --

21  170 -- 180 -- 170,000, right?

22  A     I'll take your word, but it seems approximate.

23  Q     Well, rounding up with 1200 to 130 plus 40, 170 --

24  A     Okay.

25  Q     -- right?  So you took out 170,000 votes from the class
```

1  6 voting classes, right?

2  A     Correct.

3  Q     Were those favors in favor of the plan or against the

4  plan?

5  A     I believe it was both, but there was a large reject

6  amount.

7  Q     There was a large population that were rejecting the

8  plan that were stricken, correct?

9  A     It was both, but --

10  Q    But more --

11  A    -- more had rejected.

12  Q    Right.  You had -- so the asbestos claims had all voted

13  in favor of the plan originally, right?

14  A    Uh, can you clarify?

15  Q    Sure.  Class 6(c), the 27,000 votes were largely cast

16  in favor of the plan to accept, right?

17  A    I would have to review again --

18  Q    Well --

19  A    -- I don't remember offhand.

20  Q    -- that's why I wanted you to have your charts in front

21  of you, sir.

22  A    (Indiscernible) --

23  Q    Go to your original declaration, tab A, you can see the

24  tally there for class 6.  Do you see those 27,000 votes?

25        (Pause)

1   A      Okay, yes, yes, 6(c).

2   Q      Okay.  And they all voted to accept the plan, correct?

3   A      There were a handful of reject votes.

4   Q      A handful, but the vast majority of that 27,000 was to

5   accept, correct?

6   A      Correct.

7   Q      And you struck about 1200 of those, right?

8   A      Correct.

9   Q      And why did you do that?

10  A      After review, they did not meet the -- they did not

11  follow procedures.

12  Q      Okay.  And voting class 6(c), which is the asbestos

13  claims class, right?

14  A      Correct.

15  Q      Did you receive any individual ballots from asbestos

16  claimants?

17  A      I would have to review again, but I believe we did.

18  Q      Okay.  Do you know the volume of individual ballots?

19  And I'm going to ask about master ballots too, so if you want

20  to answer in terms of your knowledge either way.

21  A      To be honest, I don't remember exactly how many today.

22  I know a majority were on the master ballots.

23  Q      Okay.  We had an attorney testify and you were asked

24  about him in your direct examination, the Bevan law firm, do

25  you remember that testimony?

1   A      Yes.

2   Q      So Mr. Bevan testified that he cast a master ballot in

3   excess of 15,000 votes.  Does that comport with your

4   recollection?

5   A      Yes.

6   Q      Okay.  Did you strike 1200 of his voting class ballots,

7   his master ballot?

8   A      I do not believe we did.

9   Q      Okay.  And you didn't strike any Bevan ballots in the

10  master ballot that he filed, correct?

11  A      Right.

12  Q      Okay.  The 1200 came from somewhere else, right?

13  A      Yes.

14  Q      Do you remember if they were off a master ballot that

15  had been cast or individual ballots, or both?

16  A      I believe they were off of master ballots.

17  Q      Okay.  One or more than one?

18  A      I would have to review my declaration, again, which

19  ones were removed.

20  Q      Okay.  Could you do that for me, sir?  I don't want you

21  to take too much time, I know we're trying to be efficient,

22  but if you can look at your declaration -- oh, do you have to

23  go into a spreadsheet?  I thought you said your declaration.

24  A      This is -- Exhibit B is a very large one.

25  Q      Okay.

1   A      So I --

2   Q      That's the excluded chart, sir?

3   A      Yes, the Exhibit B --

4   Q      Okay.

5   A      -- the excluded chart.

6   Q      And just -- I won't make you do that -- that's where we

7   would go to look to find those 1200 votes that were struck,

8   right?

9   A      Yes.  And actually, to clarify, it would be off the

10  master ballots.

11  Q      Okay, help me with that.  So you get a master ballot --

12  and I've seen that, in fact our firm filed one -- you've got

13  an attorney filing a ballot, a master ballot, right?

14  A      Uh-huh.

15  Q      Yes?

16  A      Yes.

17  Q      That's the only time you did that, so just to make sure

18  we get a good stenographic record.

19  A      Okay.

20  Q      And attached to the ballot there's a spreadsheet,

21  right, with names?

22  A      Yes.

23  Q      Now, what does Prime Clerk do to verify that that list

24  of names is accurate?

25  A      So on -- it's a twofold process.  So, one, before --

1    for those in class 6 where there were claims filed, prior to

2    service, there's a review and signoff and direction by

3    counsel and advisers to the claims that were entitled to

4    vote.  And then on the back end for this case, when a master

5    ballot did come in, we would review that -- excuse me, that

6    the claim number matched the party and also to confirm the

7    debtor that the vote would be cast against.

8    Q    Let me see if I have that right, because you're talking

9    about class 6, right?  You would --

10   A    Class 6.

11   Q    Class 6, right --

12   A    Yes.

13   Q    -- in the aggregate?  Okay, just so I'm clear.  We're

14   going to get to class 8, 9, and the others in a moment.  But,

15   as to class 6, you get a master ballot signed by an attorney

16   -- and I think you went through the steps of that, I won't

17   review those again -- and that attorney would attach a list

18   of clients?

19   A    Correct.

20   Q    Okay.  And you would then take that list and talk to

21   the debtors' counsel and the advisers to confirm that that

22   list was accurate, right?

23   A    Well, we would review it against the claims register to

24   make sure that it was accurate.  If any questions did come up

25   or we did need further review, we gave it to counsel and the

1  advisers.

2  Q    Okay.  And, as to these 1200 asbestos ballots -- I just

3  want to stay on that for a moment, so we can kind of

4  understand it -- you found 1200 defective ballots, right?

5  A    Correct.

6  Q    And by that do you mean 1200 names that were listed on

7  a chart submitted by an attorney or attorneys for a master

8  ballot you found not valid?

9  A    Correct.

10  Q    How did you do that?

11  A    We made sure that they were in compliance -- or not in

12  compliance with the solicitation procedures.

13  Q    Yeah, I'm trying to get there, sir, because is it --

14  was there -- there wasn't 1200 master ballots that you went

15  through, you went to a couple of them in asbestos, right?

16  A    There was a few master -- I mean, a large amount of

17  records, but we had a few master ballots.

18  Q    But, from that process, you teased out 1200 votes to

19  strike?

20  A    Yep.

21  Q    How did you do that?

22  A    Reviewing them to make sure that they are in

23  compliance.  In this case, pretty much it was all parties

24  that -- you know, from my recollection, that did not have a

25  valid claim tied to the master ballot record.

1  Q     Okay.  Not a valid claim, not a valid claim filed by

2  the bar date except by the Court, right?

3  A     Correct.

4  Q     So you compared some asbestos attorney's master ballot

5  against the claims register and you found 1200 didn't have

6  actual claims filed, is that fair?

7  A     Yes, or they didn't have claim numbers at all.

8  Q     Okay.  Now, help me with this.  Did you use that same

9  process -- is that a quality assurance process that you're

10  doing there?

11        (Pause)

12  A     Was that the --

13  Q     Yeah, I just want to get a name for that process when

14  you were doing the auditing of the original vote cast and

15  then the later vote?

16  A     It's all part of our quality assurance, yes.

17  Q     Okay.  Well, that's our asbestos one.  Let's work up

18  the ladder, if you will.  And, if you still have your

19  declaration, I want you to look at that paragraph 14.  The

20  generic price-fixing claims, 40,000 votes were struck, right?

21  And do you know --

22  A     Correct.

23  Q     -- if those votes were votes originally cast against

24  the plan, to reject the plan?

25  A     I'm not a hundred percent sure of the vote.

1  Q      Well, do you want to take out your charts, because I

2  have them.

3  A      Sure.

4  Q      Let's take a look.  Why don't we take a look at your

5  new exhibit, Exhibit A.  And I'm going to the -- if you go to

6  page 15 of 29, you'll see the beginning of 6(b).

7  A      Uh-huh.

8  Q      Tell me when you're there.  Do you --

9  A      I'm there.

10  Q      -- have that?  Okay.

11  A      Yep.

12  Q      And I want to drop down to page 16 of 29 where it has

13  the creditor, Mallinckrodt LLC, do you have that, sir?

14  A      Yes, I do.

15  Q      Okay.  Do you see the number of votes accepting, one?

16  A      Yep.

17  Q      And you have 54,613 votes against, right?

18  A      Correct.

19  Q      Well, does that refresh your recollection that the vast

20  majority of the 40,000 votes that were struck were votes

21  against the plan?

22  A      Well, I would have to compare it to the other report to

23  show --

24  Q      Let's --

25  A      -- where the difference was.

1   Q     Let's do that.  Can you grab your original chart?

2   A     I already did.

3   Q     And let's do the same thing.  I have to go through two

4 binders.  And if you go with me to 2(b), and then you'll have

5 -- I'm sorry, not 2(b), I mean 6(b).

6   A     6(b).

7   Q     My apologies.  I'm on page 18 of 29.

8   A     I'm there.

9   Q     Good.  Mallinckrodt LLC, how many votes in favor of

10 accepting the plan?

11   A     Fifty.

12   Q     Okay.  So that was reduced from 50 to one, right?

13   A     Yep.

14   Q     A net loss of 49.  The 40,000 came out of the rejection

15 column, because if you follow down, sir, there was only 50

16 votes in Mallinckrodt LLC and 48 in PLC, do you see that?

17   A     Yes.

18   Q     But it looks like there's a net 10,000 stricken from

19 four different debtor voting classes, Mallinckrodt LLC, PLC,

20 SpecGx -- and I'm just going to average it -- 64,000 was

21 reduced to 54,000.  Let me know if you agree with that.

22   A     Yeah, it's approximate.

23   Q     So 40,000 votes in favor of rejecting the plan were

24 stricken, do you agree with that?

25   A     So in favor of -- you mean they rejected the plan?

1   Q      Rejected the plan.  I know I --

2   A      Yes, that -- yes.

3   Q      All right.  Let's go to class 6(a).  You have 129,000

4   votes originally cast; do you know if they were for the plan?

5   A      Again, I'd have to review exactly which ones they were.

6   Q      Let's go take a look.  So if you have your first

7   declaration and if you go with me to -- voting class 6(a)

8   begins on 13 of 29, but I'd like you to go with me to 14 of

9   29, Mallinckrodt ARD, LLC.

10  A      There it is.  Yes --

11  Q      How many --

12  A      -- 6 --

13  Q      Don't go to that one yet.  How many votes were cast in

14  favor of the plan by class 6(a) for Mallinckrodt ARD?

15  A      In the original?

16  Q      Yes, sir.

17  A      There was two for.

18  Q      Two votes --

19  A      Yep.

20  Q      -- right?  Okay.  How many votes against, rejecting?

21  A      Sixty four thousand, three hundred and eighty one.

22  Q      Okay.  Now drop down to Mallinckrodt PLC, how many

23  votes in favor of accepting the plan?

24         (Pause)

25  A      There it is.  Nine to accept.

1   Q      And how many to reject?

2   A      Sixty four thousand, three hundred and fifty seven.

3   Q      Using simple math, if you double 64,065, you get to

4   about 130,000 or the 129 we see on your declaration, right?

5   A      Approximately, yes.

6   Q      And so the vast majority of those votes that were

7   stricken were all rejecting the plan, correct?

8   A      Correct.

9   Q      Now, help me with that, sir.  What process did you go

10  through to decide that all of those votes were invalid?

11  A      Again, it's the review compared against the

12  solicitation procedures to make sure that they were in

13  compliance.

14  Q      And did you consult with the debtors' counsel and their

15  professionals about that?

16  A      Yes.

17  Q      And did they tell you that they wanted them stricken

18  because they didn't think that the claims were valid?

19  A      Yes.

20  Q      Okay.  Did you do --

21  A      For the vote, yes.

22  Q      Yeah.  Did you do that with any other voting class?

23  Class 2, 3, 4, 5, in terms of this type of review of a large

24  block of votes, and go back and decide whether or not the

25  claims were valid?

70

```
 1  A     Well, not all of them -- class 2 is based on a single
 2  claim, so that was not necessary, as well as the bondholder
 3  claims, again, are based on the claim of the indenture
 4  trustee, so those are -- it's a different concept.
 5  Q     All right.  Why don't we -- I'm going to try and
 6  streamline.
 7            MR. HAVILAND:  And, Your Honor, I don't want to
 8  keep -- I'm actually at a short transition here.  I'm really
 9  trying to be efficient and I think we have some time with the
10  extra -- the hearing taking up, but I'm mindful of a break.
11  If Your Honor wanted to take one, now is probably an
12  opportunity.
13            THE COURT:  All right, let's take a 15-minute
14  recess.  We'll reconvene at 2:45.
15            MR. HAVILAND:  Thank you.
16        (Recess taken at 2:29 p.m.)
17        (Proceedings resumed at 2:45 p.m.)
18            THE COURT:  All right, we're back on the record.
19  Mr. Daloia, I'll remind you you're still under oath.
20            Mr. Haviland, you may proceed with your cross.
21            MR. HAVILAND:  Thank you, Your Honor.
22  BY MR. HAVILAND:
23  Q     Mr. Daloia, did you talk to anybody during the break?
24  A     No, I did not.
25  Q     Did you review any documents?
```

71

```
 1  A      No.
 2  Q      All right.  I just want to finish up on a couple of
 3  things that debtors' counsel asked in the direct examination.
 4          You were asked about the criteria for exclusion, do you
 5  remember that?  You talked about a blank and unsigned form
 6  would be one basis for exclusion, do you recall that?
 7  A      Yes.
 8  Q      Okay.  I want to try to understand the 170,000 votes.
 9  Can you recall if any substantial portion of those that voted
10  to reject the plan were because they were unsigned?
11  A      No, it wasn't that.
12  Q      Okay.  And was the striking of those votes because they
13  were duplications?
14  A      I don't believe so.
15  Q      Okay.  Was the striking of those votes because they
16  were superseded?
17  A      To clarify, which votes?
18  Q      Well, I'm just dealing with the population of the class
19  6 votes for now.
20  A      Okay.
21  Q      I went through that list and I came up with a number of
22  170,000.  You gave me four criteria, you said that if they
23  didn't vote, it was blank or unsigned, there was a
24  duplication or it was superseded.  So I've already covered
25  two of those.
```

1   A       Right.

2   Q       How about superseded, were any of the hundred -- a

3   substantial portion of the 170,000 superseded by any?

4   A       Not a substantial portion.

5   Q       Okay.  You testified earlier that, with respect to the

6   changes between the October 22nd and the November 1

7   declaration in the charts, you said it was at the direction

8   of counsel you were notified as to the validity of certain

9   claims.  Do you remember that?

10  A       That's correct.

11  Q       Okay.  And is it fair to say that it was at that

12  direction that these claims were deemed suspect and then the

13  votes were stricken?

14  A       The votes were stricken, not the -- it was not the

15  claims directly.

16  Q       So you didn't make a determination of validity of

17  claims, you just struck those 170,000 votes, is that right?

18  A       We don't make a determination on the validity of

19  claims, no.

20  Q       Okay.  And then you testified, sir, that -- when

21  counsel went through this process with you that those changes

22  didn't affect the vote in any class, do you remember that?

23  A       Correct.

24  Q       You agree with me, though, that the aggregate vote to

25  reject the plan was reduced by a substantial amount, 170,000,

1   right?

2   A      Yes.

3   Q      What you were saying was, as to those individual

4   classes, it didn't change the outcome of 6(a) to reject, for

5   instance, correct?

6   A      That's correct.

7   Q      And 6(b) still rejected, right?

8   A      Correct.

9   Q      And 6(c) still accepted, correct?

10  A      Correct.

11  Q      So the reduction of 170,000 diminished those votes, but

12  didn't change the outcome of the vote on a 50-50 comparison

13  to see whether there was a majority either way, right?

14  A      I'm not sure what you mean by a 50-50 comparison, but

15  on the aggregate it was -- what I testified to was based on

16  each individual plan class.

17  Q      Okay.  It didn't change the outcome where you recorded

18  in your Exhibit 6(a) -- your Exhibit A that one class voted

19  to reject, another class voted to accept, that outcome didn't

20  change?

21  A      Right, exactly.

22  Q      I want to go back to some basic principles, sir.  I was

23  trying to go through some of the things you already talked

24  about.  And we didn't have the chance to talk before this, so

25  I appreciate your time.

1     The solicitation that you sent, can I just get some

2  basic foundation from you?

3  A     Sure.

4  Q     I had my exhibits, but I want to make sure that we have

5  a clear record here.  The solicitation version of the plan,

6  would you mind looking at Joint PI Exhibit Number 1, if you

7  have access to that?  And just identify if that's the plan of

8  reorganization that was mailed out to creditors.

9     (Pause)

10  A     So Joint PI Exhibit 1, correct?

11  Q     Yes, sir.  And there's a different convention, there's

12  Joint PI and then the debtors' Phase I exhibits, I'll try to

13  be clear.

14  A     Thank you.  This -- let me see -- yes, this is the

15  original plan.  It appears that way, yes.

16  Q     Okay.  And that was the one that was mailed in June of

17  2021, right?

18  A     Yes.

19  Q     With all the material you described; the ballot, the

20  letters from the OCC and UCC, right?

21  A     Correct.

22  Q     Okay.  And you testified that since that mailing that

23  votes were coming in weekly, right?

24  A     Actually, daily.

25  Q     Daily, okay, because the deadline was early September

1    under that original solicitation, correct?

2    A     Correct.

3    Q     And you tallied -- and when I say "you," sir, I just

4    mean your group, I'm not suggesting --

5    A     No, I understand.

6    Q     Okay, unless you have an abacus right there.  But daily

7    your group would tally the vote as it came in, right?

8    A     Yes.

9    Q     Now, did you create a results page, like a kind of

10   headline at the end of the day to see where the votes stood

11   each day?

12   A     As the case progressed, yes.  We have a report that we

13   create to make sure.

14   Q     Okay.  And was that shared with the debtors?

15   A     On certain -- not daily, based on requests, though.

16   Q     All right.  And did the debtors provide feedback to the

17   daily reports that you provided?

18   A     Sometimes.

19   Q     Okay.  Was it shared with anyone else, like counsel for

20   the UCC?

21   A     If there was, we didn't send it directly.

22   Q     Do you have any personal knowledge that those reports

23   were shared with either counsel for either committee at any

24   time?

25   A     I am not sure.

1   Q    The other day, counsel for the UCC made a comment about

2 being aware that the asbestos votes came in at a later point

3 in time and I'm just wondering, do you know how he would know

4 that, how he would know when the asbestos votes came in?

5   A    No.

6   Q    There's nothing that you put in the record, right, sir,

7 in your declaration or charts that would tell us when

8 particular voting classes or master ballots were submitted,

9 right?

10   A    I wouldn't know.

11   Q    Okay.  And you just don't know whether or not there was

12 any sharing of your daily or periodic records with anyone

13 outside debtors' counsel, right?

14   A    Correct.

15   Q    Okay.  Now let me just hop to the next exhibit, which

16 is Joint PI Exhibit 3.  It should be the next -- third one in

17 your binder.  And do you recognize that as the first amended

18 joint plan of reorganization of the debtors in this case?

19      (Pause)

20   A    Yes, correct.

21   Q    You've seen that before today?

22   A    Yes, I have.

23   Q    Now, am I right that Prime Clerk did not mail that out

24 to creditors?

25   A    I honestly do not remember.

1    Q      You don't remember?

2    A      I don't remember if we served the amended, no.

3    Q      Okay.  It was filed on the 29th of September, we're

4    sitting here the first week of November, you just don't know

5    if that document was mailed out to tens of thousands of

6    people?  And that's fine if you don't remember.

7    A      No, I do not remember.  There would be an affidavit, if

8    it was.

9    Q      Right.  And you didn't do an affidavit saying that that

10   amended plan was ever served on the creditor body, right?

11   A      Not that I remember.

12   Q      And Prime Clerk did not send to the general body of

13   creditors the letter created by the UCC with their changed

14   recommendation, right?

15   A      No, we did.

16   Q      You did?  All right, I want to understand that.  You

17   sent out the letter -- and I have it, if you want to see it,

18   but it's in our -- the AHAG exhibits, but if this is easier,

19   let's do it this way.

20          There was a letter of recommendation to vote against

21   the plan created by the unsecured creditors committee back in

22   June, do you remember that?

23   A      Yes, that was served with the original packets.

24   Q      Right.  Now, are you telling me that the new letter

25   that was issued after the UCC settled and was included in the

```
 1  first amended joint plan of reorganization, that was served
 2  on creditors?
 3  A     I believe it was, on certain creditors.
 4  Q     Certain creditors, but not all?
 5  A     It would be based on the direction, but I would have to
 6  look at whatever affidavit of service was filed on that.
 7  Q     The direction of whom, sir?
 8  A     Of counsel.
 9  Q     Debtors' counsel or UCC counsel?
10  A     Debtors, debtors' counsel.
11  Q     Okay.  The debtors' counsel directed you to send the
12  UCC's letter to certain creditors, right?
13  A     I don't remember, but I believe so.
14  Q     Did Prime Clerk also serve the OCC's new letter?
15  A     Yes.
16  Q     Okay.  And who directed you to do that?
17  A     Then counsel -- debtors' counsel.
18  Q     All right.  So the letters were served, but the first
19  amended plan, you're not clear if it was, right?
20  A     No, I don't remember.
21  Q     All right.  And that's a bigger document, you have it
22  in front of you, right?
23  A     That's correct.
24  Q     All right.  Now, let's -- thank you.
25        As you were doing the vote tallies on a daily or
```

1  periodic basis, at any point in time from when that started

2  up until the original vote deadline in early September, did

3  any vote or master ballot change from one to the other, from

4  accept to reject or reject to accept?

5  A    I don't know.

6  Q    You don't know?

7  A    No.

8  Q    How would we know that, sir?

9  A    We would have to review the ballots coming in and the

10  tabulation.

11  Q    So what I'm trying to get to, sir, is if a creditor

12  interest like my group wanted to see that a master ballot was

13  changed from the time it was originally cast to a different

14  vote before the close, could we see that in the public

15  record?

16  A    Well, what you can see is on Exhibit B, if there is a

17  master ballot that was superseded by a later, timely ballot.

18  Q    Help me with that.  It was superseded by a later,

19  timely ballot, it would show --

20  A    Correct.

21  Q    -- a change in vote?

22  A    The superseded doesn't necessarily mean a change in the

23  vote, but that would be your starting point.  It means that

24  any of the record was different than the prior ballot.

25  Q    It would only show you it was superseded, but it

1   wouldn't tell you materially whether or not the vote cast

2   went from reject to accept or vice versa, fair?

3   A     Correct.

4   Q     All right.  I want to ask you about the dollar values

5   -- and I'm ambivalent, sir, if you want to look at your

6   second declaration or your first for these questions.  I'll

7   tell you when I want to do otherwise, but let's go with your

8   first declaration --

9           MR. HAVILAND:  -- which I think it's the Joint P1

10  Exhibit 4, Your Honor, the preliminary declaration of James

11  Daloia from October 22nd.

12          THE COURT:  I have it.

13  BY MR. HAVILAND:

14  Q     What I really want to do, though, sir -- Mr. Daloia,

15  that is -- I want to have you go to your preliminary voting

16  results, which are, unfortunately, disaggregated.  It's under

17  Debtor P1 Exhibit 16.

18  A     Oh, I'm sorry, which exhibit?

19  Q     Yeah, I didn't realize that in the debtors' exhibits

20  the declaration was set apart from the actual exhibit.  So

21  it's the Debtors' Phase I Exhibits 16, 17, and 18.  I want to

22  focus on 16, sir.

23          (Pause)

24  A     Bear with me one moment.

25  Q     Yep.

```
 1   A      So, I'm sorry, what number?

 2   Q      One six, 16.

 3   A      One --

 4   Q      In that second series, though.

 5          (Pause)

 6   A      Oh, I'm sorry.

 7   Q      Yeah, it's not the joint one, it's the next --

 8   A      Yeah, I'm looking at the wrong one.

 9   Q      The Debtors' Phase I exhibits.

10   A      I think this is it.  Debtor PI, Exhibit 16?

11   Q      Yes, sir.

12   A      Okay.

13   Q      And it should be your Exhibit A-1 to your first

14   declaration, right?

15   A      Yes.

16   Q      And you'll see there you've got -- we've already

17   touched upon the number accepting, the number rejecting.  I

18   want to go to the amount.  Do you see the amounts?

19          So, obviously, with class 2(b), you've got substantial

20   amounts because you've got institutional creditors right

21   there.  You've got 1.269 billion in the very first line,

22   right?

23   A      Uh-huh.

24   Q      Yes?

25   A      Yes.
```

1   Q      Now, am I correct that what Prime Clerk did is you took

2   the ballot, and the ballot listed on the ballot an amount,

3   and then you aggregated all those dollar amounts to come up

4   with these values for the amount accepting and rejecting, am

5   I correct about that?

6   A      Based on -- based on the ballots returned, correct.

7   Q      So, just to walk through the first line, 2(b), the 319

8   votes to accept aggregated to 1.269 billion --

9   A      Correct.

10  Q      -- right?

11  A      Right.

12  Q      And then the one, the one ballot to reject was 176,000,

13  right?

14  A      Correct.

15  Q      And all you did was take that off the face of the

16  ballot, right?  The ballot told you the amount and you put in

17  the spreadsheet?

18  A      Well, the amount on the ballot was based on the

19  administrative agent's records.

20  Q      Okay, but you didn't go beyond what was presented to

21  you in terms of the ballot and what was said there, right?

22  A      No.

23  Q      Okay.  And did you do that for every other voting class

24  in terms of taking the amount stated on the ballot submitted

25  to Prime Clerk and then calculate the values?  And let's hop

83

1  ahead, if we can, to -- let's do number 3, if you go to class

2  3, and I'm going to be on page 6 of 29.

3        The vote was a little tighter there, right?  You had 47

4  percent to accept and 52.5 percent to reject, right?

5  A     As you get into class 3, correct.

6  Q     Yeah.  And I'm just going to focus on class 3 because

7  it gives us a different look, right?

8        So, on a numbers basis -- and I'm struggling, sir, it's

9  not my forte -- but you're discounting ballots.  You had a

10  total ballot count there of 80, right?

11  A     Correct, 80 votes.

12  Q     And 38 said no, 42 said -- I'm sorry, 42 -- 38

13  accepted, 42 rejected, right?

14  A     Correct.

15  Q     So, as to that voting class group, the plan failed in

16  that quantum vote, right?  It didn't reach 50 percent.

17  A     Right.

18  Q     Okay.  And it also failed in a monetary sense when you

19  calculated the monetary value of each of those ballots,

20  right?  You have 51 million to accept and 355 million to

21  reject, right?

22  A     That's correct.

23  Q     And, again, all you did was take the monetary value

24  that came in on the ballots, then you totaled them up and

25  then you put them in this array so you could see a comparison

1  of the two, right?

2  A    Yes.

3  Q    And that's how you got to the final column where it

4  says, "Class voting result, accept, reject," right?

5  A    That's correct.

6  Q    Okay, great.  Now, let's hop ahead, if we can, to class

7  6.  And I am on page 13 of 29 at the bottom.  Do you see

8  that?

9       (Pause)

10  Q    I'm sorry, are you with me on --

11  A    I'm sorry.  Yes, yes, I'm there.

12  Q    I didn't hear you, I had my head down.  So there's only

13  three voting classes there and there's five votes to reject.

14  I want to turn over to the big ones, ARD and PLC, which are

15  on pages 14 and 15 of your affidavit.  Do you have those?

16  A    Yes.

17  Q    We covered this a little bit, but as to all of the

18  class 6(a) votes, they're only ascribed one dollar, right?

19  A    Correct.

20  Q    Okay.  You didn't look at the proof of claim filed by

21  any voting member in terms of what they listed on the ballot

22  for the size of their claim, correct?

23  A    No, the amount was determined by the procedures.

24  Q    Okay.  I just want to be clear, though, and I'm happy

25  to show you one.  The City of Rockford, for instance, sir,

1   filed a proof of claim, Claim Number 4388, which was accepted

2   by Prime Clerk, and it listed an amount, 1.3 million, that

3   value was not taken off that claim and then accepted as true

4   on the ballot that was submitted for Rockford, am I right

5   about that?

6   A    It's not the amount that was used to tally the vote,

7   no.

8   Q    All 6(a) claims were ascribed a dollar regardless of

9   the claim filed and the amount put in the ballot, correct?

10  A    Yes, in this report.  Yes.

11  Q    Okay.  And then as to class 6(b), it should follow on

12  page -- it's at the bottom of 16 and then it carries over,

13  your first big voting class is Mallinckrodt APAP.  Do you

14  have that?

15  A    Yes.

16  Q    On page 17.  Again, all the 6(b) claimants were

17  ascribed a dollar for their votes, right?

18  A    Correct.

19  Q    Regardless of what the voter had put down and

20  regardless of whether there was a claim filed with a

21  different amount, correct?

22  A    Correct.

23  Q    All right.  And then, finally, as to class 6(c), which

24  we talked about the asbestos, same convention, one dollar

25  regardless of the claim amount in the claim or the ballot,

1  right?

2  A     That's correct.

3  Q     All right.  And you say that was because it was part of

4  the instructions, right?

5  A     Correct, that's part of the procedures.

6  Q     All right.  Bear with me one moment.  I actually

7  covered a lot of ground by not going one by one.  All right.

8        (Pause)

9  Q     All right.  If you could stick with that Exhibit A, I

10 want to try to do some math with you, sir.

11       I told you I had some difficulty trying to get to the

12 793,000 votes in favor of --

13       (Crosstalk)

14 Q     I'm sorry?

15            THE COURT:  Mr. Sussman?  Mr. Sussman, mute your

16 phone line, please.  If I get interrupted again, I'm going to

17 kick you off the call.

18            Go ahead, Mr. Haviland.  Sorry.

19            MR. HAVILAND:  Thank you, Your Honor, I appreciate

20 it.

21 BY MR. HAVILAND:

22 Q     And I understand, Mr. Daloia, you didn't tabulate the

23 totals, but I'm trying to get to a sense of how the debtors

24 report a total of 793,000 and my math just doesn't get there,

25 sir.  So I wanted to see how much you know because you did

1  say that, as of October 22nd that the plan had been accepted

2  by more than 50 percent of the vote; am I right about that?

3  A    Correct.

4  Q    Okay.  So when I go through these voting classes, sir,

5  and I start tallying up votes -- and let's just walk through

6  it quickly -- 2(b) and (c), our first two voting classes in

7  2, you're dealing with a couple of hundred votes, right?

8  A    Correct.

9  Q    I've got about 62 votes in 2(b) and 209 votes in 2(c).

10 No more than 300 votes, right?

11 A    No, because you have 319 alone in 2(b) -- you have 320

12 alone in 2(b).

13 Q    Yeah, I'm just -- I'm picking one box out.  You've got

14 300 and, if you multiply them out, you're going to end up

15 with probably a couple thousand, right

16 A    Okay.

17 Q    Fair?

18 A    I'm not a math wizard, but sure.

19 Q    Well, and then if you go to class 3, we did this

20 already, you've got 80 total votes, the 38 to 42, right?

21 A    Correct.

22 Q    And if you math that out, you're going to deal with

23 maybe a couple thousand if you get there, right?

24 A    Correct.

25 Q    Class 4, you've got 70 total votes, right?

1  A      Correct.

2  Q      Class 5, you've got about 413 or so votes, depending on

3  which one you're looking at.

4  A      Correct.

5  Q      So you're in the hundreds until you get to class 6,

6  fair?

7  A      Yes.

8  Q      All right.  We've already looked at class 6, you've got

9  tens of thousands of votes, right?

10 A      Correct.

11 Q      And when I tally that all up, Mr. Daloia, I come up

12 with about 260,000 for class 6(b), 130,000 -- we already saw

13 the 129,000 you had -- for a total of about 390,000 votes to

14 reject the plan in class 6.

15       And do what you have to to see that.  We kind of went

16 over those numbers and I'm --

17 A      Yep.

18 Q      -- giving you my rough math, right?

19 A      Yes, roughly, it's about right.

20 Q      And so there's no way the plan is accepted at that

21 point in time because you've got a couple of thousand in

22 classes 2 to 5, and you've got a couple of hundred thousand

23 in class 6 to reject, right?

24 A      I'm not sure I understand.  That's not the full plan.

25 Q      I know, I just want to walk the classes with you.  So

1   you started class 2, up to 5, you've got a couple of thousand

2   votes to accept he plan -- just in the numbers sense, 1, 2,

3   3, 4, right?

4   A      Yes.

5   Q      You get to class 6, you've got 390,000 voters saying

6   reject, right?

7   A      Yeah, approximately.

8   Q      Okay.  It's not until you get to the opioid classes

9   that you see the ballots start to change, right?

10  A      By change --

11  Q      Well, and I didn't want to skip over the asbestos

12  claimant, you have 27,000 votes in favor of the plan.

13         So, by class 8, now you see --- in class 9, you see

14  substantial votes.  And the real big class to me, sir, is

15  class 9(b), third party payers.

16  A      That's not -- that's 9(a).

17  Q      Oh, I'm sorry.  I had it written and I didn't even read

18  the right number.  Sometimes a dyslexia even with my own

19  handwriting.  So, 9(a) is third party payers.

20             MR. HAVILAND:  And, Your Honor, I'm on page -- the

21  third -- well, it's actually not numbered.

22  BY MR. HAVILAND:

23  Q      At the end of Exhibit A, 29 of 29, there's a carryover

24  page, which is A-2, right, Mr. Daloia?

25  A      Correct.

1  Q     And that's your voting results for the opioid classes

2  and then the government's Acthar class, Class 10, correct?

3  A     Yes.

4  Q     And that's only 97 votes, so that's not impacting the

5  aggregate vote totals, right?

6  A     Not substantially, no.

7  Q     It's really these opioid votes, right?  And you've got

8  hundreds of thousands of votes to accept the plan from opioid

9  voters, right?

10 A     Correct.

11 Q     And the vast majority of which are third party payer

12 opioid claims, 9(a), right?

13 A     Let me -- yes.

14 Q     Three hundred and forty two thousand, four hundred and

15 thirty two votes to accept, 3,995 to reject, right?

16 A     That's correct.

17 Q     Now, I want to understand that and your first

18 declaration doesn't really get me there.  Your second

19 declaration gives us a little information about what's going

20 on with the opioids.  And if you want to -- can you just keep

21 that chart open, sir, and then go to your second declaration,

22 paragraph 9.

23        MR. HAVILAND:  This is Exhibit -- Joint Exhibit 3,

24 Your Honor.  It's Docket 5087, Debtors' Joint Exhibit Number

25 3, I believe.

```
 1              THE WITNESS:  So paragraph 9?

 2              MR. HAVILAND:  Paragraph 9, yeah.

 3              THE WITNESS:  Gotcha.  I'm there.

 4  BY MR. HAVILAND:

 5  Q     So let me read -- let me read that for everybody

 6  because I cannot screen share.  It's just my station in life,

 7  I'm never going to get that technology savvy, but you have

 8  it, right?

 9  A     Yes, I have it in front of me.

10  Q     Let me read it for everyone.  "Pursuant to the

11  disclosure statement order and the solicitation procedures

12  therein" -- and that's the procedures you covered with

13  counsel on your direct, right?

14  A     Correct.

15  Q     All right.  "In addition to receiving a solicitation

16  package, if available, all entities that believed they held

17  an opioid claim in voting classes 8(a) to (d), and 9(a) to

18  (h), were also permitted to vote on the plan by requesting

19  and submitting a ballot directly through an online portal

20  accessible at mnkvote.com and through the debtors' case

21  website.

22        "As of October 20th, 2021, the debtors had received

23  approximately 2,900 votes on the plan in aggregate from

24  classes 8 and 9 through the mnkvote.com portal."

25              Did I read that correctly?
```

1  A      Yes.

2  Q      So I want to unpack that, sir, because I want to

3  understand.  First of all, you didn't give us an array of the

4  vote totals across debtor entities, right?

5  A      That's correct.

6  Q      So when I see 342,000 third party payers, I don't know

7  are they voting in one debtor's estate or all of them, right?

8  A      It's my understanding that those votes would count

9  against all debtors.

10 Q      Well, I'm asking a different question.  Did the votes

11 that are tallied here, did they come in as one block against

12 all debtors or were they actually arrayed against, as I saw

13 on the ballot, different debtors' estates?

14 A      Some had different debtors and some did not have a

15 debtor --

16 Q      Now --

17 A      -- but they're all applied against all debtors --

18 they're applied -- aggregated.

19 Q      Against all 64 debtors' estates, right?

20 A      Against, yes, I believe it's 64, correct.

21 Q      And are you aware that the opioid claimants don't have

22 claims against all 64 debtors?

23 A      No, I'm not aware of their claims at all.

24 Q      Okay.  And when you got this 342,000 third party payer

25 ballot -- or ballots, Prime Clerk didn't go back and try to

1   verify whether there were in fact claims made against all the

2   different debtors' estates that there were votes coming in

3   on, fair?

4   A    Correct, there was no claim -- there was no bar date

5   related to them.  So, no, there is no verifying the claim.

6   Q    I'm going to get to that, I just want to -- you didn't

7   go back, Prime Clerk didn't go back and try to look to see

8   whether, if they voted 10,000 votes in some debtors' estate,

9   there was actually some cause of action that could be alleged

10  by the opioid claimants against that debtor estate, nothing

11  like that was done, right?

12  A    We wouldn't investigate that, no.

13  Q    But beneath this total, which is just on your Exhibit

14  A2, there is backup that gives demarcation of where the votes

15  were being arrayed among the different debtors' estates,

16  right?

17  A    It depends.

18  Q    On what?

19  A    On if they provided a debtor or not, but it wasn't

20  applied that way.

21  Q    And is there a place that we can go and look at all

22  these opioid votes?

23  A    Yeah, they're in our system, we have them available.

24  Q    They're in your system, but --

25  A    Yep.

1   Q    -- is there a place I can go and look where I'm

2   sitting?

3   A    As stated earlier, they can be made available.

4   Q    But they haven't been made publicly available for us to

5   verify what's behind that 342, right?

6   A    No, the ballots are not public --

7   Q    All right.  Do you know how many third party payers

8   there are in America?

9   A    No, I don't.

10   Q    We had an expert testify some time ago that there's no

11   more than 50,000, would that surprise you to learn that?

12           MS. MARKS:  Your Honor, I object --

13           THE WITNESS:  I -- no.

14           MS. MARKS:  Your Honor, I object to form as vague

15   and ambiguous.

16           THE WITNESS:  No.

17           MS. MARKS:  They're party payers for what?

18           THE COURT:  Well, and you're testifying,

19   Mr. Haviland.  Let's move on.

20           MR. HAVILAND:  Fair enough.

21   BY MR. HAVILAND:

22   Q    Were there 342,000 individual votes cast for whatever

23   you call third-party payers?

24   A    There is -- yes, the amount of votes reflected in the

25   votes, that matches the amount of individual votes we

1  received.

2  Q    Okay.  That's -- I want to be clear.  It's not oh I

3  want to make sure that there was a name ascribed, a different

4  name for every one of the 342,432 votes to accept the plan in

5  Class 9(a).

6  A    There were 342,000 individual votes, yes.

7  Q    Just make sure your answer is what I'm asking.  I

8  understand that's a vote tally, but just hear me out.

9  Each vote was just one vote for a third-party payer, not one

10  third-party payer casting five votes; do you understand?

11  A    I would need to go back and look at the details, but we

12  counted the individual votes.

13  Q    So, we don't know in this record whether or not one

14  third-party payer cast 1 vote or 10 votes in the 342, right?

15  A    I would have to review my records, yeah.

16  Q    There's no way we can do that right now, right?

17  A    No.

18  Q    All right.  And the same is true as to the personal

19  injury -- well, I don't want to put words in your mouth.

20  9(b), PI opioid claims, what's that stand for?

21  A    Personal injury.

22  Q    Okay.  And so, there's -- how did you differentiate a

23  PI opioid claim from a third-party payer claim?

24  A    In this report -- and, again, these were preliminary --

25  this report was based on how a party submitted their ballot.

1  Q      Well, you used the same convention in your later

2  report, right, with these classifications?

3  A      Correct.  It was how they -- I'm sorry, to clarify,

4  that's how they identified themselves on these ballots.

5  Q      And the voter self-identified if they were a third-

6  party payer claim, a PI claim, or something else, right?

7  A      Or their attorney did if it was on a master ballot.

8  Q      So, let's go back to your declaration, sir, where you

9  listed, as of October 20th --

10 A      Wait.  Sorry.  Which declaration?

11 Q      Your second one.  That's why I wanted you to keep it

12 there on your table.  Yeah, we're at paragraph 9, where I

13 just read.

14 A      Go ahead.

15 Q      I want to unpack that.

16        And you reported 2900 votes in aggregate from Classes 8

17 and 9.  What do you mean by "in aggregate"?

18 A      The total across all those classes.

19 Q      Total votes submitted, right:  master ballots and

20 individual?

21 A      Yeah, via that website, over the class of -- you know,

22 8 and 9 and the relevant subject.

23 Q      Okay.

24 A      The subclasses -- not the subject -- the subclasses.

25 Q      So, across all Classes 8 and 9, there were 2900 votes

1  on the MNK.com -- MNKvote.com website, right?

2  A    Yes, just through that website.

3  Q    Could you do a master ballot through that website?

4  A    No, the master ballot would be submitted directly to

5  us.

6  Q    Okay.  So, the 2900, these are individual opioid votes,

7  right?

8  A    Correct.

9  Q    To get to 342,000, these other totals, they came by

10  master ballots, right?

11  A    Yes, the majority.

12  Q    Okay.  How many law firms submitted master ballots in

13  Classes 8 and 9?

14  A    I forget exactly the amount, but it was probably about

15  115 or 120.

16  Q    And when I look at something like 342,000, would you

17  agree with me that the vast majority of those votes came by

18  master ballot, not tens of thousands of individual votes?

19  A    That is correct.

20  Q    All right.  Now, in your statement, you said that all

21  the votes were based upon entities that believe they had an

22  opioid claim.

23       Do you see that?

24  A    Yes.

25  Q    And what did you mean by that?

1   A      I believe it speaks for itself, you know, it's these

2   parties were voting because they believe that they have a

3   vote or a claim against Mallinckrodt or one of the entities.

4   Q      So, I know you testified that these opioid claimants

5   self-identified, right, you didn't have a list or anything to

6   check against, right?

7   A      For the most part, no.

8   Q      And you just accepted, *en masse*, all the master ballots

9   and all the lists that came in, right?

10  A      For the voting purposes, yes.

11  Q      And all these master ballots submitted by these hundred

12  law firms, all submitted lists, based on beliefs that all the

13  people on the lists had opioid claims, right?

14  A      That's -- yes.

15  Q      Prime Clerk had no way to go back and verify whether a

16  belief was a reality in terms of whether somebody actually

17  had an opioid claim, correct?

18  A      No -- correct, no.

19  Q      Okay.  Because you didn't have any claims to verify

20  against, right?

21  A      That's correct.

22  Q      This voting bloc was all based upon attorneys

23  submitting master ballots, based upon beliefs that their

24  clients had claims; is that fair?

25  A      For the most part, yes.

AA0000428

1   Q     Well, you had the 2900 votes of people you could

2   actually see coming into (indiscernible), right?

3   A     Right.  And that I'm saying, it's because there's also

4   state parties in there, as well.

5   Q     Sure.  And you know the State of Rhode Island, for

6   instance, did you know -- did Mr. Rice vote against the plan

7   or in favor of the State of Rhode Island?

8   A     I would have to go back and look at that individual

9   vote.

10  Q     The state is an easy one, right; that's 50 voters,

11  right?

12  A     Again, not necessarily.

13  Q     Well, there's only 50 states, as far as I know.

14  A     Right.  But there's also territories and state entities

15  that were also entitled to vote.

16  Q     Fair enough.  I do want to -- let's stay with your

17  affidavit, sir, because I'd like to finish up.  I don't have

18  the time here, but I appreciate your jumping around with me,

19  because it's helpful to get to the finish line, here.

20  And just to button up an issue, you do not have a document

21  ready-made to be able to break down the vote totals in your

22  Exhibit A(2) by debtor organizations, right.

23  You've not done that?

24  A     Correct.

25  Q     All right.  Who -- strike that.

1         Okay.  In your paragraph 9 -- and I'm still there.  I

2    said I wasn't done unpacking, because there's a lot in

3    there -- you have a Footnote 4.

4         Do you see that?

5    A    Yes.

6    Q    Okay.  Let me read it for those who are listening.  We

7    have 197 folks on the Zoom here:

8              "My preliminary declaration noted that certain

9    votes in Classes 8(a), 8(d), and 9(h) were temporarily

10   withheld from the tabulation."

11        And, sir, you could get your old declaration, your

12   first one.  This paragraph 9 was not in there, right, you

13   added this information?

14   A    That's correct.

15   Q    And you added this footnote, right?

16   A    Yes.

17   Q    I meant to ask you, you were up pretty late getting

18   this tabulation done.  We got a (indiscernible) in the

19   morning on the first day of trial.

20        Were you actually working on the tabulation through the

21   weekend until 1:00 a.m.?

22   A    Sorry.  Your screen broke up a little bit.

23   Q    Mine did?

24   A    Yeah, can you repeat that.

25   Q    Yeah.  I just wanted to know, the second declaration

1  didn't come in until early in the morning.

2      Was Prime Clerk working through the weekend to do the

3  final tabulation that we're looking at here?

4  A    Well, we were originally scheduled to file this on the

5  Friday, which I believe was the 29th.  From my understanding,

6  there was a motion filed for an examiner, which led to

7  further review and checks.  We were still making, you know,

8  doing quality assurance and reviewing and, therefore, it was

9  filed on the 31st.

10 Q    So, you jumped to something I was going to cover with

11 you in a moment, but let's do that now since you brought it

12 up.

13      Because the reason for the delay, and I'll say because

14 the court order, you knew, said, this final tabulation should

15 be filed by four o'clock on Friday, the 29th.

16      You knew that?

17 A    Yes.

18 Q    Okay.  But you didn't file it then because there had

19 been a motion for an examiner filed?

20 A    That's my understanding, yes.

21 Q    How did you hear about that?

22 A    I would have heard it from Latham.

23 Q    Okay.  And what did they tell you about that?

24      MS. MARKS:  Your Honor, I would interject an

25 objection here.  You know, Mr. Daloia can answer generally,

1  but I would ask him not to reveal the substance of privileged

2  communications if Latham would have told Prime Clerk about

3  any legal analysis about that motion.

4         THE COURT:  Well, is there a privilege between a

5  claims agent and the debtors' counsel?

6         MS. MARKS:  So, I don't know if there's any case

7  law on point directly answering that, but to the extent that

8  Prime Clerk is considered an agent of the debtors for these

9  purposes, if we revealed privileged information to them, I

10  would argue, respectfully, that it should be protected.

11         THE COURT:  Well, aren't they appointed for the

12  convenience of the Court, because otherwise, the Court would

13  be handling the claims as they came in and the vote

14  tabulations.  And we appoint a claims agent so the Court

15  doesn't have to do that.  I don't think they're an agent of

16  the debtors.

17         MS. MARKS:  Your Honor, I just wanted to voice our

18  objection, you know, for the record, but I'm fine with

19  Mr. Daloia going ahead and answering if he remembers, as long

20  as it's not considered a waiver.

21         THE COURT:  Mr. Haviland?

22         MR. HAVILAND:  Your Honor, I would just like to

23  make clear, our objection to the objection that there should

24  be no withholding of testimony by this witness in terms of

25  what he knows, given where we are in the discussion.  If he

1  was told information, I don't think there's a privilege.

2  There shouldn't be a privilege.  And I want to know what he

3  did with the information in terms of the weekend.

4            THE COURT:  The objection is overruled.

5            You can answer.

6  BY MR. HAVILAND:

7  Q    Mr. Daloia, do you have the question again?

8  A    Yeah, would you mind repeating it?

9  Q    Yeah, no worries.

10       So, you were told only Friday, the day that your final

11  tabulation was due, that there had been a motion for an

12  examiner filed; is that fair?

13  A    Yes.

14  Q    Was the file tabulation done and ready to be filed by

15  4:00 p.m.?

16  A    The final tabulation was in a final form, yes.

17  Q    So, Prime Clerk was ready to remit its obligation under

18  the Court's order and file that report by four o'clock on

19  Friday, right?

20  A    That was our intention.

21  Q    But then the debtors told you a motion had come in and

22  you didn't meet that deadline, right?

23  A    That's correct.

24  Q    You worked through the weekend to change totals or

25  adjust totals, right?

1  A     We worked through the weekend to do quality assurance,

2  based on that.

3  Q     What was your instruction in terms of additional

4  quality assurance, beyond the point where Prime Clerk was

5  prepared to certify the vote totals as final?

6  A     Mainly, it was a review of any of the classes or what

7  was asked to be reviewed as part of the motion.

8  Q     And we see, sir, from your affidavit -- and we've

9  looked at this a couple of times -- paragraph 14, that

10 process led to striking 170,000 votes to reject the plan

11 under Class 6, right?

12         MS. MARKS:  Objection.  That misstates his prior

13 testimony.

14         THE COURT:  Could you repeat the question, Mr.

15 Haviland.

16         MR. HAVILAND:  Yes, Your Honor.

17 BY MR. HAVILAND:

18 Q     We know, as a result of that process that you undertook

19 over the weekend, it led to the exclusion of 170,000 votes

20 from Class 6, right?

21 A     No, that's not correct.

22 Q     Well, we went through the math.  We saw how there were

23 excluded votes as a result of the final tables from the

24 original to the final, right?

25 A     Yes.

1  Q     And I did the math with you.  You had 129,000 in Class

2  6(a), 40,000 in Class 6(b), and about 1200 in Class 6(c).

3        Do you remember that?

4  A     Uh-huh.  Yeah.

5  Q     Did the voters instruct you to focus on Class 6 when

6  you did this additional evaluation over the weekend?

7  A     There was a further review of Class 6, as well as other

8  classes, as well.

9  Q     Well, did they direct you to focus on Class 6?

10 A     That was part of the focus, yes.

11 Q     Why did they tell you that, do you know?

12 A     It was as -- I do not know.

13 Q     Well, what did they tell you about going into Class 6

14 and analyzing vote totals?

15 A     It was just a further quality assurance review.  I

16 don't have specific instructions.

17 Q     Did they tell you to look at Class 6 votes to compare

18 against whether or not there were valid claims filed?

19        MS. MARKS:  Objection; vague and ambiguous as to

20 what "valid claims" means.

21        THE COURT:  Do you want to rephrase, Mr. Haviland.

22        MR. HAVILAND:  Yes, Your Honor.

23 BY MR. HAVILAND:

24 Q     Did the debtors instruct you to look at these vote

25 totals that you were prepared to certify as final and compare

```
 1   them against claims to see whether or not the ballots and
 2   votes casted would be accepted?
 3   A     Well, that -- so this is -- that was done prior.
 4         You're asking about the weekend.  So, we reviewed --
 5   only the quality assurance review was done over the weekend
 6   and to check what had already been made final.
 7   Q     I was asking -- so, I am focused on that window, sir,
 8   from the time you got the instructions on Friday to the time
 9   you did your amended certification of 1:00 a.m. on Monday
10   morning.  I want to focus on that window, okay.
11   A     Uh-huh.
12   Q     Over that time, you were doing additional quality
13   assurance, right?
14   A     Correct.
15   Q     Based upon instructions debtors' counsel gave you after
16   the motion for an examiner came in, correct?
17   A     (No verbal response.)
18   Q     And what were the instructions --
19         THE COURT:  I'm sorry, Mr. Daloia.  Your last
20   answer didn't come through.
21         THE WITNESS:  It was correct.
22         THE COURT:  Okay.  Thank you.
23   BY MR. HAVILAND:
24   Q     As a result of those instructions, you identified these
25   Class 6 votes to be excluded, correct?
```

1  A      Yeah, I can't say it was part of the weekend.

2  Q      Well, just -- why don't you tell me what you did over

3  the weekend.

4  A      I believe that occurred prior to the weekend.

5  Q      Oh, you were prepared to put these tallies in your

6  Friday declaration, had you filed at four o'clock; is that

7  right?

8  A      I would have to go back, but I believe this was a

9  discussion that occurred first on Friday.

10  Q      I'm sorry?

11  A      The discussion regarding removal of these occurred on

12  Friday.

13  Q      After a motion for an examiner came in, right?

14  A      I don't know the timing, as it relates to the motion.

15  Q      So, Prime Clerk was engaged and appointed by the Court

16  for the function of solicitation and vote totals and engaged

17  in the process since June and then in the span of one day,

18  adjusted these vote totals, right?

19  A      I don't know what one has to do with the other, but,

20  yes.

21  Q      Okay.  I may be finished, just give me one moment, sir.

22  I appreciate your time today, too.

23          MR. HAVILAND:  Your Honor, I have no further

24  questions.  Thank you.

25          THE COURT:  Thank you, Mr. Haviland.

```
 1            Ms. Marks, redirect -- oh, wait.  Maybe there's
 2   other cross.
 3            MS. MARKS:  Your Honor, I believe --
 4            THE COURT:  Let me see if there's other cross
 5   first, before we go.  Let's see.
 6            I have -- Ms. Leamy, you raised your hand.  Go
 7   ahead.
 8            MS. LEAMY:  Good afternoon, Your Honor.  I just
 9   have a few questions of the witness.  I'll be very brief.
10                      CROSS-EXAMINATION
11   BY MS. LEAMY:
12   Q    Mr. Daloia, good afternoon.  My name is Jane Leamy.
13   I'm a trial attorney with the Office of the United States
14   Trustee.
15        If you could look at your declaration, please, I had a
16   question regarding Footnote 4.?
17   A    The final declaration?
18   Q    Yes.
19   A    Okay.
20   Q    Just let me know when you're there, at Footnote 4 on
21   page 5.
22   A    I'm there.
23   Q    Okay.  Thank you.
24   A    Yeah.
25   Q    My focus is on the last sentence of that footnote where
```

1   you say:

2              "In accordance with the disclosure statement order

3   and the solicitation procedures therein, instead of

4   disregarding the votes as invalid and defective, these votes

5   were reclassified into Class 9(b) for purposes of the final

6   tabulation."

7        Can you tell us why or the specific basis on which the

8   votes were reclassified.

9   A    It was at the direction of counsel, however, my

10  understanding is it's very -- since these were individuals

11  that had filed ballots and they were unsophisticated,

12  unknown, you know, they didn't have a claims process, so it

13  was clear from just the ballots themselves being individuals

14  that collected a class that was states and entities that

15  obviously would not be individuals, they were moved for 9(b).

16  Q    So, it was made primarily on the basis of the names of

17  the parties, being able to tell they were individuals versus

18  entities; is that --

19  A    Correct.  Or a State.

20  Q    All right.  I had a question about the packages that

21  were sent out, the solicitation packages, and I wanted to

22  know that in connection with the solicitation process,

23  whether Prime Clerk kept track -- or excuse me -- whether

24  Prime Clerk received back any packages that were

25  undeliverable from the post office?

1   A    I don't know exactly, but I can, based on my

2   experience, say that we would have received certain packages

3   back as undeliverable.

4   Q    In this case, did Prime Clerk maintain or keep track of

5   those packages that were undeliverable?

6   A    I believe we have a list or I should actually say we're

7   still compiling the list, because it sometimes takes a little

8   bit of time for undeliverable packages to be returned.

9   Q    And is it possible, if someone wanted to go back and

10  see how many were returned as undeliverable for say, Class 6

11  versus Class 14, would you be able to do that?

12  A    Yes, we would be able to do that.

13  Q    Okay.  And just one final question.

14       I know you said that with respect to Class 14, which is

15  the equities and securities class, you went to the transfer

16  agent to get information regarding the equity and security

17  holders.

18       Did you receive back any packages from the transfer

19  agent?

20  A    Not that I know of.

21            MS. LEAMY:  That's all I had.  Thank you.

22            THE COURT:  Thank you, Ms. Leamy.

23            Mr. Eggerman, you were next and then Mr. May, I'll

24  come to you.

25            MR. EGGERMAN:  Thank you, Your Honor.

1          Can you hear me okay?

2          THE COURT:  Yes.

3          MR. EGGERMAN:  I will be brief.

4                    CROSS-EXAMINATION

5  BY MR. EGGERMAN:

6  Q     Good afternoon, Mr. Daloia.

7  A     Good afternoon.

8  Q     Am I correct that all opioid creditors were each

9  entitled to one vote in the amount of one dollar on account

10 of their opioid claims?

11 A     Yes.

12 Q     Now, in your experience, is it typical for disputed,

13 unliquidated tort claimants to be afforded one vote for one

14 dollar?

15 A     Yes.

16 Q     And in those cases, the tort creditors believe they

17 have claims in excess of one dollar against the debtor,

18 correct?

19          MR. HAVILAND:  Objection, Your Honor.  There's a

20 lack of foundation to that question about other cases.

21          THE COURT:  Well, I think there's also a problem

22 with -- I don't know if this witness can testify about what

23 someone may or may not believe the value of their claim is.

24 BY MR. EGGERMAN:

25 Q     Mr. Daloia, in your cases, those unliquidated disputed

1    tort claimants are entitled to assert a voted claim in the

2    amount of one dollar?

3    A      In my experience, for the most part, you know, any

4    unliquidated, wholly unliquidated, disputed claim, it does

5    vote a dollar.

6    Q      And even though those claimants' claims are in dispute,

7    obviously, to vote in the amount of one dollar --

8                MR. HAVILAND:  Objection, Your Honor.  I just want

9    to object to the leading.  I don't believe this witness is

10   adverse to counsel.  I would ask that the questions be framed

11   in a different manner.

12               THE COURT:  Do you want to rephrase it,

13   Mr. Eggerman.

14               MR. EGGERMAN:  Sure.

15   BY MR. EGGERMAN:

16   Q      In those cases --

17               UNIDENTIFIED:  And I don't think there's much

18   coming out there --

19               THE COURT:  If you are not one of the people

20   cross-examining a witness, mute your phone.  If I find out

21   who it is, we are going to kick you off.

22               Jermaine, can you find out who that was and just

23   remove them from the call.

24               THE CLERK:  Yes.

25               THE COURT:  Sophie Macon (phonetic), she gets

AA0000442

1   kicked out.

2            UNIDENTIFIED:  (Inaudible.)

3            THE COURT:  There's somebody else speaking, too.

4            Ms. Macon, can you hear me?

5        (No verbal response)

6            THE COURT:  Kick Ms. Macon off this call, please.

7            All right.  Sorry.  Go ahead, Mr. Eggerman.

8            MR. EGGERMAN:  I'll just -- I'll short circuit the

9   question.

10  BY MR. EGGERMAN:

11  Q    In those cases where a claim is disputed, in the

12  unliquidated, in what amount are those claimants typically

13  entitled to vote?

14  A    It's always based on the procedure, so it's usually

15  either one dollar or anything that is, you know, the

16  undisputed portion of the claim.

17  Q    You testified on cross that voting deadlines for

18  Classes 8 and 9 were extended.

19        Do you recall that testimony?

20  A    Yes.

21  Q    I'd like to call your attention to the Canadian

22  Elevator Pension Fund's Exhibit 3, which is the solicitation

23  order.

24        Do you have that handy?

25  A    Yes.  Give me one minute to clear some space.

```
 1          (Pause)

 2               THE WITNESS:  Exhibit 3?

 3   BY MR. EGGERMAN:

 4   Q     Yes.

 5   A     Okay.  I'm there.

 6   Q     And you're looking at the solicitation order?

 7   A     Yes.

 8   Q     I'd like to call your attention to paragraph 42, which

 9   is on page 18 of that order.

10   A     Okay.  I found it.  Yes.

11   Q     Can you take a look at that.

12   A     Uh-huh.

13   Q     Now, is it your understanding that paragraph 42 is the

14   basis for the voting deadline for Classes 8 and 9?

15   A     I believe that's one of the paragraphs that the basis

16   is based on.

17               MR. EGGERMAN:  Your Honor, I have nothing further.

18               THE COURT:  Thank you, Mr. Eggerman.

19               Mr. May?

20               MR. MAY:  Thank you, Your Honor.

21               Can you hear me?

22               THE COURT:  Yes.

23               MR. MAY:  Thank you.

24                         CROSS-EXAMINATION

25   BY MR. MAY:
```

```
1   Q     Mr. Daloia -- I hope I got it right --

2   A     You got it.

3   Q     -- my name is Laurence May and I am counsel to the

4   Canadian Elevator Industry Pension Trust.  I have a few

5   questions for you.

6         First, I'd like to direct your attention to the

7   declaration that you filed on October 26.  It's Docket 4999

8   on the court docket, and I believe it's Debtors' Exhibit 20.

9         So, if you could get that document in front of you,

10  it's your declaration that was filed in connection with the

11  confirmation hearing.

12        And tell me when you're ready.

13             THE COURT:  Are you talking about the original one

14  or the revised one, Mr. May.

15             MR. MAY:  No, this is a separate one, Your Honor,

16  that was filed on October 26th, 2021, and it related

17  primarily to my client's claims, as opposed to balloting and

18  solicitation parties that were entitled to only receive the

19  solicitation packages.

20             UNIDENTIFIED:  I believe that's an affidavit of

21  service.  Is that right, Mr. May?

22             MR. MAY:  No, Document 4999 is a declaration of

23  Mr. Daloia of Prime Clerk, in support of confirmation of the

24  first amended joint plan.  It's Plaintiff's -- Debtors'

25  Exhibit 20.
```

```
 1              THE COURT:  I have it.

 2              THE WITNESS:  I have it.

 3              MR. MAY:  Okay.  Good.

 4   BY MR. MAY:

 5   Q    So, in the last -- I'd direct your attention to the

 6   last sentence of your declaration where you state, and I'm

 7   going to quote here, your understanding is that at the time

 8   the solicitation of the plan commenced, no holders of claims

 9   were classified in Class 13.

10         Do you see that reference in the last paragraph of your

11   declaration?

12   A    Yes.

13   Q    Okay.  So, first, what type of claims were classified

14   in Class 13?

15   A    I would have to look.  I believe it's 5(10)(b).

16   Q    And you understand 5(10)(b) claims tend to be claims

17   that are subordinated because they rise out of the purchase

18   or sale of a security; is that correct?

19   A    Fully, no, but I understand that they're defined as

20   subordinated claims.

21   Q    Subordinated claims, okay.

22         And how did you come to the understanding that there

23   were no Class 13 claims, either filed or scheduled, in these

24   cases?

25   A    It was at the direction or review of counsel and
```

1   advisors of the filed claims.  Nothing was classified in 13,

2   as of the time of the voting record date.

3   Q    I'm sorry, I lost you.  I heard the first part that you

4   said it was a result of a review with counsel.  I'm sorry, I

5   didn't catch the rest of your answer.

6   A    So, with review with counsel and direction of counsel

7   and the advisors, that nothing was classified as a Class 13

8   claim as of the voting record date.

9   Q    And who were these advisors?

10  A    That would be Latham and AlixPartners.

11  Q    So, your understanding is as a result of information

12  that was provided to you by financial advisors and the

13  debtors' counsel; is that correct?

14  A    Correct.

15  Q    Okay.  Now, did you take any independent steps to

16  determine whether the advice being provided to you was

17  accurate?

18  A    I don't understand the question.

19  Q    Well, for example, Prime Clerk was the claims

20  processing agent and the agent for notification; the entity

21  with whom proofs of claim were filed, correct?

22  A    That's correct.

23  Q    So, in determining whether there were any claims in

24  Class 13, did you or anyone under your supervision, go

25  through the filed proofs of claim to see if the advice you

1  were receiving was accurate?

2  A    No, that's not our function.

3  Q    It's not your function to review proofs of claim?

4  A    It's not our function to make a determination on where

5  a claim falls within a plan class.

6  Q    Within a particular class?

7  A    Correct.

8  Q    Okay.  So this determination was a determination made

9  by others and that's where your understanding comes from,

10 correct?

11 A    Correct.

12 Q    Okay.  Were you aware of the claims filed by my client

13 in these cases?

14 A    As of when?

15 Q    As of the date that you said that there were no claims

16 classified in Class 13, which was, I believe, the voting

17 record date.  At that point in time, were you aware of the

18 claims that had been filed by my client in this case?

19 A    No, not specifically.

20 Q    And so, were you aware of the nature of those claims at

21 all?

22 A    No.

23 Q    In your discussions with the advisors and counsel for

24 the debtors, did anyone advise you that the Canadian Elevator

25 Industry Pension Trust had claims arising out of the purchase

1  or sale of securities?

2  A    No.

3  Q    Okay.  Now, we did file proofs of claim in this case

4  and I'll tell you they were on the claims docket.  I'll give

5  you the claims number in a minute.

6       But do you have any indication if these claims, my

7  client's claims were not filed or were not determined as

8  subordinated claims, whether they fell in any other class?

9  A    I believe they fell into 6(f).

10 Q    What class is 6(f)?

11 A    If I can review that declaration again, the other

12 general unsecured notes.

13 Q    So, if they fell in Class 6(f) they would have received

14 a solicitation package, correct?

15 A    Yes.

16 Q    Can you show me anywhere in the proofs of claim, I mean

17 in the affidavit that you filed, that a solicitation package

18 was sent to the Canadian Elevator Industry Pension Trust?

19 A    I would have to review the solicitation affidavits.

20 Q    Which specific affidavit would you have to review?

21 A    I don't know the docket numbers offhand, but there is

22 an affidavit for the solicitation of service.

23 Q    All right.  So, it's your view, based upon what you

24 were told that my client had a Class 6-f claim, is that

25 correct; am I understanding your testimony properly?

AA0000449

1  A     Yeah.

2  Q     Okay.  So, my client would have received a solicitation

3  package and would have the right to vote on the plan; is that

4  correct?

5  A     That's correct.

6  Q     Okay.  Were you aware that the debtors filed a

7  confirmation brief on October 27th of this year, it's Docket

8  5016, and in Footnote 124, they stated that no holders of

9  Class 13 subordinated claims existed as of the voting record

10 date.

11 A     I was not aware of that.

12 Q     You were not aware.

13       Is that (indiscernible) statement in the brief

14 accurate, to your understanding?

15 A     That there was, as of the voting record date, there was

16 no one in Class 13, correct.

17 Q     Now, your declaration 4999 states in paragraph 14 that

18 Prime Clerk received an opt-out form for Class 13

19 subordinated claims from the Canadian Elevator Industry

20 Pension Trust.

21       Do you see that?

22 A     Right.

23 Q     And how did you learn of this opt-out form?

24 A     They sent it to Prime Clerk and it's -- you know, we

25 tablet or record everything that does come in, so it's part

1  of that record.

2  Q    So, is it your understanding that we are mistaken and

3  that we shouldn't have filed that opt-out form because we

4  were not Class 13 creditors, but we were in fact Class 6(f)

5  creditors; is that your testimony?

6  A    I don't determine the validity of those opt-out forms.

7  Q    I'm not asking you that.

8       I'm asking you if you determined that the opt-out form

9  was, in your mind or your understanding, incorrect because

10  our client's claim didn't belong in Class 13, but it belonged

11  in Class 6(f)?

12  A    I wouldn't make that determination, so no.

13  Q    So, when -- is part of your group at Prime Clerk

14  responsible for reviewing the claims filed in the case or is

15  that some other group?

16  A    Yes.

17  Q    But I assume you're generally familiar with the process

18  that these individuals go through in reviewing these claims,

19  correct?

20  A    Not that -- I know enough to be dangerous.  That's the

21  best way to say it.

22  Q    Well, you probably know more than me, so, okay, I'll go

23  with that.

24       So, are you aware if individuals who review those

25  claims look at Box 3 on the form of claim, which indicates

1    where notices are to be sent?

2    A    Well, in general, Prime Clerk records, you know, what

3    is put on the claim form.  So, if Box 3 is part of it, then,

4    yes, they would record that within the claims register.

5    Q    So, if my client's claim fell in Class 6(f), then they

6    would be entitled to a solicitation package, correct?

7    A    That's correct.

8    Q    And that solicitation package would have been sent to

9    the notice party that was indicated on the proof of claim

10   that they filed; is that also correct?

11   A    It would have been on the address that was in the

12   record.  The notices -- from my understanding, the notices

13   and additional notice address, those additional notice

14   addresses would also receive a confirmation hearing notice.

15   Q    Well, I'm going to represent to you, sir, that the

16   notice form required notices to be sent to my firm.

17   Can you point to any proof of -- affidavit of service that

18   indicated that a solicitation package was sent to my firm,

19   Eiseman & Levine, on behalf of the Canadian Elevator Industry

20   Pension Trust.

21   A    I would have to review the affidavits to be sure.

22   Q    And as you sit here today, you can't tell me which

23   specific affidavits you would have to review, can you?

24   A    Do I know the docket numbers, no, but I would know that

25   it would be the solicitation affidavit.

1  Q     Well, was the solicitation affidavit -- I want to

2  direct your attention to Document 3210, which is an affidavit

3  of service of solicitation materials which you executed, and

4  I'll tell you in a moment, it's referenced in your

5  declaration of October 26th -- I'm trying to find the

6  specific exhibit number if you'd give me a moment -- I think

7  it's Plaintiff's Exhibit 11.

8            THE COURT:  Plaintiff's Exhibit or Debtors'

9  Exhibit 11?

10           MR. MAY:  I'm sorry, Debtors' Exhibit 11.  I

11  apologize.

12           THE WITNESS:  I don't -- I think -- it says

13  available electronically.  I don't see it on the ...

14  BY MR. MAY:

15  Q     Well, is there any way you can get electronic access

16  to -- it's your affidavit of service and solicitation

17  materials.  It's an extraordinarily lengthy document.

18           MS. MARKS:  Your Honor?

19           THE WITNESS:  I have it.  It's its own binder.

20           THE COURT:  Hold on.

21       (Pause)

22  BY MR. MAY:

23  Q     Do you have it in front of you now, sir?

24  A     Yes, I do.

25  Q     Okay.  Thank you.

1      If you look through your affidavit, is there anything

2   specifically in the affidavit which would refresh you or

3   indicate to you that service of solicitation materials were

4   served on my client?

5   A    It would be in the exhibit that outlines who received

6   packages in 6(f).

7   Q    In 6(f)?

8   A    Yep.  So, I believe that's Exhibit YY, and it's also

9   assuming that they weren't paid.  I don't believe they'd be a

10  protected party, as opposed to, you know, (indiscernible)

11  disclosure.

12  Q    So, if I took the time and the effort to go through

13  Exhibit YY, is it your testimony that I would see listed on

14  the parties who received notice, either my firm as a noticed

15  party for Canadian Elevator Industry Pension Trust or a

16  similar entry for the client, itself?

17  A    That's correct.

18  Q    Okay.  All right.  I'm going to do that.

19      Now, as I understand your direct testimony, and, again,

20  your reference in your declaration of October 26th, is it

21  your testimony that no opt-out notice forms were sent to any

22  entity in Class 13 because it was your determination, based

23  on information provided to you that no such entities existed?

24  A    Not my determination, but, yes, based on instruction

25  provided to us.

1   Q      So, based on instruction provided to you, it is clear

2   that no opt-out notices were sent to anyone who otherwise

3   might have been a Class 13 creditor, because your

4   instructions were no such creditors existed; is that correct?

5   A      I'm sorry, could you repeat that.

6   Q      Based on the information and the instruction provided

7   to you, is it your testimony that no opt-out package was sent

8   to any entity with respect to Class 13, because you were

9   advised that there were no entities in that class?

10  A      That's correct.

11  Q      Okay.  Now, as part of your discussions with advisors

12  and debtors' counsel, were you made aware of a pre-petition

13  litigation brought by the Canadian, as lead plaintiff,

14  brought by the Canadian Elevator Industry Pension Trust

15  against the debtor and certain of its officers or directors?

16  A      No.

17  Q      They never told you about that?

18  A      Not in preparation, no.

19  Q      And I gather they didn't mention the fact to you that

20  during the course of this case, the debtors have sought and

21  obtained a 105 injunction to enjoin any continuation of that

22  lawsuit and have gotten that injunction extended from time to

23  time.  That was also not told to you in connection with your

24  discussions as to whether there were any claims in Class 13;

25  is that correct, as well?

1  A      Correct, it was not.

2  Q      Okay.  So, if the claims asserted in that litigation

3  were claims based upon the purchaser's sale of an equity

4  security, would those claims not be subject to subordination

5  under 510, as you understand it?

6  A      I wouldn't know.

7  Q      Well, you do have some understanding of subordination

8  under a 510.  I believe I heard your testifying generally

9  about that issue.

10  A      No, I testified that I understand how the definition

11  calls it unsubordinated, but I don't know, you know, the

12  legality, you know, in terms of the legality related to it.

13  Q      Okay.  But as -- I just wanted to make sure, I guess I

14  get this point and then I'll go on to something else -- there

15  was no discussion with anyone whatsoever with respect to any

16  securities law litigations that were pending at the time of

17  the bankruptcy case and how the claims asserted in those

18  litigations might be classified under the plan; is that

19  correct?

20  A      That is correct.

21  Q      Okay.  Now --

22          THE COURT:  Mr. May, how much longer do you have?

23          MR. MAY:  About 15 minutes.

24          THE COURT:  All right.  Let's take another recess

25  for 15 minutes.  We'll reconvene at 4:15.

```
 1              MR. MAY:  Thank you, Your Honor.
 2         (Recess taken at 4:00 p.m.)
 3         (Proceedings resumed at 4:15 p.m.)
 4              THE COURT:  All right.  Go ahead, Mr. May.
 5              MR. MAY:  Thank you, Your Honor.
 6                   CROSS-EXAMINATION (Resumed)
 7   BY MR. MAY:
 8   Q    Mr. Daloia, would you take a look at the order
 9   approving the disclosure statement, which I think you had
10   before you previously.  I believe that's our Exhibit 3.
11   A    I have it in front of me.
12   Q    Okay.  And can you take a look at what is Exhibits 4.5
13   and 4.5(a), which, if you have a hard copy, I think they
14   start at 1121 of the PDF.
15   A    Okay.  I have --
16   Q    Do you have it in front of you, sir?
17   A    No, I have the order.  I don't have all the exhibits.
18   Q    Okay.  Well, do you have them available to you or
19   should I proceed or are you just going to search -- do you
20   want a few minutes to look for them?
21   A    I would prefer to have them in front of me.
22              MS. MARKS:  Mr. Daloia, you may have those in the
23   binders next to you.
24              Mr. May, is this your Exhibit P1-3?
25              MR. MAY:  Yes, I believe so.
```

1          MS. MARKS:  It may be in the Canadian Elevator

2   Industry Pension Trust binder as that exhibit, P1-3, the full

3   document.

4       (Pause)

5          THE WITNESS:  There it is.

6          And I apologize, what page?

7   BY MR. MAY:

8   Q    It's page 1121 of the PDF.  If you look at the exhibits

9   it's 4.5 and 4.5A.

10  A    4.5 -- got it right here.

11  Q    Got it?  Good.  Good.

12      Now, I believe it's your testimony that the disclosure

13  statement order and the exhibits basically was your Bible as

14  to who was to be served with what set of documents; is that

15  correct?

16  A    For the most part, yes.

17  Q    Exhibit 4.5 and 4.5A are notices that were supposed to

18  be provided to holders of impaired claims in Class 13.

19      Do you see that on page 1121?

20  A    Yes.

21  Q    Okay.  And is it your testimony that none of the

22  documents that were listed as part of Exhibit 4.5 and 4.5A

23  were served on anyone because you had determined or someone

24  had determined that there were no claims in this class; is

25  that correct?

```
 1   A      That's correct.
 2   Q      Okay.  Last few questions, I want to turn you back, if
 3   I might, to the declaration that you filed in October 26,
 4   which is Document 499 --
 5   A      Hold on a second.
 6          Sorry about that.
 7   Q      Could you take a look at paragraph 9 of your
 8   declaration.
 9   A      Okay.
10   Q      And paragraph 9 states that Prime Clerk was working
11   with Compushare (phonetic) to identify entities who purchased
12   the debtors' stock at any time between January 1st, 2019,
13   through the voting record date.
14          Do you see where I'm referring to at the beginning of
15   the paragraph?
16   A      Yes, but it's registered --
17   Q      Registered holders.
18   A      Yes, registered holders.
19   Q      Right.  That's a defined term in the paragraph,
20   correct?
21   A      No, (indiscernible) -- yes, sorry, it is.
22   Q      Okay.  So, who determined the January 1 start date for
23   doing this investigation, so to speak?
24   A      That would be Latham.
25   Q      That would be you?
```

1  A     No, Latham.

2  Q     Oh, Latham.  Latham.

3        And were you told how this date was selected?

4  A     No.

5  Q     Okay.  Could you have done such an investigation for

6  years prior to January 1, 2019, would that have been

7  possible?

8  A     If requested, yes.

9  Q     Okay.  So, you could have gone back to some prior

10 period of time to determine the identity of any entities who,

11 at one time, may have owned equity securities in Mallinckrodt

12 PLC; is that correct?

13 A     We could, yes, we could make that request.

14 Q     Now, in paragraph 9, there's a little confusion on my

15 part and maybe you can clear this up.  Paragraph 9 goes on to

16 say that in accordance with the solicitation procedures,

17 Prime Clerk served the confirmation hearing notice, the

18 notice of non-voting status and registered holder opt-out

19 form (along with a prepackaged, postage-paid return envelope

20 for use by current registered holders) to return their

21 registered holder opt-out form.

22 Do you see that, where I'm quoting from?

23 A     Yes.

24 Q     Okay.  I read, that and maybe I'm wrong, and you can

25 correct me if I am, I read that as saying that -- well, let

1  me rephrase that.

2      What's the significance of the word "current" before

3  "registered holders" in the portion of the declaration I just

4  read?

5  A    Current is those, as of the record date.

6  Q    So, am I reading this correctly by saying that the opt-

7  out notice forms that were referenced in this paragraph 9

8  were only sent to current registered holders?

9  A    That's correct.

10 Q    Okay.  So, this opt-out form wasn't sent to anyone else

11 who was a record -- who may have owned securities in

12 Mallinckrodt before the record voting date; is that correct?

13 A    That's correct.

14 Q    Okay.

15          MR. MAY:  I have no more questions, Your Honor.

16          THE COURT:  All right.  Thank you.

17          Any other cross?

18      (No verbal response)

19          THE COURT:  All right.  Ms. Marks, redirect?

20          MS. MARKS:  Yes, Your Honor.  Just some short

21 redirect.

22          THE COURT:  By the way, Mr. May, that's the first

23 time a lawyer has said they were only going to take 15

24 minutes and only took 5; usually, lawyer time goes the

25 opposite way, so I appreciate that.  Thank you.

1        (Laughter)

2               MR. MAY:  You're most welcome.

3                         REDIRECT EXAMINATION

4    BY MS. MARKS:

5    Q    Mr. Daloia, during Mr. Haviland's cross-examination,

6    that was the first attorney who cross-examined you, you were

7    asked about valid claims.  Specifically, you were asked about

8    votes being excluded because they couldn't be tied to a valid

9    claim.

10        Do you generally remember that?

11   A    Yes.

12   Q    And I'd like to clarify what constitutes a valid claim.

13   Did Prime Clerk strike ballots because they could not be tied

14   to a proof of claim that was validly filed?

15   A    Yes.

16   Q    Did Prime Clerk make any determinations about whether

17   the claims, themselves, were valid; meaning, they had merit?

18   A    No.

19   Q    Did Prime Clerk strike any ballots because the claims

20   were determined not to have merit?

21   A    No.

22   Q    So, when you testified earlier about valid claims and

23   invalid claims, you were referring only to whether the proofs

24   of claim were filed validly?

25   A    Correct.

1  Q      And we covered this on your direct exam, but when Prime

2  Clerk struck ballots because they couldn't be tied to validly

3  filed proofs of claim, was that always in accordance with the

4  procedures?

5  A      Yes.

6  Q      When Mr. Haviland asked you about the work that Prime

7  Clerk overtook over the weekend between October 29th when you

8  were going to file your final declaration and October 31st,

9  when you did end up filing it, do you remember those

10 questions about the weekend?

11 A      Yes.

12 Q      And did the debtors ask you to do anything during that

13 weekend, other than confirm whether votes submitted complied

14 with the solicitation procedures?

15 A      No.

16 Q      In connection with that analysis, did you check to see

17 whether votes were tied to timely filed proofs of claim?

18 A      Yes.

19 Q      Did Prime Clerk do any evaluation of the merits of

20 those proofs of claim over that weekend?

21 A      No.

22 Q      And did you look only at reject votes or did you look

23 at all votes within the relevant classes to see whether they

24 complied with the solicitation procedures?

25 A      All votes.

1    Q     And I believe you covered this, but to confirm, as a

2    result of the additional quality assurance work that resulted

3    in the final tabulation, did the outcome of the vote from

4    accept to reject, or vice-versa, change for any voting class?

5    A     No, it did not.

6    Q     So, I would now like to compare Exhibit A(2) to the

7    preliminary and final declarations to one another.  So, I

8    would ask Ms. Reiser if she could pull those up, A(2) to the

9    preliminary declaration is Debtors' Exhibit P116 and Exhibit

10   A(2) to the final declaration is Debtors' Exhibit P123, and

11   we're going to focus on the last page.  A(2) is the last page

12   to both of these documents.

13         Now, you were asked earlier about the debtors excluding

14   reject votes, do you remember that?

15   A     Yes.

16   Q     So, I'd like to look, I'd like to compare these two

17   boxes.  The top chart is from the preliminary declaration.

18         Do you see that for Class 9(a) in your preliminary

19   declaration, the number accepting the plan was about 342,000

20   votes?

21   A     Correct.

22   Q     And do you see the number rejecting was 3,995?

23   A     Yes.

24   Q     And then if you look at the chart on the bottom, this

25   is from your final declaration, the number accepting has gone

1   down to approximately 225,000; is that right?

2   A    Yes.

3   Q    And the number rejecting has only gone down by one vote

4   to 3,994?

5   A    Yes.

6   Q    And so, I'm not going to make you do the math, but, in

7   fact, for the number accepting, did it drop by approximately

8   120,000?

9   A    Approximately.

10  Q    So, that means that the debtors excluded approximately

11  120,000 votes that accepted the plan between the preliminary

12  declaration and the final declaration?

13  A    Correct.

14  Q    And only one vote that rejected the plan was excluded?

15  A    Correct.

16          MS. MARKS:  You can take that down now.  Thank

17  you.

18  BY MS. MARKS:

19  Q    You were asked by Mr. May about whether his client, the

20  Canadian Elevator Industry Pension Fund was served.

21  A    Yes.

22  Q    Do you remember that?

23  A    Yes.

24  Q    And you told him that you would need to review your

25  affidavit of service for the procedures?

1   A       For if we had served them, yes.

2   Q       So, I would like to take a look at that document.  It

3   was very lengthy and I don't think either of you had time to

4   look at it when he was asking you.

5           This is Debtors' Exhibit P111.  It's in that big

6   binder.  Do you have that?

7                MS. MARKS:  And we can also display this.  It's

8   going to Exhibit YY to the affidavit and, specifically, I

9   believe it's PDF page 896.

10  BY MS. MARKS:

11  Q       And, Mr. Daloia, it's also on the screen if you're

12  having trouble finding that page --

13  A       Yes.

14  Q       -- it might be faster just to look at the screen.

15  A       I'll look at the screen.

16  Q       So, I'd like to blow up -- if you look in the middle,

17  you do see that there are several entries here for the

18  Canadian Elevator Industry Pension Trust Fund.

19          And does this confirm that service was made on this

20  address?

21  A       Yes, it does.

22  Q       Okay.  Thank you, Mr. Daloia.  I have no further

23  questions.

24                THE COURT:  Okay.  Thank you, Ms. Marks.

25                Mr. Daloia, you are excused.  Thank you.

 1                    THE WITNESS:  Thank you.

 2         (Witness excused)

 3                    THE COURT:  All right.  Anything else for today?

 4                    MR. HAVILAND:  Your Honor, Don Haviland.  I just

 5     want to renew our objection to the admissibility of those

 6     exhibits, if I may, if Your Honor would give me a moment?

 7                    THE COURT:  I've already ruled and your objection

 8     is preserved.

 9                    MR. HAVILAND:  Thank you, Your Honor.

10                    THE COURT:  Any else, Ms. Marks?

11                    MS. MARKS:  No, nothing else for today, Your

12     Honor.

13                    THE COURT:  All right.  So, where are we for

14     tomorrow?  Let's take a look at our calendar here.  You're

15     starting at 9:30 tomorrow, correct -- no, I'm sorry -- yes,

16     9:30 tomorrow.  And all I have is Mallinckrodt all day, so

17     what do we have going forward tomorrow?

18                    I know we have the issues relating to the first

19     lien lenders, is that right, is that what we're doing

20     tomorrow?

21                    MS. MARKS:  That's right, Your Honor, and we do

22     think that will take -- that may not take the full day, but

23     it will take a substantial amount of time.

24                    THE COURT:  Okay.  Anything else on for tomorrow?

25                    MS. MARKS:  I see Mr. Merchant is on.

1          Anything else, Mike?

2          MR. MERCHANT:  Yeah, Mike Merchant, again, for the

3   record.  Your Honor, I'm not aware of anything other than

4   that going forward tomorrow.

5          THE COURT:  All right.  And then the following

6   week, we pick up with the administrative claim filed by the

7   Acthar Insurance Claimants, correct?

8          MS. MARKS:  Correct.

9          THE COURT:  And that week will be -- I have a

10  couple of things on my calendar that may or may not come off

11  that week, but we'll just see how -- I'd ask the parties to

12  be a little bit flexible because I may have to stop in the

13  middle just to take a hearing in another matter.  It doesn't

14  look like anything is going to be substantial, but for the

15  most part, the week is open, except for the 11th, which is a

16  court holiday and the court will be closed.

17         The week after, that I know I just entered an

18  order today for the 15th on the motion to appoint an

19  examiner.

20         What else will go forward on the 15th, do we know,

21  Mr. Merchant?

22         MS. MARKS:  Your Honor, I can take this one.

23         THE COURT:  Okay.

24         MS. MARKS:  Your Honor, I believe that the Acthar

25  administrative claims hearing probably will need to go into

1  that week, as well, so we expect that that, you know,

2  depending on how much time Your Honor has next week, if more

3  days free up, then we'll be able to get through it faster,

4  but under the current schedule, we believe that the Acthar

5  trial will go into the week of the 15th and we'll need

6  the 15th and the 19th.  I believe those were the two days

7  that Your Honor had available that week.

8           THE COURT:  Yes.  The rest of my week is filled;

9  although, like I said, some of these things might come off

10 because there are a lot of, I have a lot of omnibus or fee

11 application hearings, which, a lot of times, you know,

12 there's nothing that needs to go forward or things getting

13 resolved under COC or CNO.

14          So, I can leave -- I may have time.  It's not on

15 the calendar for Mallinckrodt.  I don't know how that works

16 for the parties, but since that week is being reserved just

17 for the first lien lender issue, hopefully, the counsel, the

18 debtors and the first lien lenders can be flexible ongoing

19 forward if we need to, with their witnesses.

20          MS. MARKS:  Yes, Your Honor.  We'll be flexible.

21 And I don't want to speak for Attestor, but I believe that,

22 you know, the parties to the Acthar admin claims hearing will

23 also be flexible, and if you have more time, it will be used.

24          THE COURT:  All right.  And how do we see things

25 going forward after the 15th, I know we have the 22nd, 23rd,

1   and 24th leading up to Thanksgiving is blocked off for this

2   case.  What do we anticipate happening that week?

3          MS. MARKS:  Your Honor, I think I'll really

4   depends how long the Acthar admin claims hearing lasts.  If

5   that hearing can be concluded by the 19th, you know, if Your

6   Honor has some more days freed up, then we will be ready to

7   resume the plan confirmation hearing, Phase II, the week of

8   November 22nd.

9          We are not necessarily counting on that.  You

10  know, sometimes these processes take longer than expected, so

11  it is possible that the Acthar admin claims hearing would

12  need to go into the week of the 22nd, but we may need to play

13  that by ear and see how that plays out.

14         THE COURT:  Well, I think I did give parties 15

15  hours, right, per side on that issue --

16         MS. MARKS:  Yes.

17         THE COURT:  -- so, hopefully, we should be able to

18  get done.  I'm hoping we get done, if not next week, at least

19  early the week of the 15th.  So, keep that in mind for

20  whatever might be available to go forward on the 22nd, 23rd,

21  and 24th.

22         MS. MARKS:  Thank you, Your Honor.

23         Yeah, you know, there will be some other -- for

24  example, we will need a Phase II pretrial conference.  We

25  will need to set that.

1          So, I think once we are into next week and we see

2     how the Acthar trial is going, we will have a better sense

3     and we can schedule some of the events like that, the week of

4     the 22nd or when appropriate.

5          THE COURT:  All right.  Okay.

6          Well, then, I will see everybody tomorrow morning

7     at 9:30.

8          Anything else before we adjourn from anybody?

9          MR. MERCHANT:  Your Honor, I just have one

10    question regarding the schedule next week.  I think what we

11    were told from chambers is on the 9th and 10th, we would be

12    starting at two o'clock each day because of other matters

13    that were scheduled or conflicts that the Court may have.  It

14    sounded like you may have more availability than that, but I

15    just wanted to confirm the start time on those dates.

16         THE COURT:  As of right now, I don't.  I have a

17    hearing scheduled --

18         MR. MERCHANT:  Okay.

19         THE COURT:  -- at 11:00 a.m. and, actually, one at

20    2:00 p.m. on the 9th.  And, actually, the one at 2:00 p.m. is

21    a chambers conference, so that probably won't take very long.

22    So, we could probably start at 9:30 on the 9th.  I'd have to

23    stop at 11:00 if that case does not come off.  If it does, we

24    can just keep ongoing until lunchtime and then I'll have to

25    take a break at 2:00 for that chambers conference, but

1   that'll be, as I said, probably relatively short.  So, we

2   should have a fairly full day on the 9th.

3            On the 10th, I have hearings at 1:00 and 2:00;

4   again, an omnibus and a status conference.  That probably

5   won't take that long, so we can, again, start at 9:30 on the

6   10th, and we'll see how it goes with those other two

7   hearings, if they come off or not.  We can just keep going.

8   If they do, I'll take short breaks to handle those.

9            And then on Friday, we're starting at 9:30.  I

10  have a one o'clock that hopefully won't take longer than an

11  hour.  So, we'll just keep going, take a break to handle the

12  other matter, and then come back on.  So, we have a fairly

13  good amount of time for next week.

14            MR. MERCHANT:  Thank you, Your Honor.  That's all.

15            THE COURT:  All right.  Anything else?

16            MR. MERCHANT:  No, nothing, Your Honor.  Thank

17  you.

18            THE COURT:  Thank you, all.

19            We are adjourned.  I'll see everybody tomorrow

20  morning.

21            MS. MARKS:  Thank you, Your Honor.

22        (Proceedings concluded at 4:37 p.m.)

23

24

25

1                              <u>CERTIFICATE</u>

2

3          We certify that the foregoing is a correct transcript

4   from the electronic sound recording of the proceedings in the

5   above-entitled matter.

6
    /s/Mary Zajaczkowski              November 5, 2021
7   Mary Zajaczkowski, CET**D-531

8
    /s/William J. Garling             November 5, 2021
9   William J. Garling, CE/T 543

10

11  /s/ Tracey J. Williams            November 5 , 2021
    Tracey J. Williams, CET-914
12

13

14

15

16

17

18

19

20

21

22

23

24

25

AA0000473

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

|  |  |
|---|---|
| In re:<br><br>MALLINCKRODT PLC, *et al.*<br><br>Debtors.[1] | ) Chapter 11<br>)<br>) Case No. 20-12522 (JTD)<br>)<br>) (Jointly Administered)<br>)<br>) **Re: Docket Nos. 4675, 4820, 4988 & 5207** |

**ORDER IN CONNECTION WITH EXPEDITED MOTION FOR
PRE-CONFIRMATION DETERMINATION THAT DEBTORS
CANNOT REJECT OR DISCHARGE POST-CONFIRMATION
ROYALTY OBLIGATIONS RELATED TO SALE OF ACTHAR GEL**

Upon the motion (the "**Motion**")[2] of sanofi-aventis U.S. LLC ("**Sanofi**"), for entry

of an order determining that the Debtors cannot reject or discharge their post-confirmation

Royalty obligations to Sanofi under the Debtors' proposed joint plan of reorganization (the

"**Plan**"); and the Court having jurisdiction to consider the Motion and the relief requested

therein pursuant to 28 U.S.C. §§ 157 and 1334, and the Amended Standing Order of

Reference from the United States District Court for the District of Delaware dated as of

February 29, 2012; and consideration of the Motion and the relief requested therein being

a core proceeding under 28 U.S.C. § 157(b); and the Court having authority to enter a final

order consistent with Article III of the United States Constitution; and venue being proper

before this Court under 28 U.S.C. §§ 1408 and 1409; and it appearing that proper and

adequate notice of the Motion has been given and that no other or further notice is

necessary; and good and sufficient cause appearing therefor and upon the record of this

---

[1] A complete list of the Debtors in these chapter 11 cases may be obtained on the website of the Debtors' claims and noticing agent at http://restructuring.primeclerk.com/Mallinckrodt. The Debtors' mailing address is 675 McDonnell Blvd., Hazelwood, Missouri 63042.

[2] Capitalized terms not otherwise defined herein have the meanings set forth in the Motion.

AA0000474

contested matter including the hearing on November 4, 2021, at which the Court provided findings of fact and conclusions of law supporting its determinations below, it is hereby

**ORDERED, ADJUDGED, AND DECREED THAT:**

1. The Motion is GRANTED in part and DENIED in part, as set forth herein.

2. The Court hereby determines that the APA is not executory for purposes of Section 365 of the Bankruptcy Code and cannot be rejected under Section 365 of the Bankruptcy Code.

3. The Court also hereby determines, however, that Sanofi's claims for post-Petition Date breaches of the APA, including for any payment of any royalties thereunder, by the Debtors constitute pre-Petition Date unsecured claims that may be discharged under the Bankruptcy Code.

4. This Order shall be immediately effective and enforceable upon its entry.

5. This Court shall retain jurisdiction with respect to all matters arising from or related to the implementation and/or interpretation of this Order. This Order finally resolves the dispute presented by the Motion and is final and appealable.

**Dated: November 8th, 2021**
**Wilmington, Delaware**

**JOHN T. DORSEY**
**UNITED STATES BANKRUPTCY JUDGE**

AA0000475

# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| In re: | ) Chapter 11 |
|  | ) |
|  | ) Case No. 20-12522 (JTD) |
| MALLINCKRODT PLC, *et al.* | ) |
|  | ) (Jointly Administered) |
| Debtors.[1] | ) |
| _____ | ) **Re: Docket No. 5210** |

## NOTICE OF APPEAL AND STATEMENT OF ELECTION

Pursuant to Rule 8003 of the Federal Rules of Bankruptcy Procedure and 28 U.S.C. § 158(a)(1), sanofi-aventis U.S. LLC ("**Sanofi**") submits this Notice of Appeal in conformity with Official Bankruptcy Form B417.

### Part 1: Identity of Appellant

1. Name(s) of Appellant(s): sanofi-aventis U.S. LLC.

2. Position of Appellant(s) in the adversary proceeding or bankruptcy case which is subject of this appeal: creditor and party-in-interest.

### Part 2: Identify the subject of this appeal

1. Describe the judgment, order, or decree appealed from:

   *Order in Connection with Expedited Motion for Pre-Confirmation Determination That Debtors Cannot Reject or Discharge Post-Confirmation Royalty Obligations Related to Sale of Acthar Gel* [D.I. 5210] (the "**Order**").

   A copy of the Order is attached hereto as **Exhibit A**.

2. State the date on which the judgment, order, or decree was entered: November 8, 2021.

### Part 3: Identify the subject of this appeal

List the names of all parties to the judgment, order, or decree appealed from and the names, addresses, and telephone numbers of their attorneys (attach additional pages if necessary):

---

[1] A complete list of the Debtors in these chapter 11 cases may be obtained on the website of the Debtors' claims and noticing agent at http://restructuring.primeclerk.com/Mallinckrodt. The Debtors' mailing address is 675 McDonnell Blvd., Hazelwood, Missouri 63042.

AA0000476

1. Mallinckrodt plc and its affiliated debtors listed on **Attachment 1** hereto.

   **Attorneys:**

   George A. Davis, Esq.
   George Klidonas, Esq.
   Andrew Sorkin, Esq.
   Anupama Yerramalli, Esq.
   Latham & Watkins LLP
   885 Third Avenue
   New York, New York 10022
   Telephone:     (212) 906-1200

   Jeffrey E. Bjork, Esq.
   Latham & Watkins LLP
   355 South Grand Avenue
   Suite 100
   Los Angeles, California 90071
   Telephone:     (213) 485-1234

   Jason B. Gott, Esq.
   Latham & Watkins LLP
   330 North Wabash Avenue
   Suite 2800
   Chicago, Illinois 60611
   Telephone:     (312) 876-7700

   Elizabeth Marks, Esq.
   Latham & Watkins LLP
   Clarendon Street
   Boston, Massachusetts 02116
   Telephone:     (617) 948-6000

   Mark D. Collins, Esq.
   Michael J. Merchant, Esq.
   Robert J. Stern, Jr., Esq.
   Amanda R. Steel, Esq.
   Brendan J. Schlauch, Esq.
   Richards, Layton & Finger, P.A.
   One Rodney Square
   920 North King Street
   Wilmington, Delaware 19801
   Telephone:     (302) 651-7700

AA0000477

**Part 4:  Optional election to have appeal heard by District Court (applicable only in certain districts)**

If a Bankruptcy Appellate Panel is available in this judicial district, the Bankruptcy Appellate Panel will hear this appeal unless, pursuant to 28 U.S.C. § 158(c)(1), a party elects to have the appeal heard by the United States District Court.  If an appellant filing this notice wishes to have the appeal heard by the United States District Court, check below.  Do not check the box if the appellant wishes the Bankruptcy Appellate Panel to hear the appeal.

      ☐  Appellant elects to have the appeal heard by the United States District Court rather than by the Bankruptcy Appellate Panel.

Dated: November 19, 2021

**DLA PIPER LLP (US)**

*/s/ Stuart M. Brown*
Stuart M. Brown (DE #4050)
Aaron S. Applebaum (DE #5587)
Kaitlin MacKenzie (DE #5924)
1201 North Market Street, Suite 2100
Wilmington, Delaware 19801
Telephone:     (302) 468-5700
Facsimile:     (302) 394-2341
Email: stuart.brown@us.dlapiper.com
      aaron.applebaum@us.dlapiper.com
      kaitlin.mackenzie@us.dlapiper.com

- and -

Jason Hopkins (TX 24059969)
1900 North Pearl Street
Suite 2200
Dallas, Texas 75201-2482
Telephone:     (214) 743-4546
Email: jason.hopkins@us.dlapiper.com

**MILLER & MARTIN PLLC**
Laura F. Ketcham
Volunteer Building Suite 1200
832 Georgia Avenue
Chattanooga, Tennessee 37402
Telephone:     (423) 785-8383
Facsimile:     (423) 321-1556
Email: laura.ketcham@millermartin.com

*Attorneys for sanofi-aventis U.S. LLC*

## ATTACHMENT 1

Acthar IP Unlimited Company
IMC Exploration Company
Infacare Pharmaceutical Corporation
INO Therapeutics LLC
Ludlow LLC
MAK LLC
Mallinckrodt APAP LLC
Mallinckrodt ARD Finance LLC
Mallinckrodt ARD Holdings Inc.
Mallinckrodt ARD Holdings Limited
Mallinckrodt ARD IP Unlimited Company
Mallinckrodt ARD LLC
Mallinckrodt Brand Pharmaceuticals LLC
Mallinckrodt Buckingham Unlimited Company
Mallinckrodt Canada ULC
Mallinckrodt CB LLC
Mallinckrodt Critical Care Finance LLC
Mallinckrodt Enterprises Holdings, Inc.
Mallinckrodt Enterprises LLC
Mallinckrodt Enterprises UK Limited
Mallinckrodt Group S.a.r.l.
Mallinckrodt Holdings GmbH
Mallinckrodt Hospital Products Inc.
Mallinckrodt Hospital Products IP Unlimited Company
Mallinckrodt International Finance SA
Mallinckrodt International Holdings S.a.r.l.
Mallinckrodt IP Unlimited Company
Mallinckrodt LLC Mallinckrodt Lux IP S.a.r.l.
Mallinckrodt Manufacturing LLC
Mallinckrodt Pharma IP Trading Unlimited Company
Mallinckrodt Pharmaceuticals Ireland Limited
Mallinckrodt Pharmaceuticals Limited
Mallinckrodt Quincy S.a.r.l.
Mallinckrodt UK Finance LLP
Mallinckrodt UK Ltd
Mallinckrodt US Holdings LLC
Mallinckrodt US Pool LLC
Mallinckrodt Veterinary, Inc.
Mallinckrodt Windsor Ireland Finance Unlimited Company
Mallinckrodt Windsor S.a.r.l.
MCCH LLC MEH, Inc.
MHP Finance LLC
MKG Medical UK Ltd

AA0000479

MNK 2011 LLC
MUSHI UK Holdings Limited
Ocera Therapeutics, Inc.
Petten Holdings Inc.
SpecGx Holdings LLC
SpecGx LLC
ST Operations LLC
ST Shared Services LLC
ST US Holdings LLC
ST US Pool LLC
Stratatech Corporation
Sucampo Holdings Inc.
Sucampo Pharma Americas LLC
Sucampo Pharmaceuticals, Inc.
Therakos, Inc.
Vtesse LLC
WebsterGx Holdco LLC
Mallinckrodt Equinox Finance LLC

AA0000480

**<u>EXHIBIT A</u>**

**(Appealed Order)**

AA0000481

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| In re: | ) Chapter 11 |
|  | ) |
|  | ) Case No. 20-12522 (JTD) |
| MALLINCKRODT PLC, *et al.* | ) |
|  | ) (Jointly Administered) |
| Debtors.[1] | ) |
|  | ) **Re: Docket Nos. 4675, 4820, 4988 & 5207** |

### ORDER IN CONNECTION WITH EXPEDITED MOTION FOR PRE-CONFIRMATION DETERMINATION THAT DEBTORS CANNOT REJECT OR DISCHARGE POST-CONFIRMATION ROYALTY OBLIGATIONS RELATED TO SALE OF ACTHAR GEL

Upon the motion (the "**Motion**")[2] of sanofi-aventis U.S. LLC ("**Sanofi**"), for entry of an order determining that the Debtors cannot reject or discharge their post-confirmation Royalty obligations to Sanofi under the Debtors' proposed joint plan of reorganization (the "**Plan**"); and the Court having jurisdiction to consider the Motion and the relief requested therein pursuant to 28 U.S.C. §§ 157 and 1334, and the Amended Standing Order of Reference from the United States District Court for the District of Delaware dated as of February 29, 2012; and consideration of the Motion and the relief requested therein being a core proceeding under 28 U.S.C. § 157(b); and the Court having authority to enter a final order consistent with Article III of the United States Constitution; and venue being proper before this Court under 28 U.S.C. §§ 1408 and 1409; and it appearing that proper and adequate notice of the Motion has been given and that no other or further notice is necessary; and good and sufficient cause appearing therefor and upon the record of this

---

[1]  A complete list of the Debtors in these chapter 11 cases may be obtained on the website of the Debtors' claims and noticing agent at http://restructuring.primeclerk.com/Mallinckrodt. The Debtors' mailing address is 675 McDonnell Blvd., Hazelwood, Missouri 63042.

[2]  Capitalized terms not otherwise defined herein have the meanings set forth in the Motion.

AA0000482

contested matter including the hearing on November 4, 2021, at which the Court provided findings of fact and conclusions of law supporting its determinations below, it is hereby

**ORDERED, ADJUDGED, AND DECREED THAT:**

1.      The Motion is GRANTED in part and DENIED in part, as set forth herein.

2.      The Court hereby determines that the APA is not executory for purposes of Section 365 of the Bankruptcy Code and cannot be rejected under Section 365 of the Bankruptcy Code.

3.      The Court also hereby determines, however, that Sanofi's claims for post-Petition Date breaches of the APA, including for any payment of any royalties thereunder, by the Debtors constitute pre-Petition Date unsecured claims that may be discharged under the Bankruptcy Code.

4.      This Order shall be immediately effective and enforceable upon its entry.

5.      This Court shall retain jurisdiction with respect to all matters arising from or related to the implementation and/or interpretation of this Order.  This Order finally resolves the dispute presented by the Motion and is final and appealable.

**Dated: November 8th, 2021**
**Wilmington, Delaware**

**JOHN T. DORSEY**
**UNITED STATES BANKRUPTCY JUDGE**

AA0000483

## <u>CERTIFICATE OF SERVICE</u>

I, Stuart M. Brown, hereby certify that on this 19th day of November, 2021, a true and correct copy of the foregoing was served via cm/ecf upon the parties receiving e-filing notifications in this case.

/s/ *Stuart M. Brown*　　　　　　
Stuart M. Brown (DE 4050)

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| | ) Case No. 20-12522 (JTD) |
| MALLINCKRODT PLC, *et al.* | ) |
| | ) (Jointly Administered) |
| Debtors.[1] | ) |
| | ) **Re: Docket No. 5210, 5409** |
| | ) |
| | ) District Court Case No. 21-cv-1636 |
| _____ | Bankruptcy BAP No. 21-82 |

## STATEMENT OF ISSUES ON APPEAL

Pursuant to Rule 8009 of the Federal Rules of Bankruptcy Procedure, appellant sanofi-aventis U.S. LLC ("**Sanofi**"), through its undersigned counsel, submits this statement of issues on appeal of the Court's *Order in Connection with Expedited Motion for Pre-Confirmation Determination That Debtors Cannot Reject or Discharge Post-Confirmation Royalty Obligations Related to Sale of Acthar Gel* [D.I. 5210].

1.     Whether the Court erred in ruling that damages resulting from debtors' post-confirmation breaches of a non-executory contract may be discharged as pre-petition unsecured claims under Title 11 of the United States Code.

2.     Whether the Court erred in ruling that future royalty obligations under a non-executory asset purchase agreement, which only arise, if at all, after the debtors choose to sell Acthar Gel post-petition and post-confirmation, constitute pre-petition general unsecured claims that may be discharged under Title 11 of the United States Code.

3.     Whether the Court erred in ruling that debtors may continue to sell Acthar Gel,

---

[1]     A complete list of the Debtors in these chapter 11 cases may be obtained on the website of the Debtors' claims and noticing agent at http://restructuring.primeclerk.com/Mallinckrodt. The Debtors' mailing address is 675 McDonnell Blvd., Hazelwood, Missouri 63042.

AA0000485

the rights to which were acquired pursuant to an asset purchase agreement subject to a perpetual royalty, without paying the royalty as and when it arises and comes due post-petition and post-confirmation.

Dated: December 2, 2021

**DLA PIPER LLP (US)**

 /s/ Stuart M. Brown
Stuart M. Brown (DE #4050)
Aaron S. Applebaum (DE #5587)
Kaitlin MacKenzie (DE #5924)
1201 North Market Street, Suite 2100
Wilmington, Delaware 19801
Telephone:     (302) 468-5700
Facsimile:     (302) 394-2341
Email:  stuart.brown@us.dlapiper.com
            aaron.applebaum@us.dlapiper.com
            kaitlin.mackenzie@us.dlapiper.com

- and -

Jason Hopkins (TX 24059969)
1900 North Pearl Street
Suite 2200
Dallas, Texas 75201-2482
Telephone:     (214) 743-4546
Email: jason.hopkins@us.dlapiper.com

- and -

**MILLER & MARTIN PLLC**
Laura F. Ketcham
Volunteer Building Suite 1200
832 Georgia Avenue
Chattanooga, Tennessee 37402
Telephone:     (423) 785-8383
Facsimile:     (423) 321-1556
Email: laura.ketcham@millermartin.com

*Attorneys for sanofi-aventis U.S. LLC*

AA0000486

## <u>CERTIFICATE OF SERVICE</u>

I, Stuart M. Brown, hereby certify that on this 2nd day of December, 2021, a true and correct copy of the foregoing was served via cm/ecf upon the parties receiving e-filing notifications in this case.

/s/ *Stuart M. Brown*
Stuart M. Brown (DE 4050)

AA0000487