No. 21-cv-01636-LPS

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF DELAWARE

In re MALLINCKRODT, PLC, et al., *Debtors*.*

SANOFI-AVENTIS U.S. LLC, *Appellant*,

v.

MALLINCKRODT, PLC, et al., *Appellees*.

On Appeal from the United States Bankruptcy Court
for the District of Delaware, No. 20-12522 (JTD)

## BRIEF OF DEBTORS-APPELLEES

Mark D. Collins (No. 2981)
Michael J. Merchant (No. 3854)
Amanda R. Steele (No. 5530)
Brendan J. Schlauch (No. 6115)
**RICHARDS, LAYTON & FINGER, P.A.**
One Rodney Square
920 N. King Street
Wilmington, Delaware 19801
(302) 651-7700
collins@rlf.com
merchant@rlf.com
steele@rlf.com
schlauch@rlf.com

Melissa Arbus Sherry
James A. Tomberlin
Andrew Sorkin
**LATHAM & WATKINS LLP**
555 Eleventh Street, NW, Suite 1000
Washington, DC 20004
(202) 637-2200
melissa.sherry@lw.com
james.tomberlin@lw.com
andrew.sorkin@lw.com

*(additional counsel listed on inside cover)*

---

* A complete list of the Debtors in these Chapter 11 cases may be obtained on the website of the Debtors' claims and noticing agent at http://restructuring.primeclerk.com/Mallinckrodt. The Debtors' mailing address is 675 McDonnell Blvd., Hazelwood, Missouri 63042.

George A. Davis
George Klidonas
Anupama Yerramalli
1271 Avenue of the Americas
New York, New York 10020
(212) 906-1200
george.davis@lw.com
george.klidonas@lw.com
anu.yerramalli@lw.com

Jeffrey E. Bjork
355 South Grand Avenue, Suite 100
Los Angeles, California 90071
(213) 485-1234
jeff.bjork@lw.com

Jason B. Gott
330 North Wabash Avenue, Suite 2800
Chicago, Illinois 60611
(312) 876-7700
jason.gott@lw.com

*Counsel for Debtors-Appellees*

## CORPORATE DISCLOSURE STATEMENT

Mallinckrodt plc and its affiliates that are Debtors and Debtors-in-possession in the above-captioned chapter 11 proceedings (collectively, "Debtors"), by and through undersigned counsel, respectfully represent:

1. Debtor-Appellee Mallinckrodt plc, chartered in Ireland, has no parent company, and no publicly held company owns 10% or more of Mallinckrodt plc. Mallinckrodt plc is publicly traded.

2. Debtor-Appellee Acthar IP Unlimited Company, chartered in Ireland, is a wholly-owned subsidiary of Debtor Mallinckrodt Pharma IP Unlimited Company.

3. Debtor-Appellee IMC Exploration Company, chartered in Maryland, is a wholly-owned subsidiary of Debtor ST US Holdings LLC.

4. Debtor-Appellee Infacare Pharmaceutical Corporation, chartered in Delaware, is a wholly-owned subsidiary of Debtor Therakos, Inc.

5. Debtor-Appellee INO Therapeutics LLC, chartered in Delaware, is a wholly-owned subsidiary of Debtor Therakos, Inc.

6. Debtor-Appellee Ludlow LLC, chartered in Massachusetts, is a wholly-owned subsidiary of Debtor MNK 2011 LLC.

7. Debtor-Appellee MAK LLC, chartered in Delaware, is a wholly-owned subsidiary of Debtor MEH, Inc.

8.    Debtor-Appellee Mallinckrodt APAP LLC, chartered in Delaware, is a wholly-owned subsidiary of Debtor SpecGx LLC.

9.    Debtor-Appellee Mallinckrodt ARD Finance LLC, chartered in Delaware, is a wholly-owned subsidiary of Debtor Mallinckrodt Enterprises Holdings, Inc.

10.    Debtor-Appellee Mallinckrodt ARD Holdings Inc., chartered in Delaware, is a wholly-owned subsidiary of Debtor Therakos, Inc.

11.    Debtor-Appellee Mallinckrodt ARD Holdings Limited, chartered in the United Kingdom, is a wholly-owned subsidiary of Debtor Mallinckrodt International Finance SA.

12.    Debtor-Appellee Mallinckrodt ARD IP Unlimited Company, chartered in Ireland, is a wholly-owned subsidiary of Debtor Acthar IP Unlimited Co.

13.    Debtor-Appellee Mallinckrodt ARD LLC, chartered in California, is a wholly-owned subsidiary of Debtor Mallinckrodt ARD Holdings, Inc.

14.    Debtor-Appellee Mallinckrodt Brand Pharmaceuticals LLC, chartered in Delaware, is a wholly-owned subsidiary of Debtor ST US Holdings LLC.

15.    Debtor-Appellee Mallinckrodt Buckingham Unlimited Company is chartered in Ireland.  Half of Mallinckrodt Buckingham Unlimited Company is owned by Debtor Mallinckrodt Pharmaceuticals Limited, and the other half is owned by Debtor Mallinckrodt International Finance SA.

16.     Debtor-Appellee Mallinckrodt Canada ULC, chartered in Canada, is a wholly-owned subsidiary of non-Debtor Mallinckrodt Canada Cooperatie U.A.

17.     Debtor-Appellee Mallinckrodt CB LLC, chartered in Delaware, is a wholly-owned subsidiary of Debtor Mallinckrodt International Finance SA.

18.     Debtor-Appellee Mallinckrodt Critical Care Finance LLC, chartered in Delaware, is a wholly-owned subsidiary of Debtor Mallinckrodt ARD Holdings Inc.

19.     Debtor-Appellee Mallinckrodt Enterprises Holdings, Inc. is chartered in California.  Half of Mallinckrodt Enterprises Holdings, Inc., is owned by Debtor Petten Holdings Inc., and the other half is owned by Debtor MEH, Inc.

20.     Debtor-Appellee Mallinckrodt Enterprises LLC is chartered in Delaware.  Half of Mallinckrodt Enterprises LLC is owned by Debtor WebsterGx Holdco LLC, and the other half is owned by Debtor Mallinckrodt ARD Finance LLC.

21.     Debtor-Appellee Mallinckrodt Enterprises UK Limited, chartered is the United Kingdom, is a wholly-owned subsidiary of Debtor MUSHI UK Holdings Limited.

22.     Debtor-Appellee Mallinckrodt Equinox Finance LLC, chartered in Delaware, is a wholly-owned subsidiary of Debtor Petten Holdings Inc.

23.     Debtor-Appellee   Mallinckrodt   Group   S.à   r.l.,   chartered   in Luxembourg, is a wholly-owned subsidiary of Debtor Mallinckrodt International Finance SA.

24.     Debtor-Appellee   Mallinckrodt   Holdings   GmbH,   chartered   in Switzerland, is a wholly-owned subsidiary of Debtor Mallinckrodt International Finance SA.

25.     Debtor-Appellee Mallinckrodt Hospital Products Inc., chartered in Delaware, is a wholly-owned subsidiary of Debtor MCCH LLC.

26.     Debtor-Appellee   Mallinckrodt   Hospital   Products   IP   Unlimited Company, chartered in Ireland, is a wholly-owned subsidiary of Debtor Mallinckrodt IP Unlimited Company.

27.     Debtor-Appellee Mallinckrodt International Finance SA, chartered in Luxembourg, is a wholly-owned subsidiary of Debtor Mallinckrodt plc.

28.     Debtor-Appellee Mallinckrodt International Holdings S.à r.l., chartered in Luxembourg, is a wholly-owned subsidiary of Debtor Mallinckrodt International Finance SA.

29.     Debtor-Appellee Mallinckrodt IP Unlimited Company, chartered in Ireland, is a wholly-owned subsidiary of Debtor Mallinckrodt Pharma IP Trading Unlimited Company.

30.     Debtor-Appellee Mallinckrodt LLC, chartered in Delaware, is a wholly-owned subsidiary of Debtor Mallinckrodt Enterprises LLC.

31.     Debtor-Appellee Mallinckrodt Lux IP S.à r.l., chartered in Luxembourg, is a wholly-owned subsidiary of Debtor Mallinckrodt International Finance SA.

32.     Debtor-Appellee Mallinckrodt Manufacturing LLC, chartered in Delaware, is a wholly-owned subsidiary of Debtor Mallinckrodt Hospital Products Inc.

33.     Debtor-Appellee Mallinckrodt Pharma IP Trading Unlimited Company, chartered in Ireland, is a wholly-owned subsidiary of Debtor Mallinckrodt International Finance SA.

34.     Debtor-Appellee Mallinckrodt Pharmaceuticals Ireland Limited, chartered in Ireland, is a wholly-owned subsidiary of Debtor Mallinckrodt International Finance SA.

35.     Debtor-Appellee Mallinckrodt Pharmaceuticals Limited, chartered in the United Kingdom, is a wholly-owned subsidiary of Debtor Mallinckrodt International Holdings S.à r.l.

36.     Debtor-Appellee Mallinckrodt Quincy S.à r.l., chartered in Luxembourg, is a wholly-owned subsidiary of Debtor Mallinckrodt Buckingham Unlimited Company.

37.     Debtor-Appellee Mallinckrodt UK Finance LLP is chartered in the United Kingdom.  Half of Mallinckrodt UK Finance LLP is owned by Debtor Mallinckrodt Pharmaceuticals Limited, and half is owned by Debtor Mallinckrodt International Finance SA.

38.     Debtor-Appellee Mallinckrodt UK Ltd, chartered in the United Kingdom, is a wholly-owned subsidiary of Debtor Mallinckrodt plc.

39.     Debtor-Appellee Mallinckrodt US Holdings LLC, chartered in Delaware, is a wholly-owned subsidiary of Debtor ST US Holdings LLC.

40.     Debtor-Appellee Mallinckrodt US Pool LLC, chartered in Nevada, is a wholly-owned subsidiary of Debtor Petten Holdings Inc.

41.     Debtor-Appellee Mallinckrodt Veterinary, Inc., chartered in Delaware, is a wholly-owned subsidiary of Debtor ST US Holdings LLC.

42.     Debtor-Appellee Mallinckrodt Windsor Ireland Finance Unlimited Company, chartered in Ireland, is a wholly-owned subsidiary of Debtor Mallinckrodt Windsor S.à r.l.

43.     Debtor-Appellee Mallinckrodt Windsor S.à r.l., chartered in Luxembourg, is a wholly-owned subsidiary of Debtor Mallinckrodt Quincy S.à r.l.

44.     Debtor-Appellee MCCH LLC, chartered in Delaware, is a wholly-owned subsidiary of Debtor MCCH LLC.

45.    Debtor-Appellee MEH, Inc., chartered in Nevada, is a wholly-owned subsidiary of Debtor Mallinckrodt International Finance SA.

46.    Debtor-Appellee MHP Finance LLC, chartered in Delaware, is a wholly-owned subsidiary of Debtor Mallinckrodt ARD Holdings Inc.

47.    Debtor-Appellee MKG Medical UK Ltd, chartered in the United Kingdom, is a wholly-owned subsidiary of Debtor Mallinckrodt Windsor S.à r.l.

48.    Debtor-Appellee MNK 2011 LLC, chartered in Delaware, is a wholly-owned subsidiary of Debtor Mallinckrodt Brand Pharmaceuticals LLC.

49.    Debtor-Appellee MUSHI UK Holdings Limited, chartered in the United Kingdom, is a wholly-owned subsidiary of Debtor Mallinckrodt ARD Holdings Limited.

50.    Debtor-Appellee Ocera Therapeutics, Inc., chartered in Delaware, is a wholly-owned subsidiary of Debtor MAK LLC.

51.    Debtor-Appellee Petten Holdings Inc., chartered in Delaware, is a wholly-owned subsidiary of ST US Holdings LLC.

52.    Debtor-Appellee SpecGx Holdings LLC, chartered in New York, is a wholly-owned subsidiary of Debtor Mallinckrodt LLC.

53.    Debtor-Appellee SpecGx LLC, chartered in Delaware, is a wholly-owned subsidiary of Debtor SpecGx Holdings LLC.

54.   Debtor-Appellee ST Operations LLC, chartered in Delaware, is a wholly-owned subsidiary of Debtor MEH, Inc.

55.   Debtor-Appellee ST Shared Services LLC, chartered in Delaware, is a wholly-owned subsidiary of Debtor Petten Holdings, Inc.

56.   Debtor-Appellee ST US Holdings LLC, chartered in Nevada, is a wholly-owned subsidiary of Debtor MEH, Inc.

57.   Debtor-Appellee ST US Pool LLC, chartered in Delaware, chartered in Delaware, is a wholly-owned subsidiary of Debtor ST US Holdings LLC.

58.   Debtor-Appellee Stratatech Corporation, chartered in Delaware, is a wholly-owned subsidiary of Debtor Mallinckrodt Hospital Products Inc.

59.   Debtor-Appellee Sucampo Holdings Inc., chartered in Delaware, is a wholly-owned subsidiary of Debtor Sucampo Pharmaceuticals, Inc.

60.   Debtor-Appellee Sucampo Pharma Americas LLC, chartered in Delaware, is a wholly-owned subsidiary of Debtor Sucampo Holdings Inc.

61.   Debtor-Appellee Sucampo Pharmaceuticals, Inc., chartered in Delaware, is a wholly-owned subsidiary of Debtor MEH, Inc.

62.   Debtor-Appellee Therakos, Inc., chartered in Florida, is a wholly-owned subsidiary of Debtor Mallinckrodt Hospital Products Inc.

63.   Debtor-Appellee Vtesse LLC, chartered in Delaware, is a wholly-owned subsidiary of Debtor Sucampo Pharmaceuticals, Inc.

64.     Debtor-Appellee WebsterGx Holdco LLC, chartered in New York, is a wholly-owned subsidiary of Debtor Mallinckrodt Enterprises Holdings, Inc.

# TABLE OF CONTENTS

**Page**

CORPORATE DISCLOSURE STATEMENT ........................................................i

INTRODUCTION ...........................................................................................1

STATEMENT OF THE ISSUE.........................................................................3

STATEMENT OF THE CASE..........................................................................3

     A.     Background On The APA ....................................................3

     B.     The Bankruptcy Proceedings ...........................................5

SUMMARY OF THE ARGUMENT .................................................................8

ARGUMENT ...............................................................................................10

I.     The Bankruptcy Court Correctly Held That Sanofi's Right To Royalty Payments Under The APA Constituted A Dischargeable Prepetition Claim.......................................................................................................10

II.    Sanofi's Arguments To The Contrary Fail ........................................14

     A.     Payments Arising Under Prepetition Contracts Are Prepetition Claims........................................................15

     B.     Debtors' Ownership Of Acthar Is Not Subject To Royalty Payments ............................................................19

     C.     Policy Considerations Favor Discharge Of Prepetition Claims..........24

CONCLUSION ...........................................................................................27

CERTIFICATE OF COMPLIANCE................................................................29

CERTIFICATE OF SERVICE .......................................................................30

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

## CASES

*In re Access Beyond Techs, Inc*.,
  237 B.R. 32 (Bankr. D. Del. 1991) ......................................................................19

*In re Columbia Gas Sys. Inc.*,
  50 F.3d 233 (3d Cir. 1995) .........................................................................7, 12, 13

*In re Foothills Texas, Inc.*,
  476 B.R. 143 (Bankr. D. Del. 2012)...................................................................23

*In re Grossman's*,
  607 F.3d 114 (3d Cir. 2010) (en banc) ..................................................10, 12, 17

*In re Hays & Co. v. Merrill Lynch, Pierce, Fenner & Smth, Inc*.,
  885 F.2d 1149 (3d Cir. 1989) .............................................................................18

*In re JZ L.L.C*.,
  371 B.R. 412 (B.A.P. 9th Cir. 2007) ..................................................................19

*In re Kaiser Grp. Int'l Inc*.,
  399 F.3d 558 (3d Cir. 2005) ...............................................................................20

*Matter of M. Frenville Co*.,
  744 F.2d 332 (3d Cir. 1984) ...............................................................................17

*In re Munple, Ltd.*,
  868 F.2d 1129 (9th Cir. 1989) ............................................................................12

*In re Particle Drilling Techs.*,
  No. 09-33744, 2009 WL 2382030 (Bankr. S.D. Tex. July 29, 2009) ...............23

*In re Surfside Resort & Suits, Inc*.,
  344 B.R. 179 (Bankr. M.D. Fla. 2006).............................................................19

*In re Waste Systems International, Inc*.,
  280 B.R. 824 (Bankr. D. Del. 2002)..................................................7, 13, 16, 17

*In re Weinstein*,
   997 F.3d 497 (3d Cir. 2021) ........................................................................*passim*

*Wright v. Owens Corning*,
   679 F.3d 101 (3d Cir. 2012) ...............................................................................17

## STATUTES

11 U.S.C. § 101(5)(A) ..................................................................................10, 15, 16

11 U.S.C. § 363 .................................................................................................11, 15

11 U.S.C. § 1141 ...............................................................................................10, 15

## OTHER AUTHORITY

H.R. Rep. No. 95-595 (1977) .....................................................................10, 13, 25

# INTRODUCTION

This appeal involves an asset purchase agreement (APA) executed in 2001. Debtors' predecessor-in-interest (Questcor) paid $100,000 and, in return, received the intellectual property rights to Acthar® Gel (Acthar).  Under the APA, Questcor (or its successor-in-interest) was required to make royalty payments based on future sales of Acthar.  Although those payments continue to accrue as Debtors continue to sell Acthar, Debtors receive no ongoing or continual benefit from the seller (Sanofi's predecessor-in-interest); the intellectual property rights were already transferred in full two decades ago.

The Bankruptcy Code and applicable case law make clear that future, contingent payments arising out of prepetition contracts are prepetition claims (*i.e.*, ones that arise before the date of the debtor's bankruptcy petition).  And such claims are dischargeable under Chapter 11.  When Debtors filed for Chapter 11, they accordingly took the view that their liability for any royalty payments would be discharged.  Some of those royalties had not yet accrued; they were contingent on future Acthar sales.  But because the claims arose under the prepetition APA, the Bankruptcy Court held that Sanofi's royalty payment claims were subject to discharge.  That decision was correct.

On appeal, Sanofi argues to the contrary for three reasons.  *First*, Sanofi contends that the payments were not prepetition claims because its claims arise when

1

Debtors sell Acthar.  But that argument ignores the fact that the Bankruptcy Code defines "claim" to include rights to payment that are "contingent" on a future event—like selling Acthar.  Third Circuit precedent similarly recognizes that where a prepetition contract creates future contingent payment obligations, those obligations arise prepetition—regardless of when the obligations accrue under non-bankruptcy law.  That the Third Circuit has already rejected exactly the sort of "accrual" test Sanofi advances is the final nail.

*Second*, Sanofi argues that the APA did not transfer all rights to Acthar, but instead created a property interest that the seller retains in the property sold.  OB12-13.  Sanofi did not make this retained property argument below.  To the contrary, Sanofi conceded that the royalty payment is a *contractual* obligation and that it had conveyed to Debtors all of its rights in Acthar.  The argument is thus waived.  It is also wrong.  Sanofi relies primarily on language in the APA stating that the intellectual property was transferred "subject to" the APA's terms and conditions.  But those two words are not specific to the royalty payment, and a fair reading of the APA makes clear that Sanofi did not retain any ownership interest in the intellectual property or proceeds from it.

*Finally*, Sanofi argues that the result in this case is unjust.  But the Bankruptcy Code was intended to afford debtors broad relief, by ensuring that even remote or contingent legal obligations of the debtor can be dealt with in the bankruptcy case.

2

While Sanofi complains that it will receive only a fraction of the amount owed for its unsecured claims, that is the fate of all general unsecured creditors in Chapter 11. The inequity would be to treat Sanofi more favorably than those similarly situated.

## STATEMENT OF THE ISSUE

Whether the Bankruptcy Court erred in determining that all of Debtors' payment obligations arising out of the 2001 Asset Purchase Agreement are prepetition claims that may be discharged under the Bankruptcy Code.

## STATEMENT OF THE CASE

### A.    Background On The APA

On July 27, 2001, Questcor Pharmaceuticals, Inc. (predecessor-in-interest to Debtor Mallinckrodt Pharmaceuticals Ireland Limited (MPIL))[1] and Aventis (Sanofi's predecessor-in-interest) executed the APA.  App. 27.  Under Section 2.1, Questcor purchased from Aventis, and Aventis sold, assigned, and conveyed to Questcor, all of Aventis's "rights, title, and interests" relating to Acthar.  These assets consisted primarily of trademarks, know-how, regulatory filings and related rights, and certain Acthar-related equipment, inventory, and raw materials. App. 30 (APA ¶ 2.1).

---

[1] MPIL is the only Debtor that is or ever has been bound by the APA; references in this brief to "Debtors" do not concede any liability to any other Debtor.

In exchange, in Section 2.3, Questcor agreed to "pay to [Aventis] as full and fair consideration for the Assets" a "Purchase Price" defined in three subparagraphs (a) through (c) as:

(a)  $100,000 due (at the earliest) 90 days after the APA's Effective Date;

(b)  $11 per vial of "finished [Acthar] Product in [Aventis's] Inventory" and "a purchase price equal to [Aventis]'s standard costs" for the remaining inventory; and

(c)  a "Royalty Payment" defined as "an annual royalty equal to one percent (1%) of all Net Sales in excess of Ten Million Dollars ($10,000,000) in any given calendar year" "for so long as Purchaser, any of its Affiliates or any of its licensees, or any of their respective successors or assigns, sells the Product."

App. 31-32 (APA ¶ 2.3).

Questcor granted Aventis "a purchase money security interest in and to the Assets, as security solely for the performance by [Questcor] of its payment obligations only for the portion of the Purchase Price set forth in Section 2.3(a) and 2.3(b), together with the right of [Aventis] to repossess the Assets" for nonpayment. App. 32 (APA ¶ 2.4). That security interest does not apply to the royalty payment in (c), and the APA does not include any similar provision describing a security interest or other property interest granted or retained in connection with the royalty payment.

In 2014, Questcor became a wholly-owned subsidiary of Mallinckrodt plc and Questcor assigned all of its rights, title, and interest, and delegated all of its

obligations, responsibilities, and duties under the APA—including to make the "Royalty Payment"—to Debtor MPIL.  App. 56-60.

### B.    The Bankruptcy Proceedings

On October 12, 2020, Debtors filed voluntary Chapter 11 petitions in the United States Bankruptcy Court for the District of Delaware.  D.I. 1, 2.[2]  On October 12, 2021, after Debtors filed the *First Amended Joint Plan of Reorganization of Mallinckrodt plc and Its Debtor Affiliates Under Chapter 11 of the Bankruptcy Code* [D.I. 4508] (as may be further amended, modified, or supplemented from time to time, the Plan), Sanofi filed a motion (the Determination Motion) seeking a determination that either (i) the APA is non-executory and Debtors cannot discharge royalty payments that arise post-bankruptcy or (ii) the APA is executory and (if the Bankruptcy Court authorizes Debtors to reject the APA) Debtors can no longer sell Acthar.  App. 12-25.

On October 20, 2021, Debtors filed an objection to Sanofi's motion.  App. 151-73.  Debtors asked the Bankruptcy Court to determine that Sanofi's claims for royalty payments due for past or future Acthar sales under the APA were prepetition claims subject to discharge under the Bankruptcy Code.  App. 151-73.  Debtors explained that, under the APA, Sanofi was not presently conferring any right on Debtors to sell Acthar and that Sanofi had no right to stop Debtors from selling

---

[2]  "D.I." refers to the docket in the main Chapter 11 Case, Case No. 20-12522 (JTD).

Acthar based on Debtors' breach of the APA by non-payment of royalties. *Id.* Debtors also asserted that, while they believed the APA was executory due to remaining material obligations on both sides, Sanofi's claims for royalty payments would be discharged regardless. App. 153, 158-66. If the APA is executory, then Sanofi's contract rejection damages are prepetition, unsecured, dischargeable claims. App. 153, 158-63. If the APA is non-executory, then Sanofi's right to payment of royalties is still a prepetition, unsecured, dischargeable claim, because claims under a prepetition contract—even if dependent on some future event—are prepetition claims. App. 153, 163-66.

On October 29, 2021, the Bankruptcy Court held a hearing to consider, among other things, the Determination Motion. At the hearing, Sanofi argued that its "contract claim, that royalty claim . . . arises, if at all, from post-confirmation sales of Acthar Gel." App. 288. Debtors argued "that obligations under a pre-petition contract are pre-petition claims," which "arise when the contract is signed." App. 305-06.

In a November 4, 2021 bench ruling, the Bankruptcy Court denied the Determination Motion. App. 334-44. The Bankruptcy Court ruled that while the APA is not an executory contract subject to rejection, Debtors' breach of the APA "only results in a prepetition unsecured claim for damages subject to discharge upon confirmation of a plan of reorganization." App. 336, 334-44.

The Bankruptcy Court recognized that the Third Circuit had addressed this issue and had concluded that "'[i]n cases where the non-bankrupt party [h]as fully performed it makes no sense to talk about assumption or rejection.  At that point a liability exists for the debtor, a simple claim held by the non-bankrupt against the estate . . . .'"  App. 338-39 (quoting *In re Columbia Gas Sys. Inc.*, 50 F.3d 233, 239 (3d Cir. 1995)).  In particular, the Bankruptcy Court found the situation here similar to that in *In re Waste Systems International, Inc*., 280 B.R. 824 (Bankr. D. Del. 2002), where, "as here, there are no post-petition transactions," and "[t]he only transaction . . . occurred prepetition."  App. 339.  The Bankruptcy Court accordingly rejected Sanofi's argument, concluding that "[w]hile a right to payment under the APA may accrue post-petition, any claims arising from the APA are prepetition general unsecured claims."  *Id*.  The Bankruptcy Court also recognized that "Sanofi did not retain any type of ownership interest in Acthar," because "the contract at issue is not a license, but rather was an outright sale of Acthar and all related assets that was consummated prepetition."  App. 339-40.  The Bankruptcy Court thus held that the prepetition contractual claims "are subject to discharge under the debtor's proposed plan."  App. 340.

On November 8, 2021, a written order followed.  App. 1-2.  On November 19, 2021, Sanofi appealed.  App. 476-84.  And, on February 3, 2022, the Bankruptcy Court issuing its opinion on confirmation, overruling all objections and finding that

the Plan satisfies all the requirements of the Bankruptcy Code, except as to one Plan provision not relevant to this appeal.  D.I. 6347; *see* D.I. 6378 (revised opinion). The court invited Debtors to submit a revised confirmation order, which Debtors are currently preparing.  *Id.*

## SUMMARY OF THE ARGUMENT

The Bankruptcy Code discharges prepetition claims against chapter 11 debtors, with very limited exceptions.  And it defines "claim" to include not just those obligations that are currently due, but also those that are "contingent" on future events.  The Bankruptcy Court correctly held that the royalty payments were dischargeable prepetition claims.  Debtors' obligation to pay royalties under the APA was contingent on future Acthar sales.  But that contingent obligation came into existence when the APA was signed over 20 years ago.  The Bankruptcy Code and applicable case law make clear that Sanofi's claims are prepetition claims, regardless of when they may accrue.

Sanofi makes three arguments to the contrary, but each fails.  *First*, Sanofi argues that its claims for royalty payments arise when the obligations become due, rather than when the obligations were created.  The Bankruptcy Code forecloses that argument.  And the Third Circuit has rejected the exact "accrual" test Sanofi advances.  The law is clear that contingent payments created under a prepetition contract are prepetition claims.

*Second*, Sanofi argues that royalty payments under the APA run with or attach to the assets sold in the APA, so that Sanofi retains a property interest in that intellectual property.  That is contrary to Sanofi's concession in the Bankruptcy Court that the APA transferred all intellectual property rights to Acthar, and it is contrary to Sanofi's concession that it held only a contractual claim.  Only after the Bankruptcy Court rejected that theory and held that the APA was a sales contract (not a license) did Sanofi reverse course.  Sanofi's new and novel argument that the APA is a sales contract but that Sanofi nevertheless retains certain property rights to Acthar is both waived and wrong.

*Finally*, Sanofi appeals to public policy.  Sanofi argues that Debtors cannot reject executory contracts while continuing to enjoy their benefits, so the same should be true for non-executory contracts.  But the difference is that under a non-executory contract, the debtor is by definition no longer receiving *any* material benefit; it instead has only a liability.  The relief granted is entirely consistent with the purpose of Chapter 11:  to permit debtors to discharge prepetition liabilities.

**ARGUMENT**

## I.   THE BANKRUPTCY COURT CORRECTLY HELD THAT SANOFI'S RIGHT TO ROYALTY PAYMENTS UNDER THE APA CONSTITUTED A DISCHARGEABLE PREPETITION CLAIM

The Bankruptcy Court correctly held that Sanofi's right to royalty payments under the APA were dischargeable prepetition claims.  That conclusion follows from the plain language of the Bankruptcy Code, as well as the relevant case law.

Section 101 of the Bankruptcy Code defines a "claim" as a "right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, *contingent*, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured." 11 U.S.C. § 101(5)(A) (emphasis added).  The legislative history makes clear that Congress adopted the "broadest possible definition" of "claim" to "permit[] the broadest possible relief in the bankruptcy court" by "contemplat[ing] that all legal obligations of the debtor, no matter how remote or contingent, will be able to be dealt with in the bankruptcy case."  H.R. Rep. No. 95-595, at 309 (1977); *see In re Grossman's*, 607 F.3d 114, 121 (3d Cir. 2010) (en banc) (relying on this legislative history).  And Section 1141 provides that "the confirmation of a plan discharges the debtor from any [liability on a claim] that arose before the date of such confirmation."  *Id*. § 1141(d)(1)(A).

The APA contained three payment obligations: (a) $100,000 cash; (b) cash for finished product that Sanofi held in inventory at the time; and (c) an "annual

10

royalty equal to one percent (1%) of all Net Sales [of Acthar] in excess of"
$10,000,000.  App. 31-32 (APA ¶ 2.3).  The obligations in Section 2.3(a) and (b)
were paid in full many years before Debtors filed for Chapter 11, and are not at issue
here.   Sanofi's right to receive the royalty payments in Section 2.3(c) are
"contingent" claims under Section 101(5)(A), in that they come due only upon
certain future events—namely, Debtors' making over $10 million in Acthar sales in
a given year.  These contingent payment rights came into existence when the APA
was signed.  They are accordingly prepetition claims arising under a prepetition
contract, which are discharged under Section 1141(d)(1)(A).

Well-settled Third Circuit law compels that conclusion.  Just last year, in *In
re Weinstein Co. Holdings LLC*, the Third Circuit articulated the rule that "a non-
executory contract where only the debtor has material obligations left to perform . . .
is a liability of the estate," and the counterparty "only ha[s] an unsecured claim
against the debtor, on which it can typically expect to recover merely cents on the
dollar."  997 F.3d 497, 505-06 (3d Cir. 2021).  The film production agreement at
issue provided that the debtor would pay a film producer (Cohen) a fixed initial
payment, as well as future payments "equal to roughly 5% of the Picture's net profits
. . . [i]f the Picture is produced with [Cohen] as the producer thereof" and other
conditions were met.  *Id.* at 502.  A media company sought to purchase the
agreement from the debtor under 11 U.S.C. § 363, and the court considered whether

11

the contract was executory (in which case the debtor or buyer would need to cure all existing defaults) or non-executory (in which case cure is generally not required). In the latter context, the court made clear that the contract "*is only a liability for the estate*" and is thus subject to discharge. *In re Weinstein*, 997 F.3d at 504-505.[3]

In *In re Columbia Gas Systems Inc*., the Third Circuit similarly explained that when "the nonbankrupt party" to a contract has no material obligations left, "only a liability exists for the debtor," and "the nonbankrupt party is 'relegated to the position of a general creditor of the bankrupt estate.'" 50 F.3d 233, 239-40 (3d Cir. 1995) (quoting *In re Munple, Ltd.*, 868 F.2d 1129, 1130 (9th Cir. 1989)).  In that case, the relevant agreement required the debtor to make two payments, one of which had already been paid out and one of which had not yet come due as of the petition date. *Id.* at 240.  Because the nonbankrupt parties had no material obligations under the agreement, the court held that they had "a general unsecured claim" with the "lowest payment priority." *Id.* at 240.  To hold otherwise, the Third Circuit noted, would "'offend the general policy of the bankruptcy laws'" by "elevating the

---

[3] That decision built on *In re Grossman's*, discussed further below, which set out the controlling principle that "a 'claim' arises when an individual is exposed pre-petition to a product or other conduct giving rise to an injury, which underlies a 'right to payment' under the Bankruptcy Code."  607 F.3d at 125 (claim asserted arose in 1977 when the plaintiff purchased asbestos-containing products from debtor, even though the asbestos-related disease did not manifest until 2006).

nonbankrupt's claim" above general unsecured claims.  *Id.* at 239 n.9 (quoting H.R. Rep. No. 95-595, at 186 (1977)).

Likewise, in *In re Waste Systems International, Inc.*, the bankruptcy court concluded that postpetition royalty payments made pursuant to a prepetition agreement were dischargeable general unsecured claims, as "[t]he obligation to make the royalty payments arose when the [agreement] was executed pre-petition." 280 B.R. 824, 827 (Bankr. D. Del. 2002).  The relevant agreement provided that the debtor "shall pay . . . a royalty of One Dollar ($1.00) per ton for all waste delivered." *Id.* at 825.  The creditor argued that the royalty payments were "post-petition administrative claims because the payments arise only *after*" the debtor delivers waste.  *Id.* at 827 (emphasis added).  The court rejected that argument, holding that "[t]he fact that the pre-petition obligation is dependent upon the occurrence of a post-petition event *does not* make the obligation an administrative claim."  *Id.* at 828 (emphasis added).  Instead, "the obligation is a contingent claim" arising prepetition and, under the Bankruptcy Code, "[w]hether the event occurs or not determines the amount of the contingent claim, not its priority."  *Id.* at 828.

Under these cases, it is clear that Sanofi has a prepetition claim against Debtors for payment, which is dischargeable under the Plan.  The 2001 execution of a written contract between Questcor and Aventis created a contingent claim for the "royalty" component of the APA's purchase price.  Thus, the Bankruptcy Court

correctly concluded that, "[w]hile a right to payment under the APA may *accrue* post-petition, any claims *arising* from the APA are prepetition general unsecured claims" and "are subject to discharge under the debtor's proposed plan." App. 339-40 (emphasis added).

## II. SANOFI'S ARGUMENTS TO THE CONTRARY FAIL

Sanofi disagrees with the Bankruptcy Court for three reasons. *First*, Sanofi argues that the royalty payments arise when the obligations become due (*i.e.*, each year that Debtors make over $10 million in Acthar sales), rather than when the obligations were created (*i.e.*, when the parties entered into the APA). That argument is squarely foreclosed by the language of the Bankruptcy Code and binding precedent. *Second*, Sanofi argues that royalty payments under the APA "run[] with" or "attach[]" to the assets sold in that agreement. OB13. That argument is raised for the first time on appeal and is thus waived. It is also wrong, as the APA makes clear that Sanofi did not retain any ownership interest in the intellectual property or proceeds from it. *Finally*, Sanofi argues that public policy concerns weigh against permitting Debtors to discharge the royalty payments—but the Chapter 11 process was created to permit debtors to discharge unsecured prepetition claims just like these.

## A.     Payments Arising Under Prepetition Contracts Are Prepetition Claims

Sanofi argues that APA royalty payments resulting from post-confirmation sales "cannot be said to have arisen pre-Petition Date," because "[i]t is the Debtors' affirmative act of selling Acthar Gel that gives rise to the Royalty."  OB16-17.  That argument is fundamentally at odds with the plain language of the Bankruptcy Code and applicable case law.

Sanofi fails to grapple with the statutory scheme.  Sanofi argues that 11 U.S.C. § 1141 "provides that only claims that arise *prior to confirmation* may be discharged."  OB10.  But Sanofi never cites or discusses the statutory definition of "claim" in Section 101(5), which includes "contingent" claims.   11 U.S.C. § 101(5)(A).  The word "contingent" does not appear once in Sanofi's brief, and Sanofi fails to explain why the royalty payments are not contingent claims arising under the APA.

Sanofi's attempts to distinguish applicable precedent fare no better.  Sanofi argues that the Third Circuit "made clear" in *In re Weinstein Co.* that future obligations arising under a non-executory contract may not be treated as unsecured claims.  OB25.  Not so.  Sanofi's sole support is the court's statement that a purchaser of a "non-executory contract" under 11 U.S.C. § 363 "must satisfy post-closing obligations."  997 F.3d at 501.  But the court's articulation of the rules applicable to Section 363 sales is irrelevant here.  As the court explained, if no buyer decides

15

voluntarily to assume liability on the non-executory contract by acquiring it, "the nonbankrupt counterparty . . . only ha[s] an unsecured claim against the debtor, on which it can typically expect to recover merely cents on the dollar." *Id.* at 506.

Sanofi also argues that *In re Columbia Gas* is inapplicable because that case involved "a fixed obligation to pay an amount certain by a specified date in the future," while Debtors here do not have any obligation to make future payments unless they sell Acthar. OB19. That is a distinction without a difference: Sanofi is simply pointing out that the claims in *In re Columbia Gas* were "unmatured," rather than "contingent." But both are "claims" subject to discharge. 11 U.S.C. § 101(5)(A).

Sanofi purports to distinguish *In re Waste Systems International* as applying only to administrative expense claims. OB21. Sanofi concedes (at 22) that the bankruptcy court concluded that "any claims arising from [the royalty agreement] are general unsecured claims" *because* the royalty agreement was "a pre-petition non-executory contract." 280 B.R. at 827. But Sanofi contends that the court's analysis of when "future, post-confirmation claims" arise was "dicta." OB22. In fact, the first step of the court's analysis asked whether there was "a post-petition transaction," so the court was required to decide when the claims under the royalty agreement arose. 280 B.R. at 827. Like Sanofi, the claimant argued that the royalty payments "ar[o]se only *after*" the affirmative act triggering the royalty payment

occurred.  *Id.* (emphasis added).  And the court rejected that argument, concluding that the royalty payment obligation was a "contingent claim."  *Id.* at 828.  Sanofi offers no explanation for why the same is not true here.  Sanofi also tries (at 21-22) to distinguish the case as involving a "transfer[ of] real property (on which was situated a waste treatment facility)" rather than "a sale of an asset" but, again, Sanofi fails to explain why that difference matters.  It does not.

Sanofi argues (at 18-19) that the Third Circuit's decisions in *In re Grossman's*, 607 F.3d 114 (3d Cir. 2010) (en banc) and *Wright v. Owens Corning*, 679 F.3d 101 (3d Cir. 2012) support its position.  The opposite is true.  In *In re Grossman's*, the Third Circuit overruled an earlier decision which held that a claim arose "when the underlying state law cause of action accrued."  607 F.3d at 125 (overruling *Matter of M. Frenville Co.*, 744 F.2d 332 (3d Cir. 1984)).  Emphasizing that the definition of "claim" in Section 101(5) also included "contingent," "unmatured," and "unliquidated" claims, the Third Circuit rejected *Frenville*'s "accrual" test on the grounds that it "does not account for the fact that a 'claim' can exist under the Code *before* a right to payment exists under state law."  *Id.* at 121 (emphasis added).  Instead, the court held that "a 'claim' arises when an individual is exposed pre-petition to a product or other conduct giving rise to an injury, which underlies a 'right to payment' under the Bankruptcy Code"—even if the injury does not occur until much later.  *Id.* at 125; *see also Owens Corning*, 679 F.3d 101, 107

(3d Cir. 2012) (holding that "a claim arises when an individual is exposed *pre-confirmation* to a product or other conduct giving rise to an injury that underlies a 'right to payment' under the Code" and concluding that plaintiff's postpetition, pre-confirmation exposure to the debtors' asbestos-related products was a claim).

Sanofi repeatedly argues (at 15, 18, 19, 23) that *In re Grossman's* and *Owens Corning* changed the legal landscape. True, but not in the way Sanofi suggests. Both decisions represent a significant *expansion* of the Third Circuit's interpretation of "claim" under Section 101(5)—and, by extension, an expansion of the liabilities that can be discharged in bankruptcy. Sanofi's reliance on those cases is ironic for that reason. But also because Sanofi's argument (at 19) that a claim arises only when Debtors sell Acthar essentially asks this Court to revive the overruled *Frenville* test. Just as *In re Grossman's* and *Owens Corning* instruct courts to consider when the claimant came into contact with the debtor (rather than when the injury manifested), *In re Weinstein*, *In re Columbia Gas*, and *In re Waste Systems International* instruct courts to consider when an obligation giving rise to a payment arose (rather than when the payment comes due).

Sanofi further argues that "as a non-executory contract, the APA should be deemed to 'ride through' confirmation unaffected." OB24-25 (quoting *In re Hays & Co. v. Merrill Lynch, Pierce, Fenner & Smth, Inc*., 885 F.2d 1149 (3d Cir. 1989)). But *In re Hays* is inapplicable. It dealt with the narrow issue of whether a bankruptcy

trustee was bound *during the bankruptcy case* by an arbitration clause in a prepetition, non-executory contract with a creditor it was trying to sue, not whether rights to payment (*i.e.*, claims) under a debtor's prepetition, non-executory contracts are discharged after bankruptcy.  The other cases Sanofi cites are either inapposite[4] or fully consistent with *In re Weinstein*, *In re Columbia Gas*, and *In re Waste Systems International*.[5]

### B.    Debtors' Ownership Of Acthar Is Not Subject To Royalty Payments

Sanofi argues that the APA created "a property interest that the seller retains in the property sold" and that "the Royalty is an obligation that attached to and runs with the property sold."  OB12-13.  That argument is waived and wrong.

In the Bankruptcy Court, Sanofi argued that Debtors could continue selling Acthar only if they continued to pay the royalty, *i.e.*, that Debtors possessed only a license to sell Acthar that they would be forced to surrender if Debtors failed to pay

---

[4]  *See, e.g.*, *In re JZ L.L.C.*, 371 B.R. 412, 425 (B.A.P. 9th Cir. 2007) (unscheduled *executory* contract rode through bankruptcy); *In re Surfside Resort & Suits, Inc.*, 344 B.R. 179, 192 (Bankr. M.D. Fla. 2006) (bankruptcy did not release *non-debtor* counterparty from preexisting duty to pay claim); *In re Access Beyond Techs, Inc.*, 237 B.R. 32, 41 (Bankr. D. Del. 1991) (*executory* contract must be assumed before it can be sold).

[5]  *See, e.g.*, *Stewart Foods*, 64 F.3d 141, 145 (4th Cir. 1995) ("[R]egardless of the nature of the contract, if at the time of the bankruptcy filing the debtor has an obligation under the contract to pay money to the non-debtor party, that obligation is handled as a pre-petition claim in the bankruptcy proceedings").

the royalty.  *See* App. 20-21, 189.  The Bankruptcy Court rejected that argument, concluding that "Sanofi did not retain any type of ownership interest in Acthar," because "the contract at issue is not a license, but rather was an outright sale of Acthar and all related assets that was consummated prepetition."  App. 339-40.  That conclusion was correct.[6]  And on appeal, Sanofi appears to accept that the APA is a sales contract rather than a license.[7]

Instead, Sanofi changes course and argues that the intellectual property was sold (not licensed) but that the royalty obligation "attached to" or "runs with" the transferred intellectual property assets and Sanofi therefore retains a property interest in those assets.  OB12-13.  Sanofi forfeited that argument by failing to raise it below.  *See In re Kaiser Grp. Int'l Inc.*, 399 F.3d 558, 565 (3d Cir. 2005) ("[W]hen a party fails to raise an issue in the bankruptcy court, the issue is waived and may not be considered by the district court on appeal.").

---

[6]  Section 2.1 provides for the complete, absolute transfer and conveyance of the relevant assets.  If the parties had intended to make the royalty payments a condition of Debtors' right to exploit Acthar intellectual property rights like in a license, that would have been memorialized in an express and unambiguous way in the APA.  For example, the APA could have (but did not) contemplate termination events or rights.  To the contrary, the APA identifies the sole and discrete circumstance under which Sanofi may retain any right in or to any of the transferred assets: a purchase money security interest granted to secure payment of the first two components of the purchase price, the $100,000 cash and the payment for finished product inventory.  App. 32 (APA ¶ 2.4).

[7]  Sanofi does cite *In re Monument Record Corp.*, which relied on a license theory and is therefore distinguishable.  *See* 61 B.R. 866, 868-69 (Bankr. M.D. Tenn. 1986).

But Sanofi did more than just fail to raise the argument.  Sanofi repeatedly conceded that it *did not* retain a property interest in Acthar under the APA.  Counsel for Sanofi acknowledged that "the purchase and sale of the ability to sell Acthar Gel . . . happened 20 years ago" and "[t]here is no dispute as to that portion of the" APA. App. 285; *see* App. 284 (describing the "two components" of the APA as (1) "the sale of th[e rights to Acthar], in exchange for a set of consideration" and (2) "an ongoing professional royalty").  At several points, Sanofi's counsel explicitly stated that its claim was contractual in nature.  App. 288 (referring to Sanofi's "royalty claim" as a "contract claim"), 316 (referring to Sanofi's "contract claim[] relating to the post-confirmation sale of Acthar"), 317 (referring to "this contract claim").  And Sanofi's arguments below and on appeal about whether royalty payment obligations arise pre- or postpetition are premised on its royalty claims being *contractual*, rather than stemming from some retained *property* interest in Acthar.  After all, bankruptcy would not impair any property rights Sanofi retained in the intellectual property, so the timing of the obligations would not matter.  The Court should not permit Sanofi to press a newfound property right on appeal.

In any event, Sanofi's new argument is wrong.  Section 2.1 contemplates the complete, absolute transfer and conveyance of the relevant assets.  In arguing to the contrary, Sanofi relies primarily on the two words "subject to"—namely, the Acthar rights were transferred "'subject to' the other terms and conditions of the APA"

which, according to Sanofi, "necessarily includes the annual Royalty."   OB13. Those two words cannot withstand the strain Sanofi puts on them.   As Sanofi concedes, the "subject to" language in Section 2.1 (Sale of Assets) has no particular connection to the royalty payment in subparagraph (c) of Section 2.3 (Purchase Price).   Section 2.3(c) is simply one of many terms and conditions.   And to the extent Sanofi argues that the "subject to" language created a property interest in *every* term and condition in the APA, that interpretation would produce absurd results.   Instead, the commonplace reading of the phrase "subject to" is that it delineates priorities among contract terms where they may otherwise conflict with one another.   (For example, the immediate grant of all rights in equipment, which would include the right to possession, in Section 2.1 of the APA conflicts with the more specific provisions regarding the transition of manufacturing and disposition of the equipment in Article 6 of the APA.   In that very limited regard, Article 6 would trump Section 2.1.)   No such conflict exists between Section 2.1 and Section 2.3(c).

More to the point, it is clear that Sanofi did not believe the "terms and conditions" in Section 2.3 gave rise to a property interest by their own force:   Sanofi separately negotiated and obtained a property interest for the payment obligations in Section 2.3(a) and (b), which Sanofi lost when those obligations were satisfied years ago.   Section 2.4 creates a security interest in the transferred assets "as security solely for the performance by Purchaser of its payment obligations only for the portion of

22

the Purchase Price set forth in Sections 2.3(a) and 2.3(b)."  App. 32.  If Sanofi were correct about the "subject to" language in Section 2.1, Section 2.4 would not have been necessary.  That the APA expressly gives Sanofi a property interest in the performance of the payment obligations in Section 2.3(a) and (b)—but *not* the royalty payment obligation in Section 2.3(c)—is unmistakable evidence that the parties did not intend to create a property right in the performance of that royalty payment obligation.[8]

Sanofi tries to argue for a presumption that royalties create property interests, citing precedent explaining that royalties "in the oil and gas industry" reflect "'an interest in real property regarded as a covenant running with the land.'"  OB12 n.29 (quoting *In re Foothills Texas, Inc.*, 476 B.R. 143, 147 (Bankr. D. Del. 2012)).  But that industry-specific rule regarding real property is inapplicable here; parties' expectations are not the same in the intellectual property context, where royalties generally *do not* create any property interests.  *See, e.g.*, *In re Particle Drilling Techs.*, No. 09-33744, 2009 WL 2382030, at *3 (Bankr. S.D. Tex. July 29, 2009) (in intellectual property context, "a royalty interest. . . *cannot* be considered a covenant

---

[8]  If the APA were at all ambiguous on this score, extrinsic evidence could have been introduced to resolve the ambiguity.  But because Sanofi failed to raise this argument below, the time for such an evidentiary record has long since passed.

that runs with the land" and instead "'is consideration for the sale of the [intellectual property] and subject to the law of contracts'" (citation omitted)).

Sanofi also cites a provision in the APA that permits assignment only if the assignee assumes responsibility for the royalty payment, which Sanofi argues "makes clear that the Royalty is an obligation that was intended to stay with the intellectual property." OB13. That provision does not support Sanofi's reading of the APA either. As previously discussed, the APA, including Section 7.6, does not contain any restrictions on conveyance of the *Acthar intellectual property* by Debtors. Section 7.6 addresses only the assignment of each party's "rights and obligations *hereunder*"—*i.e.*, under the APA. App. 44 (APA ¶ 7.6). As Debtors had obtained ownership of Acthar in a "moment in time" transaction, it follows that the APA's assignment clause applies only to still-pending rights and obligations left behind under the APA after such property transfer. As Sanofi has strenuously argued throughout this dispute, the only material obligation left to be performed is Debtors' *contractual* obligation to pay royalties. *See* App. 284-85, 288, 316, 317. For the reasons discussed, that obligation arose prepetition and is subject to discharge in bankruptcy.

## C. Policy Considerations Favor Discharge Of Prepetition Claims

With neither applicable law nor the language of the APA on its side, Sanofi turns to unpersuasive policy arguments. It argues (at 26) that "[i]t is . . . the fact that

the non-debtor counterparty has unperformed material obligations remaining on the contract, that makes it inherently fair for an executory contract to be rejected, and explains why . . . non-executory contracts may not" be rejected.  Far from an "unfair windfall" (at 27), the relief the Bankruptcy Court granted Debtors is precisely what the Bankruptcy Code was intended to provide.

The reason executory and non-executory contracts are treated differently is that in the latter context "where the counterparty performed but the debtor has not," the contract "*is only a liability for the estate*."  *In re Weinstein*, 997 F.3d at 504-505 (emphasis added).  A nondebtor counterparty (like Sanofi) that has fully performed and holds only a contract claim against the debtor is in the same position as any other general unsecured creditor.  Thus, to treat such a contract "as an executory contract risks inadvertent assumption, for the debtor would effectively be agreeing to pay the liability in full when the counterparty should instead pursue the claim against the estate like other (typically unsecured) creditors."  *Id.* (internal citation omitted).

Sanofi's argument boils down to a complaint about the scope of dischargeable claims under the Bankruptcy Code.  The legislative history of Section 101(5) makes clear that Congress adopted the "broadest possible definition" of "claim" to "permit[] the broadest possible relief in the bankruptcy court" by "contemplat[ing] that all legal obligations of the debtor, no matter how remote or contingent, will be able to be dealt with in the bankruptcy case."  H.R. Rep. No. 95-595, at 309 (1977).

That broad relief can be a "[bitter] pill . . . to swallow" for contract counterparties who do business with the debtor, "but bankruptcy inevitably creates harsh results for some players."  *In re Weinstein Co.*, 997 F.3d at 511.  And the rule that Sanofi advocates would produce a more troubling inequity: it would preference Sanofi's claims over those of other similarly situated creditors.

## CONCLUSION

For the foregoing reasons, this Court should affirm.

February 24, 2022                                    Respectfully submitted,
Wilmington, Delaware

*/s/ Michael J. Merchant*                            Melissa Arbus Sherry
Mark D. Collins (No. 2981)                           James A. Tomberlin
Michael J. Merchant (No. 3854)                       Andrew Sorkin
Amanda R. Steele (No. 5530)                          **LATHAM & WATKINS LLP** 555
Brendan J. Schlauch (No. 6115)                       Eleventh Street, NW, Suite 1000
**RICHARDS, LAYTON & FINGER,**                       Washington, DC 20004
**P.A.**                                             (202) 637-2200
One Rodney Square                                    melissa.sherry@lw.com
920 N. King Street                                   james.tomberlin@lw.com
Wilmington, Delaware 19801                           andrew.sorkin@lw.com
(302) 651-7700
collins@rlf.com                                      George A. Davis
merchant@rlf.com                                     George Klidonas
steele@rlf.com                                       Anupama Yerramalli
schlauch@rlf.com                                     1271 Avenue of the Americas
                                                     New York, New York 10020
                                                     (212) 906-1200
                                                     george.davis@lw.com
                                                     george.klidonas@lw.com
                                                     anu.yerramalli@lw.com

                                                     Jeffrey E. Bjork
                                                     355 South Grand Avenue, Suite 100
                                                     Los Angeles, California 90071
                                                     (213) 485-1234
                                                     jeff.bjork@lw.com

27

Jason B. Gott (*pro hac vice*)
330 North Wabash Avenue, Suite 2800
Chicago, Illinois 60611
(312) 876-7700
jason.gott@lw.com


*Counsel for Debtors-Appellees*

## CERTIFICATE OF COMPLIANCE

I hereby certify that this document contains 6,179 words, excluding the parts exempted by Federal Rule of Bankruptcy Procedure 8015(g), as counted by Microsoft Word.

I hereby certify that this document complies with the typeface requirements of Federal Rule of Bankruptcy Procedure 8015(a)(5) and the type-style requirements of Federal Rule of Bankruptcy Procedure 8015(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Times New Roman.

*/s/ Michael J. Merchant*
Michael J. Merchant

## CERTIFICATE OF SERVICE

I certify that on February 24, 2022, I caused to be served the foregoing Brief

Of Debtors-Appellees via the CM/ECF Electronic Filing system.

*/s/ Michael J. Merchant*
Michael J. Merchant
