No. 21-cv-01636-TLA

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

———————————————

In re MALLINCKRODT, PLC, et al., *Debtors*.[*]

———————————————

SANOFI-AVENTIS U.S. LLC, *Appellant*,

v.

MALLINCKRODT, PLC, et al., *Appellees*.

———————————————

On Appeal from the United States Bankruptcy Court
for the District of Delaware, No. 20-12522 (JTD)

———————————————

## REORGANIZED DEBTORS' MOTION
## TO DISMISS APPEAL AS EQUITABLY MOOT

———————————————

Mark D. Collins (No. 2981)
Michael J. Merchant (No. 3854)
Amanda R. Steele (No. 5530)
Brendan J. Schlauch (No. 6115)
**RICHARDS, LAYTON
& FINGER, P.A.**
One Rodney Square
920 N. King Street
Wilmington, Delaware 19801
(302) 651-7700
collins@rlf.com
merchant@rlf.com
steele@rlf.com
schlauch@rlf.com

Melissa Arbus Sherry
James A. Tomberlin
Andrew Sorkin
**LATHAM & WATKINS LLP**
555 Eleventh Street, NW, Suite 1000
Washington, D.C. 20004
(202) 637-2200
melissa.sherry@lw.com
james.tomberlin@lw.com
andrew.sorkin@lw.com

*(additional counsel listed on inside cover)*

---

[*] A complete list of the Debtors in these Chapter 11 cases may be obtained on the website of the Debtors' claims and noticing agent at http://restructuring.ra.kroll.com/Mallinckrodt. The Debtors' mailing address is 675 McDonnell Blvd., Hazelwood, Missouri 63042.

George A. Davis
George Klidonas
Anupama Yerramalli
1271 Avenue of the Americas
New York, New York 10020
(212) 906-1200
george.davis@lw.com
george.klidonas@lw.com
anu.yerramalli@lw.com

Jeffrey E. Bjork
355 South Grand Avenue, Suite 100
Los Angeles, California 90071
(213) 485-1234
jeff.bjork@lw.com

Jason B. Gott
330 North Wabash Avenue, Suite 2800
Chicago, Illinois 60611
(312) 876-7700
jason.gott@lw.com

*Counsel for Debtors-Appellees*

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ...................................................................... ii

PRELIMINARY STATEMENT ................................................................1

BACKGROUND ......................................................................................2

    A.    Events Leading Up To The Bankruptcy................................3

    B.    The Chapter 11 Cases............................................................3

    C.    Sanofi's Determination Motion.............................................5

    D.    Plan Confirmation And Subsequent Proceedings .................6

    E.    Plan Consummation ..............................................................7

ARGUMENT ...........................................................................................9

I.    The Unstayed Plan Has Been Substantially Consummated .........10

    A.    Substantial Consummation..................................................10

    B.    Failure To Seek A Stay .......................................................11

II.    Granting Relief Would Significantly Harm Third Parties And Scramble The Plan .......................................................................12

    A.    Effect Of Granting Relief On New Mallinckrodt's Finances .............13

    B.    Harm To Third Parties........................................................15

    C.    Scrambling Effects .............................................................17

III.    Public Policy Favors Dismissal ..................................................20

CONCLUSION ......................................................................................21

i

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*In re Chateaugay Corp.*,
  10 F.3d 944 (2d Cir. 1993) ................................................................18

*In re Continental Airlines*,
  91 F.3d 553 (3d Cir. 1996) .......................................................*passim*

*In re Millennium Lab Holdings II, LLC*,
  945 F.3d 126 (3d Cir. 2019) ........................................10, 15, 19, 20

*Nordhoff Inv.'s Inc. v. Zenith Elecs. Corp.*,
  258 F.3d 180 (3d Cir. 2001) ................................................11, 15, 16

*In re Phila. Newspapers, LLC*,
  690 F.3d 161 (3d Cir. 2012) ........................................10, 15, 16, 18

*In re Semcrude, L.P.*,
  728 F.3d 314 (3d Cir. 2013) .......................................................11, 18

*In re Specialty Equip. Cos.*,
  3 F.3d 1043 (7th Cir. 1993) ..............................................................19

*In re Tribune Media Co.*,
  799 F.3d 272 (3d Cir. 2015) ....................................................*passim*

*In re UNR Indus., Inc.*,
  20 F.3d 766 (7th Cir. 1994) ..............................................................15

*In re Zenith Elecs. Corp.*,
  329 F.3d 338 (3d Cir. 2003) .............................................................11

## STATUTES

11 U.S.C. §§ 1101(2)(A)-(C) ...................................................................11

Mallinckrodt plc and its affiliated reorganized debtors ("New Mallinckrodt") submit this motion to dismiss Sanofi's above-captioned appeal of the Bankruptcy Court's Order dated November 8, 2021 [Bankr. D.I. 5210] as equitably moot.[1]  New Mallinckrodt relies on the appeal record and the accompanying Declaration of Bryan Reasons ("Decl."), and states as follows:

## PRELIMINARY STATEMENT

In this appeal, Sanofi seeks a ruling that the annual royalty payments it was owed under a prepetition asset purchase agreement were not prepetition claims dischargeable under the Plan.  If Sanofi were to prevail on appeal, it would be entitled to annual royalty payments from New Mallinckrodt—the present value of which Sanofi asserts is $190 million.  Over $12 million of that amount would be an immediately payable administrative expense claim for royalty payments that came due during the bankruptcy proceedings.  Saddling New Mallinckrodt with that kind of new liability—when it just emerged from one of the most complex chapter 11 bankruptcies to date during exceedingly difficult market conditions—would harm purchasers of equity and debt securities that made new investments in the Company

---

[1] "Bankr. D.I." refers to the docket in the main chapter 11 case, No. 20-12522 (JTD). "D.I." refers to the docket in this appeal.  "APP" refers to pages in Appellants' Appendix or Appellees' Supplemental Appendix.  Capitalized terms not defined have the meanings ascribed to them in the Fourth Amended Joint Plan of Reorganization (the "Plan") [Bankr. D.I. 6510] or the Confirmation Order [Bankr. D.I. 6660].

in reliance on the validity of the Confirmation Order.  The potential liability would also undermine New Mallinckrodt's liquidity position, and weaken the reorganized enterprise, at the expense of all other stakeholders.

Sanofi's failure to seek a stay in connection with this appeal makes the case for dismissal stronger.  Sanofi claims entitlement to payments it alleges are worth $190 million in present value.  Yet Sanofi never sought a stay in connection with this appeal.  It requested only a limited stay in connection with a separate, unrelated appeal, and made clear it was *not* seeking to prevent the Plan from becoming effective.  Sanofi's requested stay would not have had any effect on the equities of granting the relief sought here, and its failure to seek a stay in connection with this appeal weighs in favor of finding this appeal equitably moot.  Dismissal—or affirmance—is the only equitable result.  *See In re Tribune Media Co.*, 799 F.3d 272, 278 (3d Cir. 2015) (if a court "can readily resolve the merits of an appeal against the appealing party," it may do so before addressing equitable mootness), *id.* at 289 n.2 ("a court is not inhibited from considering the merits before considering equitable mootness") (Ambro, J. concurring) (citation omitted).

## BACKGROUND

The facts most pertinent to this Motion are presented below.  Additional background and procedural history can be found in the Debtors' merits brief in this appeal.  *See* D.I. 15 at 3-8.

### A.   Events Leading Up To The Bankruptcy

Mallinckrodt is a global specialty biopharmaceutical company that produces and sells generic and branded products. Decl. ¶ 6. In the years leading up to the bankruptcy, certain Mallinckrodt entities were named in thousands of lawsuits stemming from the production and sale of opioid products and were subject to a number of government investigations. *See* Bankr. D.I. 128 at 32-35. Mallinckrodt entities separately faced litigation and government investigations relating to other business lines, including its Acthar® Gel ("Acthar") product. *Id.* at 36-37. The cost and burden associated with those matters, and the fact that any judgments could quickly aggregate into tens of billions of dollars, ultimately led the Debtors to file for chapter 11 protection. *Id.* at 5, 36-38.

### B.   The Chapter 11 Cases

On October 12, 2020, the Debtors filed chapter 11 petitions. Bankr. D.I. 1. By then, the Debtors had already negotiated and executed a Restructuring Support Agreement ("RSA"), which included cornerstone settlements with major governmental opioid claimants and the fulcrum class of funded debt creditors, the Guaranteed Unsecured Noteholders. Bankr. D.I. 128 at 7. The Debtors had also achieved settlements of significant litigation with the Department of Justice and the Centers for Medicare and Medicaid Services concerning Acthar. *Id.* at 10-11.

The core settlements underlying the RSA, which were reflected in the Plan, included an allocation of the residual value of the reorganized enterprise between the Guaranteed Unsecured Noteholders and the opioid claimants.  Decl. ¶ 8.  Under the RSA (and the Plan), the Guaranteed Unsecured Noteholders received all of the equity of the reorganized enterprise (before dilution for certain plan transactions), while the opioid claimants received deferred cash payments totaling $1.725 billion and certain other assets, including warrants to purchase 19.99% of the equity of the reorganized enterprise at an agreed-upon strike price.  *Id.*  During the bankruptcy, the Plan was amended to incorporate a settlement with additional opioid claimant constituencies and a settlement (also incorporated in an amended RSA) with an ad hoc group of Term Loan Lenders, the Debtors' largest funded debt constituency.  Bankr. D.I. 1631; *see* Decl. ¶ 11 (explaining background of Supporting Term Loan Lenders settlement providing crucial support for the Plan and the restructuring).

Each of the RSA creditor constituencies bargained for the right to terminate the RSA if certain case milestones were not met.  The RSA parties originally bargained for the right to terminate if the Debtors did not emerge from bankruptcy by January 2022.  *Id.* ¶ 9.  As part of the Supporting Term Loan Lenders' settlement, the parties renegotiated some of those milestones, initially permitting any party to terminate unless the Debtors emerged from bankruptcy by November 15, 2021.  *Id.* ¶ 11.  Over the course of the case, the Debtors achieved settlements with other key

4

constituencies as well.  *See* Bankr. D.I. 6510-4 at 2-4 (Second Lien Noteholders); Decl. ¶ 11 (Revolving Lenders).

The settlements included in the RSA were memorialized in the conditions precedent in the solicitation version of the Plan, one of which required that the RSA "remain in full force and effect and not have been terminated, and the parties thereto shall be in compliance therewith."  Bankr. D.I. 2916 at 110.

### C.    Sanofi's Determination Motion

Sanofi's claim in this appeal relates to an asset purchase agreement ("APA") to which Debtor Mallinckrodt Pharmaceuticals Ireland Limited ("MPIL") and Sanofi were successors-in-interest.  The agreement transferred all "rights, title, and interests" relating to Acthar to the Debtors' predecessor-in-interest and (among other provisions) established a "Royalty Payment" amounting to "one percent (1%) of all Net Sales in excess of Ten Million Dollars ($10,000,000) in any given calendar year" "for so long as Purchaser, any of its Affiliates or any of its licensees, or any of their respective successors or assigns, sells the Product."  APP31-32.

On October 12, 2021, Sanofi filed a motion seeking a determination that either (i) the APA is non-executory and the Debtors cannot discharge royalty payments that arise post-bankruptcy or (ii) the APA is executory and (if the Bankruptcy Court authorizes the Debtors to reject the APA) the Debtors can no longer sell Acthar. APP12-25 ("Determination Motion").  The Debtors objected.  APP151-73.  In a

November 4, 2021 bench ruling, the Bankruptcy Court denied the Determination Motion.  APP334-44.  The court ruled that while the APA is not an executory contract subject to rejection, the Debtors' breach of the APA "only results in a prepetition unsecured claim for damages subject to discharge upon confirmation of a plan of reorganization."  APP336, 334-44; *see* APP1-2 (written order).  Sanofi appealed.  APP476-84.

On November 22, 2021, Sanofi filed an amended proof of claim against MPIL.  Proof of Claim No. 52141.  In it, Sanofi asserted that the present value of its royalty payments under the APA—including future payments—was approximately $190 million.  *Id.* at 2; *see id.* at 10-14 (explaining that this figure included "claims for all present and future Royalty payments and damages under the APA, consistent with the Court's ruling in the November 8 Order").[2]

### D.    Plan Confirmation And Subsequent Proceedings

Following the denial of Sanofi's Determination Motion, the Bankruptcy Court held a confirmation hearing that concluded on January 6, 2022.  The court issued an opinion confirming the Plan on February 3, 2022.  Bankr. D.I. 6347; Bankr. D.I. 6378 (revised opinion).  On March 2, 2022, it entered the Confirmation Order.  Bankr. D.I. 6660.

---

[2] The Debtors did not agree with this valuation, and valued Sanofi's claim at roughly $45 million.  Bankr. D.I. 6378 at 69-70 n.178; Bankr. D.I. 5759 at 228:3-229:11.

Sanofi appealed from the Confirmation Order, challenging the Plan's treatment of its prepetition claims. *See* Case No. 1:22-cv-216-TLA, Dkt. 1. In connection with that appeal, Sanofi sought a limited stay of distributions to Class 6 General Unsecured Creditors under the Plan. Bankr. D.I. 6685. The Bankruptcy Court denied the motion. Bankr. D.I. 6942, 7021. Sanofi filed a renewed stay motion in this Court, which was likewise denied. Case No. 1:22-cv-216-TLA, Dkt. 15, 41-42. Sanofi never sought a stay in connection with this appeal or the relief at issue. And throughout the stay briefing, Sanofi made clear that it sought only a "limited stay of distribution[s]" to Class 6 creditors and "d[id] not ask to delay the Debtors' reorganization, or the occurrence of the Effective Date." Bankr. D.I. 6685 at 21; Case No. 1:22-cv-216-TLA, Dkt. 15 at 16.

### E.      Plan Consummation

Mallinckrodt plc, the parent company, is an Irish public limited company, and was required to commence an examinership proceeding in Ireland to recognize the result of the chapter 11 proceeding. Bankr. D.I. 6660 at 30. The examinership proceeding concluded on April 27, 2022.

As required by the Plan, after the Confirmation Order was entered, the Debtors undertook to raise exit financing, which market turmoil made quite challenging. Decl. ¶ 22. The Debtors ultimately issued new first lien secured notes to new-money

bondholders on June 16, 2022.  *Id.*  The same day, substantially concurrently with the issuance of the new secured notes, the Plan went effective.  *Id.* ¶ 16.

On and immediately after the Effective Date, New Mallinckrodt undertook an array of complex transactions to effectuate the Plan and continue post-closing business operations.  Among other things, the Mallinckrodt companies:

(a)   Cancelled their pre-petition public equity;

(b)   Caused the creation of New Mallinckrodt and caused New Mallinckrodt to acquire substantially all of the assets of Mallinckrodt plc;

(c)   Issued the New Mallinckrodt Ordinary Shares and distributed those shares to the holders of Guaranteed Unsecured Notes Claims;

(d)   Entered into the New Opioid Warrant Agreement, issued the New Opioid Warrants, and distributed those warrants to the Opioid MDT II (the master trust for disbursements to opioid creditors);

(e)   Issued new First Lien Notes in exchange for $650 million in financing from third-party lenders;

(f)   Paid $22,631,640 in cash and entered into the New Takeback Term Loans in a principal amount of $1,762,634,900.41 in satisfaction of the First Lien Term Loan Claims;

(g)   Issued the Takeback Second Lien Notes in a principal amount of $375 million, and paid an approximately $19 million Noteholder Consent Fee, in partial satisfaction of the Guaranteed Unsecured Note Claims;

(h)   Issued the New Second Lien Notes in a principal amount of $322,868,000 in satisfaction of the Second Lien Notes Claims;

(i)   Paid approximately $900 million in cash to satisfy the First Lien Revolving Credit Facility Claims;

(j)   Paid approximately $135 million in cash in exchange for the discharge of General Unsecured Claims;

(k)     Paid approximately $1.4 million in cash in exchange for the discharge of the Allowed Trade Claims;

(l)     Paid approximately $447 million, and assumed the obligation to make the Opioid Deferred Cash Payments of $1.275 billion over the next 8 years, as part of the Opioid Settlement;

(m)     Paid approximately $18 million, and assumed the obligation to make the Federal/State Acthar Deferred Payment of $245 million over the next 7 years, as part of the Federal/State Acthar Settlements; and

(n)     Assumed or rejected, as applicable, all of the Executory Contracts and Unexpired Leases, and made approximately $23.8 million in cure payments.

*Id*. ¶¶ 17-31.

Immediately following the Effective Date, equity in New Mallinckrodt began trading in the OTC marketplace.  *Id.* ¶ 19.  Approximately 1.2 million shares, or approximately 9% of the total number of shares, have thus far traded in public market transactions, and shares will continue to publicly trade moving forward.  *Id.* ¶ 20. As of June 30, 2022, the opening price of New Mallinckrodt's shares was $24.50 per share, implying a total equity value of approximately $325 million.  *Id.*  New Mallinckrodt's new debt instruments, including the newly issued New First Lien Notes and newly issued New Second Lien Notes, are also actively trading in the debt markets.  *Id.* ¶ 24.

## ARGUMENT

Courts have dismissed appeals as equitably moot following plan confirmation when "effective relief could conceivably be fashioned," but "implementation of that

relief would be inequitable." *In re Continental Airlines*, 91 F.3d 553, 559 (3d Cir. 1996) (en banc) (citation omitted).  The "equitable mootness analysis proceeds by asking two questions:   '(1) whether a confirmed plan has been substantially consummated; and (2) if so, whether granting the relief requested in the appeal will (a) fatally scramble the plan and/or (b) significantly harm third parties who have justifiably relied on plan confirmation.'"   *In re Millennium Lab Holdings II, LLC*, 945 F.3d 126, 140 (3d Cir. 2019) (quoting *In re Tribune Media Co.*, 799 F.3d 272, 278 (3d Cir. 2015)).   Courts also consider other factors, including whether an appellant sought and obtained a stay (which relates to the first prong), and "the public policy of affording finality to bankruptcy judgments."   *In re Phila. Newspapers, LLC*, 690 F.3d 161, 168-70 (3d Cir. 2012) (citation omitted).   Both prongs and all related factors favor dismissal.

## I.   THE UNSTAYED PLAN HAS BEEN SUBSTANTIALLY CONSUMMATED

The Plan has been substantially consummated, and Sanofi's failure to seek a stay to prevent that result weighs in favor of dismissal.

### A.   Substantial Consummation

Substantial consummation occurs upon the (A) "transfer of all or substantially all of the property proposed by the plan to be transferred"; (B) "assumption by the debtor or by the successor to the debtor under the plan of the business or of the management of all or substantially all of the property dealt with by the plan"; and

10

(C) "commencement of distribution under the plan." 11 U.S.C. §§ 1101(2)(A)-(C); *see In re Semcrude, L.P.*, 728 F.3d 314, 321 (3d Cir. 2013). Those requirements have been met. Plan distributions have been made, new obligations have been incurred, and New Mallinckrodt has emerged from chapter 11 as a reorganized enterprise. *See* Decl. ¶¶ 16-31, *supra* at 7-9.

### B.    Failure To Seek A Stay

The equitable mootness doctrine prevents courts from being placed in the position of "'unscrambling complex bankruptcy reorganizations,'" particularly "'when the appealing party should have acted before the plan became extremely difficult to retract.'" *In re Zenith Elecs. Corp.*, 329 F.3d 338, 340 (3d Cir. 2003) (citation omitted). Accordingly, an appellant's failure to seek a stay pending appeal weighs heavily against granting relief. *See Tribune*, 799 F.3d at 281-82; *see also Nordhoff Inv.'s Inc. v. Zenith Elecs. Corp.*, 258 F.3d 180, 191 (3d Cir. 2001) (Alito, J., concurring that appeal was equitably moot, "primarily influenced by the appellants' failure to seek a stay").

Sanofi sought a limited stay in connection with its appeal of the Confirmation Order. But it never sought a stay in connection with this appeal. Sanofi's stay motions asserted that the Plan's allocation to general unsecured creditors in Class 6 violated the absolute priority rule and unfairly discriminated among its subclasses. Case No. 1:22-cv-216-TLA, Dkt. 15 at 12-15; Bankr. D.I. 15-20. The stay Sanofi

sought was to "hold the cash" set aside for Class 6 and not make any distributions to Class 6 claimants "until Sanofi's appeal is decided." Bankr. D.I. 6685 at 21. And Sanofi went out of its way to emphasize that "[t]he stay [sought] will not delay the occurrence of the Effective Date or the Debtors' reorganization." Case No. 1:22-cv-216-TLA, Dkt. 15 at 16. A narrow stay of distributions to certain prepetition creditors would have had no impact on the equities of granting relief in this appeal, which relates to whether New Mallinckrodt owes royalty payments to Sanofi and has nothing to do with Class 6 distributions under the Plan. Sanofi's failure to seek a stay to ensure it could receive that relief weighs in favor of dismissal.

## II.    GRANTING RELIEF WOULD SIGNIFICANTLY HARM THIRD PARTIES AND SCRAMBLE THE PLAN

Imposing $190 million in new liability would adversely affect the Company's finances. And while New Mallinckrodt disagrees with Sanofi's $190 million valuation, and believes that the present value of Sanofi's claim is only roughly $45 million, that is beside the point for current purposes. *See supra* note 2. When it comes to assessing equitable mootness, the Court should assume Sanofi is correct about its claim's value. *See Continental*, 91 F.3d at 656 (counseling against asking whether investors' "reliance [on the finality of the confirmed plan] was 'reasonable' or based on a 30%, 60%, or 100% probability" that an appellant is correct). The critical point is that, if granted, the relief Sanofi seeks would significantly harm third-party investors and other creditors, and would scramble the Plan.

12

A.     **Effect Of Granting Relief On New Mallinckrodt's Finances**

According to the valuations presented at the confirmation hearing and relied on by the Bankruptcy Court, New Mallinckrodt's total enterprise value was approximately $5 billion.  Bankr. D.I. 2917 at 830 (Disclosure Statement valuation with mid-point of $5.45 billion); Bankr. D.I. 5000 at ¶ 10 (declaration indicating 7% reduction of valuation prior to confirmation hearing).  After giving effect to the Plan transactions, New Mallinckrodt has approximately $3.6 billion in funded debt outstanding, in addition to $1.52 billion of deferred settlement obligations to the opioid creditors and on account of the Federal/State Acthar Settlement.  Decl. ¶¶ 17(i)-(k), 26, 28.

Based on trading prices for New Mallinckrodt's equity on the over-the-counter market, New Mallinckrodt's implied total equity value is approximately $325 million.   Decl.  ¶ 20.   Reducing New Mallinckrodt's equity market capitalization by $190 million would substantially affect the value of equity in New Mallinckrodt that is actively trading in the market.

The relief Sanofi seeks would also negatively impact the Company's liquidity position, to the detriment of new investors and other parties.  As reflected in the Confirmation Opinion, New Mallinckrodt is expected to have adequate liquidity to finance current operations and maintain adequate cash reserves for a business of its size under the Plan as confirmed.  *See* Bankr. D.I. 6378 at 74-75.  The Company

believes that its "minimum liquidity" needed to operate the business is approximately $250 million.  Decl. ¶ 34.

According to the figures Sanofi asserts, the royalty payments it seeks from New Mallinckrodt would total approximately $190 million, or between approximately $6 to $8 million per year.  Proof of Claim No. 52141.  Burdening future sales of Acthar—one of New Mallinckrodt's most profitable products—with those ongoing obligations would negatively impact the Company's cashflow and liquidity situation, reduce the Company's operating flexibility going forward, and undermine the fresh start the bankruptcy afforded it.  Decl. ¶¶ 35-36.

Additionally, of the $190 million in present value Sanofi claims the royalty obligation is worth, Sanofi asserts that over $12 million would be immediately payable administrative expenses for payments that came due during the bankruptcy proceedings.  *See* Proof of Claim No. 52141 at 13 (asserting a claim of approximately $7.5 million for 2021 (all of which would be administrative expense liability) and a claim of approximately $6.4 million for 2022 (nearly half of which would be administrative expense liability)); Proof of Claim No. 51066 (asserting approximately $1.8 million in administrative expense liability for 2020).   An immediate payment of over $12 million in administrative claims would further impact New Mallinckrodt's liquidity.  Decl. ¶ 35.

### B.    Harm To Third Parties

Among the most important considerations in evaluating equitable mootness is harm to "third parties," especially parties that have invested new money or credit in the enterprise.  *See, e.g.*, *Millennium*, 945 F.3d at 142 (citing harm to new lenders and equity holders); *Tribune*, 799 F.3d at 281 (new equity); *Nordhoff*, 258 F.3d at 188 (holders of publicly traded bonds).  Granting the relief sought in this appeal would harm the major constituencies that have relied on the Confirmation Order, including new equity owners and new bondholders that provided the financing necessary for the Plan to go effective.

*New Stockholders*.  New Mallinckrodt's shares are now heavily traded.  Decl. ¶ 20.  Purchasers in the securities markets are paradigmatic "third parties" with no apparent prior connection to the Debtors or the bankruptcy.  *Nordhoff*, 258 F.3d at 188 (secondary market purchasers of bonds are "third part[ies]" with "reliance interests"); *In re UNR Indus., Inc.*, 20 F.3d 766, 769 (7th Cir. 1994) (Easterbrook, J.) (dismissing appeal because shareholders who bought on public markets "purchased on the assumption that all asbestos payments would be borne by the Trust" rather than the reorganized entity).

Those equity purchasers would be significantly harmed by an award of relief against New Mallinckrodt in this appeal.  Imposing an unplanned and continuous royalty obligation on New Mallinckrodt with an alleged present value of $190

million would result in a corresponding decrease in the Company's equity market capitalization and share price, inflicting a substantial loss on new equity investors—a highly inequitable outcome.  Decl. ¶ 21.

*New Bondholders and Lenders*.  After entry of the Confirmation Order, outside investors also agreed to provide financing by purchasing new debt securities from New Mallinckrodt in the amount of $650 million.  *Id.* ¶ 22.  Although some of those purchasers were also prepetition lenders, they had no obligation to invest additional money, and thus are considered third parties.  *See Nordhoff*, 258 F.3d at 188.  The financing was crucial, as it was principally used to refinance the Debtors' revolving loans—a requirement for Plan consummation.

In addition, the Guaranteed Unsecured Noteholders' and Second Lien Noteholders' prepetition claims were satisfied in part through the New Second Lien Notes, and the claims of the Term Loan Lenders were exchanged for New Term Loans.  Decl. ¶¶ 17, 23.  The New Second Lien Notes trade in the bond market, and the New Term Loans trade in the term loan markets.  *Id.* ¶ 24.  The open-market purchasers of those new notes and term loans are prototypical third parties.  *See Nordhoff*, 258 F.3d at 188.  Adding a $190 million liability to New Mallinckrodt's balance sheet would undoubtedly have impacted their investment decisions as well as the pricing of the loans they purchased.

*Opioid Stakeholders, Employees, Counterparties, and Other Stakeholders*. New Mallinckrodt is a critical supplier in the pharmaceutical industry.  It also has major obligations to the opioid stakeholders, including cash payments.  Imposing material additional obligations would negatively impact those creditors and third parties.   Among other things, imposing a $190 million obligation on New Mallinckrodt would decrease the value of the New Opioid Warrants contributed to the Opioid MDT II.  Decl. ¶ 21.  Because the company's market capitalization would be diminished as a result of that obligation, so too would the value of the New Opioid Warrants, as decreased equity value would lead the Opioid MDT II to sell the warrants at a lower price than their expected future value, or hold the warrants without exercising them.  *Id.*  This would reduce the future distributable value available to individual Opioid Claimants and countless programs across the country established to abate the opioid crisis.  *Id.*

### C.    Scrambling Effects

Beyond the unfairness to new investors and other stakeholders, granting the relief Sanofi seeks would have a scrambling effect on the Plan that cannot be undone. Imposing an asserted $190 million liability would have substantial negative effects on the Company's liquidity and equity value—effects far more substantial than cases in which equitable mootness arguments have been rejected.  *See, e.g.*, *Tribune*, 799 F.3d at 283 (claim involving "whether one of two classes of creditors is entitled to

$30 million in the context of a $7.5 billion reorganization"); *id.* at 282 n.4 (discussing cases involving "lower . . . potential recovery," citing *Phila. Newspapers*, 690 F.3d at 170 (claim worth 1.7% of the price of debtor's assets) and *In re Chateaugay Corp.*, 10 F.3d 944, 953 (2d Cir. 1993) (claim worth up to 10% of a reorganized debtor's working capital)); *In re Semcrude, L.P.*, 728 F.3d 314, 324 (3d Cir. 2013) (claim worth $207,300.62 in context of over $2 billion reorganization).

The frustration of parties' settled expectations would likewise have a scrambling effect here.  Each of the RSA parties bargained for a restructuring under which a Plan had to be completed on agreed financial terms *and* on the agreed schedule, or they would be entitled to revisit their settlement or investments.  *See supra* at 4.  Because the Plan was not confirmed by November 15, 2021, those parties had a right to terminate the RSA, but they chose not to do so.  It is impossible to know whether any of the RSA parties *would have* exercised that right—or sought to renegotiate their economic deals—if the Bankruptcy Court or this Court had ruled that New Mallinckrodt is subject to ongoing royalty payments with a present value of $190 million.  But it is certain that, if this appeal were successful, those settling creditors will have lost their bargained-for option to renegotiate or walk away from the Plan.

*Millennium* stands for the proposition that revising a plan to the detriment of settling parties, while not returning those parties to the *status quo ante*, is a kind of

"scrambling" that supports equitable mootness. 945 F.3d at 143-44. *Continental* applied a similar principle to affirm dismissal of a claim for $117 million in administrative expenses as equitably moot. 91 F.3d at 652, 654-65 (citing investor's "reli[ance] on . . . unstayed Confirmation Order in making the decision to proceed to close" their investment in the plan and noting that "[b]y the time the district court ruled on the appeal, it was no longer possible to restore the parties to their earlier positions"). As in those cases, it would be "profoundly inequitable" here to reallocate nearly two hundred million dollars to administrative expenses and other future obligations without allowing other stakeholders to renegotiate their deal points, as they could have done. *Millennium*, 945 F.3d at 144; *see generally* *Continental*, 91 F.3d at 564-65 (claim is equitably moot "when its acceptance 'would amount to imposing a different plan of reorganization on the parties'" (quoting *In re Specialty Equip. Cos.*, 3 F.3d 1043, 1048 (7th Cir. 1993)).

One final point bears mention. This appeal standing alone is equitably moot; but it does not stand alone. New Mallinckrodt has concurrently filed motions to dismiss three other appeals on similar equitable mootness grounds.[3] None is the

---

[3] Case No. 21-cv-01780-TLA (appeal regarding $600 million administrative expense claim); Case Nos. 22-cv-00330-TLA, 22-cv-00331-TLA (consolidated appeals regarding make-whole obligation of at least $110 million). New Mallinckrodt has filed a motion to dismiss two additional appeals for equitable mootness as well. *See* Case Nos. 21-cv-01271-TLA, 22-cv-00222-TLA (appeals challenging Plan valuation and treatment of opioid claims).

19

kind of "low-value appeal" that would involve only "minor changes to a plan of reorganization." *Tribune*, 799 F.3d at 282 n.4. And none of the appellants have equity on their side. Each appeal independently impacts third-party reliance interests and scrambles the Plan. Taken together, the effect of granting the relief sought in these appeals would be truly extraordinary and unmanageable—amounting to roughly $900 million in new liability for the Company. *See generally Continental*, 91 F.3d at 555 (affirming dismissal for equitable mootness of three appeals).

## III.  PUBLIC POLICY FAVORS DISMISSAL

Subjecting New Mallinckrodt to the relief Sanofi seeks, notwithstanding its failure to seek a meaningful stay, would harm creditors and reorganizing debtors in this case and future cases by creating a "bankruptcy discount." That result would be contrary to the purpose of the equitable mootness doctrine. The doctrine allows debtors to avoid "protracted litigation based on arguable blemishes in a reorganization plan," and "'assures [stakeholders] that . . . they may make financial decisions based on a reorganized entity's exit from Chapter 11 without fear that an appellate court will wipe out or interfere with their deal.'" *Millennium*, 945 F.3d at 140 & n.16 (citation omitted); *see Continental*, 91 F.3d at 565 (equitable mootness inquiry asks "whether we want to encourage or discourage reliance by investors and others on the finality of bankruptcy confirmation orders").

This bankruptcy—and the appeals on which New Mallinckrodt seeks dismissal for equitable mootness—illustrate the importance of this issue. A core settlement involved the allocation of equity interests in the reorganized enterprise between the Guaranteed Unsecured Noteholders and the opioid claimants. Decl. ¶¶ 8, 13. That kind of settlement cannot happen without high confidence in the finality of confirmation orders and the resulting marketability of equity securities. If creditors negotiating an equity split have to bear the risk that long-running appeals could crush the value of their equity, they would need to discount that equity value during negotiations, or decline to accept equity at all. "[U]ndermin[ing] public confidence in the finality of bankruptcy confirmation orders" and discouraging investment in reorganized enterprises would "make successful completion of large reorganizations like this more difficult." *Continental*, 91 F.3d at 565.

## CONCLUSION

For the foregoing reasons, Sanofi's appeal should be dismissed as equitably moot.

July 1, 2022                                Respectfully submitted,
Wilmington, Delaware

*/s/ Michael J. Merchant*                   Melissa Arbus Sherry
Mark D. Collins (No. 2981)                  James A. Tomberlin
Michael J. Merchant (No. 3854)              Andrew Sorkin
Amanda R. Steele (No. 5530)                 **LATHAM & WATKINS LLP**
Brendan J. Schlauch (No. 6115)              555 Eleventh Street, NW, Suite 1000
**RICHARDS, LAYTON**                        Washington, D.C. 20004
**& FINGER, P.A.**                          (202) 637-2200
One Rodney Square                           melissa.sherry@lw.com
920 N. King Street                          james.tomberlin@lw.com
Wilmington, Delaware 19801                  andrew.sorkin@lw.com
(302) 651-7700
collins@rlf.com                             George A. Davis
merchant@rlf.com                            George Klidonas
steele@rlf.com                              Anupama Yerramalli
schlauch@rlf.com                            1271 Avenue of the Americas
                                            New York, New York 10020
                                            (212) 906-1200
                                            george.davis@lw.com
                                            george.klidonas@lw.com
                                            anu.yerramalli@lw.com

                                            Jeffrey E. Bjork
                                            355 South Grand Avenue, Suite 100
                                            Los Angeles, California 90071
                                            (213) 485-1234
                                            jeff.bjork@lw.com

                                            Jason B. Gott
                                            330 North Wabash Avenue, Suite 2800
                                            Chicago, Illinois 60611
                                            (312) 876-7700
                                            jason.gott@lw.com

*Counsel for Reorganized Debtors-Appellees*

22

## CERTIFICATE OF COMPLIANCE

I hereby certify that this document contains 4843 words, excluding the parts exempted by Federal Rule of Bankruptcy Procedure 8015(g), as counted by Microsoft Word.

I hereby certify that this document complies with the typeface requirements of Federal Rule of Bankruptcy Procedure 8015(a)(5) and the type-style requirements of Federal Rule of Bankruptcy Procedure 8015(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Times New Roman.

*/s/ Michael J. Merchant*
Michael J. Merchant

## CERTIFICATE OF SERVICE

I certify that on July 1, 2022, I caused to be served the foregoing *Reorganized Debtors' Motion to Dismiss Appeal as Equitably Moot* via the CM/ECF Electronic Filing system.

*/s/ Michael J. Merchant*
Michael J. Merchant