# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| IN RE: MALLINCKRODT PLC, *et al.*, | : | Chapter 11 |
| | : | |
| Debtors. | : | Case No. 20-12522-JTD |

_____

| | | |
|---|---|---|
| SANOFI-AVENTIS U.S. LLC, | : | |
| | : | |
| | : | |
| Appellant, | : | Civ. No. 21-1636-TLA |
| v. | : | |
| | : | |
| MALLINCKRODT PLC, *et al.*, | : | |
| | : | |
| Appellees. | : | |

_____

## **MEMORANDUM OPINION**

December 20, 2022
Wilmington, Delaware

AMBRO, *Circuit Judge*, sitting by designation.

In October 2020, Mallinckrodt plc and 63 of its subsidiaries (collectively, "Mallinckrodt") filed Chapter 11 petitions in the Bankruptcy Court for the District of Delaware. Sanofi-aventis U.S. LLC ("Sanofi") appeals the Bankruptcy Court's order denying its motion for a determination that Mallinckrodt may not discharge certain royalty payment obligations in that consolidated bankruptcy. As Sanofi's rights to royalty payments are contingent claims that arose before Mallinckrodt's bankruptcy filing, I affirm the Court's decision.

# I.

Our focus is an Asset Purchase Agreement (the "APA") under which Sanofi sold Mallinckrodt intellectual property relating to Acthar Gel and Mallinckrodt agreed to pay Sanofi future royalties.[1] Acthar Gel is a therapeutic product treating certain inflammatory and autoimmune conditions for which corticotropin is the active ingredient.

Sanofi moved for a determination that either (1) the APA is not executory and Mallinckrodt cannot discharge royalty payments due post-petition, or (2) the APA is executory, and if Mallinckrodt rejects it Mallinckrodt cannot continue to sell Acthar Gel. The Bankruptcy Court ruled the APA was not executory,[2] but that all claims for post-

---

[1] The APA was executed by Aventis Pharmaceuticals Inc., predecessor-in-interest to Sanofi, and Questcor Pharmaceuticals, Inc., predecessor-in-interest to Mallinckrodt Pharmaceuticals Ireland Limited. For simplicity, references herein are only to the entities currently party to the contract.

[2] An executory contract, for purposes of Bankruptcy Code § 365, is "a contract under which the obligation[s] of both the bankrupt and the other party to the contract are so far unperformed that the failure of either to complete performance would constitute a

petition date breaches of it—including for failure to pay royalties—resulted only in "pre-[p]etition [d]ate unsecured claims that may be discharged" on confirmation of Mallinckrodt's plan of reorganization. App. 11. Sanofi appealed, accepting the APA was not executory but challenging the determination that its claims for future royalties were dischargeable.

A summary of the relevant facts is as follows. In 2001, Sanofi and Mallinckrodt entered the APA, under which Sanofi agreed to sell Mallinckrodt intellectual property relating to Acthar Gel (the "Acthar Gel IP"), including trademarks, regulatory rights, and know-how. In return, Mallinckrodt paid $100,000 and certain costs for existing inventory (the "Up-Front Consideration"). It also agreed to pay Sanofi an annual royalty equal to 1% of all net sales of Acthar Gel that exceed $10,000,000 in each year (the "Royalty") for so long as it (or any of its affiliates or successors) sold the product. Mallinckrodt also granted Sanofi a purchase-money security interest in the Acthar Gel IP, securing its obligation to pay the Up-Front Consideration but not the Royalty. More general provisions provided the sale was "subject to the terms and conditions of [the APA]" and restricted the ability of the parties to assign the contract without consent. App. 30, 44.

Two issues appear: (1) Are Sanofi's claims for post-petition date royalty payments dischargeable in Mallinckrodt's bankruptcy because they were contingent claims that arose when the APA was executed; and (2) alternatively, does Sanofi retain a property interest

---

material breach excusing performance of the other." *Enter. Energy Corp. v. United States (In re Columbia Gas Sys., Inc.)*, 50 F.3d 233, 239 (3d Cir. 1995).

3

in the Acthar Gel IP requiring Mallinckrodt to pay the Royalty when it sells Acthar Gel post-petition and post-confirmation?[3]

## II.

Addressing the first, I start with relevant statutes. Section 1141(d)(1)(A) of the Bankruptcy Code provides that confirmation of a plan of reorganization "discharges the debtor from any debt that arose before the date of such confirmation."[4] "Debt" is "liability on a claim," and "claim," in turn, means a "*right to payment* whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, *contingent*, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured." 11 U.S.C. §§ 101(12); 101(5) (emphases added). Put together, the takeaway is that a contingent right to payment arising before the date of a plan's confirmation may be discharged by that confirmation.

---

[3] Only conclusions of law are being appealed. Exercising the District Court's appellate jurisdiction, I review those de novo. *In re Anes*, 195 F.3d 177, 180 (3d Cir. 1999).

[4] Section 1141(d)(1)(A) provides for the discharge of any debt that arises before *confirmation*, not before the *bankruptcy petition*. Yet I frame the question as whether Sanofi's claim for royalty payments arose pre-petition because the result here hinges on whether it did so when the APA was signed in 2001. Because I hold it did, I need not address the treatment of claims arising post-petition but pre-confirmation. Of course, certain of those claims may qualify for administrative expense treatment, receiving first or nearly-first priority of payment in bankruptcy. *See* §§ 1129(a)(9)(A); 507(a)(2); 503(b). And, under § 1141(d)(1), any pre-confirmation claims are discharged "*except as otherwise provided ... in the plan*," so parties might seek to preserve in it the post-confirmation survival of their claims when they extend credit to the bankruptcy estate. But are creditors whose claims arise between filing and confirmation, and have neither administrative expense nor plan protection, always out of luck? This is a question for another day, but authorities suggest courts say they typically are. *See* 8 *Collier on Bankruptcy* ¶ 1141.05[1][a] (16th ed. 2022) (collecting cases) (courts have generally interpreted § 1141(d)(1) as discharging claims arising during the administration of a Chapter 11 case).

4

As seemingly straightforward Bankruptcy Code provisions can sometimes mask complexity, it is useful to examine the case law. In its seminal case *In re Grossman's*, the Third Circuit addressed *en banc* the dischargeability of unliquidated future claims in bankruptcy, specifically tort claims. 607 F.3d 114 (3d Cir. 2010). It held that, for bankruptcy purposes, "a 'claim' arises when an individual is exposed pre-petition to a product or other conduct giving rise to an injury … [that] underlies a 'right to payment.'" *Id.* at 125. Thus, when creditors were exposed to the debtor's asbestos containing products before the bankruptcy, their personal injury claims arose at that time even if their physical injuries appeared only later. In so holding, the Court explicitly overruled *In re M. Frenville Co.*, 744 F.2d 332 (3d Cir. 1984), which had said a "claim" arises under the Code when the applicable state law cause of action accrues (such as when the injury manifests). *In re Grossman's*, 607 F.3d at 120-21. It did so because *Frenville*'s rule was "universally rejected" as conflicting with the Code's broad definition of the term "claim." *Id*. While *Grossman's* rule does not perfectly fit the contractual context here, no doubt it prefers an "expansive treatment" of what claims may be discharged. *Id.* at 121.

Returning to the statutory analysis, I start with Sanofi's argument that its claims for future royalties should not be considered "contingent." The Second Circuit has said that, "in the context of a contract claim, … contingent claims refer to obligations that will become due upon the happening of a future event that was within the actual or presumed contemplation of the parties at the time the original relationship between the parties was created." *Olin Corp. v. Riverwood Int'l Corp.* (*In re Manville Forest Products Corp.*), 209 F.3d 125, 128-29 (2d Cir. 2000) (internal quotation marks omitted). Yet Sanofi suggests

5

"contingent" claims should include only those depending on extrinsic events over which the debtor has no control, and not those that flow from its voluntary actions taken post-confirmation, such as a decision to sell a product. For support, they cite two cases from the Ninth and Eleventh Circuits, where the Courts held that attorneys' fee-shifting provisions in lending agreements survived the debtors' discharge for the debts created under those agreements. *Siegel v. Fed. Home Loan Mortg. Corp.*, 143 F.3d 525 (9th Cir. 1998); *Shure v. Vermont (In re Sure-Snap Corp.)*, 983 F.2d 1015 (11th Cir. 1993). By litigating after discharge, the debtors opened themselves up to paying the fees if they lost the suits. *Siegel*, 143 F.3d at 533-34; *Sure-Snap*, 983 F.2d at 1018.

But, to say nothing about the differences in equities in those situations and here, the contingency of being owed future royalty payments—a key feature of the compensation structure agreed in the pre-bankruptcy sale—is hardly analogous to the contingency of accruing legal fees because a counterparty may later contest an already discharged debt. And more to the point, a hard-and-fast rule that claims are never contingent when they depend, at least in part, on the debtor's voluntary post-bankruptcy conduct gives far too narrow a construction to the word "contingent."

Here, Sanofi's claims for future royalty payments were plainly contingent. They depended on sales of Acthar Gel reaching the thresholds that triggered payments, which in turn depended on several other factors such as Mallinckrodt's ability to sell the product, customer demand, and the lack of external events making sales difficult or impossible (like regulatory obstacles, for instance). Further, the APA parties clearly contemplated the possibility of future royalties when the APA was signed pre-petition. *See e.g., Olin Corp.*,

6

209 F.3d at 129. And though estimating claims is certainly not certain, the Bankruptcy Court could extrapolate past sales to estimate the present value of Sanofi's unsecured claim for future royalties. *See, e.g.*, *Maynard v. Elliot,* 283 U.S. 273, 278 (1931).

Perhaps the tougher question, at least at first glance, is whether Sanofi's claims for royalties arose at the time the APA was signed or instead arise in each year the sales threshold is reached triggering royalty payments. The Third Circuit has never dealt directly with this issue but approached it in *Columbia Gas*. There it decided whether a settlement agreement, under which the debtor had made its first installment payment into escrow before filing, but not its second, was executory. 50 F.3d at 238-240. The Court held it was not and suggested the payees were, therefore, "relegated to the position of a general creditor" holding "a simple claim … against" the estate for the remaining payment. *Id.* at 239-40. Still, that case dealt with a future claim for a sum-certain with no real contingency except the passage of time. Hence it does not precisely address our question.

Other courts are not unanimous in their treatment of whether claims for post-confirmation breaches of pre-petition contracts arise pre- or post-bankruptcy, even when dealing with similar agreements. For example, two bankruptcy court decisions on future royalties due under contracts clash. In *In re Waste Systems Int'l, Inc.*, the Court found claims for perpetual royalty payments, tied to future deliveries and given as consideration in the sale of a garbage dump, arose when the sale took place. 280 B.R. 824, 827 (Bankr. D. Del. 2002). But in *In re Monument Record Corp.* the Court held a debtor, even after its bankruptcy discharge, needed to make royalty payments due under a pre-petition agreement if it continued to market the relevant recordings. 61 B.R. 866, 868-69 (Bankr.

7

M.D. Tenn. 1986). It left unclear, however, whether the debtor's rights to use the recordings derived from a license or its full title. *Id.* The Seventh and Fourth Circuits conflict on whether claims for future condominium fees arise when a unit is purchased, with one holding they do, and the other, relying on a theory that the payment of the fees was mandated by a covenant running with the land, holding they exist only later. *Compare In re Rosteck*, 899 F.2d 694, 697 (7th Cir. 1990) (claims arise on the purchase date), *with In re Rosenfeld*, 23 F.3d 833, 837 (4th Cir. 1994) (claims arise when assessed). Yet courts have consistently found that claims for indemnity under an indemnity agreement arise at the time it was signed, even if the claims for which reimbursement is sought are brought only after a debtor's discharge. *See, e.g., Olin Corp.*, 209 F.3d at 129-30 (claim for indemnification made under pre-petition indemnity agreement arose when it was signed, even though suit against indemnitee seeking environmental damages was brought only later); *Employees' Ret. Sys. of the State of Haw. v. Osborne* (*In re THC Fin. Corp.*), 686 F.2d 799, 803-04 (9th Cir. 1982) (claim for indemnification made under pre-petition indemnity agreement arose when it was signed, even though ejectment action against indemnitee was brought only later). This survey reveals the unsurprising: context is important.

So here, once we recognize the claim for future royalties as contingent, the answer becomes easy. Sanofi's contingent claim for future royalties arose at the time of the sale of the Acthar Gel IP under the APA. It is at that moment the parties fixed their rights against each other: Sanofi sold full title to the intellectual property, it received a right to future contingent payments in return, and having done so, it assumed the risk of Mallinckrodt's

8

creditworthiness. That the Royalty's amount was meant to track the future success of the product (and thus depended on it) does not transform it from a contingent claim for future payments to one that survives discharge and receives special priority over other unsecured claims. And by analogy to the tort context in *Grossman's*, it is no matter a state law cause of action for damages would accrue only when Mallinckrodt failed to make a payment in a given year.

Finally, I address Sanofi's contention that the recent *Weinstein* decision in the Third Circuit supports its position. *See Spyglass Media Group, LLC v. Bruce Cohen Productions (In re Weinstein Co. Holdings)*, 997 F.3d 497 (3d Cir. 2021). Sanofi claims that because the nondebtor buyer in that case was required to pay an ongoing royalty to a film producer under a nonexecutory contract that it bought from the bankruptcy estate, the royalty here should survive also. But those were different facts requiring a different result. The nondebtor buyer in *Weinstein* voluntarily assumed obligations to the producer in the contract it bought from the debtor. Importantly, "[i]f no buyer came forward, the [producer] would only have an unsecured claim against the debtor, on which it can typically expect to recover merely cents on the dollar." *Id.* at 506.

Applied to our case, there is no buyer of Mallinckrodt's interest under the APA. Sanofi is left with a claim against Mallinckrodt. That claim, to repeat, depends on future sales of Acthar Gel—an agreement fully contemplated by the parties in the prepetition APA—and so it fits neatly as a contingent claim under Code § 101(5). This means it arose at the time Sanofi signed the APA. Thus I agree with the Bankruptcy Court that Sanofi's

9

claims result only in pre-petition unsecured claims that were discharged on confirmation of Mallinckrodt's plan of reorganization.[5]

### III.

Sanofi advances an alternative theory to argue Mallinckrodt's future royalty obligation survives its plan confirmation. That is, it retained a property interest in the Acthar Gel IP that is not severable by bankruptcy and requires any owner to pay the Royalty. It claims this interest was created by language in the APA that says the "sale" of the Acthar Gel IP was "subject to the terms and conditions of [the APA]," which include the obligation to pay the Royalty. Analogizing to the oil-and-gas context, it suggests this purported property interest is like a royalty that is a covenant "running with the land."

This fallback fails. Even were I to assume such a property right in intellectual property could be created, I cannot agree the boilerplate "subject to" language does so. Sanofi's reading would have this general language—which sets out priority among contract terms that may otherwise conflict—create a very specific right and do far too much work. Instead, the Royalty was written along with the other forms of monetary compensation and described as part of the "Purchase Price" and "full and fair consideration" for the sale. App. 31. This indicates, with no suggestion to the contrary,

---

[5] Sanofi also cites *In re Hays & Co v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 885 F.2d 1149 (3d Cir. 1989), to advance a related argument that the nonexecutory APA (and Royalty) should "ride through" plan confirmation unaffected. But that case held only that a Chapter 11 trustee was bound—during a bankruptcy case—by an arbitration provision in a nonexecutory contract signed by the debtor pre-petition. *Id*. at 1153. To say this holding bars discharge of a pre-petition claim under a nonexecutory contract assumes far too much, ignores the text of the Code, and contradicts what was stated in *Columbia Gas* and *Weinstein*.

10

that the Royalty is merely a contractual right to a deferred portion of a purchase price contingent on future sales.

\* \* \*

I close by addressing Sanofi's appeal to fairness: that it is unfair to allow Mallinckrodt to continue selling Acthar Gel without paying the Royalty. That argument flips the script, for to allow the Royalty to survive discharge would give Sanofi special treatment over other unsecured creditors for which it did not bargain. For example, it could have sought to protect itself against a potential Mallinckrodt bankruptcy by taking a security interest in the assets sold to secure the Royalty payments (like it did for the Up-Front Consideration), structuring the transaction as a license, or even forming outside bankruptcy a joint venture to retain part ownership of the assets. Because it failed to do so, Sanofi's fairness arguments fall flat against the Bankruptcy Code's base theme of a "fresh start."

For the reasons stated, I affirm the order of the Bankruptcy Court.[6]

---

[6] Mallinckrodt's motion to dismiss Sanofi's appeal as equitably moot is thus dismissed as moot.